

# HOUSING CHOICE VOUCHER PROGRAM

# ADMINISTRATIVE PLAN

Revised November 21, 2024

EXHIBIT
**D-1**

INTRODUCTION

ABOUT THE REFERENCES CITED IN THE HCV ADMINISTRATIVE PLAN

## Table of Contents

.................................................................................................................................1

HUD.........................................................................................................................29

State Law ................................................................................................................29

Industry Practice ....................................................................................................29

Resources and Where to Find Them ......................................................................30

CHAPTER 1 ...............................................................................................................33

OVERVIEW OF THE PROGRAM AND PLAN INTRODUCTION .......................33

1-I.A. OVERVIEW ...................................................................................................33

1-I.B. ORGANIZATION AND STRUCTURE OF HACA .......................................33

1-I.C. HACA's MISSION STATEMENT ................................................................34

1-I.D. HACA'S PROGRAMS ..................................................................................34

1-I.E. HACA'S COMMITMENT TO ETHICS AND SERVICE ............................34

1-II.A. OVERVIEW AND HISTORY OF THE PROGRAM ...................................35

1-II.B. HCV PROGRAM BASICS ..........................................................................36

1-II.C. THE HCV PARTNERSHIPS .......................................................................36

The HCV Relationships: .......................................................................................37

What Does HUD Do?...................................................................................38

What Does HACA Do?.................................................................................38

What does the Owner do? .............................................................................38

What Does the Family Do?...........................................................................39

1-II.D. APPLICABLE REGULATIONS...................................................................40

1-III.A. OVERVIEW AND PURPOSE OF THE ADMINISTRATIVE PLAN .............................40

1-III.B. CONTENTS OF THE PLAN [24 CFR 982.54] ........................................40

Mandatory vs. Discretionary Policy.....................................................................42

1-III.C. ORGANIZATION OF THE PLAN .............................................................42

1-III.D. UPDATING AND REVISING THE PLAN ....................................................42

CHAPTER 2 ...........................................................................................................42

FAIR HOUSING AND EQUAL OPPORTUNITY INTRODUCTION ...............................42

PART I: NONDISCRIMINATION ........................................................................43

2-I.A. OVERVIEW .............................................................................................43

2-I.B. NONDISCRIMINATION ...........................................................................44

Providing Information to Families and Owners ...............................................45

Discrimination Complaints ..............................................................................45

PART II: POLICIES RELATED TO PERSONS WITH DISABILITIES ....................46

2-II.A. OVERVIEW ............................................................................................46

2-II.B. DEFINITION OF REASONABLE ACCOMMODATION ...........................47

Types of Reasonable Accommodations ...........................................................47

2-II.C. REQUEST FOR AN ACCOMMODATION ...............................................48

2-II.D. VERIFICATION OF DISABILITY ............................................................48

2-II.E. APPROVAL/DENIAL OF A REQUESTED ACCOMMODATION ..............49

2-II.F. PROGRAM ACCESSIBILITY FOR PERSONS WITH HEARING OR VISION
IMPAIRMENTS .................................................................................................50

2-II.G. PHYSICAL ACCESSIBILITY ..................................................................50

2-II.H. DENIAL OR TERMINATION OF ASSISTANCE .......................................51

PART III: IMPROVING ACCESS TO SERVICES FOR PERSONS WITH LIMITED ENGLISH
PROFICIENCY (LEP) ........................................................................................52

2-III.A. OVERVIEW ...........................................................................................52

2-III.B. ORAL INTERPRETATION .....................................................................52

2-III.C. WRITTEN TRANSLATION ....................................................................53

2-III.D. IMPLEMENTATION PLAN ....................................................................53

EXHIBIT 2-1: DEFINITION OF A PERSON WITH A DISABILITY UNDER FEDERAL CIVIL
RIGHTS LAWS .................................................................................................54

CHAPTER 3 ...........................................................................................................55

ELIGIBILITY INTRODUCTION ...............................................................................55

PART I: DEFINITIONS OF FAMILY AND HOUSEHOLD MEMBERS ....................55

3-I.A. OVERVIEW ............................................................................................55

3-I.B. FAMILY AND HOUSEHOLD ..................................................................................56

    Family ......................................................................................................................56

        Gender Identity ....................................................................................................56

    Household...............................................................................................................57

3-I.C. FAMILY BREAK-UP AND REMAINING MEMBER OF TENANT FAMILY.................57

    Family Break-up [24 CFR 982.315] ............................................................................57

    Remaining Member of a Tenant Family [24 CFR 5.403] ..................................................59

3-I.D. HEAD OF HOUSEHOLD [24 CFR 5.504(b)] ........................................................59

3-I.E. SPOUSE, CO-HEAD, AND OTHER ADULT ..........................................................59

3-I.F. DEPENDENT [24 CFR 5.603]................................................................................60

    Joint Custody of Dependents.....................................................................................60

3-I.G. FULL-TIME STUDENT [24 CFR 5.603; HCV GB, p. 5-29] ....................................60

3-I.H. ELDERLY AND NEAR-ELDERLY PERSONS, AND ELDERLY FAMILY ...................60

3-I.I. PERSONS WITH DISABILITIES AND DISABLED FAMILY .....................................61

    Persons with Disabilities ..........................................................................................61

    Disabled Family .....................................................................................................61

3-I.J. GUESTS [24 CFR 5.100] .....................................................................................61

3-I.K. FOSTER CHILDREN AND FOSTER ADULTS .......................................................62

3-I.L. ABSENT FAMILY MEMBERS ...............................................................................62

    Definitions of Temporarily and Permanently Absent ....................................................62

    Absent Students......................................................................................................63

    Absences Due to Placement in Foster Care [24 CFR 5.403] ............................................63

    Absent Head, Spouse, or Co-head..............................................................................63

    Family Members Permanently Confined for Medical Reasons [HCV GB, p. 5-22] ...................63

    Return of Permanently Absent Family Members...........................................................64

3-I.M. LIVE-IN AIDE ...................................................................................................64

PART II: BASIC ELIGIBILITY CRITERIA.........................................................................65

3-II.A. INCOME ELIGIBILITY AND TARGETING............................................................65

    Definitions of the Income Limits [24 CFR 5.603(b)] .....................................................65

    Using Income Limits for Eligibility [24 CFR 982.201]....................................................65

Using Income Limits for Targeting [24 CFR 982.201]...................................................66

3-II.B. CITIZENSHIP OR ELIGIBLE IMMIGRATION STATUS [24 CFR 5, Subpart E] ...........66

Declaration [24 CFR 5.508].................................................................66

U.S. Citizens and Nationals.................................................................67

Eligible Noncitizens .......................................................................67

Ineligible Noncitizens .....................................................................67

Mixed Families.............................................................................68

Ineligible Families [24 CFR 5.514(d), (e), and (f)]........................................68

Timeframe for Determination of Citizenship Status [24 CFR 5.508(g)] .......................68

3-II.C. SOCIAL SECURITY NUMBERS [24 CFR 5.216, 5.218, Notice PIH 2018-24 ................68

3-II.D. FAMILY CONSENT TO RELEASE OF INFORMATION ...................................71

3-II.E. STUDENTS ENROLLED IN INSTITUTIONS OF HIGHER EDUCATION ....................71

Dependent Child...........................................................................72

Institution of Higher Education............................................................73

Determining Student Eligibility ...........................................................74

Determining Parental Income Eligibility ...................................................75

PART III: DENIAL OF ASSISTANCE .........................................................77

3-III.A. OVERVIEW ......................................................................77

Forms of Denial...........................................................................77

Prohibited Reasons for Denial of Program Assistance ......................................78

3-III.B. MANDATORY DENIAL OF ASSISTANCE .............................................78

3-III.C. OTHER PERMITTED REASONS FOR DENIAL OF ASSISTANCE............................78

Preliminary Eligibility Criteria...........................................................79

Criminal Activity Screening Criteria [24 CFR 982.553] ....................................79

MANDATORY DENIAL OF ASSISTANCE ........................................................79

Previous Behavior in Assisted Housing .....................................................81

Screening for Eligibility .................................................................83

Screening for Suitability as a Tenant [24 CFR 982.307] ...................................84

3-III.E. CRITERIA FOR DECIDING TO DENY ASSISTANCE......................................85

Consideration of Circumstances............................................................85

Removal of a Family Member's Name from the Application ..........................................86

Reasonable Accommodation..........................................................................................86

3-III.F. NOTICE OF ELIGIBILITY OR DENIAL ............................................................87

Additional policies relating to the informal reviews process ...........................................87

3-III.G. PROHIBITION AGAINST DENIAL OF ASSISTANCE TO VICTIMS OF DOMESTIC
VIOLENCE, DATING VIOLENCE, SEXUAL ASSAULT AND STALKING............................88

Notification.....................................................................................................................88

Victim Documentation ...................................................................................................88

EXHIBIT 3-1: DETAILED DEFINITIONS RELATED TO DISABILITIES ..................90

Person with Disabilities..................................................................................................90

Individual with Handicaps .............................................................................................91

EXHIBIT 3-2: DEFINITION OF INSTITUTION OF HIGHER EDUCATION.............93

CHAPTER 4 ....................................................................................................................98

APPLICATIONS, WAITING LIST AND TENANT SELECTION INTRODUCTION ...................98

PART I: THE APPLICATION PROCESS ...........................................................................98

4-I.A. OVERVIEW.............................................................................................................98

4-I.B. APPLYING FOR ASSISTANCE ...............................................................................99

Lottery Application Process ...........................................................................................99

4-I.C. ACCESSIBILITY OF THE APPLICATION PROCESS ..........................................100

Elderly and Disabled Populations .................................................................................100

Limited English Proficiency.........................................................................................101

4-I.D. PLACEMENT ON THE WAITING LIST................................................................101

Ineligible for Placement on the Waiting List ...............................................................101

Eligible for Placement on the Waiting List ..................................................................102

PART II: MANAGING THE WAITING LIST ..................................................................102

4-II.A. OVERVIEW .........................................................................................................102

4-II.B. ORGANIZATION OF THE WAITING LIST..........................................................102

4-II.C. OPENING AND CLOSING THE WAITING LIST.................................................103

4-II.D. FAMILY OUTREACH...........................................................................................105

4-II.E. REPORTING CHANGES IN FAMILY CIRCUMSTANCES...................................106

4-II.F. UPDATING THE WAITING LIST ............................................................................106

    Purging the Waiting List ..............................................................................................107

    Removal from the Waiting List.....................................................................................107

PART III: SELECTION FOR HCV ASSISTANCE ..........................................................108

4-III.A. OVERVIEW .........................................................................................................108

4-III.B. SELECTION AND HCV FUNDING SOURCES...................................................108

    Special Admissions [24 CFR 982.203] ........................................................................108

    Targeted Funding ........................................................................................................108

4-III.C. SELECTION METHOD .......................................................................................109

    Local Preferences ........................................................................................................109

    Income Targeting Requirement [24 CFR 982.201(b)(2)] ..............................................116

    Order of Selection from the Tenant-Based Assistance Waiting List .............................117

4-III.D. NOTIFICATION OF SELECTION .......................................................................117

4-III.E. THE APPLICATION INTERVIEW .......................................................................118

4-III.F. COMPLETING THE APPLICATION PROCESS ...................................................119

CHAPTER 5 ....................................................................................................................120

BRIEFINGS AND VOUCHER ISSUANCE ......................................................................120

5-I.A. OVERVIEW ...........................................................................................................120

5-I.B. BRIEFING [24 CFR 982.301 and PIH Notice: 2020-32] ....................................120

    Notification and Attendance.........................................................................................124

    Oral Briefing [24 CFR 982.301(a)] ..............................................................................124

    Briefing Packet [24 CFR 982.301(b); New HCV GB, *Housing Search and Leasing,* p. 7] ........125

    Additional Items to be Included in the Briefing Packet ................................................126

5-I.C. FAMILY OBLIGATIONS .......................................................................................127

    Time Frames for Reporting Changes Required by Family Obligations.........................127

    Family Obligations [24 CFR 982.551].........................................................................127

PART II: SUBSIDY STANDARDS AND VOUCHER ISSUANCE ...................................129

5-II.A. OVERVIEW ..........................................................................................................129

5-II.B. DETERMINING FAMILY UNIT (VOUCHER) SIZE [24 CFR 982.402].........................130

5-II.C. EXCEPTIONS TO SUBSIDY STANDARDS .........................................................131

5-II.D. VOUCHER ISSUANCE [24 CFR 982.302]........................................................................132

5-II.E. VOUCHER TERM AND EXTENSIONS ........................................................................133

Voucher Term ...............................................................................................................................133

Extensions of Voucher Term.........................................................................................................133

Suspensions of Voucher Term ......................................................................................................134

Expiration of Voucher Term .........................................................................................................135

CHAPTER 6 .........................................................................................................................................135

INCOME AND SUBSIDY DETERMINATIONS ...............................................................................135

PART I: ANNUAL INCOME ..............................................................................................................135

6-I.A. OVERVIEW...............................................................................................................................135

6-I.B. HOUSEHOLD COMPOSITION AND INCOME .....................................................................136

Summary of Income Included and Excluded by Person................................................................136

Temporarily Absent Family Members ..........................................................................................137

Absent Students .............................................................................................................................137

Absences Due to Placement in Foster Care ..................................................................................137

Absent Head, Spouse, or Co-head.................................................................................................138

Family Members Permanently Confined for Medical Reasons ....................................................138

Joint Custody of Dependents.........................................................................................................138

Caretakers for a Child ...................................................................................................................138

6-I.C. ANTICIPATING ANNUAL INCOME .....................................................................................139

Basis of Annual Income Projection...............................................................................................139

Known Changes in Income ...........................................................................................................140

Projecting Income .........................................................................................................................141

6-I.D. EARNED INCOME...................................................................................................................141

Types of Earned Income Included in Annual Income...................................................................141

6-I.E. EARNED INCOME DISALLOWANCE FOR PERSONS WITH DISABILITIES ............144

Eligibility.......................................................................................................................................144

Calculation of the Disallowance ...................................................................................................144

Original Calculation Method.........................................................................................................145

Revised Calculation Method .........................................................................................................146

6-I.G. ASSETS [24 CFR 5.609(b)(3);  24 CFR 5.603(b) ............................................. 148

6-I.H. PERIODIC PAYMENTS ........................................................................... 155

6-I.I. PAYMENTS IN LIEU OF EARNINGS .................................................... 157

6-I.J. WELFARE ASSISTANCE ......................................................................... 157

Sanctions Resulting in the Reduction of Welfare Benefits [24 CFR 5.615] ................ 157

6-I.K. PERIODIC AND DETERMINABLE ALLOWANCES [24 CFR 5.609(b)(7)] ................ 158

6-I.L. STUDENT FINANCIAL ASSISTANCE [24 CFR 5.609(b)(9); Notice PIH 2015-21] ....... 159

6-I.M. ADDITIONAL EXCLUSIONS FROM ANNUAL INCOME ........................... 161

PART II: ADJUSTED INCOME .......................................................................... 163

6-II.A. INTRODUCTION ..................................................................................... 163

6-II.B. DEPENDENT DEDUCTION ................................................................... 164

6-II.C. ELDERLY OR DISABLED FAMILY DEDUCTION ................................ 164

6-II.D. MEDICAL EXPENSES DEDUCTION .................................................... 164

Summary of Allowable Medical Expenses from IRS Publication 502 ......................... 165

6-II.E. DISABILITY ASSISTANCE EXPENSES DEDUCTION ........................... 165

Eligible Auxiliary Apparatus ........................................................................ 166

Eligible Attendant Care ................................................................................ 167

6-II.F. CHILD CARE EXPENSE DEDUCTION ................................................. 168

Clarifying the Meaning of *Child* for This Deduction ...................................... 168

Qualifying for the Deduction ........................................................................ 168

Earned Income Limit on Child Care Expense Deduction .................................. 169

Eligible Child Care Expenses ........................................................................ 169

6-III.A. OVERVIEW OF RENT AND SUBSIDY CALCULATIONS ..................... 171

Minimum Rent ............................................................................................. 171

Utility Reimbursement ................................................................................ 172

6-III.B. FINANCIAL HARDSHIPS AFFECTING MINIMUM RENT [24 CFR 5.630] ........... 172

HUD-Defined Financial Hardship ................................................................. 172

Implementation of Hardship Exemption ......................................................... 173

Temporary Hardship .................................................................................... 174

Long-Term Hardship .................................................................................... 175

6-III.C. APPLYING PAYMENT STANDARDS [24 CFR 982.505; 982.503(b)] ........................175

    Changes in Payment Standards ................................................................................176

    Decreases..................................................................................................................176

    Increases...................................................................................................................176

    Changes in Family Unit Size (Voucher Size) ...........................................................177

    Reasonable Accommodation.....................................................................................177

6-III.D. APPLYING UTILITY ALLOWANCES [24 CFR 982.517] ............................................177

    Reasonable Accommodation.....................................................................................177

6-III.E. PRORATED ASSISTANCE FOR MIXED FAMILIES [24 CFR 5.520] ........................178

EXHIBIT 6-1: ANNUAL INCOME INCLUSIONS................................................................179

EXHIBIT 6-2: ANNUAL INCOME EXCLUSIONS................................................................182

EXHIBIT 6-3: TREATMENT OF FAMILY ASSETS ............................................................184

.................................................................................................................................184

EXHIBIT 6-4: EARNED INCOME DISALLOWANCE FOR PERSONS WITH DISABILITIES

.................................................................................................................................185

EXHIBIT 6-5: THE EFFECT OF WELFARE BENEFIT REDUCTION ....................................187

CHAPTER 7 ....................................................................................................................189

VERIFICATION ...............................................................................................................189

7-I.A. FAMILY CONSENT TO RELEASE OF INFORMATION [24 CFR 982.516 AND..........189

982.551, 24 CFR 5.230]..................................................................................................189

    Consent Forms.........................................................................................................189

    Form HUD-9886-A ...................................................................................................190

    Penalties for Failing to Consent ...............................................................................190

7-I.B.1 USE OF OTHER PROGRAMS' INCOME DETERMINATIONS...................................191

7-I.C. OVERVIEW OF VERIFICATION REQUIREMENTS ...................................................193

    Requirements for Acceptable Documents..................................................................193

    File Documentation ..................................................................................................193

7-I.D. UP-FRONT INCOME VERIFICATION (UIV) ............................................................194

    EIV Income Reports..................................................................................................194

    New Hires Report [Notice PIH 2023-27]...................................................................195

No Income Reported by HHS or SSA Report...........................................................196

EIV Identity Verification Report........................................................................196

Deceased Tenants Reports [Notice PIH 2012-4 and Notice PIH 2023-27] ...............196

Upfront Income Verification Using Non-HUD Systems ........................................197

7-I.E. VERIFICATION HIERARCHY [Notice PIH 2023-27] ......................................197

7-I.F. LEVEL 4 VERIFICATION [Notice PIH 2023-27] ............................................197

HUD identifies two types of Level 4 verification: written-third party verification from the source and EIV + self-certification. ...........................................197

EIV + Self-Certification......................................................................................197

Written Third-Party Verification from the Source.................................................198

•    While HUD considers standardized third-party forms to be less reliable than the third-party written verification described above, this form of verification is mandatory when the family cannot provide acceptable documentation. Written third-party verification is also required when there appears to be unreported income and other forms of verification are not available.....................198

Upfront Income Verification Using Non-HUD Systems (Optional) ...........................201

When Third-Party Information is Late.................................................................201

When Third-Party Verification is Not Required ...................................................202

7-I.J. SELF-CERTIFICATION.............................................................................202

7-II.A. VERIFICATION OF LEGAL IDENTITY ....................................................203

7-II.B. SOCIAL SECURITY NUMBERS [24 CFR 5.216, Notice PIH 2023-27; Notice PIH 2018-24]..........................................................................................................204

7-II.C. DOCUMENTATION OF AGE ..................................................................206

7-II.D. FAMILY RELATIONSHIPS ....................................................................206

Marriage ..........................................................................................................206

Separation or Divorce.......................................................................................207

Absence of Adult Member ................................................................................207

Foster Children and Foster Adults ....................................................................207

7-II.E. VERIFICATION OF STUDENT STATUS...................................................207

7-II.F. DOCUMENTATION OF DISABILITY .......................................................209

Family Members Receiving SSA Disability Benefits..............................................209

7-II.G. CITIZENSHIP OR ELIGIBLE IMMIGRATION STATUS [24 CFR 5.508]....................210

U.S. Citizens and Nationals.........................................................................................210

Eligible Immigrants ...................................................................................................211

7-II.H. VERIFICATION OF PREFERENCE STATUS ...............................................211

Displaced Family Local Preference: ...........................................................................211

Applicants eligible for the Family Unification Program (FUP)Vouchers: ..................212

PART III: VERIFYING INCOME AND ASSETS (Streamlining rule published 3/8/2016 982.516)

.....................................................................................................................................213

7-III.A. EARNED INCOME ......................................................................................214

7-III.B. BUSINESS AND SELF EMPLOYMENT INCOME ......................................214

7-III.C. PERIODIC PAYMENTS AND PAYMENTS IN LIEU OF EARNINGS ........215

Social Security/SSI Benefits ......................................................................................215

7-III.D. ALIMONY OR CHILD SUPPORT ..............................................................216

7-III.E. ASSETS AND INCOME FROM ASSETS .....................................................217

7-III.F. NET INCOME FROM RENTAL PROPERTY ...............................................217

7-III.G. RETIREMENT ACCOUNTS ........................................................................218

7-III.H. INCOME FROM EXCLUDED SOURCES ....................................................218

7-III.I. ZERO ANNUAL INCOME STATUS ..............................................................219

7-III.J. STUDENT FINANCIAL ASSISTANCE ........................................................219

7-III.K. PARENTAL INCOME OF STUDENTS SUBJECT TO ELIGIBLITY RESTRICTIONS

.....................................................................................................................................219

PART IV: VERIFYING MANDATORY DEDUCTIONS .............................................220

7-IV.A. DEPENDENT AND ELDERLY/DISABLED HOUSEHOLD DEDUCTIONS .............220

Dependent Deduction .................................................................................................220

Elderly/Disabled Family Deduction ...........................................................................220

7-IV.B. MEDICAL EXPENSE DEDUCTION ............................................................220

Eligible Household ....................................................................................................221

Qualified Expenses ....................................................................................................221

Unreimbursed Expenses .............................................................................................221

Expenses Incurred in Past Years ................................................................................221

7-IV.C. DISABILITY ASSISTANCE EXPENSES ......................................................222

7-IV.D. CHILD CARE EXPENSES ...........................................................................224

Allowable Type of Child Care ................................................................................226

Reasonableness of Expenses ................................................................................226

EXHIBIT 7-1: SUMMARY OF DOCUMENTATION REQUIREMENTS FOR NONCITIZENS [HCV GB, pp. 5-9 and 5-10] ............................................................................227

CHAPTER 8 ............................................................................................................228

HOUSING QUALITY STANDARDS AND RENT REASONABLENESS DETERMINATIONS.228

8-I.A. GENERAL HUD REQUIREMENTS ..............................................................228

8-I.B. ADDITIONAL LOCAL REQUIREMENTS ....................................................230

8-I.C. LIFE THREATENING CONDITIONS [24 CFR 982.404(a); FR Notice 1/18/17] ...........231

8-I.D. OWNER AND FAMILY RESPONSIBILITIES [24 CFR 982.404] .................232

8-I.E. SPECIAL REQUIREMENTS FOR CHILDREN ...........................................232

8-I.F. VIOLATION OF HQS SPACE STANDARDS [24 CFR 982.403] .................233

PART II: THE INSPECTION PROCESS .................................................................233

8-II.A. OVERVIEW [24 CFR 982.405] Types of Inspections ..............................233

Inspection of PHA-owned Units [24 CFR 982.352(b)] ................................234

Performing the RVI Inspection ..............................................................................237

8-II.B. INITIAL HQS INSPECTION [24 CFR 982.401(a)] ...................................237

8-II.C. ANNUAL/BIENNIAL HQS INSPECTIONS ...............................................239

8-II.D. SPECIAL INSPECTIONS  [24 CFR 982.405(g)] ......................................239

8-II.E. QUALITY CONTROL INSPECTIONS [24 CFR 982.405(b); HCV GB, p. 10-32]..........240

8-II.F. INSPECTION RESULTS AND REINSPECTIONS FOR UNITS UNDER HAP CONTRACT ............................................................................................................240

8-II.G. ENFORCING OWNER COMPLIANCE .......................................................242

8-II.H. ENFORCING FAMILY COMPLIANCE WITH HQS [24 CFR 982.404(b)] ...........243

PART III: RENT REASONABLENESS [24 CFR 982.507] .....................................243

8-III.B. WHEN RENT REASONABLENESS DETERMINATIONS ARE REQUIRED Owner-Initiated Rent Determinations .......................................................................243

8-III.C. HOW COMPARABILITY IS ESTABLISHED.............................................245

8-III.D. PHA RENT REASONABLENESS METHODOLOGY....................................246

EXHIBIT 8-1: OVERVIEW OF HUD HOUSING QUALITY STANDARDS .............247

EXHIBIT 8-2: SUMMARY OF TENANT PREFERENCE AREAS RELATED TO HOUSING

QUALITY ...................................................................................................................250

CHAPTER 9 ..............................................................................................................251

GENERAL LEASING POLICIES ..............................................................................251

9-I.A. TENANT SCREENING ...................................................................................251

9-I.B. REQUESTING TENANCY APPROVAL [Form HUD-52517] ..........................252

9-I.C. OWNER PARTICIPATION ..............................................................................254

9-I.D. ELIGIBLE UNITS ...........................................................................................254

   Ineligible Units [24 CFR 982.352(a)] ....................................................................254

   PHA-Owned Units [24 CFR 982.352(b)] ...............................................................254

   Special Housing Types [24 CFR 982 Subpart M] ...................................................254

   Duplicative Assistance [24 CFR 982.352(c)] ..........................................................255

   Housing Quality Standards (HQS) [24 CFR 982.305 and 24 CFR 982.401] .............255

   Unit Size ..............................................................................................................255

   Rent Reasonableness [24 CFR 982.305 and 24 CFR 982.507] ...............................256

   Rent Burden [24 CFR 982.508] ............................................................................256

9-I.E. LEASE AND TENANCY ADDENDUM ............................................................256

   Lease Form and Tenancy Addendum......................................................................256

   Lease Information [24 CFR 982.308(d)]..................................................................257

   Security Deposit [24 CFR 982.313 (a) and (b)]......................................................257

   Separate Non-Lease Agreements between Owner and Tenant...................................258

   PHA Review of Lease ............................................................................................258

9-I.F. TENANCY APPROVAL [24 CFR 982.305] .....................................................259

9-I.G. HAP CONTRACT EXECUTION [24 CFR 982.305] .........................................260

9-I.H. CHANGES IN LEASE OR RENT [24 CFR 982.308] ........................................261

CHAPTER 10 ............................................................................................................262

MOVING WITH CONTINUED ASSISTANCE AND PORTABILITY INTRODUCTION............262

10-I.A. ALLOWABLE MOVES .................................................................................262

10-I.B. RESTRICTIONS ON MOVES .......................................................................263

   Restrictions on Elective Moves [24 CFR 982.35(c)] ...............................................265

10-I.C. MOVING PROCESS .....................................................................................266

Reexamination of Family Income and Composition...................................................................266

Voucher Issuance and Briefing ................................................................................................266

Housing Assistance Payments [24 CFR 982.311(d)]................................................................266

HACA Policy............................................................................................................................267

PART II: PORTABILITY ........................................................................................................267

10-II.A. OVERVIEW ...............................................................................................................267

10-II.B. INITIAL PHA ROLE..................................................................................................268

Social security numbers (SSNs) ..............................................................................................272

Documentation of SSNs for all nonexempt household members whose SSNs have not been verified through the EIV system.................................................................................................272

Documentation of legal identity ..............................................................................................272

Documentation of citizenship or eligible immigration status...................................................272

Documentation of participation in the earned income disallowance (EID) benefit ...................272

Documentation of participation in a family self-sufficiency (FSS) program .............................272

If applicable, information related to the family's health and medical care and disability assistance expense phased-in hardship exemption, including what stage the family is in and how many months remain in that phase-in stage. ........................................................................................272

10-II.C. RECEIVING PHA ROLE............................................................................................274

CHAPTER 11 ..........................................................................................................................281

REEXAMINATIONS INTRODUCTION ..................................................................................281

11-I.A. OVERVIEW .................................................................................................................281

11-I.C. SCHEDULING ANNUAL REEXAMINATIONS .........................................................283

Notification of and Participation in the Annual Reexamination Process...................................283

11-I.D. CONDUCTING ANNUAL REEXAMINATIONS .........................................................284

EIV and Fraud .........................................................................................................................285

11-I.E. DETERMINING ONGOING ELIGIBILITY OF CERTAIN STUDENTS [24 CFR 982.552(b)(5)]..........................................................................................................................286

11-I.F. EFFECTIVE DATES.....................................................................................................286

PART II: INTERIM REEXAMINATIONS [24 CFR 982.516].................................................287

11-II.A. OVERVIEW ...............................................................................................................287

11-II.B. CHANGES IN FAMILY AND HOUSEHOLD COMPOSITION ..................................288

New Family Members Not Requiring Approval ..........................................................288

New Family and Household Members Requiring Approval ......................................288

Departure of a Family or Household Member ..........................................................290

Family absent from the Unit ....................................................................................291

Children Absent from the Unit .................................................................................291

Adult Dependents Absent from the unit ....................................................................292

Joint Custody ...........................................................................................................292

Visitors ....................................................................................................................292

Family Break-Up ......................................................................................................292

11-II.C. CHANGES AFFECTING INCOME OR EXPENSES ......................................292

PHA-Initiated Interim Reexaminations ....................................................................292

Family-Initiated Interim Reexaminations ................................................................293

Reporting Requirements for Changes in income and family composition .................293

11-II.D. PROCESSING THE INTERIM REEXAMINATION ......................................294

Effective Dates ........................................................................................................294

If the family share of the rent is to *increase*: .............................................................294

If the family share of the rent is to *decrease*: ...........................................................295

PART III: RECALCULATING FAMILY SHARE AND SUBSIDY AMOUNT .........................296

11-III.A. OVERVIEW .................................................................................................296

11-III.B. CHANGES IN PAYMENT STANDARDS AND UTILITY ALLOWANCES .............296

Payment Standards [24 CFR 982.505] .....................................................................296

Subsidy Standards [24 CFR 982.505(c)(4)] .............................................................297

Utility Allowances [24 CFR 982.517(d)] .................................................................297

11-III.C. NOTIFICATION OF NEW FAMILY SHARE AND HAP AMOUNT ........................297

11-III.D. DISCREPANCIES .........................................................................................297

CHAPTER 12 ............................................................................................................298

TERMINATION OF ASSISTANCE AND TENANCY ...................................................298

PART I: GROUNDS FOR TERMINATION OF ASSISTANCE......................................298

12-I.A. OVERVIEW ....................................................................................................298

12-I.B. FAMILY NO LONGER REQUIRES ASSISTANCE [24 CFR 982.455] .........................298

12-I.C. FAMILY CHOOSES TO TERMINATE ASSISTANCE ...................................................299

12-I.D. MANDATORY TERMINATION OF ASSISTANCE ....................................................299

   Eviction [24 CFR 982.552(b)(2), 24 CFR 5.2005(c)(1)] ..............................................299

   Failure to Provide Consent [24 CFR 982.552(b)(3)] ................................................299

   Failure to Document Citizenship [24 CFR 982.552(b)(4) and [24 CFR 5.514(c)] .....................300

   Lifetime Registered Sex Offenders [Notice PIH 2012-28] ..........................................300

12-I.E. MANDATORY POLICIES AND OTHER AUTHORIZED TERMINATIONS .............301

12-II.B. METHOD OF TERMINATION [24 CFR 982.552(a)(3)] .................................................306

12-II.C. ALTERNATIVES TO TERMINATION OF ASSISTANCE ...........................................306

12-II.D. CRITERIA FOR DECIDING TO TERMINATE ASSISTANCE ...................................306

12-II.E. TERMINATIONS RELATED TO DOMESTIC VIOLENCE, DATING VIOLENCE, SEXUAL ASSAULT OR STALKING ...............................................................................309

   VAWA Protections against Termination ...............................................................309

   Limitations on VAWA Protections [24 CFR 5.2005(d) and (e)] ...................................310

12-II.F. TERMINATION NOTICE [HCV GB, p. 15-7] ................................................................311

PART III: TERMINATION OF TENANCY BY THE OWNER ...................................................312

12-III.A. OVERVIEW ....................................................................................................312

12-III.B. GROUNDS FOR OWNER TERMINATION OF TENANCY .......................................313

12-III.C. EVICTION [24 CFR 982.310(e) and (f) and Form HUD-52641-A, Tenancy .................315

Addendum] ...................................................................................................................315

12-III.D. DECIDING WHETHER TO TERMINATE TENANCY [24 CFR 982.310(h), 24 CFR 982.310(h)(4)] .............................................................................................................315

12-III.E. EFFECT OF TENANCY TERMINATION ON THE FAMILY'S ASSISTANCE .........316

   EXHIBIT 12-1: STATEMENT OF FAMILY OBLIGATIONS ....................................................317

CHAPTER 13 ...............................................................................................................319

OWNERS INTRODUCTION ..........................................................................................319

13-I.A. OWNER RECRUITMENT AND RETENTION ..........................................................320

[HCV GB, pp. 2-4 to 2-6] ...............................................................................................320

   Recruitment ...............................................................................................................320

   Retention ...................................................................................................................320

13-I.B. BASIC HCV PROGRAM REQUIREMENTS ..............................................................321

13-I.C. OWNER RESPONSIBILITIES [24 CFR 982.452] ..................................................322

13-I.D. OWNER QUALIFICATIONS ...........................................................................323

   Owners Barred from Participation [24 CFR 982.306(a) and (b)] ................................323

   Leasing to Relatives [24 CFR 982.306(d), HCV GB p. 11-2] ....................................323

   Conflict of Interest [24 CFR 982.161; HCV GB p. 8-19; Form HUD-52641, Section 13].........324

   Owner Actions That May Result in Disapproval of a Tenancy Request ......................325

   Legal Ownership of Unit ..........................................................................326

13-I.E. NON-DISCRIMINATION [HAP Contract – Form HUD-52641] ..................................327

PART II. HAP CONTRACTS .....................................................................................327

13-II.A. OVERVIEW ...............................................................................................327

13-II.B. HAP CONTRACT CONTENTS ......................................................................327

13-II.C. HAP CONTRACT PAYMENTS .....................................................................328

   Owner Certification of Compliance ............................................................329

   Late HAP Payments [24 CFR 982.451(a)(5)] ..............................................329

   Termination of HAP Payments [24 CFR 982.311(b)] ...................................330

13-II.D. BREACH OF HAP CONTRACT [24 CFR 982.453].............................................330

13-II.E. HAP CONTRACT TERM AND TERMINATIONS ...............................................331

13-II.F. CHANGE IN OWNERSHIP / ASSIGNMENT OF THE HAP CONTRACT [HUD- 52641] ....................................................................................................................333

13-II.G. FORECLOSURE [Notice PIH 2010-49] ...........................................................334

CHAPTER 14 ........................................................................................................335

PROGRAM INTEGRITY INTRODUCTION ...................................................................335

14-I.A. PREVENTING ERRORS AND PROGRAM ABUSE...............................................335

14-I.B. DETECTING ERRORS AND PROGRAM ABUSE .................................................336

14-I.C. INVESTIGATING ERRORS AND PROGRAM ABUSE ..........................................337

14-II.A. SUBSIDY UNDER- OR OVERPAYMENTS .......................................................339

14-II.B. FAMILY-CAUSED ERRORS AND PROGRAM ABUSE ........................................340

   Family Reimbursement to PHA [HCV GB pp. 22-12 to 22-13] ......................340

   PHA Reimbursement to Family [HCV GB p. 22-12] ....................................340

14-II.C. OWNER-CAUSED ERROR OR PROGRAM ABUSE ............................................341

Owner Reimbursement to HACA ....................................................................................341

14-II.D. PHA-CAUSED ERRORS OR PROGRAM ABUSE .........................................343

14-II.E. CRIMINAL PROSECUTION ............................................................................344

14-II.F. FRAUD AND PROGRAM ABUSE RECOVERIES ..........................................344

CHAPTER 15 .............................................................................................................................344

SPECIAL HOUSING TYPES ...................................................................................................344

PART I: SINGLE ROOM OCCUPANCY ...............................................................................345

15-I.A. OVERVIEW ......................................................................................................345

15-I.B. PAYMENT STANDARD, UTILITY ALLOWANCE, AND HAP CALCULATION ......346

15-I.C. HOUSING QUALITY STANDARDS (HQS) ......................................................346

PART II: CONGREGATE HOUSING .......................................................................................347

15-II.A. OVERVIEW ....................................................................................................347

15-II.B. PAYMENT STANDARD, UTILITY ALLOWANCE, AND HAP CALCULATION .....347

15-II.C. HOUSING QUALITY STANDARDS .............................................................347

PART III: GROUP HOME ........................................................................................................348

15-III.A. OVERVIEW ...................................................................................................348

15-III.B. PAYMENT STANDARD, UTILITY ALLOWANCE, AND HAP CALCULATION ...348

15-III.C. HOUSING QUALITY STANDARDS ............................................................349

PART IV: SHARED HOUSING .................................................................................................351

15-IV.A. OVERVIEW ...................................................................................................351

15-IV.B. PAYMENT STANDARD, UTILITY ALLOWANCE AND HAP CALCULATION ....352

15-IV.C. HOUSING QUALITY STANDARDS .............................................................353

PART V: COOPERATIVE HOUSING .....................................................................................354

15-V.A. OVERVIEW .....................................................................................................354

15-V.B. PAYMENT STANDARD, UTILITY ALLOWANCE AND HAP CALCULATION .....354

15-V.C. HOUSING QUALITY STANDARDS ...............................................................354

PART VI: MANUFACTURED HOMES ...................................................................................355

15-VI.A. OVERVIEW ...................................................................................................355

15-VI.B. SPECIAL REQUIREMENTS FOR MANUFACTURED HOME OWNERS WHO LEASE A SPACE ........................................................................................................355

15-VI.C. PAYMENT STANDARD, UTILITY ALLOWANCE AND HAP CALCULATION ....356

PART VII: HOMEOWNERSHIP ..................................................................357

CHAPTER 16 ............................................................................................358

PROGRAM ADMINISTRATION INTRODUCTION ........................................358

PART I: ADMINISTRATIVE FEE RESERVE [24 CFR 982.155]........................359

PART II: SETTING PROGRAM STANDARDS AND SCHEDULES .....................360

16-II.A. OVERVIEW ................................................................................360

16-II.B. PAYMENT STANDARDS [24 CFR 982.503; HCV GB, Chapter 7]...........360

Updating Payment Standards ...................................................................361

Unit-by-Unit Exceptions .........................................................................362

"Success Rate" Payment Standard Amounts ................................................363

Decreases in the Payment Standard below the Basic Range ............................363

16-II.C. UTILITY ALLOWANCES [24 CFR 982.517] ...................................363

Air Conditioning ....................................................................................364

Reasonable Accommodation .....................................................................364

PART III: INFORMAL REVIEWS AND HEARINGS .......................................365

16-III.A. OVERVIEW ..............................................................................365

16-III.B. INFORMAL REVIEWS ...............................................................365

Scheduling an Informal Review ................................................................366

Informal Review Procedures [24 CFR 982.554(b)] .......................................366

Reasonable Accommodation for Persons with Disabilities ............................369

16-III.C. INFORMAL HEARINGS FOR PARTICIPANTS [24 CFR 982.555] ..........369

Decisions Subject to Informal Hearing .......................................................370

Informal Hearing Procedures ...................................................................376

Scheduling an Informal Hearing [24 CFR 982.555(d)] ..................................376

Failure to Appear...................................................................................377

Pre-Hearing Right to Discovery [24 CFR 982.555(e)] ...................................378

Participant's Right to Bring Counsel [24 CFR 982.555(e)(3)] .........................378

Informal Hearing Officer [24 CFR 982.555(e)(4)] .......................................378

Attendance at the Informal Hearing ..........................................................379

Conduct at Hearings ............................................................................................................379

*Evidence* [24 CFR 982.555(e)(5)] ......................................................................................379

Hearing Officer's Decision [24 CFR 982.555(e)(6)] ..........................................................380

Procedures for Rehearing or Further Hearing ....................................................................382

16-III.D. HEARING AND APPEAL PROVISIONS FOR NON-CITIZENS [24 CFR 5.514] ......382

Informal Hearing Procedures for Residents ........................................................................384

Retention of Documents ......................................................................................................385

PART IV: OWNER OR FAMILY DEBTS TO HACA ....................................................................385

16-IV.A. OVERVIEW ..................................................................................................................385

16-IV.B. REPAYMENT POLICY ................................................................................................386

Owner Debts to HACA ........................................................................................................386

Family Debts to HACA ........................................................................................................386

Repayment Agreement ........................................................................................................387

Repayment Agreement Guidelines ......................................................................................387

Payment Thresholds ............................................................................................................387

PART V: SECTION 8 MANAGEMENT ASSESSMENT PROGRAM (SEMAP) ......................389

16-V.A. OVERVIEW ....................................................................................................................389

16-V.B. SEMAP CERTIFICATION [24 CFR 985.101] ..............................................................389

16-V.C. SEMAP INDICATORS [24 CFR 985.3 and form HUD-52648] ...................................390

SEMAP Indicators ..............................................................................................................391

Indicator 1: Selection from the waiting list ........................................................................391

Indicator 2: Rent reasonableness ........................................................................................391

Indicator 3: Determination of adjusted income ..................................................................391

Indicator 4: Utility allowance schedule ..............................................................................391

Indicator 5: HQS quality control inspections ......................................................................392

Indicator 6: HQS enforcement ............................................................................................392

Indicator 7: Expanding housing opportunities ....................................................................392

Indicator 8: FMR limit and payment standards ..................................................................392

Indicator 9: Annual reexaminations ....................................................................................393

- This indicator shows whether the PHA completes a reexamination for each participating family at

least every 12 months. .................................................................................................393

    Indicator 10: Correct tenant rent calculations ......................................................393

    Indicator 11: Pre-contract HQS inspections..........................................................393

    Indicator 12: Annual HQS inspections...................................................................393

    Indicator 13: Lease-up............................................................................................393

    Indicator 14: Family self-sufficiency (FSS) enrollment and escrow account balances ..............394

    De-concentration Bonus Indicator ........................................................................394

PART VI: RECORD KEEPING..........................................................................................394

16-VI.A. OVERVIEW ........................................................................................................394

16-VI.B. RECORD RETENTION [24 CFR 982.158; 24 CFR 908.101]........................395

16-VI.C. RECORDS MANAGEMENT ............................................................................395

    Privacy Act Requirements [24 CFR 5.212 and Form-9886].....................................396

    Upfront Income Verification (UIV) Records ..........................................................396

    Criminal Records.....................................................................................................396

    Medical/Disability Records.....................................................................................397

PART VII: REPORTING AND RECORD KEEPING FOR CHILDREN WITH
ENVIRONMENTAL INTERVENTION BLOOD LEAD LEVEL ..................................398

16-VII.A. OVERVIEW ......................................................................................................398

16-VII.B. REPORTING REQUIREMENT [24 CFR 35.1225(e); Notice PIH 2017-13]...............398

16-VII.C. DATA COLLECTION AND RECORD KEEPING [24 CFR 35.1225(f)]....................399

16-VIII.A. OVERVIEW .....................................................................................................399

16-VIII.B. METHODOLOGY.............................................................................................399

PART IX: VIOLENCE AGAINST WOMEN ACT (VAWA): NOTIFICATION,
DOCUMENTATION, CONFIDENTIALITY ....................................................................400

16-IX.A. OVERVIEW ........................................................................................................400

16-IX.B. DEFINITIONS [24 CFR 5.2003, 42 USC 13925 ]..........................................400

16-IX.C. NOTIFICATION [24 CFR 5.2005(a)]................................................................401

16-IX.D. DOCUMENTATION [24 CFR 5.2007].............................................................403

16-IX.E. CONFIDENTIALITY [24 CFR 5.2007(b)(4)]...................................................405

Protections for Applicants ................................................................................................406

Protections for Residents..................................................................................................406

Removing the Abuser or Perpetrator from the Household ................................................406

Moving to Another Unit ................................................................................................407

Documenting You Are or Have Been a Victim of Domestic Violence, Dating Violence, Sexual Assault or Stalking...............................................................................................407

Confidentiality ..............................................................................................................408

Reasons a Tenant Eligible for Occupancy Rights under VAWA May Be Evicted or Assistance May Be Terminated ........................................................................................409

Other Laws ....................................................................................................................409

Non-Compliance with The Requirements of This Notice ................................................409

For Additional Information ............................................................................................409

    TO BE COMPLETED BY OR ON BEHALF OF THE VAWA VICTIM: ...........................413

CHAPTER 17 ................................................................................................................421

PROJECT-BASED VOUCHERS ....................................................................................421

    17-I.A. OVERVIEW [24 CFR 983.5; ........................................................................422

    17-I.B. TENANT-BASED VS. PROJECT-BASED VOUCHER ASSISTANCE..................423

    17-I.C. RELOCATION REQUIREMENTS [24 CFR 983.7]............................................424

    17-I.D. EQUAL OPPORTUNITY REQUIREMENTS [24 CFR 983.8].............................424

    PART II: PBV OWNER PROPOSALS ........................................................................424

    17-II.A. OVERVIEW ..................................................................................................424

    17-II.B. OWNER PROPOSAL SELECTION PROCEDURES ........................................425

      Solicitation and Selection of PBV Proposals ........................................................427

      PHA-Owned Units ..............................................................................................430

      PHA Notice of Owner Selection ..........................................................................431

    17-II.C. HOUSING TYPE [24 CFR 983.52]................................................................432

    17-II.D. PROHIBITION OF ASSISTANCE FOR CERTAIN UNITS ...............................432

      Ineligible Housing Types ....................................................................................432

      Subsidized Housing ............................................................................................433

    17-II.F. CAP ON NUMBER OF PBV UNITS IN EACH PROJECT ...............................434

      Promoting Partially-Assisted Projects..................................................................437

    17-II.G. SITE SELECTION STANDARDS ................................................................437

    17-II.H. ENVIRONMENTAL REVIEW [24 CFR 983.58] ............................................439

PART III: DWELLING UNITS ........................................................................................440

17-III.A. OVERVIEW .................................................................................................440

17-III.B. HOUSING QUALITY STANDARDS [24 CFR 983.101]................................440

17-III.C. HOUSING ACCESSIBILITY FOR PERSONS WITH DISABILITIES.......................440

17-III.D. INSPECTING UNITS ..................................................................................440

PART IV: REHABILITATED AND NEWLY CONSTRUCTED UNITS ....................................442

17-IV.A. OVERVIEW [24 CFR 983.151].....................................................................442

17-IV.C. CONDUCT OF DEVELOPMENT WORK ........................................................443

17-IV.D. COMPLETION OF HOUSING ......................................................................444

17-V.A. OVERVIEW .................................................................................................445

17-V.B. HAP CONTRACT REQUIREMENTS ..............................................................445

Termination by PHA [24 CFR 983.205(c) and FR Notice 1/18/17]............................447

Termination by Owner [24 CFR 983.205(d)] ...........................................................447

17-V.C. AMENDMENTS TO THE HAP CONTRACT ....................................................449

17-V.D. HAP CONTRACT YEAR, ANNIVERSARY AND EXPIRATION DATES [24 CFR 983.207(b) and 983.302(e)] ...................................................................................449

17-V.E. OWNER RESPONSIBILITIES UNDER THE HAP CONTRACT [24 CFR 983.210]....450

17-V.F. ADDITIONAL HAP REQUIREMENTS ............................................................451

17-VI.A. OVERVIEW ...............................................................................................453

17-VI.B. ELIGIBILITY FOR PBV ASSISTANCE [24 CFR 983.251(a) and (b)] .......................453

17-VI.C. ORGANIZATION OF THE WAITING LIST [24 CFR 983.251(c)] ............................454

17-VI.D. SELECTION FROM THE WAITING LIST [24 CFR 983.251(c)]................................454

17-VI.E. OFFER OF PBV ASSISTANCE ...................................................................481

17-VI.F. OWNER SELECTION OF TENANTS ............................................................483

17-VI.G. TENANT SCREENING [24 CFR 983.255] ...................................................484

17-VII.A. OVERVIEW ..............................................................................................485

17-VII.B. LEASE [24 CFR 983.256] .........................................................................485

7-VII.C. MOVES ....................................................................................................488

17-VII.D. EXCEPTIONS TO THE OCCUPANCY CAP [24 CFR 983.262]................................490

17-VIII.A. OVERVIEW .............................................................................................492

17-VIII.B. RENT LIMITS [24 CFR 983.301]....................................................................492

17-VIII.C. REASONABLE RENT [24 CFR 983.303]........................................................497

17-VIII.D. EFFECT OF OTHER SUBSIDY AND RENT CONTROL .........................................498

17-IX.A. HOUSING ASSISTANCE PAYMENTS [24 CFR 983.351] ......................................499

17-IX.B. VACANCY PAYMENTS [24 CFR 983.352]........................................................499

17-IX.C. TENANT RENT TO OWNER [24 CFR 983.353].................................................500

17-IX.D. OTHER FEES AND CHARGES [24 CFR 983.354]..............................................501

CHAPTER 18 ...............................................................................................509

CHOICE MOBILITY POLICY ................................................................................509

II.  Eligibility and Voucher Caps ..........................................................................509

III.  Notification of Eligibility ..............................................................................511

IV.  Waiting Lists.............................................................................................511

V.  Exercising the Choice Mobility Option ..............................................................512

•    Voucher Request:....................................................................................512

•    Acknowledgement of Request:...................................................................513

•    Waiting List Management: .........................................................................513

VI.  Screening Process for the Choice Mobility HCV Voucher .......................................513

VII.  Transitioning from Project Based Rental Assistance to the Housing Choice Voucher Program
................................................................................................................514

VIII.  Promoting Self-Sufficiency Through Choice Mobility ..........................................515

CHAPTER 19 ...............................................................................................516

SPECIAL PURPOSE VOUCHERS ............................................................................516

PART I: FAMILY UNIFICATION PROGRAM (FUP) ...................................................517

19-I.A. PROGRAM OVERVIEW .............................................................................517

19-I.B. PUBLIC CHILD WELFARE AGENCY (PCWA) ................................................518

19-I.C. FUP FAMILY VOUCHER ELIGIBILITY CRITERIA ...........................................519

19-I.D. FUP YOUTH VOUCHER ELIGIBILITY CRITERIA ...........................................520

19-I.E. ASSISTANCE PERIOD...............................................................................521

19-I.F. REFERRALS AND WAITING LIST MANAGEMENT ...........................................528

19-I.G. PHA HCV ELIGIBILITY DETERMINATION ...................................................530

*Housing Authority of the City of Austin*                          *Housing Choice Voucher Program*

19-I.H. LEASE UP ................................................................................................530

19-I.I. TERMINATION OF ASSISTANCE ............................................................531

19-I.J. FUP PORTABILITY .................................................................................532

19-I.K. PROJECT-BASING FUP VOUCHERS ....................................................533

PART II: FOSTER YOUTH TO INDEPENDENCE INITIATIVE..........................533

19-II.A. PROGRAM OVERVIEW [Notice PIH 2020-28; Notice PIH 2021-26; FR Notice 1/24/22]
................................................................................................................533

19-II.B. PARTNERING AGENCIES ...................................................................533

19-II.C. YOUTH ELIGIBILITY CRITERIA .........................................................534

19-II.D. SUPPORTIVE SERVICES....................................................................535

19-II.E. REFERRALS AND WAITING LIST MANAGEMENT ...............................536

19-II.F. PHA HCV ELIGIBILITY DETERMINATION ..........................................537

19-II.G. LEASE UP .........................................................................................538

19-II.H. MAXIMUM ASSISTANCE PERIOD .....................................................539

   Education, Workforce Development, or Employment Activities ...............................541

   FSS Enrollment at 24 Months ..........................................................................542

   FSS Enrollment Between 36 and 48 Months ......................................................543

   FSS Enrollment After 48 Months......................................................................543

19-II.I. TERMINATION OF ASSISTANCE ........................................................546

19-II.J. PORTABILITY .....................................................................................546

19-II.K. PROJECT-BASING FYI VOUCHERS [FYI FAQs; FR Notice 1/24/22] .......546

PART III: VETERANS AFFAIRS SUPPORTIVE HOUSING (VASH) PROGRAM .................547

19-III.A. OVERVIEW .......................................................................................547

19-III.B. REFERRALS ......................................................................................548

19-III.C. HCV PROGRAM ELIGIBILITY ...........................................................548

19-III.D. CHANGES IN FAMILY COMPOSITION................................................550

19-III.E. LEASING............................................................................................551

19-III.F. PORTABILITY .....................................................................................552

19-III.G. TERMINATION OF ASSISTANCE .......................................................553

19-III.H. PROJECT-BASING VASH VOUCHERS ................................................555

PART IV: MAINSTREAM VOUCHER PROGRAM ................................................................556

19-IV.A. PROGRAM OVERVIEW [Notice PIH 2024-30 updates Sections 5 (f) and (g) of PIH 2020-01; PIH 2012-31] ................................................................................................................556

19-IV.B. ELIGIBLE POPULATION ...............................................................................557

19-IV.C. PARTNERSHIP AND SUPPORTIVE SERVICES.....................................................558

19-IV.D. WAITING LIST ADMINISTRATION ..................................................................558

Mainstream NED for homeless or institutional transitions .........................................560

19-IV.E. PORTABILITY ............................................................................................561

19.IV.G EXTRAORDINARY ADMINISTRATIVE FEES (EAF) ..............................................561

19.IV.H ..................................................................................................................562

PART IV: NON-ELDERLY DISABLED (NED) VOUCHERS..................................................563

19-V.A. PROGRAM OVERVIEW [Notice PIH 2013-19] ....................................................563

19-V.B. ELIGIBLE POPULATION ................................................................................564

19-V.C. WAITING LIST............................................................................................565

19-V.D. LEASE UP .................................................................................................567

19-V.E. PORTABILITY .............................................................................................568

PART VI: STABILITY VOUCHER PROGRAM ................................................................568

19-VI.A. PROGRAM OVERVIEW [Notice PIH 2022-24]....................................................568

19-VI.B. PARTNERING ORGANIZATION [Notice PIH 2022-24] ..........................................569

19-VI.C. REFERRALS [Notice PIH 2022-24]...................................................................569

19-VI.D. WAITING LIST [Notice PIH 2022-24] ...............................................................571

19-VI.E. FAMILY ELIGIBILITY [Notice PIH 2022-24]......................................................572

19-VI.F. HOUSING SEARCH AND LEASING .................................................................576

19-VI.G. PAYMENT STANDARDS ...............................................................................579

19-VI.H. PROJECT-BASED UNITS ..............................................................................580

EXHIBIT 19-1: SAMPLE Stability Voucher (SV) Homeless Provider's Certification.................581

EXHIBIT 19-2: SAMPLE Victim Service Provider's Certification .......................................583

PART VII: EMERGENCY HOUSING VOUCHER PROGRAM...............................................585

PART I: FUNDING ..............................................................................................586

PART II: PARTNERING AGENCIES ......................................................................590

PART III: WAITING LIST MANAGEMENT ...........................................................................592

PART IV: FAMILY ELIGIBLTY ........................................................................................593

PART V: HOUSING SEARCH AND LEASING .......................................................................598

PART VI: USE OF FUNDS, REPORTING, AND FINANCIAL RECORDS ..........................603

GLOSSARY ...........................................................................................................................605

A.   ACRONYMS USED IN THE HOUSING CHOICE VOUCHER (HCV) PROGRAM .............605

B.   GLOSSARY OF SUBSIDIZED HOUSING TERMS ............................................................608

ADDENDUM 1 ......................................................................................................................622

EMERGENCY TRANSFER MOVE PLAN ..............................................................................622

FOR VICTIMS OF DOMESTIC VIOLENCE, DATING VIOLENCE, SEXUAL ASSAULT, OR
STALKING..............................................................................................................................622

Attachment:  Local organizations offering assistance to victims of domestic violence, dating
violence, sexual assault, or stalking include the following (list may not be exhaustive): ..............627

INTRODUCTION

**ABOUT THE REFERENCES CITED IN THE MODEL ADMINISTRATIVE PLAN**

**AUTHORITIES IN THE MODEL ADMINISTRATIVE PLAN**

The authority for PHA policies is derived from many sources. Primary among these sources are regulations and guidance issued by HUD. State law also directs PHA Policy. State law must be followed where such law exists and does not conflict with federal regulations.  Industry practice may also be used to develop policy as long as it does not conflict with federal requirements or prohibitions.

**HUD**

HUD provides the primary source of PHA Policy through federal regulations, HUD Notices and handbooks. Compliance with federal regulations, current HUD Notices and HUD handbooks is mandatory.

HUD provides guidance to PHAs through HUD published guidebooks, expired HUD notices and handbooks.  Basing PHA policy on HUD guidance is optional, as long as PHA policies comply with federal law, federal regulations and mandatory policy. Because HUD has already determined that the guidance it provides is consistent with mandatory policies, PHA reliance on HUD guidance provides HACA with a "safe harbor."

Material posted on the HUD website can provide further clarification of HUD policies. For example, FAQs on the HUD website can provide direction on the application of federal regulations in various aspects of the program.

**State Law**

Where there is no mandatory federal guidance, PHAs must comply with state law, if it exists. Where state law is more restrictive than federal law, but does not conflict with it, HACA should follow the state law.

**Industry Practice**

Where no law or HUD authority exists on a particular subject, industry practice may support PHA Policy. Industry practice refers to a way of doing things or a policy that has been adopted by a majority of PHAs.

**RESOURCES CITED IN THE MODEL ADMINISTRATIVE PLAN**

The model administrative plan cites several documents. Where a document or resource is cited frequently, it may be abbreviated. Where it is cited only once or twice, the model administrative plan may contain the entire name of the document or resource.  Following is a key to abbreviations used for various sources that are frequently cited in the administrative plan and a list of references and document locations that are referenced in the model administrative plan.

**HUD HCV Guidebook**

In November 2019 HUD began issuing a new version of the HCV Guidebook chapter-by-chapter. Unlike the previous version of the HCV Guidebook in which chapters were numbered, the new version of the guidebook includes chapter names, but no numbers. As the new version of the guidebook has not yet been fully released, and since the previous version of the guidebook contains guidance not found in the new version, the model policy cites both versions of the guidebook. Therefore, where the HCV Guidebook is cited in the model policy, the citation will make a distinction between the "old" and "new" versions of the guidebook. The "old" version of the guidebook will continue to be cited as *HCV GB* with a chapter/page reference (example: HCV GB, p. 5-4). If HUD has also released a new chapter on the same topic with information that either adds new information or updates existing information from the previous guidebook, the new guidebook will be cited as *New HCV GB* with a chapter title and page reference (example: New HCV GB, *Payment Standards,* p. 11).

**Abbreviations**

Throughout the model administrative plan, abbreviations are used to designate certain documents in citations. The following is a table of abbreviations of documents cited in the model administrative plan.

| Abbreviation | Document |
|---|---|
| CFR | Code of Federal Regulations |
| HCV GB | Housing Choice Voucher Program Guidebook (7420.10G). |
| HUD-50058 IB | HUD-50058 Instruction Booklet |
| RHIIP FAQs | Rental Housing Integrity Improvement Program (RHIIP) Frequently Asked Questions. |
| VG | PIH Notice 2004-01 Verification Guidance, March 9, 2004. |
| HB 4350.3 | Occupancy Requirements of Subsidized Multifamily Housing Programs |

**Resources and Where to Find Them**

Following is a list of resources helpful to HACA or referenced in the model administrative plan, and the online location of each.

**Resources and Where to Find Them**

Following is a list of resources helpful to the PHA or referenced in the model administrative plan, and the online location of each.

| Document and Location |
|---|
| Code of Federal Regulations<br><br>https://www.ecfr.gov/ |
| Earned Income Disregard FAQ<br><br>https://www.hud.gov/program_offices/public_indian_housing/phr/about/ao_faq_eid |
| Eligibility of Students for Assisted Housing Under Section 8 of the U.S. Housing Act of 1937; Final Rule<br><br>http://edocket.access.gpo.gov/2008/pdf/E8-19435.pdf |
| Enterprise Income Verification (EIV) System, Security Procedures for Upfront Income Verification data<br><br>https://www.hud.gov/sites/documents/EIVSECGUIDEPHA.PDF |
| Executive Order 11063<br><br>https://www.archives.gov/federal-register/codification/executive-order/11063.html |
| Federal Register<br><br>https://www.federalregister.gov/ |
| Housing Choice Voucher Program Guidebook (7420.10G), Updated Chapters<br><br>https://www.hud.gov/program_offices/public_indian_housing/programs/hcv/guidebook |
| HUD-50058 Instruction Booklet<br><br>https://www.hud.gov/sites/documents/FORM50058INSTRUCTBOOKLET.PDF |
| Joint Statement of the Department of Housing and Urban Development and the Department of Justice, issued May 17, 2004<br><br>https://www.justice.gov/sites/default/files/crt/legacy/2010/12/14/joint_statement_ra.pdf |

*Housing Authority of the City of Austin*                    *Housing Choice Voucher Program*

---

Final Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons, published January 22, 2007

https://www.lep.gov/guidance/HUD_guidance_Jan07.pdf

---

Notice PIH 2010-26 (HA), Nondiscrimination and Accessibility Notice

https://www.hud.gov/sites/documents/DOC_8993.PDF

---

Notice PIH 2017-12, Administrative Guidance for Effective and Mandated Use of the Enterprise Income Verification (EIV) System

https://www.hud.gov/sites/documents/PIH2017-12EIVNOTICE.PDF

---

Notice PIH 2018-24, Verification of Social Security Numbers (SSNs) and Social Security (SS) and Supplemental Security Income (SSI) Benefits; and Effective Use of the Enterprise Income Verification (EIV) System's Identity Verification Report

https://www.hud.gov/sites/dfiles/PIH/documents/PIH-2018-24_EIV_SSN_Notice_FINAL.pdf

---

OMB Circular A-133

https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/circulars/A133/a133.pdf

---

Project-Based Voucher Program; Final Rule

http://www.gpo.gov/fdsys/pkg/FR-2005-10-13/pdf/05-20035.pdf

---

VAWA Final Rule

http://www.gpo.gov/fdsys/pkg/FR-2010-10-27/pdf/2010-26914.pdf

---

The HUD website is https://www.hud.gov/.

Guidebooks, handbooks and other HUD resources may be found at the HUDClips website: https://www.hud.gov/program_offices/administration/hudclips.

The new HCV Guidebook may be found at: https://www.hud.gov/program_offices/public_indian_housing/programs/hcv/guidebook

---

# CHAPTER 1
## OVERVIEW OF THE PROGRAM AND PLAN INTRODUCTION

HACA receives its funding for the Housing Choice Voucher (HCV) program from the U.S. Department of Housing and Urban Development. HACA is not a federal department or agency. A public housing agency (HACA) is a governmental or public body, created and authorized by state law to develop and operate housing and housing programs for low-income families. HACA enters into an Annual Contributions Contract with HUD to administer the program requirements on behalf of HUD. HACA must ensure compliance with federal laws, regulations and notices and must establish policy and procedures to clarify federal requirements and to ensure consistency in program operation.

This chapter contains information about HACA and its programs with emphasis on the HCV program. It also contains information about the purpose, intent and use of the plan and guide.

There are three parts to this chapter:

    Part I: The Public Housing Agency (HACA). This part includes a description of HACA, its jurisdiction, its programs, and its mission and intent.

    Part II: The HCV Program. This part contains information about the Housing Choice Voucher program operation, roles and responsibilities, and partnerships.

    Part III: The HCV Administrative Plan. This part discusses the purpose and organization of the plan and its revision requirements.

## PART I: HACA

### 1-I.A. OVERVIEW

This part explains the origin of HACA's creation and authorization, the general structure of the organization, and the relationship between HACA Board and staff.

### 1-I.B. ORGANIZATION AND STRUCTURE OF HACA

The Section 8 tenant-based Housing Choice Voucher (HCV) assistance program is funded by the federal government and administered by the Housing Authority of the City of Austin (HACA) for the jurisdiction of the City of Austin, Texas.

HACA is governed by a Board of Commissioners and is appointed in accordance with state housing law and generally serves in the same capacity as the Directors of a corporation. The Board of Commissioners establishes policies under which HACA conducts business and ensures that those policies are followed by HACA staff. The Board of Commissioners is responsible for preserving and expanding the agency's resources and assuring the agency's continued viability.

Formal actions of HACA are taken through written resolutions, adopted by the Board of Commissioners and entered into the official HACA record.

The principal staff member of HACA is the President/CEO, who is selected and hired by the Board of Commissioners. The CEO oversees day-to-day operations of HACA and is directly responsible for carrying out the policies established by the Board of Commissioners. The CEO's duties include ensuring for the hiring, training and supervising of HACA staff, as well as

budgeting and financial planning for the agency.  Additionally, the CEO is charged with ensuring compliance with federal and state laws and program mandates.

## 1-I.C. HACA's MISSION STATEMENT

To cultivate sustainable affordable housing communities and partnerships that inspires self- reliance, growth and optimism.

## 1-I.D. HACA'S PROGRAMS

The following programs are included under this administrative plan:

> HACA Policy

> HACA's administrative plan is applicable to the operation of the Housing Choice Voucher program.

## 1-I.E. HACA'S COMMITMENT TO ETHICS AND SERVICE

As a public service agency, HACA is committed to providing excellent service to HCV applicants, participant families and owners, and the public. In order to provide superior service, HACA resolves to:

Administer applicable federal and state laws and regulations to achieve high ratings in compliance measurement indicators while maintaining efficiency in program operation to ensure fair and consistent treatment of clients served.

Provide decent, safe, and sanitary housing – in compliance with program housing quality standards – for very low-income families while ensuring that family rents are fair, reasonable, and affordable.

Encourage self-sufficiency of participant families and assist in the expansion of family opportunities, which address educational, socio-economic, recreational and other human service needs.

Promote fair housing and the opportunity for very low- and low-income families of all races, ethnicities, national origins, religions, ethnic backgrounds and with all types of disabilities, to participate in the Housing Choice Voucher program and to experience freedom of housing choice.

Promote a housing program, which maintains quality service and integrity while providing an incentive to private property owners to rent to very low-income and low-income families.

Promote a market-driven housing program that will help qualified low-income families be successful in obtaining affordable housing and increase the supply of housing choices for such families.

Create positive public awareness and expand the level of family, owner, and community support in accomplishing HACA's mission.

Attain and maintain a high level of standards and professionalism in day-to-day management of all program components.

Administer an efficient, high-performing agency through continuous improvement of HACA's support systems and commitment to our employees and their development. HACA will make every effort to keep program participants informed of HCV program rules and regulations, and to advise participants of how the program rules affect them.

## PART II: THE HOUSING CHOICE VOUCHER (HCV) PROGRAM

## 1-II.A. OVERVIEW AND HISTORY OF THE PROGRAM

The intent of this section is to provide the public and staff with information related to the overall operation of the program. There have been many changes to the program since its inception in 1974 and a brief history of the program will assist the reader to better understand the program.

The United States Housing Act of 1937 (the "Act") is responsible for the birth of federal housing program initiatives. The Act was intended to provide financial assistance to states and cities for public works projects, slum clearance and the development of affordable housing developments for low-income residents.

The Housing and Community Development (HCD) Act of 1974 created a new federally assisted housing program – the Section 8 Existing program (also known as the Section 8 Certificate program). The HCD Act represented a significant shift in federal housing strategy from locally owned public housing to privately owned rental housing.

Under the Certificate program, federal housing assistance payments were made directly to private owners of rental housing, where this housing was made available to lower-income families. Eligible families were able to select housing in the private rental market. Assuming that the housing met certain basic physical standards of quality ("housing quality standards") and was within certain HUD-established rent limitations ("fair market rents"), the family would be able to receive rental assistance in the housing unit. Family contribution to rent was generally set at 30 percent of the family's adjusted income, with the remainder of the rent paid by the program.

Another unique feature of the Certificate program was that the rental assistance remained with the eligible family, if the family chose to move to another privately-owned rental unit that met program requirements (in contrast to the public housing program where the rental assistance remains with the unit, should the family decide to move). Consequently, the Certificate program was characterized as tenant-based assistance, rather than unit-based assistance.

The Housing and Community Development (HCD) Act of 1987 authorized a new version of tenant-based assistance – the Section 8 Voucher program. The Voucher program was very similar to the Certificate program in that eligible families were able to select housing in the private rental market and receive assistance in that housing unit.

However, the Voucher program permitted families more options in housing selection. Rental housing still had to meet the basic housing quality standards, but there was no fair market rent limitation on rent. In addition, family contribution to rent was not set at a limit of 30 percent of adjusted income. Consequently, depending on the actual rental cost of the unit selected, a family might pay more or less than 30 percent of their adjusted income for rent.

From 1987 through 1999, public housing agencies managed both the Certificate and Voucher tenant-based assistance programs, with separate rules and requirements for each. From 1994

through 1998, HUD published a series of new rules, known as "conforming" rules, to more closely combine and align the two similar housing programs, to the extent permitted by the law.

In 1998, the Quality Housing and Work Responsibility Act (QHWRA) – also known as the Public Housing Reform Act – was signed into law. QHWRA eliminated all statutory differences between the Certificate and Voucher tenant-based programs and required that the two programs be merged into a single tenant-based assistance program, now known as the Housing Choice Voucher (HCV) program.

The HCV program was modeled closely on the pre-merger Voucher program. However, unlike the pre-merger Voucher program, the HCV program requires an assisted family to pay at least 30 percent of adjusted income for rent.

The transition of assistance from the Certificate and Voucher programs to the new HCV program began in October 1999. By October 2001, all families receiving tenant-based assistance were converted to the HCV program.

## 1-II.B. HCV PROGRAM BASICS

The purpose of the HCV program is to provide rental assistance to eligible families. The rules and regulations of the HCV program are determined by the U.S. Department of Housing and Urban Development. HACA is afforded choices in the operation of the program, which are included in HACA's administrative plan, a document approved by the Board of Commissioners of HACA.

The HCV program offers mobility to eligible families because they may search for suitable housing anywhere in PHA's jurisdiction and may be eligible to move under portability to other PHAs' jurisdictions.

When a family is determined to be eligible for the program and funding is available, HACA issues the family a housing voucher. When the family finds a suitable housing unit and funding is available, HACA will enter into a contract with the owner and the family will enter into a lease with the owner. Each party makes their respective payment to the owner so that the owner receives full rent.

Even though the family is determined to be eligible for the program, the owner has the responsibility of approving the family as a suitable renter. HACA continues to make payments to the owner as long as the family is eligible and the housing unit continues to qualify under the program.

## 1-II.C. THE HCV PARTNERSHIPS

To administer the HCV program, HACA enters into a contractual relationship with HUD (Consolidated Annual Contributions Contract). HACA also enters into contractual relationships with the assisted family and the owner or landlord of the housing unit.

For the HCV program to work and be successful, all parties involved – HUD, HACA, the owner, and the family – have important roles to play. The roles and responsibilities of all parties are defined in federal regulations and in legal documents that parties execute to participate in the program.

The chart on the following page illustrates key aspects of these relationships.



**Owner / Landlord**

### What Does HUD Do?

HUD has the following major responsibilities:

Develop regulations, requirements, handbooks, notices and other guidance to implement HCV housing program legislation passed by Congress;

Allocate HCV program funds to PHAs;

Provide technical assistance to PHAs on interpreting and applying HCV program requirements;

Monitor PHAs compliance with HCV program requirements and PHAs performance in program administration.

### What Does HACA Do?

HACA administers the HCV program under contract with HUD and has the following major responsibilities:

Establish local policies;

Review applications from interested applicants to determine whether applicants are eligible for the program;

Maintain waiting list and select families for admission;

Issue voucher to eligible families and provide information on how to lease units;

Conduct outreach to owners, with special attention to owners outside areas of poverty or minority concentration;

Approve the rental unit (including assuring compliance with housing quality standards and rent reasonableness), the owner, and the tenancy;

Make housing assistance payments to the owner in a timely manner;

Recertify families for continued eligibility under the program;

Ensure that owners and families comply with program rules and their contractual obligations;

Provide families and owners with prompt, professional service;

Comply with all fair housing and equal opportunity requirements, HUD regulations and requirements, the Annual Contributions Contract, HUD-approved applications for funding, HACA's administrative plan and other applicable federal, state and local laws.

### What does the Owner do?

The owner has the following major responsibilities:

Screen families who apply for tenancy, to determine suitability as renters.

- HACA can provide some information to the owner, but the primary responsibility for tenant screening rests with the owner.

- The owner should consider family background factors such as rent and bill-paying history,

history of caring for property, respecting the rights of others to peaceful enjoyment of the property, compliance with essential conditions of tenancy, whether the family is engaging in drug-related criminal activity or other criminal activity that might threaten others.

Comply with the terms of the Housing Assistance Payments contract, executed with HACA;

Comply with all applicable fair housing laws and discriminate against anyone;

Maintain the housing unit in accordance with Housing Quality Standards (HQS) and make necessary repairs in a timely manner;

Collect rent due from the assisted family and otherwise comply with and enforce provisions of the dwelling lease.

## What Does the Family Do?

The family has the following responsibilities:

Provide HACA with complete and accurate information, determined by HACA to be necessary for administration of the program;

Make their best and most timely efforts to locate qualified and suitable housing;

Attend all appointments scheduled by HACA;

Allow HACA to inspect the unit at reasonable times and after reasonable notice;

Take responsibility for care of the housing unit, including any violations of housing quality standards caused by the family;

Comply with the terms of the lease with the owner;

Comply with the family obligations of the voucher;

Not commit serious or repeated violations of the lease;

Not engage in drug-related or violent criminal activity;

Notify HACA and the owner before moving or terminating the lease;

Use the assisted unit only for residence and as the sole residence of the family. Not sublet the unit, assigns the lease, or have any interest in the unit;

Promptly notify HACA of any changes in family composition;

Not commit fraud, bribery, or any other corrupt or criminal act in connection with any housing programs.

## 1-II.D. APPLICABLE REGULATIONS

Applicable regulations include:

> 24 CFR Part 5: General Program Requirements
> 24 CFR Part 8: Nondiscrimination
> 24 CFR Part 35: Lead-Based Paint
> 24 CFR Part 982: Section 8 Tenant-Based Assistance: Housing Choice Voucher Program
> 24 CFR Part 983: Project-Based Vouchers
> 24 CFR Part 985: The Section 8 Management Assessment Program (SEMAP)

## PART III: THE HCV ADMINISTRATIVE PLAN

## 1-III.A. OVERVIEW AND PURPOSE OF THE ADMINISTRATIVE PLAN

The HCV administrative plan is required by HUD. The purpose of the administrative plan is to establish policies for carrying out the programs in a manner consistent with HUD requirements and local goals and objectives contained in HACA's agency plan. This administrative plan is a supporting document to HACA agency plan, and is available for public review as required by CFR 24 Part 903.

This administrative plan is set forth to define HACA's local policies for operation of the housing programs in the context of federal laws and regulations. All issues related to the HCV program not addressed in this document are governed by such federal regulations, HUD handbooks and guidebooks, notices and other applicable law. The policies in this administrative plan have been designed to ensure compliance with the consolidated ACC and all HUD-approved applications for program funding.

HACA is responsible for complying with all changes in HUD regulations pertaining to the HCV program. If such changes conflict with this plan, HUD regulations will have precedence.

Administration of the HCV program and the functions and responsibilities of HACA staff shall comply with HACA's personnel policy and HUD regulations as well as all federal, state and local fair housing laws and regulations.

## 1-III.B. CONTENTS OF THE PLAN [24 CFR 982.54]

The HUD regulations at [24 CFR 982.54] define the policies that must be included in the administrative plan. They are as follows:

> Selection and admission of applicants from HACA waiting list, including any PHA admission preferences, procedures for removing applicant names from the waiting list, and procedures for closing and reopening the HACA waiting list (Chapter 4);

> Issuing or denying vouchers, including PHA Policy governing the voucher term and any extensions or suspensions of the voucher term. If HACA decides to allow extensions of the voucher term, the HACA administrative plan must describe how HACA determines whether to grant extensions or suspensions, and how HACA determines the length of any extension (Chapter 5)

> Any special rules for use of available funds when HUD provides funding to HACA for a

special purpose (e.g., desegregation), including funding for specified families or a specified category of families (Chapter 4);

Occupancy policies, including definition of what group of persons may qualify as a 'family', definition of when a family is considered to be 'continuously assisted'; standards for denying admission or terminating assistance based on criminal activity or alcohol abuse in accordance with 982.553 (Chapters 3 and 12);

Encouraging participation by owners of suitable units located outside areas of low income or minority concentration (Chapter 13);

Assisting a family that claims that illegal discrimination has prevented the family from leasing a suitable unit (Chapter 2);

Providing information about a family to prospective owners (Chapters 3 and 9);

Disapproval of owners (Chapter 13);

Subsidy standards (Chapter 5);

Family absence from the dwelling unit (Chapter 12);

How to determine who remains in the program if a family breaks up (Chapter 3);

Informal review procedures for applicants (Chapter 16);

Informal hearing procedures for participants (Chapter 16);

The process for establishing and revising voucher payment standards, including policies on administering decreases in the payment standard during the HAP contract term (Chapter 16);

The method of determining that rent to owner is a reasonable rent (initially and during the term of a HAP contract) (Chapter 8);

Special policies concerning special housing types in the program (e.g., use of shared housing) (Chapter 15);

Policies concerning payment by a family to HACA of amounts the family owes HACA (Chapter 16);

Interim redeterminations of family income and composition (Chapter 11);

Restrictions, if any, on the number of moves by a participant family (Chapter 10);

Approval by the board of commissioners or other authorized officials to charge the administrative fee reserve (Chapter 16);

Procedural guidelines and performance standards for conducting required housing quality standards inspections (Chapter 8); and

PHA screening of applicants for family behavior or suitability for tenancy (Chapter 3).

## Mandatory vs. Discretionary Policy

HUD makes a distinction between:

Mandatory policies: those driven by legislation, regulations, current handbooks, notices, and legal opinions, and

Optional, non-binding guidance, including guidebooks, notices that have expired and recommendations from individual HUD staff.

HUD expects PHAs to adopt local policies and procedures that are consistent with mandatory policies in areas where HUD gives HACA discretion. HACA's administrative plan is the foundation of those policies and procedures. HUD's directions require PHAs to make policy choices that provide guidance to staff and consistency to program applicants and participants.

Creating policies based upon HUD guidance is not mandatory, but provides HACA with a "safe harbor." HUD has already determined that the recommendations and suggestions it makes are consistent with mandatory policies. If HACA adopts an alternative strategy, it must make its own determination that the alternative approach is consistent with legislation, regulations, and other mandatory requirements. There may be very good reasons for adopting a policy or procedure that is different from HUD's safe harbor, but PHAs should carefully think through those decisions.

## 1-III.C. ORGANIZATION OF THE PLAN

The Plan is organized to provide information to users in particular areas of operation.

## 1-III.D. UPDATING AND REVISING THE PLAN

HACA will revise the HCV Administrative Plan as needed to comply with changes in HUD regulations. HACA's Board of Commissioners must approve the original policy and any changes and a copy will be provided to HUD.

This HCV Administrative Plan shall supersede and replace all previous HCV or Section 8 Plans. This HCV Administrative Plan shall be effective the date that it is approved by HACA's Board of Commissioners.

<div align="center">

## CHAPTER 2
## FAIR HOUSING AND EQUAL OPPORTUNITY INTRODUCTION

</div>

This chapter explains the laws and Department of Housing and Urban Development (HUD) regulations requiring Public Housing Authorities (PHAs) to affirmatively further civil rights and fair housing in all federally assisted housing programs. The letter and spirit of these laws are implemented through consistent policy and processes. The responsibility to further nondiscrimination pertains to all areas of HACA's housing choice voucher (HCV) operations.

This chapter describes HUD regulations and HACA policies related to these topics in three parts:

Part I: Nondiscrimination. This part presents the body of laws and regulations governing the responsibilities of HACA regarding nondiscrimination.

Part II: Policies Related to Persons with Disabilities. This part discusses the rules and policies of the housing choice voucher program related to reasonable accommodation for

persons with disabilities. These rules and policies are based on the Fair Housing Act (42.U.S.C.) and Section 504 of the Rehabilitation Act of 1973, and incorporate guidance from the Joint Statement of The Department of Housing and Urban Development and the Department of Justice (DOJ), issued May 17, 2004.

Part III: Prohibition of Discrimination Against Limited English Proficiency Persons. This part details the obligations of HACA to ensure meaningful access to the HCV program and its activities by persons with limited English proficiency (LEP). This part incorporates the Final Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition against National Origin Discrimination Affecting Limited English Proficient Persons published January 22, 2007, in the *Federal Register.*

## PART I: NONDISCRIMINATION

## 2-I.A. OVERVIEW

HACA will affirmatively further fair housing in all of its policies.  HACA's Affirmatively Furthering Fair Housing Addendum provides a significant amount of additional information on HACA's fair housing efforts above and beyond the agency's adherence to federal, state and local nondiscrimination and reasonable accommodation laws and regulations and serves as a complement to the HCV Administrative Plan's Chapter 2 on Fair Housing and Equal Opportunity. The Affirmatively Furthering Fair Housing Addendum can be found at the end of this Administrative Plan as Appendix #1.

Federal laws require PHAs to treat all applicants and participants equally, providing the same opportunity to access services, regardless of family characteristics and background. Federal law prohibits discrimination in housing on the basis of race, color, religion, sex, national origin, age, familial status, and disability. In addition, HUD regulations provide for additional protections regarding sexual orientation, gender identity, and marital status. The PHA will comply fully with all federal, state, and local nondiscrimination laws, and with rules and regulations governing fair housing and equal opportunity in housing and employment, including:

Title VI of the Civil Rights Act of 1964

Title VIII of the Civil Rights Act of 1968 (as amended by the Community Development Act of 1974 and the Fair Housing Amendments Act of 1988)

- Executive Order 11063 and 13988

Section 504 of the Rehabilitation Act of 1973

The Age Discrimination Act of 1975

Title II of the Americans with Disabilities Act (to the extent that it applies, otherwise Section 504 and the Fair Housing Amendments govern)

Violence Against Women Reauthorization Act of 2013 (VAWA)

The Equal Access to Housing in HUD Programs Regardless of Sexual Orientation or Gender Identity Final Rule, published in the *Federal Register Fe*bruary 3, 2012 and further clarified in Notice PIH 2014-20.

When more than one civil rights law applies to a situation, the laws will be read and applied together.

Any applicable state laws or local ordinances and any legislation protecting individual rights of tenants, applicants, or staff that may subsequently be enacted will also apply.

## 2-I.B. NONDISCRIMINATION

Federal regulations prohibit discrimination against certain protected classes and other groups of people. State and local requirements, as well as HACA policies, can prohibit discrimination based on other factors.

Except as allowed by law, HACA shall not discriminate because of race, color, sex, religion, familial status, age, disability or national origin (called "protected classes")

> Familial status means one or more individuals under the age of eighteen years living with (1) a parent or another person having legal custody of such individual or individuals or (2) the designee of such parent or other person having such custody, with the written permission of such parent or other person.

> The familial status protections shall also apply to any person who is pregnant or is in the process of securing legal custody of any individual who has not yet attained the age of eighteen years.

HACA will not discriminate on the basis of marital status, gender identity, or sexual orientation [FR Notice 02/03/12; Executive Order 13988].

> <u>HACA Policy</u>

> HACA will not discriminate against other protected classes including: students or people with Acquired Immune Deficiency or HIV status ("AIDS/HIV" status).

HACA will not use any of these factors to:

Deny to any family the opportunity to apply for housing, nor deny to any qualified applicant the opportunity to participate in the housing choice voucher program;

Provide housing that is different from that provided to others;

Subject anyone to segregation or disparate treatment;

Subject anyone to sexual harassment

Restrict anyone's access to any benefit enjoyed by others in connection with the housing program;

Treat a person differently in determining eligibility or other requirements for admission;

Steer an applicant or participant toward or away from a particular area based on any of these factors;

Deny anyone access to the same level of services;

Deny anyone the opportunity to participate in a planning or advisory group that is an integral part of the housing program;

Discriminate in the provision of residential real estate transactions;

Discriminate against someone because they are related to or associated with a member of a protected class;

Publish or cause to be published an advertisement or notice indicating the availability of housing that prefers or excludes persons who are members of a protected class.

### Providing Information to Families and Owners

HACA must take steps to ensure that families and owners are fully aware of all applicable civil rights laws. As part of the briefing process, HACA must provide information to HCV applicant families about civil rights requirements and the opportunity to rent in a broad range of neighborhoods [24 CFR 982.301]. The Housing Assistance Payments (HAP) contract informs owners of the requirement not to discriminate against any person because of race, color, religion, sex, national origin, age, familial status, or disability in connection with the contract.

### Discrimination Complaints

If an applicant or participant believes that any family member has been discriminated against by HACA or an owner, the family should advise HACA.  HACA will make every reasonable attempt to determine whether the applicant's or participant's assertions have merit and take any warranted corrective action. In addition, HACA is required to provide the applicant or participant with information about how to file a discrimination complaint [24 CFR 982.304].

Upon receipt of a housing discrimination complaint, the PHA is required to:

- Provide written notice of the complaint to those alleged and inform the complainant that such notice was made

- Investigate the allegations and provide the complainant and those alleged with findings and either a proposed corrective action or an explanation of why corrective action is not warranted

- Keep records of all complaints, investigations, notices, and corrective actions
  [Notice PIH 2014-20]

HACA Policy

HACA shall conspicuously post a Fair Housing and Equal Opportunity poster and the toll-free Discrimination Complaint hotline number at HACA central administration office.

Applicants or participants who believe that they have been subject to unlawful discrimination may notify HACA either orally or in writing.

Within 10 business days of receiving the complaint, the HACA will provide a written notice to those alleged to have violated the rule. The HACA will also send a written notice to the complainant informing them that notice was sent to those alleged to have violated the rule, as well as information on how to complete and submit a housing discrimination complaint form to HUD's Office of Fair Housing and Equal Opportunity (FHEO).

HACA will attempt to remedy discrimination complaints made against HACA and will conduct an investigation into all allegations of discrimination.

Within 10 business days following the conclusion of the HACA's investigation, the HACA will provide the complainant and those alleged to have violated the rule with findings and either a proposed corrective action plan or an explanation of why corrective action is not warranted.

HACA will keep a record of all complaints, investigations, notices, and corrective actions. (See Chapter 16.)

In addition to the policies outlined in the HCV Administrative Plan, HACA further complies with fair housing laws through the implementation of the Affirmatively Furthering Fair Housing Plan as adopted by the HACA Board of Commissioners.

## PART II: POLICIES RELATED TO PERSONS WITH DISABILITIES

### 2-II.A. OVERVIEW

One type of disability discrimination prohibited by the Fair Housing Act is the refusal to make reasonable accommodation in rules, policies, practices, or services when such accommodation may be necessary to afford a person with a disability the equal opportunity to use and enjoy a program or dwelling under the program.

HACA must ensure that persons with disabilities have full access to HACA's programs and services. This responsibility begins with the first contact by an interested family and continues through every aspect of the HCV program.

HACA Policy

HACA will advise applicants and participants in writing of their right to request accommodations, on the intake application, reexamination documents, and notices of adverse action by HACA, by including the following language:

"The Housing Authority of the City of Austin is committed to compliance with the Americans with Disabilities Act and the Fair Housing Act.  If you or anyone in your family is a person with disabilities, and you require a specific accommodation in order to fully utilize our programs and services, please contact the Housing Authority by calling (512) 477-1314.  Se habla espanol"

The applicant can request a reasonable accommodation from the Admissions Director or the HCV Director.  HCV program participants may contact their assigned Housing Eligibility Specialist or the HCV Director.  The HCV Director will serve as the Reasonable Accommodations Coordinator for the HCV program.

## 2-II.B. DEFINITION OF REASONABLE ACCOMMODATION

A reasonable accommodation is an adjustment made to a rule, policy, practice, or service that allows a person with a disability to have equal access to the HCV program. For example, reasonable accommodations may include making home visits, extending the voucher term, or approving an exception payment standard in order for a participant to lease an accessible dwelling unit.

Federal regulations stipulate that requests for accommodations will be considered reasonable if they do not create an "undue financial and administrative burden" for HACA, or result in a "fundamental alteration" in the nature of the program or service offered. A fundamental alteration is a modification that alters the essential nature of a provider's operations.

### Types of Reasonable Accommodations

When needed, HACA will modify normal procedures to accommodate the needs of a person with disabilities. Examples include:

Permitting applications and reexaminations to be completed by mail;

Conducting home visits;

Using higher payment standards (either within the acceptable range or with HUD approval of a payment standard outside HACA range) if HACA determines this is necessary to enable a person with disabilities to obtain a suitable housing unit;

Providing time extensions for locating a unit when necessary because of lack of availability of accessible units or special challenges of the family in seeking a unit;

Permitting an authorized designee or advocate to participate in the application or certification process and any other meetings with HACA staff;

Displaying posters and other housing information in locations throughout HACA's office in such a manner as to be easily readable from a wheelchair;

Allowing a HACA-approved live-in aide to reside in the unit if that person is determined to be essential to the care of a person with disabilities, is not obligated for the support of the person with disabilities and would not be otherwise living in the unit.

## 2-II.C. REQUEST FOR AN ACCOMMODATION

If an applicant or participant indicates that an exception, change, or adjustment to a rule, policy, practice, or service is needed because of a disability, HUD requires that HACA treat the information as a request for a reasonable accommodation, even if no formal request is made [Joint Statement of the Departments of HUD and Justice: Reasonable Accommodations under the Fair Housing Act].

The family must explain what type of accommodation is needed to provide the person with the disability full access to HACA's programs and services.

If the need for the accommodation is not readily apparent or known to HACA, the family must explain the relationship between the requested accommodation and the disability. There must be an identifiable connection, or nexus, between the requested accommodation and the individual's disability.

> HACA Policy
>
> HACA will encourage the family to make its request in writing using a reasonable accommodation request form. However, HACA will consider the accommodation any time the family indicates that an accommodation is needed whether or not a formal written request is submitted.

## 2-II.D. VERIFICATION OF DISABILITY

The regulatory civil rights definition for persons with disabilities is provided in Exhibit 2-1 at the end of this chapter. The definition of a person with a disability for the purpose of obtaining a reasonable accommodation is much broader than the HUD definition of disability, which is used for waiting list preferences and income allowances.

Before providing an accommodation, HACA must determine that the person meets the definition of a person with a disability, and that the accommodation will enhance the family's access to HACA's programs and services.

If a person's disability is obvious or otherwise known to HACA, and if the need for the requested accommodation is also readily apparent or known, no further verification will be required [Joint Statement of the Departments of HUD and Justice: Reasonable Accommodations under the Fair Housing Act].

If a family indicates that an accommodation is required for a disability that is not obvious or otherwise known to HACA, HACA must verify that the person meets the definition of a person with a disability, and that the limitations imposed by the disability require the requested accommodation.

When verifying a disability, HACA will follow the verification policies provided in Chapter 7. All information related to a person's disability will be treated in accordance with the confidentiality policies provided in Chapter 16. In addition to the general requirements that govern all verification efforts, the following requirements apply when verifying a disability:

> Third-party verification must be obtained from an individual identified by the family who is competent to make the determination. A doctor or other medical professional, a peer support

group, a non-medical service agency, or a reliable third party who is in a position to know about the individual's disability may provide verification of a disability [Joint Statement of the Departments of HUD and Justice: Reasonable Accommodations under the Fair Housing Act]

HACA must request only information that is necessary to evaluate the disability-related need for the accommodation. HACA will not inquire about the nature or extent of any disability.

Medical records will not be accepted or retained in the participant file.

In the event that HACA does receive confidential information about a person's specific diagnosis, treatment, or the nature or severity of the disability, HACA will dispose of it. In place of the information, HACA will note in the file that the disability and other requested information have been verified, the date the verification was received, and the name and address of the knowledgeable professional who sent the information [Notice PIH 2010-26].

## 2-II.E. APPROVAL/DENIAL OF A REQUESTED ACCOMMODATION [Joint Statement of the Departments of HUD and Justice: Reasonable Accommodations under the Fair Housing Act, Notice PIH 2010-26].

HACA must approve a request for an accommodation if the following three conditions are met:

The request was made by or on behalf of a person with a disability.

There is a disability-related need for the accommodation.

The requested accommodation is reasonable, meaning it would not impose an undue financial and administrative burden on HACA, or fundamentally alter the nature of HACA's HCV operations (including the obligation to comply with HUD requirements and regulations).

Requests for accommodations must be assessed on a case-by-case basis, taking into account factors such as the overall size of HACA's program with respect to the number of employees, type of facilities and size of budget, type of operation including composition and structure of workforce, the nature and cost of the requested accommodation, and the availability of alternative accommodations that would effectively meet the family's disability-related needs.

Before making a determination whether to approve the request, HACA may enter into discussion and negotiation with the family, request more information from the family, or may require the family to sign a consent form so that HACA may verify the need for the requested accommodation.

HACA Policy

After a request for an accommodation is presented, HACA will respond, in writing, within 30 calendar days.

If HACA denies a request for an accommodation because it is not reasonable (it would impose an undue financial and administrative burden or fundamentally alter the nature of HACA's operations), HACA will either list recommended alternatives or include a request to discuss with the family whether an alternative accommodation could effectively address the family's disability-related needs without a fundamental alteration to the HCV program

and without imposing an undue financial and administrative burden. The family will be given 30 days from the date of the written notice to respond and discuss alternative accommodations with HACA.

If the family does not respond to HACA within 30 days of the notice, or if HACA believes that the family has failed to identify a reasonable alternative accommodation after interactive discussion and negotiation, HACA will notify the family, in writing, of its determination within 30 days from the date of the most recent discussion or communication with the family. The notice will inform the family of the right to appeal HACA's decision through an informal review (applicants) or hearing (participants) process (see Chapter 14).

## 2-II.F. PROGRAM ACCESSIBILITY FOR PERSONS WITH HEARING OR VISION IMPAIRMENTS

HUD regulations require HACA to ensure that persons with disabilities related to hearing and vision have reasonable access to HACA's programs and services [24 CFR 8.6].

At the initial point of contact with each applicant, HACA shall inform all applicants of alternative forms of communication that can be used other than plain language paperwork.

HACA Policy

To meet the needs of persons with hearing impairments, TTD/TTY (text telephone display /teletype) communication will be available. This service is available through Relay Texas. Relay Texas provides telephone-interpreting service between people who can hear and those who are deaf, hard-of-hearing, deaf-blind or speech-disabled.

Additional accommodations include providing sign language interpreters, at HACA's expense, for scheduled appointments and meetings, upon advance request of the hearing impaired resident or applicant.

To meet the needs of persons with vision impairments, large-print and audio versions of key program documents will be made available upon request. When visual aids are used in public meetings or presentations, or in meetings with HACA staff, one-on-one assistance will be provided upon request.

Additional examples of alternative forms of communication include having material explained orally by staff, or having a third party representative (a friend, relative or advocate, named by the applicant/resident) to receive, interpret and explain housing materials and be present at all meetings.

## 2-II.G. PHYSICAL ACCESSIBILITY

HACA must comply with a variety of regulations pertaining to physical accessibility, including the following:

Notice PIH 2010-26

Section 504 of the Rehabilitation Act of 1973

The Americans with Disabilities Act of 1990

The Architectural Barriers Act of 1968

The Fair Housing Act of 1988

HACA's policies concerning physical accessibility must be readily available to applicants and participants. They can be found in three key documents:

This plan describes the key policies that govern HACA's responsibilities with regard to physical accessibility.

Notice PIH 2006-26 summarizes information about pertinent laws and implementing regulations related to non-discrimination and accessibility in federally funded housing programs.

HACA Plan provides information about self-evaluation, needs assessment, and transition plans.

The design, construction, or alteration of HACA facilities must conform to the Uniform Federal Accessibility Standards (UFAS). Newly constructed facilities must be designed to be readily accessible to and usable by persons with disabilities. Alterations to existing facilities must be accessible to the maximum extent feasible, defined as not imposing an undue financial and administrative burden on the operations of the HCV program.

When issuing a voucher to a family that includes an individual with disabilities, HACA will include a current list of available accessible units known to HACA and will assist the family in locating an available accessible unit, if necessary.

In general, owners must permit the family to make reasonable modifications to the unit. However, the owner is not required to pay for the modification and may require that the unit be restored to its original state at the family's expense when the family moves.

## 2-II.H. DENIAL OR TERMINATION OF ASSISTANCE

HACA's decision to deny or terminate the assistance of a family that includes a person with disabilities is subject to consideration of reasonable accommodation [24 CFR 982.552 (2)(iv)].

When applicants with disabilities are denied assistance, the notice of denial must inform them of HACA's informal review process and their right to request an informal review.  In addition, the notice must inform applicants with disabilities of their right to request reasonable accommodations to participate in the informal review process.

When a participant family's assistance is terminated, the notice of termination must inform them of HACA's informal hearing process and their right to request a hearing and reasonable accommodation.

When reviewing reasonable accommodation requests, HACA must consider whether any

mitigating circumstances can be verified to explain and overcome the problem that led to HACA's decision to deny or terminate assistance. If a reasonable accommodation will allow the family to meet the requirements, HACA must make the accommodation.

## PART III: IMPROVING ACCESS TO SERVICES FOR PERSONS WITH LIMITED ENGLISH PROFICIENCY (LEP)

### 2-III.A. OVERVIEW

Language for Limited English Proficiency Persons (LEP) can be a barrier to accessing important benefits or services, understanding and exercising important rights, complying with applicable responsibilities or understanding other information provided by the HCV program. In certain circumstances, failure to ensure that LEP persons can effectively participate in or benefit from federally assisted programs and activities may violate the prohibition under Title VI against discrimination based on national origin. This part incorporates the Final Guidance to Federal Assistance Recipients Regarding Title VI Prohibition against National Origin Discrimination Affecting Limited English Proficient Persons, published January 22, 2007, in the *Federal Register.*

HACA will take affirmative steps to communicate with people who need services or information in a language other than English. These persons will be referred to as Persons with Limited English Proficiency (LEP).

LEP is defined as persons who do not speak English as their primary language and who have a limited ability to read, write, speak or understand English. For the purposes of this administrative plan, LEP persons are HCV applicants and participants, and parents and family members of applicants and participants.

In order to determine the level of access needed by LEP persons, HACA will balance the following four factors: (1) the number or proportion of LEP persons eligible to be served or likely to be encountered by the Housing Choice Voucher program; (2) the frequency with which LEP persons come into contact with the program; (3) the nature and importance of the program, activity, or service provided by the program to people's lives; and (4) the resources available to HACA and costs. Balancing these four factors will ensure meaningful access by LEP persons to critical services while not imposing undue burdens on HACA.

### 2-III.B. ORAL INTERPRETATION

The PHA will offer competent interpretation services free of charge, upon request, to the LEP person.

> HACA Policy

> HACA will analyze the various kinds of contacts it has with the public, to assess language needs and decide what reasonable steps should be taken. "Reasonable steps" may not be reasonable where the costs imposed substantially exceed the benefits.

> Where feasible, HACA will train and hire bilingual staff to be available to act as interpreters and translators and will standardize documents.

Where persons with LEP desire, they will be permitted to use, at their own expense, an interpreter of their own choosing, in place of or as a supplement to the free language services offered by HACA. The interpreter may be a family member or friend.

## 2-III.C. WRITTEN TRANSLATION

Translation is the replacement of a written text from one language into an equivalent written text in another language.

HACA Policy

In order to comply with written-translation obligations, HACA will take the following steps:

HACA will provide written translations of vital documents for each eligible LEP language group that constitutes 5 percent or 1,000 persons, whichever is less, of the population of persons eligible to be served or likely to be affected or encountered. Such documents include but are not limited to: the housing application, briefing packet, annual recertification packet, notice of rent change, termination notice, and notice of informal hearing. Translation of other documents, if needed, can be provided upon request.

If there are fewer than 50 persons in a different LEP language group, HACA will not translate vital written materials, but will, upon request of the LEP person, provide competent oral interpretation of those written materials, free of cost.

HACA will also provide written notice in the primary language of the LEP language group of the right to receive competent oral interpretation of those written materials, free of cost.

## 2-III.D. IMPLEMENTATION PLAN

After completing the four-factor analysis and deciding what language assistance services are appropriate, HACA shall determine whether it is necessary to develop a written implementation plan to address the identified needs of the LEP populations it serves.

If HACA determines that it is not necessary to develop a written implementation plan, the absence of a written plan does not obviate the underlying obligation to ensure meaningful access by LEP persons to HACA's Housing Choice Voucher program and services.

HACA Policy
HACA has developed a written LEP plan/standard operating procedure. The following five steps were taken when developing the plan. HACA: (1) Identified persons with LEP who need language assistance; (2) identified language assistance measures; (3) trained staff; (4) provided notice to persons with LEP; and (5) is monitoring and updating the LEP plan as needed. The plan will be reviewed on an ongoing basis and will be updated as needed to address the needs of HACA's LEP population.

| EXHIBIT 2-1: DEFINITION OF A PERSON WITH A DISABILITY UNDER FEDERAL CIVIL RIGHTS LAWS [24 CFR Parts 8.3 and 100.201] |
|---|

A person with a disability, as defined under federal civil rights laws, is any person who:

Has a physical or mental impairment that substantially limits one or more of the major life activities of an individual, or

Has a record of such impairment, or

Is regarded as having such impairment

The phrase "physical or mental impairment" includes:

Any physiological disorder or condition, cosmetic or disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive; digestive; genito-urinary; hemic and lymphatic; skin; and endocrine; or

Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities. The term "physical or mental impairment" includes, but is not limited to: such diseases and conditions as orthopedic, visual, speech and hearing impairments, cerebral palsy, autism, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, mental retardation, emotional illness, drug addiction and alcoholism.

"Major life activities" includes, but is not limited to, caring for oneself, performing manual tasks, walking, seeing, hearing, breathing, learning, and/or working.

"Has a record of such impairment" means has a history of, or has been classified as having, a mental or physical impairment that substantially limits one or more major life activities.

"Is regarded as having an impairment" is defined as having a physical or mental impairment that does not substantially limit one or more major life activities but is treated by a public entity (such as HACA) as constituting such a limitation; has none of the impairments defined in this section but is treated by a public entity as having such an impairment; or has a physical or mental impairment that substantially limits one or more major life activities, only as a result of the attitudes of others toward that impairment.

The definition of a person with disabilities does not include:

Current illegal drug users

People whose alcohol use interferes with the rights of others

Persons who objectively pose a direct threat or substantial risk of harm to others that cannot be controlled with a reasonable accommodation under the HCV program

The above definition of disability determines whether an applicant or participant is entitled to any of the protections of federal disability civil rights laws. Thus, a person who does not meet this disability is not entitled to a reasonable accommodation under federal civil rights and fair housing laws and regulations.

## CHAPTER 3
## ELIGIBILITY INTRODUCTION

HACA is responsible for ensuring that every individual and family admitted to the HCV program meets all program eligibility requirements. This includes any individual approved to join the family after the family has been admitted to the program. The family must provide any information needed by HACA to confirm eligibility and determine the level of the family's assistance.

To be eligible for the HCV program:

The applicant family must:

- Qualify as a family as defined by HUD and HACA.

- Have income at or below HUD-specified income limits.

- Qualify on the basis of citizenship or the eligible immigrant status of family members.

- Provide social security number information for household members as required.

- Consent to HACA's collection and use of family information as provided for in HACA-provided consent forms.

- Not currently receiving a duplicative subsidy.


HACA must determine that the current or past behavior of household members does not include activities that are prohibited by HUD or HACA.

This chapter contains three parts:

Part I: Definitions of Family and Household Members. This part contains HUD and HACA definitions of family and household members and explains initial and ongoing eligibility issues related to these members.

Part II: Basic Eligibility Criteria. This part discusses income eligibility, and rules regarding citizenship, social security numbers, and family consent.

Part III: Denial of Assistance. This part covers factors related to an applicant's past or current conduct (e.g. criminal activity) that can cause HACA to deny assistance.

## PART I: DEFINITIONS OF FAMILY AND HOUSEHOLD MEMBERS

## 3-I.A. OVERVIEW

Some eligibility criteria and program rules vary depending upon the composition of the family requesting assistance. In addition, some requirements apply to the family as a whole and others apply to individual persons who will live in the assisted unit. This part provides information that is needed to correctly identify family and household members, and to apply HUD's eligibility rules.

## 3-I.B. FAMILY AND HOUSEHOLD [24 CFR 982.201(c); FR Notice 02/03/12; Notice PIH 2014-20]

The terms *family* and *household* have different meanings in the HCV program.

### Family

To be eligible for assistance, an applicant must qualify as a family. *Family* as defined by HUD includes, but is not limited to the following, regardless actual or perceived sexual orientation, gender identity, or marital status, a single person, who may be an elderly person, disabled person, near-elderly person, or any other single person; or a group of persons residing together. Such group includes, but is not limited to a family with or without children (a child who is temporarily away from the home because of placement in foster care is considered a member of the family), an elderly family, a near-elderly family, a disabled family, a displaced family, or the remaining member of a tenant family. The PHA has the discretion to determine if any other groups of persons qualify as a family.

> **Gender Identity** means actual or perceived gender characteristics.

> **Sexual orientation** means homosexuality, heterosexuality, or bisexuality.

> HACA Policy

A family also includes two or more individuals who are not related by blood, marriage, adoption, or other operation of law but who either can demonstrate that they have lived together previously or certify that each individual's income and other resources will be available to meet the needs of the family.

Each family must identify the individuals to be included in the family at the time of application and must notify HACA if the family's composition changes.

For minors who are not the head of household's children, the head of household must provide:

(1) A court order establishing custody; or

(2) Proof that the adult is receiving income for the child; or

(3) Records from the school or medical records which establish the unit as the child's residence; or

(4) Records from a non-profit or government agency providing services to the child which establish the unit as the child's residence; or

(5) A custodial affidavit or unsworn declaration from at least one of the parents authorizing the head of household to maintain custody of the minor and one of the documents from items identified in 1-4 above or

(6) Records or a letter from the Texas Department of Family and Regulatory Services indicating current placement of the child with the head of household when the child is a blood relative of the head of household.

### Household

*Household* is a broader term that includes additional people who, with HACA's permission, live in an assisted unit, such as live-in aides, foster children, and foster adults.

## 3-I.C. FAMILY BREAK-UP AND REMAINING MEMBER OF TENANT FAMILY

### Family Break-up [24 CFR 982.315]

Except under the following conditions, HACA has discretion to determine which members of an assisted family continue to receive assistance if the family breaks up:

- ☐ If the family breakup results from an occurrence of domestic violence, dating violence, sexual assault or stalking, HACA must ensure that the victim retains assistance. (For documentation requirements and policies related to domestic violence, dating violence, sexual assault and stalking, see section 16-IX.D of this plan.)

- • In accordance with Notice PIH 2017-08, for HUD–Veterans Affairs Supportive Housing (HUD–VASH) vouchers, when the veteran is the perpetrator of domestic violence, dating violence, sexual assault, stalking, or human trafficking, the victim must continue to be assisted. Upon termination of the perpetrator's HUD–VASH voucher, the victim should be given a regular HCV if one is available, and the perpetrator's HUD–VASH voucher should be used to serve another eligible family. If a regular HCV is not available, the victim will continue to use the HUD–VASH voucher, which must be issued to another eligible family upon the voucher's turnover.

- ☐ If a court determines the disposition of property between members of the assisted family, HACA is bound by the court's determination of which family members continue to receive assistance.

  <u>HACA Policy</u>

  When a family on the waiting list breaks up into two otherwise eligible families, only one of the new families may retain the original application date. Other former family members may make a new application with a new application date if the waiting list is open.

  If a family breaks up into two otherwise eligible families while receiving assistance, only one of the new families will continue to be assisted. The family may request a change of Head of Household unless HACA determines, in its sole discretion that the requested change is for the purpose of the family obtaining a benefit by circumventing a limitation or requirement of the housing program, federal statute, regulation or other PHA Policy.

  If a court determines the disposition of property between members of the applicant or resident family in a divorce or separation decree, HACA will abide by the court's determination.

  In the absence of a judicial decision or an agreement among the original family members,

HACA will determine which family will retain their placement on the waiting list or continue to receive assistance. In making its determination, HACA will take into consideration the following factors: (1) the interest of any minor children, including custody arrangements; (2) the interest of any ill, elderly, or disabled family members; (3) the interest of any family member who is the victim of domestic violence, dating violence, sexual assault or stalking, including a family member who was forced to leave an assisted unit as a result of such actual or threatened abuse; (4) any possible risks to family members as a result of criminal activity; and (5) the recommendations of social service professionals

### Remaining Member of a Tenant Family [24 CFR 5.403]

The HUD definition of family includes the *remaining member of a tenant family,* which is a member of an assisted family who remains in the unit when other members of the family have left the unit. Household members such as live-in aides, foster children, and foster adults do not qualify as remaining members of a family.

If dependents are the only "remaining members of a tenant family" and there is no family member able to assume the responsibilities of the head of household, see Chapter 6, Section 6-I.B, for the policy on "Caretakers for a Child."

## 3-I.D. HEAD OF HOUSEHOLD [24 CFR 5.504(b)]

*Head of household* means the adult member of the family who is considered the head for purposes of determining income eligibility and rent. The head of household is responsible for ensuring that the family fulfills all of its responsibilities under the program, alone or in conjunction with a co-head or spouse.

HACA Policy

The family may request a change of head of household.  The head of household must have the legal capacity to enter into a lease under state and local law. An emancipated minor under state law may be designated as head of household.  The head of household is responsible for ensuring that the family fulfills all of its responsibilities under the program, alone or in conjunction with a co- head or spouse.

HACA may deny the request to change the head of the household if it determines that the requested change is to circumvent the HCV wait list for another adult household member. Examples include, but are not limited to transferring the voucher to another adult when the head-of-household is no longer eligible for the HCV program or if the head-of-household decides to give up their voucher and move. Requests to change the head of household are subject to consideration of reasonable accommodation requests and extenuating circumstances.

## 3-I.E. SPOUSE, CO-HEAD, AND OTHER ADULT

A family may have a spouse or co-head, but not both [HUD-50058 IB, p. 13].

*Spouse* means the marriage partner of the head of household.

HACA Policy

A *marriage partner* includes the partner in a "common law" marriage as defined in Texas state law. The term "spouse" does not apply to friends, roommates, or significant others who are not marriage partners. A minor who is emancipated under state law may be designated as a spouse.

A *co-head* is an individual in the household who is equally responsible with the head of household for ensuring that the family fulfills all of its responsibilities under the program, but who is not a spouse. A family can have only one co-head.

HACA Policy

Minors who are emancipated under state law may be designated as a co-head.

*Other adult* means a family member, other than the head, spouse, or co-head, who is 18 years of age or older. Foster adults and live-in aides are not considered other adults.

## 3-I.F. DEPENDENT [24 CFR 5.603]

A *dependent* is a family member who is under 18 years of age or a person of any age who is a person with a disability or a full-time student, except that the following persons can never be dependents: the head of household, spouse, co-head, foster children/adults and live-in aides. Identifying each dependent in the family is important because each dependent qualifies the family for a dependent allowance as described in Chapter 6.

### Joint Custody of Dependents

HACA Policy

Dependents that are subject to a joint custody arrangement will be considered a member of the family, if they live with the applicant or participant family 50 percent or more of the time.

When more than one applicant or participant family is claiming the same dependents as family members, only the family with primary custody at the time of the initial examination or reexamination will be able to claim the dependents. If there is a dispute about which family should claim them, HACA will make the determination based on available documents such as signed court orders plus school enrollment records, proof of receipt of governmental assistance (i.e. food stamps, TANF, Social Security or SSI benefits) or an IRS return showing which family has claimed the child(ren) for income tax purposes.

## 3-I.G. FULL-TIME STUDENT [24 CFR 5.603; HCV GB, p. 5-29]

A *full-time student* (FTS) is a person who is attending school or vocational training on a full-time basis. The educational institution defines the time commitment or subject load that is needed to be full-time.

Identifying each FTS is important because: (1) each family member that is an FTS, other than the head, spouse, or co-head, qualifies the family for a dependent allowance, and (2) the earned income of such a FTS is treated differently from the income of other family members.

## 3-I.H. ELDERLY AND NEAR-ELDERLY PERSONS, AND ELDERLY FAMILY [24 CFR 5.100 and 5.403, FR Notice 02/03/12]

**Elderly Persons**

An *elderly person* is a person who is at least 62 years of age.

**Near-Elderly Persons**

A *near-elderly person* is a person who is 50-61 years of age.

**Elderly Family**

An *elderly family* is one in which the head, spouse, co-head, or sole member is an elderly person. Identifying elderly families is important because elderly families qualify for elderly family allowances as described in Chapter 6.

### 3-I.I. PERSONS WITH DISABILITIES AND DISABLED FAMILY [24 CFR 5.403, FR Notice 02/03/12]

#### Persons with Disabilities

Under the HCV program, special rules apply to persons with disabilities and to any family whose head, spouse, or co-head is a person with disabilities. The technical definitions of individual with handicaps and persons with disabilities are provided in Exhibit 3-1 at the end of this chapter. These definitions are used for a number of purposes including ensuring that persons with disabilities are not discriminated against based upon disability.

As discussed in Chapter 2, HACA must make all aspects of the HCV program accessible to persons with disabilities and consider reasonable accommodations requested based upon a person's disability.

#### Disabled Family

A *disabled family* is one in which the head, spouse, or co-head is a person with disabilities. Identifying disabled families is important because these families qualify for disabled family allowance as described in Chapter 6.

Even though persons with drug or alcohol dependencies are considered persons with disabilities this does not prevent HACA from denying assistance for reasons related to alcohol and drug abuse in accordance with policies found in Part III of this chapter, or from terminating assistance following the policies in Chapter 12.

### 3-I.J. GUESTS [24 CFR 5.100]

A *guest* is a person temporarily staying in the unit with the consent of a member of the household who has expressed or implied authority to such consent.

> HACA Policy
>
> A guest can remain in the assisted unit no longer than 30 consecutive days or a total of 90 cumulative calendar days during any 12-month period.  If the executed lease defines a shorter time frame for guest, the time period listed in the lease would prevail.
>
> For the purpose of deciding whether to terminate voucher assistance for alleged unauthorized guest, HACA will apply the thirty/ninety day test.
>
> Children who attend college or trade school but who may come home for the summer and during breaks are not subject to the time limitations of guests as described above.
>
> Children who are subject to a joint custody arrangement or for whom a family has visitation privileges, that are not included as a family member because they live outside of the assisted household more than 50 percent of the time, are not subject to the time limitations of guests as described above.

A family may request an exception to this policy for valid reasons (e.g., care of a relative recovering from a medical procedure is expected to last 40 consecutive days). An exception will not be made unless the family can identify and provide documentation of the residence to which the guest will return.

Guests who represent the unit address as their residence address for receipt of benefits or other purposes will be considered unauthorized occupants. In addition, guests who remain in the unit beyond the allowable time limit will be considered unauthorized occupants, and their presence constitutes violation of the lease.

## 3-I.K. FOSTER CHILDREN AND FOSTER ADULTS

A *foster adult* is a member of the household who is 18 years of age or older and meets the definition of a *foster adult* under state law. In general, a foster adult is a person who is 18 years of age or older, is unable to live independently due to a debilitating physical or mental condition, and is placed with the family by an authorized placement agency or by judgment, decree, or other order of any court of competent jurisdiction.

A *foster child* is a member of the household who meets the definition of a *foster child* under state law. In general, a foster child is placed with the family by an authorized placement agency (e.g., public child welfare agency) or by judgment, decree, or other order of any court of competent jurisdiction.

Foster children and foster adults who are living with an applicant or who have been approved by the PHA to live with a participant family are considered household members but not family members. The income of foster children/adults is not counted in family annual income, and foster children/adults do not qualify for a dependent deduction [24 CFR 5.603; HUD-50058 IB, p. 13].

> HACA Policy

> A foster child or foster adult may be allowed to reside in the unit if their presence would not result in a violation of space standards as described in Section 8-I.F. of this policy.

> HACA will require the applicant or tenant family to provide documentation to support such arrangement in their household.

Children that are temporarily absent from the home as a result of placement in foster care are discussed in Section 3-I.L.

## 3-I.L. ABSENT FAMILY MEMBERS

Individuals may be absent from the family, either temporarily or permanently, for a variety of reasons including educational activities, placement in foster care, employment, illness, incarceration, and court order.

### Definitions of Temporarily and Permanently Absent

> HACA Policy

Generally an individual who is or is expected to be absent from the assisted unit for 90 consecutive days or less is considered temporarily absent and continues to be considered a family member. Generally an individual who is or is expected to be absent from the assisted unit for more than 90 consecutive days is considered permanently absent and no longer a family member. Exceptions to this general policy are discussed below. However, the family may not be absent from the unit for a period of more than 180 consecutive calendar days in any circumstance, or for any reason. (24 CFR 982.312)

### Absent Students

<u>HACA Policy</u>

When someone who has been considered a family member attends school away from home, the person will continue to be considered a family member unless information becomes available to HACA indicating that the student has established a separate household or the family declares that the student has established a separate household. This applies at time of initial application as well.

To be considered a family member, the individual attending school must be enrolled in an accredited two or four-year College or training institution and the student will reside in the unit during holidays and summer breaks. For subsidy standards, the temporarily absent child will be counted as a family member.

### Absences Due to Placement in Foster Care [24 CFR 5.403]

Children temporarily absent from the home as a result of placement in foster care are considered members of the family.

<u>HACA Policy</u>

If a child has been placed in foster care, HACA will verify with the appropriate agency whether and when the child is expected to be returned to the home. Unless the agency confirms that the child has been permanently removed from the home, the child will be counted as a family member for initial eligibility and continued participation. For subsidy standards, the temporarily absent child will be counted as a family member.

### Absent Head, Spouse, or Co-head

<u>HACA Policy</u>

An employed head, spouse, or co-head absent from the unit more than 180 consecutive days due to employment or an employment situation that requires the employee to be away from the home will continue to be considered a family member.

### Family Members Permanently Confined for Medical Reasons [HCV GB, p. 5-22]

If a family member is confined to a nursing home or hospital on a permanent basis, that person is no longer considered a family member and the income of that person is not counted [HCV GB, p. 5-22].

<u>HACA Policy</u>

An individual confined to a nursing home or hospital on a permanent basis is not considered

a family member.

HACA will request verification of the family member's permanent absence from a responsible medical professional. If the responsible medical professional cannot provide a determination, the person will be considered temporarily absent.   If the family certifies that the family member is confined on a permanent basis, they may present, and HACA will consider, any additional documentation or evidence.

### Return of Permanently Absent Family Members

HACA Policy

The family must request HACA approval for the return of any adult family members that HACA previously determined to be permanently absent. The individual is subject to the eligibility and screening requirements discussed elsewhere in this chapter.

## 3-I.M. LIVE-IN AIDE

*A Live-in aide* is a person who resides with one or more elderly persons, or near-elderly persons, or persons with disabilities, and who: (1) is determined to be essential to the care and well-being of the persons, (2) is not obligated for the support of the persons, and (3) would not be living in the unit except to provide the necessary supportive services [24 CFR 5.403].

HACA must approve a live-in aide if needed as a reasonable accommodation in accordance with 24 CFR 8, to make the program accessible to and usable by the family member with disabilities.

The income of the live-in aide is not counted in the calculation of annual income for the family [24 CFR 5.609(b)]. Relatives may be approved as live-in aides if they meet all of the criteria defining a live-in aide.   Because live-in aides are not family members, a relative who serves as a live-in aide would not be considered a remaining member of a tenant family.

HACA Policy

A family's request for a live-in aide must be made in writing. Written verification will be required from a reliable, knowledgeable professional, such as a doctor, social worker, or case worker, that the live-in aide is essential for the care and well-being of the elderly, near-elderly, or disabled family member. At each annual re-examination, the head of household and the live-in aide must sign the live-in aide agreement form.  The live-in aide agreement includes a certification from the family and live-in aide stating that the live-in aid is (1) not obligated for the support of the person(s) needing the care, and (2) would not be living in the unit except to provide the necessary supportive services.

HACA has discretion not to approve a particular person as a live-in aide, and may withdraw such approval if [24 CFR 982.316(b)]:

   The person commits fraud, bribery or any other corrupt or criminal act in connection with any federal housing program;

   The person commits drug-related criminal activity or violent criminal activity; or

   The person currently owes rent or other amounts to HACA or to another PHA in

connection with Section 8 or public housing assistance under the 1937 Act.

Within 20 business days of receiving a request for a live-in aide, including all required documentation related to the request, HACA will notify the family of its decision in writing. If HACA denies the request for a live-in aide or denies approval of a particular live-in aide, the family may request an informal hearing within the required timeframe specified in the decision letter.

<div align="center">

### PART II: BASIC ELIGIBILITY CRITERIA

</div>

### 3-II.A. INCOME ELIGIBILITY AND TARGETING

**Income Limits**

HUD establishes income limits for all areas of the country and publishes them annually in the *Federal Register*. They are based upon estimates of median family income with adjustments for family size. The income limits are used to determine eligibility for the program and for income targeting purposes as discussed in this section.

**Definitions of the Income Limits [24 CFR 5.603(b)]**

**Low-income family** A family whose annual income does not exceed 80 percent of the median income for the area, adjusted for family size.

**Very low-income family** A family whose annual income does not exceed 50 percent of the median income for the area, adjusted for family size.

**Extremely low-income family** A very low-income family whose annual income does not exceed the higher of:

(1) The poverty guidelines established by the Department of Health and Human Services applicable to the family of the size involved (except in the case of families living in Puerto Rico or any other territory or possession of the United States); or

(2) Thirty (30) percent of the median income for the area, as determined by HUD, with adjustments for smaller and larger families, except that HUD may establish income ceilings higher or lower than 30 percent of the area median income for the area if HUD finds that such variations are necessary because of unusually high or low family incomes.

**Using Income Limits for Eligibility [24 CFR 982.201]**

Income limits are used for eligibility only at admission. Income eligibility is determined by comparing the annual income of an applicant to the applicable income limit for their family size. In order to be income eligible, an applicant family must be one of the following:

A *very low-income* family

A *low-income* family that has been "continuously assisted" under the 1937 Housing Act. A family is considered to be continuously assisted if the family is already receiving assistance

under any 1937 Housing Act program at the time the family is admitted to the HCV program [24 CFR 982.4; 24 CFR 982.201(b)]

> HACA Policy
>
> HACA will consider a family to be *continuously assisted* if the family was leasing a unit under any 1937 Housing Act program at the time they were selected from HACA's waiting list.

A low-income family that qualifies for voucher assistance as a non-purchasing household living in HOPE 1 (public housing homeownership), HOPE 2 (multifamily housing homeownership) developments, or other HUD-assisted multifamily homeownership programs covered by 24 CFR 248.173

A low-income or moderate-income family that is displaced as a result of the prepayment of a mortgage or voluntary termination of a mortgage insurance contract on eligible low-income housing as defined in 24 CFR 248.101

HUD permits HACA to establish additional categories of low-income families that may be determined eligible. The additional categories must be consistent with HACA plan and the consolidated plans for local governments within HACA's jurisdiction.

> HACA Policy
>
> HACA has not established any additional categories of eligible low-income families.

### Using Income Limits for Targeting [24 CFR 982.201]

At least 75 percent of the families admitted to HACA's program during the fiscal year must be extremely low-income families. HUD may approve exceptions to this requirement if HACA demonstrates that it has made all required efforts, but has been unable to attract an adequate number of qualified extremely low-income families.

Families continuously assisted under the 1937 Housing Act and families living in eligible low-income housing that are displaced as a result of prepayment of a mortgage or voluntary termination of a mortgage insurance contract are not counted for income targeting purposes.

## 3-II.B. CITIZENSHIP OR ELIGIBLE IMMIGRATION STATUS [24 CFR 5, Subpart E]

Housing assistance is available only to individuals who are U.S. citizens, U.S. nationals (herein referred to as citizens and nationals), or noncitizens that have eligible immigration status. At least one family member must be a citizen, national, or noncitizen with eligible immigration status in order for the family to qualify for any level of assistance.

All applicant families must be notified of the requirement to submit evidence of their citizenship status when they apply. Where feasible, and in accordance with HACA's Limited English Proficiency Plan, the notice must be in a language that is understood by the individual if the individual is not proficient in English.

### Declaration [24 CFR 5.508]

HUD requires each family member to declare whether the individual is a citizen, a national, or an eligible noncitizen, except those members who elect not to contend that they have eligible immigration status. Those who elect not to contend their status are considered to be ineligible noncitizens. For citizens, nationals and eligible noncitizens the declaration must be signed personally by the head, spouse, co-head, and any other family member 18 or older, and by a parent or guardian for minors. The family must identify in writing any family members who elect not to contend their immigration status (see Ineligible Noncitizens below). No declaration is required for live-in aides, foster children, or foster adults.

## U.S. Citizens and Nationals

In general, citizens and nationals are required to submit only a signed declaration as verification of their status. However, HUD regulations permit HACA to request additional documentation of their status, such as a passport.

> HACA Policy
>
> Family members who declare citizenship or national status will be required to provide additional documentation supporting the individual's declaration of citizenship and national status. Documents accepted included original birth certificate, original baptismal certificate, original naturalization certificate, and an unexpired INS card.

## Eligible Noncitizens

In addition to providing a signed declaration, those declaring eligible noncitizen status must sign a verification consent form and cooperate with HACA's efforts to verify their immigration status as described in Chapter 7. The documentation required for establishing eligible noncitizen status varies depending upon factors such as the date the person entered the U.S., the conditions under which eligible immigration status has been granted, the person's age, and the date on which the family began receiving HUD-funded assistance. Documentation reviewed and accepted will be in accordance with the Immigration and Nationality Act.

Lawful residents of the Marshall Islands, the Federated States of Micronesia, and Palau, together known as the Freely Associated States, or FAS, are eligible for housing assistance under section 141 of the Compacts of Free Association between the U.S. Government and the Governments of the FAS [Public Law 106-504].

## Ineligible Noncitizens

Those noncitizens who do not wish to contend their immigration status are required to have their names listed on a non-contending family members listing, signed by the head, spouse, or co-head (regardless of citizenship status), indicating their ineligible immigration status. HACA is not required to verify a family member's ineligible status and is not required to report an individual's unlawful presence in the U.S. to the United States Citizenship and Immigration Services (USCIS).

Providing housing assistance to noncitizen students is prohibited [24 CFR 5.522]. This prohibition extends to the noncitizen spouse of a noncitizen student as well as to minor children who accompany or follow to join the noncitizen student. Such prohibition does not extend to the citizen spouse of a noncitizen student or to the children of the citizen spouse and noncitizen student. Such a family is eligible for prorated assistance as a mixed family.

### Mixed Families

A family is eligible for assistance as long as at least one member is a citizen, national, or eligible noncitizen. Families that include eligible and ineligible individuals are considered *mixed families*. Such families will be given notice that their assistance will be prorated and that they may request a hearing if they contest this determination. See Chapter 6 for a discussion of how rents are prorated, and Chapter 16 for a discussion of informal hearing procedures.

### Ineligible Families [24 CFR 5.514(d), (e), and (f)]

HACA may elect to provide assistance to a family before the verification of the eligibility of the individual or one family member [24 CFR 5.512(b)]. Otherwise, no individual or family may be assisted prior to the affirmative establishment by HACA that the individual or at least one family member is eligible. Verification of eligibility for this purpose occurs when the individual or family members have submitted documentation to HACA in accordance with program requirements [24 CFR 5.512(a)].

> <u>HACA Policy</u>
>
> HACA will not provide assistance to a family before the verification of at least one family member as a citizen, national or eligible noncitizen is made.
>
> When HACA determines that an applicant family does not include any citizens, nationals, or eligible noncitizens, following the verification process, the family will be sent a written notice within 20 calendar days of the determination.
>
> The notice will explain the reasons for the denial of assistance, that the family may be eligible for proration of assistance, and will advise the family of its right to request an appeal to the United States Citizenship and Immigration Services (USCIS), or to request an informal hearing with HACA. The informal hearing with HACA may be requested in lieu of the USCIS appeal, or at the conclusion of the USCIS appeal process. The notice must also inform the applicant family that assistance may not be delayed until the conclusion of the USCIS appeal process, but that it may be delayed pending the completion of the informal hearing process.
>
> Informal hearing procedures are contained in <u>Chapter 16</u>.

### Timeframe for Determination of Citizenship Status [24 CFR 5.508(g)]

For new occupants joining the assisted family, HACA must verify status at the first interim or regular reexamination following the person's occupancy, whichever comes first.
If an individual qualifies for a time extension for the submission of required documents, HACA must grant such an extension for no more than 30 days [24 CFR 5.508(h)].
Each family member is required to submit evidence of eligible status only one time during continuous occupancy.

> <u>HACA Policy</u>
>
> HACA will verify the citizenship status of applicants at the time other eligibility factors are determined.

### 3-II.C. SOCIAL SECURITY NUMBERS [24 CFR 5.216, 5.218, Notice PIH 2018-24

The applicant and all members of the applicant's household must disclose the complete and accurate social security number (SSN) assigned to each household member, and the documentation necessary to verify each SSN.  If a child under age 6 has been added to an applicant family within 6 months prior to voucher issuance, an otherwise eligible family may be admitted to the program and must disclose and document the child's SSN within 90 days of the effective date of the initial HAP contract.   A detailed discussion of acceptable documentation is provided in Chapter 7.

*Note:* These requirements do not apply to noncitizens who do not contend eligible immigration status and existing program participants as of January 31, 2010, who have previously disclosed their SSN and HUD has determined the SSN to be valid.

In addition, each participant who has not previously disclosed an SSN, has previously disclosed an SSN that HUD or the SSA determined was invalid, or has been issued a new SSN must submit their complete and accurate SSN and the documentation required to verify the SSN at the time of the next interim or annual recertification. Participants age 62 or older as of January 31, 2010, whose determination of eligibility was begun before January 31, 2010, are exempt from this requirement and remain exempt even if they move to a new assisted unit.

HACA must deny assistance to an applicant family if they do not meet the SSN disclosure and documentation requirements contained in 24 CFR 5.216.

> HACA Policy
>
> If the provided documentation is not acceptable evidence of the social security number, HACA will explain to the applicant the reasons the document is not acceptable and request that the individual obtain and submit acceptable documentation of the SSN to HACA within 90 calendar days.  The explanation and request will be documented in the applicant file.  If the applicant family is otherwise eligible to participate in the program, the family will maintain its position on the waiting list for this 90 calendar day period.
>
> If all household members have not disclosed their SSN at the time a voucher becomes available, the available voucher will be offered to the next eligible applicant family on the waiting list.  At the conclusion of the 90 calendar day period and if the applicant family has still not submitted acceptable evidence of the SSN, HACA will grant the family an additional 90 calendar day period to comply with the SSN disclosure and documentation requirement if the family was unable to comply with the requirements due to circumstances that could not have reasonably been foreseen and were outside the control of the family.

If a child under the age of 6 years was added to the assistance applicant household within the 6-month period prior to the household's date of admission, the assistance applicant may become a participant, so long as the documentation required in this section is provided to the processing entity within 90 calendar days from the date of admission into the program. The processing entity must grant an extension of one additional 90-day period if the processing entity determines that, in its discretion, the assistance applicant's failure to comply was due to circumstances that could not reasonably have been foreseen and were outside the control of the assistance applicant. If the applicant family fails to

produce the documentation required in this section within the required time period, the housing authority may terminate assistance or tenancy of the individual participant or the entire family.

### HACA Policy

HACA will grant one additional 90-day extension if needed for reasons beyond the resident's control such as delayed processing of the SSN application by the SSA, natural disaster, fire, death in the family or other emergency.

### 3-II.D. FAMILY CONSENT TO RELEASE OF INFORMATION [24 CFR 5.232, HCV GB, p. 5-13]

HUD requires each adult family member, and the head of household, spouse, or co-head, regardless of age, to sign form HUD-9886, Authorization for the Release of Information/Privacy Act Notice, the form HUD-52675 Debts Owed to Public Housing Agencies and Terminations, and other consent forms as needed to collect information relevant to the family's eligibility and level of assistance. Chapter 7 provides detailed information concerning the consent forms and verification requirements. The consent form remains effective until the family is denied assistance, assistance is terminated, or the family provides written notification to revoke consent.

> HACA must deny admission to the program if any member of the applicant family fails to sign and submit the consent forms for obtaining information in accordance with 24 CFR 5, Subparts B and F [24 CFR 982.552(b)(3)].

However, this does not apply if the applicant or participant, or any member of their family, revokes their consent with respect to the ability of HACA to access financial records from financial institutions, unless HACA establishes a policy that revocation of consent to access financial records will result in denial or termination of assistance or admission [24 CFR 5.232(c)]

> HACA Policy

> HACA has established a policy that revocation of consent to access financial records will result in denial of admission and termination of assistance.

### 3-II.E. STUDENTS ENROLLED IN INSTITUTIONS OF HIGHER EDUCATION [24 CFR 5.612 and FR Notice 4/10/06, FR Notice 9/21/16]

Section 327 of Public Law 109-115 and the implementing regulation at 24 CFR 5.612 established new restrictions on the eligibility of certain students (both part- and full-time) who are enrolled in institutions of higher education.

If a student enrolled at an institution of higher education is under the age of 24, is not a veteran, is not married, does not have a dependent child, and is not a person with disabilities receiving HCV assistance as of November 30, 2005, the student's eligibility must be examined along with the income eligibility of the student's parents. In these cases, both the student and the student's parents must be income eligible for the student to receive HCV assistance. If, however, a student in these circumstances is determined independent from their parents in accordance with PHA Policy, the income of the student's parents will not be considered in determining the student's eligibility.

The new law does not apply to students who reside with parents who are applying to receive HCV assistance. It is limited to students who are seeking assistance on their own, separately from their parents.

**Definitions**

In determining whether and how the new eligibility restrictions apply to a student, HACA will rely on the following definitions [FR 4/10/06, FR Notice 9/21/16].

### Dependent Child

In the context of the student eligibility restrictions, *dependent child* means a dependent child of a student enrolled in an institution of higher education. The dependent child must also meet the definition of *dependent* in 24 CFR 5.603, which states that the dependent must be a member of the assisted family, other than the head of household or spouse, who is under 18 years of age, or is a person with a disability, or is a full-time student. Foster children and foster adults are not considered dependents.

ndependent Student

<u>HACA Policy</u>

HACA will consider a student "independent" from their parents and the parents' income will not be considered when determining the student's eligibility if the following four criteria are all met:

The individual is of legal contract age under state law.

The individual has established a household separate from their parents for at least one year prior to application for occupancy or the individual meets the U.S. Department of Education's definition of independent student.

**To be considered an *independent student* according to the Department of Education, a student must meet one or more of the following criteria:**

The individual is at least 24 years old by December 31 of the award year for which aid is sought.

The individual is an orphan, in foster care, or a ward of the court or was an orphan, in foster care, or ward of the court at any time when the individual was 13 years of age or older.

The individual is, or was immediately prior to attaining the age of majority, an emancipated minor or in legal guardianship as determined by a court of competent jurisdiction in the individual's state of legal residence.

The individual is a veteran of the U.S. Armed Forces or is currently serving on active duty in the Armed Forces for other than training purposes.

The individual is a graduate or professional student

The individual is married

The individual has one or more legal dependents other than a spouse (for example, dependent children or an elderly dependent parent).

The individual has been verified during the school year in which the application is submitted as either an unaccompanied youth who is a homeless child or youth, or as unaccompanied, at risk of homelessness, and self-supporting by:

> A local educational agency homeless liaison.

> The director of a program funded under subtitle B of title IV of the McKinney-Vento Homeless Assistance Act or a designee of the director.

> A financial aid administrator

> The individual is a student for whom a financial aid administrator makes a documented determination of independence by reason of other unusual circumstances.

> The individual was not claimed as a dependent by their parents pursuant to IRS regulations, as demonstrated on the parents' most recent tax forms.

> The individual provides a certification of the amount of financial assistance that will be provided by their parents. This certification must be signed by the individual providing the support and must be submitted even if no assistance is being provided.

> If the PHA determines that an individual meets the definition of a *vulnerable youth* such a determination is all that is necessary to determine that the person is an *independent student* for the purposes of using only the student's income for determining eligibility for assistance.

HACA will verify that a student meets the above criteria in accordance with the policies in Section 7-II.E.

## Institution of Higher Education

HACA will use the statutory definition under section 102 of the Higher Education Act of 1965 to determine whether a student is attending an *institution of higher education* (see Exhibit 3-2).

### *Parents*

> <u>HACA Policy</u>

> For purposes of student eligibility restrictions, the definition of *parents* includes biological or adoptive parents, stepparents (as long as they are currently married to the biological or adoptive parent), and guardians (e.g., grandparents, aunt/uncle, godparents, etc.).

### *Person with Disabilities*

HACA will use the statutory definition under section 3(b)(3)(E) of the 1937 Act to determine whether a student is a *person with disabilities* (see Exhibit 3-1).

### *Veteran*

HACA Policy

A *veteran* is a person who served in the active military, naval, or air service and who was discharged or released from such service under conditions other than dishonorable.

### *Vulnerable Youth*

HACA Policy

A *vulnerable youth* is an individual who meets the U.S. Department of Education's definition of *independent student* in paragraphs (b), (c), or (h), as adopted in Section II of FR Notice 9/21/16:

> The individual is an orphan, in foster care, or a ward of the court, or was an orphan, in foster care, or ward of the court at any time when the individual was 13 years of age or older

> The individual is, or was immediately prior to attaining the age of majority, an emancipated minor or in legal guardianship as determined by a court of competent jurisdiction in the individual's state of legal residence

> The individual has been verified during the school year in which the application is submitted as either an unaccompanied youth who is a homeless child or youth, or as unaccompanied, at risk of homelessness, and self-supporting by:

>> A local educational agency homeless liaison

>> The director of a program funded under subtitle B of title IV of the McKinney-Vento Homeless Assistance Act or a designee of the director

>> A financial aid administrator

### Determining Student Eligibility

If a student is applying for assistance on their own, apart from their parents, HACA must determine whether the student is subject to the eligibility restrictions contained in 24 CFR 5.612. If the student is subject to those restrictions, HACA must ensure that: (1) the student is individually eligible for the program, (2) either the student is independent from their parents or the student's parents are income eligible for the program, and (3) the "family" with which the student is applying is collectively eligible for the program.

HACA Policy

For any student who is subject to the 5.612 restrictions, HACA will:

> Follow its usual policies in determining whether the student individually and the student's "family" collectively is eligible for the program

> Determine whether the student is independent from their parents in accordance with the definition of *independent student* in this section

Follow the policies below, if applicable, in determining whether the student's parents are income eligible for the program

If HACA determines that the student, the student's parents (if applicable), or the student's "family" is not eligible, HACA will send a notice of denial in accordance with the policies in Section 3-III.F, and the applicant family will have the right to request an informal review in accordance with the policies in Section 16-III.B.

### Determining Parental Income Eligibility

<u>HACA Policy</u>

For any student who is subject to the 5.612 restrictions and who does not satisfy the definition of *independent student* in this section, HACA will determine the income eligibility of the student's parents as follows:

If the student's parents are married and living together, HACA will obtain a joint income declaration and certification of joint income from the parents.

If the student's parent is widowed or single, HACA will obtain an income declaration and certification of income from that parent.

If the student's parents are divorced or separated, HACA will obtain an income declaration and certification of income from each parent.

If the student has been living with one of their parents and has not had contact with or does not know where to contact their other parent, HACA will require the student to submit a certification under penalty of perjury describing the circumstances and stating that the student does not receive financial assistance from the other parent. HACA will then obtain an income declaration and certification of income from the parent with whom the student has been living or had contact.

In determining the income eligibility of the student's parents, HACA will use the income limits for the jurisdiction in which the parents live.

## 3-II.F. EIV SYSTEM SEARCHES [Notice PIH 2018-18; EIV FAQs; EIV System Training 9/30/20]

### Existing Tenant Search

Prior to admission to the program, the PHA must search for all household members using the EIV Existing Tenant Search module. The PHA must review the reports for any SSA matches involving another PHA or a multifamily entity and follow up on any issues identified. The PHA must provide the family with a copy of the Existing Tenant Search results if requested. At no time may any family member receive duplicative assistance.

If the tenant is a new admission to the PHA, and a match is identified at a multifamily property, the

PHA must report the program admission date to the multifamily property and document the notification in the tenant file. The family must provide documentation of move-out from the assisted unit, as applicable.

> HACA Policy
>
> HACA will contact the PHA or owner identified in the report to confirm that the family has moved out of the unit and obtain documentation of current tenancy status, including a form HUD-50058 or 50059, as applicable, showing an end of participation. HACA will only approve assistance contingent upon the move-out from the currently occupied assisted unit.**Debts Owed to PHAs and Terminations**

All adult household members must sign the form HUD-52675 Debts Owed to Public Housing and Terminations. Prior to admission to the program, the PHA must search for each adult family member in the Debts Owed to PHAs and Terminations module.

If a current or former tenant disputes the information in the module, the tenant should contact the PHA directly in writing to dispute the information and provide any documentation that supports the dispute. If the PHA determines that the disputed information is incorrect, the PHA will update or delete the record from EIV. Former tenants may dispute debt and termination information for a period of up to three years from the end of participation date in the program.

> HACA Policy
>
> HACA will require each adult household member to sign the form HUD-52675 once at the eligibility determination. Any new members added to the household after admission will be required to sign the form HUD-52675 prior to being added to the household.
>
> HACA will search the Debts Owed to PHAs and Terminations module as part of the eligibility determination for new households and as part of the screening process for any household members added after the household is admitted to the program. If any information on debts or terminations is returned by the search, HACA will determine if this information warrants a denial in accordance with the policies in Part III of this chapter.

**Income and Income Validation Tool (IVT) Reports**

For each new admission, the PHA is required to review the EIV Income and IVT Reports to confirm and validate family reported income within 120 days of the IMS/PIC submission date of the new admission. The PHA must print and maintain copies of the EIV Income and IVT reports in the tenant file and resolve any discrepancies with the family within 60 days of the EIV Income or IVT report dates.

## PART III: DENIAL OF ASSISTANCE

### 3-III.A. OVERVIEW

A family that does not meet the eligibility criteria discussed in Parts I and II, must be denied assistance. In this section we will discuss other situations and circumstances in which denial of assistance is mandatory and those in which denial of assistance is optional.

While the regulations state that the PHA must prohibit admission for certain types of criminal activity and give the PHA the option to deny for other types of previous criminal history, more recent HUD rules and OGC guidance must also be taken into consideration when determining whether a particular individual's criminal history merits denial of admission.

When considering any denial of admission, PHAs may not use arrest records as the basis for the denial. Further, HUD does not require the adoption of "One Strike" policies and reminds PHAs of their obligation to safeguard the due process rights of applicants and tenants [Notice PIH 2015-19].

HUD's Office of General Counsel issued a memo on April 4, 2016, regarding the application of Fair Housing Act standards to the use of criminal records. This memo states that a PHA violates the Fair Housing Act when their policy or practice has an unjustified discriminatory effect, even when the PHA had no intention to discriminate. Where a policy or practice that restricts admission based on criminal history has a disparate impact on a particular race, national origin, or other protected class, that policy or practice is in violation of the Fair Housing Act if it is not necessary to serve a substantial, legitimate, nondiscriminatory interest of the PHA, or if that interest could be served by another practice that has a less discriminatory effect [OGC Memo 4/4/16].

PHAs who impose blanket prohibitions on any person with any conviction record, no matter when the conviction occurred, what the underlying conduct entailed, or what the convicted person has done since then will be unable to show that such policy or practice is necessary to achieve a substantial, legitimate, nondiscriminatory interest. Even a PHA with a more tailored policy or practice that excludes individuals with only certain types of convictions must still prove that its policy is necessary. To do this, the PHA must show that its policy accurately distinguishes between criminal conduct that indicates a demonstrable risk to resident safety and property and criminal conduct that does not.

### Forms of Denial [24 CFR 982.552(a)(2); HCV GB, p. 5-35]

Denial of assistance includes any of the following:

   Not placing the family's name on the waiting list

   Denying or withdrawing a voucher

   Refusing to enter into a HAP contract or approve a lease

   Refusing to process a request for or to provide assistance under portability procedures

### Prohibited Reasons for Denial of Program Assistance **[24 CFR 982.202(b), 24 CFR 5.2005(b)]**

HUD rules prohibit denial of program assistance to the program based on any of the following criteria:

Age, disability, race, color, religion, sex, or national origin (See Chapter 2 for additional information about fair housing and equal opportunity requirements.)

Where a family lives prior to admission to the program

Where the family will live with assistance under the program. Although eligibility is not affected by where the family will live, there may be restrictions on the family's ability to move outside HACA's jurisdiction under portability. (See Chapter 10.)

Whether members of the family are unwed parents, recipients of public assistance, or children born out of wedlock

Whether the family includes children

Whether a family decides to participate in a family self-sufficiency program.

Whether or not a qualified applicant is or has been a victim of domestic violence, dating violence, sexual assault or stalking if the applicant is otherwise qualified for assistance (See section 3-III.G.)

## 3-III.B. MANDATORY DENIAL OF ASSISTANCE [24 CFR 982.553(a)]

HUD requires HACA to deny assistance in the following cases:

Any member of the household has been evicted from federally-assisted housing in the last 3 years for drug-related criminal activity.  HUD also permits public housing authorities to adopt a policy to deny admissions or terminate assistance if any member of the family has been evicted from federally assisted housing in the last five years (24 CFR 982.552 (c) (1) (ii).  HUD also permits, but does not require, HACA to admit an otherwise-eligible family if the household member has completed HACA-approved drug rehabilitation program or the circumstances which led to eviction no longer exist (e.g., the person involved in the criminal activity no longer lives in the household).

> HACA Policy
>
> Mandatory denials for criminal activity is described below under Criminal Activity Screening Criteria.

## 3-III.C. OTHER PERMITTED REASONS FOR DENIAL OF ASSISTANCE

HUD permits, but does not require, HACA to deny assistance for the reasons discussed in this

section.

> HACA will conduct an individualized assessment of each candidate's application. In making a decision to deny admission, HACA will consider the factors discussed in Sections 3-III.E and 3-III.F. Upon consideration of such factors, HACA may, on a case-by-case basis, decide not to deny admission.

> HACA will consider the existence of mitigating factors, such as loss of employment or other financial difficulties, before denying admission to an applicant based on the failure to meet prior financial obligations.

### Preliminary Eligibility Criteria

All applications will be screened for preliminary eligibility before they are added to the HACA voucher waiting list. If an applicant is found to be preliminarily ineligible, their application will not be added to the program's waiting list. The following criteria shall be used to determine preliminary ineligibility.

> An applicant is deemed preliminarily ineligible and shall be rejected and not placed on the HACA HCV waiting list if currently housed in this same program and listed as the head of household or co-head of household.

HACA complies with all Fair Housing laws. Applicants have the right to request a Reasonable Accommodation. HACA will consider all Reasonable Accommodation requests under the Fair Housing Act and Section 504 of the American Disabilities Act. Information related to the Fair Housing Act, Section 504 and Requests for Reasonable Accommodation will be included in the denial letters.

If the basis for the denial relates to family violence, the applicant may qualify for an exception under the VAWA Amendments. Information related to VAWA will be included in the denial letters.

### Criminal Activity Screening Criteria [24 CFR 982.553]

This section outlines HACA's screening criteria when considering an applicant's history of criminal activity involving crimes of physical violence to persons or property and other criminal acts that would adversely affect the health, safety or welfare of other tenants.

> <u>HACA Policy</u>

> If any household member has been convicted of the following criminal activities, during the designated review (look back) period, the family will be denied admission. The designated review period commences as of the date of the criminal offense.

> ### MANDATORY DENIAL OF ASSISTANCE [24 CFR 982.553(a)]

> HACA aims to screen applicants fairly and in a manner that seeks to reduce barriers for

persons with criminal histories.

<u>HACA Policy</u>

The following describes HACA's policy as it relates to HUD's mandatory denial language. Per 24 CFR 982.553 (a), HACA must prohibit admissions for the following reasons:

1) Any member of the household has been evicted from federally-assisted housing in the last 3 years for drug-related criminal activity.

   a)  HACA may consider admitting the applicant if the evicted household member who engaged in drug-related criminal activity has successfully completed a supervised drug rehabilitation program approved by HACA or;

   b)  The circumstances leading to eviction no longer exist (for example, the criminal household member has died or is imprisoned).

2) HACA determines that a household member is currently engaging in illegal use of a drug.

3) HACA determines that it has reasonable cause to believe that a household member's illegal drug use or a pattern of illegal drug use may threaten the health, safety, or right to peaceful enjoyment of the premises by other residents.

4) Any household member has ever been convicted of drug-related criminal activity for manufacture or production of methamphetamine on the premises of federally assisted housing or any location.

5) Any member of the household is subject to a lifetime sex offender registration requirement under a state sex offender registration program or as required under federal law. HACA will perform criminal history background checks necessary to determine whether any household member is subject to a lifetime sex offender registration requirement in the state where the housing is located and in other states where the household members are known to have resided.

   As it relates to #2 above, currently engaged in the illegal use of a drug includes recent behavior within 12 months.

   As it relates to #2 and #3 above, HACA may consider admitting the applicant if the household member who engaged in the drug-related criminal activity has successfully completed a supervised drug rehabilitation program approved by HACA or the household member who engaged in the drug-related criminal activity no longer lives in the household.

**HACA will not deny an application solely on the basis of an arrest.** If, however, HACA receives arrest information for a disqualifying activity, in addition to a prior conviction within a respective look-back period, it may take that arrest into consideration in making a decision with regard to an applicant's assistance. Additional information may be considered, if available, including police reports, statements, disposition of criminal charges such as abandonment, plea, dismissal, prosecution or acquittal, and any other evidence relevant to determining whether or not the applicant engaged in the disqualifying activity. In sum, any evidence of criminal conduct will be considered if it indicates a demonstrable risk to safety of residents and/or property.

## Individualized Assessment

In making its decision to deny assistance, HACA will consider the criminal background discussed in Sections 3-III.E and 3-III.F, on an individual and case-by-case basis taking into consideration the nature and gravity of the offense and any other mitigating factors known and available. Upon consideration of such factors, HACA may, on a case-by-case basis, decide not to deny assistance.

## Previous Behavior in Assisted Housing [24 CFR 982.552 c]

HUD authorizes HACA to deny admission based on relevant information pertaining to the family's previous behavior in assisted housing.

In the event of the receipt of unfavorable information with respect to an applicant, HACA must consider the time, nature and extent of the applicant's conduct (including the seriousness of the offense). As discussed in Section 3-III.F, HACA may also need to consider whether the cause of the unfavorable information may be that the applicant is the victim of domestic violence, dating violence or stalking.

### HACA Policy

HACA will deny admission to an applicant family for the following reasons.

1) If the head of household, spouse, or co-head owes rent or other amounts to HACA or any other PHA in connection with Section 8 or other public housing assistance under the 1937 Act. Any amounts owed to HACA or other federally subsidized programs will have to be repaid by the applicant before Admissions approval.

2) Misrepresented or does not provide complete information related to eligibility, including income, award of preferences for admission, expenses, family composition or rent.

3) Any family member has committed fraud, bribery or any other corrupt or criminal act in connection with any federal housing program. This includes intentional misrepresentation of citizenship or immigration status within the last four years.

4) Refuses to sign and submit consent forms for obtaining information necessary to determine eligibility and continued eligibility for housing assistance.

5) Any family member currently under eviction status or that has been evicted

from federally-assisted housing in the last three years.

6) Has engaged in or threatened violent or abusive behavior that threaten the health or safety of property owners, management staff, HACA staff, persons performing contract administration functions or other responsibilities on behalf of HACA including contractors, subcontractors or agents  within the last four years.

Abusive or violent behavior towards HACA personnel includes verbal as well as physical abuse or violence. Use of racial epithets, or other language, written or oral, that is customarily used to intimidate may be considered abusive or violent behavior.

*Threatening* refers to oral or written threats or physical gestures that communicate intent to abuse or commit violence.

3-III.D. SCREENING

### Screening for Eligibility

HACA is authorized to obtain criminal conviction records from law enforcement agencies to screen applicants for admission to the HCV program. This authority assists HACA in complying with HUD requirements and PHA policies to deny assistance to applicants who are engaging in or have engaged in certain criminal activities. In order to obtain access to the records HACA must require every applicant family to submit a consent form signed by each adult household member [24 CFR 5.903].

> HACA Policy
>
> HACA requires criminal background checks for all applicant household and family members 18 years of age or older. HACA will use a third-party vendor or other government agency to provide the criminal history reports. The report will be requested after a consent form has been signed. The report encompasses a national criminal history search.

HACA is required to perform criminal background checks necessary to determine whether any household member is subject to a lifetime registration requirement under a state sex offender program in the state where the housing is located, as well as in any other state where a household member is known to have resided [24 CFR 982.553(a)(2)(i)].

> HACA Policy
>
> An online National Sex Offender check covering sex offender registries in all states is performed for all adults.

Additionally, HACA must ask whether the applicant, or any member of the applicant's household, is subject to a lifetime registered sex offender registration requirement in any state [Notice PIH 2012-28].

### Applicants' Grievance Procedure

If HACA proposes to deny admission based on a criminal record or on sex offender registration information, HACA must notify the household of the proposed action and must provide the subject of the record and the applicant a copy of the record and an opportunity to dispute the accuracy and relevance of the information prior to a denial of admission [24 CFR 5.903(f) and 5.905(d)]. Individuals denied admissions based on criminal record or sex offender registration information will be permitted to present mitigating and extenuating reasons for why they should be considered in light of a conviction including facts and circumstances surrounding criminal conduct, age at the time of conviction, evidence of good tenant history, employment, or rehabilitation.

> HACA Criminal Record Policy & Process
>
> HACA complies with HUD requirements, including 24 CFR 5.903(f) and 5.905(d) in the

following manner:

- <u>Authorization</u> -- HACA will require each household member age 17 and older to sign a consent form allowing HACA to request the criminal history report.

- <u>Criminal Records</u> --Once the consent is signed, HACA will request the criminal history report from its third party vendor or other government agency.  HACA does not obtain criminal conviction records directly from law enforcement agencies.

- <u>Information Sharing</u> -- Upon review of the criminal history report, if there is information on the report that may be grounds for denial, HACA will share the information with the applicant and provide an opportunity for the family to dispute the accuracy of the information or provide additional relevant information.

- <u>Notice of Denial</u>-- After review of the report and any information provided by the family, HACA will determine if a denial is applicable.  If a denial is warranted, a written notice of denial will be given to the family if they are present or mailed if they are not. The notice will provide the detailed summary of the criminal history that caused the reason for the proposed denial.

- <u>Right to Appeal</u> --Additionally, the denial notice will advise the applicant of the right to request an informal hearing to dispute the accuracy of the data and the basis for the denial. The request must be made in writing within 15 calendar days of the date of the denial notice. If the family fails to request an informal hearing within 15 calendar days of the date of the official denial letter, the denial shall become final.

## Screening for Suitability as a Tenant [24 CFR 982.307]

HACA has no liability or responsibility to the owner for the family's behavior or suitability for tenancy. HACA has the authority to conduct additional screening to determine whether an applicant is likely to be a suitable tenant.

> <u>HACA Policy</u>
>
> HACA will not conduct additional screening to determine an applicant family's suitability for tenancy.

The owner is responsible for screening and selection of the family to occupy the owner's unit. HACA must inform the owner that screening and selection for tenancy is the responsibility of the owner. An owner may consider a family's history with respect to factors such as: payment of rent and utilities, caring for a unit and premises, respecting the rights of other residents to the peaceful enjoyment of their housing, criminal activity that is a threat to the health, safety or property of others, and compliance with other essential conditions of tenancy.

HUD requires HACA to provide prospective owners with the family's current and prior address (as shown in HACA records) and the name and address (if known) of the owner at the family's current and prior addresses. HUD permits HACA to provide owners with additional information, as long as families are notified that the information will be provided, and the same type of

information is provided to all owners.

HACA may not disclose to the owner any confidential information provided to HACA by the family in response to a PHA request for documentation of domestic violence, dating violence, sexual assault or stalking except at the written request or with the written consent of the individual providing the documentation [24 CFR 5.2007(a)(4)].

> HACA Policy
>
> HACA will inform owners of their responsibility to screen prospective tenants upon request and will provide owners with the required known name and address information, at the time of the initial HQS inspection or before. HACA will not provide any additional information to the owner, such as tenancy history or criminal history.

### 3-III.E. CRITERIA FOR DECIDING TO DENY ASSISTANCE

#### Evidence [24 CFR 982.553(c)]

> HACA Policy
>
> HACA will use the concept of the preponderance of the evidence as the standard for making all admission decisions.
>
> *Preponderance of the evidence* is defined as evidence which is of greater weight or more convincing than the evidence which is offered in opposition to it; that is, evidence which as a whole shows that the fact sought to be proved is more probable than not. Preponderance of the evidence may not be determined by the number of witnesses, but by the greater weight of all evidence.

#### Consideration of Circumstances [24 CFR 982.552(c)(2)]

HUD authorizes HACA to consider all relevant circumstances when deciding whether to deny assistance based on a family's past history except in the situations for which denial of assistance is mandatory (see Section 3-III.B).

> HACA Policy
>
> HACA will consider the following factors prior to making its decision:
>
> The seriousness of the case, especially with respect to how it would affect other residents' safety or property.
>
> The effects that denial of assistance may have on other members of the family who were not involved in the action or failure to act
>
> The extent of participation or culpability of individual family members, including whether the culpable family member is a minor or a person with disabilities, or (as discussed further in section 3-III.G) a victim of domestic violence, dating violence, sexual assault or stalking.
>
> The length of time since the violation occurred, including the age of the individual at the time of the conduct, as well as the family's recent history and the likelihood of favorable conduct in the future.

Evidence of the applicant family's participation in social service or other appropriate counseling service programs.

In the case of drug or alcohol abuse, whether the culpable household member is participating in or has successfully completed a supervised drug or alcohol rehabilitation program or has otherwise been rehabilitated successfully.

HACA will require the applicant to submit evidence of the household member's current participation in or successful completion of a supervised drug or alcohol rehabilitation program, or evidence of otherwise having been rehabilitated successfully.

If previously incarcerated, the length of time the culpable family member has been released into society.

## Removal of a Family Member's Name from the Application

Should the HACA's screening process reveal that an applicant's household includes an individual subject to state lifetime registered sex offender registration; the PHA must offer the family the opportunity to remove the ineligible family member from the household. If the family is unwilling to remove that individual from the household, HACA must deny admission to the family [Notice PIH 2012-28].

For other criminal activity, HACA may permit the family to exclude the culpable family members as a condition of eligibility. [24 CFR 982.552(c)(2)(ii)].

HACA Policy

As a condition of receiving assistance, a family may agree to remove the culpable family member from the application. In such instances, the head of household must certify that the family member will not be permitted to visit, stay as a guest, or reside in the assisted unit.

After admission to the program, the family must present evidence of the former family member's current address upon HACA's request.

## Reasonable Accommodation [24 CFR 982.552(c)(2)(iv)]

If the family includes a person with disabilities, HACA's decision concerning denial of admission is subject to consideration of reasonable accommodation in accordance with 24 CFR Part 8.

HACA Policy

If the family indicates that the behavior of a family member with a disability is the reason for the proposed denial of assistance, HACA will determine whether the behavior is related to the disability. If so, upon the family's request, HACA will determine whether admitting the family as a reasonable accommodation is appropriate. HACA will only consider accommodations that can reasonably be expected to address the behavior that is the basis of the proposed denial of assistance. See Chapter 2 for a discussion of reasonable accommodation.

## 3-III.F. NOTICE OF ELIGIBILITY OR DENIAL

If the family is eligible for assistance, HACA will notify the family in writing and schedule a tenant briefing, as discussed in Chapter 5.

If HACA determines that a family is not eligible for the program for any reason, the family must be notified promptly. The notice must describe: (1) the reasons for which assistance has been denied, (2) the family's right to an informal review, and (3) the process for obtaining the informal review [24 CFR 982.554 (a)]. See Chapter 16, for informal review policies and procedures.

<u>HACA Policy</u>

Notice policies related to preliminary ineligibility are as follows:

If an applicant is determined not to be eligible, the applicant shall be notified in writing of such ineligibility. The notice must specify the reasons for the determination and offer the applicant an opportunity for a review of the decision.

If the applicant makes a written request for an informal review for a rejection within the time frame allowed, the Hearing Officer will conduct the informal review. This review does not deprive the applicant of other rights if she or he believes that she or he has been discriminated against on the basis of race, color, religion, sex, national origin, age, disability or familial status. The informal review shall only review the particular decision in question. If the Hearing Officer believes that the rejection was improper, the applicant's application shall be processed in the same manner as all other applications in accordance with the date and time the application was submitted. The applicant will be entitled to review all documentation, including police reports, which are relied upon by HACA and provided the opportunity to dispute the accuracy and relevance of that record. If the Hearing Officer decides that the rejection was proper, the rejection will be final. The applicant will not be eligible to reapply or have this decision reviewed again until the proper time has elapsed.

**Additional policies relating to the informal reviews process can be found in Chapter 16, Part 3.**

If HACA uses a criminal record or sex offender registration information obtained under 24 CFR 5, Subpart J, as the basis of a denial, a copy of the record must precede the notice to deny, with an opportunity for the applicant to dispute the accuracy and relevance of the information before HACA can move to deny the application. In addition, a copy of the record must be provided to the subject of the record [24 CFR 5.903(f) and 5.905(d)]. HACA must give the family an opportunity to dispute the accuracy and relevance of that record, in the informal review process in accordance with program requirements [24 CFR 982.553(d)].

<u>HACA Policy</u>

If based on a criminal record or sex offender registration information, an applicant family appears to be ineligible; HACA will notify the family in writing of the proposed denial and provide a copy of the record to the applicant and to the subject of the record. The family will be given 15 calendar days to dispute the accuracy and relevance of the information. If the family does not contact HACA to dispute the information within that

15-day period, HACA will proceed with issuing the notice of denial of admission. A family that does not exercise their right to dispute the accuracy of the information prior to issuance of the official denial letter will still be given the opportunity to do so as part of the informal review process.

Notice requirements related to denying assistance to noncitizens are contained in Section 3-II.B.

Notice policies related to denying admission to applicants who may be victims of domestic violence, dating violence, sexual assault or stalking are contained in Section 3-III.G.

### 3-III.G. PROHIBITION AGAINST DENIAL OF ASSISTANCE TO VICTIMS OF DOMESTIC VIOLENCE, DATING VIOLENCE, SEXUAL ASSAULT AND STALKING

The Violence against Women Act of 2013 (VAWA) and the HUD regulation at 24 CFR 5.2005(b) prohibit HACA from denying an applicant admission to the HCV program "on the basis that the applicant is or has been a victim of domestic violence, dating violence, sexual assault or stalking, if the applicant otherwise qualifies for assistance or admission."

Definitions of key terms used in VAWA are provided in section 16-IX of this plan, where general VAWA requirements and policies pertaining to notification, documentation, and confidentiality are also located.

#### Notification

VAWA 2013 expanded notification requirements to include the obligation for PHAs to provide applicants who are denied assistance with a notice of rights and the form HUD-5382at the time the applicant is denied.

HACA Policy

HACA acknowledges that a victim of domestic violence, dating violence, sexual assault or stalking may have an unfavorable history (e.g., a poor credit history, a record of previous damage to an apartment) that would warrant denial under HACA's policies. Therefore, if HACA makes a determination to deny assistance to an applicant family, HACA will include in its notice of denial the VAWA information described in section 16-IX.C of this plan as well as including a copy of the form HUD-5382  HACA will request that an applicant wishing to claim protection under VAWA notify HACA in writing within 14 business days.   HACA may extend this 14 day period, upon written request of the individual, at its discretion. [24 CFR 5.2007(a)]

**Documentation**

#### Victim Documentation *[24 CFR 5.2007]*

HACA Policy

If an applicant claims the protection against denial of assistance that VAWA provides to victims of domestic violence, dating violence, sexual assault or stalking, HACA will

request in writing that the applicant provide documentation supporting the claim in accordance with section
16-IX.D of this plan.

Perpetrator Documentation

> <u>HACA Policy</u>
>
> If the perpetrator of the abuse is a member of the applicant family, the applicant must provide additional documentation consisting of one of the following:
>
> > A signed statement (1) requesting that the perpetrator be removed from the application and (2) certifying that the perpetrator will not be permitted to visit or to stay as a guest in the assisted unit
> >
> > Documentation that the perpetrator has successfully completed, or is successfully undergoing, rehabilitation or treatment. The documentation must be signed by an employee or agent of a domestic violence service provider or by a medical or other knowledgeable professional from whom the perpetrator has sought or is receiving assistance in addressing the abuse. The signer must attest under penalty of perjury to his or her belief that the rehabilitation was successfully completed or is progressing successfully. The victim and perpetrator must also sign or attest to the documentation.

| EXHIBIT 3-1: DETAILED DEFINITIONS RELATED TO DISABILITIES |
|---|

### Person with Disabilities [24 CFR 5.403]

The term *person with disabilities* means a person who has any of the following types of conditions:

Has a disability, as defined in 42 U.S.C. Section 423(d)(1)(A), which reads:

Inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months; *or*

In the case of an individual who has attained the age of 55 and is blind (within the meaning of "blindness" as defined in section 416(i)(1) of this title), inability by reason of such blindness to engage in substantial gainful activity, requiring skills or ability comparable to those of any gainful activity in which he has previously engaged with some regularity and over a substantial period of time.

Has a developmental disability as defined in the Developmental Disabilities Assistance and Bill of Rights Act of 2000 [42 U.S.C.15002(8)], which defines developmental disability in functional terms as follows:

**(A) In General**

The term "developmental disability" means a severe, chronic disability of an individual that:

(i)  is attributable to a mental or physical impairment or combination of mental and physical impairments;

(ii) is manifested before the individual attains age 22;

(iii) is likely to continue indefinitely;

(iv) results in substantial functional limitations in 3 or more of the following areas of major life activity: (I) Self-care, (II) Receptive and expressive language, (III) Learning, (IV) Mobility, (V) Self-direction, (VI) Capacity for independent living, (VII) Economic self-sufficiency; and

(v)  reflects the individual's need for a combination and sequence of special, interdisciplinary, or generic services, individualized supports, or other forms of assistance that are of lifelong or extended duration and are individually planned and coordinated.

**(B) Infants and Young Children**

An individual from birth to age 9, inclusive, who has a substantial developmental delay or specific congenital or acquired condition, may be considered to have a developmental disability without meeting 3 or more of the criteria described in clauses (i) through (v) of

subparagraph (A) if the individual, without services and supports, has a high probability of meeting those criteria later in life.

Has a physical, mental, or emotional impairment that is expected to be of long-continued and indefinite duration; substantially impedes his or her ability to live independently, and is of such a nature that the ability to live independently could be improved by more suitable housing conditions.

People with the acquired immunodeficiency syndrome (AIDS) or any conditions arising from the etiologic agent for AIDS are not excluded from this definition.

A person whose disability is based solely on any drug or alcohol dependence does not qualify as a person with disabilities for the purposes of this program.

For purposes of reasonable accommodation and program accessibility for persons with disabilities, the term *person with disabilities* refers to an individual with handicaps.

### Individual with Handicaps [24 CFR 8.3]

*Individual with handicaps* means any person who has a physical or mental impairment that substantially limits one or more major life activities; has a record of such impairment; or is regarded as having such impairment. The term does not include any individual who is an alcoholic or drug abuser whose current use of alcohol or drugs prevents the individual from participating in the program or activity in question, or whose participation, by reason of such current alcohol or drug abuse, would constitute a direct threat to property or the safety of others. As used in this definition, the phrase:

(1) Physical or mental impairment includes:

    (a) Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive; digestive; genito-urinary; hemic and lymphatic; skin; and endocrine; or

    (b) Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities. The term physical or mental impairment includes, but is not limited to, such diseases and conditions as orthopedic, visual, speech and hearing impairments, cerebral palsy, autism, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, mental retardation, emotional illness, drug addiction and alcoholism.

(2) *Major life activities* means functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working.

(3) Has a record of such an impairment means has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities.

(4) *Is regarded as having an impairment* means:

    (a) Has a physical or mental impairment that does not substantially limit one or more major life activities but that is treated by a recipient as constituting such a limitation;

(b) Has a physical or mental impairment that substantially limits one or more major life activities only as a result of the attitudes of others toward such impairment; or

(c) Has none of the impairments defined in paragraph (1) of this section but is treated by a recipient as having such an impairment.

---

<div style="border:1px solid black; padding:8px;">

**EXHIBIT 3-2: DEFINITION OF INSTITUTION OF HIGHER EDUCATION**
**[20U.S.C. 1001 and 1002]**

</div>

**Eligibility of Students for Assisted Housing Under Section 8 of the U.S. Housing Act of 1937; Supplementary Guidance; Notice [Federal Register, April 10, 2006]**

*Institution of Higher Education* shall have the meaning given this term in the Higher Education Act of 1965 in 20 U.S.C. 1001 and 1002.

*Definition of ''Institution of Higher Education'' From 20 U.S.C. 1001*

(a) Institution of higher education. For purposes of this chapter, other than subchapter IV and part C of subchapter I of chapter 34 of Title 42, the term ''institution of higher education'' means an educational institution in any State that

   (1) Admits as regular students only persons having a certificate of graduation from a school providing secondary education, or the recognized equivalent of such a certificate;

   (2) Is legally authorized within such State to provide a program of education beyond secondary education;

   (3) Provides an educational program for which the institution awards a bachelor's degree or provides not less than a 2-year program that is acceptable for full credit toward such a degree;

   (4) Is a public or other nonprofit institution; and

   (5) Is accredited by a nationally recognized accrediting agency or association, or if not so accredited, is an institution that has been granted pre-accreditation status by such an agency or association that has been recognized by the Secretary for the granting of pre-accreditation status, and the Secretary has determined that there is satisfactory assurance that the institution will meet the accreditation standards of such an agency or association within a reasonable time.

(b) Additional institutions included. For purposes of this chapter, other than subchapter IV and part C of subchapter I of chapter 34 of Title 42, the term ''institution of higher education'' also includes—

   (1) Any school that provides not less than a 1-year program of training to prepare students for gainful employment in a recognized occupation and that meets the provision of paragraphs (1), (2), (4), and (5) of subsection (a) of this section; and

   (2) A public or nonprofit private educational institution in any State that, in lieu of the requirement in subsection (a)(1) of this section, admits as regular students persons who are beyond the age of compulsory school attendance in the State in which the institution is located.

(c) List of accrediting agencies. For purposes of this section and section 1002 of this title, the Secretary shall publish a list of nationally recognized accrediting agencies or associations that

   the Secretary determines, pursuant to subpart 2 of part G of subchapter IV of this chapter, to

be reliable authority as to the quality of the education or training offered.

*Definition of ''Institution of Higher Education'' From 20 U.S.C. 1002*

(a) Definition of institution of higher education for purposes of student assistance programs

(1) Inclusion of additional institutions. Subject to paragraphs (2) through (4) of this subsection, the term ''institution of higher education'' for purposes of subchapter IV of this chapter and part C of subchapter I of chapter 34 of title 42 includes, in addition to the institutions covered by the definition in section 1001 of this title—

(A) A proprietary institution of higher education (as defined in subsection (b) of this section);

(B) A postsecondary vocational institution (as defined in subsection (c) of this section); and

(C) Only for the purposes of part B of subchapter IV of this chapter, an institution outside the United States that is comparable to an institution of higher education as defined in section 1001 of this title and that has been approved by the Secretary for the purpose of part B of subchapter IV of this chapter.

(2) Institutions outside the United States

(A) In general. For the purpose of qualifying as an institution under paragraph (1)(C), the Secretary shall establish criteria by regulation for the approval of institutions outside the United States and for the determination that such institutions are comparable to an institution of higher education as defined in section 1001 of this title (except that a graduate medical school, or a veterinary school, located outside the United States shall not be required to meet the requirements of section 1001 (a)(4) of this title). Such criteria shall include a requirement that a student attending such school outside the United States is ineligible for loans made, insured, or guaranteed under part B of subchapter IV of this chapter unless—

(i) In the case of a graduate medical school located outside the United States—

(I)(a) At least 60 percent of those enrolled in, and at least 60 percent of the graduates of, the graduate medical school outside the United States were not persons described in section 1091(a)(5) of this title in the year preceding the year for which a student is seeking a loan under part B of subchapter IV of this chapter; and

(b) At least 60 percent of the individuals who were students or graduates of the graduate medical school outside the United States or Canada (both nationals of the United States and others) taking the examinations administered by the Educational Commission for Foreign Medical Graduates received a passing score in the year preceding the year for which a student is seeking a loan under part B of subchapter IV of this chapter; or

(II) The institution has a clinical training program that was approved by a State as of January 1, 1992; or

(ii) In the case of a veterinary school located outside the United States that does not meet the requirements of section 1001(a)(4) of this title, the institution's students complete their clinical training at an approved veterinary school located in the United States.

(B) Advisory panel

 (i) In general. For the purpose of qualifying as an institution under paragraph (1)(C) of this subsection, the Secretary shall establish an advisory panel of medical experts that shall—

  (I) Evaluate the standards of accreditation applied to applicant foreign medical schools; and

  (II) Determine the comparability of those standards to standards for accreditation applied to United States medical schools.

 (ii) Special rule; if the accreditation standards described in clause (i) are determined not to be comparable, the foreign medical school shall be required to meet the requirements of section 1001 of this title.

(C) Failure to release information. The failure of an institution outside the United States to provide, release, or authorize release to the Secretary of such information as may be required by subparagraph (A) shall render such institution ineligible for the purpose of part B of subchapter IV of this chapter.

(D) Special rule: If, pursuant to this paragraph, an institution loses eligibility to participate in the programs under subchapter IV of this chapter and part C of subchapter I of chapter 34 of title 42, then a student enrolled at such institution may, notwithstanding such loss of eligibility, continue to be eligible to receive a loan under part B while attending such institution for the academic year succeeding the academic year in which such loss of eligibility occurred.

(3) Limitations based on course of study or enrollment. An institution shall not be considered to meet the definition of an institution of higher education in paragraph (1) if such institution—

(A) Offers more than 50 percent of such institution's courses by correspondence, unless the institution is an institution that meets the definition in section 2471 (4)(C) of this title;

(B) Enrolls 50 percent or more of the institution's students in correspondence courses, unless the institution is an institution that meets the definition in such section, except that the Secretary, at the request of such institution, may waive the applicability of this subparagraph to such institution for good cause, as determined by the Secretary in the case of an institution of higher education that provides a 2-or 4-year program of

instruction (or both) for which the institution awards an associate or baccalaureate degree, respectively;

(C) Has a student enrollment in which more than 25 percent of the students are

incarcerated, except that the Secretary may waive the limitation contained in this subparagraph for a nonprofit institution that provides a 2-or 4-year program of instruction (or both) for which the institution awards a bachelor's degree, or an associate's degree or a postsecondary diploma, respectively; or

(D) Has a student enrollment in which more than 50 percent of the students do not have a secondary school diploma or its recognized equivalent, and does not provide a 2-or 4-year program of instruction (or both) for which the institution awards a bachelor's degree or an associate's degree, respectively, except that the Secretary may waive the limitation contained in this subparagraph if a nonprofit institution demonstrates to the satisfaction of the Secretary that the institution exceeds such limitation because the institution serves, through contracts with Federal, State, or local government agencies, significant numbers of students who do not have a secondary school diploma or its recognized equivalent.

(4) Limitations based on management. An institution shall not be considered to meet the definition of an institution of higher education in paragraph (1) if—

(A) The institution, or an affiliate of the institution that has the power, by contract or ownership interest, to direct or cause the direction of the management or policies of the institution, has filed for bankruptcy, except that this paragraph shall not apply to a nonprofit institution, the primary function of which is to provide health care educational services (or an affiliate of such an institution that has the power, by contract or ownership interest, to direct or cause the direction of the institution's management or policies) that files for bankruptcy under chapter 11 of title 11 between July 1, 1998, and December 1, 1998; or

(B) The institution, the institution's owner, or the institution's chief executive officer has been convicted of, or has pled no contender or guilty to, a crime involving the acquisition, use, or expenditure of funds under subchapter IV of this chapter and part C of subchapter I of chapter 34 of title 42, or has been judicially determined to have committed fraud involving funds under subchapter IV of this chapter and part C of subchapter I of chapter 34 of title 42.

(5) Certification. The Secretary shall certify an institution's qualification as an institution of higher education in accordance with the requirements of subpart 3 of part G of subchapter IV of this chapter.

(6) Loss of eligibility. An institution of higher education shall not be considered to meet the definition of an institution of higher education in paragraph (1) if such institution is removed from eligibility for funds under subchapter IV of this chapter and part C of subchapter I of chapter 34 of title 42 as a result of an action pursuant to part G of subchapter IV of this chapter.

(b) Proprietary institution of higher education

(1) Principal criteria. For the purpose of this section, the term ''proprietary institution of higher education'' means a school that—

(A) Provides an eligible program of training to prepare students for gainful employment in

a recognized occupation;

(B) Meets the requirements of paragraphs (1) and (2) of section 1001 (a) of this title;

(C) Does not meet the requirement of paragraph (4) of section 1001 (a) of this title;

(D) Is accredited by a nationally recognized accrediting agency or association recognized by the Secretary pursuant to part G of subchapter IV of this chapter;

(E) Has been in existence for at least 2 years; and

(F) Has at least 10 percent of the school's revenues from sources that are not derived from funds provided under subchapter IV of this chapter and part C of subchapter I of chapter 34 of title 42, as determined in accordance with regulations prescribed by the Secretary.

(2) Additional institutions. The term ''proprietary institution of higher education'' also includes a proprietary educational institution in any State that, in lieu of the requirement in paragraph (1) of section 1001 (a) of this title, admits as regular students persons who are beyond the age of compulsory school attendance in the State in which the institution is located.

(c) Postsecondary vocational institution.

(1) Principal criteria. For the purpose of this section, the term ''postsecondary vocational institution'' means a school that—

(A) Provides an eligible program of training to prepare students for gainful employment in a recognized occupation;

(B) Meets the requirements of paragraphs (1), (2), (4), and (5) of section 1001 (a) of this title; and

(C) Has been in existence for at least 2 years.

(2) Additional institutions. The term ''postsecondary vocational institution'' also includes an educational institution in any State that, in lieu of the requirement in paragraph (1) of section 1001 (a) of this title, admits as regular students persons who are beyond the age of compulsory school attendance in the State in which the institution is located.

## CHAPTER 4
## APPLICATIONS, WAITING LIST AND TENANT SELECTION INTRODUCTION

When a family wishes to receive Housing Choice Voucher (HCV, also known as Section 8) assistance, the family must submit an application that provides HACA with the information needed to determine the family's eligibility. HUD requires HACA to place all families that apply for assistance on a waiting list. When HCV assistance becomes available, HACA must select families from the waiting list in accordance with HUD requirements and HACA policies as stated in the administrative plan and the annual plan.

HACA is required to adopt  clear policies and procedures for accepting applications, placing families on the waiting list, selecting families from the waiting list and must follow these policies and procedures  consistently. The actual order in which families are selected from the waiting list can be affected if a family has certain characteristics designated by HUD or HACA to receive preferential treatment. Funding earmarked exclusively for families with particular characteristics may also alter the order in which families are served.

HUD regulations require that all families have an equal opportunity to apply for and receive housing assistance, and that HACA affirmatively further fair housing goals in the administration of the program [24 CFR 982.53, HCV GB p. 4-1]. Adherence to the selection policies described in this chapter ensures that HACA will comply with all relevant fair housing requirements, as described in Chapter 2.

This chapter describes HUD and HACA policies for taking applications, managing the waiting list and selecting families from the waiting list for HCV assistance. The policies outlined in this chapter are organized into three sections, as follows:

> Part I: The Application Process. This part provides an overview of the application process, and discusses how applicants can obtain and submit applications.  It also specifies how HACA will handle the applications it receives.

> Part II: Managing the Waiting List. This part presents the policies that govern how HACA's waiting list is structured, when it is opened and closed, and how the public is notified of the opportunity to apply for assistance. It also discusses the process HACA will use to keep the waiting list current.

> Part III: Selection for HCV Assistance. This part describes the policies that guide HACA in selecting families for HCV assistance as such assistance becomes available. It also specifies how in-person interviews will be used to ensure that HACA has the information needed to make a final eligibility determination.

### PART I: THE APPLICATION PROCESS

## 4-I.A. OVERVIEW

This part describes HACA's policies for making applications available, accepting applications, making preliminary determinations of eligibility and the placement of applicants on the waiting list. This part also describes HACA's obligation to ensure the accessibility of the application process to elderly persons, people with disabilities, and people with limited English proficiency (LEP).

## 4-I.B. APPLYING FOR ASSISTANCE [HCV GB, pp. 4-11 – 4-16, Notice PIH 2009-36]

Any family that wishes to receive HCV assistance must apply for admission to the program. HUD permits HACA to determine the format and content of HCV applications, to determine how such applications will be made available to interested families and to determine how applications will be accepted by HACA. However, HACA must include Form HUD-92006, Supplement to Application for Federally Assisted Housing, as an attachment to HACA's application. This form gives applicants the option to identify an individual or organization that HACA may contact and the reason(s) the individual or organization may be contacted.

<u>HACA Policy</u>

Depending upon the length of time that applicants may need to wait to receive assistance, HACA may use a one- or two-step application process.

A one-step process will be used when it is expected that a family will be selected from the waiting list within 60 days of the date of application. At application, the family must provide all of the information necessary to establish family eligibility and level of assistance.

A two-step process will be used when it is expected that a family will not be selected from the waiting list for at least 60 days from the date of application. Under the two-step application process, HACA initially will require families to provide only the information needed to make an initial assessment of the family's eligibility, and to determine the family's placement on the waiting list. The family will be required to provide all of the information necessary to establish family eligibility and level of assistance when the family is selected from the waiting list.

### Lottery Application Process [Notice PIH 2012-34]

A PHA has flexibility to determine whether to keep the waiting list open indefinitely or whether to open the waiting list periodically for defined application periods. PHAs should only make this determination after careful analysis and consideration of all circumstances, including whether the length of the waiting list makes the wait for housing unreasonably long or whether there is a sufficient number of eligible applicants to ensure that new and turnover vouchers under the PHA's HCV program are issued as quickly as possible.

<u>HACA Policy</u>

HACA will open the HCV waiting list for a defined period of time. The dates and times of the waiting list opening will be publicly announced in advance.

PHAs should also keep in mind safety concerns when reopening waiting lists in areas of high demand. PHAs can use various strategies to avoid application intake procedures that may cause a safety concern for the public and PHA staff. Offering only one central location to submit applications under such circumstances is not advisable.

PHAs may consider the use of a lottery or other random choice technique to select which applicants will be placed on the waiting list. In making this determination, PHAs should consider whether this is a reasonable approach in their jurisdiction. This approach would be reasonable for

PHAs located in areas where the volume of applications is high enough that placing each eligible applicant on the waiting list would result in an unrealistic waiting period for housing.

> HACA Policy
>
> HACA will use an online application process to accept applications during the period of the open waiting list.  Applications can be submitted from any location with internet access.
>
> HACA will use a lottery system to select applicants to be placed onto the waiting list.  After all complete and unduplicated applications are received during the waiting list opening; HACA will conduct a random lottery to select the applicants.  Applicants will be randomly assigned a number, and the applicants will be placed on the waiting list in order of the assigned numbers and according to HACA preference(s).
>
> HACA has determined that this is a reasonable approach due to the high volume of applications anticipated.  Placing all applications on the waiting list would create an unrealistic waiting period for housing.  Use of the lottery system is a fair way to create a waiting list with realistic waiting periods.  The online application process also protects the safety of all that apply and allows for multiple locations for completing applications.  The lottery process also promotes safety as there is no rush to be first, since date and time of the application is not considered, as long as the application was completed during the waiting list opening.

## 4-I.C. ACCESSIBILITY OF THE APPLICATION PROCESS

### Elderly and Disabled Populations [24 CFR 8 and HCV GB, pp. 4-11 – 4-13]

HACA must take steps to ensure that the application process is accessible to those people who might have difficulty complying with the normal, standard HACA application process. This could include people with disabilities, certain elderly individuals, as well as persons with limited English proficiency (LEP). HACA must provide reasonable accommodation to the needs of individuals with disabilities. The application-taking facility and the application process must be fully accessible, or HACA must provide an alternate approach that provides full access to the application process. Chapter 2 provides a full discussion of HACA's policies related to providing reasonable accommodations for people with disabilities.

> HACA Policy
>
> HACA will use an internet application process.  Families can access the internet application through HACA's website, www.hacanet.org or by going directly to the application web page.  Access to the application will be available during the entire time of the waiting list opening.  Once the waiting list is closed, applicants will be able to go to an Applicant Portal to view the status of their application.  The HACA website will have a link to this Applicant Portal.  When applicants first log in to the Applicant Portal, they will be required to provide correct identifying information. With this information, applicants will then be required to create a username and password to view their current status on the waiting list.
>
> In advance of the waiting list opening, HACA will provide training to social service and community partners.  This training will explain the application process, demonstrate how

to complete an application online and show how applicants can view their current status through the Applicant Portal.  HACA will encourage all social service partners to provide assistance to the elderly and disabled to ensure that they have access to the application process.

In cases where elderly or disabled families do not have access to the internet and are not able to access the application through a social service or partner agency, HACA will provide a separate phone number to call and complete the application over the phone.

### Limited English Proficiency

HACA is required to take reasonable steps to ensure equal access to their programs and activities by persons with limited English proficiency [24 CFR 1]. Chapter 2 provides a full discussion on HACA's policies related to ensuring access to people with limited English proficiency (LEP).

## 4-I.D. PLACEMENT ON THE WAITING LIST

When HACA's waiting list is open, HACA will accept applications through the internet application process. All complete, unduplicated and valid applications received while the waiting list is open will be entered into a lottery.  Before opening the waiting list, HACA will announce the number of applicants that will be drawn through the lottery process.   Once the waiting list is closed, HACA will complete the lottery selections.

After completing the lottery drawing, HACA will review each complete application selected and make a preliminary assessment of the family's eligibility. HACA must accept applications from families for whom the list is open unless there is good cause for not accepting the application (such as denial of assistance) for the grounds stated in the regulations [24 CFR 982.206(b)(2)]. Where the family is determined to be ineligible, HACA must notify the family in writing [24 CFR 982.201(f)]. Where the family is determined to be eligible, the family will be placed on a waiting list of applicants.

No applicant has a right or entitlement to be listed on the waiting list, or to any particular position on the waiting list [24 CFR 982.202(c)].

### Ineligible for Placement on the Waiting List

<u>HACA Policy</u>

The lottery drawing will be random.  The process will be overseen by a third party.  HACA will maintain documentation and records of the lottery process.  Within 45 days of the closing of the waiting list, families can login to the Applicant Portal to receive notification of whether or not they have been selected.  Families that are not selected in the lottery will not be placed on the waiting list and do not have the right to appeal this decision.

If after completing the lottery, HACA can determine from the information provided that a selected family is preliminarily ineligible, the family will not be placed on the waiting list. When a family is determined to be preliminarily ineligible, HACA will send written notification through the mail of the preliminary ineligibility determination within 45 days of selecting a completed application through the lottery process. The notice will specify the reasons for ineligibility, and will inform the family of their right to request an informal

review and explain the process for doing so (see Chapter 16). If upon conclusion of the informal review process, the family's preliminary eligibility is restored, the family will be restored to their original lottery selection spot on the waiting list. If upon conclusion of the informal review process, the family's preliminary eligibility remains denied, the family will not be placed on the waiting list.

### Eligible for Placement on the Waiting List

HACA Policy

All complete, unduplicated and valid applications received before the waiting list is closed will be entered into the lottery drawing. Once the lottery is complete, HACA will use the Applicant Portal to provide notification of eligibility to be placed on the waiting list. This written notification will not be sent through the mail. The notification will appear on the Applicant Portal within 45 days of closing the waiting list. If applicable, the notice will also indicate the waiting list preference(s) for which the family claimed eligibility.

Placement on the waiting list does not indicate that the family is, in fact, eligible for assistance. A final determination of eligibility and qualification for preferences will be made when the family is selected from the waiting list.

Applicants will be placed on the waiting list using a lottery system. Once each application has been randomly assigned a number, the applications will be placed on the waiting list in order of the assigned numbers and according to PHA preference(s).

## PART II: MANAGING THE WAITING LIST

### 4-II.A. OVERVIEW

HACA must have policies regarding various aspects of organizing and managing the waiting list of applicant families. This includes opening the list to new applicants, closing the list to new applicants, notifying the public of waiting list openings and closings, updating waiting list information, purging the list of families that are no longer interested in or eligible for assistance, as well as conducting outreach to ensure a sufficient number of applicants.

In addition, HUD imposes requirements on how HACA may structure its waiting list and how families must be treated if they apply for assistance from HACA that administers more than one assisted housing program.

### 4-II.B. ORGANIZATION OF THE WAITING LIST [24 CFR 982.204 and 205]

HACA's HCV waiting list must be organized in such a manner to allow HACA to accurately identify and select families for assistance in the proper order, according to the admissions policies described in this plan.

HACA Policy

The waiting list will contain the following information for each applicant listed:

Applicant name and address;

Social Security number

Family member count

Date and time of application;

Lottery number of selection through the lottery process.

Certification from Head of household claiming  any local preference;

Racial or ethnic designation of the head of household.

HUD requires HACA to maintain a single waiting list for the HCV program unless it serves more than one county or municipality. Such PHAs are permitted, but not required, to maintain a separate waiting list for each county or municipality served.

HACA Policy

HACA will maintain a single waiting list for the HCV program.

HACA will not merge the HCV waiting list with the waiting list for Project Based Rental Assistance (PBRA)and other subsidized housing programs.

HACA will use separate waiting lists for Project-based Voucher (PBV) units in individual projects.  Specifications regarding selection from the PBV waiting lists can be found in Chapter 17.

If HACA's waiting list for tenant-based assistance is open when an applicant is placed on the waiting list for the PHA's Project Based Rental Assistance (PBRA), Project-based Voucher program or moderate rehabilitation program, HACA will direct the applicant to the internet link to complete an application for HCV tenant based assistance.

Similarly, if HACA's waiting list for its Project Based Rental Assistance (PBRA), Project-based Voucher program or moderate rehabilitation program is open when an applicant is placed on the waiting list for its tenant-based program, and if the other program includes units suitable for the applicant, HACA will direct the applicant to the internet link for the other programs to complete an application.

A family's decision to apply for, receive, or refuse other housing assistance will not affect the family's placement on the HCV waiting list, or any preferences for which the family may qualify.

## 4-II.C. OPENING AND CLOSING THE WAITING LIST [24 CFR 982.206]

**Closing the Waiting List**

HACA is permitted to close the waiting list if it has an adequate pool of families to use its available HCV assistance. Alternatively, HACA may elect to continue to accept applications only

from certain categories of families that meet particular preferences or funding criteria.

HACA Policy

HACA will close the waiting list when the estimated waiting period for housing assistance for applicants on the list reaches at least 12 months for the most current applicants. Where HACA has particular preferences or funding criteria that require a specific category of family, HACA may elect to continue to accept applications from these applicants or re-open the waiting list for these applicants, while closing the waiting list to others.

Decisions about the waiting lists will be based on the number of applicants who potentially qualify for available funding. Closing the waiting lists, restricting intake, or opening the waiting list will be publicly announced. HACA will provide public notice by publication in local newspapers of general circulation, and in minority media and other suitable means.

**Reopening the Waiting List**

If the waiting list has been closed, it cannot be reopened until HACA publishes a notice in local newspapers of general circulation, minority media, and other suitable media outlets. The notice must comply with HUD fair housing requirements and must specify who may apply, and where applicants can find information on how to use the web portal for applying.

HACA Policy

HACA will announce the reopening of the waiting list at least 30 calendar days prior to the date applications will first be accepted. If the list is only being reopened for certain categories of families, this information will be contained in the notice.

Should HACA determine to re-open its HCV waiting list after any period of closure, it shall offer housing to all remaining eligible applicants on its current list. During the period when the waiting list is closed, HACA will not maintain a list of individuals who wish to be notified when the waiting list is re-opened. Applications for the Housing Choice Voucher Program will be accepted only during specific times as determined by the needs of the Housing Authority and as announced.

HACA will make use of the internet for all applications. HACA will not designate a specific location to accept applications. HACA will accept all applications received through the website during the open waiting list period. Once the waiting list is closed, HACA will complete a lottery drawing to select the pre-determined number of applications.

All applicants will be directed to the internet to complete the application. If an applicant is elderly or disabled and does not have internet access, HACA will first direct the applicant to request assistance from family members or social service providers to complete the application through the internet. If the family is an elderly or disabled family and is unable to access the internet, HACA will accept phone applications. Under no circumstances will anyone be denied the right to request or submit an application. All applications must be completed during the time of the waiting list opening.

HACA will give public notice by publishing the relevant information in suitable media outlets including, but not limited to:

Austin American-Statesman
The Austin Chronicle
El Mundo
The Villager

Notices may also be sent to organizations that typically assist low-income families, including but not limited to:

ECHO – The Ending Community Homelessness Coalition
The Salvation Army
Lifeworks
Safe Alliance
Austin Children's Shelter
Austin Travis County Integral Care
Green Doors
Foundation Communities
Austin Independent School District
AIDS Services of Austin
Caritas of Austin
Any Baby Can
Front Steps
Texas Riogrande Legal Aid
Austin Tenant's Council

## 4-II.D. FAMILY OUTREACH [HCV GB, pp. 4-2 to 4-4]

HACA must conduct outreach as necessary to ensure that HACA has a sufficient number of applicants on the waiting list to use the HCV resources it has been allotted and to assure that HACA is affirmatively furthering fair housing and complying with the Fair Housing Act.

Because HUD requires HACA to admit a specified percentage of extremely low-income families (see Chapter 4, Part III), HACA may need to conduct special outreach to ensure that an adequate number of such families apply for assistance [HCV GB, p. 4-20 to 4-21].

PHA outreach efforts must comply with fair housing requirements. This includes:

Analyzing the housing market area and the populations currently being served to identify underserved populations.

Ensuring that outreach efforts are targeted to media outlets that reach eligible populations that are underrepresented in the program.

Avoiding outreach efforts that prefer or exclude people who are members of a protected class.

PHA outreach efforts must be designed to inform qualified families about the availability of

assistance under the program. These efforts may include, as needed, any of the following activities:

Submitting press releases to local newspapers, including minority newspapers.

Developing informational materials and flyers to distribute to other agencies.

Providing application forms to other public and private agencies that serve the low income population.

Developing partnerships with other organizations that serve similar populations, including agencies that provide services for persons with disabilities.

HACA Policy

HACA will monitor the characteristics of the population being served and the characteristics of the population as a whole in HACA's jurisdiction. Targeted outreach efforts will be undertaken if a comparison suggests that certain populations are being underserved.

## 4-II.E. REPORTING CHANGES IN FAMILY CIRCUMSTANCES

HACA Policy

While the family is on the waiting list, the family must inform HACA of changes in family size or composition, preference status or contact information, including current residence, mailing address and phone number. HACA will provide information to applicants through the Applicant Portal.  A link to the Applicant Portal will be provided on HACA's website (www.hacanet.org).   Invitations to the eligibility interview will be sent through the mail.  If a family needs to make any changes to their application information, the changes must be submitted through the Applicant Portal.  Every family that submitted their original application through the internet will be required to complete updates through the Applicant Portal.  To avoid unauthorized changes, families will establish a username and password when logging into the Applicant Portal for the first time.

If an elderly or disabled family was accommodated and applied by phone, paper updates will be accepted through the mail or by fax, but they will be encouraged to submit such changes via the Applicant Portal.   Update forms will be mailed to elderly or disabled families upon request.  Completed update forms may be mailed, faxed or submitted in person to HACA's Admissions department. To avoid unauthorized changes, a photo ID must be presented in person or through fax, to confirm the applicant's identity before any requested changes to the application are made by the Admissions department.

Changes in an applicant's circumstances while on the waiting list may affect the family's qualification for a particular family unit size or entitlement to a preference. When an applicant reports a change that affects their placement on the waiting list, the waiting list will be updated accordingly.

## 4-II.F. UPDATING THE WAITING LIST [24 CFR 982.204]

HUD requires HACA to establish policies to use when removing applicant names from the waiting list.

## Purging the Waiting List

The decision to withdraw an applicant family that includes a person with disabilities from the waiting list is subject to reasonable accommodation. If the applicant did not respond to HACA's request for information or updates, and the PHA determines that the family did not respond to HACA because of the family member's disability, HACA must reinstate the applicant family to their former position on the waiting list [24 CFR 982.204(c)(2)].

> HACA Policy
>
> The waiting list will be updated as needed to ensure that all applicants and applicant information is current and timely.
>
> To update the waiting list, HACA will send an update request through first class mail to each family on the waiting list to determine whether the family continues to be interested in, and to qualify for, the program. Information regarding this update request will also be placed on the applicant portal.  This update request will be sent to the last address that HACA has on record for the family. The update request will provide a deadline by which the family must respond and will state that failure to respond will result in the applicant's name being removed from the waiting list.
>
> The family's response must be in writing and may be delivered in person, by mail, email or by fax. Responses should be postmarked or received by HACA not later than 15 calendar days from the date of HACA's update request letter.
>
> If the family fails to respond within 15 calendar days, the family will be removed from the waiting list without further notice.
>
> If the notice is returned by the post office with no forwarding address, the applicant will be removed from the waiting list without further notice.
>
> If the notice is returned by the post office with a forwarding address, the notice will be re-sent to the address indicated. The family will have 15 calendar days to respond from the date the letter was re-sent.  If the family fails to respond within the time period, the family will be removed from the waiting list without further notice.
>
> When a family is removed from the waiting list during the update process for failure to respond, no informal review will be offered. Such failures to act on the part of the applicant prevent HACA from making an eligibility determination; therefore, no informal review is required.
>
> If a family is removed from the waiting list for failure to respond, HACA's President/CEO or his or her designee may reinstate the family if it is determined the lack of response was due to HACA error, or to circumstances beyond the family's control.

## Removal from the Waiting List

> HACA Policy
>
> HACA will remove applicants from the waiting list if they have requested in writing that

their name be removed. In such cases, no informal review is required and none will be offered.

If HACA determines that the family is not eligible for assistance (see Chapter 3), at any time while the family is on the waiting list the family will be removed from the waiting list.

If a family is removed from the waiting list because HACA has determined the family is not eligible for assistance, a notice will be sent to the family's address of record. The notice will state the reasons the family was removed from the waiting list and will inform the family how to request an informal review regarding HACA's decision (see Chapter 16) [24 CFR 982.201(f)].

## PART III: SELECTION FOR HCV ASSISTANCE

## 4-III.A. OVERVIEW

As vouchers become available, families on the waiting list must be selected for assistance in accordance with the policies described in this part.

The order in which families are selected from the waiting list depends on the selection method chosen by HACA and is impacted in part by any selection preferences for which the family qualifies. The availability of targeted funding also may affect the order in which families are selected from the waiting list.

HACA must maintain a clear record of all information required to verify that the family is selected from the waiting list according to HACA's selection policies [24 CFR 982.204(b) and 982.207(e)].

## 4-III.B. SELECTION AND HCV FUNDING SOURCES

### Special Admissions [24 CFR 982.203]

HUD may award funding for specifically named families living in specified types of units. In these cases, HACA may admit such families whether or not they are on the waiting list, and, if they are on the waiting list, without considering the family's position on the waiting list. These families are considered non-waiting list selections. HACA will maintain records showing that such families were admitted with special program funding. HACA will provide special admission to the following:

1. Current HACA Project Based Rental Assistance (PBRA)families involuntarily displaced because of HACA action involving rehabilitation, demolition or other disposition of dwelling units.

2. Families residing in a multifamily rental housing project when HUD sells, forecloses or demolishes the project.

3. Families residing in a project covered by a project-based Section 8 HAP contract at or near the end of the HAP contract term.

### Targeted Funding [24 CFR 982.204(e)]

HUD may award HACA funding for a specified category of families on the waiting list. HACA must use this funding only to assist the families within the specified category. In order to assist families within a targeted funding category, HACA may skip families that do not qualify within the targeted funding category. Within this category of families, the order in which such families are assisted is determined according to the policies provided in Section 4-III.C.

> HACA Policy
>
> HACA administers the following types of targeted funding:
>
> Mainstream Vouchers for non-elderly persons with disabilities who are homeless or who are transitioning out of institutions or other segregated settings
>
> VASH - Veterans Affairs for Supportive Housing
>
> Family Unification Program
>
> Non-elderly Disabled
>
> Foster Youth to Independence
>
> Stability Vouchers
>
> Emergency Housing Vouchers

**Order of Selection – specified category vouchers**

When HACA resumes voucher issuance after a funding shortfall, HACA will first issue vouchers to specified category vouchers until HACA is assisting the required number of special purpose families.

**Regular HCV Funding**

Regular HCV funding may be used to assist any eligible family on the waiting list. Families are selected from the waiting list according to the policies provided in Section 4-III.C.

## 4-III.C. SELECTION METHOD

PHAs must describe the method for selecting applicant families from the waiting list, including the system of admission preferences that HACA will use [24 CFR 982.202(d)].

### Local Preferences [24 CFR 982.207; HCV p. 4-16]

PHAs are permitted to establish local preferences, and to give priority to serving families that meet those criteria. HUD specifically authorizes and places restrictions on certain types of local preferences. HUD also permits HACA to establish other local preferences, at its discretion. Any local preferences established must be consistent with HACA plan and the consolidated plan, and must be based on local housing needs and priorities that can be documented by generally accepted data sources.

> HACA Policy
>
> Families can claim eligibility for any local preference any time from the date they applied up until the time their name is drawn off the waiting list. Preference claims will be

verified once they have been drawn off the waiting list during the interview process. If HACA is unable to verify a preference claim, the family will be placed back on the waiting list without the preference.

HACA will open the waiting list or leave the waiting list open for certain preference groups as needed to meet the preference caps listed below.

1. Non-specified category vouchers will use the following local preferences for purposes of establishing priority. The local preferences are weighted differently, with the higher number representing a higher ranking. Each applicant family can be granted a maximum of one local preference plus the residency preference (if they qualify).

2. Weights for each preference are as follows:

>     Elderly                          = 2
>     Disabled                         = 2
>     Involuntarily Displaced          = 2
>     Homeless                         = 3
>     Families with Minor Children     = 2
>     Residency                        = 1
>     RAD Choice Mobility              = 3
>     FUP/FYI Youth                    = 3
>     RAD or PBRA Relocation           = 4
>     PBV Right to Move                = 4
>     HACA VAWA Emergency              = 5

(A)  **Elderly Preference:**  HACA will give preference to elderly families. An elderly family is a family in which the head, spouse or co-head is age 62 or older.

(B)  **Disabled Preference:**  HACA will give preference to disabled families. A disabled family is a family in which the head, spouse or co-head is disabled using the current HUD definition of disability.

(C)  **Involuntary Displacement Preference:**  HACA will give preference to families displaced as a result of natural disaster or government action. The following documentation will be used to verify displacement status:

> Certification from a unit of government concerning displacement due to natural disaster; or

> Certification from a unit of government concerning displacement due to code enforcement or public improvement/development or displacement by inaccessibility of a unit.

The displacement must have occurred within six months of requesting the involuntary displacement preference. Also, HACA will offer a preference to any family that has been terminated from its HCV program due to insufficient program funding.

(D)    **Homeless Preference:**  Each calendar year, up to 25% of vouchers issued will be dedicated to the homeless preference.

Applicants given the homeless preference must meet all of the following criteria:

a)  Meet the HUD definition of homeless. See definitions section at the end of the Administrative Plan.

b)  Are referred to HACA by a coalition of homeless service providers with whom HACA has executed a Memorandum of Understanding (MOU) outlining the provider's responsibilities with respect to the provision of housing search assistance and supportive services for the referred household.

c)  Have received a written commitment from the referring homeless service provider for housing search / location assistance.

d)   Have received a written commitment from the homeless service provider to offer support services on an as needed basis to help the household transition from homelessness to permanent housing; and

e)  Have received a written commitment from the homeless service provider to offer supportive services to help the household maintain housing and comply with HCV rules.

While a referral from the coalition of homeless service providers is required for this preference, use of the offered supportive services is not a requirement.  The choice of the applicant to refuse the offered services will not jeopardize any housing assistance for which they are eligible.

HACA will execute a Memorandum of Understanding with one entity representing a coalition of homeless service providers that will serve as the primary point of contact for communicating homeless referrals to HACA.  HACA reserves the right to establish additional MOUs as necessary to ensure that homeless applicants have the opportunity to apply for housing assistance under this preference.

If it is determined that an applicant referred by a homeless service provider, as described above, does not meet the criteria described therein, the applicant will not receive the preference and:

if the applicant was only on the HCV waiting list because of the homeless referral, the applicant will be removed from the HCV waiting list

if the applicant was on the HCV waiting list through the regular application process, the applicant will return to their lottery position on the waiting list without the homeless preference.

If HACA denies an applicant's homeless preference claim, HACA will notify the applicant and referring service provider in writing, including the reason(s) for the preference denial.  Applicants have the right to appeal the denial of eligibility for

the homeless preference using the established process for informal hearings.

Individuals and families transitioning, or "moving up," from Permanent Supportive Housing (PSH) units will be included as a priority group as part of this homeless preference. These are persons that were previously homeless prior to entry into a PSH program but who no longer require that level of supportive services. Referrals could also include individuals and families participating in a Continuum of Care homeless rental assistance program, which is not renewed. This would require a referral from the current case manager or PSH provider as well as documentation that the family was homeless prior to entering into the PSH unit. This documentation must be provided as part of the referral.

(E)     **Families with Minor Children Preference:** HACA will give preference to families with minor children. A minor child is a child under age 18 who meets HUD and HACA's definition of a family member (See Section 3.I.B for the definition of Family Members).

> Minor children of a live in aide do not qualify the family for this preference.

> Minor children that are foster children of an authorized adult member of the assisted family do not qualify the family for this preference.

(F)     **Residency Preference:** HACA will give preference to persons who reside in the following Texas Counties: Travis, Hays, Bastrop, Caldwell and Williamson counties. The residency status will be determined at the time of the eligibility interview. This preference will not have the purpose or effect of delaying or otherwise denying admission to the program based on the race, color, ethnic origin, gender, sexual orientation, religion, disability, or age of any member of an applicant family.

Applicants who are working or who have been notified that they are hired to work in a residency preference area will be treated as residents of the residency preference area with documented proof of employment in the residency preference area. Applicants who are graduates of, or active participants in, education and training programs in a residency preference area are eligible for this preference if the education or training program is designed to prepare individuals for the job market.

(G)     **Rental Assistance Demonstration (RAD) Choice Mobility Preference:** As required by HUD and in accordance with all HUD RAD guidelines, if HACA participates in RAD, HACA will provide a Choice-Mobility option to residents of covered RAD projects in accordance with policies outlined in Chapter 18 of this HCV Administrative Plan.

(H)    **FUP/FYI Youth Preference:**  HACA will give preference to FUP and FYI youth whose 36-60 month FUP/FYI voucher is expiring and they will lack adequate housing as a result of voucher expiration.  To be eligible for this voucher, the FUP or FYI Youth must be referred by the Texas Department of Family Protective Services (TDFPS), Lifeworks or another social service agency.  The referral must indicate that without continued voucher assistance, the FUP or FYI Youth will lack adequate housing.  Receipt of this preference is not a guarantee of uninterrupted voucher assistance, as issuance of vouchers is dependent on funding availability.

(I)    **RAD or PBRA Relocation Preference:** HACA may give preference to families currently housed in HACA's properties that are undergoing significant renovation or redevelopment through RAD or redevelopment of a PBRA property and would require long term (more than 6 months) relocation of residents. If HACA chooses to exercise this option for valid business purposes, HACA will have a special opening of the waiting list only for the identified properties. Families that select this option and apply during the open period will receive this preference.

(J)    **HACA VAWA Emergency Preference:**  HACA will give preference to families living in a HACA owned Project Based Rental Assistance (PBRA) property, who are victims of domestic violence, dating violence, sexual assault or stalking and meet the eligibility requirements outlined in HACA's VAWA Emergency Transfer Move Plan.  Due to the potentially life-threatening nature of a VAWA emergency, this preference is the most heavily weighted preference.

(K)    **PBV Right to Move (24 CFR 983.261):** HACA will give preference to families living in a project-based voucher unit who request comparable tenant-based rental assistance and give the owner advance written notice of intent to vacate (with a copy to the PHA) in accordance with the lease.  Residents living in a PBV unit may request a tenant-base voucher 12 months after living in a PBV unit.

2.    Specified category vouchers waiting list selection criteria.

A.    **Family Unification Program Vouchers** (targeted funding) Waiting list policy:

Placing FUP eligible families referred by CPS on HACA's HCV waiting list:

The waiting list will remain open for FUP eligible referrals.  Eligibility for the FUP vouchers will be based on the respective HUD Notice of Funding Availability and may be limited to referrals from the Texas DFPS.  When HACA receives a completed application and referral from the Texas Department of Family and Protective Service (DFPS), the applicant will be placed on the waiting list in order according to the date and time when HACA first received both documents.   FUP eligible applicants are granted a preference over all other applicants not eligible for FUP vouchers. Applicants certified eligible for the FUP vouchers will be coded as such on HACA's waiting list. This preference will be granted only for the issuance

of FUP vouchers and not any other voucher. If FUP vouchers are not available, FUP eligible families will maintain their original place on the waiting list for the issuance of non-FUP vouchers. All families granted a FUP preference will be prioritized based on date and time of being certified eligible and any other applicable preference (elderly, disable, displaced, homeless, residency).

If a youth or family coded as FUP ceases to meet the criteria for FUP eligibility before the family has moved into an assisted unit, HACA will remove the FUP coding. If the family or youth was previously on the Housing Choice Voucher waiting list, they will maintain their original place on the waiting list. If the youth or family was only on the waiting list due to a FUP referral, they will be removed from the waiting list or lose their voucher if already issued.

B.    **Non-Elderly Disabled Program** vouchers (targeted funding) waiting list policy:

For the issuance of Non-Elderly Disabled (NED) vouchers, only applicants certified eligible for NED Vouchers will be issued a NED voucher. To be an eligible application for a NED voucher, HACA will have to receive both (1) a completed application and (2) a completed referral from the Texas Department of Aging and Disability Services (DADS) through their service provider ARCIL (Area Resource Center for Independent Living) or verification of age, verification of disability, verification of residence in an eligible institution, and confirmation from another independent agency or organization that routinely provides care and case management services to persons transitioning from institutions that the agency will provide such services to the applicant. Until both are received, the application will not be considered an eligible application. The applicant will only be placed on the waiting list once both documents have been received.

Therefore, NED eligible applicants are granted a preference over all other applicants not eligible for NED vouchers. Applicants certified eligible for the NED vouchers will be coded as such on HACA's waiting list. This preference will be granted only for the issuance of NED vouchers and not any other voucher. If NED vouchers are not available, NED eligible families will maintain their original place on the waiting list for the issuance of non-NED vouchers. All families granted a NED preference will be prioritized based on date and time of being certified eligible and any other applicable preference (elderly, disable, displaced, homeless, residency).

(a.)    Identifying NED eligible families currently on HACA's HCV waiting list

(i)    Upon receipt of the list of NED families referred by Texas DADS through ARCIL, HACA will compare the names with those of families already on HACA's HCV waiting list. Any family currently on the HCV waiting list that matches the referral list, will be coded as NED,

and will be granted a NED preference for NED vouchers. For issuance of non-NED vouchers, these applicants will be assisted in order of their original position on HACA's HCV waiting list in accordance with HACA's admissions policies. Therefore they will not lose their original position on the waiting list as a result of receiving a NED preference.

(b.)  Placing NED eligible families referred by ARCIL or by direct application with necessary supplemental documentation on HACA's HCV waiting list:

Those eligible applicants on the current waiting list will have priority over families not on the waiting list.  If additional funding is available, and all eligible families on the waiting list are exhausted, the waiting list will remain open for NED eligible families. Eligibility for the NED vouchers will be based on the respective HUD Notice of Funding. When HACA receives a completed application and referral from ARCIL or necessary supplemental documents, the applicant will be placed on the waiting list after all lottery applicants and in order according to the date and time when HACA first had received both documents.

If a family coded as NED ceases to meet the criteria for NED eligibility before the family has moved into an assisted unit, HACA will remove the NED coding.  If the family was previously on the waiting list, they will maintain their original place on the waiting list.  If the family was only on the waiting list due to a NED referral, or direct application for an NED voucher, they will be removed from the waiting list or lose their voucher if already issued.

C.  **Veterans Affairs Supportive Housing (VASH):** HACA accepts VASH applicants as referrals in the order received from the Veterans Affairs administration.

D.  Mainstream Vouchers – HACA will maintain a separate Mainstream Voucher waiting list as allowed per Notice PIH 2024-30. Chapter 19 further describes Mainstream Voucher waitlist requirements and local preferences.

E.  **Project-Based Vouchers (PBV):** HACA will use separate waiting lists for PBV units in individual projects or buildings (or for sets of such units). See Chapter 17-VI.D for selection method.

F. Foster Youth to Independence (FYI)
Placing FYI eligible families referred by CPS on HACA's HCV waiting list:

The waiting list will remain open for FYI eligible referrals.  Eligibility for the FYI vouchers will be based on the respective HUD Notice of Funding Availability and limited to referrals approved by the Texas DFPS, identified by the Coordinated Entry System.  When HACA receives a completed application and referral from

the Texas Department of Family and Protective Service (DFPS) or other identified service provider, the applicant will be placed on the waiting list in order according to the date and time when HACA first received both documents.  FYI eligible applicants are granted a preference over all other applicants not eligible for FYI vouchers. Applicants certified eligible for the FYI vouchers will be coded as such on HACA's waiting list. This preference will be granted only for the issuance of FYI vouchers and not any other voucher. If FYI vouchers are not available, FYI eligible families will maintain their original place on the waiting list for the issuance of non-FYI vouchers. All families granted a FYI preference will be prioritized based on date and time of being certified eligible and any other applicable preference (elderly, disable, displaced, homeless, residency).

If an applicant coded as FYI ceases to meet the criteria for FYI eligibility before the family has moved into an assisted unit, HACA will remove the FYI coding.  If the family or youth was previously on the Housing Choice Voucher waiting list, they will maintain their original place on the waiting list.  If the youth or family was only on the waiting list due to a FYI referral, they will be removed from the waiting list or lose their voucher if already issued.

## Income Targeting Requirement [24 CFR 982.201(b)(2)]
HUD requires that extremely low-income (ELI) families make up at least 75 percent of the families admitted to the HCV program during HACA's fiscal year. ELI families are those with annual incomes at or below the federal poverty level or 30 percent of the area median income, whichever number is higher. To ensure this requirement is met, HACA may skip non-ELI families on the waiting list in order to select an ELI family.

Low income families admitted to the program that are "continuously assisted" under the 1937 Housing Act [24 CFR 982.4(b)], as well as low-income or moderate-income families admitted to the program that are displaced as a result of the prepayment of the mortgage or voluntary termination of an insurance contract on eligible low-income housing, are not counted for income targeting purposes [24 CFR 982.201(b)(2)(v)].

> HACA Policy
> HACA will monitor progress in meeting the income targeting requirement throughout the fiscal year.  Extremely low-income families will be selected ahead of other eligible families on an as-needed basis to ensure the income targeting requirement is met.

## Order of Selection
HACA system of preferences may select families based on local preferences according to the date and time of application, or by a random selection process (lottery) [24 CFR 982.207(c)].  If HACA does not have enough funding to assist the family at the top of the waiting list, it is not permitted to skip down the waiting list to a family that it can afford to subsidize when there are not sufficient funds to subsidize the family at the top of the waiting list [24 CFR 982.204(d) and (e)].

> HACA Policy

Except for special admissions, all voucher program participants will be selected from the Tenant-Based Housing Choice Voucher Program waiting list. The Authority utilizes a lottery system for admission to the Program. Applications for the Program are taken when the waiting list is open. To reach potentially eligible families, The Authority will advertise the waiting list opening through a wide variety of sources including daily and local newspapers, minority media, service agencies, and broadcast media. Once the application period has closed, applicants will be selected by lottery and placed on the waiting list in order of their selection and according to the eligible preferences.

### Order of Selection from the Tenant-Based Assistance Waiting List:

Applicants issued a random lottery number are placed on the waiting list in numerical order from lowest to highest. Local preference ranking will be applied after applicants are assigned a numerical number based on the randomly assigned lottery number.

In situations where there are not enough applicants on the waiting list to fill the target number of slots (example: FUP, NED, VASH or the Homeless preference), referrals may be received and applicants added to the waiting list (after proper public notice of the opening of the waiting list for the specified category.) These applicants will be placed on the waiting list with any preferences that they claim.

When selecting applicants for specified categories (i.e. FUP, NED, VASH,), families will be selected from the waiting list based on the targeted funding for which they qualify. Within each targeted funding or preference category, families will be selected according to their lottery number, after applying any preferences (elderly, disabled, homeless, residency, and family with minor children) which apply. Documentation will be maintained by HACA as to whether families on the list qualify for and are interested in targeted funding. If a higher placed family on the waiting list is not qualified or not interested in targeted funding, there will be a notation maintained so that HACA does not have to ask higher placed families each time targeted selections are made.

If families referred do not qualify for the target funding category, they will not be added to the regular HCV waiting list, unless the regular HCV waiting list is open.

## 4-III.D. NOTIFICATION OF SELECTION

When a family has been selected from the waiting list, HACA must notify the family. [24 CFR 982.554(a)].

<u>HACA Policy</u>

When a family is selected from the waiting list, HACA will notify the family by first class mail at least 10 business days in advance of the scheduled interview. The notice will inform the family of the following:

> Date, time, and location of the scheduled application interview, including any procedures for rescheduling the interview;

> Who is required to attend the interview;

> All documents that must be provided at the interview including information about

what constitutes acceptable documentation; and

If a notification letter is returned to HACA with no forwarding address, the family will be removed from the waiting list. A notice of denial (see Chapter 3) will be sent to the family's address of record, as well as to any known alternate address.

## 4-III.E. THE APPLICATION INTERVIEW

HUD recommends that HACA obtain the information and documentation needed to make an eligibility determination through a face-to-face interview [HCV GB, pg. 4-16]. Being invited to attend an interview does not constitute admission to the program.

Assistance cannot be provided to the family until all SSN documentation requirements are met. However, if the PHA determines that an applicant family is otherwise eligible to participate in the program, the family may retain its place on the waiting list for a period of time determined by the PHA [Notice PIH 2018-24.

Reasonable accommodation must be made for persons with disabilities who are unable to attend an interview due to their disability.

HACA Policy

Families selected from the waiting list are required to participate in an eligibility interview.

The head of household and the spouse/co-head will be strongly encouraged to attend the interview together. However, either the head of household or the spouse/co-head may attend the interview on behalf of the family. Verification of information pertaining to adult members of the household not present at the interview will not begin until signed release forms are returned to HACA.

The head of household or spouse/co-head must provide acceptable documentation of legal identity. (Chapter 7 provides a discussion of proper documentation of legal identity). If the family representative does not provide the required documentation at the time of the interview, he or she will be required to provide it within 10 business days.

Pending disclosure and documentation of social security numbers, HACA will allow the family to retain its place on the waiting list for **90 days.**  If not all household members have disclosed their SSNs by the next time HACA is issuing vouchers, HACA will issue a voucher to the next eligible applicant family on the waiting list.

If the family is claiming a waiting list preference, the family must provide documentation to verify their eligibility for a preference (see Chapter 7). If the family is verified as eligible for the preference, HACA will proceed with the interview. If HACA determines the family is not eligible for the preference, the interview will not proceed and the family will be placed back on the waiting list according to the date and time of their application.

The family must provide the information necessary to establish the family's eligibility. The family must also complete required forms, provide required signatures and submit required documentation. If any materials are missing, HACA will provide the family with

a written list of items that must be submitted.

Any required documents or information that the family is unable to provide at the interview must be provided within 7 calendar days of the interview (Chapter 7 provides details about longer submission deadlines for particular items, including documentation of eligible non-citizen status). If the family is unable to obtain the information or materials within the required time frame, the family may request an extension. If the required documents and information are not provided within the required time frame (plus any extensions), the family will be sent a notice of denial (see Chapter 3).

An advocate, interpreter or other assistant may assist the family with the application and the interview process.

Interviews will be conducted in English. For limited English proficient (LEP) applicants, HACA will provide translation services in accordance with HACA's LEP plan.

If the family is unable to attend a scheduled interview, the family should contact HACA in advance of the interview to schedule a new appointment. In all circumstances, if a family fails to attend a scheduled interview, without prior HACA approval, their application will be made inactive based on the family's failure to supply information needed to determine eligibility.  The notice of rejection will state that failure to request a rescheduled appointment within 15 calendar days of the missed appointment date will be interpreted to mean that the family is no longer interested and their application will remain inactive. Due to the high volume of applicants on the waiting list, applicant families will only be allowed a maximum of three scheduled appointments, unless HACA receives documentation verifying that illness, disability, family death or hospitalization did not allow for attendance.  The family must provide the information necessary to establish the family's eligibility and determine the appropriate level of assistance, as well as completing required forms, providing required signatures, and submitting required documentation. If any materials are missing, HACA will provide the family with a written list of items that must be submitted.

## 4-III.F. COMPLETING THE APPLICATION PROCESS

HACA must verify all information provided by the family (see Chapter 7). Based on verified information, HACA must make a final determination of eligibility (see Chapter 3) and must confirm that the family qualified for any special admission, targeted admission, or selection preference that affected the order in which the family was selected from the waiting list.

### HACA Policy

If HACA determines that the family is ineligible, HACA will send written notification of the ineligibility determination within 10 business days of the determination. The notice will specify the reasons for ineligibility, and will inform the family of its right to request an informal review (Chapter 16).

If a family fails to qualify for any criteria that affected the order in which they were selected from the waiting list (e.g. targeted funding, extremely low-income), the family will be returned to its original position on the waiting list. HACA will notify the family in writing that they have been returned to the waiting list, and will specify the reasons.

If HACA determines that the family is eligible to receive assistance, HACA will invite the family to attend a briefing in accordance with the policies in <u>Chapter 5</u>.

## CHAPTER 5
## BRIEFINGS AND VOUCHER ISSUANCE

**INTRODUCTION**

This chapter explains the briefing and voucher issuance process. When a family is determined to be eligible for the Housing Choice Voucher (HCV) program, HACA must ensure that the family fully understands the way the program operates and the family's obligations under the program. This is accomplished through both an oral briefing and provision of a briefing packet containing the HUD required documents and other information the family needs to know in order to lease a unit under the program. Once the family is fully informed of the program's requirements, HACA issues the family a voucher. The voucher includes the unit size for which the family qualifies based on HACA's subsidy standards, as well as the issue and expiration of the voucher. The voucher is the document that authorizes the family to begin its search for a unit, and limits the amount of time the family has to successfully locate an acceptable unit.

This chapter describes HUD regulations and PHA policies related to these topics in two parts:

> <u>Part I: Briefings and Family Obligations</u>. This part details the program's requirements for briefing families orally, and for providing written materials describing the program and its requirements. It includes a particular focus on the family's obligations under the program.

> <u>Part II: Subsidy Standards and Voucher Issuance</u>. This part discusses HACA's standards for determining how many bedrooms a family of a given composition qualifies for, which in turn affects the amount of subsidy the family can receive. It also discusses the policies that dictate how vouchers are issued, and how long families have to locate a unit.

**PART I: BRIEFINGS AND FAMILY OBLIGATIONS**

**5-I.A. OVERVIEW**

HUD regulations require HACA to conduct mandatory briefings for applicant families who qualify for a voucher. The briefing provides a broad description of owner and family responsibilities, explains HACA's procedures, and includes instructions on how to lease a unit. This part describes how oral briefings will be conducted, specifies what written information will be provided to families, and lists the family's obligations under the program.

**5-I.B. BRIEFING [24 CFR 982.301 and PIH Notice: 2020-32]**

**Notification of Briefing**

Prior to issuance of a voucher, the PHA must give the family an oral briefing and provide the family with a briefing packet containing written information about the program. Families may be briefed in

individual face-to-face meetings, through group briefing sessions, or via remote briefing sessions.

HACA must give the family an oral briefing and provide the family with a briefing packet containing written information about the program. Families will be given the option to receive the briefing packet in electronic format or hard copy.  Families may be briefed individually or in groups. At the briefing, HACA must ensure effective communication in accordance with Section 504 requirements (Section 504 of the Rehabilitation Act of 1973), and ensure that the briefing site is accessible to individuals with disabilities. For a more thorough discussion of accessibility requirements, refer to Chapter 2.

> HACA Policy
>
> HACA will conduct briefings individually or in groups either in-person or remotely via webcast, video call, by phone, by mail or by another virtual method.
>
> - The head of household is required to attend the briefing.
>
> - Families that attend group briefings and still need individual assistance will be referred to an appropriate staff person.  If additional assistance is needed due to a disability or LEP need, staff will coordinate services to ensure information is communicated appropriately to meet the needs of the applicant.
>
> - Briefings will be conducted in English. For Limited English Proficient (LEP) applicants, HACA will provide interpretation services in accordance with HACA's LEP plan (See Chapter 2).

**Remote Briefings**

**Accessibility Requirements for Persons with Disabilities and LEP Individuals**

As with in-person briefings, the platform for conducting remote briefings must be accessible and the briefing conducted in accordance with Section 504 and accessibility requirements. This includes ensuring any information, websites, emails, digital notifications, and other virtual platforms are accessible for persons with vision, hearing, and other disabilities. Further, providing effective communication in a digital context may require the use of individualized auxiliary aids or services, such as audio description, captioning, sign language and other types of interpreters, keyboard accessibility, accessible documents, screen reader support, and transcripts. Auxiliary aids or services must be provided in accessible formats, in a timely manner, and in such a way to protect the privacy and independence of the individual.

If no method of conducting a remote briefing is available that appropriately accommodates an individual's disability, the PHA may not hold against the individual his or her inability to participate in the remote briefing, and the PHA should consider whether postponing the remote briefing to a later date is appropriate or whether there is a suitable alternative.

Due to the individualized nature of disability, the appropriate auxiliary aid or service necessary, or reasonable accommodation, will depend on the specific circumstances.

Limited English Proficiency (LEP) requirements also apply to remote briefings, including the use of interpretation services and document translation. See Chapter 2 for a more thorough discussion of accessibility and LEP requirements, all of which apply in the context of remote briefings.

<u>HACA Policy</u>

<u>HACA will provide an opportunity for remote briefing participants to ask questions.</u>

<u>After the remote briefing,</u> HACA staff will reach out directly to tenants by phone to make sure their questions have been answered.

**Identify and Resolve Technology Barriers Prior to Conducting the Remote Briefing.** The lack of technology or inability to use technology for a remote briefing can impose a disadvantage for individuals or families that may not be apparent to HACA.  Thus, HACA will determine if barriers exist prior to scheduling the remote briefing.  If the participant does not have proper technology access which will allow the individual to fully participate, then the remote briefing will be postponed, or an in-person alternative must be provided

HACA will never require that an individual with disabilities provide their own auxiliary aids or services, including for remote hearings or remote briefings.  HACA will not rely on an adult or minor child accompanying a person with a disability to interpret or facilitate communication for such person, except in an emergency involving an imminent threat to the safety or welfare of an individual or the public where there is no interpreter available; or where the individual with a disability specifically requests that the accompanying adult interpret or facilitate communication, the accompanying adult agrees to provide such assistance, and reliance on the adult for such assistance is appropriate under the circumstances. . (28 CFR 35.160-164; 24 CFR 8.6).

**Reasonable Accommodations.**   HACA is required to make reasonable accommodations in policies, practices, and procedures to ensure persons with disabilities have a full and equal opportunity to participate in and benefit from all aspects of the remote briefing.  This obligation is in addition to the obligation to ensure effective communication under Section 504 and the ADA.

If no method of conducting a remote briefing is available that appropriately accommodates an individual's disability, HACA will not hold the remote briefing. HACA will consider whether postponing the remote briefing to a later date is

appropriate or whether there is a suitable alternative to meet the participant's satisfaction more expeditiously.

**Requirement for persons with limited English proficiency (LEP).** HACA must take reasonable steps to ensure full and meaningful access to the remote briefing for LEP persons consistent with its obligations under Title VI of the Civil Rights Act of 1964[1]. The obligation to provide meaningful access for LEP persons, regarding remote briefings, is particularly important meaning that HACA will generally need to coordinate with a remote language interpretation service prior to the remote briefing. Further, conferencing technology may provide for remote interpretation; if video technology is available, remote interpretation using video is generally preferred over voice-only because of the additional visual cues. HACA will not rely on minors to interpret.

For written materials, HACA will engage with a language translation service. All written materials related to the remote briefing, whether paper or electronic, and whether provided before, during, or after the remote hearing, if needed, will be provided in a translated format.

**Presenting Documents Prior to a Remote Briefing**. If video or telephone conference is used for the remote briefing, all materials being presented, whether paper or electronic, will be provided to the individual or family prior to the remote briefing. Individuals or families may prefer paper printouts over electronic documents, due to lack of access to printers, difficulty viewing detailed documents on a cell phone, or difficulty viewing screen sharing on an app. Any materials made available to the individual or family must meet the requirements for accessibility for persons with disabilities and persons with LEP.

**Establish Procedures**. HACA will establish written procedures of all aspects of how the remote briefing will be conducted and the procedures will be readily available to the public. The procedures will explain how documents will be presented prior to the remote briefing. Note that when making procedures readily available to the public, HACA will meet the obligations under Section 504 and the ADA to effectively communicate to persons with disabilities, and under Title VI of the Civil Rights Act of 1964 to provide meaningful access to individuals with LEP.

**Personally Identifiable Information (PII).** For documents that contain PII and are provided prior to a remote briefing, HACA will minimizing the risk of exposure or misuse of the data collected, used, and shared. PII is

information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information directly linked or linkable to a specific individual. Examples of PII include name, social security number, biometric records, date and place of birth, and mother's maiden name. When considering how remote briefing information is shared, HACA shall ensure that electronic information stored or transmitted is secure per Notice PIH-2015-06.

### Notification and Attendance

<u>HACA Policy</u>

Families will be notified of their eligibility for assistance at the time they are invited to attend a briefing. The notice will identify who is required to attend the briefing, as well as the date and time of the scheduled briefing. The notice will also inform the family of any additional requirements for in-person or remote briefings as addressed in relevant policy elsewhere in this section.

The notice will be sent by first class mail and will also be sent by email if the family has provided a valid email address to the PHA.

If the notice is returned by the post office with no forwarding address, the applicant will be denied and their name will not be placed back on the waiting list. If the notice is returned by the post office with a forwarding address, the notice will be re-sent to the address indicated.

Applicants who fail to attend a scheduled briefing will be scheduled for another briefing automatically. HACA will notify the family of the date and time of the second scheduled briefing. Applicants who fail to attend two scheduled briefings, without HACA approval, will be denied assistance (see Chapter 3).

### Oral Briefing [24 CFR 982.301(a)]

The following describes the briefing requirements for the HCV tenant-based voucher program. The briefing requirements for the HCV project-based voucher program are available in Chapter 17 of this plan.

Each briefing must provide information on the following subjects:

- How the Housing Choice Voucher program works;

- Family and owner responsibilities;

- Where the family can lease a unit, including renting a unit inside or outside the PHA's jurisdiction, and any information on selecting a unit that HUD provides;

- An explanation of how portability works. The PHA may not discourage the family from choosing to live anywhere in the PHA jurisdiction or outside the PHA jurisdiction under portability, unless otherwise expressly authorized by statute, regulation, PIH Notice, or court order;

- HACA must inform the family of how portability may affect the family's assistance through screening, subsidy standards, payment standards, and any other elements of the portability process which may affect the family's assistance;

- The advantages of areas that do not have a high concentration of low-income families; and

In briefing a family, HACA will take appropriate steps to ensure effective communication in accordance with 24 CFR 8.6 and 28 CFR part 35, subpart E, and must provide information on the reasonable accommodation process.

### Briefing Packet [24 CFR 982.301(b); New HCV GB, *Housing Search and Leasing,* p. 7]

Documents and information provided in the briefing packet must include the following:

- The term of the voucher, voucher suspensions, and the PHA's policies on any extensions of the term. If the PHA allows extensions, the packet must explain how the family can request an extension.

- A description of the method used to calculate the housing assistance payment for a family, including how the PHA determines the payment standard for a family andhow the PHA determines total tenant payment for a family.

- An explanation of how the PHA determines the maximumrent for an assisted unit.

- Where the family may lease a unit and an explanation of how portability works, including information on how portability may affect the family's assistance through screening, subsidy standards, payment standards, and any other elements of the portability process that may affect the family's assistance.

- The HUD-required tenancy addendum, which must be included in the lease.

- The form the family must use to request approval of tenancy**,** and a description of the procedure for requesting approval for a tenancy.

- A statement of the PHA policy on providing information about families to prospective owners.

- PHA subsidy standards, including when the PHA will consider granting exceptions to the standards as allowed by 24 CFR 982.402(b)(8), and when exceptions are required as a reasonable accommodation for persons with disabilities under Section 504, the Fair Housing Act, or the Americans with Disabilities Act;

- Materials (e.g., brochures) on how to select a unit and any additional information on selecting a unit that HUD provides..

- Information on Federal, State, and local equal opportunity laws, the contact information for the Section 504 coordinator, a copy of the housing discrimination complaint form, and information

on how to request a reasonable accommodation or modification (including information on requesting exception payment standards as a reasonable accommodation) under Section 504, the Fair Housing Act, and the Americans with Disabilities Act;

- A list of landlords known to the PHA who may be willing to lease a unit to the family or other resources (e.g., newspapers, organizations, online search tools) known to the PHA that may assist the family in locating a unit. PHAs must ensure that the list of landlords or other resources covers areas outside of poverty or minority concentration.

- Notice that if the family includes a person with disabilities, the PHA is subject to the requirement under 24 CFR 8.28(a)(3) to provide a current listing of accessible units known to the PHA and, if necessary, other assistance in locating an available accessible dwelling unit;

- The family obligations under the program;

- The advantages of areas that do not have a high concentration of low-income families which may include, access to accessible and high-quality housing, transit, employment opportunities, educational opportunities, recreational facilities, public safety stations, retail services, and health services;

- A description of when the PHA is required to give a participant family the opportunity for an informal hearing and how to request a hearing.

- 

- ***Providing information for persons with limited English proficiency (LEP).*** The PHA must take reasonable steps to ensure meaningful access by persons with limited English proficiency in accordance with Title VI of the Civil Rights Act of 1964 and HUD's implementing regulations at 24 CFR part 1.

### Additional Items to be Included in the Briefing Packet

In addition to items required by the regulations, PHAs may wish to include supplemental materials to help explain the program to both participants and owners [HCV GB p. 8-7, Notice PIH 2017-12].

> HACA Policy

> HACA will make the following additional materials available electronically or via hard copy, if requested:

>> Information on how to fill out and file a housing discrimination complaint form.

>> Information about the protections afforded by the Violence Against Women Act of 2005 (VAWA) to victims of domestic violence, dating violence, sexual assault and stalking (see section 16-IX.C)

>> Copy of the Orientation presentation

>> Copy of locating home brochure created by HACA

>> Copy of  Housing Choice Voucher Program tenant packet

Copy of Certification packet

## 5-I.C. FAMILY OBLIGATIONS

Obligations of the family are described in the housing choice voucher (HCV) regulations and on the voucher itself. These obligations include responsibilities the family is required to fulfill, as well as prohibited actions. HACA must inform families of these obligations during the oral briefing, and the same information must be included in the briefing packet. When the family's unit is approved and the HAP contract is executed, the family must meet those obligations in order to continue participating in the program. Violation of any family obligation may result in termination of assistance, as described in <u>Chapter 12</u>.

### Time Frames for Reporting Changes Required by Family Obligations

<u>HACA Policy</u>

Unless otherwise noted, families are required to report any changes in family composition, income or circumstances in writing within 30 calendar days from the date it occurred.

### Family Obligations [24 CFR 982.551]

The family obligations of the voucher are listed as follows

The family must supply any information that HACA or HUD determines to be necessary, including submission of required evidence of citizenship or eligible immigration status.

The family must supply any information requested by HACA or HUD for use in a regularly scheduled reexamination or interim reexamination of family income and composition.

The family must disclose and verify social security numbers and sign and submit consent forms for obtaining information.

Any information supplied by the family must be true and complete.

The family is responsible for any Housing Quality Standards (HQS) breach by the family caused by failure to pay tenant-provided utilities or appliances, or damages to the dwelling unit or premises beyond normal wear and tear caused by any member of the household or guest.

<u>HACA Policy</u>

Damages beyond normal wear and tear will be considered to be damages which could be assessed against the security deposit.

The family must allow HACA to inspect the unit at reasonable times and after reasonable notice, as described in Chapter 8 of this plan.

The family must not commit any serious or repeated violation of the lease.

<u>HACA Policy</u>

HACA will determine if a family has committed serious or repeated violations of the lease based on available evidence, including but not limited to, a court-ordered eviction, or an owner's notice to evict, police reports, and affidavits from the owner, neighbors, or other credible parties with direct knowledge.

*Serious and repeated lease violations* will include, but not be limited to, nonpayment of rent, disturbance of neighbors, destruction of property, living or housekeeping habits that cause damage to the unit or premises, and criminal activity. Generally, the criterion to be used will be whether or not the reason for the eviction was the fault of the tenant or guests.

Any incidents of, or criminal activity related to, domestic violence, dating violence, sexual assault or stalking will not be construed as serious or repeated lease violations by the victim [24CFR 5.2005(c)(1)].

The family must notify HACA and the owner before moving out of the unit or terminating the lease.

HACA Policy

The family must comply with lease requirements regarding written notice to the owner.

The family must provide written notice to HACA at the same time the owner is notified.

The family must promptly give HACA a copy of any owner eviction notice.

The family must use the assisted unit for residence by the family. The unit must be the family's only residence.

The composition of the assisted family residing in the unit must be approved by HACA. The family must promptly notify HACA in writing of the birth, adoption, or custody of a minor child. The family must request PHA approval to add any other family member as an occupant of the unit.

HACA Policy

The request to add a family member must be submitted in writing and approved prior to the person moving into the unit. HACA will determine eligibility of the new member in accordance with the policies in Chapter 3.

The family must promptly notify HACA in writing if any family member no longer lives in the unit.

If HACA has given approval, a foster child or a live-in aide may reside in the unit. HACA has the discretion to adopt reasonable policies concerning residency by a foster child or a live-in aide, and to define when PHA consent may be given or denied. For policies related to the request and approval/disapproval of foster children, foster adults, and live-in aides, see Chapter 3 (Sections I.K and I.M), and Chapter 11 (Section II.B).

The family must not sublease the unit, assign the lease, or transfer the unit.

HACA Policy

Subleasing includes receiving payment to cover rent and utility costs by a person living in the unit who is not listed as a family member.

The family must supply any information requested by HACA to verify that the family is living in the unit or information related to family absence from the unit.

The family must promptly notify HACA when the family is absent from the unit.

HACA Policy

Notice is required under this provision when any individual family member or all family members will be absent from the unit for an extended period. An extended period is defined as any period greater than 30 calendar days. Written notice must be provided to HACA at the start of the extended absence.

The family must pay utility bills and provide and maintain any appliances that the owner is not required to provide under the lease [Form HUD-52646, Voucher].

The family must not own or have any interest in the unit, (other than in a cooperative and owners of a manufactured home leasing a manufactured home space).

Family members must not commit fraud, bribery, or any other corrupt or criminal act in connection with the program. (See Chapter 14, Program Integrity for additional information).

Family members must not engage in drug-related criminal activity or violent criminal activity or other criminal activity that threatens the health, safety or right to peaceful enjoyment of other residents and persons residing in the immediate vicinity of the premises. See Chapter 12 for HUD and PHA policies related to drug-related and violent criminal activity.

Members of the household must not engage in abuse of alcohol in a way that threatens the health, safety or right to peaceful enjoyment of the other residents and persons residing in the immediate vicinity of the premises. See Chapter 12 for a discussion of HUD and PHA policies related to alcohol abuse.

An assisted family or member of the family must not receive HCV program assistance while receiving another housing subsidy, for the same unit or a different unit under any other federal, state or local housing assistance program.

A family must not receive HCV program assistance while residing in a unit owned by a parent, child, grandparent, grandchild, sister or brother of any member of the family, unless HACA has determined (and has notified the owner and the family of such determination) that approving rental of the unit, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities. [Form HUD-52646, Voucher]

## PART II: SUBSIDY STANDARDS AND VOUCHER ISSUANCE

## 5-II.A. OVERVIEW

HACA must establish subsidy standards that determine the number of bedrooms needed for families of different sizes and compositions. This part presents the policies that will be used to determine the family unit size (also known as the voucher size) a particular family should receive,

and the policies that govern making exceptions to those standards. HACA must also establish policies related to the issuance of the voucher, to the voucher term, and to any extensions of the voucher term.

## 5-II.B. DETERMINING FAMILY UNIT (VOUCHER) SIZE [24 CFR 982.402]

For each family, HACA determines the appropriate number of bedrooms under HACA subsidy standards and enters the family unit size on the voucher that is issued to the family. The family unit size does not dictate the size of unit the family must actually lease, nor does it determine who within a household will share a bedroom/sleeping room.

The following requirements apply when HACA determines family unit size:

The subsidy standards must provide for the smallest number of bedrooms needed to house a family without overcrowding.

The subsidy standards must be consistent with space requirements under the housing quality standards.

The subsidy standards must be applied consistently for all families of like size and composition.

A child who is temporarily away from the home because of placement in foster care is considered a member of the family in determining the family unit size.

If children are projected to be out of the home for a period of more than 6 months from the initial removal date but will be returned to the home, the voucher size may be reduced.

A family that consists of a pregnant woman (with no other persons) must be treated as a two-person family.

Any live-in aide (approved by HACA to reside in the unit to care for a family member who is disabled or is at least 50 years of age) must be counted in determining the family unit size;

Unless a live-in-aide resides with a family, the family unit size for any family consisting of a single person must be either a zero- or one-bedroom unit, as determined under HACA subsidy standards.

HACA Policy

Considering the great demand for HCV assistance and the limited funding, HACA's policy regarding subsidy standards is designed to help the maximum number of families in need. If a family is within the subsidy range, they will not be upgraded unless there is an approved exception as defined in 5-II.C. below.

HACA will assign one bedroom for each two persons within the household unless an exception has been granted.

Live-in aides will be allocated a separate bedroom. A live-in aide's family members may be allowed to reside in the unit, however, a larger bedroom size would not be considered and the total number of people in the dwelling unit must meet housing subsidy standards. The live-in aide or live-in aide's family members will not be considered as remaining

family members for continued occupancy purposes.

Single person families will be allocated one bedroom.

The head of household and spouse (if present) will be granted one bedroom unless an exception is approved.

HACA will reference the following chart in determining the appropriate voucher size for a family:

| Voucher Size | Person in Household (minimum –maximum) |
|---|---|
| Single Room Occupancy | 1-1 |
| 0 or efficiency bedroom | 1-2 |
| 1 bedroom | 1-2 |
| 2 bedrooms | 2-4 |
| 3 bedrooms | 4-6 |
| 4 bedrooms | 6-8 |
| 5 bedrooms | 8-10 |

## 5-II.C. EXCEPTIONS TO SUBSIDY STANDARDS

In determining family unit size for a particular family, HACA may grant an exception to its established subsidy standards if HACA determines that the exception is justified by the age, sex, health, handicap, or relationship of family members or other personal circumstances [24 CFR 982.402(b)(8)].

HACA Policy

HACA will consider granting an exception for any of the reasons specified in the regulation: age and gender, health, handicap, or relationship of family members or other personal circumstances.

The family must request any exception to the subsidy standards in writing. The request must explain the need or justification for a larger unit size, and must include appropriate documentation. Requests based on health-related reasons must be verified by a knowledgeable professional source (e.g. doctor or health professional), unless the disability and the disability–related request for accommodation is readily apparent or otherwise known. The family's continued need for an additional bedroom due to special medical equipment must be re-verified at the annual reexamination.

HACA will notify the family of its determination within 15 calendar days of receiving the family's request. If a participant family's request is denied, the notice will inform the family of their right to request an informal hearing.

Requests for upgrades in bedroom size or exceptions to the subsidy standards may include, but are not limited to:

Two elderly or disabled household members may be given separate bedrooms as a reasonable accommodation for a person with a disability or because of a medical necessity or health condition.

When a child in the household reaches age 10, if a family makes the request in writing for an additional bedroom so children with different genders can have their own room, HACA will consider approving upgrading the voucher bedroom size if HACA has enough funds to support the total number of HUD allocated vouchers. HACA will not provide an upgrade in bedroom size if funds are not available to lease the maximum number of HUD allocated vouchers.

Same gender children or household members would not be eligible for an upgrade in bedroom size so each could have their own room, unless as a reasonable accommodation for a person with a disability.

A need for a separate bedroom for reasons related to a family member's disability, medical necessity, or health condition. The additional bedroom should be to accommodate a person with a disability because it has been determined by a knowledgeable professional (e.g. doctor or health professional) that the person with a disability needs their own bedroom because of a stated health condition or disability.

For requests to approve an additional bedroom for medical equipment that has been determined necessary by a knowledgeable professional (e.g. doctor or health professional), the additional bedroom should not be approved for the purpose of storing exercise equipment or other medical equipment if such equipment could be stored in the common living space, one of the existing bedrooms, a garage, or storage area. HACA will not require a person with disabilities to store exercise equipment or other medical equipment in an unheated or non-air conditioned garage or room. Also, HACA will not require storage in a common living space if such storage will hinder mobility within the unit. The results of a unit inspection to support the need for the additional bedroom for medical equipment will be placed in the file.

For a single person who is not elderly, disabled, or a remaining family member, an exception cannot override the regulatory limit of a zero or one bedroom [24 CFR 982.402(b)(8)].

For a single parent or guardian with children, the parent or guardian will be provided a separate bedroom from their children.

## 5-II.D. VOUCHER ISSUANCE [24 CFR 982.302]

When a family is selected from the waiting list (or as a special admission as described in Chapter 4), or when a participant family wants to move to another unit, HACA issues a Housing Choice Voucher, form HUD-52646. This chapter deals only with voucher issuance for applicants. For voucher issuance associated with moves of program participants, please refer to Chapter 10.

The voucher is the family's authorization to search for housing. It specifies the unit size for which the family qualifies, and includes both the date of voucher issuance and date of expiration. It

contains a brief description of how the program works and explains the family obligations under the program. The voucher is evidence that HACA has determined the family to be eligible for the program, and that HACA expects to have money available to subsidize the family if the family finds an approvable unit. However, HACA does not have any liability to any party by the

issuance of the voucher, and the voucher does not give the family any right to participate in HACA's housing choice voucher program [Voucher, form HUD-52646]

A voucher can be issued to an applicant family only after HACA has determined that the family is eligible for the program based on verification of information received within the 60 days prior to issuance [24 CFR 982.201(e)] and after the family has attended an oral briefing [HCV 8-1].

> HACA Policy
>
> Vouchers will be issued to eligible applicants immediately following the mandatory briefing.

HACA should have sufficient funds to house an applicant before issuing a voucher. If funds are insufficient to house the family at the top of the waiting list, HACA must wait until it has adequate funds before it calls another family from the list [HCV GB p. 8-10].

> HACA Policy
>
> Prior to issuing any vouchers, HACA will determine whether it has sufficient funding in accordance with the policies in Part VIII of Chapter 16.

If HACA determines that there is insufficient funding after a voucher has been issued, HACA may rescind the voucher and place the affected family back on the waiting list.

## 5-II.E. VOUCHER TERM AND EXTENSIONS

### Voucher Term [24 CFR 982.303]

The initial term of a voucher must be at least 60 calendar days. The initial term must be stated on the voucher [24 CFR 982.303(a)].

> HACA Policy
>
> The initial voucher term will be 120 calendar days.
>
> The family must submit a Request for Tenancy Approval and proposed lease within the 120-day period unless HACA grants an extension.

### Extensions of Voucher Term [24 CFR 982.303(b)]

HACA has the authority to grant extensions of search time, to specify the length of an extension, and to determine the circumstances under which extensions will be granted. There is no limit on the number of extensions that HACA can approve. Discretionary policies related to extension and expiration of search time must be described in HACA's administrative plan [24 CFR 982.54].

PHAs must approve additional search time if needed as a reasonable accommodation to make the program accessible to and usable by a person with disabilities. The extension period must be reasonable for the purpose.

The family must be notified in writing of HACA's decision to approve or deny an extension. HACA's decision to deny a request for an extension of the voucher term is not subject to informal review [24 CFR 982.554(c)(4)].

> HACA Policy

> HACA may approve one 30-day extension beyond 120 days upon written request from the family if funding is available.

> HACA will consider additional extensions in the following circumstances:

>> It is necessary as a reasonable accommodation for a person with disabilities.

>> Following is a list of extenuating circumstances that HACA may consider in making its decision.

>> - Serious illness or death in the family
>> - Other family emergency
>> - Obstacles due to employment
>> - Whether the family has already submitted requests for tenancy approval that were not approved by HACA
>> - Whether family size or other special circumstances make it difficult to find a suitable unit
>> - Obstacles because of limited English proficiency
>> - Obstacles due to transportation difficulties
>> - Unable to locate an affordable unit
>> - Obstacles due to portability

Any request for an additional extension must include the reason(s) an additional extension is necessary. HACA may require the family to provide documentation to support the request.

All requests for extensions to the voucher term must be made in writing and submitted to HACA prior to the expiration date of the voucher (or extended term of the voucher).

HACA will decide whether to approve or deny an extension request within 10 calendar days of the date the request is received, and will provide the family written notice of its decision.

There will not be extensions approved beyond 150 days, unless as a reasonable accommodation for a person with a disability and approved in writing by the Housing Choice Voucher Director, Intake and Special Programs Director, or Assisted Housing Vice President.

## Suspensions of Voucher Term [24 CFR 982.303(c)]

The PHA must provide for suspension of the initial or any extended term of the voucher from the date the family submits a request for HACA approval of the tenancy until the date the HACA notifies the family in writing whether the request has been approved or denied.

### Expiration of Voucher Term

Once a family's housing choice voucher term (including any extensions) expires, the family is no longer eligible to search for housing under the program. If the family still wishes to receive assistance, HACA may require that the family reapply, or may place the family on the waiting list with a new application date but without requiring reapplication. Such a family does not become ineligible for the program on the grounds that it was unable to locate a unit before the voucher expired [HCV GB p. 8-13].

> HACA Policy
>
> If an applicant family's voucher term or extension expires before the family has submitted a Request for Tenancy Approval (RTA) or HACA has approved a tenancy, HACA will require the family to reapply for assistance.
>
> Within 10 calendar s days after the expiration of the voucher term or any extension, HACA will notify the family in writing that the voucher term has expired and that the family must reapply in order to be placed on the waiting list.

## CHAPTER 6
## INCOME AND SUBSIDY DETERMINATIONS

[24 CFR Part 5, Subparts E and F; 24 CFR 982]

## INTRODUCTION

A family's income determines eligibility for assistance and is also used to calculate the family's payment and HACA's subsidy. HACA will use the policies and methods described in this chapter to ensure that only eligible families receive assistance and that no family pays more or less than its obligation under the regulations. This chapter describes HUD regulations and PHA policies related to these topics in three parts as follows:

> Part I: Annual Income. HUD regulations specify the sources of income to include and exclude to arrive at a family's annual income. These requirements and PHA policies for calculating annual income are found in Part I.
>
> Part II: Adjusted Income. Once annual income has been established HUD regulations require HACA to subtract from annual income any of five mandatory deductions for which a family qualifies. These requirements and PHA policies for calculating adjusted income are found in Part II.
>
> Part III: Calculating Family Share and PHA Subsidy. This part describes the statutory formula for calculating total tenant payment (TTP), the use of utility allowances, and the methodology for determining PHA subsidy and required family payment.

## PART I: ANNUAL INCOME

## 6-I.A. OVERVIEW

The general regulatory definition of *annual income* shown below is from [24 CFR 5.609].

5.609 Annual income.

(a) Annual income means all amounts, monetary or not, which:

(1) Go to, or on behalf of, the family head or spouse (even if temporarily absent) or to any other family member; or

(2) Are anticipated to be received from a source outside the family during the 12-month period following admission or annual reexamination effective date; and

(3) Which are not specifically excluded in paragraph [5.609(c)].

(4) Annual income also means amounts derived (during the 12-month period) from assets to which any member of the family has access.

In addition to this general definition, HUD regulations establish policies for treating specific types of income and assets. The full texts of those portions of the regulations are provided in exhibits at the end of this chapter as follows:

> Annual Income Inclusions (Exhibit 6-1)
>
> Annual Income Exclusions (Exhibit 6-2)
>
> Treatment of Family Assets (Exhibit 6-3)
>
> Earned Income Disallowance for Persons with Disabilities (Exhibit 64)
>
> The Effect of Welfare Benefit Reduction (Exhibit 6-5)

Sections 6-I.B and 6-I.C discuss general requirements and methods for calculating annual income. The rest of this section describes how each source of income is treated for the purposes of determining annual income. HUD regulations present income inclusions and exclusions separately [24 CFR 5.609(b) and 24 CFR 5.609(c)]. In this plan, however, the discussions of income inclusions and exclusions are integrated by topic (e.g., all policies affecting earned income are discussed together in section 6-I.D). Verification requirements for annual income are discussed in Chapter 7.

## 6-I.B. HOUSEHOLD COMPOSITION AND INCOME

Income received by all family members must be counted unless specifically excluded by the regulations. It is the responsibility of the head of household to report changes in family composition. The rules on which sources of income are counted vary somewhat by family member. The chart below summarizes how family composition affects income determinations.

| Summary of Income Included and Excluded by Person ||
|---|---|
| Live-in aides | Income from all sources is excluded [24 CFR 5.609(c)(5)]. |
| Foster child or foster adult | Income from all sources is excluded [24 CFR 5.609(c)(2)]. |
| Head, spouse, or co-head Other adult family members | All sources of income not specifically excluded by the regulations are included. |

| Children under 18 years of age | Employment income is excluded [24 CFR 5.609(c)(1)]. |
|---|---|
| | All other sources of income, except those specifically excluded by the regulations, are included. |
| Full-time students 18 years of age or older (not head, spouse, or co-head) | Employment income above $480/year is excluded [24 CFR 5.609(c)(11)]. |
| | All other sources of income, except those specifically excluded by the regulations, are included. |

## Temporarily Absent Family Members

The income of family members approved to live in the unit will be counted, even if the family member is temporarily absent from the unit [HCV GB, p. 5-18].

<u>HACA Policy</u>

Generally an individual who is or is expected to be absent from the assisted unit for 90 consecutive days or less is considered temporarily absent and continues to be considered a family member. Generally an individual who is or is expected to be absent from the assisted unit for more than 90 consecutive days is considered permanently absent and no longer a family member. Under no circumstances shall a family member be absent from the unit for a period exceeding 90 consecutive days unless HACA determines that urgent or unusual circumstances exist and the household has obtained prior written approval from HACA. Exceptions to this general policy are discussed below.

## Absent Students

<u>HACA Policy</u>

When someone who has been considered a family member attends school away from home, the person will continue to be considered a family member unless information becomes available to HACA indicating that the student has established a separate household or the family declares that the student has established a separate household. To be considered a family member, the student would need to live at the assisted families' residence at semester breaks and during the summer break.

## Absences Due to Placement in Foster Care

Children temporarily absent from the home as a result of placement in foster care are considered members of the family [24 CFR 5.403].

<u>HACA Policy</u>

If a child has been removed from the assisted unit and placed in foster care, HACA will make every attempt to verify with the appropriate agency whether and when the child is expected to be returned to the assisted unit. Unless the agency confirms that the child has been permanently removed from the assisted unit, the child will be counted as a family member. However, the household will not receive the $480 dependent allowance until the

child is reunited with the assisted family. If more than 180 days elapse and the child has not been returned, then if applicable, HACA shall notify the family in writing that they will be subject to a voucher downgrade based on their remaining household composition.

## Absent Head, Spouse, or Co-head

<u>HACA Policy</u>

An employed head, spouse, or co-head absent from the unit more than 90 consecutive days due to employment or to serve in the armed forces (not including pay for exposure to hostile fire) will continue to be considered a family member. The income from such employment will be included for purposes of determining rent.

## Family Members Permanently Confined for Medical Reasons

If a family member is confined to a nursing home or hospital on a permanent basis, that person is no longer considered a family member and the income of that person is not counted [HCV GB, p. 5-22].

<u>HACA Policy</u>

If there is a question about the status of a family member, HACA will request verification from a responsible medical professional and will use this determination. If the responsible medical professional cannot provide a determination, the person generally will be considered temporarily absent. The family may present evidence that the family member is confined on a permanent basis and request that the person not be considered a family member.

## Joint Custody of Dependents

<u>HACA Policy</u>

Dependents that are subject to a joint custody arrangement will be considered a member of the family, if they live with the applicant or participant family 50 percent or more of the time.

When more than one applicant or participant family is claiming the same dependents as family members, the family with primary custody at the time of the initial examination or reexamination will be able to claim the dependents. If there is a dispute about which family should claim them, HACA will make the determination based on available documents such as court orders, or an IRS return showing which family has claimed the child for income tax purposes.

## Caretakers for a Child

<u>HACA Policy</u>

The approval of a caretaker is at the owner and HACA's discretion and subject to the owner and HACA's screening criteria.  If neither a parent nor a designated guardian remains in a household receiving HCV assistance, HACA will take the following actions.

(1) If a responsible agency has determined that another adult is to be brought into the unit to care for a child for an indefinite period, the designated caretaker will not

be considered a family member until a determination of custody or legal guardianship is made.

(2) If a caretaker has assumed responsibility for a child without the involvement of a responsible agency or formal assignment of custody or legal guardianship, the caretaker will be treated as a visitor for 90 days. During the 90-day timeframe, the caretaker must request to be added to the lease through HACA's admissions process. The caretaker will be subject to HACA's screening criteria and must be deemed eligible in order to be added to the lease. After the 90 days has elapsed and the add-on process has been completed, the caretaker will be considered a family member unless information is provided that would confirm that the caretaker's role is temporary. In such cases, HACA will extend the caretaker's status as an eligible visitor.

(3) At any time that custody or guardianship legally has been awarded to a caretaker, the assistance will be transferred to the caretaker, as head of household, upon successfully completing the add-on process through the Admissions department. The caretaker will be required to sign an agreement where he/she will agree to preserve the rental assistance for the original household member(s)/children. The caretakers' income will be included.  The caretaker will agree to terminate the lease should the remaining household members move out of the household.

(4) During any period that a caretaker is considered a visitor, the income of the caretaker is not counted in annual income and the caretaker does not qualify for any deductions from income.

## 6-I.C. ANTICIPATING ANNUAL INCOME

HACA is required to count all income "anticipated to be received from a source outside the family during the 12-month period following admission or annual reexamination effective date" [24 CFR 5.609(a)(2)]. Policies related to anticipating annual income are provided below.

### Basis of Annual Income Projection

HACA generally will use current circumstances to determine anticipated income for the coming 12-month period. HUD authorizes HACA to use other than current circumstances to anticipate income when:

An imminent change in circumstances is expected [HCV GB, p. 5-17]

It is not feasible to anticipate a level of income over a 12-month period (e.g., seasonal or  cyclic income) [24 CFR 5.609(d)]

HACA believes that past income is the best available indicator of expected future income [24 CFR 5.609(d)]

PHAs are required to use HUD's Enterprise Income Verification (EIV) system in its entirety as a third party source to verify employment and income information, and to reduce administrative subsidy payment errors in accordance with HUD administrative guidance [24 CFR 5.233(a)(2)].

HUD allows PHAs to use tenant-provided documents (pay-stubs) to project income once EIV

data has been received in such cases where the family does not dispute the EIV employer data and where HACA does not determine it is necessary to obtain additional third-party data.

<u>HACA Policy</u>

When EIV is obtained and the family does not dispute the EIV employer data, HACA will use current tenant-provided documents to project annual income. When the tenant provided documents are pay stubs, HACA will make every effort to obtain the most recent pay stubs to include a minimum of 2 and up to 4 consecutive pay stubs dated within the last 60 days.

HACA will obtain written and/or oral third-party verification in accordance with the verification requirements and policy in Chapter 7 in the following cases:

- ☐ If EIV or other UIV data is not available,
- ☐ If the family disputes the accuracy of the EIV employer data, and/or
- ☐ If HACA determines additional information is needed.

In such cases, HACA will review and analyze current data to anticipate annual income. In all cases, the family file will be documented with a clear record of the reason for the decision, and a clear audit trail will be left as to how HACA annualized projected income.

When HACA cannot readily anticipate income based upon current circumstances (e.g., in the case of seasonal employment, unstable working hours, or suspected fraud), HACA will review and analyze historical data for patterns of employment, paid benefits, and receipt of other income and use the results of this analysis to establish annual income.

Any time current circumstances are not used to project annual income, a clear rationale for the decision will be documented in the file. In all such cases, the family may present information and documentation to HACA to show why the historic pattern does not represent the family's anticipated income.

## Known Changes in Income

If HACA verifies an upcoming increase or decrease in income, annual income is calculated by applying each income amount to the appropriate 12-month period.

**Example:** An employer reports that a full-time employee who has been receiving $8/hour will begin to receive $8.25/hour in the eighth week after the effective date of the reexamination. In such a case HACA would calculate annual income as follows: ($8/hour × 40 hours × 7 weeks) + ($8.25 × 40 hours × 45 weeks).

The family may present information that demonstrates that implementing a change before its effective date would create a hardship for the family. In such cases HACA, will calculate annual income using current circumstances and then require an interim reexamination when the change actually occurs. This requirement will be imposed even if HACA's policy on reexaminations does not require interim reexaminations for other types of changes.

When tenant-provided documents are used to anticipate annual income, they will be dated within the last 60 days of the reexamination interview date.

*Housing Authority of the City of Austin*                    *Housing Choice Voucher Program*

## Projecting Income

In HUD's EIV webcast of January 2008, HUD made clear that PHAs are not to use EIV quarterly wages to project annual income.

## 6-I.D. EARNED INCOME

### Types of Earned Income Included in Annual Income

#### Wages and Related Compensation

The full amount, before any payroll deductions, of wages and salaries, overtime pay, commissions, fees, tips and bonuses, and other compensation for personal services is included in annual income [24 CFR 5.609(b)(1)].

> <u>HACA Policy</u>
>
> For persons who regularly receive bonuses or commissions, HACA will verify and then average amounts received for the two years preceding admission or reexamination. If only a one-year history is available, HACA will use the prior year amounts. In either case the family may provide, and HACA will consider, a credible justification for not using this history to anticipate future bonuses or commissions. If a new employee has not yet received any bonuses or commissions, HACA will count only the amount estimated by the employer. The file will be documented appropriately.

#### Some Types of Military Pay

All regular pay, special pay and allowances of a member of the Armed Forces are counted [24 CFR 5.609(b)(8)] except for the special pay to a family member serving in the Armed Forces who is exposed to hostile fire [24 CFR 5.609(c)(7)].

**Types of Earned Income <u>Not</u> Counted in Annual Income**

#### Temporary, Nonrecurring, or Sporadic Income [24 CFR 5.609(c)(9)]

This type of income (including gifts) is not included in annual income. Sporadic income includes temporary payments from the U.S. Census Bureau for employment lasting no longer than 180 days [Notice PIH 2009-19].

> <u>HACA Policy</u>
>
> Sporadic income is income that is not received periodically and cannot be reliably predicted. For example, the income of an individual who works occasionally as a handyman would be considered sporadic if future work could not be anticipated and no historic, stable pattern of income existed. A pattern of temporary employment during the previous 12 months would NOT be considered sporadic income and would be included in the annual income for the purposes of determining rent. The inclusion of this income may be disputed if there has been a change in circumstances.

#### Children's Earnings

Employment income earned by children (including foster children) under the age of 18 years is not included in annual income [24 CFR 5.609(c)(1)]. (See Eligibility chapter for a definition of *foster children*.)

### Certain Earned Income of Full-Time Students

Earnings in excess of $480 for each full-time student 18 years old or older (except for the head, spouse, or co-head) are not counted [24 CFR 5.609(c)(11)]. To be considered "full-time," a student must be considered "full-time" by an educational institution with a degree or certificate program [HCV GB, p. 5-29].

### Income of a Live-in Aide

Income earned by a live-in aide, as defined in [24 CFR 5.403], is not included in annual income [24 CFR 5.609(c)(5)]. (See Eligibility chapter for a full discussion of live-in aides.)

### Income Earned under Certain Federal Programs

Income from some federal programs is specifically excluded from consideration as income [24 CFR 5.609(c)(17)], including:

Payments to volunteers under the Domestic Volunteer Services Act of 1973 (42 U.S.C. 5044(g), 5058)

Awards under the federal work-study program (20 U.S.C. 1087)

Payments received from programs funded under Title V of the Older Americans Act of 1985 (42 U.S.C. 3056(f)); i.e. Green Thumb, National Council on Aging, National Council of Senior Citizens, American Association of Retired Persons (AARP), U.S. Forest Service, National Association for Spanish-Speaking Elderly, National Urban League, and National Council on Black Aging. Senior Community Service Employment Program (SCSEP) ACIN I-73-04

Allowances, earnings, and payments to AmeriCorps participants under the National and Community Service Act of 1990 (42 U.S.C. 12637(d))

Allowances, earnings, and payments to participants in programs funded under the Workforce Investment Act of 1998 (29 U.S.C. 2931)

Any amount received under the School Lunch Act and the Child Nutrition Act of 1966 (42 U.S.C. 1780(b)), including reduced-price lunches and food under the Special Supplemental Food Program for Women, Infants, and Children (WIC).

### Resident Service Stipend

Amounts received under a resident service stipend are not included in annual income. A resident service stipend is a modest amount (not to exceed $200 per individual per month) received by a resident for performing a service for HACA or owner, on a part-time basis, that enhances the quality of life in the development. Such services may include, but are not limited to, fire patrol, hall monitoring, lawn maintenance, resident initiatives coordination, and serving as a member of HACA's governing board. No resident may receive more than one such stipend during the same

period of time [24 CFR 5.600(c)(8)(iv)].

### State and Local Employment Training Programs

Incremental earnings and benefits to any family member resulting from participation in qualifying state or local employment training programs (including training programs not affiliated with a local government) and training of a family member as resident management staff are excluded from annual income. Amounts excluded by this provision must be received under employment training programs with clearly defined goals and objectives and are excluded only for the period during which the family member participates in the training program [24 CFR 5.609(c)(8)(v)].

> HACA Policy
>
> HACA defines *training program* as "a learning process with goals and objectives, generally having a variety of components, and taking place in a series of sessions over a period of time. It is designed to lead to a higher level of proficiency, and it enhances the individual's ability to obtain employment. It may have performance standards to measure proficiency. Training may include, but is not limited to: (1) classroom training in a specific occupational skill, (2) on-the-job training with wages subsidized by the program, or (3) basic education" [expired Notice PIH 98-2, p. 3].
>
> HACA defines *incremental earnings and benefits* as the difference between: (1) the total amount of welfare assistance and earnings of a family member prior to enrollment in a training program, and (2) the total amount of welfare assistance and earnings of the family member after enrollment in the program [expired Notice PIH 98-2, pp. 3–4].
>
> In calculating the incremental difference, HACA will use as the pre-enrollment income the total annualized amount of the family member's welfare assistance, and earnings reported on the family's most recently completed HUD-50058.
>
> End of participation in a training program must be reported in accordance with HACA's interim reporting requirements.

### HUD-Funded Training Programs

Amounts received under training programs funded in whole or in part by HUD [24 CFR 5.609(c)(8)(i)] are excluded from annual income. Eligible sources of funding for the training include operating subsidy, Section 8 administrative fees, and modernization, Community Development Block Grant (CDBG), HOME program, and other grant funds received from HUD.

> HACA Policy
>
> To qualify as a training program, the program must meet the definition of *training program* provided above for state and local employment training programs.

### Earned Income Tax Credit

Earned income tax credit (EITC) refund payments received on or after January 1, 1991 (26 U.S.C. 32(j)), are excluded from annual income [24 CFR 5.609(c)(17)]. Although many families receive the EITC annually when they file taxes, an EITC can also be received throughout the year. The prorated share of the annual EITC is included in the employee's payroll check.

### Earned Income Disallowance

The earned income disallowance for persons with disabilities is discussed in section 6-I.E below.

## 6-I.E. EARNED INCOME DISALLOWANCE FOR PERSONS WITH DISABILITIES [24 CFR 5.617; Streamlining Final Rule (SFR) Federal Register 3/8/16]

The earned income disallowance (EID) encourages people with disabilities to enter the work force by not including the full value of increases in earned income for a period of time. The full text of [24 CFR 5.617] is included as Exhibit 6-4 at the end of this chapter. Eligibility criteria and limitations on the disallowance are summarized below.

### Eligibility

This disallowance applies only to individuals in families already participating in the HCV program (not at initial examination). To qualify, the family must experience an increase in annual income that is the result of one of the following events:

Employment of a family member who is a person with disabilities and who was previously unemployed for one or more years prior to employment. *Previously unemployed* includes a person who annually has earned not more than the minimum wage applicable to the community multiplied by 500 hours. The applicable minimum wage is the federal minimum wage unless there is a higher state or local minimum wage.

Increased earnings by a family member who is a person with disabilities and whose earnings increase during participation in an economic self-sufficiency or job-training program. A self-sufficiency program includes a program designed to encourage, assist, train, or facilitate the economic independence of HUD-assisted families or to provide work to such families [24 CFR 5.603(b)].

New employment or increased earnings by a family member who is a person with disabilities and who has received benefits or services under Temporary Assistance for Needy Families (TANF) or any other state program funded under Part A of Title IV of the Social Security Act within the past six months. If the benefits are received in the form of monthly maintenance, there is no minimum amount. If the benefits or services are received in a form other than monthly maintenance, such as one-time payments, wage subsidies, or transportation assistance, the total amount received over the six-month period must be at least $500.

### Calculation of the Disallowance

Calculation of the earned income disallowance for an eligible member of a qualified family begins with a comparison of the member's current income with his or her "baseline income." The family member's baseline income is his or her income immediately prior to qualifying for the EID. The family member's baseline income remains constant throughout the period that he or she is participating in the EID.

HACA Policy

While qualification for the disallowance is the same for all families, calculation of the disallowance will differ depending on when the family member qualified for the EID. Participants qualifying prior

to May 9, 2016, will have the disallowance calculated under the "Original Calculation Method" described below which requires a maximum lifetime disallowance period of up to 48 consecutive months. Participants qualifying on or after May 9, 2016, will be subject to the "Revised Calculation Method" Which shortens the lifetime disallowance period to 24 consecutive months.

Under both the original and new methods, the EID eligibility criteria, the benefit amount, the single lifetime eligibility requirement and the ability of the applicable family member to stop and restart employment during the eligibility period are the same.

### Original Calculation Method

#### *Initial 12-Month Exclusion*

During the initial 12-month exclusion period, the full amount (100 percent) of any increase in income attributable to new employment or increased earnings is excluded. The 12 months are cumulative and need not be consecutive.

> <u>HACA Policy</u>
>
> The initial EID exclusion period will begin on the first of the month following the date an eligible member of a qualified family is first employed or first experiences an increase in earnings.
>
> This applies regardless of whether the eligible member reported the employment or increase in earnings in a timely manner (within 30 days of occurrence) or not.  Example: an eligible family member reports a new job on June 12, 2008.  HACA's third party verification confirms that the family member actually started employment on January 5, 2008.  The initial EID exclusion period for this family member will begin on February 1, 2008.

#### *Second 12-Month Exclusion and Phase-In*

During the second 12-month exclusion period, the exclusion is reduced to half (50 percent) of any increase in income attributable to employment or increased earnings. The 12 months are cumulative and need not be consecutive.

#### *Lifetime Limitation*

The EID has a four-year (48-month) lifetime maximum. The four-year eligibility period begins at the same time that the initial exclusion period begins and ends 48 months later. The one-time eligibility for the EID applies even if the eligible individual begins to receive assistance from another housing agency, if the individual moves between public housing and Section 8 assistance, or if there are breaks in assistance.

> <u>HACA Policy</u>
>
> During the 48-month eligibility period, HACA will conduct an interim reexamination each time there is a change in the family member's annual income that affects or is affected by the EID (e.g., when the family member's income falls to a level at or below his/her

prequalifying income, when one of the exclusion periods ends and at the end of the lifetime maximum eligibility period).

Per the Housing Opportunities Through Modernization Act (HOTMA) no new EID clients allowed to be added effective 1-1-2024 and EID sunsets 1-1-2026. Clients with current EID remain through their eligibility period.

### Revised Calculation Method
*Initial 12-Month Exclusion*

During the initial exclusion period of 12 consecutive months, the full amount (100 percent) of any increase in income attributable to new employment or increased earnings is excluded.

> HACA Policy
>
> The initial EID exclusion period will begin on the first of the month following the date an eligible member of a qualified family is first employed or first experiences an increase in earnings.

*Second 12-Month Exclusion*

During the second exclusion period of 12 consecutive months, HACA must exclude at least 50 percent of any increase in income attributable to employment or increased earnings.

> HACA Policy
>
> During the second 12-month exclusion period, HACA will exclude 100 percent of any increase in income attributable to new employment or increased earnings.

*Lifetime Limitation*

The EID has a two-year (24-month) lifetime maximum. The two-year eligibility period begins at the same time that the initial exclusion period begins and ends 24 months later. During the 24-month period, an individual remains eligible for EID even if they begin to receive assistance from a different housing agency, move between public housing and Section 8 assistance, or have breaks in assistance.

### Individual Savings Accounts [24 CFR 960.255(d)]

> HACA Policy
>
> HACA chooses not to establish a system of individual savings accounts (ISAs) for Families who qualify for the EID.

6-I.F. BUSINESS INCOME [24 CFR 5.609(b)(2)]

Annual income includes "the net income from the operation of a business or profession.

Expenditures for business expansion or amortization of capital indebtedness shall not be used as deductions in determining net income. An allowance for depreciation of assets used in a business or profession may be deducted, based on straight line depreciation, as provided in Internal Revenue Service regulations. Any withdrawal of cash or assets from the operation of a business or profession will be included in income, except to the extent the withdrawal is reimbursement of cash or assets invested in the operation by the family" [24 CFR 5.609(b)(2)].

**Business Expenses**

Net income is "gross income less business expense" [HCV GB, p. 5-19].

> <u>HACA Policy</u>
>
> To determine business expenses that may be deducted from gross income, HACA will use current applicable Internal Revenue Service (IRS) rules for determining allowable business expenses [see IRS Publication 535], unless a topic is addressed by HUD regulations or guidance as described below.

**Business Expansion**

HUD regulations do not permit HACA to deduct from gross income expenses for business expansion.

> <u>HACA Policy</u>
>
> *Business expansion* is defined as any capital expenditures made to add new business activities, to expand current facilities, or to operate the business in additional locations. For example, purchase of a street sweeper by a construction business for the purpose of adding street cleaning to the services offered by the business would be considered a business expansion. Similarly, the purchase of a property by a hair care business to open at a second location would be considered a business expansion.

**Capital Indebtedness**

HUD regulations do not permit HACA to deduct from gross income the amortization of capital indebtedness.

> <u>HACA Policy</u>
>
> *Capital indebtedness* is defined as the principal portion of the payment on a capital asset such as land, buildings, and machinery. This means HACA will allow as a business expense interest, but not principal, paid on capital indebtedness.

**Negative Business Income**

If the net income from a business is negative, no business income will be included in annual income; a negative amount will not be used to offset other family income.

**Withdrawal of Cash or Assets from a Business**

HUD regulations require HACA to include in annual income the withdrawal of cash or assets from the operation of a business or profession unless the withdrawal reimburses a family member for cash or assets invested in the business by the family.

HACA Policy

Acceptable investments in a business include cash loans and contributions of assets or equipment. For example, if a member of an assisted family provided an up-front loan of $2,000 to help a business get started, HACA will not count as income any withdrawals from the business up to the amount of this loan until the loan has been repaid. Investments do not include the value of labor contributed to the business without compensation.

**Co-owned Businesses**

HACA Policy

If a business is co-owned with someone outside the family, the family must document the share of the business it owns. If the family's share of the income is lower than its share of ownership, the family must document the reasons for the difference.

## 6-I.G. ASSETS [24 CFR 5.609(b)(3);  24 CFR 5.603(b)]

**Overview**

There is no asset limitation for participation in the HCV program. However, HUD requires that HACA include in annual income the anticipated "interest, dividends, and other net income of any kind from real or personal property" [24 CFR 5.609(b)(3)]. This section discusses how the income from various types of assets is determined. For most types of assets, HACA must determine the value of the asset in order to compute income from the asset. Therefore, for each asset type, this section discusses:

> How the value of the asset will be determined

> How income from the asset will be calculated

Exhibit 6-1 provides the regulatory requirements for calculating income from assets [24 CFR 5.609(b)(3)], and Exhibit 6-3 provides the regulatory definition of *net family assets*. This section begins with a discussion of general policies related to assets and then provides HUD rules and PHA policies related to each type of asset.

Optional policies for family self-certification of assets are found in Chapter 7.

**General Policies**

*Income from Assets*

HACA generally will use current circumstances to determine both the value of an asset and the anticipated income from the asset. As is true for all sources of income, HUD authorizes HACA to use other than current circumstances to anticipate income when (1) an imminent change in circumstances is expected (2) it is not feasible to anticipate a level of income over 12 months or (3) HACA believes that past income is the best indicator of anticipated income. For example, if a family member owns real property that typically receives rental income but the property is currently vacant, HACA can take into consideration past rental income along with the prospects of obtaining a new tenant.

HACA Policy

Any time current circumstances are not used to determine asset income, a clear rationale for the decision will be documented in the file. In such cases the family may present information and documentation to HACA to show why the asset income determination does not represent the family's anticipated asset income. Assets owned by every family member, including minors, are reviewed.

### Valuing Assets

The calculation of asset income sometimes requires HACA to make a distinction between an asset's market value and its cash value.

The market value of an asset is its worth in the market (e.g., the amount a buyer would pay for real estate or the total value of an investment account).

The cash value of an asset is its market value less all reasonable amounts that would be incurred when converting the asset to cash.

HACA Policy

Reasonable costs that would be incurred when disposing of an asset include, but are not limited to, penalties for premature withdrawal, broker and legal fees, and settlement costs incurred in real estate transactions [HCV GB, p. 5-28].

### Lump-Sum Receipts

Payments that are received in a single lump sum, such as inheritances, capital gains, lottery winnings, insurance settlements, and proceeds from the sale of property, are generally considered assets, not income. However, such lump-sum receipts are counted as assets only if they are retained by a family in a form recognizable as an asset (e.g., deposited in a savings or checking account) [RHIIP FAQs]. (For a discussion of lump-sum payments that represent the delayed start of a periodic payment, most of which are counted as income, see sections 6-I.H and 6-I.I.)

### Imputing Income from Assets [24 CFR 5.609(b)(3), Notice PIH 2012-29]

When net family assets are $5,000 or less, HACA will include in annual income the actual income anticipated to be derived from the assets. When the family has net family assets in excess of $5,000, HACA will include in annual income the greater of (1) the actual income derived from the assets or (2) the imputed income. Imputed income from assets is calculated by multiplying the total cash value of all family assets by the average passbook savings rate as determined by HACA.

HACA Policy

HACA will initially set the imputed asset passbook rate at the national rate established by the Federal Deposit Insurance Corporation (FDIC).

HACA will review the passbook rate annually to ensure that it remains within 0.75 percent of a national average. The rate will not be adjusted unless the current HACA rate is no longer within 0.75 percent of the national rate. If it is no longer within 0.75 percent of the national rate, the passbook rate will be set at the current national rate.

Changes to the passbook rate will be updated in standard operating procedures with an

effective date indicated.

### Determining Actual Anticipated Income from Assets

It may or may not be necessary for HACA to use the value of an asset to compute the actual anticipated income from the asset. When the value is required to compute the anticipated income from an asset, the market value of the asset is used. For example, if the asset is a property for which a family receives rental income, the anticipated income is determined by annualizing the actual monthly rental amount received for the property; it is not based on the property's market value. However, if the asset is a savings account, the anticipated income is determined by multiplying the market value of the account by the interest rate on the account.

### Withdrawal of Cash or Liquidation of Investments

Any withdrawal of cash or assets from an investment will be included in income except to the extent that the withdrawal reimburses amounts invested by the family. For example, when a family member retires, the amount received by the family from a retirement investment plan is not counted as income until the family has received payments equal to the amount the family member deposited into the retirement investment plan

### Jointly Owned Assets

The regulation at [24 CFR 5.609(a)(4)] specifies that annual income includes "amounts derived (during the 12-month period) from assets to which any member of the family has access."

#### HACA Policy

If more than one person owns an asset and any family member has unrestricted access to the asset, HACA will count the full value of the asset. A family member has unrestricted access to an asset when he or she can legally dispose of the asset without the consent of any of the other owners.

If more than one person, including a family member, owns an asset but the family member does not have unrestricted access to the asset, HACA will prorate the asset according to the percentage of ownership. If no percentage is specified or provided for by state or local law, HACA will prorate the asset evenly among all owners.

### Assets Disposed Of for Less than Fair Market Value [24 CFR 5.603(b)]

HUD regulations require HACA to count as a current asset any business or family asset that was disposed of for less than fair market value during the two years prior to the effective date of the examination/reexamination, except as noted below.

### Minimum Threshold

The *HVC Guidebook* permits HACA to set a threshold below which assets disposed of for less than fair market value will not be counted [HCV GB, p. 5-27].

#### HACA Policy

HACA will not include the value of assets disposed of for less than fair market value unless the cumulative fair market value of all assets disposed of during the past two years exceeds the gross amount received for the assets by more than $1,000.

When the two-year period expires, the income assigned to the disposed asset(s) also expires. If the two-year period ends between annual re-certifications, the family may request an interim recertification to eliminate consideration of the asset(s).

Assets placed by the family in non-revocable trusts are considered assets disposed of for less than fair market value except when the assets placed in trust were received through settlements or judgments.

### *Separation or Divorce*

The regulation also specifies that assets are not considered disposed of for less than fair market value if they are disposed of as part of a separation or divorce settlement and the applicant or tenant receives important consideration not measurable in dollar terms.

#### HACA Policy

All assets disposed of as part of a separation or divorce settlement will be considered assets for which important consideration not measurable in monetary terms has been received. In order to qualify for this exemption, a family member must be subject to a formal separation or divorce settlement agreement established through arbitration, mediation, or court order.

### *Foreclosure or Bankruptcy*

Assets are not considered disposed of for less than fair market value when the disposition is the result of a foreclosure or bankruptcy sale.

### *Family Declaration*

#### HACA Policy

Families must sign a declaration form at initial certification and each annual recertification identifying all assets that have been disposed of for less than fair market value or declaring that no assets have been disposed of for less than fair market value. HACA may verify the value of the assets disposed of if other information available to HACA does not appear to agree with the information reported by the family.

**Types of Assets**

**Checking and Savings Accounts**

For regular checking accounts and savings accounts, *cash value* has the same meaning as *market value*. If a checking account does not bear interest, the anticipated income from the account is zero.

> HACA Policy
>
> In determining the value of a checking account, HACA will use the current balance.
>
> In determining the value of a savings account, HACA will use the current balance.
>
> In determining the anticipated income from an interest bearing checking or savings account, HACA will multiply the value of the account by the current rate of interest paid on the account.
>
> Checking and savings accounts earning less than $20 in annual interest will have a minimal impact on the family's total tenant payment (TTP). Therefore, it is not cost effective to obtain third party verification for these types of accounts, and document review is acceptable.

***Investment Accounts Such as Stocks, Bonds, Saving Certificates, and Money Market Funds***

Interest or dividends earned by investment accounts are counted as actual income from assets even when the earnings are reinvested. The cash value of such an asset is determined by deducting from the market value any broker fees, penalties for early withdrawal, or other costs of converting the asset to cash.

> HACA Policy
>
> In determining the market value of an investment account, HACA will use the value of the account on the most recent investment report.
>
> How anticipated income from an investment account will be calculated depends on whether the rate of return is known.
>
> For assets that are held in an investment account with a known rate of return (e.g., savings certificates), asset income will be calculated based on that known rate (market value multiplied by rate of earnings).
>
> When the anticipated rate of return is not known (e.g., stocks), HACA will calculate asset income based on the earnings for the most recent reporting period.

***Equity in Real Property or Other Capital Investments***

Equity (cash value) in a property or other capital asset is the estimated current market value of the asset less the unpaid balance on all loans secured by the asset and reasonable costs (such as broker fees) that would be incurred in selling the asset [HCV GB, p. 5-25]

HACA Policy

> HACA will determine the current market value through the jurisdictional appraisal district records.

> HACA will determine the unpaid balance by first using the payoff amount for the loan (mortgage). If the payoff amount is not available, HACA will use the basic loan balance information.

> HACA will determine equity by deducting the unpaid balance from the market value. Equity in real property and other capital investments is considered in the calculation of asset income except for the following types of asset

> Equity accounts in HUD homeownership programs [24 CFR5.603(b)]

> The value of a home currently being purchased with assistance under the HCV program Homeownership Option for the first 10 years after the purchase date of the home [24 CFR 5.603(b), Notice PIH 2012-3]

> Equity in owner-occupied cooperatives and manufactured homes in which the family lives [HCV GB, p. 5-25]

> Equity in real property when a family member's main occupation is real estate [HCV GB, p. 5-25]. This real estate is considered a business asset, and income related to this asset will be calculated as described in section 6-I.F.

> Interests in Indian Trust lands [24 CFR 5.603(b)]

> Real property and capital assets that are part of an active business or farming operation[HCV GB, p. 5-25]

HACA must also deduct from the equity the reasonable costs for converting the asset to cash. Using the formula for calculating equity specified above, the net cash value of real property is the market value of the loan (mortgage) minus the expenses to convert to cash [Notice PIH 2012-3].

HACA Policy

> For the purposes of calculating expenses to convert to cash for real property, HACA will use ten percent of the market value of the home.

A family may have real property as an asset in two ways: (1) owning the property itself and (2) holding a mortgage or deed of trust on the property. In the case of a property owned by a family member, the anticipated asset income generally will be in the form of rent or other payment for the use of the property. If the property generates no income, actual anticipated income from the asset will be zero.

In the case of a mortgage or deed of trust held by a family member, the outstanding balance (unpaid principal) is the cash value of the asset. The interest portion only of payments made to the family in accordance with the terms of the mortgage or deed of trust is counted as anticipated asset income.

HACA Policy

In the case of capital investments owned jointly with others not living in a family's unit, a prorated share of the property's cash value will be counted as an asset unless HACA determines that the family receives no income from the property and is unable to sell or otherwise convert the asset to cash.

**Trusts**

A *trust* is a legal arrangement generally regulated by state law in which one party (the creator or grantor) transfers property to a second party (the trustee) who holds the property for the benefit of one or more third parties (the beneficiaries).

*Revocable Trusts*

If any member of a family has the right to withdraw the funds in a trust, the value of the trust is considered an asset [HCV GB, p. 5-25]. Any income earned as a result of investment of trust funds is counted as actual asset income, whether the income is paid to the family or deposited in the trust.

*Non-revocable Trusts*

In cases where a trust is not revocable by, or under the control of, any member of a family, the value of the trust fund is not considered an asset. However, any income distributed to the family from such a trust is counted as a periodic payment or a lump-sum receipt, as appropriate [24 CFR 5.603(b)]. (Periodic payments are covered in section 6-I.H. Lump-sum receipts are discussed earlier in this section.)

**Retirement Accounts**

*Company Retirement/Pension Accounts*

In order to correctly include or exclude as an asset any amount held in a company retirement or pension account by an employed person, HACA must know whether the money is accessible before retirement [HCV GB, p. 5-26].

While a family member is employed, only the amount the family member can withdraw without retiring or terminating employment is counted as an asset [HCV GB, p. 5-26].

After a family member retires or terminates employment, any amount distributed to the family member is counted as a periodic payment or a lump-sum receipt, as appropriate [HCV GB, p. 5-26], except to the extent that it represents funds invested in the account by the family member. (For more on periodic payments, see section 6-I.H.) The balance in the account is counted as an asset only if it remains accessible to the family member.

*IRA, Keogh, and Similar Retirement Savings Accounts*

IRA, Keogh, and similar retirement savings accounts are counted as assets even though early withdrawal would result in a penalty [HCV GB, p. 5-25].

**Personal Property**

Personal property held as an investment, such as gems, jewelry, coin collections, antique cars, etc., is considered an asset [HCV GB, p. 5-25].

HACA Policy

In determining the value of personal property held as an investment, HACA will use the family's estimate of the value. HACA may obtain an appraisal to confirm the value of the asset if there is reason to believe that the family's estimated value is off by $50 or more. The family must cooperate with the appraiser, but cannot be charged any costs related to the appraisal.

Generally, personal property held as an investment generates no income until it is disposed of. If regular income is generated (e.g., income from renting the personal property), the amount that is expected to be earned in the coming year is counted as actual income from the asset.

Necessary items of personal property are not considered assets [24 CFR 5.603(b)].

HACA Policy

Necessary personal property consists of only those items not held as an investment, and may include clothing, furniture, household furnishings, jewelry, and vehicles, including those specially equipped for persons with disabilities.

*Life Insurance*

The cash value of a life insurance policy available to a family member before death, such as a whole life or universal life policy, is included in the calculation of the value of the family's assets [HCV GB 5-25]. The cash value is the surrender value. If such a policy earns dividends or interest that the family could elect to receive, the anticipated amount of dividends or interest is counted as income from the asset whether or not the family actually receives it.

## 6-I.H. PERIODIC PAYMENTS

Periodic payments are forms of income received on a regular basis. HUD regulations specify periodic payments that are and are not included in annual income.

**Periodic Payments Included in Annual Income**

Periodic payments from sources such as social security, unemployment and welfare assistance, annuities, insurance policies, retirement funds, and pensions. However, periodic payments from retirement accounts, annuities, and similar forms of investments are counted only after they exceed the amount contributed by the family [24 CFR 5.609(b)(4) and (b)(3)].

Disability or death benefits and lottery receipts paid periodically, rather than in a single lump sum [24 CFR 5.609(b)(4) and HCV, p. 5-14].

**Lump-Sum Payments for the Delayed Start of a Periodic Payment**

Most lump-sums received as a result of delays in processing periodic payments, such as unemployment or welfare assistance, are counted as income. However, lump-sum receipts for the delayed start of periodic social security or supplemental security income (SSI) payments are not counted as income [CFR 5.609(b)(4)]. Additionally, any deferred

disability benefits that are received in a lump-sum or in prospective monthly amounts from the Department of Veterans Affairs are to be excluded from annual income 24 CFR 5.609(c)(14)]. In addition, child support lump sum payments will not be counted unless a consistent and regular payment pattern of larger than average payments appear within the 12 payment OAG child support verification report.

HACA Policy

When a delayed-start payment is received and reported during the period in which HACA is processing an annual reexamination, HACA will adjust the tenant rent retroactively for the period the payment was intended to cover. The family may pay in full any amount due or request to enter into a repayment agreement with HACA.

See the chapter on reexaminations for information about a family's obligation to report lump-sum receipts between annual reexaminations.

### *Treatment of Overpayment Deductions from Social Security Benefits*

HACA must make a special calculation of annual income when the Social Security Administration (SSA) overpays an individual, resulting in a withholding or deduction from his or her benefit amount until the overpayment is paid in full. The amount and duration of the withholding will vary depending on the amount of the overpayment and the percent of the benefit rate withheld. Regardless of the amount withheld or the length of the withholding period, HACA must use the reduced benefit amount after deducting only the amount of the overpayment withholding from the gross benefit amount [Notice PIH 2018-24].

### *Periodic Payments Excluded from Annual Income*

Payments received for the care of foster children or foster adults (usually persons with disabilities, unrelated to the assisted family, who are unable to live alone) [24 CFR 5.609(c)(2)]. Kinship guardianship assistance payments (Kin-GAP) and other similar guardianship payments are treated the same as foster care payments and are likewise excluded from annual income [Notice PIH 2012-10].

HACA Policy

HACA will exclude payments for the care of foster children and foster adults only if the care is provided through an official arrangement with a local welfare agency [HCV GB, p. 5-18].

Amounts paid by a state agency to a family with a member who has a developmental disability and is living at home to offset the cost of services and equipment needed to keep the developmentally disabled family member at home [24 CFR 5.609(c)(16)].

Amounts received under the Low-Income Home Energy Assistance Program (42 U.S.C. 1626(c)) [24 CFR 5.609(c)(17)].

Amounts received under the Child Care and Development Block Grant Act of 1990 (42

U.S.C. 9858q) [24 CFR 5.609(c)(17)].

Earned Income Tax Credit (EITC) refund payments (26 U.S.C. 32(j)) [24 CFR 5.609(c)(17)].
*Note:* EITC may be paid periodically if the family elects to receive the amount due as part of payroll payments from an employer.

Lump-sums received as a result of delays in processing Social Security and SSI payments (see section 6-I.H.) [24 CFR 5.609(b)(4)].

Lump-sums or prospective monthly amounts received as deferred disability benefits from the Department of Veterans Affairs (VA) [24 CFR 5.609(c)(14)].

## 6-I.I. PAYMENTS IN LIEU OF EARNINGS

Payments in lieu of earnings, such as unemployment and disability compensation, worker's compensation, and severance pay, are counted as income [24 CFR 5.609(b)(5)] if they are received either in the form of periodic payments or in the form of a lump-sum amount or prospective monthly amounts for the delayed start of a periodic payment. If they are received in a one-time lump sum (as a settlement, for instance), they are treated as lump-sum receipts [24 CFR 5.609(c)(3)]. (See also the discussion of periodic payments in section 6-I.H and the discussion of lump-sum receipts in section 6-I.G.)

## 6-I.J. WELFARE ASSISTANCE

### Overview

Welfare assistance is counted in annual income. Welfare assistance includes Temporary Assistance for Needy Families (TANF) and any payments to individuals or families based on need that are made under programs funded separately or jointly by federal, state, or local governments [24 CFR 5.603(b)].

### Sanctions Resulting in the Reduction of Welfare Benefits [24 CFR 5.615]

HACA must make a special calculation of annual income when the welfare agency imposes certain sanctions on certain families. The full text of the regulation at [24 CFR 5.615] is provided as Exhibit 6-5. The requirements are summarized below. This rule applies only if a family was receiving HCV assistance at the time the sanction was imposed.

#### Covered Families

The families covered by [24 CFR 5.615] are those "who receive welfare assistance or other public assistance benefits ('welfare benefits') from a State or other public agency ('welfare agency') under a program for which Federal, State or local law requires that a member of the family must participate in an economic self-sufficiency program as a condition for such assistance" [24 CFR 5.615(b)]

### Imputed Income

When a welfare agency imposes a sanction that reduces a family's welfare income because the family commits fraud or fails to comply with the agency's economic self-sufficiency program or work activities requirement, HACA must include in annual income "imputed" welfare income. HACA must request that the welfare agency provide the reason for the reduction of benefits and the amount of the reduction of benefits. The imputed welfare income is the amount that the benefits were reduced as a result of the sanction.

This requirement does not apply to reductions in welfare benefits: (1) at the expiration of the lifetime or other time limit on the payment of welfare benefits, (2) if a family member is unable to find employment even though the family member has complied with the welfare agency economic self-sufficiency or work activities requirements, or (3) because a family member has not complied with other welfare agency requirements [24 CFR 5.615(b)(2)].

### Offsets

The amount of the imputed welfare income is offset by the amount of additional income the family begins to receive after the sanction is imposed. When the additional income equals or exceeds the imputed welfare income, the imputed income is reduced to zero [24 CFR 5.615(c)(4)].

## 6-I.K. PERIODIC AND DETERMINABLE ALLOWANCES [24 CFR 5.609(b)(7)]

Annual income includes periodic and determinable allowances, such as alimony and child support payments, and regular contributions or gifts received from organizations or from persons not residing with an assisted family.

### Alimony and Child Support

HACA must count alimony or child support amounts awarded as part of a divorce or separation agreement.

>  HACA Policy
>
>  HACA will count court-awarded amounts for alimony and child support unless HACA verifies that: (1) the payments are not being made, and (2) the family has made reasonable efforts to collect amounts due, including filing with courts or agencies responsible for enforcing payments [HCV GB, pp. 5-23 and 5-47].
>
>  Families who do not have court-awarded alimony and child support awards are not required to seek a court award and are not required to take independent legal action to obtain collection.
>
>  HACA has a written agreement with the Texas Office of Attorney General to access child support income information through an electronic database system. This is a form of upfront income verification. Authorization to access this information is recorded on the Texas OAG Form 1825, which is signed by the family's head of household and retained in the family's tenant file.

**Regular Contributions or Gifts**

HACA must count as income regular monetary and nonmonetary contributions or gifts from persons not residing with an assisted family [24 CFR 5.609(b)(7)]. Temporary, nonrecurring, or sporadic income and gifts are not counted [24 CFR 5.609(c)(9)].

> HACA Policy
>
> Examples of regular contributions include: (1) regular payment of a family's bills (e.g., utilities, telephone, rent, credit cards and car payments), (2) cash or other liquid assets provided to any family member on a regular basis, and (3) "in-kind" contributions such as groceries and clothing provided to a family on a regular basis.
>
> HACA will count as income monetary and nonmonetary contributions or gifts to a family that may come from nonrecurring or different sources, but the family is able to pay an expense on a regular basis. For example, a family pays for cable television service monthly and receives monetary contributions to pay it from a different source each month. The cost of the cable service will be included as income.
>
> Nonmonetary contributions will be valued at the cost of purchasing the items, as determined by HACA. For contributions that may vary from month to month (e.g., utility payments), HACA will include an average amount based upon past history.

## 6-I.L. STUDENT FINANCIAL ASSISTANCE [24 CFR 5.609(b)(9); Notice PIH 2015-21]

In 2005, Congress passed a law (**for Section 8 programs only**) requiring that certain student financial assistance be included in annual income. Prior to that, the full amount of student financial assistance was excluded. For some students, the full exclusion still applies.

**Student Financial Assistance <u>Included</u> in Annual Income**

The regulation requiring the inclusion of certain student financial assistance applies only to students who satisfy all of the following conditions:

> They are enrolled in an institution of higher education, as defined under the Higher Education Act (HEA) of 1965.
>
> They are seeking or receiving Section 8 assistance on their own—that is, apart from their parents—through the HCV program, the project-based voucher program, or the moderate rehabilitation program.
>
> They are under 24 years of age **OR** they have no dependent children.

> For students who satisfy these three conditions, any financial assistance in excess of tuition and other required fees and charges received: (1) under the 1965 HEA, (2) from a private source, or (3) from an institution of higher education, as defined under the 1965 HEA, must be included in annual income.

To determine annual income in accordance with the above requirements, HACA will use the definitions of *dependent child, institution of higher education,* and *parents* in Section 3-II.E, along with the following definitions [FR 4/10/06, pp. 18148-18150]:

> *Assistance under the Higher Education Act of 1965* includes Pell Grants, Federal Supplement Educational Opportunity Grants, Academic Achievement Incentive Scholarships, State Assistance under the Leveraging Educational Assistance Partnership Program, the Robert G. Byrd Honors Scholarship Program, and Federal Work Study programs.

> *Assistance from private sources* means assistance from nongovernmental sources, including parents, guardians, and other persons not residing with the student in an HCV assisted unit.

> *Tuition and fees* are defined in the same manner in which the U.S, Department of Education defines *tuition and fees* [Notice PIH 2015-21].

- This is the amount of tuition and required fees covering a full academic year most frequently charged to students.

- The amount represents what a typical student would be charged and may not be the same for all students at an institution.

- If tuition is charged on a per-credit-hour basis, the average full-time credit hour load for an academic year is used to estimate average tuition.

- Required fees include all fixed-sum charges that are required of a large proportion of all students. Examples include, but are not limited to, writing and science lab fees and fees specific to the student's major or program (i.e., nursing program).

- Expenses related to attending an institution of higher education must **not** be included as tuition. Examples include, but are not limited to, room and board, books, supplies, meal plans, transportation and parking, student health insurance plans, and other non-fixed-sum charges.

> <u>HACA Policy</u>
> Regular financial support from parents or guardians to students for food, clothing, personal items and entertainment is not considered student financial assistance and is included in annual income.

**Student Financial Assistance <u>Excluded</u> from Annual Income [24 CFR 5.609(c)(6)]**
Any student financial assistance not subject to inclusion under [24 CFR 5.609(b)(9)] is fully excluded from annual income under [24 CFR 5.609(c)(6)], whether it is paid directly to the student or to the educational institution the student is attending. This includes any financial assistance received by:

> Students residing with parents who are seeking or receiving Section 8 assistance

> Students who are enrolled in an educational institution that does **not** meet the 1965 HEA definition of *institution of higher education*

> Students who are over 23 **AND** have at least one dependent child, as defined in Section 3-II.E

> Students who are receiving financial assistance through a governmental program not

authorized under the 1965 HEA.

## 6-I.M. ADDITIONAL EXCLUSIONS FROM ANNUAL INCOME

Other exclusions contained in 24 CFR 5.609(c) that have not been discussed earlier in this chapter include the following:

- Reimbursement of medical expenses [24 CFR 5.609(c)(4)]

- Amounts received by participants in other publicly assisted programs which are specifically for or in reimbursement of out-of-pocket expenses incurred and which are made solely to allow participation in a specific program [24 CFR 5.609(c)(8)(iii)]

- Amounts received by a person with a disability that are disregarded for a limited time for purposes of Supplemental Security Income eligibility and benefits because they are set aside for use under a Plan to Attain Self-Sufficiency (PASS) [(24 CFR 5.609(c)(8)(ii)]

- Reparation payments paid by a foreign government pursuant to claims filed under the laws of that government by persons who were persecuted during the Nazi era [24 CFR 5.609(c)(10)]

- Adoption assistance payments in excess of $480 per adopted child [24 CFR 5.609(c)(12)]

- Refunds or rebates on property taxes paid on the dwelling unit [24 CFR 5.609(c)(15)]

- Amounts paid by a state agency to a family with a member who has a developmental disability and is living at home to offset the cost of services and equipment needed to keep the developmentally disabled family member at home [24 CFR 5.609(c)(16)]

- Amounts specifically excluded by any other federal statute [24 CFR 5.609(c)(17), FR Notice 5/20/14]. HUD publishes an updated list of these exclusions periodically. It includes:

  (a) The value of the allotment provided to an eligible household under the Food Stamp Act of 1977 (7 U.S.C. 2017 (b))

  (b) Benefits under Section 1780 of the School Lunch Act and Child Nutrition Act of 1966, including WIC

  (c) Payments to volunteers under the Domestic Volunteer Services Act of 1973 (42 U.S.C. 5044(g), 5058)

  (d) Payments received under the Alaska Native Claims Settlement Act (43 U.S.C. 1626(c))

  (e) Income derived from certain sub marginal land of the United States that is held in trust for certain Indian tribes (25 U.S.C. 459e)

  (f) Payments or allowances made under the Department of Health and Human Services' Low-Income Home Energy Assistance Program (42 U.S.C. 8624(f))

  (g) Payments received under programs funded in whole or in part under the Workforce Investment Act of 1998 (29 U.S.C. 2931)

(h)  Deferred disability benefits from the Department of Veterans Affairs, whether received as a lump sum or in monthly prospective amounts

(i)  Income derived from the disposition of funds to the Grand River Band of Ottawa Indians (Pub. L. 94-540, 90 Stat. 2503-04)

(j)  Payments, funds, or distributions authorized, established, or directed by the Seneca Nation Settlement Act of 1990 (25 U.S.C. 1774f(b))

(k)  A lump sum or periodic payment received by an individual Indian pursuant to the Class Action Settlement Agreement in the United States District Court case entitled *Elouise Cobell et al.* v. *Ken Salazar et al.,* for a period of one year from the time of receipt of that payment as provided in the Claims Resolution Act of 2010

(l)  The first $2,000 of per capita shares received from judgment funds awarded by the Indian Claims Commission or the U. S. Claims Court, the interests of individual Indians in trust or restricted lands, including the first $2,000 per year of income received by individual Indians from funds derived from interests held in such trust or restricted lands (25 U.S.C. 1407-1408)

(m)  Benefits under the Indian Veterans Housing Opportunity Act of 2010 (only applies to Native American housing programs)

(n)   Payments received from programs funded under Title V of the Older Americans Act of 1985 (42 U.S.C. 3056(f))

(o)  Payments received on or after January 1, 1989, from the Agent Orange Settlement Fund or any other fund established pursuant to the settlement in *In Re Agent Orange* product liability litigation, M.D.L. No. 381 (E.D.N.Y.)

(p)  Payments received under 38 U.S.C. 1833(c) to children of Vietnam veterans born with spinal bifida, children of women Vietnam veterans born with certain birth defects, and children of certain Korean service veterans born with spinal bifida

(q)  Payments received under the Maine Indian Claims Settlement Act of 1980 (25 U.S.C. 1721)

(r)  The value of any child care provided or arranged (or any amount received as payment for such care or reimbursement for costs incurred for such care) under the Child Care and Development Block Grant Act of 1990 (42 U.S.C. 9858q)

(s)  Earned income tax credit (EITC) refund payments received on or after January 1, 1991 (26 U.S.C. 32(j))

(t)  Payments by the Indian Claims Commission to the Confederated Tribes and Bands of Yakima Indian Nation or the Apache Tribe of Mescalero Reservation (Pub. L. 95-433)

(u)   Amounts of scholarships funded under Title IV of the Higher Education Act of 1965j, including awards under federal work-study programs or under the Bureau of Indian Affairs student assistance programs (20 U.S.C. 1087uu). For Section 8 programs, the exception found in § 237 of Public Law 109–249 applies and requires that the amount of financial assistance in excess of tuition and mandatory fees shall be considered income in accordance with the provisions codified at 24 CFR 5.609(b)(9), except for those persons with disabilities as defined by 42 U.S.C. 1437a(b)(3)(E) (Pub. L. 109–249) (See Section 6-I.L. for exceptions.)

(v)   Allowances, earnings and payments to AmeriCorps participants under the National and Community Service Act of 1990 (42 U.S.C. 12637(d))

(w)   Any amount of crime victim compensation (under the Victims of Crime Act) received through crime victim assistance (or payment or reimbursement of the cost of such assistance) as determined under the Victims of Crime Act because of the commission of a crime against the applicant under the Victims of Crime Act (42 U.S.C. 10602)

(x)   Any amounts in an "individual development account" as provided by the Assets for Independence Act, as amended in 2002

(y)   Payments made from the proceeds of Indian tribal trust cases as described in Notice PIH 2013–30, "Exclusion from Income of Payments under Recent Tribal Trust Settlements" (25 U.S.C. 117b(a))

(z)   Major disaster and emergency assistance received under the Robert T. Stafford Disaster Relief and Emergency Assistance Act and comparable disaster assistance provided by states, local governments, and disaster assistance organizations.

(aa) Distributions from an ABLE account, and actual or imputed interest on the ABLE account balance

## PART II: ADJUSTED INCOME

## 6-II.A. INTRODUCTION

HUD regulations require PHAs to deduct from annual income any of five mandatory deductions for which a family qualifies. The resulting amount is the family's adjusted income. Mandatory deductions are found in [24 CFR 5.611].

5.611(a) Mandatory deductions - In determining adjusted income, the responsible entity [PHA] must deduct the following amounts from annual income:

(1) $480 for each dependent;

(2) $400 for any elderly family or disabled family;

(3) The sum of the following, to the extent the sum exceeds three percent of annual income:

(i) Unreimbursed medical expenses of any elderly family or disabled family;

(ii) Unreimbursed reasonable attendant care and auxiliary apparatus expenses for each member of the family who is a person with disabilities, to the extent necessary to enable any member of the family (including the member who is a person with disabilities) to be employed. This deduction may not exceed the earned income received by family members who are 18 years of age or older and who are able to work because of such attendant care or auxiliary apparatus; and

(4) Any reasonable child care expenses necessary to enable a member of the family to be employed or to further his or her education.

This part covers policies related to these mandatory deductions. Verification requirements related to these deductions are found in Chapter 7.

**Anticipating Expenses**

> HACA Policy
>
> Generally, HACA will use current circumstances to anticipate expenses. When possible, for costs that are expected to fluctuate during the year (e.g., child care during school and non-school periods and cyclical medical expenses), HACA will estimate costs based on historic data and known future costs.
>
> If an elderly or disabled family has an accumulated debt for medical or disability assistance that the family expects to pay during the period for which the income determination is being made. However, amounts previously deducted will not be allowed even if the amounts were not paid as expected in a preceding period.
> In addition, the family will be required to provide documentation of the reported debt for medical or disability assistance expenses. HACA may also require the family to provide documentation of payments made in the preceding year.

## 6-II.B. DEPENDENT DEDUCTION

An allowance of $480 is deducted from annual income for each dependent [24 CFR 5.611(a)(1)]. *Dependent* is defined as any family member other than the head, spouse, or co-head who is under the age of 18 or who is 18 or older and is a person with disabilities or a full-time student. Foster children, foster adults, and live-in aides are never considered dependents [24 CFR 5.603(b)].

## 6-II.C. ELDERLY OR DISABLED FAMILY DEDUCTION    A single deduction of $400 is

taken for any elderly or disabled family [24 CFR 5.611(a)(2)]. An *elderly family* is a family whose head, spouse, co-head, or sole member is 62 years of age or older, and a *disabled family* is a family whose head, spouse, co-head, or sole member is a person with disabilities [24 CFR 5.403].

## 6-II.D. MEDICAL EXPENSES DEDUCTION [24 CFR 5.611(a)(3)(i)]

Unreimbursed medical expenses may be deducted to the extent that, in combination with any disability assistance expenses, they exceed three percent of annual income.

The medical expense deduction is permitted only for families in which the head, spouse, or co-head is at least 62 or is a person with disabilities. If a family is eligible for a medical expense deduction, the medical expenses of all family members are counted [VG, p. 28].

**Definition of *Medical Expenses***

HUD regulations define *medical expenses* at [24 CFR 5.603(b)) to mean "medical expenses, including medical insurance premiums, that are anticipated during the period for which annual income is computed, and that are not covered by insurance."

HACA Policy

The most current IRS Publication 502, *Medical and Dental Expenses,* will be used to determine the costs that qualify as medical expenses.

| **Summary of Allowable Medical Expenses from IRS Publication 502** | |
|---|---|
| Services of medical professionals | Substance abuse treatment programs |
| Surgery and medical procedures that are necessary, legal, non-cosmetic | Psychiatric treatment |
| Services of medical facilities | Ambulance services and some costs of transportation related to medical expenses |
| Hospitalization, long-term care, and in-home nursing services | The cost and care of necessary equipment related to a medical condition (e.g., eyeglasses/lenses, hearing aids, crutches, and artificial teeth) |
| Prescription medicines and insulin, but <u>not</u> nonprescription medicines even if recommended by a doctor | |
| Improvements to housing directly related to medical needs (e.g., ramps for a wheel chair, handrails) | Cost and continuing care of necessary service animals |
| **Note:** This chart provides a summary of eligible medical expenses only. Detailed information is provided in IRS Publication 502. Medical expenses are considered only to the extent they are not reimbursed by insurance or some other source. | |

**Families That Qualify for Both Medical and Disability Assistance Expenses**

HACA Policy

This policy applies only to families in which the head, spouse, or co-head is 62 or older or is a person with disabilities.

When expenses anticipated by a family could be defined as either medical or disability assistance expenses, HACA will consider them medical expenses unless it is clear that the expenses are incurred exclusively to enable a person with disabilities to work.

**6-II.E. DISABILITY ASSISTANCE EXPENSES DEDUCTION [24 CFR 5.603(b) and**

**24 CFR 5.611(a)(3)(ii)]**

Reasonable expenses for attendant care and auxiliary apparatus for a disabled family member may be deducted if they: (1) are necessary to enable a family member 18 years or older to work, (2) are not paid to a family member or reimbursed by an outside source, (3) in combination with any medical expenses, exceed three percent of annual income, and (4) do not exceed the earned income received by the family member who is enabled to work.

**Earned Income Limit on the Disability Assistance Expense Deduction**

A family can qualify for the disability assistance expense deduction only if at least one family member (who may be the person with disabilities) is enabled to work [24 CFR 5.603(b)].

The disability expense deduction is capped by the amount of "earned income received by family members who are 18 years of age or older and who are able to work" because of the expense [24 CFR 5.611(a)(3)(ii)].
The earned income used for this purpose is the amount verified before any earned income disallowances or income exclusions are applied.

> <u>HACA Policy</u>
>
> The family must identify the family members enabled to work as a result of the disability assistance expenses. In evaluating the family's request, HACA will consider factors such as how the work schedule of the relevant family members relates to the hours of care provided, the time required for transportation, the relationship of the family members to the person with disabilities, and any special needs of the person with disabilities that might determine which family members are enabled to work.
>
> When HACA determines that the disability assistance expenses enable more than one family member to work, the expenses will be capped by the sum of the family members' incomes.

**Eligible Disability Expenses**

Examples of auxiliary apparatus are provided in the *HCV Guidebook* as follows: "Auxiliary apparatus are items such as wheelchairs, ramps, adaptations to vehicles, or special equipment to enable a blind person to read or type, but only if these items are directly related to permitting the disabled person or other family member to work" [HCV GB, p. 5-30].

HUD advises PHAs to further define and describe auxiliary apparatus [VG, p. 30].

**Eligible Auxiliary Apparatus**

> <u>HACA Policy</u>
>
> Expenses incurred for maintaining or repairing an auxiliary apparatus is eligible. In the case of an apparatus that is specially adapted to accommodate a person with disabilities (e.g., a vehicle or computer), the cost to maintain the special adaptations (but not maintenance of the apparatus itself) is an eligible expense. The cost of service animals trained to give assistance to persons with disabilities, including the cost of acquiring the animal, veterinary care, food, grooming, and other continuing costs of care, will be included.

## Eligible Attendant Care

The family determines the type of attendant care that is appropriate for the person with disabilities.

> HACA Policy
>
> Attendant care includes, but is not limited to, reasonable costs for home medical care, nursing services, in-home or center-based care services, interpreters for persons with hearing impairments, and readers for persons with visual disabilities.
>
> Attendant care expenses will be included for the period that the person enabled to work is employed plus reasonable transportation time. The cost of general housekeeping and personal services is not an eligible attendant care expense. However, if the person enabled to work is the person with disabilities, personal services necessary to enable the person with disabilities to work are eligible.
>
> If the care attendant also provides other services to the family, HACA will prorate the cost and allow only that portion of the expenses attributable to attendant care that enables a family member to work. For example, if the care provider also cares for a child who is not the person with disabilities, the cost of care must be prorated. Unless otherwise specified by the care provider, the calculation will be based upon the number of hours spent in each activity and/or the number of persons under care.

### *Payments to Family Members*

No disability assistance expenses may be deducted for payments to a member of an assisted family [24 CFR 5.603(b)]. However, expenses paid to a relative who is not a member of the assisted family may be deducted if they are not reimbursed by an outside source.

### Necessary and Reasonable Expenses

The family determines the type of care or auxiliary apparatus to be provided and must describe how the expenses enable a family member to work. The family must certify that the disability assistance expenses are necessary and are not paid or reimbursed by any other source.

> HACA Policy
>
> HACA determines the reasonableness of the expenses based on typical costs of care or apparatus in the locality. To establish typical costs, HACA will collect information from organizations that provide services and support to persons with disabilities. A family may present, and HACA will consider, the family's justification for costs that exceed typical costs in the area.

### Families That Qualify for Both Medical and Disability Assistance Expenses

> HACA Policy
>
> This policy applies only to families in which the head or spouse is 62 or older or is a person with disabilities.
>
> When expenses anticipated by a family could be defined as either medical or disability

assistance expenses, HACA will consider them medical expenses unless it is clear that the expenses are incurred exclusively to enable a person with disabilities to work.

## 6-II.F. CHILD CARE EXPENSE DEDUCTION

HUD defines *child care expenses* at [24 CFR 5.603(b)] as "amounts anticipated to be paid by the family for the care of children under 13 years of age during the period for which annual income is computed, but only where such care is necessary to enable a family member to actively seek employment, be gainfully employed, or to further his or her education and only to the extent such amounts are not reimbursed. The amount deducted shall reflect reasonable charges for child care. In the case of child care necessary to permit employment, the amount deducted shall not exceed the amount of employment income that is included in annual income."

### Clarifying the Meaning of *Child* for This Deduction

Child care expenses do not include child support payments made to another on behalf of a minor who is not living in an assisted family's household [VG, p. 26]. However, child care expenses for foster children that are living in the assisted family's household are included when determining the family's child care expenses [HCV GB, p. 5-29].

### Qualifying for the Deduction

#### Determining Who Is Enabled to Pursue an Eligible Activity

<u>HACA Policy</u>

The family must identify the family member(s) enabled to pursue an eligible activity. The term *eligible activity* in this section means any of the activities that may make the family eligible for a child care deduction (seeking work, pursuing an education, or being gainfully employed).

In evaluating the family's request, HACA will consider factors such as how the schedule for the claimed activity relates to the hours of care provided, the time required for transportation, the relationship of the family member(s) to the child, and any special needs of the child that might help determine which family member is enabled to pursue an eligible activity.

#### Seeking Work

<u>HACA Policy</u>

If the child care expense being claimed is to enable a family member to seek employment, the family must provide evidence of the family member's efforts to obtain employment at each reexamination. The deduction may be reduced or denied if the family member's job search efforts are not commensurate with the child care expense being allowed by HACA.

***Furthering Education***

> HACA Policy

> If the child care expense being claimed is to enable a family member to further his or her education, the member must be enrolled in school (academic or vocational) or participating in a formal training program. The family member is not required to be a full-time student, but the time spent in educational activities must be commensurate with the child care claimed.

***Being Gainfully Employed***

> HACA Policy

> If the child care expense being claimed is to enable a family member to be gainfully employed, the family must provide evidence of the family member's employment during the time that child care is being provided. Gainful employment is any legal work activity (full- or part-time) for which a family member is compensated.

### Earned Income Limit on Child Care Expense Deduction

When a family member looks for work or furthers his or her education, there is no cap on the amount that may be deducted for child care – although the care must still be necessary and reasonable. However, when child care enables a family member to work, the deduction is capped by "the amount of employment income that is included in annual income" [24 CFR 5.603(b)].

The earned income used for this purpose is the amount of earned income verified after any earned income disallowances or income exclusions are applied.

When the person who is enabled to work is a person with disabilities who receives the earned income disallowance (EID) or a full-time student whose earned income above $480 is excluded, child care costs related to enabling a family member to work may not exceed the portion of the person's earned income that actually is included in annual income. For example, if a family member who qualifies for the EID makes $15,000 but because of the EID only $5,000 is included in annual income, child care expenses are limited to $5,000.

HACA must not limit the deduction to the least expensive type of child care. If the care allows the family to pursue more than one eligible activity, including work, the cap is calculated in proportion to the amount of time spent working [HCV GB, p. 5-30].

> HACA Policy

> When the child care expense being claimed is to enable a family member to work, the deduction is capped by the amount of employment income that is included in annual income. Only one family member's income will be considered for a given period of time. The family may provide information that supports a request to designate another family member as the person enabled to work.

### Eligible Child Care Expenses

The type of care to be provided is determined by the assisted family. HACA may not refuse to give a family the child care expense deduction because there is an adult family member in the

household that may be available to provide child care [VG, p. 26].

### *Allowable Child Care Activities*

> <u>HACA Policy</u>
>
> For school-age children, costs attributable to public or private school activities during standard school hours are not considered. Expenses incurred for supervised activities after school or during school holidays (e.g., summer day camp, after-school sports league) are allowable forms of child care.
>
> The costs of general housekeeping and personal services are not eligible. Likewise, child care expenses paid to a family member who lives in the family's unit are not eligible; however, payments for child care to relatives who do not live in the unit are eligible.
>
> If a child care provider also renders other services to a family or child care is used to enable a family member to conduct activities that are not eligible for consideration, HACA will prorate the costs and allow only that portion of the expenses that is attributable to child care for eligible activities.
>
> For example, if the care provider also cares for a child with disabilities who is 13 or older, the cost of care will be prorated. Unless otherwise specified by the child care provider, the calculation will be based upon the number of hours spent in each activity and/or the number of persons under care.

### *Necessary and Reasonable Costs*

Child care expenses will be considered necessary if: (1) a family adequately explains how the care enables a family member to work, actively seek employment, or further his or her education, and (2) the family certifies, and the child care provider verifies, that the expenses are not paid or reimbursed by any other source.

> <u>HACA Policy</u>
>
> Child care expenses will be considered for the time required for the eligible activity plus reasonable transportation time. For child care that enables a family member to go to school, the time allowed may include not more than one study hour for each hour spent in class.
>
> The amount deducted shall reflect reasonable charges for child care. In the case of child care necessary to permit employment, the amount deducted shall not exceed the amount of employment income that is included in annual income.
>
> HACA may review the reasonableness of child care costs using schedules of child care costs such as from local welfare agencies. Families may present, and HACA will consider, justification for costs that exceed typical costs in the area.

## PART III: CALCULATING FAMILY SHARE AND PHA SUBSIDY

## 6-III.A. OVERVIEW OF RENT AND SUBSIDY CALCULATIONS

**TTP Formula [24 CFR 5.628]**

HUD regulations specify the formula for calculating the total tenant payment (TTP) for an assisted family. TTP is the highest of the following amounts, rounded to the nearest dollar:

    30 percent of the family's monthly adjusted income (adjusted income is defined in Part II)

    10 percent of the family's monthly gross income (annual income, as defined in Part I, divided by 12)

    The welfare rent (in as-paid states only)

    A minimum rent between $0 and $50 that is established by HACA

HACA has authority to suspend and exempt families from minimum rent when a financial hardship exists, as defined in section 6-III.B.

The amount that a family pays for rent and utilities (the family share) will never be less than the family's TTP but may be greater than the TTP depending on the rent charged for the unit the family selects.

***Welfare Rent* [24 CFR 5.628]**

    <u>HACA Policy</u>

    Welfare rent does not apply in this locality.

**Minimum Rent [24 CFR 5.630]**

    <u>HACA Policy</u>

    The minimum rent for this locality is $0.

    On December 15, 2023, HACA's Board approved changing the minimum rent from $25.00 to zero. HACA received approval from HUD to phase in the minimum rent change from $25.00 to zero with annual re-certifications, initials, and interims, effective March 1, 2024, and any effective dates after this time.

**Family Share [24 CFR 982.305(a)(5)]**

If a family chooses a unit with a gross rent (rent to owner plus an allowance for tenant-paid utilities) that exceeds HACA's applicable payment standard: (1) the family will pay more than the TTP, and (2) at initial occupancy HACA may not approve the tenancy if it would require the family share to exceed 40 percent of the family's monthly adjusted income. The income used for this determination must have been verified no earlier than 60 days before the family's voucher was issued. (For a discussion of the application of payment standards, see section 6-III.C.)

**PHA Subsidy [24 CFR 982.505(b)]**

HACA will pay a monthly housing assistance payment (HAP) for a family that is equal to the lower of (1) the applicable payment standard for the family minus the family's TTP or (2) the gross rent for the family's unit minus the TTP. (For a discussion of the application of payment standards, see section 6-III.C.)

**Utility Reimbursement [24 CFR 982.514(b)] 982.514(c)]**

When HACA subsidy for a family exceeds the rent to owner, the family is due a utility reimbursement. HUD permits HACA to pay the reimbursement to the family or directly to the utility provider.

> <u>HACA Policy</u>
>
> HACA will make monthly utility reimbursements to the family.

**6-III.B. FINANCIAL HARDSHIPS AFFECTING MINIMUM RENT [24 CFR 5.630]**

> <u>HACA Policy</u>
>
> HACA has established a minimum rent **of $0.**

**Overview**

If HACA establishes a minimum rent greater than zero, HACA must grant an exemption from the minimum rent if a family is unable to pay the minimum rent because of financial hardship.

The financial hardship exemption applies only to families required to pay the minimum rent. If a family's TTP is higher than the minimum rent, the family is not eligible for a hardship exemption. If HACA determines that a hardship exists, the family share is the highest of the remaining components of the family's calculated TTP.

**HUD-Defined Financial Hardship**

Financial hardship includes the following situations:

(1) The family has lost eligibility for or is awaiting an eligibility determination for a federal, state, or local assistance program. This includes a family member who is a noncitizen lawfully admitted for permanent residence under the Immigration and Nationality Act who would be entitled to public benefits but for Title IV of the Personal Responsibility and Work Opportunity Act of 1996.

> <u>HACA Policy</u>
>
> A hardship will be considered to exist only if the loss of eligibility has an impact on the family's ability to pay the minimum rent.
>
> Loss of eligibility due to fraud will not be considered a hardship under this circumstance.
>
> For a family waiting for a determination of eligibility, the hardship period will end as of the first of the month following (1) implementation of assistance, if approved, or (2) the decision to deny assistance. HACA does not consider a family appealing a denial decision under eligibility determination as "awaiting an eligibility determination." A family whose request for assistance is denied may request a hardship exemption based upon one of the

other allowable hardship circumstances.

(2) The family would be evicted because it is unable to pay the minimum rent.

> <u>HACA Policy</u>
>
> For a family to qualify under this provision, the cause of the potential eviction must be the family's failure to pay rent to the owner or tenant-paid utilities.

(3) Family income has decreased because of changed family circumstances, including the loss of employment.

> <u>HACA Policy</u>
>
> For a family to qualify under this provision, the loss of employment (or source of income) must have been involuntary, and the income in question must have been included in the calculation of the family's annual income.

(4) A death has occurred in the family.

> <u>HACA Policy</u>
>
> In order to qualify under this provision, a family must describe how the death has created a financial hardship (e.g., because of funeral-related expenses or the loss of the family member's income).

(5) The family has experienced other circumstances determined by HACA.

> <u>HACA Policy</u>
>
> HACA has not established any additional hardship criteria.

## Implementation of Hardship Exemption

### *Determination of Hardship*

When a family requests a financial hardship exemption, HACA must suspend the minimum rent requirement beginning the first of the month following the family's request.

HACA then determines whether the financial hardship exists and whether the hardship is temporary or long-term.

> <u>HACA Policy</u>
>
> HACA defines temporary hardship as a hardship expected to last 90 days or less. Long-term hardship is defined as a hardship expected to last more than 90 days.

When the minimum rent is suspended, the family share reverts to the highest of the remaining components of the calculated TTP. The example below demonstrates the effect of the minimum rent exemption.

| Example: Impact of Minimum Rent Exemption | |
|---|---|
| Assume HACA has established a minimum rent of $35. | |
| **Family Share – No Hardship** | **Family Share – With Hardship** |
| $0   30% of monthly adjusted income<br>$15  10% of monthly gross income<br>N/A  Welfare rent<br>$35  Minimum rent | $0   30% of monthly adjusted income<br>$15  10% of monthly gross income<br>N/A  Welfare rent<br>$35  Minimum rent |
| Minimum rent applies.<br>TTP = $35 | Hardship exemption granted.<br>TTP = $15 |

HACA Policy

To qualify for a hardship exemption, a family must submit a request for a hardship exemption in writing. The request must explain the nature of the hardship and how the hardship has affected the family's ability to pay the minimum rent.

HACA will make the determination of hardship within 30 calendar days.

*No Financial Hardship*

If HACA determines there is no financial hardship, HACA will reinstate the minimum rent and require the family to repay the amounts suspended.

HACA Policy

HACA will require the family to repay the suspended amount within 30 calendar days of HACA's notice that a hardship exemption has not been granted.

## Temporary Hardship

If HACA determines that a qualifying financial hardship is temporary, HACA must suspend the minimum rent for the 90-day period beginning the first of the month following the date of the family's request for a hardship exemption.

At the end of the 90-day suspension period, the family must resume payment of the minimum rent and must repay HACA the amounts suspended. HUD requires HACA to offer a reasonable repayment agreement, on terms and conditions established by HACA. HACA also may determine that circumstances have changed and the hardship is now a long-term hardship.

HACA Policy

HACA will enter into a repayment agreement in accordance with the procedures found in Chapter 16 of this plan.

### Long-Term Hardship

If HACA determines that the financial hardship is long-term, HACA must exempt the family from the minimum rent requirement for so long as the hardship continues. The exemption will apply from the first of the month following the family's request until the end of the qualifying hardship. When the financial hardship has been determined to be long-term, the family is not required to repay the minimum rent.

> HACA Policy

> The hardship period ends when any of the following circumstances apply:

> (1) At an interim or annual reexamination, the family's calculated TTP is greater than the minimum rent.

> (2) For hardship conditions based on loss of income, the hardship condition will continue to be recognized until new sources of income are received that are at least equal to the amount lost. For example, if a hardship is approved because a family no longer receives a $60/month child support payment, the hardship will continue to exist until the family receives at least $60/month in income from another source or once again begins to receive the child support.

> For hardship conditions based upon hardship-related expenses, the minimum rent exemption will continue to be recognized until the cumulative amount exempted is equal to the expense incurred.

### 6-III.C. APPLYING PAYMENT STANDARDS [24 CFR 982.505; 982.503(b)]

**Overview**

HACA's schedule of payment standards is used to calculate housing assistance payments for HCV families. This section covers the application of HACA's payment standards. The establishment and revision of HACA's payment standard schedule are covered in Chapter 16.

*Payment standard* is defined as "the maximum monthly assistance payment for a family assisted in the voucher program (before deducting the total tenant payment by the family)" [24 CFR 982.4(b)].

The payment standard for a family is the lower of (1) the payment standard for the family unit size, which is defined as the appropriate number of bedrooms for the family under HACA's subsidy standards [24 CFR 982.4(b)], or (2) the payment standard for the size of the dwelling unit rented by the family.

If HACA has established an exception payment standard for a designated part of a zip code area or FMR area and a family's unit is located in the exception area, HACA must use the appropriate payment standard for the exception area.

HACA is required to pay a monthly housing assistance payment (HAP) for a family that is the lower of (1) the payment standard for the family minus the family's TTP or (2) the gross rent for the family's unit minus the TTP.

If during the term of the HAP contract for a family's unit, the owner lowers the rent, HACA will recalculate the HAP using the lower of the initial payment standard or the gross rent for the unit [HCV GB, p. 7-8].

### Changes in Payment Standards

When HACA revises its payment standards during the term of the HAP contract for a family's unit, it will apply the new payment standards in accordance with HUD regulations.

### Decreases

If a PHA changes its payment standard schedule, resulting in a lower payment standard amount, during the term of a HAP contract, the PHA is not required to reduce the payment standard used to calculate subsidy for families under HAP contract as long as the HAP contract remains in effect [FR Notice 11/16/16].

However, if the PHA does choose to reduce the payment standard for families currently under HAP contract, the initial reduction to the payment standard may not be applied any earlier than the effective date of the family's second regular reexamination following the effective date of the decrease in the payment standard amount. At that point, the PHA may either reduce the payment standard to the current amount in effect on the PHA's payment standard schedule, or may reduce the payment standard to another amount that is higher than the normally applicable amount on the schedule. The PHA may also establish different policies for designated areas within their jurisdiction (e.g., different zip code areas)

In any case, the PHA must provide the family with at least 12 months' notice that the payment standard is being reduced before the effective date of the change. The PHA's policy on decreases in the payment standard during the term of the HAP contract apply to all families under HAP contract at the time of the effective date of the decrease in the payment standard within the designated area.

> <u>HACA Policy</u>
>
> If HACA changes its payment standard schedule resulting in a lower payment standard amount, during the term of a HAP contract, HACA will not reduce the payment standard used to calculate subsidy for families under HAP contract as long as the HAP contract remains in effect.  The lower payment standard would be applied if a family moves to a new unit or for any new HAP Contracts.
>
> The PHA will not establish different policies for decreases in the payment standard for designated areas within their jurisdiction.

### Increases

If the payment standard is increased during the term of the HAP contract, the increased payment standard will be used to calculate the monthly housing assistance payment for the family beginning on

the effective date of the family's next regular reexamination or the next interim recertification on or after the effective date of the increase in the payment standard.

Families requiring or requesting interim reexaminations will not have their HAP payments calculated using the higher payment standard until their next annual reexamination [HCV GB, p. 7-8].

### Changes in Family Unit Size (Voucher Size)

Irrespective of any increase or decrease in the payment standard, if the family unit size increases or decreases during the HAP contract term, the new family unit size must be used to determine the payment standard for the family beginning at the family's first regular reexamination following the change in family unit size.

### Reasonable Accommodation

If a family requires a higher payment standard as a reasonable accommodation for a family member who is a person with disabilities, HACA is allowed to establish a higher payment standard for the family  of not more than 120 percent of the published FMR.


## 6-III.D. APPLYING UTILITY ALLOWANCES [24 CFR 982.517]

### Overview

HACA-established utility allowance schedule is used in determining family share and HACA subsidy.  A family's utility allowance is determined by the size of dwelling unit leased by a family or the voucher unit size for which the family qualifies using HACA's subsidy standards, whichever is the lower of the two. See Chapter 5 for information on HACA's subsidy standards.


For policies on establishing and updating utility allowances, see Chapter 16.

### Reasonable Accommodation

HCV program regulations require HACA to approve a utility allowance amount higher than shown on HACA's schedule if a higher allowance is needed as a reasonable accommodation for a family member with a disability. For example, if a family member with a disability requires such an accommodation, HACA will approve an allowance for air-conditioning, even if HACA has determined that an allowance for air-conditioning generally is not needed.

The family must request the higher allowance and provide HACA with an explanation of the need for the reasonable accommodation and information about the amount of additional allowance required [HCV GB, p. 18-8].


### Utility Allowance Revisions

At reexamination, HACA must use HACA current utility allowance schedule [ HCV GB, P. 18-8].

> HACA Policy
>
> Revised utility allowances will be applied to a family's rent and subsidy calculations at the

first annual reexamination that is effective after the allowance is adopted.

## 6-III.E. PRORATED ASSISTANCE FOR MIXED FAMILIES [24 CFR 5.520]

HUD regulations prohibit assistance to ineligible family members. A *mixed family* is one that includes at least one U.S. citizen or eligible immigrant and any number of ineligible family members. HACA must prorate the assistance provided to a mixed family. HACA will first determine assistance as if all family members were eligible and then prorate the assistance based upon the percentage of family members that actually are eligible. For example, if HACA subsidy for a family is calculated at $500 and two of four family members are ineligible, HACA subsidy would be reduced to $250.

| EXHIBIT 6-1: ANNUAL INCOME INCLUSIONS |
|---|

**24 CFR 5.609**

*(a) Annual income means all amounts, monetary or not, which:*

(1) Go to, or on behalf of, the family head or spouse (even if temporarily absent) or to any other family member; or

(2) Are anticipated to be received from a source outside the family during the 12-month period following admission or annual reexamination effective date; and

(3) Which are not specifically excluded in paragraph (c) of this section.

(4) Annual income also means amounts derived (during the 12-month period) from assets to which any member of the family has access.

*(b) Annual income includes, but is not limited to:*

(1) The full amount, before any payroll deductions, of wages and salaries, overtime pay, commissions, fees, tips and bonuses, and other compensation for personal services;

(2) The net income from the operation of a business or profession. Expenditures for business expansion or amortization of capital indebtedness shall not be used as deductions in determining net income. An allowance for depreciation of assets used in a business or profession may be deducted, based on straight line depreciation, as provided in Internal Revenue Service regulations. Any withdrawal of cash or assets from the operation of a business or profession will be included in income, except to the extent the withdrawal is reimbursement of cash or assets invested in the operation by the family;

(3) Interest, dividends, and other net income of any kind from real or personal property. Expenditures for amortization of capital indebtedness shall not be used as deductions in determining net income. An allowance for depreciation is permitted only as authorized in paragraph (b)(2) of this section. Any withdrawal of cash or assets from an investment will be included in income, except to the extent the withdrawal is reimbursement of cash or assets invested by the family. Where the family has net family assets in excess of $5,000, annual income shall include the greater of the actual income derived from all net family assets or a percentage of the value of such assets based on the current passbook savings rate, as determined by HUD;

(4) The full amount of periodic amounts received from Social Security, annuities, insurance policies, retirement funds, pensions, disability or death benefits, and other similar types of periodic receipts, including a lump-sum amount or prospective monthly amounts for the delayed start of a periodic amount (except as provided in paragraph (c)(14) of this section);

(5) Payments in lieu of earnings, such as unemployment and disability compensation, worker's compensation and severance pay (except as provided in paragraph (c)(3) of this section);

(6) Welfare assistance payments.

(i) Welfare assistance payments made under the Temporary Assistance for Needy Families (TANF) program are included in annual income only to the extent such payments:

(A) Qualify as assistance under the TANF program definition at 45 CFR 260.31[2]; and

(B) Are not otherwise excluded under paragraph (c) of this section.

(ii) If the welfare assistance payment includes an amount specifically designated for shelter and utilities that is subject to adjustment by the welfare assistance agency in accordance with the actual cost of shelter and utilities, the amount of welfare assistance income to be included as income shall consist of:

(A) The amount of the allowance or grant exclusive of the amount specifically designated for shelter or utilities; plus

(B) The maximum amount that the welfare assistance agency could in fact allow the family for shelter and utilities. If the family's welfare assistance is ratably reduced from the standard of need by applying a percentage, the amount calculated under this paragraph shall be the amount resulting from one application of the percentage.

(7) Periodic and determinable allowances, such as alimony and child support payments, and regular contributions or gifts received from organizations or from persons not residing in the dwelling;

(8) All regular pay, special pay and allowances of a member of the Armed Forces (except as provided in paragraph (c)(7) of this section)

(9) For section 8 programs only and as provided in 24 CFR 5.612, any financial assistance, in excess of amounts received for tuition and mandatory fees that an individual receives under the Higher Education Act of 1965 (20 U.S.C. 1001 et seq.), from private sources, or from an institution of higher education (as defined under the Higher Education Act of 1965 (20 U.S.C. 1002)), shall be considered income to that individual, except that financial assistance described in this paragraph is not considered annual income for persons over the age of 23 with dependent children. For purposes of this paragraph, "financial assistance" does not include loan proceeds for the purpose of determining income.

---

[2] Text of 45 CFR 260.31 follows.

| HHS DEFINITION OF "ASSISTANCE" |
|---|

**45 CFR:  GENERAL TEMPORARY ASSISTANCE FOR NEEDY FAMILIES**

**260.31  What does the term "assistance" mean?**

(a)(1) The term "assistance" includes cash, payments, vouchers, and other forms of benefits designed to meet a family's ongoing basic needs (i.e., for food, clothing, shelter, utilities, household goods, personal care items, and general incidental expenses).

(2) It includes such benefits even when they are:

(i) Provided in the form of payments by a TANF agency, or other agency on its behalf, to individual recipients; and

(ii) Conditioned on participation in work experience or community service (or any other work activity under 261.30 of this chapter).

(3) Except where excluded under paragraph (b) of this section, it also includes supportive services such as transportation and child care provided to families who are not employed.

(b) [The definition of "assistance"] excludes: (1) Non-recurrent, short-term benefits that:

(i) Are designed to deal with a specific crisis situation or episode of need;

(ii) Are not intended to meet recurrent or ongoing needs; and

(iii) Will not extend beyond four months.

(2) Work subsidies (i.e., payments to employers or third parties to help cover the costs of employee wages, benefits, supervision, and training);

(3) Supportive services such as child care and transportation provided to families who are employed;

(4) Refundable earned income tax credits;

(5) Contributions to, and distributions from, Individual Development Accounts;

(6) Services such as counseling, case management, peer support, child care information and referral, transitional services, job retention, job advancement, and other employment-related services that do not provide basic income support; and

(7) Transportation benefits provided under a Job Access or Reverse Commute project, pursuant to section 404(k) of [the Social Security] Act, to an individual who is not otherwise receiving assistance.

| EXHIBIT 6-2: ANNUAL INCOME EXCLUSIONS |
|:---:|

**24 CFR 5.609**

*(c) Annual income does not include the following:*

(1) Income from employment of children (including foster children) under the age of 18 years;

(2) Payments received for the care of foster children or foster adults (usually persons with disabilities, unrelated to the tenant family, who are unable to live alone);

(3) Lump-sum additions to family assets, such as inheritances, insurance payments (including payments under health and accident insurance and worker's compensation), capital gains and settlement for personal or property losses (except as provided in paragraph (b)(5) of this section);

(4) Amounts received by the family that are specifically for, or in reimbursement of, the cost of medical expenses for any family member;

(5) Income of a live-in aide, as defined in Sec. 5.403;

(6) Subject to paragraph (b)(9) of this section, the full amount of student financial assistance paid directly to the student or to the educational institution;

(7) The special pay to a family member serving in the Armed Forces who is exposed to hostile fire;

(8) (i) Amounts received under training programs funded by HUD;

(ii) Amounts received by a person with a disability that are disregarded for a limited time for purposes of Supplemental Security Income eligibility and benefits because they are set aside for use under a Plan to Attain Self-Sufficiency (PASS);

(iii) Amounts received by a participant in other publicly assisted programs which are specifically for or in reimbursement of out-of-pocket expenses incurred (special equipment, clothing, transportation, child care, etc.) and which are made solely to allow participation in a specific program;

(iv) Amounts received under a resident service stipend. A resident service stipend is a modest amount (not to exceed $200 per month) received by a resident for performing a service for the PHA or owner, on a part-time basis, that enhances the quality of life in the development. Such services may include, but are not limited to, fire patrol, hall monitoring, lawn maintenance, resident initiatives coordination, and serving as a member of the PHA's governing board. No resident may receive more than one such stipend during the same period of time;

(v) Incremental earnings and benefits resulting to any family member from participation in qualifying State or local employment training programs (including training programs not affiliated with a local government) and training of a family member as resident management staff. Amounts excluded by this provision must be received under employment training programs with clearly defined goals and objectives, and are excluded only for the period during which the family member participates in the employment training program;

(9) Temporary, nonrecurring or sporadic income (including gifts);

(10) Reparation payments paid by a foreign government pursuant to claims filed under the laws of that government by persons who were persecuted during the Nazi era;

(11) Earnings in excess of $480 for each full-time student 18 years old or older (excluding the head of household and spouse);

(12) Adoption assistance payments in excess of $480 per adopted child;

(13) [Reserved]

(14) Deferred periodic amounts from supplemental security income and social security benefits that are received in a lump sum amount or in prospective monthly amounts, or any deferred Department of Veterans Affairs disability benefits that are received in a lump sum amount or prospective monthly amounts.

(15) Amounts received by the family in the form of refunds or rebates under State or local law for property taxes paid on the dwelling unit;

(16) Amounts paid by a State agency to a family with a member who has a developmental disability and is living at home to offset the cost of services and equipment needed to keep the developmentally disabled family member at home; or

(17) Amounts specifically excluded by any other Federal statute from consideration as income for purposes of determining eligibility or benefits under a category of assistance programs that includes assistance under any program to which the exclusions set forth in 24 CFR 5.609(c) apply. A notice will be published in the Federal Register and distributed to PHAs and housing owners identifying the benefits that qualify for this exclusion. Updates will be published and distributed when necessary. [See Section 6-I.M. for a list of benefits that qualify for this exclusion.]

| EXHIBIT 6-3: TREATMENT OF FAMILY ASSETS |
|:---:|

**24 CFR 5.603(b) Net Family Assets**

(1) Net cash value after deducting reasonable costs that would be incurred in disposing of real property, savings, stocks, bonds, and other forms of capital investment, excluding interests in Indian trust land and excluding equity accounts in HUD homeownership programs. The value of necessary items of personal property such as furniture and automobiles shall be excluded.

(2) In cases where a trust fund has been established and the trust is not revocable by, or under the control of, any member of the family or household, the value of the trust fund will not be considered an asset so long as the fund continues to be held in trust. Any income distributed from the trust fund shall be counted when determining annual income under Sec. 5.609.

(3) In determining net family assets, PHAs or owners, as applicable, shall include the value of any business or family assets disposed of by an applicant or tenant for less than fair market value (including a disposition in trust, but not in a foreclosure or bankruptcy sale) during the two years preceding the date of application for the program or reexamination, as applicable, in excess of the consideration received therefore. In the case of a disposition as part of a separation or divorce settlement, the disposition will not be considered to be for less than fair market value if the applicant or tenant receives important consideration not measurable in dollar terms.

(4) For purposes of determining annual income under Sec. 5.609, the term "net family assets" does not include the value of a home currently being purchased with assistance under part 982, subpart M of this title. This exclusion is limited to the first 10 years after the purchase date of the home.

> ### EXHIBIT 6-4: EARNED INCOME DISALLOWANCE FOR PERSONS WITH DISABILITIES

## 24 CFR 5.617 Self-sufficiency incentives for persons with disabilities–Disallowance of increase in annual income

*(a) Applicable programs.* The disallowance of earned income provided by this section is applicable only to the following programs: HOME Investment Partnerships Program (24

CFR part 92); Housing Opportunities for Persons with AIDS (24 CFR part 574); Supportive Housing Program (24 CFR part 583); and the Housing Choice Voucher Program (24 CFR part 982).

*(b) Definitions.* The following definitions apply for purposes of this section.

*Baseline income.* The annual income immediately prior to implementation of the disallowance described in paragraph (c)(1) of this section of a person with disabilities (who is a member of a qualified family).

*Disallowance.* Exclusion from annual income.

*Previously unemployed* includes a person with disabilities who has earned, in the twelve months previous to employment, no more than would be received for 10 hours of work per week for 50 weeks at the established minimum wage.

*Qualified family.* A family residing in housing assisted under one of the programs listed in paragraph (a) of this section or receiving tenant-based rental assistance under one of the programs listed in paragraph (a) of this section.

(1) Whose annual income increases as a result of employment of a family member who is a person with disabilities and who was previously unemployed for one or more years prior to employment;

(2) Whose annual income increases as a result of increased earnings by a family member who is a person with disabilities during participation in any economic self-sufficiency or other job training program; or

(3) Whose annual income increases, as a result of new employment or increased earnings of a family member who is a person with disabilities, during or within six months after receiving assistance, benefits or services under any state program for temporary assistance for needy families funded under Part A of Title IV of the Social Security Act, as determined by the responsible entity in consultation with the local agencies administering temporary assistance for needy families (TANF) and Welfare-to-Work (WTW) programs. The TANF program is not limited to monthly income maintenance, but also includes such benefits and services as one-time payments, wage subsidies and transportation assistance-- provided that the total amount over a six-month period is at least $500.

*(c) Disallowance of increase in annual income—*

(1) *Initial 12-month exclusion.* During the 12-month period beginning on the date a member who is a person with disabilities of a qualified family is first employed or the family first experiences an

increase in annual income attributable to employment, the responsible entity must exclude from annual income (as defined in the regulations governing the applicable program listed in paragraph (a) of this section) of a qualified family any increase in income of the family member who is a person with disabilities as a result of employment over prior income of that family member.

 (2) Second twelve month exclusion and p*hase-in of rent increase.* Upon expiration of the 12-month period defined in paragraph (c)(1) of this section and for the subsequent 12-month period, the responsible entity must exclude from annual income of a qualified family at least 50 percent of any increase in income of such family member as a result of employment over the family member's baseline income.

 (3) *Maximum 2-year disallowance.* The disallowance of increased income of an individual family member who is a person with disabilities as provided in paragraph (c)(1) or (c)(2) of this section is limited to a lifetime 24-month period. The disallowance applies for a maximum of 12 months for disallowance under paragraph (c)(1) of this section and a maximum of 12 months for disallowance under paragraph (c)(2) of this section, during the 24- month period starting from the initial exclusion under paragraph (c)(1) of this section.

 (4) *Effect of changes on currently participating families.* Families eligible for and participating in the disallowance of earned income under this section prior to *May 9, 2016* will continue to be governed by this section in effect as it existed immediately prior to that date (see 24 CFR parts 0 to 199, revised as of April 1, 2016).

 (d) *Inapplicability to admission.* The disallowance of increases in income as a result of employment of persons with disabilities under this section does not apply for purposes of admission to the program (including the determination of income eligibility or any income targeting that may be applicable).

| EXHIBIT 6-5: THE EFFECT OF WELFARE BENEFIT REDUCTION |
|---|

**[24 CFR 5.615]**

**Public housing program and Section 8 tenant-based assistance program: How welfare benefit reduction affects family income.**

*(a) Applicability* - This section applies to covered families who reside in public housing (part 960 of this title) or receive Section 8 tenant-based assistance (part 982 of this title).

*(b) Definitions* - The following definitions apply for purposes of this section:

*Covered families* - Families who receive welfare assistance or other public assistance benefits ("welfare benefits") from a State or other public agency ("welfare agency") under a program for which Federal, State, or local law requires that a member of the family must participate in an economic self- sufficiency program as a condition for such assistance.

*Economic self-sufficiency program* - See definition at Sec. 5.603.

*Imputed welfare income* - The amount of annual income not actually received by a family, as a result of a specified welfare benefit reduction, that is nonetheless included in the family's annual income for purposes of determining rent.

*Specified welfare benefit reduction* -

(1) A reduction of welfare benefits by the welfare agency, in whole or in part, for a family member, as determined by the
welfare agency, because of fraud by a family member in connection with the welfare program; or because of welfare agency sanction against a family member for noncompliance with a welfare agency requirement to participate in an economic
self-sufficiency program.

(2) "Specified welfare benefit reduction" does not include a reduction or termination of welfare benefits by the welfare agency:

(i) At expiration of a lifetime or other time limit on the payment of welfare benefits;

(ii) Because a family member is not able to obtain employment, even though the family member has complied with welfare agency economic self-sufficiency or work activities requirements; or

(iii) Because a family member has not complied with other welfare agency requirements.

*(c) Imputed welfare income* -

(1) A family's annual income includes the amount of imputed welfare income (because of a specified welfare benefits reduction, as specified in notice to HACA by the welfare agency), plus the total amount of other annual income as determined in accordance with Sec. 5.609.

(2) At the request of HACA, the welfare agency will inform HACA in writing of the amount and term of any specified welfare benefit reduction for a family member, and the reason for such reduction, and will also inform HACA of any subsequent changes in the term or amount of such specified welfare benefit reduction. HACA will use this information to determine the

amount of imputed welfare income for a family.

(3) A family's annual income includes imputed welfare income in family annual income, as determined at HACA's interim or regular reexamination of family income and composition, during the term of the welfare benefits reduction (as specified in information provided to HACA by the welfare agency).

(4) The amount of the imputed welfare income is offset by the amount of additional income a family receives that commences after the time the sanction was imposed. When such additional income from other sources is at least equal to the imputed

(5) HACA may not include imputed welfare income in annual income if the family was not an assisted resident at the time of sanction.

*(d) Review of PHA decision -*

(1) Public housing - If a public housing tenant claims that HACA has not correctly calculated the amount of imputed welfare income in accordance with HUD requirements, and if HACA denies the family's request to modify such amount, HACA shall give the tenant written notice of such denial, with a brief explanation of the basis for HACA determination of the amount of imputed welfare income. HACA notice shall also state that if the tenant does not agree with HACA determination, the tenant may request a grievance hearing in accordance with part 966, subpart B of this title to review HACA determination. The tenant is not required to pay an escrow deposit pursuant to Sec. 966.55(e) for the portion of tenant rent attributable to the imputed welfare income in order to obtain a grievance hearing on HACA determination.

(2) Section 8 participant - A participant in the Section 8 tenant-based assistance program may request an informal hearing, in accordance with Sec. 982.555 of this title, to review HACA determination of the amount of imputed welfare income that must be included in the family's annual income in accordance with this section. If the family claims that such amount is not correctly calculated in accordance with HUD requirements, and if HACA denies the family's request to modify such amount, HACA shall give the family written notice of such denial, with a brief explanation of the basis for HACA determination of the amount of imputed welfare income. Such notice shall also state that if the family does not agree with HACA determination, the family may request an informal hearing on the determination under HACA hearing procedure.

*(e) PHA relation with welfare agency -*

(1) HACA must ask welfare agencies to inform HACA of any specified welfare benefits reduction for a family member, the reason for such reduction, the term of any such reduction, and any subsequent welfare agency determination affecting the amount or term of a specified welfare benefits reduction. If the welfare agency determines a specified welfare benefits reduction for a family member, and gives HACA written notice of such reduction, the family's annual incomes shall include the imputed welfare income because of the specified welfare benefits reduction.

(2) HACA is responsible for determining the amount of imputed welfare income that is included in the family's annual income as a result of a specified welfare benefits reduction as determined by the welfare agency, and specified in the notice by the welfare agency to

HACA. However, HACA is not responsible for determining whether a reduction of welfare benefits by the welfare agency was correctly determined by the welfare agency in accordance with welfare program requirements and procedures, nor for providing the opportunity for review or hearing on such welfare agency determinations.

(3) Such welfare agency determinations are the responsibility of the welfare agency, and the family may seek appeal of such determinations through the welfare agency's normal due process procedures. HACA shall be entitled to rely on the welfare agency notice to HACA of the welfare agency's determination of a specified welfare benefits reduction.

<div align="center">

## CHAPTER 7
## VERIFICATION

</div>

<div align="center">

[24 CFR 982.516, 24 CFR 982.551, 24 CFR 5.230, Notice PIH 2018-18]]

</div>

## INTRODUCTION

HACA must verify all information that is used to establish the family's eligibility and level of assistance and is required to obtain written authorization from the family in order to collect the information. Applicants and program participants must cooperate with the verification process as a condition of receiving assistance. HACA must not pass the cost of verification to the family.

HACA will follow the verification guidance provided by HUD in Notice PIH 2018-18, and any subsequent guidance issued by HUD. This chapter summarizes those requirements and provides supplementary HACA policies.

Part I describes the general verification process. Part II provides more detailed requirements related to family, Part III provides information on income and assets, and Part IV covers mandatory deductions.

Verification policies, rules and procedures will be modified as needed to accommodate persons with disabilities. All information obtained through the verification process will be handled in accordance with the records management policies of HACA.

<div align="center">

**PART I: GENERAL VERIFICATION REQUIREMENTS**

</div>

## 7-I.A. FAMILY CONSENT TO RELEASE OF INFORMATION [24 CFR 982.516 AND 982.551, 24 CFR 5.230]

The family must supply any information that the HACA or HUD determines is necessary to the administration of the program and must consent to HACA verification of that information [24 CFR 982.551].

### Consent Forms

It is required that all adult applicants and participants sign form HUD-9886, Authorization for Release of Information. The purpose of form HUD-9886 is to facilitate automated data collection and computer matching from specific sources and provides the family's consent only for the

specific purposes listed on the form. HUD and HACA may collect information from State Wage Information Collection Agencies (SWICAs) and current and former employers of adult family members. Only HUD is authorized to collect information directly from the Internal Revenue Service (IRS) and the Social Security Administration (SSA). Adult family members must sign other consent forms as needed to collect information relevant to the family's eligibility and level of assistance.

## Form HUD-9886-A [24 CFR 5.230(b)(1), b(2), (c)(4), and (c)(5); and Notice PIH 2023-27]

All adult family members must sign form HUD-9886, Authorization for Release of Information.

The PHA has the discretion to establish polices around when family members must sign consent forms when they turn 18. PHAs must establish these policies stating when family members will be required to sign consent forms at intervals other than at reexamination.

> ### HACA Policy
>
> Family members turning 18 years of age between annual recertifications will be required to sign the Consent to the Release of Information Form HUD-9886 at the family's next annual reexamination.

## Penalties for Failing to Consent [24 CFR 5.232]

> While the family is obligated to release information to the PHA, under HOTMA, this does not apply if the applicant or participant, or any member of the assistance applicant's or participant's family revokes their consent with respect to the ability of the PHA to access financial records from financial institutions, unless the PHA establishes an admission and occupancy policy that revocation of consent to access financial records will result in denial or termination of assistance or admission [24 CFR 5.232(c)].HACA Policy
>
> The HACA has established a policy that revocation of consent to access financial records will result in denial of admission or termination of assistance.
>
> In order for a family to revoke their consent, the family must provide a written notice to HACA.
>
> Within 15 business days of the date the family provides written notice, HACA will send the family a notice acknowledging receipt of the request and explaining that revocation of consent will result in denial or termination of assistance, as applicable. At the same time, HACA will notify their local HUD office.

## 7-I.B.1 USE OF OTHER PROGRAMS' INCOME DETERMINATIONS [24 CFR 5.609(c)(3) and Notice PIH 2023-27]

PHAs may, but are not required to, determine a family's annual income, including income from assets, prior to the application of any deductions, based on income determinations made within the previous 12-month period, using income determinations from means-tested federal public assistance programs.

**HACA Policy**

When available and applicable, HACA will accept other programs' Safe Harbor determinations of income at annual reexamination to determine the family's total annual income. HACA will not accept other programs' determinations of income for any new admission or interim reexamination.

- HACA may accept Safe Harbor determinations from the following programs:
- Temporary Assistance for Needy Families (TANF)
- Supplemental Nutrition Assistance Program (SNAP)
- Supplemental Security Income (SSI)
- The Special Supplemental Nurition for Woman, Infants, and Children (WIC)

To be accepted, Safe Harbor verification must be third-party verification (this can be in the form of a tenant-provided document). The Safe Harbor verification may be in the form of an award letter from the relevant federal program.  The verification must:

- State the family size
- Be for the entire family (i.e. the family members listed in the documentation must match the family's composition in the assisted unit)
- State the amount of the family's annual income
- Show that the family's income determination was made in the previous 12 months.

The Safe Harbor documentation will be considered acceptable if any of the following dates fall into the 12-month period prior to the receipt of the documentation by HACA.

- Income determination effective date;
- Program administrator's signature date;
- Family's signature date;
- Report effective date; or
- Other report-specific dates that verify the income determination date.

If a family provides multiple acceptable Safe Harbor verifications (i.e. a verification from more than

one agency or program, or multiple verifications from the same federal program), HACA will review all of the verifications and use the verification that has the most recent income determination date.

The annual income does not have to be broken down by family member or income type. Annual income includes income earned from assets, therefore when using Safe Harbor to verify a family's income, HACA will not ask about a family's net family assets, or the family's earned income from those assets.

HACA will only use the total income determination outlined in the Safe Harbor verification. HACA will not review any other information such as income exclusions and inclusions and will not mix and match Safe Harbor income determinations and other income determinations.

HACA will still require third-party verification of all deductions such as the health and medical care expense or child care expense deductions. The amounts of unreimbursed reasonable attendant care expenses and child-care expenses deducted from a family's annual income, must still be capped by the amount earned by any family member who is enabled to work as a result of the expense. Therefore, HACA will obtain third-party verification of the applicable employment income and cap the respective expense deductions accordingly.

If the Safe Harbor verification is not acceptable (does not meet all requirements outlined above), is unavailable, or is disputed by the family, HACA will use the verification hierarchy method to verify income and assets.

The use of Safe Harbor verification does not remove the household's obligation to comply with the interim recertification and reporting changes requirements. If the family has a change in income that occurs after the annual reexam effective date, HACA will conduct an interim reexam if the change meets the requirements for performing an interim reexamination as outlined in Chapter 11. In this case, HACA will use third-party verification to verify the change.

## 7-I.C. OVERVIEW OF VERIFICATION REQUIREMENTS

### HUD's Verification Hierarchy [Notice PIH 2018-18]

HUD mandates the use of EIV system and offers administrative guidance on the use of other methods to verify family information and specifies the circumstances in which each method will be used. In general, HUD requires HACA to use the most reliable form of verification that is available and to document the reasons when HACA uses a lesser form of verification.

In order of priority, the forms of verification that HACA will use are:

Up-front Income Verification (UIV) using HUD's Enterprise Income Verification (EIV) system

Up-front Income Verification (UIV) using a non-HUD system

Written Third-Party Verification (may be provided by applicant or participant)

Written Third-party Verification Form

Oral Third-party Verification

Self-Certification/Tenant Declaration

Each of the verification methods is discussed in subsequent sections below.

### Requirements for Acceptable Documents

<u>HACA Policy</u>

Any documents used for verification must be the original (not photocopies) and must be dated within  120days of the date they are provided to HACA. The documents must not be damaged, altered or in any way illegible.

For fixed-income sources, a statement dated within the appropriate benefit year is acceptable documentation

HACA will accept documents dated up to 6 months before the effective date of the family's reexamination if the document represents the most recent scheduled report from a source. For example, if the holder of a pension annuity provides semi-annual reports, HACA would accept the most recent report.

Print-outs from web pages are considered original documents.

HACA staff member who views the original document must make a photocopy..

Any family self-certifications/tenant declaration must be made in a format acceptable to HACA and must be signed by the family member whose information or status is being verified.

### File Documentation

The HACA must document in the file how the figures used in income and rent calculations were

determined. All verification attempts, information obtained, and decisions reached during the verification process will be recorded in the family's file in sufficient detail to demonstrate that HACA has followed all of the verification policies set forth in this plan. The record should be sufficient to enable a staff member or HUD reviewer to understand the process followed and conclusions reached.

> HACA Policy
>
> HACA will document, in the family file, the following:
>
> Reported family annual income
>
> Value of assets
>
> Expenses related to deductions from annual income
>
> Other factors influencing adjusted income

When HACA is unable to obtain third party verification, HACA will document in the family file the reason that third-party verification was not available [24 CFR 982.516 (a) (2)); Notice PIH 2018-18].

## 7-I.D. UP-FRONT INCOME VERIFICATION (UIV)

Up-front income verification (UIV) refers to the HACA's use of the verification tools available from independent sources that maintain computerized information about earnings and benefits. UIV will be used to the extent that these systems are available to the HACA.

There may be legitimate differences between the information provided by the family and UIV-generated information. If the family disputes the accuracy of UIV data, no adverse action can be taken until HACA has independently verified the UIV information and the family has been granted an opportunity to contest any adverse findings through the informal review/hearing process of HACA.

See Chapter 6 for HACA's policy on the use of UIV/EIV to project annual income.

**Upfront Income Verification Using HUD's Enterprise Income Verification (EIV) System (Mandatory)**

PHAs must use HUD's EIV system in its entirety as a third-party source to verify tenant employment and income information during annual and streamlined reexaminations of family composition and income in accordance with 24 CFR 5.236 and administrative guidance issued by HUD. The PHA may, but is not required to, use EIV as a third-party source during interim reexaminations. HUD's EIV system contains data showing earned income, unemployment benefits, social security benefits, and SSI benefits for participant families.

### EIV Income Reports

PHAs are required to obtain an EIV Income report for each family any time the PHA conducts an

annual reexamination. However, PHAs are **not required** to use the EIV Income reports:

- At annual reexamination if HACA used Safe Harbor verification from another means-test federal assistance program to determine the family's annual income.

- During any interim reexaminations.

HACA POLICY

- Except for when Safe Harbor verification from another means-tested federal assistance program is used to determine the family's annual income, HACA will obtain EIV Income reports for all annual reexaminations for all families. Reports will be generated as part of the regular reexamination process. HACA will ensure that all EIV Income Reports are pulled within 120 days of the effective date of the annual reexamination.

- Income reports will only be used in interim reexaminations as necessary. EIV may be used to verify that families claiming zero income are not receiving income from any of these sources listed in EIV.

- Income reports will be retained in participant files with the applicable annual documents or interim reexamination documents (if applicable) for the duration of tenancy.

- When the PHA determines through EIV reports and third-party verification that a family has concealed or under-reported income, corrective action will be taken pursuant to the policies in Chapter 14, Program Integrity.

### New Hires Report [Notice PIH 2023-27]

PHAs that do not require families to undergo interim reexaminations for earned income increases after an interim decrease are not required to review this report between a family's annual reexamination. If the PHA requires an interim for increases in earned income after an interim decrease, then the PHA must review the report quarterly after the family's interim decrease.

HACA Policy

In accordance with HACA policies in Chapter 11, HACA does not process interim reexaminations for families who have increases in earned income. Except for instances in which HACA uses Safe Harbor income determinations to determine a family's annual income, HACAwill only review the New Hires Report at annual reexamination.

### No Income Reported by HHS or SSA Report

The PHA must identify in its policies and procedures when this report will be pulled [Notice PIH 2023-27].

HACA will generate the No Income Reported by HHS or SSA Report annually and will retain the report (if applicable).

HACA will re-verify the status of tenants identified on the report quarterly. Based on the information provided by the family and in EIV, HACA may require that family members provide verifications or sign release forms in order to obtain additional verification.

When HACA determines through this report and third-party verification that a family has concealed or under-reported income, corrective action will be taken pursuant to the policies in Chapter 14, Program Integrity

### EIV Identity Verification Report

The EIV system verifies tenant identities against SSA records. These records are compared to PIC data for a match on social security number, name, and date of birth.

PHAs are required to use EIV's *Identity Verification Report* on a monthly basis to improve the availability of income information in EIV [Notice PIH 2023-27].

When identity verification for a participant fails, a message will be displayed within the EIV system and no income information will be displayed.

HACA Policy

HACA will identify participants whose identity verification has failed by reviewing EIV's *Identity Verification Report* on a monthly basis.

HACA will attempt to resolve discrepancies by obtaining appropriate documentation from the participant. When HACA determines that discrepancies exist as a result of PHA errors, such as spelling errors or incorrect birth dates, HACA will correct the errors promptly.

### Deceased Tenants Reports [Notice PIH 2012-4 and Notice PIH 2023-27]

The Deceased Tenant Report identifies residents that have been reported by the SSA as deceased.  The PHA is required to review the report at least quarterly.

HACA Policy

HACA will review the Deceased Tenants Report on a monthly basis.

**Upfront Income Verification Using Non-HUD Systems**

HACA Policy

HACA will use the OAG Child Support Portal for child support benefit verification and the Work Number as needed.

## 7-I.E. VERIFICATION HIERARCHY [Notice PIH 2023-27]

When the PHA does not use a streamlined determination of income or an income determination from a means-tested federal assistance program, HUD requires the PHA to obtain third-party verification of:

- Reported family annual income;
- The value of net family assets when the net value exceeds $50,000 (as adjusted annually);
-  Expenses related to deductions from annual income; and
- Other factors that affect the determination of adjusted income.

**File Documentation**

The PHA must document in the file how the figures used in income and rent calculations were determined. All verification attempts, information obtained, and decisions reached during the verification process will be recorded in the family's file in sufficient detail to demonstrate that the PHA has followed all of the verification policies set forth in this plan. The record should be sufficient to enable a staff member or HUD reviewer to understand the process followed and conclusions reached.

## 7-I.F. LEVEL 4 VERIFICATION [Notice PIH 2023-27]

HUD identifies two types of Level 4 verification: written-third party verification from the source and EIV + self-certification.

**EIV + Self-Certification**

HACA Policy

- At annual reexamination, if HACA is unable to use a determination of income from a means-tested federal assistance program and if there are no reported changes to an income source, HACA will use EIV + self-certification as verification of employment income, provided the family agrees with the amounts listed in EIV.

- HACA will use an average of the last two quarters of income listed in EIV to determine income from employment. HACA will provide the family with the information in EIV. The family will be required to sign a self-certification stating that the amount listed in EIV is accurate and representative of current income. If the family disagrees with the amount in EIV, the amount is not reflective of current income, or if less than two quarters are available in EIV, HACA will use written third-party verification from the source as outlined below.

- HACA will not use this method of verification at new admission since EIV is not available for applicant families or at interim reexamination since the income information in EIV is not current

### Written Third-Party Verification from the Source

- While HUD considers standardized third-party forms to be less reliable than the third-party written verification described above, this form of verification is mandatory when the family cannot provide acceptable documentation. Written third-party verification is also required when there appears to be unreported income and other forms of verification are not available.

HACA Policy

In general, HACA will use third-party verification from the source in the following circumstances:

- At annual reexamination when EIV + self-certification is not used;
- For all new admissions; and
- For all interim reexaminations.

HACA will; not use this method if HACA is able to use an income determination from a means-tested federal assistance program or if HACA uses EIV + self-certification as outlined above.

In general, third-party documents provided by the family or the source must be dated within 120 days of the date received by HACA. However, for fixed-income sources, a statement

dated within the appropriate benefit year is acceptable documentation.

HACA may reject documentation provided by the family if the document appears to be forged, or if the document is altered, mutilated, or illegible. If HACA determines that third-party documents provided by the family are not acceptable, HACA will explain the reason to the family and request additional documentation from the family or will use a lower form of verification.

When verification of assets held by a banking or financial institution is required, HACA will obtain one statement that reflects the current balance of the account.

When pay stubs are used, HACA will require the family to provide two - four most current, consecutive pay stubs. At HACA's discretion, if additional paystubs are needed due to the family's circumstances (e.g., sporadic income, fluctuating schedule, etc.), HACA may request additional paystubs or a payroll record.

## 7-I.G. . LEVEL 3 VERIFICATION: WRITTEN, THIRD-PARTY FORM [Notice PIH 2023 -27]

HUD considers standardized third-party forms to be less reliable than the third-party written verification described above. The PHA may use this method when higher forms are unavailable or are rejected by the PHA or when the family is unable to provide acceptable verification.

HACA Policy

Typically, HACA will attempt to send written third-party verification forms to the verification source whenever higher forms of verification are unavailable.
However, on a case-by-case basis, HACA may choose to obtain oral third-party verification without first attempting, and in lieu of, a written-third party verification form.

## 7.I.H. LEVEL 2: ORAL THIRD-PARTY VERIFICATION [Notice PIH 2023-27]

HACA will attempt to obtain written third-party verification from the verification source. If written third-party verification forms are not returned within 10 days, HACA will attempt to get oral verification from a third party. HACA will document the third party in the file with the date and time of the telephone call or visit, the name of the person contacted and the telephone number, as well as the information confirmed.

**When Third-Party Information is Not Required [Notice PIH 2023-27]**

Third-party verification may not be available in all situations. HUD has acknowledged that it may not be cost-effective or reasonable to obtain third-party verification of income, assets or expenses when these items would have a minimal impact on the family's total tenant payment.

HACA Policy

If the family cannot provide original documents, HACA may choose to pay a service charge required to obtain third-party verification, unless it is not cost effective in which case a self-certification will be acceptable. The cost of verification will not be passed on to the family.

## 7-I.I. LEVEL 1: NON-THIRD-PARTY VERIFICATION TECHNIQUE: SELF-CERTIFICATION [Notice PIH 2023-27]

Non-third-party verification consists of a signed statement of reported income and/or expenses to. This verification method should be used as a last resort when the PHA has not been successful in obtain information via all other required verification techniques.

HACA Policy

When information cannot be verified by a third party or by review of documents, family members will be required to submit self-certifications attesting to the accuracy of the information they have provided to HACA.

HACA may require a family to certify that a family member does <u>not</u> receive a particular type of income or benefit.

The self-certification must be made in a format acceptable to HACA and must be signed by the family member whose information or status is being verified.

All self-certifications will include the following language:
"I/We, the undersigned, certify under penalty of perjury that the information provided here is true and correct, to the best of my knowledge and recollection. WARNING: Anyone who knowingly submits a false claim or knowingly makes a false statement is subject to criminal and/or civil penalties, including confinement for up to five years, fines, and civil and administrative penalties. (18 U.S.C. 287, 1001, 1010, 1012; 31 U.S.C. 3279, 3802)".

## Upfront Income Verification Using Non-HUD Systems (Optional)

In addition to mandatory use of the EIV system, HUD encourages PHAs to utilize other upfront verification sources.

> <u>HACA Policy</u>
>
> HACA will inform all applicants and residents of its use of the following UIV resources during the admission process and reexamination process:
>
> HUD's EIV system
>
> Texas Workforce Commission wage and benefits records portal (admissions only)
>
> Equifax online credit report portal (admissions only)
>
> Office of Attorney General child support income portal
>
> The Work Number
>
> Other resources that become available to HACA

## When Third-Party Information is Late

When third-party verification has been requested and the timeframes for submission have been exceeded, HACA will use the information from documents on a provisional basis. If HACA later receives third-party verification that differs from the amounts used to process the re-examination, HACA will conduct an interim reexamination to adjust the figures used for the reexamination.

## When Third-Party Verification is Not Required

### Primary Documents

Third-party verification is not required when legal documents are the primary source, such as a birth certificate or other legal documentation of birth.

### Imputed Assets

HUD permits HACAs to accept a self-certification from a family as verification of assets disposed of for less than fair market value [HCV GB, p. 5-28].

> HACA Policy
>
> HACA will accept a self-certification from a family as verification of assets disposed of for less than fair market value.

### Value of Assets and Asset Income [24 CFR 982.516(a)]

For families with net assets totaling $5,000 or less, the HACA may accept the family's declaration of asset value and anticipated asset income. However, HACA is required to obtain third-party verification of all assets regardless of the amount during the intake process and at least every three years thereafter.

> HACA Policy
>
> For families with net assets totaling $5,000 or less, HACA will accept the family's self-certification of the value of family assets and anticipated asset income when applicable. The family's declaration must show each asset and the amount of income expected from that asset. All family members 18 years of age and older must sign the family's declaration.
>
> HACA will use third-party documentation for assets as part of the intake process, whenever a family member is added to verify the individual's assets, and every three years thereafter.

## 7-I.J. SELF-CERTIFICATION

When HUD requires third-party verification, self-certification, or "tenant declaration," is used as a last resort when HACA is unable to obtain
third-party verification.

Self-certification, however, is an acceptable form of verification when:

- A source of income is fully excluded

- Net family assets total $5,000 or less and the PHA has adopted a policy to accept self-certification at annual recertification, when applicable

- The PHA has adopted a policy to implement streamlined annual recertification for fixed sources of income (See Chapter 11)

When HACA was required to obtain third-party verification but instead relies on a tenant declaration for verification of income, assets, or expenses, the
family's file must be documented to explain why third-party verification was not available.

HACA Policy

When information cannot be verified by a third party or by review of documents, family members will be required to submit self-certifications attesting to the accuracy of the information they have provided to the HACA.

HACA may require a family to certify that a family member does <u>not</u> receive a particular type of income or benefit.

**Section 7-I.I. LEVEL 1: NON-THIRD-PARTY VERIFICATION TECHNIQUE: SELF-CERTIFICATION [Notice PIH 2023-27] describes the self-certification method.**

**PART II: VERIFYING FAMILY INFORMATION**

## 7-II.A. VERIFICATION OF LEGAL IDENTITY

HACA Policy

HACA will require families to furnish verification of legal identity for each household member.

| Verification of Legal Identity for Adults | Verification of Legal Identity for Children |
|---|---|
| Certificate of birth, naturalization papers | Certificate of birth |
| Church issued baptismal certificate | Adoption papers |
| Current, valid driver's license or Department of Motor Vehicles identification card | Custody agreement |
| | Health and Human Services ID |
| U.S. military discharge (DD 214) | School records |
| Current U.S. passport | School or government-issued photo ID for age 16 and over |
| Current government employer | |
| identification card with picture | identification card with picture |

If a document submitted by a family is illegible or otherwise questionable, more than one of these documents may be required.

If none of these documents can be provided and at HACA's discretion, a third party who knows the person may attest to the person's identity. The certification must be provided in a format acceptable to HACA and must be signed by the family member whose information or status is being verified..

Legal identity will be verified for all applicants at the time of eligibility determination and in cases where HACA has reason to doubt the identity of a person representing themselves to be a participant.

## 7-II.B. SOCIAL SECURITY NUMBERS [24 CFR 5.216, Notice PIH 2023-27; Notice PIH 2018-24]

The family must provide documentation of a valid social security number (SSN) for each member of the household, with the exception of individuals who do not contend eligible immigration status. Exemptions also include, existing program participants who were at least 62 years of age as of January 31, 2010, and had not previously disclosed an SSN.

Note that an individual who previously declared to have eligible immigration status may not change his or her declaration for the purpose of avoiding compliance with the SSN disclosure and documentation requirements or penalties associated with noncompliance with these requirements. Nor may the head of household opt to remove a household member from the family composition for this purpose.

HUD has updated its requirements for the documentation of SSNs to make it easier for applicants to access programs if they do not have their Social Security card or other documentation that HUD typically requires at the time of initial eligibility determination. In accordance with 24 CFR 5.216(g)(1)(iii), and through Notice PIH 2023-27, HUD provided the following updated guidance.

HACA must first attempt to obtain from an applicant the following:

- A valid SSN card issued by the Social Security Administration (SSA), or

- An original document issued by a federal or state government agency that contains the name and SSN of the individual, along with other identifying information of the individual.

If the applicant is unable to provide that information, HACAmay accept as verification of an individual's SSN the applicant's self-certification of SSN and at least one-third party document, such as a bank statement, utility or cell phone bill, benefit letter, etc., that contains the name of the ndividual.  If verifying a person's SSN using this method, HACAmust document why the other SSN documentation was not available.

If the tenant's SSN is subsequently verified in EIV, no further verification is required.  If the tenant's SSN fails the SSA identity match, HACAmust obtain a valid SSN card issued by the SSA, or an original document issued by a federal or state government agency that contains the name and SSN of the individual, along with other identifying information of the individual.  The tenant's assistance must be terminated if they fail to provide the required documentation.

HACA Policy

If the provided documentation is not acceptable evidence of the social security number, HACA will explain to the applicant or resident the reasons the document is not acceptable and request that the individual obtain and submit acceptable documentation of the SSN to HACA within 90 calendar days. The explanation and request will be documented in the tenant file.

The HACA will grant one additional 90-day extension if needed for reasons beyond the participant's control such as delayed processing of the SSN application by the SSA, natural disaster, fire, death in the family, or other emergency. If the individual fails to comply with SSN disclosure and documentation requirements upon expiration of the provided time period, HACA will terminate the individual's assistance.

If an applicant family includes a child under 6 years of age who joined the household within the 6 months prior to the date of voucher issuance, an otherwise eligible family may be admitted to the program and the family must provide documentation of the child's SSN within 90 days of the effective date of the initial HAP contract. A 90-day extension will be granted if the PHA determines that the participant's failure to comply was due to unforeseen circumstances and was outside of the participant's control.

When a participant requests to add a new household member who is at least 6 years of age, or who is under the age of 6 and has an SSN, the participant must provide the complete and accurate SSN assigned to each new member at the time of recertification, in addition to the documentation required to verify it. HACA may not add the new household member until such documentation is provided.

When a participant requests to add a new household member who is under the age of 6 and has not been assigned an SSN, the participant must provide the SSN assigned to each new child and the required documentation within 90 calendar days of the child being added to the household. A 90-day extension will be granted if HACA determines that the participant's failure to comply was due to unforeseen circumstances and was outside of the participant's control. During the period HACA is awaiting documentation of the SSN, the child will be counted as part of the assisted household.

HACA Policy

HACA will verify each disclosed SSN by:

Obtaining documentation from applicants and participants that is acceptable as evidence of social security numbers

Making a copy of the original documentation submitted, returning it to the individual, and retaining a copy in the file folder

Once the individual's verification status is classified as "verified," the HACA may, at its discretion, remove and destroy copies of documentation accepted as evidence of social security numbers. The retention of the EIV Summary Report

or Income Report is adequate documentation of an individual's SSN. HACA will retain the SSN documentation in the tenant file.

Social security numbers must be verified only once during continuously-assisted occupancy.

## 7-II.C. DOCUMENTATION OF AGE

A birth certificate or other official record of birth is the preferred form of age verification for all family members. For elderly family members an original document that provides evidence of the receipt of social security retirement benefits is acceptable.

> ### HACA Policy
>
> If an official record of birth or evidence of social security retirement benefits cannot be provided, HACA will require the family to submit other documents that support the reported age of the family member (e.g., school records, driver's license, government-issued photo ID, DD-214 form, or other document from a government entity that displays the family member's name and date of birth) and to provide a self-certification.

Age must be verified only once during continuously-assisted occupancy.

## 7-II.D. FAMILY RELATIONSHIPS

Applicants and program participants are required to identify the relationship of each household member to the head of household. Definitions of the primary household relationships are provided in the Eligibility chapter.

> ### HACA Policy
>
> Family relationships are verified only to the extent necessary to determine a family's eligibility and level of assistance. Certification by the head of household normally is sufficient verification of family relationships.

### Marriage

> ### HACA Policy
>
> Certification by the head of household is normally sufficient verification. If the HACA has reasonable doubts about a marital relationship, the HACA will require the family to document the marriage.
>
> A marriage certificate generally is required to verify that a couple is married.
>
> In the case of a common law marriage, the couple must demonstrate that they hold themselves to be married (e.g., by telling the community they are married, calling each other husband and wife, using the same last name, filing joint income tax returns).

## Separation or Divorce

<u>HACA Policy</u>

Certification by the head of household is normally sufficient verification. If the HACA has reasonable doubts about a separation or divorce, the HACA will require the family to provide documentation of the divorce, or separation.

A certified copy of a divorce decree, signed by a court officer, is required to document that a couple is divorced.

A copy of a court-ordered maintenance or other court record is required to document a separation.

If no court document is available, documentation from a community-based agency will be accepted.

## Absence of Adult Member

<u>HACA Policy</u>

If an adult member who was formerly a member of the household is reported to be permanently absent, the family must provide evidence to support that the person is no longer a member of the family (e.g., documentation of another address at which the person resides such as a lease or utility bill).

## Foster Children and Foster Adults

<u>HACA Policy</u>

Third-party verification from the state or local government agency responsible for the placement of the individual with the family is required.

## 7-II.E. VERIFICATION OF STUDENT STATUS

### General Requirements

<u>HACA Policy</u>

The HACA requires families to provide information about the student status of all students who are 18 years of age or older. This information will be verified only if:

The family reports full-time student status for an adult other than the head, spouse, or co-head.

The family reports child care expenses to enable a family member to further his or her education.

The family includes a student enrolled in an *institution of higher education.*

### Restrictions on Assistance to Students Enrolled in Institutions of Higher Education

This section applies only to students who are seeking assistance on their own, separately from their parents. It does not apply to students residing with parents who are seeking or receiving HCV assistance.

<u>HACA Policy</u>

In accordance with the verification hierarchy described in Section 7-1.B, the HACA will determine whether the student is exempt from the restrictions in [24 CFR 5.612] by verifying any one of the following exemption criteria:

> The student is enrolled at an educational institution that does not meet the definition of *institution of higher education* in the Higher Education Act of 1965 (see Section Exhibit 3-2).

> The student is at least 24 years old.

> The student is a veteran, as defined in Section 3-II.E.

> The student is married.

> The student has at least one dependent child, as defined in Section 3-II.E.

> The student is a person with disabilities, as defined in Section 3-II.E, and was receiving assistance prior to November 30, 2005.

If the HACA cannot verify at least one of these exemption criteria, the HACA will conclude that the student is subject to the restrictions on assistance at [24 CFR 5.612]. In addition to verifying the student's income eligibility, the HACA will then proceed to verify either the student's parents' income eligibility (see Section 7-III.J) or the student's independence from his/her parents (see below).

***Independent Student***

<u>HACA Policy</u>

The HACA will verify a student's independence from his/her parents to determine that the student's parents' income is not relevant for determining the student's eligibility by doing all of the following:

> Either reviewing or verifying previous address information to determine whether the student has established a household separate from his/her parents for at least one year or reviewing and verifying documentation relevant to determining whether the student meets the U.S. Department of Education's definition of *independent student* (see Section 3-II.E)

> Reviewing the student's prior year income tax returns to verify the student is independent or verifying the student meets the U.S. Department of Education's definition of *independent student* (see section 3-II.E)

> Requesting and obtaining written certification directly from the student's parents identifying the amount of support they will be providing to the student, even if the amount of support is $0, except in cases in which the PHA determines that the student is a *vulnerable youth* (see section 3-II.E)

## 7-II.F. DOCUMENTATION OF DISABILITY

The HACA must verify the existence of a disability in order to allow certain income disallowances and deductions from income. The HACA is not permitted to inquire about the nature or extent of a person's disability [24 CFR 100.202(c)]. The HACA may not inquire about a person's diagnosis or details of treatment for a disability or medical condition. If the HACA receives a verification document that provides such information, the HACA will not place this information in the tenant file. Under no circumstances will the HACA request a participant's medical record(s). For more information on health care privacy laws, see the Department of Health and Human Services' website at http://www.hhs.gov/ocr/privacy.

The above cited regulation does not prohibit the following inquiries, provided these inquiries are made of all applicants, whether or not they are persons with disabilities [VG, p. 24]:

> Inquiry into an applicant's ability to meet the requirements of ownership or tenancy

> Inquiry to determine whether an applicant is qualified for a dwelling available only to persons with disabilities or to persons with a particular type of disability

> Inquiry to determine whether an applicant for a dwelling is qualified for a priority available to persons with disabilities or to persons with a particular type of disability

> Inquiring whether an applicant for a dwelling is a current illegal abuser or addict of a controlled substance

> Inquiring whether an applicant has been convicted of the illegal manufacture or distribution of a controlled substance

### Family Members Receiving SSA Disability Benefits

Verification of the receipt of disability benefits from the Social Security Administration (SSA) is sufficient verification of disability for the purpose of qualifying for waiting list preferences (if applicable) or certain income disallowances and deductions [VG, p. 23].

> HACA Policy

> For family members claiming disability who receive disability benefits from the SSA, HACA will attempt to obtain information about disability benefits through the HUD Enterprise Income Verification (EIV) system. If documentation from HUD's EIV System is not available, a SSA benefit verification letter dated within the appropriate benefit year is acceptable documentation. from each family member claiming disability status. If the family is unable to provide the document(s), HACA will ask the family to request a benefit verification letter by either calling SSA at 1-800-772-1213, or by requesting it from www.ssa.gov. Once the applicant or participant receives the benefit verification letter they will be required to provide it to HACA.

### Family Members Not Receiving SSA Disability Benefits

Receipt of veteran's disability benefits, worker's compensation, or other non-SSA benefits based on the individual's claimed disability are not sufficient verification that the individual meets HUD's definition of disability in [24 CFR 5.403].

HACA Policy

For family members claiming disability who do not receive disability benefits from the SSA, a knowledgeable professional must provide third-party verification that the family member meets the HUD definition of disability. The family member must provide written consent and contact information for HACA to contact the knowledgeable medical professional and send a request for written verification. See the Eligibility chapter for the HUD definition of disability. The knowledgeable professional will verify whether the family member does or does not meet the HUD definition.  Based upon the knowledgeable medical professional's response, HACA will or will not grant the family a wait list preference or certain income disallowances and deductions. If HACA does not receive a response from the medical professional within 30 calendar days, the family's claim for disability status is denied. The family will receive written notification of the denial, the reason for the denial and is advised of their right to request an informal hearing.

## 7-II.G. CITIZENSHIP OR ELIGIBLE IMMIGRATION STATUS [24 CFR 5.508]

**Overview**

Housing assistance is not available to persons who are not citizens, nationals, or eligible immigrants. Prorated assistance is provided for "mixed families" containing both eligible and ineligible persons. A detailed discussion of eligibility requirements is in the Eligibility chapter. This verifications chapter discusses HUD and HACA verification requirements related to citizenship status.

The family must provide a certification that identifies each family member as a U.S. citizen, a U.S. national, an eligible noncitizen or an ineligible noncitizen and submit the documents

discussed below for each family member. Once eligibility to receive assistance has been verified for an individual it need not be collected or verified again during continuously-assisted occupancy. [24 CFR 5.508(g)(5)]

### U.S. Citizens and Nationals

HUD requires a declaration for each family member who claims to be a U.S. citizen or national. The declaration must be signed personally by any family member 18 or older and by a guardian for minors.

The HACA may request verification of the declaration by requiring presentation of a birth certificate, United States passport or other appropriate documentation.

HACA Policy

HACA will not require verification of the declaration of family members who claim to be U.S. citizens or nationals.

### Eligible Immigrants

#### Documents Required

All family members claiming eligible immigration status must declare their status in the same manner as U.S. citizens and nationals.

The documentation required for eligible noncitizens varies depending upon factors such as the date the person entered the U.S., the conditions under which eligible immigration status has been granted, age, and the date on which the family began receiving HUD-funded assistance. Exhibit 7-1 at the end of this chapter summarizes documents family members must provide.

#### HACA Verification [HCV GB, pp. 5-3 and 5-7]

For family members age 62 or older who claim to be eligible immigrants, proof of age is required in the manner described in 7-II.C. of this plan. No further verification of eligible immigration status is required.

For family members under the age of 62 who claim to be eligible immigrants, the HACA must verify immigration status with the United States Citizenship and Immigration Services (USCIS).

The HACA will follow all USCIS protocols for verification of eligible immigration status.

### 7-II.H. VERIFICATION OF PREFERENCE STATUS

HACA must verify any preferences claimed by an applicant that determined placement on the waiting list.

> HACA Policy

> The HACA will offer a preference to any family that has been terminated from its HCV program due to insufficient program funding. The HACA will verify this preference using the HACA's termination records.

> HACA Policy

HACA will give preference to Elderly or Disabled families.

#### Verification of Elderly or Disabled Local Preference:

The disabled head of household or co-head of household will be subject to HACA verification methods as described in 7-II F. A head of household's or co-head of household's age will be verified at the time of the intake interview with birth certificates or original Texas DPS identification cards/driver's license in order to verify an elderly local preference. To qualify for this preference, the head of household, co-head or sole occupant must be at least 62 years old or older at time of the initial intake interview.

#### Displaced Family Local Preference:

Families displaced as a result of natural disaster or government action shall be given preference over families consisting of two or more, and non-elderly, non-

handicapped/disabled single persons. The following documentation will be used to verify displacement status:

Sworn Certification from a unit of government concerning displacement due to natural disaster.

Sworn Certification from a unit of government concerning displacement due to code enforcement or public improvement/development or displacement by inaccessibility of a unit.

### Applicants eligible for the Family Unification Program (FUP)Vouchers:

For the issuance of family unification program (FUP) vouchers, only applicants certified eligible for Family Unification Program (FUP) Vouchers will be issued a FUP voucher. Therefore FUP eligible applicants are granted a preference over all other applicants not eligible for FUP vouchers. Applicants certified eligible for the FUP vouchers will be coded as such on HACA's waitlist. This preference will be granted only for the issuance of FUP vouchers and not any other voucher. If FUP vouchers are not available, FUP eligible families will maintain their original place on the waitlist for the issuance of non-FUP vouchers. All families granted a FUP preference will be prioritized based on date and time of application and any other applicable preference (elderly, disable, displaced).

**(A)    Identifying FUP eligible families currently on HACA's HCV Waitlist**

(i)  Upon receipt of the list of families and youth currently on the Child Welfare Agency (CWA) caseload, in this case the Texas Department of Family and Protective Services (DFPS) Region 7 – Child Protective Services (CPS) caseload, compare the names with those of families and youth already on

HACA's HCV waitlist. Any family or youth currently on the HCV waitlist that matches the CPS list, will be coded as FUP eligible, and will be granted a FUP preference for FUP vouchers. For issuance of non-FUP vouchers, these applicants will be assisted in order of their original position on HACA's HCV waitlist in accordance with HACA's admissions policies. Therefore they will not lose their original position on the waitlist as a result of receiving a FUP preference.

(ii)  Identify families and youth on HACA's HCV waitlist that may be eligible for FUP, through the mail-out of an informational letter about the FUP program and its eligibility factors, and then refer self-identified families to CPS for determination of whether they meet FUP eligibility requirements; Work with and provide information to local community agencies providing homeless and transitional housing services to youth and families, to determine if they are providing interim housing services to youth and families who are on the HCV waitlist, and may be FUP eligible, but have not yet received a voucher.

**(B)    Placing FUP eligible families referred by CPS on HACA's HCV Waitlist**
Those eligible applicants on the current waitlist will have priority over families

not on the wait list.  If additional funding is available, and all eligible families on the waitlist are exhausted, the waitlist will be reopened for FUP eligible families only. Eligibility for the FUP vouchers will be based on the respective HUD Notice of Funding Availability and may be limited to referrals from the Texas state child protection agency.

## PART III: VERIFYING INCOME AND ASSETS (Streamlining rule published 3/8/2016 982.516)

Chapter 6, Part I of this plan describes in detail the types of income that are included and excluded and how assets and income from assets are handled. Any assets and income reported by the family must be verified. This part provides HACA policies that supplement the general verification procedures specified in Part I of this chapter.

HACA Policy

On January 22, 2013 HUD issued Notice PIH 2013-03 which granted administrative relief to PHAs by allowing applicant and resident self-certification of assets and the income from assets with a net value of less than $5000.  This administrative relief was temporary and renewed through 2015.

> On March 8, 2016, HUD published the Streamlining Rule in the Federal Register.  This rule made permanent changes to the way assets were verified.

The approved method to reduce administrative burden and streamline income recertification efforts states the following:

- Applicants must provide full third party verification (i.e. bank statements) at the time of determination of income eligibility.
- For a resident family with net assets equal to or less than $5,000, a PHA may accept, for purposes of recertification of income, a family's declaration that it has net assets equal to or less than $5,000, without taking additional steps to verify the accuracy of the declaration. The declaration must state the amount of income the family expects to receive from such assets; this amount must be included in the family's income.
- The PHA must obtain full third-party verification of assets every three years.
- The following HACA forms, which are signed by all adult family members, will serve as documentation of the family's self-declaration of asset income: HACA's housing application, HACA's Continued Occupancy Form, HCV program's Annual Re-certification form, and How to Report a Change form. If the family has net family assets equal to or less than $5,000, HACA will not request supporting documentation (e.g. bank statements) from the family to confirm the assets or the amount of income expected to be received from those assets.
- If the family has net assets in excess of $5,000, HACA will request supporting documentation (e.g. bank statements) from the family to confirm the assets.
- If the family has net assets is less than $5,000, HACA will request supporting documentation (e.g. bank statements) from the family to confirm the assets every three years and at the time of initial eligibility determination.

Any assets reported by the family will be reported on the HUD Form 50058.

## 7-III.A. EARNED INCOME

**Tips**

> <u>HACA Policy</u>
> Unless tip income is included in a family member's W-2 by the employer, persons who work in industries where tips are standard will be required to sign a certified estimate of tips received for the prior year and tips anticipated to be received in the coming year.

**Wages**

> <u>HACA Policy</u>
>
> For wages other than tips, the family must provide originals of the two most current, consecutive pay stubs.

## 7-III.B. BUSINESS AND SELF EMPLOYMENT INCOME

> <u>HACA Policy</u>
> Business owners and self-employed persons will be required to provide:
>
> An audited financial statement for the previous fiscal year if an audit was conducted. If an audit was not conducted, a statement of income and expenses must be submitted and the business owner or self-employed person must certify to its accuracy.
>
> All schedules completed for filing federal and local taxes in the preceding year. If
>
> accelerated depreciation was used on the tax return or financial statement, an accountant's calculation of depreciation expense, computed using straight-line depreciation rules.

HACA will provide a format for any person who is unable to provide such a statement to record income and expenses for the coming year. The business owner/self-employed person will be required to submit the information requested and to certify to its accuracy at all future reexaminations.

At any reexamination HACA may request documents that support submitted financial statements such as manifests, appointment books, cash books, or bank statements.

If a family member has been self-employed less than three (3) months, HACA will accept the family member's certified estimate of income and schedule an interim reexamination in three (3) months. If the family member has been self-employed for three (3) to twelve (12) months HACA will require the family to provide documentation of income and expenses for this period and use that information to project income.

*Housing Authority of the City of Austin*                          *Housing Choice Voucher Program*

## 7-III.C. PERIODIC PAYMENTS AND PAYMENTS IN LIEU OF EARNINGS

**Streamlined Income Determination of Fixed Income Sources [24 CFR 982.516]**

On March 8, 2016, HUD published the Streamlining Rule in the Federal Register. According to this rule, for any family member with a fixed source of income, a PHA may elect to determine that family member's income by means of a streamlined income determination. A streamlined income determination must be conducted by applying, for each fixed-income source, the verified cost of living adjustment (COLA) or current rate of interest to the previously verified or adjusted income amount.

> HACA Policy

> HACA will apply this streamlined income determination for all fixed income sources in the following way:

> - HACA will only use the streamlined income determination as part of a reexamination. HACA will require third-party verification of all income for applicants during the admissions process.
> - A "family member with a fixed source of income" is defined as a family member whose income includes periodic payments at reasonably predictable levels from one or more of the following sources:
>   - Social Security, Supplemental Security Income, Supplemental Disability Insurance;
>   - Federal, state, local, or private pension plans;
>   - Annuities or other retirement benefit programs, insurance policies, disability or death benefits, or other similar types of periodic receipts; or
>   - Any other source of income subject to adjustment by a verifiable COLA or current rate of interest.
> - HACA will use a COLA or current rate of interest specific to the fixed source of income in order to adjust the income amount. HACA will verify the appropriate COLA or current rate of interest from a public source or through tenant-provided, third party-generated documentation. If no such verification is available, then HACA will obtain third-party verification of income amounts in order to calculate the change in income for the source.
> - For any family member whose income is determined pursuant to a streamlined income determination, HACA will obtain third-party verification of all income amounts every 3 years.

### Social Security/SSI Benefits

To ensure consistency in the determination of annual Social Security and SSI income, PHAs are required to use EIV-reported Social Security and SSI benefit amounts unless the tenant disputes the EIV-reported amount [Notice PIH 2018-24].

HACA Policy

To verify the SS/SSI benefits of applicants, the HACA will request a current (dated within the last 60 days) SSA benefit verification letter from each family member that receives social security benefits. If the family is unable to provide the document(s), HACA will help the applicant request a benefit verification letter from SSA's Web site at www.ssa.gov or ask the family to request one by calling SSA at 1-800-772-1213. Once the applicant has received the benefit verification letter they will be required to provide it to the HACA.

To verify the SS/SSI benefits of participants, HACA will follow the streamlined income determination outlined above.  When third-party verification is required, HACA will obtain information about Social Security/SSI benefits through the HUD EIV System and confirm with the resident(s) that the current listed benefit amount is correct. If the resident disputes the EIV-reported benefit amount, or if benefit information is not available in HUD systems, HACA will request a current SSA benefit verification letter from each family member that receives social security benefits.  If a family member is unable to provide the document, HACA will help the resident request a benefit verification letter from SSA's Web site at www.socialsecurity.gov or ask the family to request one by calling SSA at 1-800-772-1213. Once the family has received the benefit verification letter, it will be required to provide the letter to HACA.

## 7-III.D. ALIMONY OR CHILD SUPPORT

HACA Policy

The methods HACA will use to verify alimony and child support payments differ depending on whether the family declares that it receives regular payments.

If the family declares that it ***receives regular payments***, verification will be obtained in the following order.

HACA will access child support information via the Texas Office of Attorney General (OAG) child support online portal. Information accessed is limited to the custodial parent's case number(s), names of children related to each listed case, and a record of the last 12 payments received for each case, if any. Written consent by the family is secured via the OAG Form 1825, which is kept in the family's file.

If the custodial parent does not have a Social Security number, or if HACA is unable to access the custodial parent's case information for any other reason, HACA will request a third party written verification from the Texas OAG's office directly.

- Third-party verification from the person paying the support.

- Copy of a separation or settlement agreement or a divorce decree stating the amount and type of support and payment schedules.

- Copy of the latest check and/or payment stubs.

Family's self-certification of amount received and of the likelihood of support payments being received in the future, or that support payments are not being received.

If the family declares that it ***receives irregular or no payments***, in addition to the verification process listed above, HACA may require the family to provide evidence that it has taken all reasonable efforts to collect amounts due. This may include:

A statement from any agency responsible for enforcing payment that shows the family has requested enforcement and is cooperating with all enforcement efforts.

If the family has made independent efforts at collection, a written statement from the attorney or other collection entity that has assisted the family in these efforts.

Note: Families are not required to undertake independent enforcement action.

## 7-III.E. ASSETS AND INCOME FROM ASSETS

### Disposed of for Less than Fair Market Value

The family must certify whether any assets have been disposed of for less than fair market value in the preceding two years. HACA needs to verify only those certifications that warrant documentation [HCV GB, p. 5-28].

<u>HACA Policy</u>

HACA will verify the value of assets disposed of only if:

HACA does not already have a reasonable estimation of its value from previously collected information, or

The amount reported by the family in the certification appears obviously in error.

---

Example 1: An elderly participant reported a $10,000 certificate of deposit at the last annual reexamination and HACA verified this amount. Now the person reports that she has given this $10,000 to her son. HACA has a reasonable estimate of the value of the asset; therefore, re-verification of the value of the asset is not necessary.

Example 2: A family member has disposed of its 1/4 share of real property located in a desirable area and has valued her share at approximately 5,000. Based upon market conditions, this declaration does not seem realistic. Therefore, HACA will verify the value of this asset.

---

## 7-III.F. NET INCOME FROM RENTAL PROPERTY

<u>HACA Policy</u>

The family must provide:

A current executed lease for the property that shows the rental amount or certification from the current tenant.

A self-certification from the family members engaged in the rental of property providing an estimate of expenses for the coming year and the most recent IRS Form 1040 with Schedule E (Rental Income). If schedule E was not prepared, HACA will require the family members involved in the rental of property to provide a self-

certification of income and expenses for the previous year and may request documentation to support the statement including: tax statements, insurance invoices, bills for reasonable maintenance and utilities, and bank statements or amortization schedules showing monthly interest expense.

## 7-III.G. RETIREMENT ACCOUNTS

<u>HACA Policy</u>

When third-party verification is not available, the type of original document that will be accepted depends upon the family member's retirement status.

*Before* retirement, HACA will accept an original document from the entity holding the account with a date that shows it is the most recently scheduled statement for the account but in no case earlier than 6 months from the effective date of the examination.

*Upon* retirement, HACA will accept an original document from the entity holding the account that reflects any distributions of the account balance, any lump sums taken and any regular payments.

*After* retirement, HACA will accept an original document from the entity holding the account dated no earlier than 12 months before that reflects any distributions of the account balance, any lump sums taken and any regular payments.

## 7-III.H. INCOME FROM EXCLUDED SOURCES

A detailed discussion of excluded income is provided in Chapter 6, Part I.

HUD guidance on verification of excluded income draws a distinction between income which is fully excluded and income which is only partially excluded.

For fully excluded income, the PHA is **not** required to follow the verification hierarchy, document why third-party verification is not available, or report the income on the 50058. Fully excluded income is defined as income that is entirely excluded from the annual income determination (for example, food stamps, earned income of a minor, or foster care funds) [Notice PIH 2013-04].

PHAs may accept a family's signed application or reexamination form as self-certification of fully excluded income. They do not have to require additional documentation. However, if there is any doubt that a source of income qualifies for full exclusion; PHAs have the option of requiring additional verification.

For partially excluded income, the PHA **is** required to follow the verification hierarchy and all applicable regulations, and to report the income on the 50058. Partially excluded income is defined as income where only a certain portion of what is reported by the family qualifies to be excluded and the remainder is included in annual income (for example, the income of an adult full-time student, or income excluded under the earned income disallowance).

<u>HACA Policy</u>

HACA will accept the family's self-certification as verification of fully excluded income.

HACA may request additional documentation if necessary to document the income source.

HACA will verify the source and amount of partially excluded income as described in Part 1 of this chapter.

## 7-III.I. ZERO ANNUAL INCOME STATUS

<u>HACA Policy</u>

HACA will accept a self-certification of zero income from the family at admission and reexam without taking any additional steps to verify zero reported income. HUD does not require they be notarized.

## 7-III.J. STUDENT FINANCIAL ASSISTANCE

Any financial assistance, in excess of amounts received for tuition, that a person attending an institution of higher education receives under the Higher Education Act of 1965, from private sources, or from an institution of higher education must be considered income unless the student is over the age of 23 with dependent children or is residing with parents who are seeking or receiving HCV assistance [24 CFR 5.609(b)(9) and FR 4/10/06].

For students over the age of 23 with dependent children or students residing with parents who are seeking or receiving HCV assistance, the full amount of student financial assistance is excluded from annual income [24 CFR 5.609(c)(6)]. The full amount of student financial assistance is also excluded for students attending schools that do not qualify as institutions of higher education (as defined in Exhibit 3-2). Excluded amounts are verified only if, without verification, HACA would not be able to determine whether or to what extent the income is to be excluded (see Section 7-III.H).

<u>HACA Policy</u>

For a student subject to having a portion of his/her student financial assistance included in annual income in accordance with [24 CFR 5.609(b)(9)], HACA will request third-party written verification of both the source and the amount from the educational institution attended by the student as well as from any other person or entity providing such assistance, as reported by the student.

In addition, HACA will request written verification from the institution of higher education regarding the student's tuition amount.

If HACA is unable to obtain third-party written verification of the requested information, HACA will pursue other forms of verification following the verification hierarchy in <u>Section 7-I.B</u>.

## 7-III.K. PARENTAL INCOME OF STUDENTS SUBJECT TO ELIGIBLITY RESTRICTIONS

If a student enrolled at an institution of higher education is under the age of 24, is not a veteran, is not married, does not have a dependent child, and is not a person with disabilities receiving

HCV assistance as of November 30, 2005, the income of the student's parents must be considered when determining income eligibility, unless the student is determined independent from his or her parents or a vulnerable youth in accordance with PHA Policy [24 CFR 5.612, FR 4/10/06,p. 18146 and FR Notice 9/21/16].

This provision does not apply to students residing with parents who are seeking or receiving HCV assistance. It is limited to students who are seeking or receiving assistance on their own, separately from their parents.

> HACA Policy
>
> If HACA is required to determine the income eligibility of a student's parents, HACA will request an income declaration and certification of income from the appropriate parent(s) (as determined in Section 3-II.E). HACA will send the request directly to the parents, who will be required to certify to their income under penalty of perjury. The parents will be required to submit the information directly to HACA. The required information must be submitted (postmarked) within 15 calendar days of the date of HACA's request or within any extended timeframe approved by HACA.
>
> HACA reserves the right to request and review supporting documentation at any time if it questions the declaration or certification. Supporting documentation may include, but is not limited to, Internal Revenue Service (IRS) tax returns, consecutive and original pay stubs, bank statements, pension benefit statements, benefit award letters, and other official and authentic documents from a federal, state, or local agency.

## PART IV: VERIFYING MANDATORY DEDUCTIONS

## 7-IV.A. DEPENDENT AND ELDERLY/DISABLED HOUSEHOLD DEDUCTIONS

The dependent and elderly/disabled family deductions require only that HACA verify that the family members identified as dependents or elderly/disabled persons meet the statutory definitions. No further verifications are required.

### Dependent Deduction

See Chapter 6 (6-II.B.) for a full discussion of this deduction. HACA must verify that:

> Any person under the age of 18 for whom the dependent deduction is claimed is not the head, spouse, or co-head of the family and is not a foster child
>
> Any person age 18 or older for whom the dependent deduction is claimed is not a foster adult or live-in aide, and is a person with a disability or a full time student

### Elderly/Disabled Family Deduction

See Eligibility chapter for a definition of elderly and disabled families and Chapter 6 (6-II.C.) for a discussion of the deduction. HACA must verify that the head, spouse, or co-head is 62 years of age or older or a person with disabilities.

## 7-IV.B. MEDICAL EXPENSE DEDUCTION

Policies related to medical expenses are found in 6-II.D. The amount of the deduction will be

verified following the standard verification procedures described in Part I.

**Amount of Expense**

> <u>HACA Policy</u>
>
> Medical expenses will be verified through:
>
> > Written third-party documents provided by the family, such as pharmacy printouts or receipts.
> >
> > HACA will make a best effort to determine what expenses from the past are likely to continue to occur in the future. HACA will also accept evidence of monthly payments or total payments that will be due for medical expenses during the upcoming 12 months.  This may include copies of checks used to make medical expense payments or receipts.
> >
> > Written third-party verification forms, if the family is unable to provide acceptable documentation.
>
> In addition, HACA must verify that:
>
> > The household is eligible for the deduction.
> >
> > The costs to be deducted are qualified medical expenses.
> >
> > The expenses are not paid for or reimbursed by any other source.
> >
> > Costs incurred in past years are counted only once.

### Eligible Household

The medical expense deduction is permitted only for households in which the head, spouse, or co-head is at least 62, or a person with disabilities. HACA must verify that the family meets the definition of an elderly or disabled family provided in the Eligibility chapter and as described in Chapter 7 (<u>7-IV.A.</u>) of this plan.

### Qualified Expenses

To be eligible for the medical expenses deduction, the costs must qualify as medical expenses. See Chapter 6 (<u>6-II.D.</u>) for HACA's policy on what counts as a medical expense.

### Unreimbursed Expenses

To be eligible for the medical expenses deduction, the costs must not be reimbursed by another source.

> <u>HACA Policy</u>
>
> The family will be required to certify that the medical expenses are not paid or reimbursed to the family from any source.

### Expenses Incurred in Past Years

> <u>HACA Policy</u>

When anticipated costs are related to on-going payment of medical bills incurred in past years, HACA will verify:

> The anticipated repayment schedule
>
> The amounts paid in the past, and
>
> Whether the amounts to be repaid have been deducted from the family's annual income in past years

## 7-IV.C. DISABILITY ASSISTANCE EXPENSES

Policies related to disability assistance expenses are found in 6-II.E. The amount of the deduction will be verified following the standard verification procedures described in Part I.

**Amount of Expense**

*Attendant Care*

> HACA Policy

HACA will accept written third-party documents provided by the family.

If family-provided documents are not available, the HACA will provide a third-party verification form directly to the care provider requesting the needed information.

Expenses for attendant care will be verified through:

> Written third-party documents provided by the family, such as receipts or cancelled checks dated within 60 days of re-exam or request.
>
> Third-party verification form signed by the provider, if family-provided documents are not available dated within 60 days of re-exam or request.

*Auxiliary Apparatus*

> HACA Policy

Expenses for auxiliary apparatus will be verified through:

> Written third-party documents provided by the family, such as billing statements for purchase of auxiliary apparatus, or other evidence of monthly payments or total payments that will be due for the apparatus during the upcoming 12 months.
>
> Third-party verification form signed by the provider, if family-provided documents are not available.

In addition, HACA must verify that:

> The family member for whom the expense is incurred is a person with disabilities (as described in 7-II.F above).
>
> The expense permits a family member, or members, to work (as described in 6-II.E.).

The expense is not reimbursed from another source (as described in <u>6-II.E</u>.).

**Family Member is a Person with Disabilities**

To be eligible for the disability assistance expense deduction, the costs must be incurred for attendant care or auxiliary apparatus expense associated with a person with disabilities. HACA will verify that the expense is incurred for a person with disabilities (See 7-II.F.).

**Family Member(s) Permitted to Work**

HACA must verify that the expenses claimed actually enable a family member, or members, (including the person with disabilities) to work.

> HACA Policy
>
> HACA will seek third-party verification from a Rehabilitation Agency or knowledgeable medical professional indicating that the person with disabilities requires attendant care or an auxiliary apparatus to be employed, or that the attendant care or auxiliary apparatus enables another family member, or members, to work (See 6-II.E.).
>
> If third-party and document review verification has been attempted and is either unavailable or proves unsuccessful, the family must certify that the disability assistance expense frees a family member, or members (possibly including the family member receiving the assistance), to work.

**Unreimbursed Expenses**

To be eligible for the disability expenses deduction, the costs must not be reimbursed by another source.

> HACA Policy
>
> An attendant care provider will be asked to certify that, to the best of the provider's knowledge, the expenses are not paid by or reimbursed to the family from any source.
>
> The family will be required to certify that attendant care or auxiliary apparatus expenses are not paid by or reimbursed to the family from any source.

## 7-IV.D. CHILD CARE EXPENSES

Policies related to child care expenses are found in Chapter 6 (6-II.F). The amount of the deduction will be verified following the standard verification procedures described in Part I of this chapter. In addition, HACA must verify that:

> The child is eligible for care. (12 or younger)
>
> The costs claimed are not reimbursed.
>
> The costs enable a family member to work, actively seek work, or further their education.
>
> The costs are for an allowable type of child care.
>
> The costs are reasonable.

**Eligible Child**

To be eligible for the child care deduction, the costs must be incurred for the care of a child under the age of 13. HACA will verify that the child being cared for (including foster children) is under the age of 13 (See 7-II.C.).

**Unreimbursed Expense**

To be eligible for the child care deduction, the costs must not be reimbursed by another source.

> HACA Policy

> The child care provider will be asked to certify that, to the best of the provider's knowledge, the child care expenses are not paid or reimbursed to the family from any source.

> The family will be required to certify that the child care expenses are not paid or reimbursed to the family from any source.

**Pursuing an Eligible Activity**

HACA must verify that the family member(s) that the family has identified as being enabled to seek work, pursue education, or be gainfully employed, are actually pursuing those activities.

> HACA Policy

> *Information to be Gathered*

> HACA will verify information about how the schedule for the claimed activity relates to the hours of care provided, the time required for transportation, the time required for study (for students), the relationship of the family member(s) to the child, and any special needs of the child that might help determine which family member is enabled to pursue an eligible activity.

> *Seeking Work*

> Whenever possible HACA will use documentation from a state or local agency that monitors work-related requirements (e.g., welfare or unemployment). In such cases, HACA will request family-provided verification from the agency of the member's job seeking efforts to date, and require the family to submit to the HACA any reports provided to the other agency.

>> In the event third-party verification is not available, HACA will provide the family with a form on which the family member must record job search efforts. HACA will review this information at each subsequent reexamination for which this deduction is claimed.

> *Furthering Education*

> HACA will ask that the academic or vocational educational institution verify that the person permitted to further his or her education by the child care is enrolled and provide information about the timing of classes for which the person is registered.

>> In the event third party verification is not available or timely, HACA will require the

family member to provide an original printout of his or her class schedule that provides information about the days and timing of classes.

*Gainful Employment*

HACA will seek verification from the employer of the work schedule of the person who is permitted to work because they have child care. In cases in which two or more family members could be permitted to work, the work schedules for all relevant family members may be verified.

## Allowable Type of Child Care

The type of care to be provided is determined by the family, but must fall within certain guidelines, as discussed in Chapter 6.

> <u>HACA Policy</u>
>
> HACA will verify that the type of child care selected by the family is allowable, as described in Chapter 6 (<u>6-II.F</u>).
>
> HACA will verify that the fees paid to the child care provider cover only child care costs (e.g., no housekeeping services or personal services) and are paid only for the care of an eligible child (e.g., prorate costs if some of the care is provided for ineligible family members).
>
> HACA will verify that the child care provider is not an assisted family member. Verification will be made through the head of household's declaration of family members who are expected to reside in the unit.

## Reasonableness of Expenses

Only reasonable child care costs can be deducted.

> <u>HACA Policy</u>
>
> The amount deducted shall reflect reasonable charges for child care. In the case of child care necessary to permit employment, the amount deducted shall not exceed the amount of employment income that is included in annual income.
>
> Haca may review the reasonableness of child care costs using schedules of child care costs such as from local welfare agencies. Families may present, and HACA will consider, justification for costs that exceed typical costs in the area.

| EXHIBIT 7-1: SUMMARY OF DOCUMENTATION REQUIREMENTS FOR NONCITIZENS [HCV GB, pp. 5-9 and 5-10] |

**All** noncitizens claiming eligible status must sign a declaration of eligible immigrant status on a form acceptable to HACA.

Except for persons 62 or older, all noncitizens must sign a verification consent form

Additional documents are required based upon the person's status.

**Elderly Noncitizens**

A person 62 years of age or older who claims eligible immigration status also must provide proof of age such as birth certificate, passport, or documents showing receipt of SS elderly benefits.

**All other Noncitizens**

Noncitizens that claim eligible immigration status also must present the applicable USCIS document. Acceptable USCIS documents are listed below.

| | |
|---|---|
| Form I-551 Alien Registration Receipt Card (for permanent resident aliens)<br><br>Form I-94 Arrival-Departure Record annotated with one of the following:<br><br>　"Admitted as a Refugee Pursuant to Section 207"<br><br>　"Section 208" or "Asylum"<br><br>　"Section 243(h)" or "Deportation stayed by Attorney General"<br><br>　"Paroled Pursuant to Section 221 (d)(5) of the USCIS" | Form I-94 Arrival-Departure Record with no annotation accompanied by:<br><br>　A final court decision granting asylum (but only if no appeal is taken);<br><br>　A letter from a USCIS asylum officer granting asylum (if application is filed on or after 10/1/90) or from a USCIS district director granting asylum (application filed before 10/1/90);<br><br>　A court decision granting withholding of deportation; or<br><br>　A letter from an asylum officer granting withholding or deportation (if application filed on or after 10/1/90) |
| Form I-688 Temporary Resident Card annotated "Section 245A" or Section 210". | Form I-688B Employment Authorization Card annotated "Provision of Law 274a. 12(11)" or "Provision of Law 274a.12". |

A receipt issued by the USCIS indicating that an application for issuance of a replacement document in one of the above listed categories has been made and the applicant's entitlement to the document has been verified; or

Other acceptable evidence. If other documents are determined by the USCIS to constitute acceptable evidence of eligible immigration status, they will be announced by notice published in the *Federal Register*

## CHAPTER 8
## HOUSING QUALITY STANDARDS AND RENT REASONABLENESS DETERMINATIONS
[24 CFR 982 Subpart I and 24 CFR 982.507]

## INTRODUCTION

HUD requires that all units occupied by families receiving Housing Choice Voucher (HCV) assistance meet HUD's Housing Quality Standards (HQS) and permits HACA to establish additional requirements. The use of the term "HQS" in this plan refers to the combination of both HUD and PHA-established requirements.

All units must pass an HQS inspection prior to the approval of a lease and at least once every 24 months during the term of the contract, and at other times as needed, to determine that the unit meets HQS.

HUD also requires PHAs to determine that rents for units under the program are reasonable when compared to comparable unassisted units in the market area.

This chapter explains HUD and PHA requirements related to housing quality and rent reasonableness as follows:

Part I. Physical Standards This part discusses the physical standards required of units occupied by HCV-assisted families and identifies decisions about the acceptability of the unit that may be made by the family based upon the family's preference. It also identifies life-threatening conditions that must be addressed on an expedited basis.

Part II. The Inspection Process This part describes the types of inspections HACA will make and the steps that will be taken when units do not meet HQS.

Part III. Rent Reasonableness Determinations This part discusses the policies HACA will use to make rent reasonableness determinations.

Special HQS requirements for homeownership, manufactured homes, and other special housing types are discussed in Chapter 15 to the extent that they apply in this jurisdiction.

Notice PIH 2024-26 REV-1 extended the compliance date for HCV and PBV programs until October 1, 2025. However, NSPIRE standards for carbon monoxide detectors and smoke alarms must be implemented to coomple with congressional mandares.

As stated in PIH 2024-26 REV 1, regardless of which inspection standards are used, PHAs are reminded that they must include compliance with the NSPIRE standards for carbon monoxide detectors and smoke alarms as they implement statutory mandates required by Congress.

## PART I: PHYSICAL STANDARDS

### 8-I.A. GENERAL HUD REQUIREMENTS

**HUD Performance and Acceptability Standards**

HUD's performance and acceptability standards for HCV-assisted housing are provided in [24 CFR 982.401]. These standards cover the following areas:

> Sanitary facilities
>  Food preparation and refuse disposal
> Space and Security
> Thermal Environment
> Illumination and electricity
> Structure and materials
> Interior Air Quality
> Water Supply
> Lead-based paint
> Access
> Site and neighborhood
> Sanitary condition
> Smoke Detectors

A summary of HUD performance criteria is provided in Exhibit 8-1. Additional guidance on these requirements is found in the following HUD resources

> Housing Choice Voucher Guidebook, Chapter 10.

> HUD Housing Inspection Manual for Section 8 Housing

> HUD Inspection Form, form HUD-52580 (3/01) and Inspection Checklist, form HUD-52580-A (9/00)

> HUD Notice 2003-31, Accessibility Notice: Section 504 of the Rehabilitation Act of 1973; the Americans with Disabilities Act of 1990; the Architectural Barriers Act of 1968 and the Fair Housing Act of 1988.

**Tenant Preference Items**

HUD requires HACA to enforce minimum HQS but also recognizes that certain judgments about acceptability are left to the family. For example, HACA must ensure that the unit contains the required sanitary facilities, but the family decides whether the cosmetic appearance of the facilities is acceptable. Exhibit 8-2 summarizes those items that are considered tenant preferences.

**Modifications to Provide Accessibility**

Under the Fair Housing Act of 1988 an owner must not refuse the request of a family that contains a person with a disability to make necessary and reasonable modifications to the unit. Such modifications are at the family's expense. The owner may require restoration of the unit to its original condition if the modification would interfere with the owner or next occupant's full enjoyment of the premises. The owner may not increase a customarily required security deposit. However, the landlord may negotiate a restoration agreement that requires the family to restore the unit and, if necessary to ensure the likelihood of restoration, may require the tenant to pay a reasonable amount into an interest bearing escrow account over a reasonable period of time. The interest in any such account accrues to the benefit of the tenant. The owner may also require reasonable assurances that the quality of the work will be acceptable and that any required

building permits will be obtained.[24 CFR 100.203; Notice 2003-31].

Modifications to units to provide access for a person with a disability must meet all applicable HQS requirements and conform to the design, construction, or alteration of facilities contained in the UFAS and the ADA Accessibility Guidelines (ADAAG) [28 CFR 35.151(c) and Notice 2003-31] See Chapter 2 of this plan for additional information on reasonable accommodations for persons with disabilities.

> HACA Policy
>
> Information pertaining to the Fair Housing Act of 1988 will be provided to families that contain a person with a disability.

## 8-I.B. ADDITIONAL LOCAL REQUIREMENTS

HACA may impose variations to the HQS as long as the additional criteria are not likely to adversely affect the health or safety of participant families or severely restrict housing choices for families. HUD approval is required for variations to the HQS. HUD approval is not required if the variations are clarifications of HUD's acceptability criteria or performance standards [24 CFR 982.401(a)(4)].

**Thermal Environment [HCV GB p.10-7]**

HACA must define a "healthy living environment" for the local climate. This may be done by establishing a temperature that the heating system must be capable of maintaining, that is appropriate for the local climate.

> HACA Policy
>
> The heating system must be capable of maintaining an interior temperature of 65 degrees Fahrenheit between October 1 and May 1.

**Clarifications of HUD Requirements**

> HACA Policy
>
> As permitted by HUD, HACA has adopted the following specific requirements that elaborate on HUD standards.
>
> *Walls*
>
> In areas where plaster or drywall is sagging, severely cracked, or otherwise damaged, it must be repaired or replaced.
>
> *Windows*
>
> Window sashes must be in good condition, solid and intact, and properly fitted to the window frame. Damaged or deteriorated sashes must be replaced.
>
> Windows must be weather-stripped as needed to ensure a weather-tight seal.
>
> *Doors*
>
> All exterior doors must be weather-tight to avoid any air or water infiltration, be lockable, have no holes, have all trim intact, and have a threshold.

All exterior doors must meet the lock requirements established by the Texas Property Code Section 92.151. Doors cannot have double-key dead bolt locks

All interior doors must have no holes, have all trim intact, and operate properly.

### Floors

All wood floors must be sanded to a smooth surface and sealed. Any loose or warped boards must be re-secured and made level. If they cannot be leveled, they must be replaced.

All floors must be in a finished state. Raw wood or unsealed concrete is not permitted.

All floors should have some type of base shoe, trim, or sealing for a "finished look." Vinyl base shoe is permitted.

### Sinks

All sinks and commode water lines must have shut off valves, unless faucets are wall mounted.

All sinks must have functioning stoppers.

### Toilets

All worn or cracked toilet seats and tank lids must be replaced and the toilet tank lid must fit properly.

### Security

If window security bars or security screens are present on windows that are required for egress, they must be equipped with a quick release system. The owner is responsible for ensuring that the family is instructed on the use of the quick release system.

## 8-I.C. LIFE THREATENING CONDITIONS [24 CFR 982.404(a); FR Notice 1/18/17]

HUD requires HACA to define life threatening conditions and to notify the owner or the family (whichever is responsible) of the corrections required. The responsible party must correct life threatening conditions within 24 hours of PHA notification.

HACA Policy

The following are considered life threatening conditions:

Gas leak – This includes natural gas and propane supplied to the unit that is actively leaking.

Any electrical problem or condition that could result in shock or fire

Structural damage – Damage to the unit, or any part of the unit, that appears to compromise the stability of the structure.

Major plumbing leaks or flooding, waterlogged ceiling or floor in imminent danger of falling

Absence of a working heating system when outside temperature is below 60 degrees Fahrenheit.

Absence of a functioning toilet in the unit

Any other serious deficiency deemed to be potentially life threatening.

If an owner fails to correct life threatening conditions as required by HACA, HACA will enforce the HQS in accordance with HUD requirements. See 8-II-G.

If a family fails to correct a family caused life threatening condition as required by HACA, HACA will enforce the family obligations. See 8-II.H.

## 8-I.D. OWNER AND FAMILY RESPONSIBILITIES [24 CFR 982.404]

**Family Responsibilities**

The family is responsible for correcting the following HQS deficiencies:

Tenant-paid utilities not in service

Failure to provide or maintain appliances owned by the family.

Damage to the unit or premises caused by a household member or guest beyond normal wear and tear that result in a breach of HQS. "Normal wear and tear" is defined as items which could not be charged against the tenant's security deposit under state law or court practice.

**Owner Responsibilities**

The owner is responsible for all HQS violations not listed as a family responsibility above, even if the violation is caused by the family's living habits (e.g., vermin infestation). However, if the family's actions constitute a serious or repeated lease violation the owner may take legal action to evict the family.

## 8-I.E. SPECIAL REQUIREMENTS FOR CHILDREN WITH ENVIRONMENTAL INTERVENTION BLOOD LEAD LEVEL [24 CFR 35.1225;FR Notice 1/13/17; Notice PIH 2017-13]

If HACA is notified by a public health department or other medical health care provider, or verifies information from a source other than a public health department or medical health care provider, that a child of less than 6 years of age, living in an HCV-assisted unit has been identified as having an environmental intervention blood lead level, HACA must complete a risk assessment of the dwelling unit within 15 calendar days after being notified by a public health department or other medical health care provider. The risk assessment must be completed in accordance with program requirements, and the result of the risk assessment must be immediately provided to the owner of the dwelling unit. In cases where the public health department has already completed an evaluation of the unit, this information must be provided to

the owner.

Within 30 days after receiving the risk assessment report from HACA, or the evaluation from the public health department, the owner is required to complete the reduction of identified lead-based paint hazards in accordance with the lead-based paint regulations [24 CFR 35.1325; 35.1330 and 40 CFR 745.227]. If the owner does not complete the "hazard reduction" as required, the dwelling unit is
in violation of HQS and HACA will take action in accordance with Section 8-II.G.

PHA reporting requirements, and data collection and record keeping responsibilities related to children with an environmental intervention blood lead level are discussed in Chapter 16.


## 8-I.F. VIOLATION OF HQS SPACE STANDARDS [24 CFR 982.403]

A dwelling unit must:

- Provide adequate space and security for the family

- Have at least one bedroom or living/sleeping room for each two persons

A unit that does not meet these HQS space standards is defined as *overcrowded*.

A living room may be used as sleeping (bedroom) space, but no more than two persons may occupy the space [HCV GB p. 10-6]. A bedroom or living/sleeping room must have at least:

- One window

- Two electrical outlets in proper operating condition (permanent overhead or wall-mounted light fixtures may count as one of the required electrical outlets)


If HACA determines that a unit is overcrowded because of an increase in family size or a change in family composition, HACA must issue the family a new voucher, and the family and PHA must try to find an acceptable unit as soon as possible. If an acceptable unit
is available for rental by the family, HACA must terminate the HAP contract in accordance with its terms.

## PART II: THE INSPECTION PROCESS

## 8-II.A. OVERVIEW [24 CFR 982.405] Types of Inspections

HACA conducts the following types of inspections as needed. Each type of inspection is discussed in the paragraphs that follow.

*Initial Inspections*. HACA conducts initial inspections in response to a request from the family to approve a unit for participation in the HCV program. The unit must pass the HQS inspection on or before the effective date of the HAP Contract.

*Annual/Biennial Inspections*. HUD requires HACA to inspect each unit under lease at least annually or biennially, depending on HACA policy, to confirm that the unit still meets HQS. The inspection may be conducted in conjunction with the family's annual reexamination but also may be conducted separately.

*Special Inspections.* A special inspection may be requested by the owner, the family, or a third party as a result of problems identified with a unit between annual inspections.

*Quality Control Inspections.* HUD requires that a sample of units be inspected by a supervisor or other qualified individual to evaluate the work of the inspector(s) and to ensure that inspections are performed in compliance with HQS.

*Remote Video Inspections (RVIs).* HQS inspector performs an HQS inspection from a remote location using video streaming technology via a person at the inspection site who serves as a proxy. The proxy follows the direction of the HQS inspector throughout the entire inspection process,

## Inspection of PHA-owned Units [24 CFR 982.352(b)]

HACA must obtain the services of an independent entity to perform all HQS inspections in cases where an HCV family is receiving assistance in a HACA-owned unit. A HACA-owned unit is defined as a unit that is owned by HACA that administers the assistance under the consolidated ACC (including a unit owned by an entity substantially controlled by HACA). The independent agency must communicate the results of each inspection to the family and HACA. The independent agency must be approved by HUD, and may be the unit of general local government for HACA jurisdiction (unless HACA is itself the unit of general local government or an agency of such government).

### Inspection Costs [Notice PIH 2016-05]

HACA may not charge the family for unit inspections [24 CFR 982.405(e)]. In the case of inspections of PHA-owned units, HACA may compensate the independent agency from ongoing administrative fee for inspections performed. HACA and the independent agency may not charge the family any fee or charge for the inspection [24 CFR.982.352(b)].

The PHA may not charge the owner for the inspection of the unit prior to the initial term of the lease or for a first inspection during assisted occupancy of the unit. However, the PHA may charge a reasonable fee to owners for reinspections in two situations: when the owner notifies the PHA that a repair has been made but the deficiency has not been corrected and when the time for repairs has elapsed and the deficiency has not been corrected. Fees may not be imposed for tenant-caused damages, for cases in which the inspector could not gain access to the unit, or for new deficiencies discovered during a reinspection.

The owner may not pass the cost of a reinspection fee to the family. Reinspection fees must be added to the PHA's administrative fee reserves and may only be used for activities related to the provision of tenant-based assistance.

> HACA Policy

> HACA may charge a fee for failed reinspections when the owner notifies HACA that a repair has been made but the deficiency has not been corrected.

### Notice and Scheduling

The family must allow HACA to inspect the unit at reasonable times with reasonable notice [24 CFR 982.551(d)].

> HACA Policy

Both the family and the owner will be given reasonable notice of all inspections. Except in the case of a life threatening emergency, reasonable notice is considered to be not less than 48 hours. Inspections may be scheduled between 8:00 a.m. and 5:00 p.m. Generally inspections will be conducted on business days only. In the case of a life threatening emergency, HACA will give as much notice as possible, given the nature of the emergency.

**Owner and Family Inspection Attendance**

HUD permits HACA to set policy regarding family and owner presence at the time of inspection [HCV GB p. 10-27].

> HACA Policy
>
> At the time of the inspection, if the family occupies the unit, an adult family member or an adult designated by the family must be present for the inspection.   The family may notify the inspector that the family will not be present but that the property owner or manager will be present for the inspection.   HACA staff will not enter an occupied unit without the presence of an adult family member, property owner, manager or property owner's representative.  The family may request to reschedule the inspection appointment prior to the inspection date with good cause.
>
> At initial inspection of a vacant unit, HACA will gain access as instructed by the owner and inspect the unit. The presence of the owner, owner's representative, or family representative is permitted, but is not required.

**Remote Video Inspections (RVIs)**

PIH Notice 2020-31 provides guidance on conducting Housing Quality Standards (HQS) inspections using Remote Video Inspections (RVIs). In RVIs, an HQS inspector performs an HQS inspection from a remote location using video streaming technology via a person at the inspection site who serves as a proxy.  The proxy follows the direction of the HQS inspector throughout the entire inspection process.

During the RVI, HACA remains responsible for the conduct of the inspection, and any judgments made about whether a condition is a violation.  There may be some circumstances where the application of technology provides insufficient information or evidence to HACA to allow it to make an appropriate determination.

> HACA Policy
>
> At the time of the inspection, if the family occupies the unit, an adult family member or an adult designated by the family must be present for the inspection.   The family may notify the inspector that the family will not be present but that the property owner or manager will be present for the inspection.   HACA staff will not enter an occupied unit without the presence of an adult family member, property owner, manager or property owner's representative.  The family may request to reschedule the inspection appointment prior to the inspection date with good cause.
>
> At initial inspection of a vacant unit, HACA will gain access as instructed by the owner and inspect the unit. The presence of the owner, owner's representative, or family representative is permitted, but is not required.
>
> For any properties built before 1978 where a child under 6 resides or will reside, the

inspector and designated proxy must successfully complete the free online Lead based Paint Visual Assessment Training Course,  Persons trained are to email the certificate of completion to the inspector who will add the certificate of completion to the inspection file.

### Performing the RVI Inspection

- HACA will ensure adequate privacy safeguards for the protection of Personally Identifiable Information (PII).  HACA's HQS inspector can be at HACA's office or other remote location, using equipment that provides PII safeguards.
- The inspector will choose a proxy for the inspection.  The proxy can be the landlord, property representative, tenant, or any adult associated with this tenancy.  The selection of the proxy is a mutual decision between HACA, landlord, and tenant.
- If no proxy can be established to complete the RVI inspection, an in person inspection will be completed.
- Once the inspection is scheduled, the HQS inspector uses HACA's designated streaming web-based platform to contact the proxy.  The HQS inspector uses the same electronic inspection form HACA currently uses to record any deficiencies.

- The proxy will be informed that the remote video inspection will be recorded and saved to the unit inspection file.

- After completion of the RVI inspection, the inspector will save to a computer video file for the specific unit.  All regular notice requirements for pass or failed inspections will be followed per this HCV Administrative Plan and HQS SOPs.  Specific procedures for completing the RVI inspections are outlined in a RVI Standard Operating Procedure in compliance with PIH Notice 2020-31.

### 8-II.B. INITIAL HQS INSPECTION [24 CFR 982.401(a)]

**Initial Inspections [FR Notice 1/18/17]**

The PHA may, but is not required to, approve assisted tenancy and start HAP if the unit fails HQS inspection, but only if the deficiencies identified are non-life-threatening. Further, the PHA may, but is not required to, authorize occupancy if a unit passed an alternative inspection in the last 24 months.

HACA Policy

The unit must pass the HQS inspection on or before the effective date of the HAP contract.

The PHA will not rely on alternative inspections and will conduct an HQS inspection for each unit prior to executing a HAP contract with the owner.

HACA may conduct initial inspections by a HUD's approved remote video inspection (RVIs) protocol. (PIH Notice 2020-31)

**Timing of Initial Inspections**

HUD requires PHAs with fewer than 1,250 budgeted units to complete the initial inspection, determine whether the unit satisfies HQS, and notify the owner and the family of the determination within 15 days of submission of the Request for Tenancy Approval (RTA). For PHAs with 1,250 or more budgeted units, to the extent practicable such inspection and determination must be completed within 15 days. The 15-day period is suspended for any period during which the unit is not available for inspection [24 CFR 982.305(b)(2)].

> HACA Policy
>
> HACA will complete the initial inspection, determine whether the unit satisfies HQS and Rent Reasonableness, and notify the owner and the family of the determination within 15 days of submission of the Request for Tenancy Approval (RTA).  The 15-day period will be suspended for any period during which the unit is not available for inspection.

**Inspection Results and Re-inspections**

> HACA Policy
>
> If any HQS violations are identified, the owner will be notified of the deficiencies. HACA will re-inspect the unit within 5 business days of the date the owner notifies HACA that the required corrections have been made.
>
> No timeframe will be given to correct the deficiencies.  However, if the deficiencies are not corrected in a reasonable timeframe, and the family decides to reject the unit, HACA will notify the owner that the unit has been rejected and that the family must search for another unit.

**Utilities**

Generally, at initial lease-up the owner is responsible for demonstrating that all utilities are in working order including those utilities that the family will be responsible for paying.

> HACA Policy
>
> All utility connections must be established prior to the initial inspection. The owner and family are required to coordinate to ensure that utility service is connected prior to the inspection date.

**Appliances [Form HUD-52580]**

> HACA Policy
>
> If the family is responsible for supplying the stove and/or refrigerator, HACA will allow the stove and refrigerator to be placed in the unit after the unit has met all other HQS requirements. The required appliances must be in place and inspected by HACA prior to executing the HAP contract.  HACA will re-inspect the unit within 5 business days of notification to confirm appliances are installed and working properly.

## 8-II.C. ANNUAL/BIENNIAL HQS INSPECTIONS 24 CFR 982.405 and 982.406, Notice PIH 2016-05]

> HACA Policy
>
> Each unit under HAP contract must be inspected biennially within 24 months of the last full HQS inspection. HACA reserves the right to require annual inspections of any unit or owner at any time.
>
> HACA may conduct the annual/biennial inspection by HUD's approved remote video inspection (RVIs) protocol. (PIH Notice 2020-31). .

**Scheduling the Inspection**

> HACA Policy
>
> If an adult family member cannot be present on the scheduled date, the family should request that HACA reschedule the inspection.
>
> HACA and the family will agree on a new inspection date that generally should take place within 10 business days of the originally scheduled date. HACA may schedule an inspection more than 10 business days after the original date for good cause.
>
> If the family misses the first scheduled appointment without requesting a new inspection date, HACA will automatically schedule a second inspection. If the family misses two scheduled inspections without HACA approval, HACA will consider the family to have violated its obligation to make the unit available for inspection. This may result in termination of the family's assistance in accordance with Chapter 12.

## 8-II.D. SPECIAL INSPECTIONS  [24 CFR 982.405(g)]

HACA will conduct a special inspection if the owner, family, or another source reports HQS violation in the unit. If a participant or government official reports a life-threatening condition which the owner would be required to repair within 24 hours, the PHA must inspect the unit within 24 hours of notification. If the reported condition is not life-threatening, the PHA must inspect the unit within 15 days of notification.

> HACA Policy
>
> The owner and family are required to provide maintenance request in writing to the other party prior to requesting a special inspection.  Excluding life threatening conditions, a reasonable amount of time must be provided to respond to, and complete the repairs. Requests for special inspections need to be made in writing explaining the reason for the request and include a copy of the written maintenance request submitted to the other party.
>
> During a special inspection, HACA generally will inspect only those deficiencies that were reported. However, the inspector will record any additional HQS deficiencies that

are observed and will require the responsible party to make the necessary repairs.

If the annual inspection has been scheduled or is due within 60 days of the date the special inspection is scheduled, HACA may elect to conduct a full annual inspection.

HACA may conduct special inspections by HUD's approved remote video inspection (RVIs) protocol. (PIH Notice 2020-31).

## 8-II.E. QUALITY CONTROL INSPECTIONS [24 CFR 982.405(b); HCV GB, p. 10-32]

HUD requires a HACA supervisor or other qualified person to conduct quality control inspections of a sample of units to ensure that each inspector is conducting accurate and complete inspections and that there is consistency in the application of the HQS.

The unit sample must include only units that have been inspected within the preceding three months. The selected sample should be drawn to represent a cross section of neighborhoods and the work of a cross section of inspectors

> HACA Policy
>
> The Inspections Manager, or other designated qualified person will conduct the Quality Control Inspection.
>
> Quality Control Inspections will be selected at random from HQS inspections that have been completed within the last 60 days.
>
> The Quality Control Inspection will be scheduled with the tenant.  QC Inspections will be conducted with the tenant's permission and at the tenant's convenience during normal business hours.   If the tenant is unable or unwilling to schedule a QC Inspection, another inspection will be selected.
>
> During the Quality Control Inspection, The HQS Quality Control Inspection form and the Quality Control Unit Inspection form will be completed.  Completed QC Inspections will be tracked in the QC Database and supporting documentation will be maintained in the QC Inspection File.
>
> HACA may conduct quality control inspections by HUD's approved remote video inspection (RVIs) protocol (PIH Notice 2020-31).

## 8-II.F. INSPECTION RESULTS AND REINSPECTIONS FOR UNITS UNDER HAP CONTRACT

### Notification of Corrective Actions

The owner and the family will be notified in writing of the results of all inspections. When an inspection identifies HQS failures, HACA will determine (1) whether or not the failure is a life threatening condition and (2) whether the family or owner is responsible.

> HACA Policy
>
> When life-threatening deficiencies are identified, HACA will immediately notify both

parties by telephone, facsimile, or email. The notice will specify who is responsible for correcting the violation. The corrective actions must be taken within 24 hours of HACA's notice.

When non-life threatening deficiencies are identified, HACA will send the owner and the family a written notification of the inspection results within 3 business days of the inspection. The written notice will specify who is responsible for correcting the violation, and the time frame within which the failure must be corrected. Corrections need to be made within 30 days.

The notice of inspection results will inform the owner that if life-threatening conditions are not corrected within 24 hours, and non-life threatening conditions are not corrected within 30 days (or any PHA-approved extension), the owner's HAP will be abated in accordance with PHA Policy (see 8-II.G.). Likewise, in the case of family caused deficiencies, the notice will inform the family that if corrections are not made within the specified time frame, the family's assistance will be terminated in accordance with PHA Policy (see Chapter 12).

## Extensions

For conditions that are life-threatening, HACA cannot grant an extension to the 24 hour corrective action period. For conditions that are not life-threatening, HACA may grant an exception to the required time frames for correcting the violation, if HACA determines that an extension is appropriate [24 CFR 982.404].

### HACA Policy

Extensions will be granted in cases where HACA has determined that the owner has made a good faith effort to correct the deficiencies and is unable to for reasons beyond the owner's control. Reasons may include, but are not limited to:

> A repair cannot be completed because required parts or services are not available.

> A repair cannot be completed because of weather conditions.

> A reasonable accommodation is needed because the family includes a person with disabilities.

The length of the extension will be determined on a case-by-case basis, but will not exceed 30 days, except in the case of delays caused by weather conditions. In the case of weather conditions, extensions may be continued until the weather has improved sufficiently to make repairs possible.

The necessary repairs must be made within 15 calendar days, once the weather conditions have subsided.

## Re-inspections

### HACA Policy

HACA will schedule a re-inspection within 5 business days of the notification by the

owner or family that the deficiencies have been corrected.
The family and owner will be given reasonable notice of the re-inspection appointment. If the deficiencies have not been corrected at the time of the re-inspection, the owner and family will be notified via telephone, facsimile, or email. If HACA is unable to gain entry to the unit in order to conduct the scheduled re-inspection, HACA will consider the family to have violated its obligation to make the unit available for inspection. This may result in termination of the family's assistance in accordance with Chapter 12.

HACA may conduct re-inspections by HUD's approved remote video inspection (RVIs) protocol (PIH Notice 2020-31).

## 8-II.G. ENFORCING OWNER COMPLIANCE

If the owner fails to maintain the dwelling unit in accordance with HQS, HACA must take prompt and vigorous action to enforce the owner obligations.

### HAP Abatement

If an owner fails to correct HQS deficiencies by the time specified by HACA, HUD requires HACA to abate housing assistance payments no later than the first of the month following the specified correction period (including any approved extension) [24 CFR 985.3(f)]. No retroactive payments will be made to the owner for the period of time the rent was abated. Owner rents are not abated as a result of HQS failures that are the family's responsibility.

HACA Policy
HACA will make all HAP abatements effective the first of the month following the expiration of HACA's specified correction period (including any extension).

HACA will inspect abated units within 5 business days of the owner's notification that the work has been completed. Payment will resume effective on the day the unit passes inspection.

During any abatement period, the family continues to be responsible for their share of the rent. The owner must not seek payment from the family for abated amounts and may not use the abatement as cause for eviction.

### HAP Contract Termination

HACA must decide how long any abatement period will continue before the HAP contract will be terminated. HACA should not terminate the contract until the family finds another unit, provided the family does so in a reasonable time [HCV GB p. 10-29] and must give the owner reasonable notice of the termination. HACA will issue a voucher to permit the family to move to another unit as described in Chapter 10.

HACA Policy
The maximum length of time that a HAP contract may be abated is 90 days. However, if the owner completes corrections and notifies HACA before the termination date of the HAP contract, HACA may rescind the termination notice if (1) the family still resides in the unit and wishes to remain in the unit and (2) the unit passes inspection.

A 30-day notice to terminate the HAP contract will be provided.

## 8-II.H. ENFORCING FAMILY COMPLIANCE WITH HQS [24 CFR 982.404(b)]

Families are responsible for correcting any HQS violations listed in paragraph 8.I.D. If the family fails to correct a violation within the period allowed by HACA (and any extensions), HACA will terminate the family's assistance, according to the policies described in Chapter 12.

If the owner carries out a repair for which the family is responsible under the lease, the owner may bill the family for the cost of the repair.

## PART III: RENT REASONABLENESS [24 CFR 982.507]

8-III.A. OVERVIEW

Except in the case of certain LIHTC and HOME-assisted units, no HAP contract can be approved until HACA has determined that the rent for the unit is reasonable. The purpose of the rent reasonableness test is to ensure that a fair rent is paid for each unit rented under the HCV program.

HUD regulations define a reasonable rent as one that does not exceed the rent charged for comparable, unassisted units in the same market area. HUD also requires that owners not charge more for assisted units than for comparable units on the premises. This part explains the method used to determine whether a unit's rent is reasonable.

### PHA-Owned Units [24 CFR 982.352(b)]

In cases where an HCV family is receiving assistance in a HACA-owned unit, HACA must obtain the services of an independent entity to determine rent reasonableness in accordance with program requirements, and to assist the family in negotiating the contract rent when the family requests assistance. A HACA-owned unit is defined as a unit that is owned by HACA that administers the assistance under the consolidated ACC (including a unit owned by an entity substantially controlled by HACA). The independent agency must communicate the results of the rent reasonableness determination to the family and HACA. The independent agency must be approved by HUD, and may be the unit of general local government for HACA jurisdiction (unless HACA is itself the unit of general local government or an agency of such government).

## 8-III.B. WHEN RENT REASONABLENESS DETERMINATIONS ARE REQUIRED
## Owner-Initiated Rent Determinations

HACA must make a rent reasonableness determination at initial occupancy and whenever the owner requests a rent adjustment.

The owner and family first negotiate the rent for a unit. HACA (or independent agency in the case of PHA-owned units) will assist the family with the negotiations upon request. At initial occupancy, HACA must determine whether the proposed rent is reasonable before a HAP Contract is signed. The owner must not change the rent during the initial lease term. Subsequent requests for rent adjustments must be consistent with the lease between the owner and the family. Rent increases will not be approved unless any failed items identified by the most recent HQS inspection

have been corrected.

> ### HACA Policy
>
> After the initial occupancy period, the owner may request a rent adjustment.
>
> For rent increase requests after initial lease-up, HACA may request owners to provide information about the rents charged for other units on the premises. In evaluating the proposed rents in comparison to other units on the premises, HACA will consider unit size and length of tenancy in the other units.
>
> Owners are required to request rent increases in writing through the method determined by HACA. HACA will determine whether the rent increase is reasonable and notify the owner in writing. HACA will process only one rent increase in a 12 month period.
>
> Effective dates for rent increases will be determined as follows:
>
> 1) The owner will provide HACA with the proposed effective date of rent change in accordance with the current lease effective date or month-to-month renewal arrangement.
> 2) Rent change requests received at least **60-days** prior to the proposed effective date will be effective with the proposed effective date.
> 3) Rent change requests received **less than 60-days prior** to the proposed effective date will be effective 60 days after HACA receives the rent increase request and then on the 1st of the following month.

## PHA- and HUD-Initiated Rent Reasonableness Determinations

HUD requires HACA to make a determination of rent reasonableness (even if the owner has not requested a change) if there is a 10 percent decrease in the fair market rent that goes into effect at least 60 days before the contract anniversary date. HUD also may direct HACA to make a determination at any other time. HACA may decide that a new determination of rent reasonableness is needed at any time.

> ### HACA Policy
>
> In addition to the instances described above, HACA will make a determination of rent reasonableness at any time after the initial occupancy period if: (1) HACA determines that the initial rent reasonableness determination was in error or (2) HACA determines that the information provided by the owner about the unit or other units on the same premises was incorrect.

## LIHTC- and HOME-Assisted Units [24 CFR 982.507(c)]

For units receiving low-income housing tax credits (LIHTCs) or units assisted under HUD's HOME Investment Partnerships (HOME) Program, a rent comparison with unassisted units is not

required if the voucher rent does not exceed the rent for other LIHTC or HOME-assisted units in the project that are not occupied by families with tenant-based assistance.

For LIHTCs, if the rent requested by the owner does exceed the LIHTC rents for non-voucher families, the PHA must perform a rent comparability study in accordance with program regulations. In such cases, the rent shall not exceed the lesser of: (1) the reasonable rent as determined from the rent comparability study; or (2) the payment standard established by the PHA for the unit size involved.

## 8-III.C. HOW COMPARABILITY IS ESTABLISHED

**Factors to Consider**

HUD requires PHAs to take into consideration the factors listed below when determining rent comparability. HACA may use these factors to make upward or downward adjustments to the rents of comparison units when the units are not identical to the HCV-assisted unit.

Location and age

Unit size including the number of rooms and square footage of rooms

The type of unit including construction type (e.g., single family, duplex, garden, low-rise, high-rise)

The quality of the units including the quality of the original construction, maintenance and improvements made.

Amenities, services, and utilities included in the rent

**Units that must not be used as a Comparable**

Comparable units must represent unrestricted market rents. Therefore, units that receive some form of federal, state, or local assistance that imposes rent restrictions cannot be considered comparable units.

These include units assisted by HUD through any of the following programs: Section 8 project-based assistance, Section 236 and Section 221(d)(3) Below Market Interest Rate (BMIR) projects, HOME or Community Development Block Grant (CDBG) program- assisted units in which the rents are subsidized; units subsidized through federal, state, or local tax credits; units subsidized by the Department of Agriculture rural housing programs, and units that are rent-controlled by local ordinance. [Notice PIH 2002-22, Notice PIH 2005-20 and Notice PIH2020-19]

*Note:* Notice PIH 2020-19 issued August 20, 2020, provides further guidance on the issue of what constitutes an assisted unit.

**Rents Charged for Other Units on the Premises**

The Request for Tenancy Approval (HUD-52517) requires owners to provide information, on the form itself, about the rent charged for other unassisted comparable units on the premises if the premises include more than 4 units.

By accepting HACA payment each month the owner certifies that the rent is not more than the rent charged for comparable unassisted units on the premises. If asked to do so, the owner must give HACA information regarding rents charged for other units on the premises.

## 8-III.D. PHA RENT REASONABLENESS METHODOLOGY

**How Market Data Is Collected**

> HACA Policy

> HACA will determine rent reasonableness   utilizing the following information sources: Austin Board of Realtors' Multiple Listing Service (MLS), Go Section 8 Rent Reasonableness database, copies of executed leases for unassisted units, rent rolls, and other available sources.

**How Rents Are Determined**

> HACA Policy

> The rent for a unit proposed for HCV assistance will be compared to the rent charged for comparable unassisted units in the same market area. HACA will develop a range of prices for comparable units by bedroom size within defined market areas. Units proposed for HCV assistance will be compared to the units within this rent range. Because units may be similar, but not exactly like the unit proposed for HCV assistance, HACA may make adjustments to the range of prices to account for these differences.

> The adjustment must reflect the local market. Not all differences in units require adjustments (e.g., the presence or absence of a garbage disposal may not affect the rent in some market areas).

> Adjustments may vary by unit type (e.g., a second bathroom may be more valuable in a three-bedroom unit than in a two-bedroom).

> HACA will notify the owner of the rent HACA can approve based upon its analysis of rents for comparable units. The owner may submit information about other comparable units in the market area. HACA will confirm the accuracy of the information provided and consider this additional information when making rent determinations. The owner must submit any additional information within 5 business days of HACA's request for information or the owner's request to submit information.

| **EXHIBIT 8-1: OVERVIEW OF HUD HOUSING QUALITY STANDARDS** |
| --- |

Note:   This document provides an overview of HQS. For more detailed information see the following documents:

> [24 CFR 982.401], Housing Quality Standards (HQS)
>
> Housing Choice Voucher Guidebook, Chapter 10.
>
> HUD Housing Inspection Manual for Section 8 Housing
>
> HUD Inspection Form, form HUD-52580 (3/01) and Inspection Checklist, form HUD-52580-A (9/00)

**Sanitary Facilities**

The dwelling unit must include sanitary facilities within the unit. The sanitary facilities must be usable in privacy and must be in proper operating condition and adequate for personal cleanliness and disposal of human waste.

**Food Preparation and Refuse Disposal**

The dwelling unit must have space and equipment suitable for the family to store, prepare, and serve food in a sanitary manner.

**Space and Security**

The dwelling unit must provide adequate space and security for the family. This includes having at least one bedroom or living/sleeping room for each two persons.

**Thermal Environment**

The unit must have a safe system for heating the dwelling unit. Air conditioning is not required but if provided must be in proper operating condition. The dwelling unit must not contain unvented room heaters that burn gas, oil, or kerosene. Portable electric room heaters or kitchen stoves with built-in heating units are not acceptable as a primary source of heat for units located in climatic areas where permanent heat systems are required.

**Illumination and Electricity**

Each room must have adequate natural or artificial illumination to permit normal indoor activities and to support the health and safety of occupants. The dwelling unit must have sufficient electrical sources so occupants can use essential electrical appliances. Minimum standards are set for different types of rooms. Once the minimum standards are met, the number, type and location of electrical sources are a matter of tenant preference.

**Structure and Materials**

The dwelling unit must be structurally sound. Handrails are required when four or more steps (risers) are present, and protective railings are required when porches, balconies, and stoops are thirty inches or more off the ground. The elevator servicing the unit must be working [if there is one]. Manufactured homes must have proper tie-down devices capable of surviving wind loads common to the area.

**Interior Air Quality**

The dwelling unit must be free of air pollutant levels that threaten the occupants' health. There must be adequate air circulation in the dwelling unit. Bathroom areas must have one open able window or other adequate ventilation. Any sleeping room must have at least one window. If a window was designed to be opened, it must be in proper working order.  No window can be nailed or sealed shut.

**Water Supply**

The dwelling unit must be served by an approved public or private water supply that is sanitary and free from contamination. Plumbing fixtures and pipes must be free of leaks and threats to health and safety.

**Lead-Based Paint**

Lead-based paint requirements apply to dwelling units built prior to 1978 that are occupied or can be occupied by families with children under six years of age, excluding zero bedroom dwellings. Owners must:

> Disclose known lead-based paint hazards to prospective tenants before the lease is signed,
>
> Provide all prospective families with "Protect Your Family from Lead in Your Home",
>
> Stabilize deteriorated painted surfaces and conduct hazard reduction activities within 30 days when identified by HACA
>
> Notify tenants each time such an activity is performed
>
> Conduct all work in accordance with HUD safe practices
>
> As part of ongoing maintenance ask each family to report deteriorated paint.
>
> Maintain covered housing without deteriorated paint if there is child under six in the family

For units occupied by environmental intervention blood lead level (lead poisoned) children under six years of age, a risk assessment must be conducted (paid for by HACA). If lead hazards are identified during the risk assessment, the owner must complete hazard reduction activities within 30 days.

See HCV GB p. 10-15 for a detailed description of these requirements. For additional information on lead-based paint requirements see 24 CFR 35, Subparts A, B, M, and R.

**Access**

Use and maintenance of the unit must be possible without unauthorized use of other private properties. The building must provide an alternate means of exit in case of fire.

**Site and Neighborhood**

The site and neighborhood must be reasonably free from disturbing noises and reverberations, excessive trash or vermin, or other dangers to the health, safety, and general welfare of the occupants.

**Sanitary Condition**

The dwelling unit and its equipment must be in sanitary condition and free of vermin and rodent infestation. The unit must have adequate barriers to prevent infestation.

**Smoke Detectors**

Must have at least one battery-operated or hard-wired smoke detector, in proper working condition, in the following locations:

- On each level of the unit
- Inside each bedroom or sleeping area
- Within 21 feet of any door to a bedroom measured along a path of travel
- Where a smoke detector is installed outside a bedroom is separated from an adjacent living area by a door, smoke detector must also be installed in the living area side of the door

If the dwelling unit is occupied by any person with a hearing impairment, smoke detectors must have an appropriate alarm system designed for hearing-impaired person.

**Carbon Monoxide detection**

Must meet or exceed the carbon monoxide detection standards set by the Secretary through the Federal Register notification.

**Hazards and Heath/Safety**

The unit, interior and exterior common areas accessible to the family, the site, and the surrounding neighborhood must be free of hazards to the family's health and safety.

---

| **EXHIBIT 8-2: SUMMARY OF TENANT PREFERENCE AREAS RELATED TO HOUSING QUALITY** |
|---|

Note:   This document provides an overview of unit and site characteristics and conditions for which the family determines acceptability. For more detailed information see the following documents:

Housing Choice Voucher Guidebook, Chapter 10.

HUD Housing Inspection Manual for Section 8 Housing

HUD Inspection Form, form HUD-52580 (3/01) and Inspection Checklist, form HUD-52580-A (9/00)

Provided the minimum housing quality standards have been met, HUD permits the family to determine whether the unit is acceptable with regard to the following characteristics.

*Sanitary Facilities -* The family may determine the adequacy of the cosmetic condition and quality of the sanitary facilities, including the size of the lavatory, tub, or shower; the location of the sanitary facilities within the unit; and the adequacy of the water heater.

*Food Preparation and Refuse Disposal -* The family selects size and type of equipment it finds acceptable. When the family is responsible for supplying cooking appliances, the family may choose to use a microwave oven in place of a conventional oven, stove, or range. When the owner is responsible for providing cooking appliances, the owner may offer a microwave oven in place of an oven, stove, or range only if other subsidized and unsubsidized units on the premises are furnished with microwave ovens only. The adequacy of the amount and type of storage space, the cosmetic conditions of all equipment, and the size and location of the kitchen are all determined by the family.

*Space and Security -* The family may determine the adequacy of room sizes and room locations. The family is also responsible for deciding the acceptability of the type of door and window locks.

*Energy conservation items -* The family may determine whether the amount of insulation, presence of absence of storm doors and windows and other energy conservation items are acceptable.

*Illumination and Electricity -* The family may determine whether the location and the number of outlets and fixtures (over and above those required to meet HQS standards) are acceptable or if the amount of electrical service is adequate for the use of appliances, computers, or stereo equipment.

*Structure and Materials -* Families may determine whether minor defects, such as lack of paint, or worn flooring or carpeting will affect the livability of the unit.

*Indoor Air -* Families may determine whether window and door screens, filters, fans, or other devices for proper ventilation are adequate to meet the family's needs. However, if screens are present they must be in good condition.

---

*Sanitary Conditions* - The family determines whether the sanitary conditions in the unit, including minor infestations, are acceptable.

*Neighborhood conditions* - Families may determine whether neighborhood conditions such as the presence of drug activity, commercial enterprises, and convenience to shopping will affect the livability of the unit.

Families have no discretion with respect to lead-based paint standards and smoke detectors.

## CHAPTER 9
## GENERAL LEASING POLICIES

**INTRODUCTION**

Chapter 9 covers the lease-up process from the family's submission of a Request for Tenancy Approval to execution of the HAP contract.

In order for HACA to assist a family in a particular dwelling unit, or execute a Housing Assistance Payments (HAP) contract with the owner of a dwelling unit, HACA must determine that all the following program requirements are met:

The unit itself must qualify as an eligible unit [24 CFR 982.305(a)]

The unit must be inspected by HACA and meet the Housing Quality Standards (HQS) [24 CFR 982.305(a)]

The lease offered by the owner must be approvable and must include the required Tenancy Addendum [24 CFR 982.305(a)]

The rent to be charged by the owner for the unit must be reasonable [24 CFR 982.305(a)]

The owner must be an eligible owner, approvable by HACA, with no conflicts of interest [24 CFR 982.306]

<u>For families initially leasing a unit only</u>: Where the gross rent of the unit exceeds the applicable payment standard for the family, the share of rent to be paid by the family cannot exceed 40 percent of the family's monthly adjusted income [24 CFR 982.305(a)]

**9-I.A. TENANT SCREENING**

HACA has no liability or responsibility to the owner or other persons for the family's behavior or suitability for tenancy [24 CFR 982.307(a)(1)].

HACA may elect to screen applicants for family behavior or suitability for tenancy. See Chapter 3 for a discussion of HACA's policies with regard to screening applicant families for program eligibility [24 CFR 982.307(a)(1)].

The owner is responsible for screening and selection of the family to occupy the owner's unit. At or before HACA approval of the tenancy, HACA must inform the owner that screening and selection for tenancy is the responsibility of the owner [24 CFR 982.307(a)(2)]. HACA must also inform the owner or manager or his/her rights and obligations under the Violence against

Women Act of 2013 (VAWA) [24 CFR 5.2005(a)(2)].

HACA must provide the owner with the family's current and prior address (as shown in the HACA records) and the name and address (if known to HACA) of the landlord at the family's current and prior address [24 CFR 982.307(b)(1)].

HACA is permitted, but not required, to offer the owner other information in HACA's possession about the tenancy history or drug trafficking of family members [24 CFR 982.307(b)(2)].

HACA's policy on providing information to the owner must be included in the family's briefing packet [24 CFR 982.307(b)(3)].

HACA  may not disclose to the owner any confidential information provided by the family in response to a HACA  request for documentation of domestic violence, dating violence, sexual assault or stalking except at the written request or with the written consent of the individual providing the documentation [24 CFR 5.2007(b)(4)].

> HACA Policy

> HACA will not screen applicants for family behavior or suitability for tenancy.

> HACA does have the responsibility for providing the owner with the family's current and prior address (as shown in HACA records); and the name and address (if known to HACA) of the landlord at the family's current and prior address.

> The Violence Against Women Reauthorization Act of 2005 (VAWA) requires PHAs to notify Section 8 owners of their rights and obligations under the act specifically their right to request certification from an alleged victim and their obligation to maintain the confidentiality of any information they obtain, including the identity of the victim. These are stated in [24 CFR 5.2007]. (See the subsection headed "Certification of Status and Confidentiality.")

## 9-I.B. REQUESTING TENANCY APPROVAL [Form HUD-52517]

After the family is issued a voucher, the family must locate an eligible unit, with an owner or landlord willing to participate in the voucher program. Once a family finds a suitable unit and the owner is willing to lease the unit under the program, the owner and the family must request HACA to approve the assisted tenancy in the selected unit.

The owner and the family must submit two documents to HACA:

> Completed Request for Tenancy Approval (RFTA) – [Form HUD-52517]

> Copy of the proposed lease, including the HUD-prescribed Tenancy Addendum – [Form HUD-52641-A]

The RFTA contains important information about the rental unit selected by the family, including the unit address, number of bedrooms, structure type, year constructed, utilities included in the rent, and the requested beginning date of the lease, necessary for HACA to determine whether to approve the assisted tenancy in this unit.

Owners must certify to the most recent amount of rent charged for the unit and provide an explanation for any difference between the prior rent and the proposed rent.

Owners must certify that they are not the parent, child, grandparent, grandchild, sister or brother of any member of the family, unless HACA has granted a request for reasonable accommodation for a person with disabilities who is a member of the tenant household.

For units constructed prior to 1978, owners must either 1) certify that the unit, common areas, and exterior have been found to be free of lead-based paint by a certified inspector; or 2) attach a lead-based paint disclosure statement.

Both the RFTA and the proposed lease must be submitted no later than the expiration date stated on the voucher [HCV GB p.8-15].

HACA Policy

The RFTA must be signed by both the family and the owner.

The owner may submit the RFTA on behalf of the family.

Completed RFTA (including the proposed dwelling lease) must be submitted as hard copies, in-person, by mail, email or by fax.

The family may not submit, and HACA will not process, more than one (1) RFTA at a time.

When the family submits the RFTA HACA will review the RFTA for completeness.

If the RFTA is incomplete (including lack of signature by family, owner, or both), or if the dwelling lease is not submitted with the RTA, HACA will notify the family and the owner of the deficiencies.

Missing information and/or missing documents will only be accepted as hard copies, in-person, by mail, by email, or by fax. HACA will not accept missing information over the phone.

When the family submits the RFTA and proposed lease, HACA will also review the terms of the RFTA for consistency with the terms of the proposed lease.

If the terms of the RFTA are not consistent with the terms of the proposed lease, HACA will notify the family and the owner of the discrepancies.

Corrections to the terms of the RFTA and/or the proposed lease will only be accepted as hard copies, in-person, by mail, by email or by fax. HACA will not accept corrections by phone.

Because of the time sensitive nature of the tenancy approval process, HACA will attempt to communicate with the owner and family by phone, fax, or email. HACA will use mail when the parties cannot be reached by phone, fax, or email.

## 9-I.C. OWNER PARTICIPATION

HACA does not formally approve an owner to participate in the HCV program. However, there are a number of criteria where HACA may deny approval of an assisted tenancy based on past owner behavior, conflict of interest, or other owner-related issues. There is also criteria for which HACA must disapprove an owner.  No owner has a right to participate in the HCV program [24 CFR 982.306(e)] See Chapter 13 for a full discussion of owner qualification to participate in the HCV program.

## 9-I.D. ELIGIBLE UNITS

There are a number of criteria that a dwelling unit must meet in order to be eligible for assistance under the voucher program. Generally, a voucher-holder family may choose any available rental dwelling unit on the market in HACA's jurisdiction. This includes the dwelling unit they are currently occupying.

### Ineligible Units [24 CFR 982.352(a)]

HACA may not assist a unit under the voucher program if the unit is a Project Based Rental Assistance (PBRA) or Indian housing unit; a unit receiving project-based assistance under section 8 of the 1937 Act (42 U.S.C. 1437f); nursing homes, board and care homes, or facilities providing continual psychiatric, medical, or nursing services; college or other school dormitories; units on the grounds of penal, reformatory, medical, mental, and similar public or private institutions; a unit occupied by its owner or by a person with any interest in the unit.

### PHA-Owned Units [24 CFR 982.352(b)]

Otherwise eligible units that are owned or substantially controlled by HACA issuing the voucher may also be leased in the voucher program. In order for a HACA-owned unit to be leased under the voucher program, the unit must not be ineligible housing and HACA must inform the family, both orally and in writing, that the family has the right to select any eligible unit available for lease and that the family is free to select a HACA-owned unit without any pressure or steering by HACA.

> HACA Policy
>
> HACA has eligible PHA-owned units available for leasing under the voucher program. HACA will inform the family of this housing at the time of the briefing. HACA will also inform the family, both orally and in writing, that the family has the right to select any eligible unit available for lease and that the family is free to select a HACA-owned unit without any pressure or steering by HACA.

### Special Housing Types [24 CFR 982 Subpart M]

HUD regulations permit, but do not generally require, HACA to permit families to use voucher assistance in a number of special housing types in accordance with the specific requirements applicable to those programs. These special housing types include single room occupancy (SRO) housing, congregate housing, group home, shared housing, manufactured home space (where the

family owns the manufactured home and leases only the space), cooperative housing and homeownership option. See Chapter 15 for specific information and policies on any of these housing types that HACA has chosen to allow. The regulations do require HACA to permit use of any special housing type if needed as a reasonable accommodation so that the program is readily accessible to and usable by persons with disabilities.

### Duplicative Assistance [24 CFR 982.352(c)]

A family may not receive the benefit of HCV tenant-based assistance while receiving the benefit of any of the following forms of other housing subsidy, for the same unit or for a different unit:

Public or Indian housing assistance;

Other Section 8 assistance (including other tenant-based assistance);

Assistance under former Section 23 of the United States Housing Act of 1937 (before amendment by the Housing and Community Development Act of 1974);

Section 101 rent supplements;

Section 236 rental assistance payments;

Tenant-based assistance under the HOME Program;

Rental assistance payments under Section 521 of the Housing Act of 1949 (a program of the Rural Development Administration);

Any local or State rent subsidy;

Section 202 supportive housing for the elderly;

Section 811 supportive housing for persons with disabilities; (11) Section 202 projects for non-elderly persons with disabilities (Section 162 assistance); or

Any other duplicative federal, State, or local housing subsidy, as determined by HUD. For this purpose, 'housing subsidy' does not include the housing component of a welfare payment, a social security payment received by the family, or a rent reduction because of a tax credit.

### Housing Quality Standards (HQS) [24 CFR 982.305 and 24 CFR 982.401]

In order to be eligible, the dwelling unit must be in decent, safe and sanitary condition. This determination is made using HUD's Housing Quality Standards (HQS) and/or equivalent state or local standards approved by HUD. See Chapter 8 for a full discussion of the HQS standards, as well as the process for HQS inspection at initial lease-up.

### Unit Size

In order to be eligible, the dwelling unit must be appropriate for the number of persons in the household. A family must be allowed to lease an otherwise acceptable dwelling unit with fewer bedrooms than the number of bedrooms stated on the voucher issued to the family, provided the unit meets the applicable HQS space requirements [24 CFR 982.402(d)]. The family must be allowed to lease an otherwise acceptable dwelling unit with more bedrooms than the number of

bedrooms stated on the voucher issued to the family. See Chapter 5 for a full discussion of subsidy standards.

### Rent Reasonableness [24 CFR 982.305 and 24 CFR 982.507]

In order to be eligible, the dwelling unit must have a reasonable rent. The rent must be reasonable in relation to comparable unassisted units in the area and must not be in excess of rents charged by the owner for comparable, unassisted units on the premises. See Chapter 8 for a full discussion of rent reasonableness and the rent reasonableness determination process.

### Rent Burden [24 CFR 982.508]

Where a family is initially leasing a unit and the gross rent of the unit exceeds the applicable payment standard for the family, the family share cannot exceed 40 percent of the family's adjusted monthly income. The term "family share" refers to the amount the family pays toward rent and utilities. The gross rent for the unit minus the total housing assistance payment (HAP) for the unit equals the family share. See Chapter 6 for a discussion of calculation of gross rent, the use of payment standards, and calculation of family income, family share of rent and HAP.

## 9-I.E. LEASE AND TENANCY ADDENDUM

The family and the owner must execute a written dwelling lease agreement for the assisted unit. This written lease is a contract between the tenant family and the owner; HACA is not a party to this contract.

The tenant must have legal capacity to enter a lease under State and local law. 'Legal capacity' means that the tenant is bound by the terms of the lease and may enforce the terms of the lease against the owner [24 CFR 982.308(a)]

### Lease Form and Tenancy Addendum [24 CFR 982.308]

If the owner uses a standard lease form for rental to unassisted tenants in the locality or the premises, the lease must be in such standard form. If the owner does not use a standard lease form for rental to unassisted tenants, the owner may use another form of lease. The HAP contract prescribed by HUD contains the owner's certification that if the owner uses a standard lease form for rental to unassisted tenants, the lease is in such standard form.

All provisions in the HUD-required Tenancy Addendum must be added word-for-word to the owner's standard lease form. The Tenancy Addendum includes the HUD requirements for the tenancy. Because it is part of the lease, the tenant shall have the right to enforce the Tenancy Addendum against the owner. If there is a conflict between the owner's lease and the Tenancy Addendum, the terms of the Tenancy Addendum shall prevail over any other provisions of the lease.

> HACA Policy
>
> HACA does not provide a model or standard dwelling lease for owners to use in the HCV program.

## Lease Information [24 CFR 982.308(d)]

The assisted dwelling lease must contain all of the required information as listed below:

The names of the owner and the tenant:

The unit rented (address, apartment number, and any other information needed to identify the contract unit)

The term of the lease (initial term and any provisions for renewal)

The amount of the monthly rent to owner

A specification of what utilities and appliances are to be supplied by the owner, and what utilities and appliances are to be supplied by the family

## Term of Assisted Tenancy

The initial term of the assisted dwelling lease must be for at least one year [24 CFR 982.309]. The initial lease term is also stated in the HAP contract.

The HUD program regulations permit HACA to approve a shorter initial lease term if certain conditions are met.

### HACA Policy

Generally, HACA will not approve an initial lease term of less than one (1) year.

HACA may approve an initial lease term of less than one (1) year only where HACA determines and can clearly document that: (i) Such shorter term would improve housing opportunities for the tenant; and (ii) Such shorter term is the prevailing local market practice.

During the initial term of the lease, the owner may not raise the rent to the tenant [24 CFR 982.309].

Any provisions for renewal of the dwelling lease will be stated in the dwelling lease [HCV Guidebook, pg. 8-22]. There are no HUD requirements regarding any renewal extension terms, except that they must be in the dwelling lease if they exist.

HACA may execute the HAP contract even if there is less than one year remaining from the beginning of the initial lease term to the end of the last expiring funding increment under the consolidated ACC. [24 CFR 982.309(b)].

## Security Deposit [24 CFR 982.313 (a) and (b)]

The owner may collect a security deposit from the tenant. HACA may prohibit security deposits in excess of private market practice, or in excess of amounts charged by the owner to unassisted tenants. However, if HACA chooses to do so, language to this effect must be added to Part A of the HAP contract [Form HUD-52641].

HACA Policy

HACA will allow the owner to collect any security deposit amount the owner determines is appropriate.

### Separate Non-Lease Agreements between Owner and Tenant

Owners may not demand or accept any rent payment from the family in excess of the rent to the owner as approved by HACA minus HACA's housing assistance payments to the owner [24 CFR 982.451(b)(4)].

The owner may not charge the tenant extra amounts for items customarily included in rent in the locality, or provided at no additional cost to unsubsidized tenants in the premises [24 CFR 982.510(c)].

HACA Policy

HACA permits owners and families to execute separate, non-lease agreements for services, appliances (other than range and refrigerator) and other items that are not included in the lease.

Any items, appliances, or other services that are customarily provided to unassisted families as part of the dwelling lease with those families, or are permanently installed in the dwelling unit must be included in the dwelling lease for the assisted family. These items, appliances or services cannot be placed under a separate non-lease agreement between the owner and family. Side payments for additional rent, or for items, appliances or services customarily provided to unassisted families as part of the dwelling lease for those families, are prohibited.

Any items, appliances, or other services that are not customarily provided to unassisted families as part of the dwelling lease with those families, are not permanently installed in the dwelling unit and where the family has the sole option of not utilizing the item, appliance or service, may be included in a separate non-lease agreement between the owner and the family.

The family is not liable and cannot be held responsible under the terms of the assisted dwelling lease for any charges pursuant to a separate non-lease agreement between the owner and the family. Non-payment of any charges pursuant to a separate non-lease agreement between the owner and the family cannot be a cause for eviction or termination of tenancy under the terms of the assisted dwelling lease.

Separate non-lease agreements that involve additional items, appliances or other services may be considered amenities offered by the owner and may be taken into consideration when determining the reasonableness of the rent for the property.

### PHA Review of Lease

HACA will review the dwelling lease for compliance with all applicable requirements.

HACA Policy

If the dwelling lease is incomplete or incorrect, HACA will notify the family and the owner of the deficiencies. Missing and corrected lease information will only be accepted

as hard copies, in-person, by mail, by email, or by fax. HACA will not accept missing and corrected information over the phone.

Because the initial leasing process is time-sensitive, HACA will attempt to communicate with the owner and family by phone, fax, or email. HACA will use mail when the parties can't be reached by phone, fax, or email.

HACA is permitted, but is not required, to review the lease to determine if the lease complies with State and local law and is permitted to decline to approve the tenancy if HACA determines that the lease does not comply with State or local law [24 CFR 982.308(c)]

HACA Policy

HACA will <u>not</u> review the owner's lease for compliance with state/local law.

## 9-I.F. TENANCY APPROVAL [24 CFR 982.305]

After receiving the family's Request for Tenancy Approval, with proposed dwelling lease, HACA must promptly notify the family and owner whether the assisted tenancy is approved.

Prior to approving the assisted tenancy and execution of a HAP contract, HACA must ensure that all required actions and determinations, discussed in Part I of this chapter have been completed.

These actions include ensuring that the unit is eligible; the unit has been inspected by HACA and meets the Housing Quality Standards (HQS); the lease offered by the owner is approvable and includes the required Tenancy Addendum; the rent to be charged by the owner for the unit must is reasonable; where the family is initially leasing a unit and the gross rent of the unit exceeds the applicable payment standard for the family, the share of rent to be paid by the family does not exceed 40 percent of the family's monthly adjusted income [24 CFR 982.305(a)]; the owner is an eligible owner, not disapproved by HACA, with no conflicts of interest [24 CFR 982.306]; the

family and the owner have executed the lease, including the Tenancy Addendum, and the lead-based paint disclosure information [24 CFR 982.305(b)].

HACA Policy

HACA will complete its determination within 10 business days of receiving all required information.

If the terms of the RTA/proposed lease are changed for any reason, including but not limited to negotiation with HACA, HACA will obtain corrected copies of the RFTA and proposed lease, signed by the family and the owner.

Corrections to the RTA/proposed lease will only be accepted as hard copies, in person, by mail, by email, or by fax. HACA will not accept corrections over the phone.

If HACA determines that the tenancy cannot be approved for any reason, the owner and the family will be notified in writing and given the opportunity to address any reasons for disapproval. HACA will instruct the owner and family of the steps that are necessary to obtain approval of the tenancy.

Where the tenancy is not approvable because the unit is not approvable, the family

must continue to search for eligible housing within the timeframe of the issued voucher.

If the tenancy is not approvable due to rent affordability or rent reasonableness, HACA will attempt to negotiate the rent with the owner. If a new, approvable rent is negotiated, the tenancy will be approved. If the owner is not willing to negotiate an approvable rent, the family must continue to search for eligible housing within the timeframe of the issued voucher.

## 9-I.G. HAP CONTRACT EXECUTION [24 CFR 982.305]

The HAP contract is a written agreement between HACA and the owner of the dwelling unit. Under the HAP contract, HACA agrees to make housing assistance payments to the owner on behalf of the family, and the owner agrees to comply with all program requirements as stated in the HAP contract. The HAP contract form is prescribed by HUD.

If HACA has given approval for the family of the assisted tenancy, the owner and HACA must execute the HAP contract.

The term of the HAP contract must be the same as the term of the lease [24 CFR 982.451(a)(2)].

HACA is permitted to execute a HAP contract even if the funding currently available does not extend for the full term of the HAP contract.

HACA must make a best effort to ensure that the HAP contract is executed before the beginning of the lease term. Regardless, the HAP contract <u>must</u> be executed no later than 60 calendar days from the beginning of the lease term.

HACA may not pay any housing assistance payment to the owner until the HAP contract has been executed. If the HAP contract is executed during the period of 60 calendar days from the beginning of the lease term, HACA will pay housing assistance payments after execution of the

HAP contract (in accordance with the terms of the HAP contract), to cover the portion of the lease term before execution of the HAP contract (a maximum of 60 days).

Any HAP contract executed after the 60 day period is void, and HACA may not pay any housing assistance payment to the owner.

> <u>HACA Policy</u>
>
> Owners who have not previously participated in the HCV program will be sent a HCV Property Owner information packet and will be invited to attend a HCV owner orientation in which the terms of the Tenancy Addendum and the HAP contract will be explained.
>
> The owner and the assisted family will execute the dwelling lease and the owner must provide a copy to HACA. HACA will ensure that both the owner and the assisted family receive copies of the dwelling lease.
>
> The owner and HACA will execute the HAP contract. HACA will not execute the HAP contract until the owner has submitted IRS form W-9. HACA will ensure that the owner receives a copy of the executed HAP contract.

See Chapter 13 for a discussion of the HAP contract and contract provisions.

## 9-I.H. CHANGES IN LEASE OR RENT [24 CFR 982.308]

If the tenant and the owner agree to any changes in the lease, such changes must be in writing, and the owner must immediately give HACA a copy of such changes. The lease, including any changes, must remain in accordance with the requirements of this chapter.

Generally, PHA approval of tenancy and execution of a new HAP contract are not required for changes in the lease. However, under certain circumstances, the execution of a new lease and HAP contract are required. These circumstances include:

> Changes in lease requirements governing tenant or owner responsibilities for utilities or appliances

> Changes in lease provisions governing the term of the lease

In these cases, if the HCV assistance is to continue, the family or owner must submit a written document reflecting the changes, signed by the tenant and owner.  The following are acceptable documents to reflect changes in the lease: a new Request for Tenancy Approval (RTA), a lease addendum, or a revised lease.  A new HAP Contract signed by the owner and HACA with the new terms is also required. When a family moves to a new unit, even if the unit is in the same building or complex, a new RFTA, Lease and HAP Contract would be required**.**

Where the owner is changing the amount of rent, the owner must notify HACA at least 60 days before any such changes go into effect [24 CFR 982.308(g)(4)]. HACA will agree to such an increase only if the amount of the rent to owner is considered reasonable according to the rent reasonableness standards discussed in Chapter 8. If the requested rent is not found to be reasonable, the owner must either reduce the requested rent increase, or give the family notice in accordance with the terms of the lease.

No rent increase is permitted during the initial term of the lease [24 CFR 982.309(a)(3)].

> HACA Policy
>
> Owners are required to request rent increases in writing through the method determined by HACA. HACA will determine whether the rent increase is reasonable and notify the owner in writing.  HACA will process only one rent increase in a 12 month period.
>
> Effective dates for rent increases will be determined as follows:
>
> If the request is **received 60 to 180 days before the annual recertification effective date**, the rent increase will be made effective with the next annual recertification.
>
> If the request is **received less than 60 days before the annual recertification date**, the rent increase will go into effect on the first of the month following the 60 day period after the owner requests the rent increase.

## CHAPTER 10
## MOVING WITH CONTINUED ASSISTANCE AND PORTABILITY INTRODUCTION

Freedom of choice is a hallmark of the housing choice voucher (HCV) program. In general, HUD regulations impose few restrictions on where families may live or move with HCV assistance. This chapter sets forth HUD regulations and PHA policies governing moves within or outside HACA's jurisdiction in two parts:

> Part I: Moving with Continued Assistance. This part covers the general rules that apply to all moves by a family assisted under HACA's HCV program, whether the family moves to another unit within HACA's jurisdiction or to a unit outside HACA's jurisdiction under portability.

> Part II: Portability. This part covers the special rules that apply to moves by a family under portability, whether the family moves out of or into HACA's jurisdiction. This part also covers the special responsibilities that HACA has under portability regulations and procedures.

### PART I: MOVING WITH CONTINUED ASSISTANCE

### 10-I.A. ALLOWABLE MOVES

HUD lists six regulatory conditions under which an assisted family is allowed to move to a new unit with continued assistance. Permission to move is subject to the restrictions set forth in section 10-I.B.

The family has a right to terminate the lease on notice to the owner (for the owner's breach or otherwise) and has given a notice of termination to the owner in accordance with the lease [24 CFR 982.35(b)(3)]. If the family terminates the lease on notice to the owner, the family must give HACA a copy of the notice at the same time [24 CFR 982.35(d)(1)].

The lease for the family's unit has been terminated by mutual agreement of the owner and the family [24 CFR 982.35(b)(1)(ii)].

> HACA Policy

> The following defines HACA's policy on approving moves with continued assistance:

> If the family and the owner mutually agree to terminate the lease for the family's unit, the family must give the HACA a copy of the termination agreement.

The owner has given the family a notice to vacate, has commenced an action to evict the family, or has obtained a court judgment or other process allowing the owner to evict the family [24 CFR 982.35(b)(2)]. The family must give the HACA a copy of any owner eviction notice [24 CFR 982.551(g)].

• The family or a member of the family is or has been the victim of domestic violence, dating violence, sexual assault or stalking and the move is needed to protect the health or

safety of the family or family member [24 CFR 982.35(b)(4)]. This condition applies even when the family has moved out of its unit in violation of the lease, with or without prior notification to HACA, if the family or family member who is the victim reasonably believed that he or she was imminently threatened by harm from further violence if he or she remained in the unit [24 CFR982.35(b)(4), 24 CFR 982.353(b)]. The PHA must adopt an emergency transfer plan as required by regulations at 24 CFR 5.2007(e).

> HACA Policy
>
> If a family requests permission to move with continued assistance based on a claim that the move is necessary to protect the health or safety of a family member who is or has been the victim of domestic violence, dating violence, sexual assault or stalking, HACA will request that the resident request the emergency transfer using form HUD-5383 and HACA will request documentation in accordance with section 16-IX.D of this plan.
>
> The HACA reserves the right to waive the documentation requirement if it determines that a statement or other corroborating evidence from the family or family member will suffice. In such cases the HACA will document the waiver in the family's file.
>
> HACA has adopted an emergency transfer plan, which is included as Addendum 1 to this plan.

HACA has terminated the HAP contract for the family's unit for the owner's breach [24 CFR 982.314(b)(1)(i)].

HACA determines that the family's current unit does not meet the HQS space standards because of an increase in family size or a change in family composition. In such cases, HACA must issue the family a new voucher, and the family and PHA must try to find an acceptable unit as soon as possible. If an acceptable unit is available for the family, HACA must terminate the HAP contract for the family's old unit in accordance with the HAP contract terms and must notify both the family and the owner of the termination. The HAP contract terminates at the end of the calendar month that follows the calendar month in which HACA gives notice to the owner. [24 CFR 982.403(a) and (c)]

The family has a right to terminate the lease on notice to the owner (for the owner's breach or otherwise) and has given a notice of termination to the owner in accordance with the lease [24 CFR 982.314(b)(3)]. If the family terminates the lease on notice to the owner, the family must give HACA a copy of the notice at the same time [24 CFR 982.314(d)(1)].

## 10-I.B. RESTRICTIONS ON MOVES

A family's right to move is generally contingent upon the family's compliance with program requirements [24 CFR 982.1(b)(2)]. HUD specifies two conditions under which HACA may deny a family permission to move and two ways in which HACA may restrict moves by a family.

**Denial of Moves**

HUD regulations permit HACA to deny a family permission to move under the following conditions:

### Insufficient Funding

HACA may deny a family permission to move either within or outside HACA's jurisdiction if HACA does not have sufficient funding for continued assistance [24 CFR 982.35(e)(1)]. However, Notice PIH 2016-09 significantly restricts the ability of HACA to deny permission to move due to insufficient funding and places further requirements on HACA regarding moves denied due to lack of funding. The requirements found in this notice are mandatory.

HACA Policy

HACA will deny a family permission to move on grounds that HACA does not have sufficient funding for continued assistance if (a) the move is initiated by the family, not the owner or HACA; (b) HACA can demonstrate that the move will, in fact, result in higher subsidy costs; (c) HACA can demonstrate, in accordance with the policies in Part VIII of Chapter 16, that it does not have sufficient funding in its annual budget to accommodate the higher subsidy costs; and (d) for portability moves, the receiving PHA is not absorbing the voucher.

If the PHA does not have sufficient funding for continued assistance, but the family must move from their unit (e.g., the unit failed HQS), the family may move to a higher cost unit if the move is within the PHA's jurisdiction. The PHA, however, will not allow the family to move under portability in this situation if the family wishes to move to a higher cost area.

For both moves within the PHA's jurisdiction and outside under portability, the PHA will not deny a move due to insufficient funding if the PHA previously approved the move and subsequently experienced a funding shortfall if the family cannot remain in their current unit. The PHA will rescind the voucher in this situation if the family will be allowed to remain in their current unit.

HACA will create a list of families whose moves have been denied due to insufficient funding. When funds become available, the families on this list will take precedence over families on the waiting list. HACA will use the same procedures for notifying families with open requests to move when funds become available as it uses for notifying families on the waiting list (see section 4-III.D).

HACA will inform the family of its policy regarding moves denied due to insufficient funding in a letter to the family at the time the move is denied.

### Grounds for Denial or Termination of Assistance

HACA may deny a family permission to move if it has grounds for denying or terminating the family's assistance [24 CFR 982.35(e)(2)].

HACA Policy

If HACA has grounds for denying or terminating a family's assistance, HACA will act on those grounds in accordance with the regulations and policies set forth in Chapters 3 and

12, respectively. In general, it will not deny a family permission to move for this reason; however, it retains the discretion to do so under special circumstances.

## Restrictions on Elective Moves [24 CFR 982.35(c)]

HUD regulations permit HACA to prohibit any elective move by a participant family during the family's initial lease term. They also permit HACA to prohibit more than one elective move by a participant family during any 12-month period. However, such prohibitions, if adopted, do not apply when the family or a member of the family is or has been the victim of domestic violence, dating violence, sexual assault or stalking and the move is needed to protect the health or safety of the family or family member. (For the policy on documentation of abuse, see section 10-I.A.) In addition, the PHA may not establish a policy permitting moves only at reexamination [Notice PIH 2016-09].

(For the policy on documentation of abuse, see section 10-I.A.)

> HACA Policy
>
> HACA will deny a family permission to make an elective move during the family's initial lease term. This policy applies to moves within HACA's jurisdiction or outside it under portability.
>
> HACA will consider exceptions to these policies for the following reasons: to protect the health or safety of a family member (e.g., lead-based paint hazards, domestic violence, and witness protection programs), or to address an emergency situation over which a family has no control (i.e. fire, flood, or other natural disaster).
> In addition, HACA will allow exceptions to these policies for purposes of reasonable accommodation of a family member who is a person with disabilities (see Chapter 2).
>
> If a family or owner seeks to terminate a lease prior to the end of the term, the family must make the request in writing to HACA.  Only families, who have not violated family obligations of their Assisted Lease Agreement and do not owe HACA any debts, may be approved to move.  The family must first receive approval from the Assisted Housing Director to terminate the lease before the end of the lease term.  After this approval is received in writing, the family and owner must sign a mutual rescission of lease.
>
> If the Assisted Lease Agreement is to be terminated by means of a mutual lease rescission on the part of both landlord and tenant, the fully executed rescission form must be returned to the Assisted Housing office at least 30 calendar days prior to the proposed rescission date.  Families requesting relocation more than once during any given twelve month period will be denied relocation under continued assistance regardless of any mutual lease rescission rendered.

## 10-I.C. MOVING PROCESS

**Notification**

If a family wishes to move to a new unit, the family must notify HACA and the owner before moving out of the old unit or terminating the lease on notice to the owner [24 CFR 982.35(d)(2)]. If the family wishes to move to a unit outside HACA's jurisdiction under portability, the notice to HACA must specify the area where the family wishes to move [24 CFR 982.35(d)(2) . The notices must be in writing [24 CFR 982.5].

**Approval**

> HACA Policy
>
> Upon receipt of a family's notification that it wishes to move, HACA will determine whether the move is approvable in accordance with the regulations and policies set forth in sections 10-I.A and 10-I.B. HACA will notify the family in writing of its determination within 20 business days following receipt of the family's notification.

### Reexamination of Family Income and Composition

> HACA Policy
>
> For families approved to move to a new unit within HACA's jurisdiction, HACA will perform a new annual reexamination in accordance with the policies set forth in Chapter 11 of this plan.
>
> For families moving into or families approved to move out of HACA's jurisdiction under portability, HACA will follow the policies set forth in Part II of this chapter.

### Voucher Issuance and Briefing

> HACA Policy
>
> For families approved to move to a new unit within HACA's jurisdiction, HACA will issue a new voucher within 10 business days of HACA's written approval to move. No briefing is required for these families. HACA will follow the policies set forth in Chapter 5 on voucher term, extension, and expiration. If a family does not locate a new unit within the term of the voucher and any extensions, the family may remain in its current unit with continued voucher assistance if the owner agrees and HACA approves. Otherwise, the family will lose their assistance.
>
> For families moving into or families approved to move out of HACA's jurisdiction under portability, HACA will follow the policies set forth in Part II of this chapter.

### Housing Assistance Payments [24 CFR 982.311(d)]

When a family moves out of an assisted unit, HACA may not make any housing assistance payment to the owner for any month the family moves out. The owner may keep the housing assistance payment for the month when the family moves out of the unit.

If a participant family moves from an assisted unit with continued tenant-based assistance, the term of the assisted lease for the new assisted unit may begin during the month the family moves

out of the first assisted unit. Overlap of the last housing assistance payment (for the month when the family moves out of the old unit) and the first assistance payment for the new unit, is not considered to constitute a duplicative housing subsidy.

> HACA Policy
>
> The family is still required to comply with the scheduled move out date.  No housing assistance payments will be made to the current owner after the scheduled move out date as stated in the intent to vacate notice and 30 day notice provided to the owner.  To extend payments of subsidy beyond the scheduled move out date, a written request signed by the owner and tenant is required before the scheduled move out date.

**Zero HAP Families Who Wish to Move [24 CFR 982.455]**

A participant who is not receiving any subsidy, but whose HAP contract is still in force, may request a voucher to move to a different unit. The PHA must issue a voucher to move unless it has grounds to deny assistance under the program regulations. However, if the PHA determines no subsidy would be paid at the new unit, the PHA may refuse to enter into a HAP contract on behalf of the family.

> HACA Policy
>
> If a zero HAP family requests to move to a new unit, the family may request a voucher to move. However, if no subsidy will be paid at the unit to which the family requests to move, HACA will not enter into a HAP contract on behalf of the family for the new unit.

## PART II: PORTABILITY

### 10-II.A. OVERVIEW

Within the limitations of the regulations and this plan, a participant family or an applicant family that has been issued a voucher has the right to use tenant-based voucher assistance to lease a unit anywhere in the United States providing that the unit is located within the jurisdiction of HACA administering a tenant-based voucher program [24 CFR 982.353(b)]. The process by which a family obtains a voucher from one PHA and uses it to lease a unit in the jurisdiction of another PHA is known as portability. The PHA that issues the voucher is called the **initial PHA.** The PHA that has jurisdiction in the area to which the family wants to move is called the **receiving PHA.**

The receiving PHA has the option of administering the family's voucher for the initial PHA or absorbing the family into its own program. Under the first option, the receiving PHA provides all housing services for the family and bills the initial PHA for the family's housing assistance payments and the fees for administering the family's voucher. Under the second option, the receiving PHA pays for the family's assistance with its own program funds, and the initial PHA has no further relationship with the family. The initial PHA must contact the receiving PHA via email or other confirmed delivery method to determine whether the receiving PHA will administer or absorb the initial PHA's voucher. Based on the receiving PHA's response, the

initial PHA must determine whether they will approve or deny the portability request [Notice PIH 2016-09].

PHAs commonly act as both the initial and receiving PHA because families may move into or out of their jurisdiction under portability. Each role involves different responsibilities. The PHA will follow the rules and policies in section 10-II.B when it is acting as the initial PHA for a family. It will follow the rules and policies in section 10-II.C when it is acting as the receiving PHA for a family.

In administering portability, the initial PHA and the receiving PHA must comply with financial procedures required by HUD, including the use of HUD-required forms [24 CFR 982.355(e)(5)].

PHAs must also comply with billing and payment deadlines. HUD may reduce an administrative fee to an initial or receiving PHA if the PHA does not comply with HUD portability requirements [24 CFR 982.355(e)(7)].

## 10-II.B. INITIAL PHA ROLE

### Allowable Moves under Portability

A family may move with voucher assistance only to an area where there is at least one PHA administering a voucher program [24 CFR 982.353(b)]. If there is more than one PHA in the area, the initial PHA provides the family with the contact information for the receiving PHAs that serve the area, and the family selects the receiving PHA. The family must inform the initial PHA which receiving PHA it has selected. If the family prefers not to select the receiving PHA, the initial PHA will select the receiving PHA on behalf of the family (24 CFR 982.255(b).

Applicant families that have been issued vouchers as well as participant families may qualify to lease a unit outside the PHA's jurisdiction under portability. HUD regulations and PHA policy determine whether a family qualifies.

*Applicant Families*

Under HUD regulations, most applicant families qualify to lease a unit outside HACA's jurisdiction under portability. However, HUD gives HACA discretion to deny a portability move by an applicant family for the same two reasons that it may deny any move by a participant family: insufficient funding and grounds for denial or termination of assistance. If a PHA intends to deny a family permission to move under portability due to insufficient funding, the PHA must notify HUD within 10 business days of the determination to deny the move [24 CFR 982.355(e)].

HACA Policy

In determining whether or not to deny an applicant family permission to move under portability because HACA lacks sufficient funding or has grounds for denying assistance to

the family, the initial PHA will follow the policies established in section 10-I.B of this chapter. If the PHA does deny the move due to insufficient funding, the PHA will notify HUD in writing within 10 business days of the PHA's determination to deny the move.

In addition, HACA may establish a policy denying the right to portability to nonresident applicants during the first 12 months after they are admitted to the program [24 CFR 982.353(c)].

> HACA Policy
>
> If neither the head of household nor the spouse/co-head of an applicant family had a domicile (legal residence) in HACA's jurisdiction at the time the family's initial application for assistance was submitted, the family must lease a unit within HACA's jurisdiction for at least 12 months before requesting portability.
>
> HACA will consider exceptions to this policy for purposes of reasonable accommodation (see Chapter 2) or reasons related to domestic violence, dating violence sexual assault, or stalking.

### *Participant Families*

The initial PHA must not provide portable assistance for a participant if a family has moved out of its assisted unit in violation of the lease [24 CFR 982.353(b)]. The Violence against Women Act of 2013 (VAWA) creates an exception to this prohibition for families who are otherwise in compliance with program obligations but have moved to protect the health or safety of a family member who is or has been a victim of domestic violence, dating violence, sexual assault or stalking and who reasonably believed he or she was imminently threatened by harm from further violence if he or she remained in the unit [24 CFR 982.353(b)].

> HACA Policy
>
> HACA will determine whether a participant family may move out of HACA's jurisdiction with continued assistance in accordance with the regulations and policies set forth here and in sections 10-I.A and 10-I.B of this chapter. HACA will notify the family of its determination in accordance with the approval policy set forth in section 10-I.C of this chapter.

### Determining Income Eligibility

### *Applicant Families*

An applicant family may lease a unit in a particular area under portability only if the family is income eligible for admission to the voucher program in that area [24 CFR 982.353(d)(1)]. The family must specify the area to which the family wishes to move [24 CFR 982.355(c)(1)].

The initial PHA is responsible for determining whether the family is income eligible in the area to which the family wishes to move [24 CFR 982.353(d)(1), 24 CFR 982.355(9)]. If the applicant family is not income eligible in that area, HACA must inform the family that it may not move there and receive voucher assistance [Notice PIH 2016-09].

### *Participant Families*

The income eligibility of a participant family is not re-determined if the family moves to a new jurisdiction under portability [24 CFR 982.353(d)(2).

### Reexamination of Family Income and Composition

No new reexamination of family income and composition is required for an applicant family.

> HACA Policy
>
> For a participant family approved to move out of its jurisdiction under portability, HACA generally will conduct a reexamination of family income and composition only if the family's annual reexamination must be completed on or before the initial billing deadline specified on form HUD-52665, Family Portability Information.
>
> HACA will make any exceptions to this policy necessary to remain in compliance with HUD regulations.

### Briefing

The regulations and policies on briefings set forth in Chapter 5 of this plan require HACA to provide information on portability to all applicant families that qualify to lease a unit outside HACA's jurisdiction under the portability procedures. Therefore, no special briefing is required for these families.

> HACA Policy
>
> No formal briefing will be required for a participant family wishing to move outside HACA's jurisdiction under portability. However, HACA will provide the family with the same oral and written explanation of portability that it provides to applicant families selected for admission to the program (see Chapter 5).
>
> HACA will provide the name, address, and phone of the contact for HACA in the jurisdiction to which they wish to move.  If there is more than one PHA with jurisdiction over the area to which the family wishes to move, the PHA will advise the family that the family selects the receiving PHA and notify the initial PHA of which receiving PHA was selected.  The PHA will provide the family with contact information for all of the receiving PHAs that serve the area. The PHA will not provide any additional information about receiving PHAs in the area. The PHA will further inform the family that if the family prefers not to select the receiving PHA, the initial PHA will select the receiving PHA on behalf of the family. In this case, the PHA will not provide the family with information for all receiving PHAs in the area.
>
> HACA will advise the family that they will be under the receiving PHA's policies and procedures, including screening subsidy standards voucher extension policies, and payment standards

**Voucher Issuance and Term**

An applicant family has no right to portability until after the family has been issued a voucher [24 CFR 982.353(b)]. In issuing vouchers to applicant families, HACA will follow the regulations and procedures set forth in <u>Chapter 5</u>.

> HACA Policy
>
> For families approved to move under portability, HACA will issue a new voucher within 20 business days of HACA's written approval to move.
>
> The initial term of the voucher will be 60 days.

**Voucher Extensions and Expiration**

> HACA Policy
>
> HACA will approve **no** extensions to a voucher issued to an applicant or participant family porting out of HACA's jurisdiction except under the following circumstances: (a) the initial term of the voucher will expire before the portable family will be issued a voucher by the receiving PHA, (b) the family decides to return to the initial PHA's jurisdiction and search for a unit there, (c) the family decides to search for a unit in a third PHA's jurisdiction, or (d) the family faces extenuating circumstances. In such cases, the policies on voucher extensions set forth in <u>Chapter 5</u>, section <u>5-II.E</u>, of this plan will apply, including the requirement that the family applies for an extension in writing prior to the expiration of the initial voucher term.

**Preapproval Contact with the Receiving PHA**

Prior to approving a family's request to move under portability, the initial PHA must contact the receiving PHA via e-mail or other confirmed delivery method to determine whether the receiving PHA will administer or absorb the family's voucher. Based on the receiving PHA's response, the initial PHA must determine whether it will approve or deny the move [982.355(c)(3)].

> HACA Policy
>
> HACA will use email, when possible, to contact the receiving PHA regarding whether the receiving PHA will administer or absorb the family's voucher.

**Initial Notification to the Receiving PHA**

After approving a family's request to move under portability, the initial PHA must promptly notify the receiving PHA via email or other confirmed delivery method to expect the family [24 CFR 982.355(c)(3); 24 CFR 982.355(c)(7)]. The initial PHA must also advise the family how to contact and request assistance from the receiving PHA [24 CFR 982.355(c)(6)].

> HACA Policy
>
> Because the portability process is time-sensitive, HACA will notify the receiving PHA by phone, fax, or email to expect the family. The initial PHA will also ask the receiving

PHA to provide any information the family may need upon arrival, including the name, fax, email and telephone number of the staff person responsible for business with incoming portable families and procedures related to appointments for voucher issuance. HACA will pass this information along to the family. HACA will also ask for the name, address, telephone number, fax and email of the person responsible for processing the billing information.

## Sending Documentation to the Receiving PHA

The initial PHA is required to send the receiving PHA the following documents:

Form HUD-52665, Family Portability Information, with Part I filled out [Notice PIH 2016-09]

A copy of the family's voucher [Notice PIH 2016-09]

A copy of the family's most recent form HUD-50058, Family Report, or, if necessary in the case of an applicant family, family and income information in a format similar to that of form HUD-50058 [24 CFR 982.355(c)(74), Notice PIH 2016-09]

Copies of the income verifications backing up the form HUD-50058, including a copy of the family's current EIV data [24 CFR 982.355(c)(74), Notice PIH 2016-09]

HACA Policy

In addition to these documents, HACA will provide the following information, if available, to the receiving PHA:

Social security numbers (SSNs)

Documentation of SSNs for all nonexempt household members whose SSNs have not been verified through the EIV system

Documentation of legal identity

Documentation of citizenship or eligible immigration status

Documentation of participation in the earned income disallowance (EID) benefit

Documentation of participation in a family self-sufficiency (FSS) program

If applicable, information related to the family's health and medical care and disability assistance expense phased-in hardship exemption, including what stage the family is in and how many months remain in that phase-in stage.

HACA will notify the family in writing regarding any information provided to the receiving PHA [HCV GB, p. 13-3].

## Initial Billing Deadline [Notice PIH 2016-09]

The deadline for submission of initial billing is 90 days following the expiration date of the voucher issued to the family by the initial PHA. In cases where suspension of the voucher delays the initial

billing submission, the receiving PHA must notify the initial PHA of delayed billing before the billing deadline and document the delay is due to the suspension. In this case, the initial PHA must extend the billing deadline by 30 days.

If the initial PHA does not receive a billing notice by the deadline and does not intend to honor a late billing submission, it must notify the receiving PHA in writing.   The initial PHA may report to HUD the receiving PHA's failure to comply with the deadline.  If the initial PHA will honor the late billing, no action is required.

> HACA Policy
>
> If HACA has not received an initial billing notice from the receiving PHA within the billing deadline it will contact the receiving PHA to inform them that it will not honor a late billing submission and will return any subsequent billings that it receives on behalf of the family. HACA will send the receiving PHA a written confirmation of its decision by mail.
>
> HACA will allow an exception to this policy if the family includes a person with disabilities and the late billing is a result of a reasonable accommodation granted to the family by the receiving PHA.

**Monthly Billing Payments [24 CFR 982.355(e), Notice PIH 2016-09]**

If the receiving PHA is administering the family's voucher, the receiving PHA bills the initial PHA for housing assistance payments and administrative fees. When reimbursing for administrative fees, the initial PHA must promptly reimburse the receiving PHA for the lesser of 80 percent of the initial PHA ongoing administrative fee or 100 percent of the receiving PHA's ongoing administrative fee for each program unit under contract on the first day of the month for which the receiving PHA is billing the initial PHA under portability. If the administrative fees are prorated for the HCV program, the proration will apply to the amount of the administrative fee for which the receiving PHA may bill [24 CFR 982.355(e)(2)].

The initial PHA is responsible for making billing payments in a timely manner. The first billing amount is due within 30 calendar days after the initial PHA receives Part II of form HUD-52665 from the receiving PHA. Subsequent payments must be **received** by the receiving PHA no later than the fifth business day of each month. The payments must be provided in a form and manner that the receiving PHA is able and willing to accept.

The initial PHA may not terminate or delay making payments under existing portability billing arrangements as a result of over leasing or funding shortfalls. HACA must manage its tenant-based program in a manner that ensures that it has the financial ability to provide assistance for families that move out of its jurisdiction under portability and are not absorbed by receiving HACA as well as for families that remain within its jurisdiction.

HACA Policy

The initial PHA will try to utilize direct deposit to ensure that the payment is received by the deadline unless the receiving PHA notifies the initial PHA that direct deposit is not acceptable to them. If the initial PHA extends the term of the voucher, the receiving PHA's voucher will expire 30 calendar days from the new expiration date of the initial PHA's voucher.

**Annual Updates of Form HUD-50058**

If the initial PHA is being billed on behalf of a portable family, it should receive an updated form HUD-50058 each year from the receiving PHA. If the initial PHA fails to receive an updated 50058 by the family's annual reexamination date, the initial PHA should contact the receiving PHA to verify the status of the family. The initial PHA must continue paying the receiving PHA based on the last form HUD-50058 received, unless instructed otherwise by HUD. The initial PHA may seek absorption of the vouchers by following steps outlined in Notice PIH 2016-09.

**Denial or Termination of Assistance [24 CFR 982.355(c)(9)]**

At any time, either the initial PHA or the receiving PHA may make a determination to deny or terminate assistance with the family in accordance with 24 CFR 982.552 and 24 CFR 982.553. (For PHA policies on denial and termination, see Chapters 3 and 12, respectively.)

## 10-II.C. RECEIVING PHA ROLE

If a family has a right to lease a unit in the receiving PHA's jurisdiction under portability, the receiving PHA must provide assistance for the family [24 CFR 982.355(10)]. HUD may determine in certain instances that a PHA is not required to accept incoming portable families, such as a PHA in a declared disaster area. However, the PHA must have approval in writing from HUD before refusing any incoming portable families [24 CFR 982.355(b)].

Administration of the voucher must be in accordance with the receiving PHA's policies. This requirement also applies to policies of Moving to Work agencies. The receiving PHA procedures and preferences for selection among eligible applicants do not apply to the family, and the receiving PHA waiting list is not used [24 CFR 982.355(c)(10)]. The family's unit, or voucher, size is determined in accordance with the subsidy standards of the receiving PHA [24 CFR 982.355(c)(12)], and the receiving PHA's policies on extensions of the voucher term apply [24 CFR 982.355(c)(14)].

**Responding to Initial PHA's Request [24 CFR 982.355(c)]**

The receiving PHA must respond via email or other confirmed delivery method to the initial PHA's inquiry to determine whether the family's voucher will be billed or absorbed[24 CFR 982.355(c)(3)]. If the receiving PHA informs the initial PHA that it will be absorbing the voucher, the receiving PHA cannot reverse its decision at a later date without consent of the initial PHA (24 CFR 982.355(c)(4).

> HACA Policy

> HACA will use email, when possible, to notify the initial PHA whether it will administer or absorb the family's voucher.

**Initial Contact with Family**

When a family moves into HACA's jurisdiction under portability, the family is responsible for promptly contacting HACA and complying with HACA's procedures for incoming portable families. The family's failure to comply may result in denial or termination of the receiving PHA's voucher [24 CFR 982.355(c)(8)].

If the voucher issued to the family by the initial PHA has expired, the receiving PHA must contact the initial PHA to determine if it will extend the voucher [24 CFR 982.355(c)(13)]. An informal hearing is not required when a voucher has expired without the family leasing a unit.

If for any reason the receiving PHA refuses to process or provide assistance to a family under the portability procedures, the family must be given the opportunity for an informal review or hearing [Notice PIH 2016-09]. (For more on this topic, see later under "Denial or Termination of Assistance."

If for any reason the receiving PHA refuses to process or provide assistance to a family under the portability procedures, the family must be given the opportunity for an informal review or hearing [Notice PIH 2008-43]. (For more on this topic, see later under "Denial or Termination of Assistance."

**Briefing**

HUD allows the receiving PHA to require a briefing for an incoming portable family as long as the requirement does not unduly delay the family's search [Notice PIH2016-09].

> HACA Policy

> HACA will require the family to attend a briefing. HACA will provide the family with a briefing packet (as described in Chapter 5) and, in an individual briefing, will orally inform the family about HACA's payment and subsidy standards, procedures for requesting approval of a unit, the unit inspection process, and the leasing process.

**Income Eligibility and Reexamination**

The receiving PHA does not re-determine eligibility for a portable family that was already receiving assistance in the initial PHA's voucher program [24 CFR 982.355(c)]. If the receiving PHA opts to conduct a new reexamination for a current participant family, the receiving PHA may not delay issuing the family a voucher or otherwise delay approval of a unit [24 CFR 982.355(c)(11)].

> HACA Policy
>
> For any family moving into its jurisdiction under portability, HACA will conduct a new reexamination of family income and composition based on the current 50058 provided.
>
> HACA will not delay issuing the family a voucher or delay approving a unit for the family until the reexamination process is complete unless the family is an applicant and HACA cannot otherwise confirm that the family is income eligible for admission to the program in the area where the unit is located.
>
> In conducting its own reexamination, HACA will rely upon the current 50058 submitted by the Initial PHA along with any supporting documentation and verifications provided to the extent that they (a) accurately reflect the family's current circumstances and (b) were obtained within the last 120 days.
>
> New information may be verified by documents provided by the family and readjusted retroactively to the initial start date of the first HAP, if necessary, when third party verification is received.

**Voucher Issuance**

When a family moves into its jurisdiction under portability, the receiving PHA is required to issue the family a voucher [24 CFR 982.355(c)(13)]. The family must submit a request for tenancy approval to the receiving PHA during the term of the receiving PHA's voucher [24 CFR 982.355(c)(15)].

***Timing of Voucher Issuance***

HUD expects the receiving PHA to issue the voucher within two weeks after receiving the family's paperwork from the initial PHA if the information is in order, the family has contacted the receiving PHA, and the family complies with the receiving PHA's procedures [Notice PIH 2016-09].

> HACA Policy
>
> When a family ports into its jurisdiction, HACA will issue the family a voucher based on the paperwork provided by the initial PHA unless the family's paperwork from the initial PHA is incomplete, the family's circumstances have changed, the family's voucher from the initial PHA has expired or the family does not comply with HACA's procedures. HACA will update the family's information when verification has been completed.

***Voucher Term***

The term of the receiving PHA's voucher may not expire before 30 calendar days from the

expiration   of the initial PHA's voucher [24 CFR 982.355(c)(13)]. If the initial PHA extends the term of the voucher, the receiving PHA's voucher may not expire before 30 days from the new expiration date of the initial PHA's voucher [Notice PIH 2016-09].

HACA Policy

The receiving PHA's voucher will expire 30 calendar days from the expiration date of the initial PHA's voucher.  If the initial PHA extends the term of the voucher, the receiving PHA's voucher will expire 30 calendar days from the new expiration date of the initial PHA's voucher.

***Voucher Extensions* [24 CFR 982.355(c)(14), Notice PIH 2016-09]**

Once the receiving PHA issues the portable family a voucher, the receiving PHA's policies on extensions of the voucher term apply. The receiving PHA must inform the initial PHA of any extension granted to the term of the voucher.  It must also bear in mind the billing deadline provided by the initial PHA. Unless willing and able to absorb the family, the receiving PHA should ensure that any voucher expiration date would leave sufficient time to process a request for tenancy approval, execute a HAP contract, and deliver the initial billing to the initial PHA.

HACA Policy

HACA generally will not extend the term of the voucher that it issues to an incoming portable family unless HACA plans to absorb the family into its own program, in which case it will follow the policies on voucher extension set forth in section 5-II.E.

HACA will consider an exception to this policy as a reasonable accommodation to a person with disabilities or if there are extenuating circumstances. If HACA is not absorbing the family, HACA will only grant these extensions if doing so will leave sufficient time to process a request for tenancy approval, execute a HAP contract, and deliver the initial billing to the initial PHA. (see Chapter 2).

***Voucher Suspensions [24 CFR 982.303, 24 CFR 982.355(c)(15)]***

If the family submits a request for tenancy approval during the term of the receiving PHA's voucher, the PHA must suspend the term of that voucher. The term of the voucher stops from the date that the family submits a request for PHA approval of the tenancy until the date the PHA notifies the family in writing whether the request has been approved or denied [24 CFR 982.4(b)] (see Section 5-II.E).

**Notifying the Initial PHA**

The receiving PHA must promptly notify the initial PHA if the family has leased an eligible unit under the program or if the family fails to submit a request for tenancy approval for an eligible unit within the term of the receiving PHA's voucher [24 CFR 982.355(c)(16)]. The receiving PHA is required to use Part II of form HUD-52665, Family Portability Information, for this purpose. Notice PIH 2016-09]. (For more on this topic and the deadline for notification, see below under "Administering a Portable Family's Voucher.")

If an incoming portable family ultimately decides not to lease in the jurisdiction of the receiving PHA but instead wishes to return to the initial PHA's jurisdiction or to search in another jurisdiction, the receiving PHA must refer the family back to the initial PHA. In such a case the voucher of record for the family is once again the voucher originally issued by the initial PHA. Any extension of search time provided by the receiving PHA's voucher is only valid for the family's search in the receiving PHA's jurisdiction [Notice PIH 2016-09].

**Administering a Portable Family's Voucher**

***Portability Billing [24 CFR 982.355(e)]***

To cover assistance for a portable family that was not absorbed, the receiving PHA bills the initial PHA for housing assistance payments and administrative fees. The amount of the housing assistance payment for a portable family in the receiving PHA's program is determined in the same manner as for other families in the receiving PHA's program.

The receiving PHA may bill the initial PHA for the lesser of 80 percent of the initial PHA's ongoing administrative fee or 100 percent of the receiving PHA's ongoing administrative fee for each program unit under contract on the first day of the month for which the receiving PHA is billing the initial PHA under portability. If the administrative fees are prorated for the HCV program, the proration will apply to the amount of the administrative fee for which the receiving PHA may bill (i.e., the receiving PHA may bill for the lesser of 80 percent of the initial PHA's prorated ongoing administrative fee or 100 percent of the receiving PHA's ongoing administrative fee).

If both PHAs agree, the PHAs may negotiate a different amount of reimbursement.

> HACA Policy
>
> Unless the PHA negotiates a different amount of reimbursement with the initial PHA, the PHA will bill the initial PHA the maximum amount of administrative fees allowed, ensuring any administrative fee proration has been properly applied.

***Initial Billing Deadline***

If a portable family's search for a unit is successful and the receiving PHA intends to administer the family's voucher, the receiving PHA must submit its initial billing notice (Part II of form HUD-52665) in time that the notice will be **received** no later than 90 days following the expiration date of the family's voucher issued by the initial PHA [Notice PIH 2016-09]. This deadline may be extended for 30 additional days if the delay is due to suspension of the voucher's term (see Initial Billing Section). A copy of the family's form HUD-50058, Family Report, completed by the receiving PHA must be attached to the initial billing notice. The receiving PHA may send these documents by mail, fax, or email.

> HACA Policy
>
> HACA will send its initial billing notice by fax or email, if necessary, to meet the billing deadline but will also send the notice by regular mail.

If the receiving PHA fails to send the initial billing by the deadline, it is required to absorb the family into its own program unless (a) the initial PHA is willing to accept the late submission or (b) HUD requires the initial PHA to honor the late submission (e.g., because the receiving PHA is over leased) [Notice PIH2016-09].

### *Ongoing Notification Responsibilities* [Notice PIH 2016-09, HUD-52665]

**Annual Reexamination** The receiving PHA must send the initial PHA a copy of a portable family's updated form HUD-50058 after each annual reexamination for the duration of time the receiving PHA is billing the initial PHA on behalf of the family, regardless of whether there is a change in the billing amount.

> HACA Policy
>
> HACA will send a copy of the updated HUD-50058 by regular mail no later than 10 business days after the effective date of the reexamination

**Change in Billing Amount** The receiving PHA is required to notify the initial PHA, using form HUD-52665, of any change in the billing amount for the family as a result of:

  A change in the HAP amount (because of a reexamination, a change in the applicable payment standard, a move to another unit, etc.)
  An abatement or subsequent resumption of the HAP payments
  Termination of the HAP contract
  Payment of a damage/vacancy loss claim for the family
  Termination of the family from the program

The timing of the notice of the change in the billing amount should correspond with the notification to the owner and the family in order to provide the initial PHA with advance notice of the change. Under no circumstances should the notification be later than 10 business days following the effective date of the change in the billing amount. If the receiving PHA fails to send Form HUD-52665 within 10 days of effective date of billing changes, the initial PHA is not responsible for any increase prior to notification. If the change resulted in a decrease in the monthly billing amount, the initial PHA will offset future monthly payments until the difference is reconciled.

### *Late Payments* [Notice PIH 2016-09]

If the initial PHA fails to make a monthly payment for a portable family by the fifth business day of the month, the receiving PHA must promptly notify the initial PHA in writing of the deficiency. The notice must identify the family, the amount of the billing payment, the date the billing payment was due, and the date the billing payment was received (if it arrived late). The receiving PHA must send a copy of the notification to the Office of Public Housing (OPH) in the HUD area office with jurisdiction over the receiving PHA. If the initial PHA fails to correct the problem by the second month following the notification, the receiving PHA may request by memorandum to the director of the OPH with jurisdiction over the receiving PHA that HUD transfer the unit in question. A copy of the initial notification and any subsequent correspondence between HACAs on the matter must be attached. The receiving PHA must send a copy of the memorandum to the initial PHA. If the OPH decides to grant the transfer, the

billing arrangement on behalf of the family ceases with the transfer, but the initial PHA is still responsible for any outstanding payments due to the receiving PHA.

### Overpayments [Notice PIH 2016-09]

In all cases where the receiving PHA has received billing payments for billing arrangements no longer in effect, the receiving PHA is responsible for returning the full amount of the overpayment (including the portion provided for administrative fees) to the initial PHA.

In the event that HUD determines billing payments have continued for at least three months because the receiving PHA failed to notify the initial PHA that the billing arrangement was terminated, the receiving PHA must take the following steps:

Return the full amount of the overpayment, including the portion provided for administrative fees, to the initial PHA.

Once full payment has been returned, notify the Office of Public Housing in the HUD area office with jurisdiction over the receiving PHA of the date and the amount of reimbursement to the initial PHA.

At HUD's discretion, the receiving PHA will be subject to the sanctions spelled out in [Notice

PIH 2016-09]

### Denial or Termination of Assistance

At any time, the receiving PHA may make a determination to deny or terminate assistance to a portable family for family action or inaction [24 CFR 982.355(c)(17).

In the case of a termination, HACA should provide adequate notice of the effective date to the initial PHA to avoid having to return a payment. In no event should the receiving PHA fail to notify the initial PHA later than 10 business days following the effective date of the termination of the billing arrangement [HUD-52665 Notice PIH 2016-09].

> HACA Policy
>
> If HACA elects to deny or terminate assistance for a portable family, HACA will notify the initial PHA within 10 business days after the informal review or hearing if the denial or termination is upheld. HACA will base its denial or termination decision on the policies set forth in Chapter 3 or Chapter 12, respectively. The informal review or hearing will be held in accordance with the policies in Chapter 16. The receiving PHA will furnish the initial PHA with a copy of the review or hearing decision.

**Absorbing a Portable Family**

The receiving PHA may absorb an incoming portable family into its own program when HACA executes a HAP contract on behalf of the family or at any time thereafter providing that (a) HACA has funding available under its annual contributions contract (ACC) [24 CFR 982.355(d)(1), Notice PIH 2016-09].

If the receiving PHA absorbs a family from the point of admission, the admission will be counted against the income targeting obligation of the receiving PHA [24 CFR 982.201(b)(2)(vii)].

If the receiving PHA absorbs a family after providing assistance for the family under a billing arrangement with the initial PHA, the receiving PHA must send an updated form HUD-52665 to the initial PHA no later than 10 business days following the effective date of the termination of the billing arrangement.  [Notice PIH 2016-09].

> HACA Policy
>
> If HACA decides to absorb a portable family upon the execution of a HAP contract on behalf of the family, HACA will notify the initial PHA by the initial billing deadline specified on form HUD-52665. The effective date of the HAP contract will be the effective date of the absorption.
>
> If HACA decides to absorb a family after that, it will provide the initial PHA with 30 days' advance notice, but no later than 10 business days following the effective date of the termination of the billing arrangement.
> .

Following the absorption of an incoming portable family, the family is assisted with funds available under the consolidated ACC for the receiving PHA's voucher program [24 CFR 982.355(d)], and the receiving PHA becomes the initial PHA in any subsequent moves by the family under portability. [24 CFR 982.355(e)(4)].

<div align="center">

**CHAPTER 11**
**REEXAMINATIONS INTRODUCTION**

</div>

HACA is required to reexamine each family's income and composition at least annually, and to adjust the family's level of assistance accordingly. Interim reexaminations are also needed in certain situations. This chapter discusses both annual and interim reexaminations, and the recalculation of family share and subsidy that occurs as a result. HUD regulations and PHA policies concerning reexaminations are presented in three parts:

> Part I: Annual Reexaminations. This part discusses the process for conducting annual reexaminations.
>
> Part II: Interim Reexaminations. This part details the requirements for families to report changes in family income and composition between annual reexaminations.
>
> Part III: Recalculating Family Share and Subsidy Amount. This part discusses the recalculation of family share and subsidy amounts based on the results of annual and interim reexaminations.

Policies governing reasonable accommodation, family privacy, required family cooperation, and program abuse, as described elsewhere in this plan, apply to both annual and interim reexaminations.

**PART I: ANNUAL REEXAMINATIONS [24 CFR 982.516]**

## 11-I.A. OVERVIEW

HACA must conduct a reexamination of family income and composition at least annually. This includes gathering and verifying current information about family composition, income, and

expenses. Based on this updated information, the family's income and rent must be recalculated. This part discusses the schedule for annual reexaminations, the information to be collected and verified, and annual reexamination effective dates.

## 11-I.B STREAMLINED ANNUAL REEXAMINATIONS [24 CFR 982.516(b); New HCV GB, Reexaminations]

HUD permits PHAs to streamline the income determination process for family members with fixed sources of income. While third-party verification of all income sources must be obtained during the intake process and every three years thereafter, in the intervening years the PHA may determine income from fixed sources by applying a verified cost of living adjustment (COLA) or rate of interest. The PHA may, however, obtain third-party verification of all income, regardless of the source. Further, upon request of the family, the PHA must perform third-party verification of all income sources.

Fixed sources of income include Social Security and SSI benefits, pensions, annuities, disability or death benefits, and other sources of income subject to a COLA or rate of interest. The determination of fixed income may be streamlined even if the family also receives income from other non-fixed sources.

Two streamlining options are available, depending upon the percentage of the family's income that is received from fixed sources. If at least 90 percent of the family's income is from fixed sources, the PHA may streamline the verification of fixed income and may choose whether to verify non-fixed income amounts in years where no fixed-income review is required. If the family receives less than 90 percent of its income from fixed sources, the PHA may streamline the verification of fixed income and must verify non-fixed income annually.

<u>HACA Policy for Fixed Income Families</u>

Fixed Income Sources: A fixed income source includes periodic payment at reasonably predictable levels from one or more of the following sources:

a) Social Security, Supplemental Security Income, Supplemental Disability Insurance;
b) Federal, state, local, or private pension plans; and
c) Annuities or other retirement benefits programs, insurance policies, disability or death benefits, or other similar types of periodic receipts.

1. Verifying cost of living (COLA) or interest rate - HACA will verify COLA or current interest rate from a public source or through tenant-provided, the third party generated documentation. HACA will document any fixed source of income and the applicable COLA or interest adjustment for each fixed source of income in the tenant file.

2. For any family with at least 90 percent of the family's income from fixed sources, HACA will streamline the verification of fixed income and non-fixed income. The following policy applies.

a) Third-party verification of all income sources will be obtained during the intake process and at least once every two years thereafter.

b) Fixed Income –HACA will apply the cost of living adjustment (COLA) or current interest rate to the previously verified income.

c) Non-fixed income – HACA will use the previous year's calculation. However, HACA will review and follow up on discrepancies regarding income sources in EIV.

d) Assets and Deductions – HACA will complete verification and the calculation of assets and deductions as required for non-fixed income households.

e) Application of current utility allowance and payment standard will occur annually at the reexamination.

f) If a family member with a fixed or non-fixed income source is added to the household, HACA will use third-party verification of all new income amounts for that family member.

3. HACA will obtain third-party verification of all income sources every two years.

4. For households that receive less than 90 percent of the family's income from fixed sources, third-party verification of non-fixed income will be obtained annually, and third-party verification of fixed income will be obtained every two years.

## 11-I.C. SCHEDULING ANNUAL REEXAMINATIONS

HACA must establish a policy to ensure that the annual reexamination for each family is completed *within* a 12-month period, and may require reexaminations more frequently [HCV GB p. 12-1].

> HACA Policy
>
> HACA will schedule annual reexaminations to coincide with the family's anniversary date.  HACA will begin the annual reexamination process approximately 90-120 days in advance of its scheduled effective date.
>
> *Anniversary date* is defined as 12 months from the effective date of the family's last annual reexamination or, during a family's first year in the program, from the effective date of the family's initial examination (admission).
>
> If the family moves to a new unit, HACA will perform a new annual reexamination, and the anniversary date will change based on the new lease effective date.
>
> HACA may also schedule an annual reexamination for completion prior to the anniversary date for administrative purposes.

### Notification of and Participation in the Annual Reexamination Process

HACA is required to obtain the information needed to conduct annual reexaminations. How that information will be collected is left to the discretion of HACA. However, PHAs should give tenants who were not provided the opportunity the option to complete Form HUD-92006 at this time [Notice PIH 2009-36].

HACA Policy

**Annual reexamination**

HACA may choose to conduct annual reexaminations in person, by mail, by phone, through an on-line certification process or other virtual method. Notification of the annual reexamination will be sent by mail, email or through the certification portal. Documents will be accepted by mail, by fax, email, though the on-line certification portal, DocuSign or in-person.

If the notice is returned by the post office with no forwarding address, a notice of termination (see Chapter 12) will be sent to the family's address of record, as well as to any alternate address provided in the family's file.

If the family is unable to attend a scheduled interview, the family should contact HACA at least 2 business days in advance of the interview to schedule a new appointment or request an alternative reexamination method. If a family does not attend the first scheduled interview, HACA will automatically send a second reexamination notification with a new interview appointment time.

If a family fails to attend two scheduled reexamination interviews without HACA approval, or if the notice is returned by the post office with no forwarding address, a final warning of termination notice will be mailed or emailed with a 10-day deadline. If there is no response, a final notice of termination will be sent to the family's address of record in accordance with the policies in Chapter 12.

An advocate, interpreter, or other assistant may assist the family in the interview process. The family and HACA must execute a certification attesting to the role and the assistance provided by any such third party.

## 11-I.D. CONDUCTING ANNUAL REEXAMINATIONS

As part of the annual reexamination process, families are required to provide updated information to HACA regarding the family's income, expenses, and composition [24 CFR 982.551(b)].

HACA Policy

Each participant will re-certify using HACA's current recertification form or other format required by HACA.

Families must bring all required information.

Any required documents must be provided within 14 calendar days of the recertification. A 14-day letter that details what documentation or information must be submitted will be issued to the head of household.  If the family is unable to obtain the information or materials within the required timeframe, the family may request one extension in writing addressed to the housing eligibility specialist.  If the family does not provide the required

documents or information within the required timeframe plus any approved extensions, the family will be sent a notice of termination in accordance with the policies in <u>Chapter 12</u>.

Additionally, HUD recommends that at annual reexaminations PHAs ask whether the tenant, or any member of the tenant's household, is subject to a lifetime sex offender registration requirement in any state [Notice PIH 2012-28].

<u>HACA Policy</u>

At the annual reexamination, HACA will ask whether the tenant, or any member of the tenant's household, is subject to a lifetime sex offender registration requirement in any state. HACA Staff will periodically conduct a sex offender search by using the Texas Public Sex Offender Registry and/or the National Sex Offender Public Website (NSOPW).

If HACA proposes to terminate assistance based on lifetime sex offender registration information, HACA must notify the household of the proposed action and must provide the subject of the record and the tenant a copy of the record and an opportunity to dispute the accuracy and relevance of the information prior to termination. [24 CFR 5.903(f) and 5.905(d)]. (See Chapter 12.)

The information provided by the family generally must be verified in accordance with the policies in Chapter 7. Unless the family reports a change, or the agency has reason to believe a change has occurred in information previously reported by the family, certain types of information that are verified at admission typically do not need to be re-verified on an annual basis. These include:

- Legal identity
- Age
- Social security numbers
- A person's disability status
- Citizenship or immigration status

If adding a new family member to the unit causes overcrowding according to the housing quality standards (HQS) (see Chapter 8), HACA must issue the family a new voucher, and the family and HACA must try to find an acceptable unit as soon as possible. If an acceptable unit is available for rental by the family, HACA must terminate the HAP contract in accordance with its terms [24 CFR 982.403].

### EIV and Fraud

During the reexamination process**,** Eligibility Specialists will obtain EIV (Upfront Income Verification) or TWC (Texas Workforce Commission) data at each annual review and identify any unreported or underreported income. Eligibility Specialists may obtain information from any other sources, including but not limited to: Texas Department of Human Services, the Attorney General's office, and The Work Number.

If the reexamination discloses that the participant, at the time of admission or at any previous reexamination, made misrepresentations, the participant will be notified in writing of such misrepresentation.  The procedures described in Chapter 14 will be followed and the participant may
be required to repay HACA for any overpayments made as a result of misrepresentation or may be processed for termination.  The procedures regarding enforcement of fraud are detailed in Chapter 12 and Chapter 14.

## 11-I.E. DETERMINING ONGOING ELIGIBILITY OF CERTAIN STUDENTS [24 CFR 982.552(b)(5)]

Section 327 of Public Law 109-115 established new restrictions on the ongoing eligibility of certain students (both part- and full-time) who are enrolled in institutions of higher education.

If a student enrolled in an institution of higher education is under the age of 24, is not a veteran, is not married, does not have a dependent child, and is not a person with disabilities receiving HCV assistance as of November 30, 2005, the student's eligibility must be reexamined along with the income eligibility of the student's parents on an annual basis. In these cases, both the student and the student's parents must be income eligible for the student to continue to receive HCV assistance. If, however, a student in these circumstances is determined independent from his or her parents  or is considered a *vulnerable youth* in accordance with PHA Policy, the income of the student's parents will not be considered in determining the student's ongoing eligibility.

Students who reside with parents in an HCV assisted unit are not subject to this provision. It is limited to students who are receiving assistance on their own, separately from their parents.

> HACA Policy
> During the annual reexamination process, HACA will determine the ongoing eligibility of each student who is subject to the eligibility restrictions in [24 CFR 5.612] by reviewing the student's individual income as well as the income of the student's parents. If the student has been determined "independent" from his/her parents or is considered a *vulnerable youth* based on the policies in Sections 3-II.E and 7-II.E, the parents' income will not be reviewed.
>
> If the student is no longer income eligible based on his/her own income or the income of his/her parents, the student's assistance will be terminated in accordance with the policies in Section 12-I.D.
>
> If the student continues to be income eligible based on his/her own income and the income of his/her parents (if applicable), HACA will process a reexamination in accordance with the policies in this chapter.

## 11-I.F. EFFECTIVE DATES

HACA must establish policies concerning the effective date of changes that result from an annual reexamination [24 CFR 982.516].

> HACA Policy

In general, an *increase* in the family share of the rent that results from an annual reexamination will take effect on the family's anniversary date, and the family will be notified at least 30 days in advance.

> If less than 30 days remain before the scheduled effective date, the increase will take effect on the first of the month following the end of the 30-day notice period. If a family moves to a new unit, the increase will take effect on the effective date of the new lease and HAP contract, and no 30-day notice is required.

> If HACA chooses to schedule an annual reexamination for completion prior to the family's anniversary date for administrative purposes, the effective date will be determined by HACA, but will always allow for the 30-day notice period.

> If the family causes a delay in processing the annual reexamination, *increases* in the family share of the rent will be applied retroactively, to the scheduled effective date of the annual reexamination. The family's tenant file will be documented to reflect how the family caused the delay in processing and explain why the family did not receive the full 30 days' notice of increase. The family will be responsible for any overpaid subsidy and may be offered a repayment agreement in accordance with the policies in Chapter 16.

In general, a *decrease* in the family share of the rent that results from an annual reexamination will take effect on the family's anniversary date.

> If a family moves to a new unit, the decrease will take effect on the effective date of the new lease and HAP contract.

> If HACA chooses to schedule an annual reexamination for completion prior to the family's anniversary date for administrative purposes, the effective date will be determined by HACA.

> If the family causes a delay in processing the annual reexamination, d*ecreases* in the family share of the rent will be applied the first of the month after the documents have been provided. The family's tenant file will be documented to reflect how the family caused the delay in processing.

Delays in reexamination processing are considered to be caused by the family if one or more of the following occurs: the family fails to attend the scheduled annual reexamination interview; the family fails to attend the rescheduled annual reexamination interview; the family fails to sign paperwork or provide information and/or documentation requested by HACA by the date specified, and this delay prevents HACA from completing the reexamination as scheduled.

## PART II: INTERIM REEXAMINATIONS [24 CFR 982.516]

## 11-II.A. OVERVIEW

Family circumstances may change between annual reexaminations. HUD and PHA policies dictate what kinds of information about changes in family circumstances must be reported, and

under what circumstances HACA must process interim reexaminations to reflect those changes. HUD regulations also permit HACA to conduct interim reexaminations of income or family composition at any time. When an interim reexamination is conducted, only those factors that have changed are verified and adjusted [HCV GB, p. 12-10].

In addition to specifying what information the family must report, HUD regulations permit the family to request an interim determination if other aspects of the family's income or composition changes. HACA must complete the interim reexamination within a reasonable time after the family's request.

This part includes HUD and PHA policies describing what changes families are required to report, what changes families may choose to report, and how HACA will process both PHA- and family-initiated interim reexaminations.

## 11-II.B. CHANGES IN FAMILY AND HOUSEHOLD COMPOSITION

The family is required to report all changes in family composition. HACA must adopt policies prescribing when and under what conditions the family must report changes in income and family composition. However, due to family obligations under the program, HACA has limited discretion in this area.

> HACA Policy
>
> HACA will conduct interim reexaminations to account for any changes in household composition that occur between annual reexaminations. All changes in family composition must be reported in writing within 30 days from the date of occurrence. The participant must complete an update form and provide necessary documentations to support the change.

### New Family Members Not Requiring Approval

The addition of a family member as a result of birth, adoption, or court-awarded custody does not require PHA approval. However, the family is required to promptly notify HACA of the addition [24 CFR 982.551(h)(2)].

> HACA Policy
>
> The family must inform HACA in writing of the birth, adoption or court-awarded custody of a child within 30 calendar days.

### New Family and Household Members Requiring Approval

With the exception of children who join the family as a result of birth, adoption, or court-awarded custody, a family must request PHA approval to add a new family member [24 CFR 982.551(h)(2)] or other household member (live-in aide or foster child) [24 CFR 982.551(h)(4)].

Although the PHA must verify aspects of program eligibility when any new family member is added, the Streamlining Final Rule removed the requirement that PHAs conduct a reexamination of income whenever a new family member is added. The PHA may state in policy that an income reexamination will be conducted.

If a change in family size causes a violation of Housing Quality Standards (HQS) space standards (see Chapter 8), HACA must issue the family a new voucher, and the family and PHA must try to find an acceptable unit as soon as possible. If an acceptable unit is available for rental by the family, HACA must terminate the HAP contract in accordance with its terms [24 CFR 982.403].

HACA Policy

Families must request HACA's approval to add a new family member, live-in aide, foster child, foster adult, or any person not on the lease who is expected to stay in the unit for more than 30 consecutive days, or 60 cumulative days, within a twelve- month period, and therefore no longer qualifies as a "guest." Requests must be made in writing and approved by HACA prior to the individual moving into the unit.

All requests to add household members must be in writing and approved by HACA and the owner/manager of the dwelling unit. Each Prospective household member 17 years of age or older is required to provide

Consent to release criminal background information or an original D.P.S. Criminal History Report no older than 60 calendar days.

An original Social Security Card, birth certificate, citizenship verification and income verification.

A valid picture I.D. for all add-ons 16 years or older.

**Custody documentation for minors who are not head of household's children:**
(1) A court order establishing custody; or

(2) Proof that the adult is receiving income for the child; or

(3) Records from the school or medical records which establish the unit as the child's residence; or

(4) Records from a non-profit or government agency providing services to the child which establish the unit as the child's residence; or

 (5) A custodial affidavit or unsworn declaration from at least one of the parents authorizing the head of household to maintain custody of the minor; **and** one of the documents from items identified in 1-4 above; or
(6) Records or a letter from the Texas Department of Family and Regulatory Services indicating current placement of the child with the head of household when the child is a blood relative of the head of household.

**Additional Documents required to approve adding a household member:**

A letter from the head of household's landlord agreeing to add family member(s).

All the add-on's immigration information if they were not born in the U.S. (Any

INS documents with your registration number, such as: Passports, Permanent or Temporary Resident Cards, I-94, Arrival-Departure Records, Work Permits, or Temporary Registration Cards, etc.)

For a Live-in Aide provide documentation from a qualified health professional to indicate the need for a live-in aide is required.  The live-in aide's presence must be determined essential for the care and wellbeing of the elderly or disabled family member and the live-in aide would not be living in the unit except to provide the necessary care.

Relatives or family members may qualify as live-in aides, however, a pre-existing household member does not qualify as a live-in aide.

HACA will not approve the addition of a new family or household member unless the individual meets HACA's admissions eligibility screening criteria (see Chapter 3)

HACA will not approve the addition of new family or household members other than by birth, adoption, proof of custody of a minor(s) as defined above or marriage, if it will require the family to receive a larger voucher size, unless the family can demonstrate that there are medical needs or other extenuating circumstances, including reasonable accommodation that should be considered by HACA. Exceptions will be made on a case-by-case basis.

HACA will not approve requests for additions to family composition where the request intends to provide housing assistance to extended families or multiple households. Information will be provided to the participant regarding other housing alternatives for the second household.

If HACA determines that a unit does not meet the HQS space standards (two persons per living/sleeping space) because of an increase in family size or change in family composition, HACA may issue the family a new voucher, based on the subsidy standards, and process the family to move.

HACA will notify the family in writing of the approval or denial of the additional family or household member within 15 calendar days of receiving all information required to verify the individual's eligibility.   If HACA denies approval, the reasons for the denial will be provide in the written notice.

## Departure of a Family or Household Member

Families must promptly notify HACA if any family member no longer lives in the unit [24 CFR 982.551(h)(3)]. Because household members are considered when determining the family unit (voucher) size [24 CFR 982.402], HACA also needs to know when any live-in aide, foster child, or foster adult ceases to reside in the unit.

HACA Policy

Program participants must report to HACA in writing within 30 calendar days, any members absent from the household for a period more than 30 consecutive days. This

includes any household member, live-in aides, foster child, foster adult who ceases to reside in the unit.

Household members will be removed at the request of the Head of Household, unless the reason for removal, in HACA's sole discretion, is to attempt to circumvent a limitation or requirement of federal statute, regulation, or PHA Policy, such as an imminent increase in rent portion due to new income.

In such cases, documentation of the removal of the family member may include one of the following:

> A new lease showing a new address for the removed family member.
>
> Any documentation (such a bill, agency, employment records, school, etc.) showing a new address for the removed family member.
>
> Written and signed noticed by the head of household explaining the reason for the removal.

If the change in family size requires a decrease in payment standard, this will occur at the next scheduled re-examination.

## Head-of-Household Changes

The family may request a change of head of household. The head of household must have the legal capacity to enter into a lease under state and local law. An emancipated minor under state law may be designated as head of household. The head of household is responsible for ensuring that the family fulfills all of its responsibilities under the program, alone or in conjunction with a co-head or spouse.

HACA may deny the request to change the head-of-household if it determines that the requested change is for the purpose of circumventing the HCV wait list or other limitations and requirements of the HCV program, federal statute, regulation or HACA Policy.

## Family absent from the Unit

A family receiving Housing Choice Voucher (HCV) assistance may be absent from their unit for brief periods. However, at no time shall a family be absent from their HCV subsidized unit for a period exceeding (90) days. This includes families facing work-related transfers, incarceration, rehabilitation, or hospitalization. If the assisted family leaves the unit for 90 consecutive days, their (HCV) subsidy will be processed for termination.

> HACA Policy
>
> HACA will verify family's absence from the unit by any single, or combination of the following: letters to the family, phone calls, and visits with neighbors, landlords, verification of utilities, on-site inspection, or by any other practical method.

## Children Absent from the Unit

If children/child are projected to be out of the home for a period of more than six months from the initial removal date but will be returned to the home, the Voucher size may be reduced.

Documentation must be provided defining the length of time the children/child will be absent.  If documentation reflects that the children/child will be out of the home for more than 6 months, and the parent(s) is in good standing with the HCV program, he/she will be issued an appropriate size bedroom per the subsidy standards at their next scheduled re-examination.

If the child/children later return, the parent must submit a written notice to report a change in family composition, provide proper documentation and request an appropriate bedroom size.  Voucher size will be issued according to the subsidy standards.

### Adult Dependents Absent from the unit

If an adult dependent goes into the military (full time) or attends college away from home for more than 6 months out of the year, or is incarcerated, the adult dependent will be determined absent.  In this instance, the family will be issued an appropriate size bedroom per the subsidy standards at their next scheduled reexamination.

### Joint Custody

For purposes of establishing appropriate bedroom size, parents who have joint custody of a child must produce required documentation to include divorce decrees or guardianship documents establishing the assisted unit as the primary residence for the child.  Primary residence is defined as more than 6 months out of the year.

### Visitors

The length of stay for visitors is usually defined by the landlord and indicated in the lease.  For program purposes, if any individual stays in the unit more than 30 consecutive days, the head of household must report in writing the additional person and request approval from the owner/manager and HACA to add the family member to the lease.  The proposed new household member would need to meet the admissions screening criteria as described in Chapter 3.

### Family Break-Up

In the event of family break up, the HCV subsidy shall remain with that parent/guardian whom has legal custody of any minor children involved.  Should HACA be unable to make a determination as to which parent has legal custody, other factors to be considered would include which family member was the original head of household, whether family members are forced to leave as a result of actual or threatened violence, or any other mitigating circumstances brought to the attention of HACA.  In cases where a court determines which family member remains with the subsidy, then the decision of the court shall be final.  A written decision will be provided to the family, and the family will be provided a right to appeal the decision.

## 11-II.C. CHANGES AFFECTING INCOME OR EXPENSES

Interim reexaminations can be scheduled either because HACA has reason to believe that changes in income or expenses may have occurred, or because the family reports a change.  When a family reports a change, HACA may take different actions depending on whether the family reported the change voluntarily, or because they were required to do so.

### PHA-Initiated Interim Reexaminations

PHA-initiated interim reexaminations are those that are scheduled based on circumstances or criteria defined by HACA. They are not scheduled because of changes reported by the family.

HACA Policy

HACA will conduct interim reexaminations in each of the following instances:

### Zero Income

HACA will accept a self-certification of zero income from the family at admission and and reexam without taking any additional steps to verify zero reported income. HUD does not require they be notarized.

### Seasonal or cyclic income

For a family member who has temporary or seasonal income, HACA may calculate the next 12 months earnings using an average of the past 12 months of earnings. If at the time of the annual reexamination, it is not feasible to anticipate a level of income for the next 12 months, HACA will schedule an interim reexamination to coincide with the end of the period for which it is feasible to project income.

### Other examples of HACA initiated Interim Reexaminations

If at the time of the annual reexamination, tenant-provided documents were used on a provisional basis due to the lack of third-party verification, and third-party verification becomes available, HACA will conduct an interim reexamination.

If there has been a change in circumstances for a tenant or a tenant disputes the income calculation, HACA may conduct an interim reexamination.

HACA may conduct an interim reexamination at any time in order to correct an error in a previous reexamination, or to investigate a tenant fraud complaint.

### Payment Standard Errors

If it is discovered during the screening process that the family was not downgraded or upgraded in error to the proper bedroom size based on current subsidy standard policy, HACA will conduct an interim to downgrade or upgrade to the proper bedroom size.

## Family-Initiated Interim Reexaminations

HACA must adopt policies prescribing when and under what conditions the family must report changes in family income or expenses [24 CFR 982.516(c)]. In addition, HUD regulations require that the family be permitted to obtain an interim reexamination any time the family has experienced a change in circumstances since the last determination [24 CFR 982.516(b)(2)].

## Reporting Requirements for Changes in income and family composition

HACA Policy

**Required Reporting**

The family is required to report the following in writing within 30 calendar days from the date of occurrence.

1.   1.   Families must report increases in earned and unearned income within 30 days of occurrence.

2.   All changes in family composition must be reported in writing within 30 days from the date of occurrence.

## 11-II.D. PROCESSING THE INTERIM REEXAMINATION

**Method of Reporting**

HACA Policy

The participant must complete an update form and provide necessary information to support the change.  The participant must submit any required information or documents within 14 calendar days of receiving a request from HACA.  This timeframe may be extended for good cause with HACA approval.  HACA will accept required documentation by mail, email, fax, the on-line certification portal or in person.   When all necessary verification is complete, the housing eligibility specialist will complete a Rent Change Notice reflecting the change in rent portions and the effective date.  A notice will be sent to the family and owner.  Generally, the family will not be required to attend an interview for an interim reexamination. However, if HACA determines that an interview is warranted, the family may be required to attend.

**Effective Dates**

HACA must establish the timeframes in which any changes that result from an interim reexamination will take effect [24 CFR 982.516(d)]. The changes may be applied either retroactively or prospectively, depending on whether there is to be an increase or a decrease in the family share of the rent, and whether the family reported any required information within the required time frames [HCV GB, p. 12-10].

HACA Policy

**If the family share of the rent is to *increase*:**
When the change is reported in a timely manner, the family will be given a 30-day notice prior to the first of the month for any increase in tenant rent.

The following interim increases will be processed at the next annual re-examination.

1)   Cost of living adjustments to recipients of Social Security or SSI, Welfare and Veterans assistance or increased amounts of other current unearned income will be calculated at the next annual re-examination.

2)   Increases in assets will be calculated at the next re-examination.

3)   Increases in earned income will be calculated at the next re-examination unless the household is on zero income.

### The following will be processed as interims between re-examinations:

### Zero Income

Interim increases, regardless of the amount, will be processed when current household income is zero.

If HACA experiences a change in HCV administrative fees or staffing, the Vice President of Assisted Housing, with the approval of the President and CEO, has the discretion to make changes regarding the procedures to process interim increases by providing a written notice to staff outlining which interim increases will be processed and when to process interims.

In the event an increase in income was not reported in a timely manner, HACA may:

Retroactively establish the correct Housing Assistance Payment and require the tenant to repay any amounts owed to HACA for the period they earned higher income but did not report;

Terminate the participant from the program for willful intent to commit fraud; or

Report the violation to the HUD Office of Inspector General and or local authorities for prosecution.

The family will be responsible for any overpaid subsidy and may be offered a repayment agreement in accordance with the policies in Chapter 14 and 16.

### If the family share of the rent is to *decrease*:

Changes will be made only after the tenant reports the change in writing by completing an update form and providing proper information or documentation.  If the tenant reports the change in writing with proper documentation, the change will be effective the first of the following month.   If staff is unable to process the change by the first of the month, retroactive rent will be paid back to the appropriate effective date.

If the family causes a delay in processing the interim by not providing the requested documentation, d*ecreases* in the family share of the rent will be applied the first of the month after the documents have been provided. The family's tenant file will be documented to reflect how the family caused the delay in processing.

If a family reports a decrease in income from the loss of welfare benefits due to fraud or non-compliance with a welfare agency requirement to participate in an economic self-sufficiency program, the family's share of the rent will not be reduced [24 CFR 5.615]. For more information regarding the requirement to impute welfare income see Chapter 6.

No adjustments will be made for temporary family conditions not exceeding 30 days. Families experiencing a temporary loss of income shall be referred to various social service agencies for possible assistance.

## PART III: RECALCULATING FAMILY SHARE AND SUBSIDY AMOUNT

### 11-III.A. OVERVIEW

After gathering and verifying required information for an annual or interim reexamination, HACA must recalculate the family share of the rent and the subsidy amount, and notify the family and owner of the changes [24 CFR 982.516(d)(2), HCV 12-6 and 12-10]. While the basic policies that govern these calculations are provided in Chapter 6, this part lays out policies that affect these calculations during a reexamination.

### 11-III.B. CHANGES IN PAYMENT STANDARDS AND UTILITY ALLOWANCES

In order to calculate the family share of the rent and HAP amount correctly, changes in payment standards, subsidy standards, or utility allowances may need to be updated and included in HACA's calculations.

Specific policies governing how subsidy standards, payment standards, and utility allowances are applied are discussed below.

#### Payment Standards [24 CFR 982.505]

The family share of the rent and HAP calculations must use the correct payment standard for the family, taking into consideration the family unit size, the size of unit, and the area in which the unit is located [HCV GB, p. 12-5]. See Chapter 6 for information on how to select the appropriate payment standard.

When HACA changes its payment standards or the family's situation changes, new payment standards are applied at the following times:

   If HACA's payment standard amount changes during the term of the HAP contract, the date on which the new standard is applied depends on whether the standard has increased or decreased:

- If the payment standard amount has i*ncreased,* the increased payment standard will be applied at the family's next regular reexamination or the next interim recertification following the effective date of the increase in the payment standard.

- -If the payment standard amount has *decreased*, during the term of a HAP contract, the PHA is not required to reduce the payment standard as the HAP contract remains in effect. At the family's *second annual* reexamination, the PHA may, but is not required to, apply the decreased payment standard or may gradually implement the reduced payment standard (See Chapter 6 for the PHA's policy on decreases in the payment standard).

   If the family moves to a new unit, or a new HAP contract is executed due to changes in the lease (even if the family remains in place) the current payment standard applicable to the family will be used when the new HAP contract is processed.

### Subsidy Standards [24 CFR 982.505(c)(4)]

If there is a change in the family unit size that would apply to a family during the HAP contract term, either due to a change in family composition, or a change in HACA's subsidy standards (see Chapter 5), the new family unit size must be used to determine the payment standard amount for the family at the family's *first annual* reexamination following the change in family unit size.

### Utility Allowances [24 CFR 982.517(d)]

The family share of the rent and HAP calculations must reflect any changes in the family's utility arrangement with the owner, or in HACA's utility allowance schedule [HCV GB, p. 12-5]. Chapter 16 discusses how utility allowance schedules are established.

When there are changes in the utility arrangement with the owner, HACA must use the utility allowances in effect at the time the new lease and HAP contract are executed.

At reexamination, HACA must use HACA current utility allowance schedule [HCV GB, p. 18-8].

> HACA Policy
>
> Revised utility allowances will be applied to a family's rent and subsidy calculations at the first annual reexamination after the new utility allowance is adopted and the effective date of the new utility allowance is established and provided in writing to staff.

## 11-III.C. NOTIFICATION OF NEW FAMILY SHARE AND HAP AMOUNT

HACA must notify the owner and family of any changes in the amount of the HAP payment [HUD-52641, HAP Contract]. The notice must include the following information [HCV GB, p. 12-6]:

The amount and effective date of the new HAP payment

The amount and effective date of the new family share of the rent

The amount and effective date of the new tenant rent to owner

The family must be given an opportunity for an informal hearing regarding HACA's determination of their annual or adjusted income, and the use of such income to compute the housing assistance payment [24 CFR 982.555(a)(1)(i)] (see Chapter 16).

> HACA Policy
>
> The notice to the family will include the effective date, the new HAP, the amount of the new family share of the rent, the amount of the new tenant rent to owner, the total contract rent and tenant utility assistance if applicable. The notice will also state the procedures for requesting an informal hearing.

## 11-III.D. DISCREPANCIES

During an annual or interim reexamination, HACA may discover that information previously

reported by the family was in error, or that the family intentionally misrepresented information. In addition, HACA may discover errors made by HACA. When errors resulting in the overpayment or underpayment of subsidy are discovered, corrections will be made in accordance with the policies in Chapter 14.

## CHAPTER 12
## TERMINATION OF ASSISTANCE AND TENANCY

HUD regulations specify mandatory and optional grounds for which a PHA can terminate a family's assistance. They also specify the circumstances under which an owner may terminate the tenancy of an assisted family. This chapter describes the policies that govern mandatory and optional terminations of assistance, and termination of tenancy by the owner. It is presented in three parts:

> Part I: Grounds for Termination of Assistance This part describes the various circumstances under which assistance under the program can be terminated by the family or by the PHA.

> Part II: Approach to Termination of Assistance This part describes the policies and the process that the PHA will use in evaluating decisions on whether to terminate assistance due to actions or inactions of the family where termination is an option. It specifies the alternatives that the PHA may consider in lieu of termination, the criteria the PHA will use when deciding what action to take and the steps the PHA must take when terminating a family's assistance.

> Part III: Termination of Tenancy by the Owner This part describes the HUD policies that govern the owner's right to terminate an assisted tenancy.

## PART I: GROUNDS FOR TERMINATION OF ASSISTANCE

## 12-I.A. OVERVIEW

HUD requires the PHA to terminate assistance for certain actions and inactions of the family and when the family no longer requires assistance due to increases in family income. HUD permits the PHA to terminate assistance for certain other actions or inactions of the family. In addition, a family may decide to withdraw from the program and terminate their HCV assistance at any time by notifying the PHA.

## 12-I.B. FAMILY NO LONGER REQUIRES ASSISTANCE [24 CFR 982.455]

As a family's income increases, the amount of the housing assistance payment decreases. If the amount of assistance provided by the PHA is reduced to zero, the family's assistance terminates automatically 180 days after the last HAP payment.

> HACA Policy

> A notice of termination will be sent to any family that has zero HAP for 180 consecutive days. If a participating family receiving zero assistance experiences a change in circumstances that would cause the HAP payment to rise above zero, the family must

notify HACA of the changed circumstances and request an interim reexamination before the expiration of the 180-day period.

## 12-I.C. FAMILY CHOOSES TO TERMINATE ASSISTANCE

The family may request that HACA terminate the housing assistance payments on behalf of the family at any time.

HACA Policy

The request to terminate assistance should be made in writing and signed by the head of household, spouse, or co-head. Before terminating the family's assistance, the PHA will follow the notice requirements in Section 12-II.F

## 12-I.D. MANDATORY TERMINATION OF ASSISTANCE

HUD requires HACA to terminate assistance in the following circumstances.

### Eviction [24 CFR 982.552(b)(2), 24 CFR 5.2005(c)(1)]

HACA must terminate assistance whenever a family is evicted from a unit assisted under the HCV program for a serious or repeated violation of the lease. As discussed further in section 12-II.E, incidents of actual or threatened domestic violence, dating violence, sexual assault, or stalking may not be construed as serious or repeated violations of the lease by the victim or threatened victim of such violence or stalking.

HACA Policy

A family will be considered *evicted* if the family moves after a legal eviction order has been issued, whether or not physical enforcement of the order was necessary.

If a family moves after the owner has given the family an eviction notice for serious or repeated lease violations but before a legal eviction order has been issued, termination of assistance is not mandatory. In such cases HACA will determine whether the family has committed serious or repeated violations of the lease based on available evidence and may terminate assistance or take any of the alternative measures described in section 12-II.C. In making its decision, HACA will consider the factors described in sections 12-II.D and 12-II.E. Upon consideration of such factors, HACA may, on a case-by-case basis, choose not to terminate assistance.

*Serious and repeated lease violations* will include, but not be limited to, nonpayment of rent, disturbance of neighbors, destruction of property, or living or housekeeping habits that cause damage to the unit or premises and criminal activity.

Generally, the criterion to be used will be whether or not the reason for the eviction was the fault of the tenant or guests.

### Failure to Provide Consent [24 CFR 982.552(b)(3)]

HACA must terminate assistance if any family member fails to sign and submit any consent form they are required to sign for a regular or interim reexamination. See Chapter 7 for a complete discussion of consent requirements.

### Failure to Document Citizenship [24 CFR 982.552(b)(4) and [24 CFR 5.514(c)]

HACA must terminate assistance if (1) a family fails to submit required documentation within the required timeframe concerning any family member's citizenship or immigration status; (2) a family submits evidence of citizenship and eligible immigration status in a timely manner, but United States Citizenship and Immigration Services (USCIS) primary and secondary verification does not verify eligible immigration status of the family; or (3) a family member, as determined by HACA, has knowingly permitted another individual who is not eligible for assistance to reside (on a permanent basis) in the unit.

For (3) above, such termination must be for a period of at least 24 months. This does not apply to ineligible noncitizens already in the household where the family's assistance has been prorated. See Chapter 7 for a complete discussion of documentation requirements.

### Failure to Disclose and Document Social Security Numbers [24 CFR 5.218(c), Notice PIH 2018-24]

The PHA must terminate assistance if a participant family fails to disclose the complete and accurate social security numbers of each household member and the documentation necessary to verify each social security number. See Chapter 7 for a complete discussion of documentation and certification requirements.

However, if the family is otherwise eligible for continued program assistance, and the PHA determines that the family's failure to meet the SSN disclosure and documentation requirements was due to circumstances that could not have been foreseen and were outside of the family's control, the PHA may defer the family's termination and provide the opportunity to comply with the requirement within a period not to exceed 90 calendar days from the date the PHA determined the family to be noncompliant.

> HACA Policy
>
> HACA will defer the family's termination and provide the family with the opportunity to comply with the requirement for a period of 90 calendar days for circumstances beyond the participant's control such as delayed processing of the SSN application by the SSA, natural disaster, fire, death in the family, or other emergency, if there is a reasonable likelihood that the participant will be able to disclose an SSN by the deadline.

### Methamphetamine Manufacture or Production [24 CFR 982.553(b)(1)(ii)]

HACA must terminate assistance if any household member has ever been convicted of the manufacture or production of methamphetamine on the premises of federally-assisted housing.

### Lifetime Registered Sex Offenders [Notice PIH 2012-28]

Should a PHA discover that a member of an assisted household was subject to a lifetime registration requirement at admission and was erroneously admitted after June 25, 2001, the PHA must immediately terminate assistance for the household member.

In this situation, the PHA must offer the family the opportunity to remove the ineligible family member from the household. If the family is unwilling to remove that individual from the household, the PHA must terminate assistance for the household.

**Failure of Students to Meet Ongoing Eligibility Requirements [24 CFR 982.552(b)(5) and FR 4/10/06]**

If a student enrolled at an institution of higher education is under the age of 24, is not a veteran, is not married, does not have dependent children, is not residing with his/her parents in an HCV assisted household, and is not a person with disabilities receiving HCV assistance as of November 30, 2005, HACA must terminate the student's assistance if, at the time of reexamination, either the student's income or the income of the student's parents (if applicable) exceeds the applicable income limit.

If a participant household consists of both eligible and ineligible students, the eligible students shall not be terminated, but must be issued a voucher to move with continued assistance in accordance with program regulations and PHA policies, or must be given the opportunity to lease in place if the terminated ineligible student members elect to move out of the assisted unit.

**Death of the Sole Family Member [24 CFR 982.311(d) and Notice PIH 2012-10]**

HACA must immediately terminate program assistance for deceased single member households.

## 12-I.E. MANDATORY POLICIES AND OTHER AUTHORIZED TERMINATIONS

**Mandatory Policies [24 CFR 982.553(b) and 982.551(l)]**

HUD requires HACA to establish policies that permit HACA to terminate assistance if HACA determines that:

- Any household member is currently engaged in any illegal use of a drug, or has a pattern of illegal drug use that interferes with the health, safety, or right to peaceful enjoyment of the premises by other residents

- Any household member's abuse or pattern of abuse of alcohol may threaten the health, safety, or right to peaceful enjoyment of the premises by other residents

- Any household member has violated the family's obligation not to engage in any drug-related criminal activity

- Any household member has violated the family's obligation not to engage in violent criminal activity

**Use of Illegal Drugs and Alcohol Abuse**

> HACA Policy

> HACA will terminate a family's assistance if any household member is currently engaged in any illegal use of a drug, or has a pattern of illegal drug use that interferes with the health, safety, or right to peaceful enjoyment of the premises by other residents.

> HACA will terminate assistance if any household member's abuse or pattern of abuse of

alcohol threatens the health, safety, or right to peaceful enjoyment of the premises by other residents.

Currently engaged in is defined as any use of illegal drugs during the previous six months.

HACA will consider all credible evidence, including but not limited to, any record of arrests, convictions, or eviction of household members related to the use of illegal drug or abuse of alcohol.

A record of arrest(s) will not be used solely as the basis for the termination or proof that the participant engaged in disqualifying criminal activity. If HACA receives arrest information, for a disqualifying activity, HACA may request additional information as described in Section 12-II.D.

In making its decision to terminate assistance, HACA will consider alternatives as described in <u>Section 12-II.C</u> and other factors described in <u>Sections 12-II.D</u> and <u>12-II.E</u>. Upon consideration of such alternatives and factors, HACA may, on a case-by-case basis, choose not to terminate assistance.

**Drug-Related and Violent Criminal Activity [24 CFR 5.100]**

Drug means a controlled substance as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802).

**Drug-related criminal activity** is defined by HUD as the illegal manufacture, sale, distribution, or use of a drug, or the possession of a drug with intent to manufacture, sell, distribute or use the drug.

**Violent criminal activity** means any criminal activity that has as one of its elements the use, attempted use, or threatened use of physical force substantial enough to cause, or be reasonably likely to cause, serious bodily injury or property damage.

<u>HACA Policy</u>

HACA will terminate a family's assistance if any household member has violated the family's obligation not to engage in any drug-related or violent criminal activity during participation in the HCV program.

HACA will consider all credible evidence, including but not limited to, any record of arrests and/or convictions of household members related to drug-related or violent criminal activity, and any eviction or notice to evict based on drug-related or violent criminal activity.

A record of arrest(s) will not be used solely as the basis for the termination or proof that the participant engaged in disqualifying criminal activity. If HACA receives arrest information, for a disqualifying activity, HACA may request additional information as described in Section 12-II.D.

In making its decision to terminate assistance, HACA will consider alternatives as

described in Section 12-II.C and other factors described in Sections 12-II.D and 12-II.E. Upon consideration of such alternatives and factors, HACA may, on a case-by-case basis, choose not to terminate assistance.

### Other Authorized Reasons for Termination of Assistance [24 CFR 982.552(c), 24 CFR 5.2005(c), 24 CFR 984.101(d)]

HUD permits PHAs to terminate assistance under a number of other circumstances. It is left to the discretion of PHAS whether such circumstances in general warrant consideration for the termination of assistance. As discussed further in section 12-II.E, the Violence against Women Act of 2013 explicitly prohibits PHAs from considering incidents of, or criminal activity directly related to, domestic violence, dating violence, sexual assault or stalking as reasons for terminating the assistance of a victim of such abuse.

Additionally, per 24 CFR 984.101(d), PHAs are no longer permitted to terminate assistance to a family due to the family's failure to meet its obligations under the Family Self-Sufficiency (FSS) contract of participation.

### HACA Policy

HACA **will not** terminate a family's assistance because of the family's failure to meet its obligations under the Family Self-Sufficiency program.

HACA **will** terminate a family's assistance if:

> The family has failed to comply with any family obligations under the program. See Exhibit 12-1 for a listing of family obligations and related HACA policies.

> Any family member has been evicted from federally-assisted housing in the last five years.
> Persons subject to sex offender registration requirement - If any member of the household has, during the term of assisted housing, become subject to a registration requirement under a state sex offender registration program.

> HACA has never terminated assistance under the program for any member of the family.

> Any family member has committed fraud, bribery, or any other corrupt or criminal act in connection with any federal housing program.

> The family currently owes rent or other amounts to any PHA in connection with Section 8 or public housing assistance under the 1937 Act.

> The family has not reimbursed any PHA for amounts HACA paid to an owner under a HAP contract for rent, damages to the unit, or other amounts owed by the family under the lease.

> The family has breached the terms of a repayment agreement entered into with HACA.

A family member has engaged in or threatened violent or abusive behavior toward HACA personnel.

> Abusive or violent behavior towards HACA personnel includes verbal as well as physical abuse or violence. Use of racial epithets, or other language, written or oral, that is customarily used to intimidate may be considered abusive or violent behavior.

> Threatening refers to oral or written threats or physical gestures that communicate intent to abuse or commit violence.

In making its decision to terminate assistance, HACA will consider alternatives as described in Section 12-II.C and other factors described in Sections 12-II.D and 12-II.E. Upon consideration of such alternatives and factors, HACA may, on a case-by-case basis, choose not to terminate assistance.

## Family Absence from the Unit [24 CFR 982.312]

The family may be absent from the unit for brief periods. HACA must establish a policy on how long the family may be absent from the assisted unit. However, the family may not be absent from the unit for a period of more than 180 consecutive calendar days for any reason. Absence in this context means that no member of the family is residing in the unit.

> HACA Policy

> If the family is absent from the unit for more than 90 consecutive calendar days, the family's assistance will be terminated. Notice of termination will be sent in accordance with Section 12-II.F.

## Insufficient Funding [24 CFR 982.454]

HACA may terminate HAP contracts if HACA determines, in accordance with HUD requirements, that funding under the consolidated ACC is insufficient to support continued assistance for families in the program.

> HACA Policy

> HACA will determine whether there is sufficient funding to pay for currently assisted families according to the policies in Part VIII of Chapter 16. If HACA determines there is a shortage of funding, prior to terminating any HAP contracts, HACA will determine if any other actions can be taken to reduce program costs.

> In the event that the HACA decides to stop issuing vouchers as a result of a funding shortfall, and the HACA is not assisting the required number of special purpose vouchers (NED families, HUD-Veterans Affairs Supportive Housing (VASH) families, and family unification program (FUP) families), when HACA resumes issuing vouchers, HACA will issue vouchers first to the special purpose voucher families on its waiting list until it has reached the required number of special purpose vouchers, when applicable.

> If after implementing all reasonable cost cutting measures there is not enough funding

available to provide continued assistance for current participants, the PHA will terminate HAP contracts as a last resort.

Prior to terminating HAP Contracts, HACA will notify in writing all Voucher holders who were recently issued Vouchers and have not executed a HAP Contract that due to insufficient funding from HUD, HACA cannot execute a HAP Contract at this time.

These families' Voucher's will be suspended, until funds become available. After funds have become available, the families will be notified in writing that they may continue their search for housing. If a period of 60 days has elapsed, each family will need to be recertified to determine if they're still eligible for the program as described in Chapter 3 admissions screening criteria.

HACA will next notify all current non-elderly and non-disabled household participants that are attempting to move to a new location, with no current HAP Contract in effect. These families Voucher's will be suspended, until funds become available. After funds have become available, the families will be notified in writing that they may continue  their search for housing. If a period of 60 days has elapsed, each family will need to be  recertified.

If HACA must terminate HAP contracts due to insufficient funding, HACA will do so in accordance with the following criteria and instructions.

HACA will inform the local HUD field office. HACA will terminate the minimum number needed in order to reduce HAP costs to a level within HACA's annual budget authority.
- Single, non-elderly, non-disabled individuals will be terminated first.
- Non-elderly, non-disabled households who are able to pay 90 to 100% of their adjusted income towards rent would be terminated second.
- Non-elderly, non-disabled households who are able to pay 80 to 89% of their adjusted income towards rent would be terminated third.
- Non-elderly, non-disabled households who are able to pay 70 to 79% of their adjusted income towards rent would be terminated fourth.
- Non-elderly, non-disabled households who are able to pay 60 to 69% of their adjusted income towards rent would be terminated fifth.
-  Non-elderly, non-disabled households who are able to pay 50 to 59% of their adjusted income towards rent would be terminated sixth.

## PART II: APPROACH TO TERMINATION OF ASSISTANCE

## 12-II.A. OVERVIEW

HACA is required by regulation to terminate a family's assistance for certain actions or inactions of the family. For other types of actions or inactions of the family, the regulations give the PHA the authority to either terminate the family's assistance or to take another action. This part discusses the various actions the PHA may choose to take when it has discretion, and outlines the criteria the PHA will use to make its decision about whether or not to terminate assistance. It also

specifies the requirements for the notification to the family of the PHA's intent to terminate assistance.

## 12-II.B. METHOD OF TERMINATION [24 CFR 982.552(a)(3)]

Termination of assistance for a participant may include any or all of the following:

- Terminating housing assistance payments under a current HAP contract,

- Refusing to enter into a new HAP contract or approve a lease, or

- Refusing to process a request for or to provide assistance under portability procedures.

## 12-II.C. ALTERNATIVES TO TERMINATION OF ASSISTANCE

### Change in Household Composition

As a condition of continued assistance, HACA may require that any household member who participated in or was responsible for an offense no longer resides in the unit [24 CFR 982.552(c)(2)(ii)].

> HACA Policy
>
> HACA will consider requiring the tenant to exclude a household member in order to continue to reside in the assisted unit, where that household member has participated in or been culpable for action or failure to act that warrants termination.
>
> As a condition of continued assistance, the head of household must certify that the culpable family member has vacated the unit and will not be permitted to visit or to stay as a guest in the assisted unit. The family must present evidence of the former family member's current address upon HACA's request.

### Repayment of Family Debts

> HACA Policy
>
> If a family owes amounts to HACA, as a condition of continued occupancy, HACA will require the family to repay the full amount or to enter into a repayment agreement, within 30 days of receiving notice from HACA of the amount owed. See Chapter 16 for policies on repayment agreements.

## 12-II.D. CRITERIA FOR DECIDING TO TERMINATE ASSISTANCE

### Evidence

For criminal activity, HUD permits HACA to terminate assistance if a *preponderance of the evidence* indicates that a household member has engaged in the activity, regardless of whether the household member has been arrested or convicted [24 CFR 982.553(c)].

> HACA Policy
>
> HACA will use the concept of the preponderance of the evidence as the standard for

making all termination decisions.

*Preponderance of the evidence* is defined as evidence which is of greater weight or more convincing than the evidence which is offered in opposition to it; that is, evidence which as a whole shows that the fact sought to be proved is more probable than not. Preponderance of the evidence may not be determined by the number of witnesses, but by the greater weight of all evidence**.**

## Use of Criminal Conviction Records after Admission [24 CFR 5.903]

The regulation at 24 CFR 5.903 governs a PHA's access to and use of criminal conviction records obtained from a "law enforcement agency" such as the National Crime Information Center (NCIC), police departments, and other law enforcement agencies that hold criminal conviction records. While the regulatory listing of permitted uses for these records includes PHA screening of applicants for admission to the HCV program, it specifically excludes the use of records for lease enforcement and eviction of HCV participants and excludes by omission a PHA's use of records to terminate assistance for participants. While a PHA has regulatory authority to use criminal conviction records for the purpose of applicant screening for admission, there is no corresponding authority to use these records to check for criminal and illegal drug activity by participants, and therefore, PHAs may not use records for this purpose. The limitations, however, do not apply to criminal conviction information searches from non-federal sources (i.e., sources other than the "law enforcement agencies" defined in 24 CFR 5.902(b)). There is no prohibition that bars a PHA from using non-federal sources to conduct criminal background checks of program participants.  Non-federal agency conviction record may be used only after first giving the participant or other person who is the subject of the record a copy of the records and an opportunity to dispute it.

## Consideration of Circumstances [24 CFR 982.552(c)(2)(i)]

HACA is permitted, but not required, to consider all relevant circumstances when determining whether a family's assistance should be terminated.

> HACA Policy

> HACA will consider the following factors when making its decision to terminate assistance:

>> The seriousness of the case, especially with respect to how it would affect other residents' safety or property

>> The effects that termination of assistance may have on other members of the family who were not involved in the action or failure to act

>> The extent of participation or culpability of individual family members, including whether the culpable family member is a minor or a person with disabilities or (as discussed further in section 12-II.E) a victim of domestic violence, dating violence, sexual assault or stalking

The length of time since the violation occurred, including the age of the individual at the time of the conduct, as well as the family's recent history and the likelihood of favorable conduct in the future

In the case of program abuse, the dollar amount of the overpaid assistance and whether or not a false certification was signed by the family

HACA will not terminate assistance solely on the basis of an arrest. If HACA receives arrest Information for a disqualifying activity, HACA may request additional information. Additional information that may be considered, if available, includes the following:

- The police report associated with the arrest which provides the reported circumstances of
- the arrest.
- Any statements made by witnesses or the applicant not included in the police report
- Whether criminal charges were filed
- Whether, if filed, criminal charges were abandoned, dismissed, not prosecuted, or
- ultimately resulted in an acquittal
- Any other evidence relevant to determining whether or not the applicant engaged in the
- disqualifying activity
- Evidence of criminal conduct will be considered if it indicates a demonstrable risk to safety
- and/or property.

**Consideration of Rehabilitation**

HUD authorizes PHAs to take into consideration whether a household member who had used illegal drugs or abused alcohol and is no longer engaging in such use or abuse is participating in or has successfully completed a supervised drug or alcohol rehabilitation program.

<u>HACA Policy</u>

In determining whether to terminate assistance for illegal drug use or a pattern of illegal drug use or for abuse or a pattern of abuse of alcohol, by a household member who is no longer engaging in such use or abuse, HACA will consider whether such household member is participating in or has successfully completed a supervised drug or alcohol rehabilitation program, or has otherwise been rehabilitated successfully.

For this purpose, HACA will require the tenant to submit evidence of the household member's current participation in, or successful completion of, a supervised drug or alcohol rehabilitation program or evidence of otherwise having been rehabilitated successfully.

**Reasonable Accommodation [24 CFR 982.552(c)(2)(iv)]**

If the family includes a person with disabilities, HACA's decision to terminate the family's assistance is subject to consideration of reasonable accommodation in accordance with 24 CFR Part 8.

HACA Policy

If a family indicates that the behavior of a family member with a disability is the reason for a proposed termination of assistance, HACA will determine whether the behavior is related to the disability.

If so, upon the family's request, HACA will determine whether alternative measures are appropriate as a reasonable accommodation.

HACA will only consider accommodations that can reasonably be expected to address the behavior that is the basis of the proposed termination of assistance. See Chapter 2 for a discussion of reasonable accommodation.


## 12-II.E. TERMINATIONS RELATED TO DOMESTIC VIOLENCE, DATING VIOLENCE, SEXUAL ASSAULT OR STALKING

This section describes the protections against termination of assistance that the Violence Against Women Act of 2013 (VAWA) provides for victims of domestic violence, dating violence, sexual assault and stalking. For general VAWA requirements, key VAWA definitions and PHA policies pertaining to notification, documentation, and confidentiality, see section 16-IX of this plan.

### VAWA Protections against Termination

VAWA provides four specific protections against termination of HCV assistance for victims of domestic violence, dating violence, sexual assault or stalking. (*Note:* The second, third, and fourth protections also apply to terminations of tenancy or occupancy by owners participating in the HCV programs do to the limitations discussed under the next heading.)

First, VAWA provides that a PHA may not terminate assistance to a family that moves out of an assisted unit in violation of the lease, with or without prior notification to HACA, if the move occurred to protect the health or safety of a family member who is or has been the victim of domestic violence, dating violence, sexual assault or stalking and who reasonably believed he or she was imminently threatened by harm from further violence if he or she remained in the unit [24 CFR 982.314(b)(4)].

Second, it provides that an incident or incidents of actual or threatened domestic violence, dating violence, sexual assault or stalking may not be construed either as a serious or repeated lease violation by the victim or as good cause to terminate the assistance of the victim [24 CFR 5.2005(c)(1)].

Third, it provides that criminal activity directly related to domestic violence, dating violence, sexual assault or stalking may not be construed as cause for terminating the assistance of a tenant if a member of the tenant's household, a guest, or another person under the tenant's control is the one engaging in the criminal activity and the tenant or  affiliated individual or other individual is the actual or threatened victim of the domestic violence, dating violence, sexual assault or stalking [24 CFR 5.2005(c)(2)].

Fourth, it gives PHAs the authority to terminate assistance to any tenant or lawful occupant who

engages in criminal acts of physical violence against family members or others without terminating assistance to, or otherwise penalizing, the victim of the violence [24 CFR 5.2009(a)].

### Limitations on VAWA Protections [24 CFR 5.2005(d) and (e)]

VAWA does not limit the authority of a PHA to terminate the assistance of a victim of abuse for reasons unrelated to domestic violence, dating violence, sexual assault or stalking so long as HACA does not subject the victim to a more demanding standard than it applies to other program participants [24 CFR 5.2005(d)(1)].

Likewise, VAWA does not limit the authority of a PHA to terminate the assistance of a victim of domestic violence, dating violence, sexual assault or stalking if HACA can demonstrate an actual and imminent threat to other tenants or those employed at or providing service to the assisted property if the victim is not terminated from assistance [24 CFR 5.2005(d)(2)].

HUD regulations define *actual and imminent threat* to mean words, gestures, actions, or other indicators of a physical threat that (a) is real, (b) would occur within an immediate time frame, and (c) could result in death or serious bodily harm [24 CFR 5.2005(d)(2) and (e)]. In determining whether an individual would pose an actual and imminent threat, the factors to be considered include:

The duration of the risk

The nature and severity of the potential harm

The likelihood that the potential harm will occur

The length of time before the potential harm would occur [24 CFR 5.2005(e)]

Even when a victim poses an actual and imminent threat, however, HUD regulations authorize a PHA to terminate the victim's assistance "only when there are no other actions that could be taken to reduce or eliminate the threat" [24 CFR 5.2005(d)(3)].

<u>HACA Policy</u>

In determining whether a program who is a victim of domestic violence, dating violence, sexual assault or stalking is an actual and imminent threat to other tenants or those employed at or providing service to a property, HACA will consider the following, and any other relevant, factors:

Whether the threat is toward an employee or tenant other than the victim of domestic violence, dating violence, sexual assault or stalking;

Whether the threat is a physical danger beyond a speculative threat;

Whether the threat is likely to happen within a short period of time;

Whether the threat to other tenants or employees can be eliminated in some other way, such as by helping the victim relocate to a confidential location or seeking a legal remedy to prevent the perpetrator from acting on the threat.

If the participant wishes to contest HACA's determination that he or she is an actual and imminent threat to other tenants or employees, the participant may do so as part

of the informal hearing.

**Documentation of Abuse [24 CFR 5.2007]**

HACA Policy

When an individual facing termination of assistance for reasons related to domestic violence, dating violence, sexual assault or stalking claims protection under VAWA, HACA will request that the individual provide documentation supporting the claim in accordance with the policies in section 16-IX.D of this plan.

HACA reserves the right to waive the documentation requirement if it determines that a statement or other corroborating evidence from the individual will suffice. In such cases HACA will document the waiver in the individual's file.

**Terminating the Assistance of a Domestic Violence Perpetrator [24 CFR 5.2005(c)]**

Although VAWA provides protection against termination of assistance for victims of domestic violence, it does not provide such protection for perpetrators. VAWA gives HACA the explicit authority to "terminate assistance to any individual who is a tenant or lawful occupant and who engages in criminal acts of physical violence against family members or others" without terminating assistance to "or otherwise penalizing the victim of such violence who is also a tenant or lawful occupant" [24 CFR 5.2009(a)]. This authority is not dependent on a bifurcated lease or other eviction action by an owner against an individual family member. Further, this authority supersedes any local, state, or other federal law to the contrary. However, if HACA chooses to exercise this authority, it must follow any procedures prescribed by HUD or by applicable local, state, or federal law regarding termination of assistance. This means that HACA must follow the same rules when terminating assistance to an individual as it would when terminating the assistance of an entire family [3/16/07 *Federal Register* notice on the applicability of VAWA to HUD programs].

HACA Policy

HACA will terminate assistance to a family member if HACA determines that the family member has committed criminal acts of physical violence against other family members or others. This action will not affect the assistance of the remaining, no culpable family members.

In making its decision, HACA will consider all credible evidence, including, but not limited to, a signed certification or other documentation of abuse submitted to HACA by the victim in accordance with this section and section 16-IX.D. HACA will also consider the factors in section 12-II.D. Upon such consideration, HACA may, on a case-by-case basis, choose not to terminate the assistance of the culpable family member.

If HACA does terminate the assistance of the culpable family member, it will do so in accordance with applicable law, HUD regulations, and the policies in this plan.

**12-II.F. TERMINATION NOTICE [HCV GB, p. 15-7]**

HUD regulations require HACA to provide written notice of termination of assistance to a family

only when the family is entitled to an informal hearing. However, since the family's HAP contract and lease will also terminate when the family's assistance terminates [form HUD-52641], it is a good business practice to provide written notification to both owner and family anytime assistance will be terminated, whether voluntarily or involuntarily.

> HACA Policy
>
> Whenever a family's assistance will be terminated, HACA will send a written notice of termination to the family and to the owner. The PHA will also send the Certification as a Victim of Domestic Violence, Dating Violence, Stalking or Sexual Assault form to the family with the termination notice. The notice will state the date on which the termination will become effective. This date generally will be at least 30 calendar days following the date of the termination notice, but exceptions will be made whenever HUD rules, other HACA policies, or the circumstances surrounding the termination require. When HACA notifies an owner that a family's assistance will be terminated, HACA will, if appropriate, advise the owner of his/her right to offer the family a separate, unassisted lease.

If a family whose assistance is being terminated is entitled to an informal hearing, the notice of termination that HACA sends to the family must meet the additional HUD and PHA notice requirements discussed in section 16-III.C of this plan. VAWA 2013 expands notification requirements to require PHAs to provide notice of VAWA rights and the Certification as a Victim of Domestic Violence, Dating Violence, Stalking or Sexual Assault form (HUD-5382) when a PHA terminates a household's housing benefits.

> HACA Policy
>
> Whenever HACA decides to terminate a family's assistance because of the family's action or failure to act, HACA will include in its termination notice the VAWA information described in section 16-IX.C of this plan. HACA will request in writing that a family member wishing to claim protection under VAWA notify HACA within 14 business days.
>
> Still other notice requirements apply in two situations:
>
> If a criminal record is the basis of a family's termination, the PHA must provide a copy of the record to the subject of the record and the tenant so that they have an opportunity to dispute the accuracy and relevance of the record [24 CFR 982.553(d)(2)].
>
> If immigration status is the basis of a family's termination, as discussed in section 12-I.D, the special notice requirements in section 16-III.D must be followed.

## PART III: TERMINATION OF TENANCY BY THE OWNER

### 12-III.A. OVERVIEW

Termination of an assisted tenancy is a matter between the owner and the family; the PHA is not

directly involved. However, the owner is under some constraints when terminating an assisted tenancy. Termination of tenancy for certain reasons will also result in termination of assistance as discussed in this section.

## 12-III.B. GROUNDS FOR OWNER TERMINATION OF TENANCY [24 CFR 982.310, 24 CFR 5.2005(c), and Form HUD-52641-A, Tenancy Addendum]

During the term of the lease, the owner is not permitted to terminate the tenancy except for serious or repeated violations of the lease, certain violations of state or local law, or other good cause.

### Serious or Repeated Lease Violations
The owner is permitted to terminate the family's tenancy for serious or repeated violations of the terms and conditions of the lease, except when the violations are related to incidents of actual or threatened domestic violence, dating violence, sexual assault or stalking and the victim is protected from eviction by the Violence against Women Act of 2013 (see section 12-II.E). A serious lease violation includes failure to pay rent or other amounts due under the lease. However, HACA's failure to make a HAP payment to the owner is not a violation of the lease between the family and the owner.

### Violation of Federal, State, or Local Law

The owner is permitted to terminate the tenancy if a family member violates federal, state, or local law that imposes obligations in connection with the occupancy or use of the premises.

### Criminal Activity or Alcohol Abuse
The owner may terminate tenancy during the term of the lease if any *covered person* meaning any member of the household, a guest, or another person under the tenant's control commits any of the following types of criminal activity (for applicable definitions see [24 CFR 5.100]):

> Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of the premises by, other residents (including property management staff residing on the premises)

> Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of their residences by, persons residing in the immediate vicinity of the premises

> Any violent criminal activity on or near the premises

> Any drug-related criminal activity on or near the premises.

However, in the case of criminal activity directly related to domestic violence, dating violence, sexual assault or stalking, if the tenant or affiliated individual is the victim, the criminal activity may not be construed as cause for terminating the victim's tenancy (see section 12-II.E).

The owner may terminate tenancy during the term of the lease if any member of the

household is:

> Fleeing to avoid prosecution, custody, or confinement after conviction for a crime or an attempt to commit a crime that is a felony under the laws of the place from which the individual flees, or that, in the case of the State of New Jersey, is a high misdemeanor; or

> Violating a condition of probation or parole imposed under federal or state law.

The owner may terminate tenancy during the term of the lease if any member of the household has engaged in abuse of alcohol that threatens the health, safety, or right to peaceful enjoyment of the premises by other residents.

### *Evidence of Criminal Activity*

The owner may terminate tenancy and evict by judicial action a family for criminal activity by a covered person if the owner determines the covered person has engaged in the criminal activity, regardless of whether the covered person has been arrested or convicted for such activity and without satisfying the standard of proof used for a criminal conviction. This is the case except in certain incidents where the criminal activity directly relates to domestic violence, dating violence, sexual assault, or stalking, and the tenant or an affiliated individual is the victim or threatened victim of the domestic violence, dating violence, sexual assault, or stalking.

### **Other Good Cause**

During the initial lease term, the owner may not terminate the tenancy for "other good cause" unless the owner is terminating the tenancy because of something the family did or failed to do. During the initial lease term or during any extension term, other good cause includes the disturbance of neighbors, destruction of property, or living or housekeeping habits that cause damage to the unit or premises. After the initial lease term, "other good cause" for termination of tenancy by the owner includes:

> Failure by the family to accept the offer of a new lease or revision;

> The owner's desire to use the unit for personal or family use, or for a purpose other than as a residential rental unit;

> A business or economic reason for termination of the tenancy (such as sale of the property, renovation of the unit, or desire to lease the unit at a higher rent).

After the initial lease term, the owner may give the family notice at any time, in accordance with the terms of the lease.

If a property is subject to foreclosure, during the term of the lease, the new owner of the property does not have good cause to terminate the tenant's lease, unless the new owner will occupy the unit as their primary residence and has provided the tenant with at least a 90-day notice. In that case, the lease may be terminated effective on the date of sale, although the tenant is still entitled to a 90-day notice to vacate. See Section 13-II.G for a discussion of PHA policies relating to units in foreclosure.

## 12-III.C. EVICTION [24 CFR 982.310(e) and (f) and Form HUD-52641-A, Tenancy Addendum]

The owner must give the tenant a written notice that specifies the grounds for termination of tenancy during the term of the lease. The tenancy does not terminate before the owner has given this notice, and the notice must be given at or before commencement of the eviction action.

The notice of grounds may be included in, or may be combined with, any owner eviction notice to the tenant.

Owner eviction notice means a notice to vacate, or a complaint or other initial pleading used under state or local law to commence an eviction action. The owner may only evict the tenant from the unit by instituting a court action. The owner must give HACA a copy of any eviction notice at the same time the owner notifies the family. The family is also required to give HACA a copy of any eviction notice (see Chapter 5).

> HACA Policy
>
> If the eviction action is finalized in court, the owner must provide HACA with documentation related to the eviction, including notice of the eviction date, as soon as possible, but no later than 5 business days following the court-ordered eviction.

## 12-III.D. DECIDING WHETHER TO TERMINATE TENANCY [24 CFR 982.310(h), 24 CFR 982.310(h)(4)]

An owner who has grounds to terminate a tenancy is not required to do so, and may consider all of the circumstances relevant to a particular case before making a decision. These might include:

- The nature of the offending action
- The seriousness of the offending action;
- The effect on the community of the termination, or of the owner's failure to terminate the tenancy;
- The extent of participation by the leaseholder in the offending action;
- The effect of termination of tenancy on household members not involved in the offending activity;
- The demand for assisted housing by families who will adhere to lease responsibilities;
- The extent to which the leaseholder has shown personal responsibility and taken all reasonable steps to prevent or mitigate the offending action;
- The effect of the owner's action on the integrity of the program.

The owner may require a family to exclude a household member in order to continue to reside in the assisted unit, where that household member has participated in or been culpable for action or failure to act that warrants termination.

In determining whether to terminate tenancy for illegal use of drugs or alcohol abuse by a household member who is no longer engaged in such behavior, the owner may consider whether such household member is participating in or has successfully completed a supervised drug or alcohol rehabilitation program, or has otherwise been rehabilitated successfully (42 U.S.C. 13661). For this purpose, the owner may require the tenant to submit evidence of the household member's current participation in, or successful completion of, a supervised drug or alcohol rehabilitation program or evidence of otherwise having been rehabilitated successfully.

The owner's termination of tenancy actions must be consistent with the fair housing and equal opportunity provisions in 24 CFR 5.105.

An owner's decision to terminate tenancy for incidents related to domestic violence, dating violence, sexual assault or stalking is limited by the Violence against Women Act of 2013 (VAWA) and the conforming regulations in 24 CFR Part 5, Subpart L. (See section 12-II.E.)

## 12-III.E. EFFECT OF TENANCY TERMINATION ON THE FAMILY'S ASSISTANCE

If a termination is not due to a serious or repeated violation of the lease, and if HACA has no other grounds for termination of assistance, HACA may issue a new voucher so that the family can move with continued assistance (see Chapter 10).

| EXHIBIT 12-1: STATEMENT OF FAMILY OBLIGATIONS |
|---|

Following is a listing of a participant family's obligations under the HCV program:

The family must supply any information that HACA or HUD determines to be necessary, including submission of required evidence of citizenship or eligible immigration status.

The family must supply any information requested by HACA or HUD for use in a regularly scheduled reexamination or interim reexamination of family income and composition.

The family must disclose and verify social security numbers and sign and submit consent forms for obtaining information.

Any information supplied by the family must be true and complete.

The family is responsible for any Housing Quality Standards (HQS) breach by the family caused by failure to pay tenant-provided utilities or appliances, or damages to the dwelling unit or premises beyond normal wear and tear caused by any member of the household or guest.

The family must allow HACA to inspect the unit at reasonable times and after reasonable notice, as described in Chapter 8 of this plan.

The family must not commit any serious or repeated violation of the lease.

HACA Policy

HACA will determine if a family has committed serious or repeated violations of the lease based on available evidence, including but not limited to, a court-ordered eviction, or an owner's notice to evict, police reports, and affidavits from the owner, neighbors, or other credible parties with direct knowledge.

*Serious and repeated lease violations* will include, but not be limited to, nonpayment of rent, disturbance of neighbors, and destruction of property, living or housekeeping habits that cause damage to the unit or premises, and criminal activity. Generally, the criterion to be used will be whether or not the reason for the eviction was the fault of the tenant or guests. Any incidents of, or criminal activity related to, domestic violence, dating violence, sexual assault or stalking will not be construed as serious or repeated lease violations by the victim [24 CFR 5.2005(c)(1)].

The family must notify HACA and the owner before moving out of the unit or terminating the lease.

HACA Policy

The family must get HACA approval to move to a new unit with continued assistance prior to moving out of any assisted unit.

The family must promptly give HACA a copy of any owner eviction notice.

The family must use the assisted unit for residence by the family. The unit must be the family's only residence.

The composition of the assisted family residing in the unit must be approved by HACA. The family must promptly notify HACA in writing of the birth, adoption, or court-awarded custody of a child. The family must request PHA approval to add any other family member as an occupant of the unit.

<u>HACA Policy</u>

The request to add a family member must be submitted in writing and approved prior to the person moving into the unit. HACA will determine eligibility of the new member in accordance with the policies in <u>Chapter 3</u>.

The family must promptly notify HACA in writing if any family member no longer lives in the unit.

If HACA has given approval, a foster child or a live-in aide may reside in the unit. HACA has the discretion to adopt reasonable policies concerning residency by a foster child or a live-in aide, and to define when PHA consent may be given or denied. For policies related to the request and approval/disapproval of foster children, foster adults, and live-in aides, see <u>Chapter 3</u> (Sections I.K and I.M), and <u>Chapter 11</u> (Section II.B).

The family must not sublease the unit, assign the lease, or transfer the unit.

<u>HACA Policy</u>

Subleasing includes receiving payment to cover rent and utility costs by a person living in the unit who is not listed as a family member.

The family must supply any information requested by HACA to verify that the family is living in the unit or information related to family absence from the unit.

The family must promptly notify HACA when the family is absent from the unit.

<u>HACA Policy</u>

Notice is required under this provision only when all family members will be absent from the unit for more than 30 calendar days. Written notice must be provided to HACA at the start of the extended absence.

The family must pay utility bills and provide and maintain any appliances that the owner is not required to provide under the lease [Form HUD-52646, Voucher].

The family must not own or have any interest in the unit, (other than in a cooperative and owners of a manufactured home leasing a manufactured home space).

Family members must not commit fraud, bribery, or any other corrupt or criminal act in connection with the program. (<u>See Chapter 14</u>, Program Integrity for additional information).

Family members must not engage in drug-related criminal activity or violent criminal activity or other criminal activity that threatens the health, safety or right to peaceful enjoyment of other residents and persons residing in the immediate vicinity of the premises.

See Chapter 12 for HUD and PHA policies related to drug-related and violent criminal activity.

Members of the household must not engage in abuse of alcohol in a way that threatens the health, safety or right to peaceful enjoyment of the other residents and persons residing in the immediate vicinity of the premises. <u>See Chapter 12</u> for a discussion of HUD and PHA policies related to alcohol abuse.

An assisted family or member of the family must not receive HCV program assistance while receiving another housing subsidy, for the same unit or a different unit under any other federal, state or local housing assistance program.

A family must not receive HCV program assistance while residing in a unit owned by a parent, child, grandparent, grandchild, sister or brother of any member of the family, unless HACA has determined (and has notified the owner and the family of such determination) that approving rental of the unit, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities. [Form HUD-52646, Voucher]

<div align="center">

## CHAPTER 13
## OWNERS INTRODUCTION

</div>

Owners play a major role in the HCV program by supplying decent, safe, and sanitary housing for participating families

The term "owner" refers to any person or entity with the legal right to lease or sublease a unit to a participant in the HCV program [24 CFR 982.4(b)]. The term "owner" includes a principal or other interested party [24 CFR 982.453; 24 CFR 982.306(f)], such as a designated agent of the owner.

Owners have numerous responsibilities under the program, including screening and leasing to families, maintaining the dwelling unit, enforcing the lease, and complying with various contractual obligations.

The chapter is organized in two parts:

> <u>Part I: Owners in the HCV Program</u> This part discusses the role of an owner in HACA's HCV program and highlights key owner rights and responsibilities.

> <u>Part II: HAP Contracts</u> This part explains provisions of the HAP contract and the relationship between HACA and the owner as expressed in the HAP contract.

For detailed information about HCV program responsibilities and processes, including PHA policies in key areas, owners will need to refer to several other chapters in this plan. Where appropriate, Chapter 13 will reference the other chapters.

# PART I. OWNERS IN THE HCV PROGRAM

## 13-I.A. OWNER RECRUITMENT AND RETENTION [HCV GB, pp. 2-4 to 2-6; HCV Landlord Strategy Guidebook for PHAs]

### [HCV GB, pp. 2-4 to 2-6]

### Recruitment

PHAs are responsible for ensuring that very low income families have access to all types and ranges of affordable housing in HACA's jurisdiction, particularly housing outside areas of poverty or minority concentration. A critical element in fulfilling this responsibility is for HACA to ensure that a sufficient number of owners, representing all types and ranges of affordable housing in HACA's jurisdiction, are willing to participate in the HCV program.

To accomplish this objective, PHAs must identify and recruit new owners to participate in the program.

HACA Policy

Daily phone and electronic mail marketing to private owners and apartment complex to add new units.  Individually meeting with property owners with inventories of units in areas with low concentrations of poverty or minority populations.

### Retention

Pursue advertisements to promote the program to new property owners in various community publications.

Communicate with current and prospective property owners via electronic mail and web site updates to increase awareness and attendance at tenant orientations, owner orientations, and seminars.

Distributing printed material about the program to property owners and managers

Promote the HCV Program by obtaining booth space at Austin Apartment Association and Austin Board of Realtor Trade Shows.

Contacting property owners and managers by phone or in-person

Holding owner recruitment/information meetings

Conducting HCV information seminars

Meeting with owners and real estate agents to highlight the benefits of participating in the program and answering any questions.

Outreach strategies will be monitored for effectiveness, and adapted accordingly.

In addition to recruiting owners to participate in the HCV program, HACA must also provide the kind of customer service that will encourage participating owners to remain active in the program.

> HACA Policy
>
> All HACA activities that may affect an owner's ability to lease a unit will be processed as rapidly as possible, in order to minimize vacancy losses for owners.
>
> HACA will provide owners with an information packet that explains the program, including HUD and PHA policies and procedures.
>
> Provide owners with an updated staff phone list and an owner information packet.
>
> Coordinating inspection and leasing activities between HACA, the owner, and the family.
>
> Conduct Landlord Informational Seminars.

## 13-I.B. BASIC HCV PROGRAM REQUIREMENTS

HUD requires HACA to assist families in their housing search by providing the family with a list of landlords or other parties known to HACA who may be willing to lease a unit to the family, or to help the family find a unit. Although HACA cannot maintain a list of owners that are prequalified to participate in the program, owners may indicate to HACA their willingness to lease a unit to an eligible HCV family, or to help the HCV family find a unit [24 CFR 982.301(b)(11)].

> HACA Policy
>
> HACA will maintain a listing of owners willing to lease units to HCV participants and will provide this listing to the HCV family as part of the informational briefing packet.
>
> When a family approaches an owner to apply for tenancy, the owner is responsible for screening the family and deciding whether to lease to the family, just as the owner would with any potential unassisted tenant. The PHA has no liability or responsibility to the owner or other persons for the family's behavior or suitability for tenancy. See chapters 3 and 9 for more detail on tenant family screening policies and process.
>
> If the owner is willing, the family and the owner must jointly complete a Request for Tenancy Approval (RTA, Form HUD 52517), which constitutes the family's request for assistance in the specified unit, and which documents the owner's willingness to lease to the family and to follow the program's requirements. When submitted to the PHA, this document is the first step in the process of obtaining approval for the family to receive the financial assistance it will need in order to occupy the unit. Also submitted with the RTA is a copy of the owner's proposed dwelling lease, including the HUD-required Tenancy Addendum (Form HUD-52641-A). See Chapter 9 for more detail on request for tenancy approval policies and process.

HUD regulations stipulate requirements for the approval of an assisted tenancy. The owner must be qualified to participate in the program [24 CFR 982.306]. Some owners are precluded from participating in the program, or from renting to a particular family, either because of their past history with this or another federal housing program, or because of certain conflicts of interest. Owner qualifications are discussed later in this chapter.

The selected unit must be of a type that is eligible for the program [24 CFR 982.305(a)]. Certain types of dwelling units cannot be assisted under the HCV program. Other types may be assisted under certain conditions. See chapter 9 for more detail on unit eligibility policies and process.

The selected unit must meet HUD's Housing Quality Standards (HQS) and/or equivalent state or local standards approved by HUD [24 CFR 982.305(a)]. The PHA will inspect the owner's dwelling unit at least annually to ensure that the unit continues to meet HQS requirements. See chapter 8 for a discussion of the HQS standards and policies for HQS inspections at initial lease- up and throughout the family's tenancy.

HACA must determine that the proposed rent for the unit is reasonable [24 CFR 982.305(a)]. The rent must be reasonable in relation to comparable unassisted units in the area and must not be in excess of rents charged by the owner for comparable, unassisted units on the premises. See chapter 8 for a discussion of requirements and policies on rent reasonableness, rent comparability and the rent reasonableness determination process.

At initial lease-up of a unit, if the gross rent exceeds the applicable payment standard, the PHA must ensure that the family share does not exceed 40 percent of the family's monthly adjusted income [24 CFR 982.305(a)]. See chapter 6 for a discussion of the calculation of family income, family share of rent and HAP.

The dwelling lease must comply with all program requirements [24 CFR 982.308]. Owners are encouraged to use their standard leases when renting to an assisted family. The HUD Tenancy Addendum includes the HUD requirements governing the tenancy and must be added word-for- word to the owner's lease. See chapter 9 for a discussion of the dwelling lease and tenancy addendum, including lease terms and provisions.

The PHA and the owner must execute a Housing Assistance Payment (HAP) Contract (Form HUD-52641). The HAP contract format is prescribed by HUD. See chapter 9 for a discussion of the HUD requirements for execution of the HAP contract.

## 13-I.C. OWNER RESPONSIBILITIES [24 CFR 982.452]

The basic owner responsibilities in the HCV program are outlined in the regulations as follows:

Complying with all of the owner's obligations under the housing assistance payments (HAP) contract and the lease

Performing all management and rental functions for the assisted unit, including

selecting a voucher-holder to lease the unit, and deciding if the family is suitable for tenancy of the unit

Maintaining the unit in accordance with the Housing Quality Standards (HQS), including performance of ordinary and extraordinary maintenance

Complying with equal opportunity requirements

Preparing and furnishing to the PHA information required under the HAP contract

Collecting the security deposit, the tenant rent, and any charges for unit damage by the family.

Enforcing tenant obligations under the dwelling lease

Paying for utilities and services that are not the responsibility of the family's as specified in the lease

Allowing reasonable modifications to a dwelling unit occupied or to be occupied by a disabled person [24 CFR 100.203]

Complying with the Violence against Women Reauthorization Act of 2013 (VAWA) when screening prospective HCV tenants or terminating the tenancy of an HCV family (see 24 CFR Part 5, Subpart L; 24 CFR 982.310(h)(4); and 24 CFR 982.452(b)(1))

## 13-I.D. OWNER QUALIFICATIONS

HACA does not formally approve an owner to participate in the HCV program. However, there are a number of criteria where HACA may deny approval of an assisted tenancy based on past owner behavior, conflict of interest, or other owner-related issues. No owner has a right to participate in the HCV program [24 CFR 982.306(e)].

### Owners Barred from Participation [24 CFR 982.306(a) and (b)]

HACA must not approve the assisted tenancy if HACA has been informed that the owner has been debarred, suspended, or subject to a limited denial of participation under 24 CFR part 24.

HUD may direct HACA not to approve a tenancy request if a court or administrative agency has determined that the owner violated the Fair Housing Act or other federal equal opportunity requirements, or if such an action is pending.

### Leasing to Relatives [24 CFR 982.306(d), HCV GB p. 11-2]

HACA must not approve a tenancy if the owner is the parent, child, grandparent, grandchild, sister, or brother of any member of the family. HACA may make an exception as a reasonable accommodation for a family member with a disability. The owner is required to certify that no such relationship exists. This restriction applies at the time that the family receives assistance under the HCV program for occupancy of a particular unit. Current contracts on behalf of owners and families that are related may continue, but any new leases or contracts for these families may not be approved.

### Conflict of Interest [24 CFR 982.161; HCV GB p. 8-19; Form HUD-52641, Section 13]

HACA must not approve a tenancy in which any of the following classes of persons has any interest, direct or indirect, during tenure or for one year thereafter:

Any present or former member or officer of HACA (except a participant commissioner)

Any employee of HACA, or any contractor, subcontractor or agent of HACA, who formulates policy or who influences decisions with respect to the programs

Any public official, member of a governing body, or State or local legislator, who exercises functions or responsibilities with respect to the programs

Any member of the Congress of the United States

Such "covered individual" may not have any direct or indirect interest in the HAP contract or in any benefits or payments under the contract (including the interest of an immediate family member of such covered individual) while such person is a covered individual or for one year thereafter.

> *Immediate family member* means the spouse, parent (including a stepparent), child (including a stepchild), grandparent, grandchild, sister, or brother (including a stepsister or stepbrother) of any covered individual.

HUD may waive the conflict of interest requirements, except for members of Congress, for good cause. HACA must submit a waiver request to the appropriate HUD Field Office for determination.

Any waiver request submitted by HACA must include the following [HCV Guidebook pp.11-2 and 11-3]:

Complete statement of the facts of the case;

Analysis of the specific conflict of interest provision of the HAP contract and justification as to why the provision should be waived;

Analysis of and statement of consistency with state and local laws. The local HUD office, HACA, or both parties may conduct this analysis. Where appropriate, an opinion by the state's attorney general should be obtained;

Opinion by the local HUD office as to whether there would be an appearance of impropriety if the waiver were granted;

Statement regarding alternative existing housing available for lease under the HCV program or other assisted housing if the waiver is denied;

If the case involves a hardship for a particular family, statement of the circumstances and discussion of possible alternatives;

If the case involves a public official or member of the governing body, explanation of his/her duties under state or local law, including reference to any responsibilities involving the HCV program;

If the case involves employment of a family member by HACA or assistance under the HCV program for an eligible PHA employee, explanation of the responsibilities and duties of the position, including any related to the HCV program;

If the case involves an investment on the part of a member, officer, or employee of HACA, description of the nature of the investment, including disclosure/divestiture plans.

Where HACA has requested a conflict of interest waiver, HACA may not execute the HAP contract until HUD has made a decision on the waiver request.

HACA Policy

In considering whether to request a conflict of interest waiver from HUD, HACA will consider certain factors such as consistency with state and local laws; the existence of alternative housing available to families; the individual circumstances of a particular family; the specific duties of individuals whose positions present a possible conflict of interest; the nature of any financial investment in the property and plans for disclosure/divestiture; and the possible appearance of impropriety.

**Owner Actions That May Result in Disapproval of a Tenancy Request [24 CFR 982.306(c)]**

HUD regulations permit HACA, to disapprove a request for tenancy for various actions or inactions of the owner.

If HACA disapproves a request for tenancy because an owner is not qualified, it may not terminate the HAP contract for any assisted families that are already living in the owner's properties unless the owner has violated the HAP contract for those units [HCV GB p. 11-4].

HACA Policy

HACA will refuse to approve a request for tenancy if HACA becomes aware that any of the following are true:

Owner refusal to sign the Housing Assistance Payments Contract.

The owner has violated obligations under a HAP contract under Section 8 of the 1937 Act (42 U.S.C. 1437f);

Owner's failure to execute their responsibilities as outlined in the Lease, such as, paying utilities that are specified as the owner's responsibility.

The owner has committed fraud, bribery or any other corrupt or criminal act in connection with any federal housing program;

The owner has engaged in any drug-related criminal activity or any violent criminal activity;

The owner has a history or practice of non-compliance with the HQS for units leased under the tenant-based programs, or with applicable housing standards for units leased with project-based Section 8 assistance or leased under any other federal housing program;

The owner has a history or practice of failing to terminate tenancy of tenants of units assisted under Section 8 or any other federally assisted housing program for activity engaged in by the tenant, any member of the household, a guest or another person under the control of any member of the household
that: (i) Threatens the right to peaceful enjoyment of the premises by other residents; (ii) Threatens the health or safety of other residents, of employees of HACA, or of owner employees or other persons engaged in management of the housing; (iii) Threatens the health or safety of, or the right to peaceful enjoyment of their residences, by persons residing in the immediate vicinity of the premises; or (iv) Is drug-related criminal activity or violent criminal activity;

The owner has a history or practice of renting units that fail to meet state or local housing codes;

The owner has not paid state or local real estate taxes, fines, or assessment. If the unit is sold or foreclosed on and the new owner is not willing to continue with the Section 8 program.

In cases of fraud, receiving double assistance for the same unit or receiving subsidy payments for a vacant unit, the owner will be required to reimburse HACA the total amount received after the family vacated the unit.  If the move-out date is not known, the utility cut-off date shall be used to calculate the overpayment.

In considering whether to disapprove owners for any of the discretionary reasons listed above, HACA will consider any mitigating factors. Such factors may include, but are not limited to, the seriousness of the violation in relation to program requirements, the impact on the ability of families to lease units under the program, health and safety of participating families, among others. Upon consideration of such circumstances, HACA may, on a case-by-case basis, choose to approve an owner.

### Legal Ownership of Unit

The following represents PHA Policy on legal ownership of a dwelling unit to be assisted under the HCV program.

<u>HACA Policy</u>

HACA will only enter into a contractual relationship with the legal owner or designated property manager (a property management agreement would need to be signed by the legal owner and property manager or Management Company).  No tenancy will be approved without acceptable documentation of legal ownership (e.g., deed of trust, proof of taxes for most recent year).

### 13-I.E. NON-DISCRIMINATION [HAP Contract – Form HUD-52641]

The owner must not discriminate against any person because of race, color, religion, sex, national origin, age, familial status, or disability, in connection with any actions or responsibilities under the HCV program and the HAP contract with HACA.

The owner must cooperate with HACA and with HUD in conducting any equal opportunity compliance reviews and complaint investigations in connection with the HCV program and the HAP contract with HACA.

See Chapter 2 for a more thorough discussion of Fair Housing and Equal Opportunity requirements in the HCV program.

## PART II. HAP CONTRACTS

### 13-II.A. OVERVIEW

The HAP contract represents a written agreement between the PHA and the owner of the dwelling unit occupied by a HCV assisted family. The contract spells out the owner's responsibilities under the program, as well as the PHA's obligations. Under the HAP contract, the PHA agrees to make housing assistance payments to the owner on behalf of the family approved by the PHA to occupy the unit.

The HAP contract is used for all HCV tenant-based program tenancies except for assistance under the Section 8 homeownership program, and assistance to families that own a manufactured home and use their assistance to lease the space for the manufactured home. See chapter 15 for a discussion of any special housing types included in the PHA's HCV program.

When the PHA has determined that the unit meets program requirements and the tenancy is approvable, the PHA and owner must execute the HAP contract. See chapter 9 for a discussion of the leasing process, including provisions for execution of the HAP contract.

### 13-II.B. HAP CONTRACT CONTENTS

The HAP contract format is required by HUD, specifically Housing Assistance Payment (HAP) Contract, Form HUD-52641.

The HAP contract contains three parts.

Part A of the contract includes basic contract information: the names of the tenant and all household members, the address of the contract unit, start and end dates of initial lease term, the amount of initial monthly rent to owner, the amount of initial housing assistance payment, the utilities and appliances to be supplied by owner and tenant, and the signatures of the PHA representative and owner [HCV Guidebook, pp. 11-10 and 11-11].

In general, the HAP contract cannot be modified. However, PHAs do have the discretion to add language to Part A of the HAP contract which prohibits the owner from collecting a security deposit in excess of private market practices or in excess of amounts charged to unassisted tenants. PHA policy on the amount of security deposit an owner may collect is found in Chapter 9.

PHAs also have the discretion to add language to Part A of the HAP contract that defines when the housing assistance payment by the PHA is deemed received by the owner (e.g., upon mailing by the PHA or actual receipt by the owner).

> <u>HACA Policy</u>
>
> HACA defines received by the owner as the date mailed or deposited in the owner's account via direct deposit. A payment would not be considered late due to delays in HUD funding providing HACA funding, delays in mail delivery, the bank not processing or depositing the payment correctly, or the property owner failing to notify HACA timely of an address change or change in a bank account.

Part B is the body of the contract. It describes in detail program requirements affecting the owner and owner roles and responsibilities under the HCV program. Most of the requirements contained in Part B of the HAP contract is outlined elsewhere in this plan. Topics addressed in Part B which includes:

Lease of Contract Unit

Maintenance, Utilities, and Other Services

Term of HAP Contract

Provision and Payment of Utilities and Appliances

Rent to Owner: Reasonable Rent

PHA Payment to Owner

Prohibition of Discrimination

Owner's Breach of HAP Contract

PHA and HUD Access to Premises and Owner's Records

Exclusion of Third Party Rights

Conflict of Interest

Assignment of the HAP Contract

Written Notices

Entire Agreement Interpretation

Part C of the contract includes the <u>Tenancy Addendum</u> (Form HUD-52641-A). The addendum sets forth the tenancy requirements for the program and the composition of the household, as approved by HACA. The tenant has the right to enforce the Tenancy Addendum against the owner. The terms of the Tenancy Addendum prevail over any other provisions of the lease.

## 13-II.C. HAP CONTRACT PAYMENTS

**General**

During the term of the HAP contract, and subject to the provisions of the HAP contract,

HACA must make monthly HAP payments to the owner on behalf of the family, at the beginning of each month. If a lease term begins after the first of the month, the HAP payment for the first month is prorated for a partial month.

The amount of the HAP payment is determined according to the policies described in Chapter 6, and is subject to change during the term of the HAP contract. HACA must notify the owner and the family in writing of any changes in the HAP payment.

HAP payments can be made only during the lease term, and only while the family is residing in the unit.

The monthly HAP payment by the HACA is credited toward the monthly rent to owner under the family's lease. The total of the rent paid by the tenant and the HAP payment is equal to the rent to owner as specified in the lease.

The family is not responsible for payment of the HAP payment, and HACA is not responsible for payment of the family share of rent.

The family's share of the rent cannot be more than the difference between the rent to owner and the HAP payment. The owner may not demand or accept any rent payment from the tenant in excess of this maximum [24 CFR 982.451(b)(4)]. The owner may not charge the tenant extra amounts for items customarily included in rent in the locality, or provided at no additional cost to unsubsidized tenants in the premises [24 CFR 982.510(c)]. See chapter 9 for a discussion of separate, non-lease agreements for services, appliances and other items that are not included in the lease.

If the owner receives any excess HAP from HACA, the excess amount must be returned immediately. If HACA determines that the owner is not entitled to all or a portion of the HAP, HACA may deduct the amount of overpayment from any amounts due to the owner, including amounts due under any other Section 8 HCV contract. See Chapter 16 for additional detail on owner reimbursement of HAP overpayments.

### Owner Certification of Compliance

Unless the owner complies with all provisions of the HAP contract, the owner is not entitled to receive housing assistance payments under the HAP contract [HAP Contract – Form HUD-52641].

By accepting the monthly check from HACA, the owner certifies to compliance with the terms of the HAP contract. This includes certification that the owner is maintaining the unit and premises in accordance with HQS; that the contract unit is leased to the tenant family and, to the best of the owner's knowledge, the family resides in the unit as the family's only residence; the rent to owner does not exceed rents charged by the owner for comparable unassisted units on the premises; and that the owner does not receive (other than rent to owner) any additional payments or other consideration for rent of the contract unit during the HAP term.

### Late HAP Payments [24 CFR 982.451(a)(5)]

HACA is responsible for making HAP payments promptly when due to the owner, in accordance with the terms of the HAP contract. After the first two calendar months of the

HAP contract term, the HAP contract provides for late penalties if HACA fails to make the HAP payment on time.

Penalties for late HAP payments can only be imposed if 1) the penalties are in accordance with generally accepted local rental market practices and law governing penalties for late payment by tenants; 2) it is the owner's normal business practice to charge late payment penalties for both assisted and unassisted families; and 3) the owner charges the assisted family for late payment of the family's share of the rent.

HACA is not required to pay a late payment penalty if HUD determines that the payment is late for reasons beyond HACA's control. In addition, late payment penalties are not required if

HACA intentionally delays or denies payment as a remedy to an owner breach of the HAP contract [HCV Guidebook p. 11-7].

## Termination of HAP Payments [24 CFR 982.311(b)]

HACA must continue making housing assistance payments to the owner in accordance with the HAP contract as long as the tenant continues to occupy the unit and the HAP contract is not violated.

HAP payments terminate when the HAP contract terminates or when the tenancy is terminated in accordance with the terms of the lease.

If the owner has initiated eviction proceedings against the family and the family continues to reside in the unit, HACA must continue to make housing assistance payments to the owner until the owner has obtained a court judgment or other process allowing the owner to evict the tenant.

> HACA Policy
>
> The owner must inform HACA when the owner has initiated eviction proceedings against the family and the family continues to reside in the unit.
>
> The owner must inform HACA when the owner has obtained a court judgment or other process allowing the owner to evict the tenant, and provide HACA with a copy of such judgment or determination.
>
> After the owner has obtained a court judgment or other process allowing the owner to evict the tenant, HACA will continue to make HAP payments to the owner until the family actually moves from the unit or until the family is physically evicted from the unit, whichever is earlier. The owner must inform HACA of the date when the family actually moves from the unit or the family is physically evicted from the unit.

## 13-II.D. BREACH OF HAP CONTRACT [24 CFR 982.453]

Any of the following actions by the owner constitutes a breach of the HAP contract:

If the owner violates any obligations under the HAP contract including failure to maintain the unit in accordance with HQS

If the owner has violated any obligation under any other HAP contract under Section 8

If the owner has committed fraud, bribery or any other corrupt or criminal act in connection with any federal housing program

For projects with mortgages insured by HUD or loans made by HUD, if the owner has failed to comply with the regulation for the applicable program; or if the owner has committed fraud, bribery or any other corrupt or criminal act in connection with the mortgage or loan

If the owner has engaged in drug-related criminal activity

If the owner has committed any violent criminal activity

If HACA determines that a breach of the HAP contract has occurred, it may exercise any of its rights and remedies under the HAP contract.

HACA rights and remedies against the owner under the HAP contract include recovery of any HAP overpayment, suspension of housing assistance payments, abatement or reduction of the housing assistance payment, termination of the payment or termination of the HAP contract. HACA may also obtain additional relief by judicial order or action.

HACA must notify the owner of its determination and provide in writing the reasons for the determination. The notice may require the owner to take corrective action by an established deadline. HACA must provide the owner with written notice of any reduction in housing assistance payments or the termination of the HAP contract.

> HACA Policy
>
> Before HACA invokes a remedy against an owner, HACA will evaluate all information and documents available to determine if the contract has been breached.
>
> If relevant, HACA will conduct an audit of the owner's records pertaining to the tenancy or unit.
>
> If it is determined that the owner has breached the contract, HACA will consider all of the relevant factors including the seriousness of the breach, the effect on the family, the owner's record of compliance and the number and seriousness of any prior HAP contract violations.

## 13-II.E. HAP CONTRACT TERM AND TERMINATIONS

The term of the HAP contract runs concurrently with the term of the dwelling lease [24 CFR 982.451(a)(2)], beginning on the first day of the initial term of the lease and terminating on the last day of the term of the lease, including any lease term extensions.

The HAP contract and the housing assistance payments made under the HAP contract terminate if [HCV Guidebook pp.11-4 and 11-5, pg. 15-3]:

The owner or the family terminates the

lease;

The lease expires;

HACA terminates the HAP contract;

HACA terminates assistance for the family;

The family moves from the assisted unit. In this situation, the owner is entitled to keep the housing assistance payment for the month when the family moves out of the unit.

180 calendar days have elapsed since HACA made the last housing assistance payment to the owner;

The family is absent from the unit for longer than the maximum period permitted by

HACA; The Annual Contributions Contract (ACC) between HACA and HUD expires

HACA elects to terminate the HAP contract.

<u>HACA Policy</u>

HACA may elect to terminate the HAP contract in each of the following situations:

Available program funding is not sufficient to support continued assistance for families in the program [24 CFR 982.454];

The unit does not meet HQS size requirements due to change in family composition [24 CFR 982.403] – see <u>chapter 8</u>;

The unit does not meet HQS [24 CFR 982.404] – see <u>Chapter 8</u>;

The family breaks up [HUD Form 52641] – see <u>Chapter 3</u>;

The owner breaches the HAP contract [24 CFR 982.453(b)] – see Section 13-II.D.

If HACA terminates the HAP contract, HACA must give the owner and the family written notice. The notice must specify the reasons for the termination and the effective date of the termination. Once a HAP contract is terminated, no further HAP payments may be made under that contract [HCV Guidebook pg.15-4].

<u>HACA Policy</u>

In general, HACA will provide the owner and the family a thirty (30) day notice prior to terminating the HAP contract or at the end of the calendar month that follows the calendar month in which HACA gives written notice to the owner. The owner is not entitled to any housing assistance payment after this period, and must return to HACA any housing assistance payment received after this period. HACA will provide less than a thirty (30) notice, if it is discovered that the family vacated the unit, and the owner failed to inform HACA of the vacancy in a timely manner. For deceased tenants, no HAP payments can be after the month the tenant passes away.

Therefore, if a tenant passes away on Feb 28th, March payment will need to be returned to HACA.

If the family moves from the assisted unit into a new unit, even if the new unit is in the same building or complex as the assisted unit, the HAP contract for the assisted unit terminates. A new HAP contract would be required [HCV GB, p. 11-17].

When the family moves from an assisted unit into a new unit, the term of the HAP contract for the new unit may begin in the same month in which the family moves out of its old unit. This is not considered a duplicative subsidy [HCV GB, p. 8-22].

## 13-II.F. CHANGE IN OWNERSHIP / ASSIGNMENT OF THE HAP CONTRACT [HUD-52641]

The HAP contract cannot be assigned to a new owner without the prior written consent of HACA.

An owner under a HAP contract must notify HACA in writing prior to a change in the legal ownership of the unit. The owner must supply all information as requested by HACA.

Prior to approval of assignment to a new owner, the new owner must agree to be bound by and comply with the HAP contract. The agreement between the new owner and the former owner must be in writing and in a form that HACA finds acceptable. The new owner must provide HACA with a copy of the executed agreement.

HACA Policy

Assignment of the HAP contract will be approved only if the new owner is qualified to become an owner under the HCV program according to the policies in Section 13-I.D. of this chapter.

HACA must receive a signed, written request from the existing owner stating the name and address of the new HAP payee and the effective date of the assignment in order to change the HAP payee under an outstanding HAP contract.

Within 10 business days of receiving the owner's request, HACA will inform the current owner in writing whether the assignment may take place.

The new owner must provide a written certification to HACA that includes:

A copy of the escrow statement or other document showing the transfer of title and recorded deed;

A copy of the owner's IRS Form W-9, Request for Taxpayer Identification Number and Certification, or the social security number of the new owner;

The effective date of the HAP contract assignment;

A written agreement to comply with the terms of the HAP contract; and

A certification that the new owner is not a prohibited relative.

If the new owner does not agree to an assignment of the HAP contract, or fails to provide the necessary documents, HACA will terminate the HAP contract with the old owner. If the new owner wants to offer the family a new lease, and the family elects to stay with continued assistance, HACA will process the leasing in accordance with the policies in <u>Chapter 9</u>.

## 13-II.G. FORECLOSURE [Notice PIH 2010-49]

Families receiving HCV assistance are entitled to certain protections set forth under the Protecting Tenants at Foreclosure Act (PTFA). During the term of the lease, the new owner of the property does not have good cause to terminate the tenant's lease, unless the new owner will occupy the unit as their primary residence and has provided the tenant with at least a 90-day notice. In that case, the lease may be terminated effective on the date of sale, although the tenant is still entitled to a 90-day notice to vacate. Further, the new owner assumes interest in the lease between the prior owner and the tenant and to the HAP contract.

Any state or local law that provides longer time periods or other additional protections for tenants also applies.

<u>HACA Policy</u>

If a property is in foreclosure, HACA will make all reasonable efforts to determine the status of the foreclosure and ownership of the property and will continue to make payments to the original owner until ownership legally transfers in accordance with the HAP contract.

HAC will attempt to obtain a written acknowledgement of the assignment of the HAP contract from the successor in interest. This will include a request for owner information, including a tax identification number and payment instructions from the new owner. Even if the new owner does not acknowledge the assignment of the HAP contract in writing, the assignment is still effective by operation of law.

HACA will inform the tenant that the tenant's obligation is to pay the rent payment to the new owner within five days after receiving written notice of the name and address of the new owner requesting payment. If the tenant has already paid the prior owner during the month of the foreclosure sale before receiving notice from the new owner, the tenant's payment for that month is considered timely. The tenant should set aside rent money or deposit rent money in a savings account and not spend it if the new owner refuses to accept payment or cannot be identified. HACA will refer the tenant to Texas RioGrande Legal Aid if the new owner is refusing rent payments.

In the event that HACA is unable to make HAP payments to the new owner due to an action or inaction by the new owner that prevents such payments (e.g., rejection of payments or failure to maintain the property according to HQS), or due to an inability to identify the new owner, HACA will either use the funds to pay:

The utilities that are the owner's responsibility after taking reasonable steps to notify the owner; except that if the unit has been or will be rendered uninhabitable due to termination or threat of termination of service, prior notice is not required. In the latter case, HACA shall notify the owner within a reasonable time after making the utility payment; or

For the family's reasonable moving costs, including security deposit costs.

HACA will also refer the tenant, as needed, to the local legal aid office in order to ensure adequate protection of the tenant's rights and enforcement of the successor in interest's performance under the HAP contract.

See Section 12-III.B for a discussion of foreclosure as it pertains to owner termination of tenancy.


# CHAPTER 14
## PROGRAM INTEGRITY INTRODUCTION

HACA is committed to ensuring that subsidy funds made available to HACA are spent in accordance with HUD requirements.

This chapter covers HUD and PHA policies designed to prevent, detect, investigate and resolve instances of program abuse or fraud. It also describes the actions that will be taken in the case of unintentional errors and omissions.

Part I: Preventing, Detecting, and Investigating Errors and Program Abuse. This part presents PHA policies related to preventing, detecting, and investigating errors and program abuse.

Part II: Corrective Measures and Penalties. This part describes the corrective measures HACA must and may take when errors or program abuses are found.

## PART I: PREVENTING, DETECTING, AND INVESTIGATING ERRORS AND PROGRAM ABUSE

### 14-I.A. PREVENTING ERRORS AND PROGRAM ABUSE

HUD created the Enterprise Income Verification (EIV) system to provide PHAs with a powerful tool for preventing errors and detecting program abuse. PHAs are required to use the EIV system in its entirety in accordance with HUD administrative guidance [24 CFR 5.233].

PHAs are
further required to:

Provide applicants and participants with form HUD-52675, "Debts Owed to PHAs and Terminations"

Require all adult members of an applicant or participant family to acknowledge receipt of form HUD-52675 by signing a copy of the form for retention in the family file

HACA Policy

To ensure that HACA's HCV program is administered effectively and according to the highest ethical and legal standards, HACA will employ a variety of techniques to ensure that both errors and intentional program abuse are rare.

HACA will discuss program compliance and integrity issues during the voucher briefing sessions described in Chapter 5.

HACA will provide each applicant and participant with a copy of "Is Fraud Worth It?" (Form HUD-1141-OIG), which explains the types of actions a family must avoid and the penalties for program abuse. .HACA will provide each applicant and participant with a copy of "What You Should Know about EIV," a guide to the Enterprise Income Verification (EIV) system published by HUD as an attachment to Notice PIH 2010-19. In addition, HACA will require the head of each household to acknowledge receipt of the guide by signing a copy for retention in the family file. HACA will place a warning statement about the penalties for fraud (as described in the False Statement Act, U.S.C. 1001 and 1010) on key PHA forms and form letters that request information from a family or owner.

PHA staff will be required to review and explain the contents of all HUD- and PHA- required forms prior to requesting family member signatures.

HACA will provide each PHA employee with the necessary training on program rules and the organization's standards of conduct and ethics.

For purposes of this chapter the term *error* refers to an unintentional error or omission. P*rogram abuse or fraud* refers to a single act or pattern of actions that constitute a false statement, omission, or concealment of a substantial fact, made with the intent to deceive or mislead.

## 14-I.B. DETECTING ERRORS AND PROGRAM ABUSE

In addition to taking steps to prevent errors and program abuse, HACA will use a variety of activities to detect errors and program abuse.

### Quality Control and Analysis of Data

Under the Section 8 Management Assessment Program (SEMAP), HUD requires HACA to review a random sample of tenant records annually to determine if the records conform to program requirements and to conduct quality control inspections of a sample of units to ensure HQS compliance [24 CFR, Part 985]. (See Chapter 16 for additional information

about SEMAP requirements).

<u>HACA Policy</u>

In addition to the SEMAP quality control requirements, HACA will employ a variety of methods to detect errors and program abuse.

HACA routinely will use available sources of up-front income verification, including HUD's EIV systems, to compare with family-provided information.

At each annual reexamination, current information provided by the family will be compared to information provided at the last annual reexamination to identify inconsistencies and incomplete information.

HACA will compare family-reported income and expenditures to detect possible unreported income.

HACA will complete a quarterly over-housed, multi-subsidy and deceased tenant review.

**Independent Audits and HUD Monitoring**

OMB Circular A-133 requires all PHAs that expend $500,000 or more in federal awards annually to have an independent audit (IPA). In addition, HUD conducts periodic on-site and automated monitoring of PHA activities and notifies HACA of errors and potential cases of program abuse.

<u>HACA Policy</u>

HACA will use the results reported in any IPA or HUD monitoring reports to identify potential program abuses as well as to assess the effectiveness of HACA's error detection and abuse prevention efforts.

**Individual Reporting of Possible Errors and Program Abuse**

<u>HACA Policy</u>

HACA will encourage staff, program participants, and the public to report possible program abuse.

## 14-I.C. INVESTIGATING ERRORS AND PROGRAM ABUSE **When HACA Will Investigate**

<u>HACA Policy</u>

HACA will review all referrals, specific allegations, complaints, and tips from any source including other agencies, companies, and individuals, to determine if they warrant investigation.

In order for HACA to investigate, the allegation must contain at least one independently- verifiable item of information, such as the name of an employer or the name of an unauthorized household member.

HACA will investigate inconsistent information related to the family that is

identified through file reviews and the verification process.

**Consent to Release of Information [24 CFR 982.516]**

HACA may investigate possible instances of error or abuse using all available PHA and public records. If necessary, HACA will require HCV families to give consent to the release of additional information.

**Analysis and Findings**

<u>HACA Policy</u>

HACA will base its evaluation on a preponderance of the evidence collected during its investigation.

***Preponderance of the evidence*** is defined as evidence which is of greater weight or more convincing than the evidence which is offered in opposition to it; that is, evidence that as a whole shows that the fact sought to be proved is more probable than not. Preponderance of evidence may not be determined by the number of witnesses, but by the greater weight of all evidence

For each investigation HACA will determine

(1) whether an error or program abuse has occurred, (2) whether any amount of money is owed HACA, and (3) what corrective measures or penalties will be assessed.

**Consideration of Remedies**

All errors and instances of program abuse must be corrected prospectively. Whether HACA will enforce other corrective actions and penalties depends upon the nature of the error or program abuse.

<u>HACA Policy</u>

In the case of family-caused errors or program abuse, HACA will take into consideration (1) the seriousness of the offense and the extent of participation or culpability of individual family members, (2) any special circumstances surrounding the case, (3) any mitigating circumstances related to the disability of a family member, (4) the effects of a particular remedy on family members who were not involved in the offense.

In the case of owner-caused errors or program abuse, HACA will take into consideration (1) the seriousness of the offense, (2) the length of time since the violation has occurred, and (3) the effects of a particular remedy on family members who were not involved in the offense.

**Notice and Appeals**

<u>HACA Policy</u>

HACA will inform the relevant party in writing of its findings and remedies within 10 business days of the conclusion of the investigation. The notice will include (1) a description of the error or program abuse, (2) the basis on which HACA determined

the error or program abuses, (3) the remedies to be employed, and (4) the family's right to appeal the results through the informal review or hearing process, if applicable (see Chapter 16).

## PART II: CORRECTIVE MEASURES AND PENALTIES

## 14-II.A. SUBSIDY UNDER- OR OVERPAYMENTS

A subsidy under- or overpayment includes (1) an incorrect housing assistance payment to the owner, (2) an incorrect family share established for the family, and (3) an incorrect utility reimbursement to a family.

### Corrections

Whether the incorrect subsidy determination is an overpayment or underpayment of subsidy, HACA must promptly correct the HAP, family share, and any utility reimbursement prospectively.

HACA Policy

Increases in the family share will be implemented only after the family has received 30 days' notice, unless the family failed to report the change in a timely manner. In this case, the change will be made retroactively to the effective date that the change occurred.

Any decreases in family share will become effective the first of the month following the discovery of the error.

Downgrade or Upgrade errors discovered during screening process

If it is discovered during the screening process that the family was not downgraded or upgraded in error to the proper bedroom size based on current voucher size criteria, HACA will perform the following activities:

Schedule the family for an appointment to discuss the downgrade options. If the family fails to attend the scheduled appointment, proceed with the downgrade based on subsidy standards and the process described below.

At the appointment, the family will be given the opportunity to move or stay at the current unit and receive a lower subsidy.

If the family elects to stay, a 60-day notice is given before the subsidy decreases due to the vouchers size downgrade. If it occurs during the re-exam, the Voucher decrease will occur at the re-exam effective date with at least a 30-day notice.

If the family elects to move to a less expensive unit, a 60-day intent to vacate notice will be issued to the owner. The tenant will then be issued a voucher with the appropriate bedroom size.

**Reimbursement**

Whether the family or owner is required to reimburse HACA or HACA is required to make retroactive subsidy payments to the owner or family depends upon which party is responsible for the incorrect subsidy payment and whether the action taken was an error or program abuse. Policies regarding reimbursement are discussed in the three sections that follow.

## 14-II.B. FAMILY-CAUSED ERRORS AND PROGRAM ABUSE

Family obligations and general administrative requirements for participating in the program are discussed throughout this plan. This section deals specifically with errors and program abuse by family members.

An incorrect subsidy determination caused by a family generally would be the result of incorrect reporting of family composition, income, assets, or expenses, but also would include instances in which the family knowingly allows HACA to use incorrect information provided by a third party.

### Family Reimbursement to PHA [HCV GB pp. 22-12 to 22-13]

HACA Policy

In the case of family-caused errors or program abuse, the family will be required to repay any excess subsidy received. HACA may, but is not required to, offer the family a repayment agreement in accordance with Chapter 16. If the family fails to repay the excess subsidy, HACA will terminate the family's assistance in accordance with the policies in Chapter 12.

### PHA Reimbursement to Family [HCV GB p. 22-12]

HACA Policy

HACA will not reimburse the family for any underpayment of assistance when the underpayment clearly is caused by the family.

**Prohibited Actions**

An applicant or participant in the HCV program must not knowingly:

Make a false statement to HACA [Title 18 U.S.C. Section 1001].

Commit fraud, bribery, or any other corrupt or criminal act in connection with any federal housing program [24 CFR 982.552(c)(iv)].

HACA Policy

Any of the following will be considered evidence of family program abuse:

Payment to the owner in excess of amounts authorized by HACA for rent, security deposit, and additional services

Offering bribes or illegal gratuities to HACA Board of Commissioners, employees, contractors, or other PHA representatives

> Offering payments or other incentives to the owner or a third party as an inducement for the third party to make false or misleading statements to HACA on the family's behalf
>
> Use of a false name or the use of falsified, forged, or altered documents
>
> Intentional misreporting of family information or circumstances (e.g. income, family composition)
>
> Omitted facts that were obviously known by a family member (e.g., not reporting employment income)
>
> Admission of program abuse by an adult family member

HACA may determine other actions to be program abuse based upon a preponderance of the evidence, as defined earlier in this chapter.

**Penalties for Program Abuse**

In the case of program abuse caused by a family HACA may, at its discretion, impose any of the following remedies.

> HACA may require the family to repay excess subsidy amounts paid by HACA, as described earlier in this section.
>
> HACA may require, as a condition of receiving or continuing assistance, that a culpable family member not reside in the unit. See policies in Chapter 3 (for applicants) and Chapter 12 (for participants).
>
> HACA may deny or terminate the family's assistance following the policies set forth in Chapter 3 and Chapter 12 respectively.
>
> HACA may refer the family for state or federal criminal prosecution as described in section 14-II.E.

## 14-II.C. OWNER-CAUSED ERROR OR PROGRAM ABUSE

Owner requirements that are part of the regular process of offering, leasing, and maintaining a unit (e.g., HQS compliance, fair housing) are addressed in the appropriate chapters of this plan. This section focuses on errors and program abuse by owners.

An incorrect subsidy determination caused by an owner generally would be the result of an incorrect owner statement about the characteristics of the assisted unit (e.g., the number of bedrooms, which utilities are paid by the family). It also includes accepting duplicate housing assistance payments for the same unit in the same month, or after a family no longer resides in the unit.

### Owner Reimbursement to HACA

In all cases of overpayment of subsidy caused by the owner, the owner must repay to HACA any excess subsidy received. HACA may recover overpaid amounts by withholding housing assistance payments due for subsequent months, or if the debt is large, HACA may allow the owner to pay in installments over a period of time [HCV GB p. 22-13].

HACA Policy

In cases where the owner has received excess subsidy, HACA will require the owner to repay the amount owed in accordance with the policies in Section 16-IV.B.

**Prohibited Owner Actions**

An owner participating in the HCV program must not:

Make any false statement to HACA [Title 18 U.S.C. Section 1001].

Commit fraud, bribery, or any other corrupt or criminal act in connection with any federal housing program [24 CFR 982.453(a)(3)] including:

HACA Policy

Any of the following will be considered evidence of owner program abuse:

Charging the family rent above or below the amount specified by HACA

Charging a security deposit other than that specified in the family's lease

Charging the family for services that are provided to unassisted tenants at no extra charge

Knowingly accepting housing assistance payments for any month(s) after the family has vacated the unit

Knowingly accepting incorrect or excess housing assistance payments

Offering bribes or illegal gratuities to HACA Board of Commissioners, employees, contractors, or other PHA representatives

Offering payments or other incentives to an HCV family as an inducement for the family to make false or misleading statements to HACA

Residing in the unit with an assisted family

Committing sexual or other harassment, either quid pro quo or hostile environment, based on the protected classes defined in Chapter 2

Retaliating against any applicant or participant reporting/alleging sexual or other harassment, either quid pro quo or hostile environment, based on the protected classes defined in Chapter 2

**Remedies and Penalties**

When HACA determines that the owner has committed program abuse, HACA may take any of the following actions:

Require the owner to repay excess housing assistance payments, as discussed earlier in

this section and in accordance with the policies in <u>Chapter 16</u>.

Terminate the HAP contract (See <u>Chapter 13</u>).

Bar the owner from future participation in any PHA programs.

Refer the case to state or federal officials for criminal prosecution as described in <u>section 14-II.E.</u>

## 14-II.D. PHA-CAUSED ERRORS OR PROGRAM ABUSE

The responsibilities and expectations of PHA staff with respect to normal program administration is discussed throughout this plan. This section specifically addresses actions of a HACA staff member that are considered errors or program abuse related to the HCV program. Additional standards of conduct may be provided in HACA personnel policy.

PHA-caused incorrect subsidy determinations include (1) failing to correctly apply HCV rules regarding family composition, income, assets, and expenses, (2) assigning the incorrect voucher size to a family, and (3) errors in calculation.

**Repayment to HACA**
Neither a family nor an owner is required to repay an overpayment of subsidy if the error or program abuse is caused by PHA staff [HCV GB. 22-12].

**PHA Reimbursement to Family or Owner**
HACA must reimburse a family for any underpayment of subsidy, regardless of whether the underpayment was the result of staff-caused error or staff or owner program abuse. Funds for this reimbursement must come from HACA's administrative fee reserves [HCV GB p. 22-12].

**Prohibited Activities**
    <u>HACA Policy</u>

    Any of the following will be considered evidence of program abuse by PHA staff:

    Failing to comply with any HCV program requirements for personal gain

    Failing to comply with any HCV program requirements as a result of a conflict of interest relationship with any applicant, participant, or owner

    Seeking or accepting anything of material value from applicants, participating families, vendors, owners, contractors, or other persons who provide services or materials to HACA

    Disclosing confidential or proprietary information to outside parties

    Gaining profit as a result of insider knowledge of PHA activities, policies, or practices

    Misappropriating or misusing HCV funds

    Destroying, concealing, removing, or inappropriately using any records related to the HCV program

    Committing any other corrupt or criminal act in connection with any federal housing program

## 14-II.E. CRIMINAL PROSECUTION

HACA Policy

When HACA determines that program abuse by an owner, family, or PHA staff member has occurred and the amount of overpaid subsidy meets or exceeds the threshold for prosecution under local or state law, HACA will refer the matter to the appropriate entity for prosecution. When the amount of overpaid assistance meets or exceeds the federal threshold, the case will also be referred to the HUD Office of Inspector General (OIG).

Other criminal violations related to the HCV program will be referred to the appropriate local, state, or federal entity.

## 14-II.F. FRAUD AND PROGRAM ABUSE RECOVERIES

HACA may retain a portion of program fraud losses that HACA recovers from a family or owner through litigation, court order, or a repayment agreement [24 CFR 982.163].

HACA must be the principal party initiating or sustaining the action to recover amounts due from tenants that are due as a result of fraud and abuse. [24 CFR 792.202] permits HACA to retain the greater of:

50 percent of the amount it actually collects from a judgment, litigation (including settlement of a lawsuit) or an administrative repayment agreement, or

Reasonable and necessary costs that HACA incurs related to the collection including costs of investigation, legal fees, and agency collection fees.

The family must be afforded the opportunity for an informal hearing in accordance with requirements in [24 CFR 982.555].

If HUD incurs costs on behalf of HACA related to the collection, these costs must be deducted from the amount retained by HACA.

## CHAPTER 15
## SPECIAL HOUSING TYPES
[24 CFR 982 Subpart M; New HCV GB, *Special Housing Types*]

## INTRODUCTION

HACA may permit a family to use any of the special housing types discussed in this chapter. However, HACA is not required to permit families receiving assistance in its jurisdiction to use these housing types, except that PHAs must permit use of any special housing type if needed as a reasonable accommodation for a person with a disability. HACA also may limit the number of families who receive HCV assistance in these housing types and cannot require families to use a particular housing type. No special funding is provided for special housing types.

HACA Policy

HACA will permit the use of Single Room Occupancy (SROs) and manufactured homes as an approved special housing type. Families will not be permitted to use other special housing types, unless use is needed as a reasonable accommodation so that the program is readily accessible to a person with disabilities.

Special housing types include single room occupancy (SRO), congregate housing, group homes, shared housing, cooperative housing, manufactured homes where the family owns the home and leases the space, and homeownership [24 CFR 982.601]. A single unit cannot be designated as more than one type of special housing. The PHA cannot give preference to households that wish to live in any of these types of housing and cannot require households to select any of these types of housing [New HCV GB, *Special Housing Types,* p. 3].

This chapter consists of the following seven parts. Each part contains a description of the housing type and any special requirements associated with it. Except as modified by this chapter, the general requirements of the HCV program apply to special housing types.

Part I: Single Room

Occupancy Part II:

Congregate Housing Part

III: Group Homes

Part IV: Shared Housing

Part V: Cooperative Housing

Part VI: Manufactured Homes (including manufactured home space

rental) Part VII: Homeownership

## PART I: SINGLE ROOM OCCUPANCY

[24 CFR 982.602 through 982.605; Form HUD-52641; New HCV GB,
*Special Housing Types,* p. 4]

## 15-I.A. OVERVIEW

A single room occupancy (SRO) unit provides living and sleeping space for the exclusive use of the occupant but requires the occupant to share sanitary and/or food preparation facilities with others. More than one person may not occupy an SRO unit. HCV regulations do not limit the number of units in an SRO facility, but the size of a facility may be limited by local ordinances.

When providing HCV assistance in an SRO unit, a separate lease and HAP contract are executed for each assisted person, and the standard form of the HAP contract is used. (form HUD-52641) with the special housing type specified in Part A of the HAP contract, as follows: "This HAP contract is used for the following special housing type under HUD regulations for the Section 8 voucher program: Single room occupancy (SRO) housing."

## 15-I.B. PAYMENT STANDARD, UTILITY ALLOWANCE, AND HAP CALCULATION

The payment standard for SRO housing is 75 percent of the 0-bedroom payment standard amount on HACA's payment standard schedule.

The utility allowance for an assisted person residing in SRO housing is 75 percent of the zero bedroom utility allowance.

The HAP for an assisted occupant in an SRO facility is the lower of the SRO payment standard amount minus the TTP or the gross rent for the unit minus the TTP.

## 15-I.C. HOUSING QUALITY STANDARDS (HQS)

HQS requirements described in Chapter 8 apply to SRO housing except that sanitary facilities, and space and security characteristics must meet local code standards for SRO housing. In the absence of applicable local code standards for SRO housing, the following standards apply:

*Access*: Access doors to the SRO unit must have working locks for privacy. The occupant must be able to access the unit without going through any other unit. Each unit must have immediate access to two or more approved means of exit from the building, appropriately marked and leading to safe and open space at ground level. The SRO unit must also have any other means of exit required by State or local law.

*Fire Safety*: All SRO facilities must have a sprinkler system that protects major spaces. "Major spaces" are defined as hallways, large common areas, and any other areas specified in local fire, building, or safety codes. SROs must also have hard-wired smoke detectors, and any other fire and safety equipment required by state or local law.

Sanitary facilities and space and security standards must meet local code requirements for SRO housing. In the absence of local code standards the requirements discussed below apply [24 CFR 982.605].

*Sanitary Facilities*: At least one flush toilet that can be used in privacy, a lavatory basin, and a bathtub or shower in proper operating condition must be provided for each six persons (or fewer) residing in the SRO facility. If the SRO units are leased only to males, flush urinals may be substituted for up to one half of the required number of toilets. Sanitary facilities must be reasonably accessible from a common hall or passageway to all persons sharing them and may not be located more than one floor above or below the SRO unit. They may not be located below grade unless the SRO units are located on that level.

*Space and Security*: An SRO unit must contain at least 110 square feet of floor space, and at least four square feet of closet space with an unobstructed height of at least five feet, for use by the occupant. If the closet space is less than four square feet, the habitable floor

space in the SRO unit must be increased by the amount of the deficiency. Exterior doors and windows accessible from outside the SRO unit must be lockable.

Because no children live in SRO housing, the housing quality standards applicable to lead- based paint do not apply.

## PART II: CONGREGATE HOUSING

[24 CFR 982.606 through 982.609; Form HUD-52641; New HCV GB, *Special Housing Types,* p. 6]

### 15-II.A. OVERVIEW

Congregate housing is intended for use by elderly persons or persons with disabilities. A congregate housing facility contains a shared central kitchen and dining area and a private living area for the individual household that includes at least a living room, bedroom and bathroom. Food service for residents must be provided.

If approved by HACA, a family member or live-in aide may reside with the elderly person or person with disabilities. HACA must approve a live-in aide if needed as a reasonable accommodation so that the program is readily accessible to and usable by persons with disabilities.

When providing HCV assistance in congregate housing, a separate lease and HAP contract are executed for each assisted family. The standard form of the HAP contract is used. (form HUD-52641) with the special housing type specified in Part A of the HAP contract, as follows: "This HAP contract is used for the following special housing type under HUD regulations for the Section 8 voucher program: Congregate housing."

### 15-II.B. PAYMENT STANDARD, UTILITY ALLOWANCE, AND HAP CALCULATION

The payment standard for an individual unit in a congregate housing facility is based on the number of rooms in the private living area for the assisted family. If there is only one room in the unit (not including the bathroom or the kitchen, if a kitchen is provided), HACA must use the payment standard for a 0- bedroom unit. If the unit has two or more rooms (other than the bathroom and the kitchen), HACA must use the 1-bedroom payment standard.

The HAP for an assisted occupant in a congregate housing facility is the lower of the applicable payment standard minus the TTP or the gross rent for the unit minus the TTP.

The gross rent for the unit for the purpose of calculating HCV assistance is the shelter portion (including utilities) of the resident's monthly housing expense only. The residents' costs for food service should not be included in the rent for a congregate housing unit.

### 15-II.C. HOUSING QUALITY STANDARDS

HQS requirements as described in Chapter 8 apply to congregate housing except for the requirements stated below.

Congregate housing must have a refrigerator of appropriate size in the private living area of each resident, a central kitchen and dining facilities located within the premises and accessible to the residents, and food service for the residents, that is not provided by the residents themselves.

The congregate housing must contain adequate facilities and services for the sanitary disposal of food waste and refuse, including facilities for temporary storage where necessary.

The housing quality standards applicable to lead-based paint do not apply unless a child under the age of six is expected to reside in the unit.

## PART III: GROUP HOME

[24 CFR 982.610 through 982.614; Form HUD-52641; New HCV GB, *Special Housing Types,* p. 8]

[24 CFR 982.610 through 982.614 and HCV GB p. 7-4]

### 15-III.A. OVERVIEW

A group home is a state approved, licensed, certified, or otherwise approved in writing by the state) facility intended for occupancy by elderly persons and/or persons with disabilities. Except for live-in aides, all persons living in a group home, whether assisted or not, must be elderly persons or persons with disabilities. Persons living in a group home must not require continuous medical or nursing care.

A group home consists of bedrooms for residents, which can be shared by no more than two people, and a living room, kitchen, dining area, bathroom, and other appropriate social, recreational, or community space that may be shared with other residents.

No more than 12 persons may reside in a group home including assisted and unassisted residents and any live-in aides.

If approved by HACA, a live-in aide may live in the group home with a person with disabilities. HACA must approve a live-in aide if needed as a reasonable accommodation so that the program is readily accessible to and usable by persons with disabilities.

When providing HCV assistance in a group home, a separate lease and HAP contract is executed for each assisted family. The standard form of the HAP contract is used. (form HUD-52641) with the special housing type specified in Part A of the HAP contract, as follows: "This HAP contract is used for the following special housing type under HUD regulations for the Section 8 voucher program: Group home."

### 15-III.B. PAYMENT STANDARD, UTILITY ALLOWANCE, AND HAP

## CALCULATION

Unless there is a live-in aide, the family unit size (voucher size) for an assisted occupant of a group home must be 0- or 1-bedroom. If there is a live-in aide, the aide must be counted in determining the household's unit size.

The payment standard used to calculate the HAP is the lower of the payment standard for the family unit size or the prorated share of the payment standard for the group home size. The prorated share is calculated by dividing the number of persons in the assisted household by the number of persons (assisted and unassisted) living in the group home. The number of persons in the assisted household equals one assisted person plus any PHA-approved live-in aide.

The HAP for an assisted occupant in a group home is the lower of the payment standard minus the TTP or the gross rent minus the TTP.

The utility allowance for an assisted occupant in a group home is the prorata share of the family unit size to the utility allowance for the group home.

The rents paid for participants residing in group homes are subject to generally applicable standards for rent reasonableness. The rent for an assisted person must not exceed the prorated portion of the reasonable rent for the group home. In determining reasonable rent, HACA must consider whether sanitary facilities and facilities for food preparation and service are common facilities or private facilities.

## 15-III.C. HOUSING QUALITY STANDARDS

The entire unit must comply with HQS requirements described in Chapter 8, except for the requirements stated below.

*Sanitary Facilities*: A group home must have at least one bathroom in the facility, with a flush toilet that can be used in privacy, a fixed basin with hot and cold running water, and a shower or bathtub with hot and cold running water. A group home may contain private or common bathrooms. However, no more than four residents can be required to share a bathroom.

*Food Preparation and Service*: Group home units must contain a kitchen and dining area with adequate space to store, prepare, and serve food. The facilities for food preparation and service may be private or may be shared by the residents. The kitchen must contain a range, an oven, a refrigerator, and a sink with hot and cold running water. The sink must drain into an approvable public or private disposal system.

- *Space and Security*: Group homes must contain at least one bedroom of appropriate size for every two people, and a living room, kitchen, dining area, bathroom, and other appropriate social, recreational, or community space that may be shared with other residents. . Doors and windows accessible from outside the unit must be lockable.

*Structure and Material*: To avoid any threat to the health and safety of the residents, group homes must be structurally sound. Elevators must be in good condition. Group homes must be accessible to and usable by residents with disabilities.

*Site and Neighborhood*: Group homes must be located in a residential setting. The site and neighborhood should be reasonably free from disturbing noises and reverberations, and other hazards to the health, safety, and general welfare of the residents, and should not be subject to serious adverse conditions, such as:

- Dangerous walks or steps

- Instability

- Flooding, poor drainage

- Septic tank back-ups

- Sewage hazards

- Mud slides

- Abnormal air pollution

- Smoke or dust

- Excessive noise

- Vibrations or vehicular traffic

- Excessive accumulations of trash

- Vermin or rodent infestation, and

- Fire hazards.

The housing quality standards applicable to lead-based paint do not apply unless a child under the age of six is expected to reside in the unit.

## PART IV: SHARED HOUSING

[24 CFR 982.615 through 982.618 ; Form HUD-52641; Notice PIH 2021-05;
New HCV GB, *Special Housing Types,* p. 11]

### 15-IV.A. OVERVIEW

Families in markets with tight rental conditions or with a prevalence of single-family housing may determine a shared housing living arrangement to be a useful way to secure affordable housing. PHAs offering shared housing as a housing solution may also experience some reduction in the average per-unit-cost (PUC) paid on behalf of assisted families.

Shared housing is a single housing unit occupied by an assisted family and another resident or residents. The unit may be a house or an apartment. The shared unit consists of both common space for use by the occupants of the unit and separate private space for each assisted family.

An assisted family may share a unit with other persons assisted under the HCV program or with other unassisted persons.

Shared housing may be offered in a number of ways, including for-profit co-living (such as a boarding house, single bedroom with common living room/kitchen/dining room) run by a private company [Notice PIH 2021-05].

The owner of a shared housing unit may reside in the unit, but housing assistance may not be paid on behalf of the owner. The resident owner may not be related by blood or marriage to the assisted family.

If approved by the PHA, a live-in aide may reside with the family to care for a person with disabilities. The PHA must approve a live-in aide if needed as a reasonable accommodation so that the program is readily accessible to and usable by persons with disabilities.

When shared housing is offered as a housing option, HUD encourages PHAs to consider ways in which the families may be assisted in finding shared housing, including for-profit shared housing matching (such as roommates or single-family homes) and online sites that charge a fee for their matching services, or nonprofit shared housing matching services. HUD further encourages PHAs to include information about this housing possibility in the family's voucher briefing.

PHAs should be aware of potential local legal barriers to HCV participants using shared housing, which can create additional obstacles for shared housing:

- Municipalities may have occupancy limits for the number of unrelated persons who may share a housing unit.
- Local zoning codes for single family housing may restrict occupancy in certain areas to households whose family members are related by blood.

PHAs should work with local jurisdictions to find solutions that encourage affordable housing and are consistent with the Fair Housing Act, Title VI, and other federal, state, and local fair housing laws. PHAs should inform HUD if they encounter barriers to shared housing that may conflict with fair housing laws.

When providing HCV assistance in shared housing, a separate lease and HAP contract are executed for each assisted family. The standard form of the HAP contract is used (form HUD-52641) with the special housing type specified in Part A of the HAP contract, as follows: "This HAP contract is used for the following special housing type under HUD regulations for the Section 8 voucher program: Shared housing."

### 15-IV.B. PAYMENT STANDARD, UTILITY ALLOWANCE AND HAP CALCULATION

The payment standard for a family in shared housing is the lower of the payment standard for the family unit size (voucher size) or the prorated share of the payment standard for the shared housing unit size.

The prorata share is calculated by dividing the number of bedrooms available for occupancy by the assisted family in the private, non-shared space by the total number of bedrooms in the unit.

---

**Example:** Family holds a two-bedroom voucher.

Shared housing unit size: bedrooms available to assisted family = 2

Total bedrooms in the unit: 3

2 Bedrooms for assisted family

÷ 3 Bedrooms in the unit

.667 pro-rata share

2 BR payment standard: $1200

3 BR payment standard: $1695 $1695 x .667 (pro-rata share) = $1131 $1131 is lower than the $1200 payment standard for the 2 BR family unit size $1131 is the payment standard used to calculate the HAP

---

The HAP for a family in shared housing is the lower of the payment standard minus the TTP or the gross rent minus the TTP.

The utility allowance for an assisted family living in shared housing is the prorata share of the utility allowance for the shared housing unit.

> **Example:** A family holds a 2-bedroom voucher. The family decides to occupy 3 out of 4 bedrooms available in the unit.
>
>   The utility allowance for a 4-bedroom unit equals $200
>
>   The utility allowance for a 2-bedroom unit equals $100
>
>   The prorata share of the utility allowance is $150 (3/4 of $200)
>
>   The PHA will use the 2-bedroom utility allowance of $100.

The rents paid for families living in shared housing are subject to generally applicable standards for rent reasonableness. The rent paid to the owner for the assisted family must not exceed the pro-rata portion of the reasonable rent for the shared unit. In determining reasonable rent, the PHA may consider whether sanitary and food preparation areas are private or shared.

## 15-IV.C. HOUSING QUALITY STANDARDS

HACA may not give approval to reside in shared housing unless the entire unit, including the portion of the unit available for use by the assisted family under its lease, meets the housing quality standards.

HQS requirements described in Chapter 8 apply to shared housing except for the requirements stated below.

  *Facilities Available for the Family*: Facilities available to the assisted family, whether shared or private, must include a living room, a bathroom, and food preparation and refuse disposal facilities.

  *Space and Security*: The entire unit must provide adequate space and security for all assisted and unassisted residents. The private space for each assisted family must contain at least one bedroom for each two persons in the family. The number of bedrooms in the private space of an assisted family must not be less than the family unit size (voucher size). A 0-bedroom or 1-bedroom unit may not be used for shared housing.

## PART V: COOPERATIVE HOUSING
[24 CFR 982.619]

### 15-V.A. OVERVIEW

This part applies to rental assistance for a cooperative member residing in cooperative housing. It does not apply to assistance for a cooperative member who has purchased membership under the HCV homeownership option, or to rental assistance for a family that leases a cooperative housing unit from a cooperative member.

A cooperative is a form of ownership (nonprofit corporation or association) in which the residents purchase memberships in the ownership entity. Rather than being charged "rent" a cooperative member is charged a "carrying charge."

The monthly carrying charge includes the member's share of the cooperative debt service, operating expenses, and necessary payments to cooperative reserve funds. It does not include down payments or other payments to purchase the cooperative unit or to amortize a loan made to the family for this purpose.

The occupancy agreement or lease and other appropriate documents must provide that the monthly carrying charge is subject to Section 8 limitations on rent to owner, and the rent must be reasonable as compared to comparable unassisted units.

When providing HCV assistance in cooperative housing, the standard form of the HAP contract is used with the special housing type specified in Part A of the HAP contract, as follows: "This HAP contract is used for the following special housing type under HUD regulations for the Section 8 voucher program: Cooperative housing."

### 15-V.B. PAYMENT STANDARD, UTILITY ALLOWANCE AND HAP CALCULATION

The payment standard and utility allowance are determined according to regular HCV program requirements.

The HAP for a cooperative housing unit is the lower of the payment standard minus the TTP or the gross rent (monthly carrying charge for the unit, plus any utility allowance), minus the TTP. The monthly carrying charge includes the member's share of the cooperative debt service, operating expenses, and necessary payments to cooperative reserve funds. The carrying charge does not include down payments or other payments to purchase the cooperative unit or to amortize a loan made to the family for this purpose.

### 15-V.C. HOUSING QUALITY STANDARDS

All standard HQS requirements apply to cooperative housing units. There are no additional HQS requirements. The PHA remedies described in 24 CFR 982.404 do not apply. Rather, if the unit

and premises are not maintained in accordance with HQS, the PHA may exercise all available remedies regardless of whether the family or cooperative is responsible for the breach of HQS.

No housing assistance payment can be made unless unit meets HQS and the defect is corrected within the period as specified by the PHA and the PHA verifies correction (see Chapter 8).

In addition to regular breaches of HQS, breaches of HQS by the family include failure to perform any maintenance for which the family is responsible in accordance with the terms of the cooperative occupancy agreement [HCV GB].

## PART VI: MANUFACTURED HOMES

[24 CFR 982.620 through 982.624; FR Notice 1/18/17; New HCV GB, *Special Housing Types,* p. 15]

]

### 15-VI.A. OVERVIEW

A manufactured home is a manufactured structure, transportable in one or more parts that is built on a permanent chassis, and designed for use as a principal place of residence. HCV- assisted families may occupy manufactured homes in three different ways.

(1) A family can choose to rent a manufactured home already installed on a space and HACA must permit it. In this instance program rules are the same as when a family rents any other residential housing, except that there are special HQS requirements as provided in 15-VI.D below.

(2) A family can purchase a manufactured home under the Housing Choice Voucher Homeownership program.

(3) HUD also permits an otherwise eligible family that owns a manufactured home to rent a space for the manufactured home and receive HCV assistance with the rent for the space as well as certain other housing expenses. PHAs may, but are not required to, provide assistance for such families.

### 15-VI.B. SPECIAL REQUIREMENTS FOR MANUFACTURED HOME OWNERS WHO LEASE A SPACE

**Family Income**

In determining the annual income of families leasing manufactured home spaces, the value of the family's equity in the manufactured home in which the family resides is not counted as a family asset.

**Lease and HAP Contract**

There is a designated HAP Contract (form HUD-52642) and designated Tenancy Addendum (form HUD 52642-A) for this special housing type.

## 15-VI.C. PAYMENT STANDARD, UTILITY ALLOWANCE AND HAP CALCULATION [FR Notice 1/18/17]

### Payment Standards

The PHA payment standard for manufactured homes is determined in accordance with 24 CFR 982.505 and is the payment standard used for the PHA's HCV program. It is based on the applicable FMR for the area in which the manufactured home space is located.

The payment standard for the family is the lower of the family unit size (voucher size) or the payment standard for the number of bedrooms in the manufactured home.

### Utility Allowance

HACA must establish utility allowances for manufactured home space rental. For the first 12 months of the initial lease term only, the allowance must include an amount for a utility hook-up charge if the family actually incurred a hook-up charge because of a move. This allowance will not be given to a family that leases in place. Utility allowances for manufactured home space must not include the costs of digging a well or installing a septic system.

If the amount of the monthly assistance payment for a family exceeds the monthly rent for the manufactured home space (including the owner's monthly management and maintenance charges), the PHA may pay the remainder to the family, lender, or utility company.

### Space Rent

The rent for the manufactured home space (including other eligible housing expenses) is the total of:

- The rent charged for the manufactured home space;
- Owner maintenance and management charges for the space;
- The monthly payments made by the family to amortize the cost of purchasing the manufactured home, including any required insurance and property taxes; and
- The applicable allowance for tenant-paid utilities

### Amortization Costs

The monthly payment made by the family to amortize the cost of purchasing the manufactured home is the debt service established at the time of application to a lender for financing the purchase of the manufactured home if monthly payments are still being made. Any increase in

debt service due to refinancing after purchase of the home may not be included in the amortization cost. Debt service for set-up charges incurred by a family may be included in the monthly amortization payments made by the family. In addition, set-up charges incurred before the family became an assisted family may be included in the amortization cost if monthly payments are still being made to amortize the charges.

**Housing Assistance Payment**

The HAP for a manufactured home space under the housing choice voucher program is the lower of the payment standard minus the TTP or the manufactured home space rent (including other eligible housing expenses) minus the TTP.

**Rent Reasonableness**

Initially, and at least annually thereafter HACA must determine that the rent for the manufactured home space is reasonable based on rents for comparable manufactured home spaces. HACA must consider the location and size of the space, and any services and maintenance to be provided by the owner. By accepting the monthly housing assistance payment, the owner of the manufactured home space certifies that the rent does not exceed rents charged by the owner for comparable unassisted spaces in the same manufactured home park or elsewhere.

If requested by the PHA, the owner must give the PHA information on rents charged by the owner for other manufactured home spaces.

## 15-VI.D. HOUSING QUALITY STANDARDS

Under either type of occupancy described in 15-VI.A above, the manufactured home must meet all HQS performance requirements and acceptability criteria discussed in Chapter 8 of this plan. In addition, the following requirement applies:

***Manufactured Home Tie-Down***

A manufactured home must be placed on the site in a stable manner, and must be free from hazards such as sliding or wind damage. The home must be securely anchored by a tie-down device that distributes and transfers the loads imposed by the unit to appropriate ground anchors to resist overturning and sliding.

## PART VII: HOMEOWNERSHIP
[24 CFR 982.625 through 982.643]

## 15-VII.A. OVERVIEW [24 CFR 982.625]

The homeownership option is used to assist a family residing in a home purchased and owned by one or more members of the family. A family assisted under this option may be newly admitted or

an existing participant in the HCV program. HACA must have the capacity to operate a successful HCV homeownership program as defined by the regulations.

There are two forms of homeownership assistance described in the regulations: monthly homeownership assistance payments and single down payment assistance grant. However, PHAs may not offer down payment assistance until and unless funding is allocated by Congress. Since this has not yet happened, only monthly homeownership assistance may be offered.

The PHA may choose not to offer homeownership assistance. However HACA must offer homeownership assistance if needed as a reasonable accommodation so that the program is readily accessible to and usable by persons with disabilities. It is the sole responsibility of HACA to determine whether it is reasonable to implement a homeownership program as a reasonable accommodation. HACA must determine what is reasonable based on the specific circumstances and individual needs of the person with a disability. HACA may determine that it is not reasonable to offer homeownership assistance as a reasonable accommodation in cases where HACA has otherwise opted not to implement a homeownership program.

HACA must approve a live-in aide if needed as a reasonable accommodation so that the program is readily accessible to and usable by persons with disabilities.

> <u>HACA Policy</u>
>
> HACA has opted not to operate a monthly homeownership assistance payments program. A single down payment assistance grant is offered through Austin Affordable Housing's down payment assistance program.

## CHAPTER 16
## PROGRAM ADMINISTRATION INTRODUCTION

This chapter discusses administrative policies and practices that are relevant to the activities covered in this plan. The policies are discussed in seven parts as described below:

<u>Part I: Administrative Fee Reserve</u> This part describes HACA's policies with regard to oversight of expenditures from its administrative fee reserve.

<u>Part II: Setting Program Standards and Schedules</u> This part describes what payment standards are, and how they are updated, as well as how utility allowances are established and revised.

<u>Part III: Informal Reviews and Hearings</u> This part outlines the requirements and procedures for informal reviews and hearings, and for informal hearings regarding citizenship status.

<u>Part IV: Owner or Family Debts to HACA</u> This part describes policies for recovery of monies that HACA has overpaid on behalf of families, or to owners, and describes the circumstances under which HACA will offer repayment agreements to owners and families. Also discussed are the consequences for failure to make payments in accordance with a repayment agreement.

<u>Part V: Section 8 Management Assessment Program (SEMAP)</u> This part describes what the SEMAP scores represent, how they are established, and how those scores affect HACA.

<u>Part VI: Record-Keeping</u> All aspects of the program involve certain types of record-keeping. This part outlines the privacy rights of applicants and participants and record retention policies HACA will follow.

<u>Part VII: Reporting and Record Keeping for Children with Environmental Intervention Blood Lead Level</u> This part describes HACA's responsibilities for reporting, data collection, and record keeping relative to children with environmental intervention blood lead levels that are less than six years of age, and are receiving HCV assistance.

<u>Part VIII: Determination of Insufficient Funding</u> This part describes HACA's policies for determining if there is sufficient funding to issue vouchers, to approve moves to higher cost units or areas, and to continue assistance for all participant families.

<u>Part IX: Violence against Women Act (VAWA): Notification, Documentation, Confidentiality</u> This part contains key terms used in VAWA and describes requirements related to notifying families and owners about their rights and responsibilities under VAWA; requesting documentation from victims of domestic violence, dating violence, sexual assault and stalking; and maintaining the confidentiality of information obtained from victims.

<div align="center">

**PART I: ADMINISTRATIVE FEE RESERVE [24 CFR 982.155]**

</div>

HACA will maintain administrative fee reserves, or unrestricted net position (UNP) for the program to pay program administrative expenses in excess of administrative fees paid by HUD for a PHA fiscal year. HUD appropriations acts beginning with FFY 2004 have specified that administrative fee funding may be used only for activities related to the provision of HCV assistance, including related development activities. [Notice PIH 2012-9] cites two examples of related development activities: unit modification for accessibility purposes and development of project-based voucher units. The notice makes clear that other activities may also qualify as related development activities. Administrative fees that remain in the UNP account from funding provided prior to 2004 may be used for "other housing purposes permitted by state and local law," in accordance with [24 CFR 982.155(b)(1)].

In addition, as specified in Notice PIH 2022-18, PHAs may use administrative fee funding for both administrative and "other expenses" needed to employ strategies and undertake activities beyond regular administrative responsibilities to facilitate the successful leasing and use of housing choice vouchers by families, such as through the use of security deposit assistance and landlord recruitment and incentive payments, among other allowable expenses specified in the notice. PHAs are also permitted to use UNP for these expenses [Notice PIH 2022-18].

If a PHA has not adequately administered its HCV program, HUD may prohibit use of funds in the UNP Account and may direct the PHA to use funds in that account to improve administration of the program, for HCV HAP expenses, or to reimburse ineligible expenses in accordance with the regulation at [24 CFR 982.155(b)(3)].

HUD requires the PHA Board of Commissioners or other authorized officials to establish the maximum amount that may be charged against the UNP account without specific approval.

> HACA Policy
>
> Expenditures from the UNP account will be made in accordance with all applicable federal requirements. Expenditures will not exceed $10,000 per occurrence without the prior approval of the PHA's Board of Commissioners.

## PART II: SETTING PROGRAM STANDARDS AND SCHEDULES

### 16-II.A. OVERVIEW

Although many of the program's requirements are established centrally by HUD, the HCV program's regulations recognize that some flexibility is required to allow HACA to adapt the program to local conditions. This part discusses how HACA establishes and updates certain schedules and standards that are used to administer the program locally. Details about how these schedules are applied to individual families are provided in other chapters. The schedules and standards discussed here include:

*Payment Standards*, which dictate the maximum subsidy a family can receive (application of the payment standards is discussed in Chapter 6); and

*Utility Allowances*, which specify how a family's payment should be adjusted to account for tenant-paid utilities (application of utility allowances is discussed in Chapter 6).

> HACA Policy
>
> Copies of the payment standard and utility allowance schedules are available for review in HACA's offices during normal business hours.
>
> Families, owners, and members of the public may submit written comments on the schedules discussed in this part, at any time, for consideration during the next revision cycle.
>
> HACA will maintain documentation to support its annual review of payment standards and utility allowance schedules. This documentation will be retained for at least 3 years.

Establishing and updating the PHA passbook rate, which is used to calculate imputed income from assets, is covered in Chapter 6 (see Section 6-I.G.).

### 16-II.B. PAYMENT STANDARDS [24 CFR 982.503; HCV GB, Chapter 7]

The payment standard sets the maximum subsidy payment a family can receive from HACA each month [24 CFR 982.505(a)]. Payment standards are based on fair market rents (FMRs) published annually by HUD. FMRs are set at a percentile within the rent distribution of standard quality rental housing units in each FMR area. For most jurisdictions FMRs are set at the 40th percentile of rents in the market area.

HACA must establish a payment standard schedule that establishes payment standard amounts for each FMR area within HACA's jurisdiction, and for each unit size within each of the FMR areas. For each unit size, HACA may establish a single payment standard amount for the whole FMR area, or may set different payment standards for different parts of the FMR area. Unless HUD grants an exception, HACA is required to establish a payment standard within a "basic range" established by HUD – between 90 and 110 percent of the published FMR for each unit size.

## Updating Payment Standards

When HUD updates its FMRs, HACA must update its payment standards if the standards are no longer within the basic range [24 CFR 982.503(b)]. HUD may require HACA to make further adjustments if it determines that rent burdens for assisted families in HACA's jurisdiction are unacceptably high [24 CFR 982.503(g)].

> HACA Policy

> HACA will review the appropriateness of the payment standards on an annual basis when the new FMRs are published, and at other times as determined necessary. In addition to ensuring the payment standards are always within the "basic range" HACA will consider the following factors when determining whether an adjustment should be made to the payment standard schedule:

> **Funding Availability**: HACA will review the budget to determine the impact projected subsidy adjustments will have on funding available for the program and the number of families served.

> **Average rental amounts for unassisted units** – HACA will review the average rental amounts from HACA's available units list and Multiple Listing Service for leased units.

> **Lease-up Time and Success Rate**: HACA may consider the percentage of families that are unable to locate suitable housing before the voucher expires and whether families are leaving the jurisdiction to find affordable housing.

> Any changes to payment standard amounts will be approved by the Board of Commissioners and the effective date will be provided in writing to staff and program participants.

## Exception Payment Standards [24 CFR 982.503(c)(5), Notice PIH 2018-01;] FR Notice 9/27/21

A non-SAFMR PHA may establish an exception payment standard for a zip code area of up to and including 110 percent of the SAFMR determined by HUD for that zip code area. Regardless of the level of the exception payment standard compared to the metropolitan area FMRs (MAFMRs), the PHA must send an email to SAFMRs@hud.gov to notify HUD that it has

adopted an exception payment standard based on the SAFMR. A PHA that adopts an exception payment standard pursuant to this authority must apply it to the entire ZIP code area, for both its HCV, and if applicable, its PBV program. For the PBV program, this means that the rent to owner may not exceed the new exception payment standard amount, provided the rent is still reasonable. A PHA that adopts an exception payment standard area must revise its briefing materials to make families aware of the exception payment standard and the area that it covers.

In addition, HUD allows PHAs to establish a HUD-Veterans Affairs Supportive Housing (HUD-VASH) exception payment standard. PHAs may go up to but no higher than 120 percent of the FMR or SAFMR specifically for VASH families. PHAs who want to establish a VASH exception payment standard over 120 percent must still request a waiver from HUD (See Section 19-III.E.).

**Voluntary Use of Small Area FMRs [24 CFR 982.503, Notice PIH 2018-01]**

PHAs that administer vouchers in a metropolitan area where the adoption of SAFMRs is not required may request approval from HUD to voluntarily adopt SAFMRs.  SAFMRs may be voluntarily adopted for one or more zip code areas.

> HACA Policy
> HACA will not voluntarily adopt the use of SAFMRs but may establish exception payment standards for a zip code area with HACA'.

**Unit-by-Unit Exceptions [24 CFR 982.503, 24 CFR 982.505(d), Notice PIH 2010-26, Streamlining Rule 3/8/2016 and Notice PIH 2016-05**

Unit-by-unit exceptions to HACA's payment standards are generally not permitted. However, an exception may be made as a reasonable accommodation for a family that includes a person with disabilities. (See Chapter 2 for a discussion of reasonable accommodations.) This type of exception does not affect HACA's payment standard schedule.

When needed as a reasonable accommodation, the PHA may make an exception to the payment standard without HUD approval if the exception amount does not exceed 120 percent of the applicable FMR for the unit size [24 CFR 982.503(b)]. The PHA may request HUD approval for an exception to the payment standard for a particular family if the required amount exceeds 120 percent of the FMR.

> HACA Policy
> A family that requires a reasonable accommodation may request a higher payment standard at the time the Request for Tenancy Approval (RTA) is submitted.
>
> The family must submit a written request for a reasonable accommodation for an exception (higher) payment standard;
>
> The family must provide supporting documentation from a medical professional

which defines the need for the exception payment standard; and

The family must provide a written explanation of why the features of the unit meet the needs of a family member with disabilities.  For example, a unit may be suitable because of its physical features or proximity to a health care provider, accessible employment, or other required services.

In order to approve an exception payment standard, HACA must determine that:

There is a shortage of affordable units that would be appropriate for the family;

The family's TTP would otherwise exceed 40 percent of adjusted monthly income;

The rent for the unit is reasonable as determined by a rent reasonableness analysis conducted in accordance with HACA's rent reasonableness certification policy and in compliance with 24 CFR 982.507;

The unit has features that meet the needs of a family member with disabilities.

## "Success Rate" Payment Standard Amounts [24 CFR 982.503(e)]

If a substantial percentage of families have difficulty finding a suitable unit, HACA may request a "success rate payment standard" that applies to the entire jurisdiction. If approved by HUD, a success rate payment standard allows HACA to set its payment standards at 90-110 percent of a higher FMR (the 50th, rather than the 40th percentile FMR). To support the request, HACA must demonstrate that during the most recent 6-month period for which information is available:

Fewer than 75 percent of families who were issued vouchers became participants;

HACA had established payment standards for all unit sizes, and for the entire jurisdiction, at 110 percent of the published FMR; and

HACA had a policy of allowing voucher holders who made sustained efforts to locate units at least 90 days to search for a unit.

Although HUD approves the success rate payment standard for all unit sizes in the FMR area, HACA may choose to adjust the payment standard for only some unit sizes in all, or a designated part, of HACA's jurisdiction within the FMR area.

## Decreases in the Payment Standard below the Basic Range [24 CFR 982.503(d)]

HACA must request HUD approval to establish a payment standard amount that is lower than the basic range. At HUD's sole discretion, HUD may approve establishment of a payment standard lower than the basic range. HUD will not approve a lower payment standard if the family share for more than 40 of program participants exceeds 30 percent of adjusted monthly income.

## 16-II.C. UTILITY ALLOWANCES [24 CFR 982.517]

A HACA-established utility allowance schedule is used in determining family share and PHA

subsidy. HACA must maintain a utility allowance schedule for (1) all tenant-paid utilities, (2) the cost of tenant-supplied refrigerators and ranges, and (3) other tenant-paid housing services such as trash collection.

The utility allowance schedule must be determined based on the typical cost of utilities and services paid by energy-conservative households that occupy housing of similar size and type in the same locality. In developing the schedule, HACA must use normal patterns of consumption for the community as a whole, and current utility rates.

The utility allowance must include the utilities and services that are necessary in the locality to provide housing that complies with housing quality standards. Costs for telephone, cable/satellite television, and internet services are not included in the utility allowance schedule.

In the utility allowance schedule, HACA must classify utilities and other housing services according to the following general categories: space heating; air conditioning; cooking; water heating; water; sewer; trash collection; other electric; cost of tenant-supplied refrigerator; cost of tenant-supplied range; and other specified housing services.

The cost of each utility and housing service must be stated separately by unit size and type. Chapter 18 of the *HCV Guidebook* provides detailed guidance to HACA about establishing utility allowance schedules.

## Air Conditioning

An allowance for air-conditioning must be provided when the majority of housing units in the market have central air-conditioning or are wired for tenant-installed air conditioners.

> <u>HACA Policy</u>
>
> HACA has included an allowance for air-conditioning in its schedule. Central air-conditioning or a portable air conditioner must be present in a unit before HACA will apply this allowance to a family's rent and subsidy calculations.

## Reasonable Accommodation

HCV program regulations require HACA to approve a utility allowance amount higher than shown on HACA's schedule if a higher allowance is needed as a reasonable accommodation for a family member with a disability. For example, if a family member with a disability requires such an accommodation, HACA will approve an allowance for air-conditioning, even if HACA has determined that an allowance for air-conditioning generally is not needed (See <u>Chapter 2</u> for policies regarding the request and approval of reasonable accommodations).

## Utility Allowance Revisions

HACA must review its schedule of utility allowances each year and must revise the schedule if there has been a change of 10 percent or more in any utility rate since the last time the allowance for that utility was revised.

HACA must maintain information supporting its annual review of utility allowance and

any revisions made in its utility allowance schedule.

## PART III: INFORMAL REVIEWS AND HEARINGS

### 16-III.A. OVERVIEW

Both applicants and participants have the right to disagree with, and appeal, certain decisions of HACA that may adversely affect them. HACA's decisions that may be appealed by applicants and participants are discussed in this section.

For participants (or applicants denied admission because of citizenship issues), the appeal process is called an "informal hearing." PHAs are required to include informal review procedures for applicants and informal hearing procedures for participants in their administrative plans [24 CFR 982.54(d)(12) and (13)].

### 16-III.B. INFORMAL REVIEWS

Informal reviews are provided for program applicants. An applicant is someone who has applied for admission to the program, but is not yet a participant in the program. Informal reviews are intended to provide a "minimum hearing requirement" [24 CFR 982.554], and need not be as elaborate as the informal hearing requirements [*Federal Register* 60, no. 127 (3 July 1995):
34690].

**Decisions Subject to Informal Review**

HACA must give an applicant the opportunity for an informal review of a decision denying assistance [24 CFR 982.554(a)]. Denial of assistance may include any or all of the following [24 CFR 982.552(a)(2)]:

- Denying listing on HACA waiting list
- Denying or withdrawing a voucher
- Refusing to enter into a HAP contract or approve a lease
- Refusing to process or provide assistance under portability procedures Informal reviews are *not* required for the following reasons [24 CFR 982.554(c)]:
- Discretionary administrative determinations by HACA
- General policy issues or class grievances
- A determination of the family unit size under HACA subsidy standards
- HACA determination not to approve an extension of a voucher term
- HACA determination not to grant approval of the tenancy
- HACA determination that the unit is not in compliance with the HQS
- HACA determination that the unit is not in accordance with the HQS due to family size or composition

> <u>HACA Policy</u>
>
> HACA will only offer an informal review to applicants for whom assistance is being denied. Denial of assistance includes: denying listing on HACA waiting list; denying or withdrawing a voucher; refusing to enter into a HAP contract or approve a lease;

refusing to process or provide assistance under portability procedures.

### Notice to the Applicant [24 CFR 982.554(a)]

HACA must give an applicant prompt notice of a decision denying assistance. The notice must contain a brief statement of the reasons for HACA decision, and must also state that the applicant may request an informal review of the decision. The notice must describe how to obtain the informal review.

### Scheduling an Informal Review

<u>HACA Policy</u>

A request for an informal review must be made in writing and delivered to HACA either in person, by first class mail or emailed, by the close of the business day, no later than 15 calendar days from the date of HACA's denial of assistance.

HACA will schedule and send written notice of the informal review within 30 calendar days of the family's request.  The notice will be mailed and if we have the family's email, the notice may be emailed.

### Informal Review Procedures [24 CFR 982.554(b)]

The informal review must be conducted by a person other than the one who made or approved the decision under review, or a subordinate of this person.

The applicant must be provided an opportunity to present written or oral objections to the decision of HACA.

<u>HACA Policy</u>

The informal review will be conducted by an appointed Hearing Officer who is a person other than the one who made or approved the decision under review, or a subordinate of this person.

The applicant will be provided an opportunity to present written or oral objections to the decision of HACA.

The Hearing Officer will render a decision on whether assistance should be granted or denied.

### Remote Informal Reviews [Notice PIH 2020-32]

There is no requirement that informal reviews be conducted in-person and, as such, HUD allows PHAs to conduct all or a portion of their informal review remotely either over the phone, via video conferencing, or through other virtual platforms. If the PHA chooses to conduct remote informal reviews, applicants may still request an in-person informal review, as applicable.

<u>HACA Policy</u>

HACA has the sole discretion to require that informal reviews be conducted remotely in case of local, state, or national physical distancing orders, and in cases of inclement

weather or natural disaster.

In addition, HACA will conduct an informal review remotely upon request of the applicant as a reasonable accommodation for a person with a disability, if an applicant does not have child care or transportation that would enable them to attend the informal review, or if the applicant believes an in-person informal review would create an undue health risk. HACA will consider other reasonable requests for a remote informal review on a case-by-case basis.

## Ensuring Accessibility for Persons with Disabilities and LEP Individuals

As with in-person informal reviews, the platform for conducting remote informal reviews must be accessible to persons with disabilities and the informal review must be conducted in accordance with Section 504 and accessibility requirements. This includes ensuring any information, websites, emails, digital notifications, and other virtual platforms are accessible for persons with vision, hearing, and other disabilities. Further, providing effective communication in a digital context may require the use of individualized auxiliary aids or services, such as audio description, captioning, sign language and other types of interpreters, keyboard accessibility, accessible documents, screen reader support, and transcripts. Auxiliary aids or services must be provided in accessible formats, in a timely manner, and in such a way to protect the privacy and independence of the individual. PHAs may never request or require that individuals with disabilities provide their own auxiliary aids or services, including for remote informal hearings.

PHAs are required to make reasonable accommodations in policies, practices, and procedures to ensure persons with disabilities have a full and equal opportunity to participate in and benefit from all aspects of the informal review process. See Chapter 2 for a more detailed discussion of reasonable accommodation requirements.

If no method of conducting a remote informal review is available that appropriately accommodates an individual's disability, the PHA may not hold against the individual his or her inability to participate in the remote informal review, and the PHA should consider whether postponing the remote informal review to a later date is appropriate or whether there is a suitable alternative.

Due to the individualized nature of disability, the appropriate auxiliary aid or service necessary, or reasonable accommodation, will depend on the specific circumstances and requirements.

As with in-person reviews, Limited English Proficiency (LEP) requirements also apply to remote informal reviews, including the use of interpretation services and document translation. See Chapter 2 for a more thorough discussion of accessibility and LEP requirements, all of which apply in the context of remote informal reviews.

**Conducting Remote Informal Reviews**

The PHA must ensure that the lack of technology or inability to use technology for remote informal reviews does not pose a disadvantage to families that may not be apparent to the PHA. The PHA should determine through a survey or other means if these barriers exist prior to conducting the remote informal review and, if the family does not have the proper technology to fully participate, either postpone the informal review or provide an alternative means of access.

As with in-person informal reviews, the PHA must provide all materials presented, whether paper or electronic, to the family prior to the remote informal review. The family must also be provided with an accessible means by which to transmit their own evidence. HACA must ensure that the applicant has the right to hear and be heard. All PHA policies and processes for remote informal reviews must be conducted in accordance with due process requirements and be in compliance with HUD regulations at 24 CFR 982.554 and guidance specified in Notice PIH 2020-32.

> HACA Policy
>
> HACA will conduct remote informal reviews via telephone conferencing call-in or via videoconferencing. If the informal review will be conducted via videoconferencing, HACA will ensure that all applicants, applicant representatives, HACA representatives and the person conducting the informal review can adequately access the platform (i.e., hear, be heard, see, and be seen). If any applicant, applicant representative, HACA representative, or person conducting the informal review is unable to effectively utilize the videoconferencing platform, the informal review will be conducted by telephone conferencing call-in.
>
> Whether the informal review is to be conducted via videoconferencing or telephone call-in, the HACA will provide all parties login information and/or conferencing call-in information before the review.

**Informal Review Decision [24 CFR 982.554(b)]**

HACA must notify the applicant of HACA's final decision, including a brief statement of the reasons for the final decision.

> HACA Policy
> HACA will notify the applicant of HACA's final decision, including a brief statement of the reasons for the final decision.
>
> In rendering a decision, HACA will evaluate the following matters:
>
> > Whether or not the grounds for denial were stated factually in the notice to the family.

The validity of grounds for denial of assistance. If the grounds for denial are not specified in the regulations, then the decision to deny assistance will be overturned.  See Chapter 3 for a detailed discussion of the grounds for applicant denial.

The validity of the evidence. HACA will evaluate whether the facts presented prove the grounds for denial of assistance. If the facts prove that there are grounds for denial, and the denial is required by HUD, HACA will uphold the decision to deny assistance.

If the facts prove the grounds for denial, the Hearing Officer will make the final decision to deny assistance.

HACA will notify the applicant of the final decision, including a statement explaining the reason(s) for the decision. The notice will be mailed within 15 calendar days of the informal review, to the applicant and his or her representative, if any.

If the decision to deny is overturned as a result of the informal review, processing for admission will resume.

If the family fails to appear for their informal review, the denial of admission will stand and the family will be so notified.

The applicant may request that the Hearing Officer consider a request for Reasonable Accommodations under the Fair Housing Act and Section 504 with respect to past conduct (see below).

If the basis for the denial relates to family violence, the applicant may qualify for an exception under the Violence against Women Amendments.

The Notice of Denial letter will include information for the tenant regarding who to contact for legal representation.

### Reasonable Accommodation for Persons with Disabilities [24 CFR 966.7]

Persons with disabilities may request reasonable accommodations to participate in the informal hearing process and HACA must consider such accommodations. HACA must also consider reasonable accommodation requests pertaining to the reasons for denial if related to the person's disability. See Chapter 2 for more detail pertaining to reasonable accommodation requests.

## 16-III.C. INFORMAL HEARINGS FOR PARTICIPANTS [24 CFR 982.555]

HACA must offer an informal hearing for certain PHA determinations relating to the individual circumstances of a participant family. A participant is defined as a family that has been admitted to HACA's HCV program and is currently assisted in the program. The purpose of the informal hearing is to consider whether HACA's decisions related to the family's circumstances are in accordance with the law, HUD regulations and PHA policies.

HACA is not permitted to terminate a family's assistance until the time allowed for the

family to request an informal hearing has elapsed, and any requested hearing has been completed. Termination of assistance for a participant may include any or all of the following:

Refusing to enter into a HAP contract or approve a lease

Terminating housing assistance payments under an outstanding HAP contract

Refusing to process or provide assistance under portability procedures

### Decisions Subject to Informal Hearing

Circumstances for which HACA must give a participant family an opportunity for an informal hearing are as follows:

A determination of the family's annual or adjusted income, and the use of such income to compute the housing assistance payment

A determination of the appropriate utility allowance (if any) for tenant-paid utilities from HACA utility allowance schedule

A determination of the family unit size under HACA's subsidy standards

A determination to terminate assistance for a participant family because of the family's actions or failure to act

A determination to terminate assistance because the participant has been absent from the assisted unit for longer than the maximum period permitted under PHA Policy and HUD rules

A determination to terminate a family's Family Self Sufficiency contract, withholds supportive services, or proposes forfeiture of the family's escrow account [24 CFR 984.303(i)]

Circumstances for which an informal hearing is not required are as follows:

Discretionary administrative determinations by HACA

General policy issues or class grievances

Establishment of HACA schedule of utility allowances for families in the program.

HACA determination not to approve an extension of a voucher term

HACA determination not to approve a unit or tenancy

HACA determination that a unit selected by the applicant is not in compliance with the HQS

HACA determination that the unit is not in accordance with HQS because of family size A determination by HACA to exercise or not to exercise any right or remedy against an owner under a HAP contract

HACA Policy

HACA will only offer participants the opportunity for an informal hearing when required to by the regulations.

## Remote Informal Hearings (PIH Notice 2020-32_

There is no requirement that informal hearings be conducted in-person, and as such, HUD allows PHAs to conduct all or a portion of their informal hearings remotely either over the phone, via video conferencing, or through other virtual platforms. If the PHA chooses to conduct remote informal hearings, applicants may still request an in-person informal hearing, as applicable.

HACA Policy

HACA may conduct informal hearings in-person or remotely via webcast, video call, by phone, by mail or by another virtual method.

HACA has the sole discretion to require that informal hearings be conducted remotely in case of local, state, or national physical distancing orders, and in cases of inclement weather or natural disaster.

In addition, HACA will conduct an informal hearing remotely upon request as a reasonable accommodation for a person with a disability, if a participant does not have child care or transportation that would enable them to attend the informal hearing, or if the participant believes an in-person hearing would create an undue health risk. HACA will consider other reasonable requests for a remote informal hearing on a case-by-case basis.

## Ensuring Accessibility for Persons with Disabilities and LEP Individuals

As with in-person informal hearings, the platform for conducting remote informal hearings must be accessible to persons with disabilities and the informal hearings must be conducted in accordance with Section 504 and accessibility requirements. This includes ensuring any information, websites, emails, digital notifications, and other virtual platforms are accessible for persons with vision, hearing, and other disabilities. Further, providing effective communication in a digital context may require the use of individualized auxiliary aids or services, such as audio description, captioning, sign language and other types of interpreters, keyboard accessibility, accessible documents, screen reader support, and transcripts. Auxiliary aids or services must be provided in accessible formats, in a timely manner, and in such a way to protect the privacy and independence of the individual. PHAs may never request or require that individuals with disabilities provide their own auxiliary aids or services, including for remote informal hearings.

PHAs are required to make reasonable accommodations in policies, practices, and procedures to ensure persons with disabilities have a full and equal opportunity to participate in and benefit

from all aspects of the informal hearing process. See Chapter 2 for a more detailed discussion of reasonable accommodation requirements.

If no method of conducting a remote informal hearings is available that appropriately accommodates an individual's disability, the PHA may not hold against the individual his or her inability to participate in the remote informal hearing, and the PHA should consider whether postponing the remote hearing to a later date is appropriate or whether there is a suitable alternative.

Due to the individualized nature of disability, the appropriate auxiliary aid or service necessary, or reasonable accommodation will depend on the specific circumstances and requirements.

As with in-person reviews, Limited English Proficiency (LEP) requirements also apply to remote informal hearings, including the use of interpretation services and document translation. See Chapter 2 for a more thorough discussion of accessibility and LEP requirements, all of which apply in the context of remote informal hearings.

**Conducting Informal Hearings Remotely**

The PHA must ensure that the lack of technology or inability to use technology for remote informal hearings does not pose a disadvantage to families that may not be apparent to the PHA. The PHA should determine through a survey or other means if these barriers exist prior to conducting the remote informal hearing and, if the family does not have the proper technology to fully participate, either postpone the informal hearing or provide an alternative means of access.

As with in-person informal hearings, the PHA must provide all materials presented, whether paper or electronic, to the family prior to the remote informal hearing. The family must also be provided with an accessible means by which to transmit their own evidence.

The PHA's essential responsibility is to ensure informal hearings meet the requirements of due process and comply with HUD regulations. Therefore, all PHA policies and processes for remote informal hearings will be conducted in accordance with due process requirements, and will be in compliance with HUD regulations at 24 CFR 982.555 and the guidance for conducting remote hearings specified in Notice PIH 2020-32.

<u>HACA Policy</u>

HACA will conduct remote informal hearings via telephone conferencing call or via video conferencing. If the informal hearing will be conducted via videoconferencing, HACA will ensure that all participants, participant representatives, advocates, witnesses, HACA representatives, and the informal hearing officer can adequately access the platform.

If any participant, representative, advocate, witness, HACA representative, or hearing officer is unable to effectively utilize the videoconferencing platform, the informal hearing will be conducted by telephone conferencing call-in.

Whether the informal hearing is to be conducted via videoconferencing or telephone call-in, HACA will provide all parties login information and/or telephone call-in information before the informal hearing.  HACA will also provide technical assistance, if needed, before the informal hearing.

HACA will never require that an individual with disabilities provide their own auxiliary aids or services for remote hearings.  HACA will not rely on an adult or minor child accompanying a person with a disability to interpret or facilitate communication for such person, except in an emergency involving an imminent threat to the safety or welfare of an individual or the public where there is no interpreter available; or where the individual with a disability specifically requests that the accompanying adult interpret or facilitate communication, the accompanying adult agrees to provide such assistance, and reliance on the adult for such assistance is appropriate under the circumstances. (28 CFR 35.160-164; 24 CFR 8.6).

**Reasonable Accommodations.**   HACA is required to make reasonable accommodations in policies, practices, and procedures to ensure persons with disabilities have a full and equal opportunity to participate in and benefit from all aspects of the informal hearing process.  This obligation is in addition to the obligation to ensure effective communication under Section 504 and the ADA.

If no method of conducting a remote informal hearing is available that appropriately accommodates an individual's disability, HACA may not hold the remote hearing.  HACA should consider whether postponing the remote hearing to a later date is appropriate or whether there is a suitable alternative to meet the participant's satisfaction more expeditiously.

**Requirement for persons with limited English proficiency (LEP).**  HACA must take reasonable steps to ensure full and meaningful access to the remote informal hearing for LEP persons consistent with its obligations under Title VI of the Civil Rights Act of 1964[3].  The obligation to provide meaningful access for LEP persons, regarding remote informal hearings, is particularly important meaning that HACA will generally need to coordinate with a remote language interpretation service prior to the remote informal hearing.  Further, conferencing technology may provide for remote interpretation; if video technology is available, remote interpretation using video is generally preferred over voice-only because of the additional visual cues.  HACA will not rely on minors to interpret.

For written materials, HACA will engage with a language translation service. All written materials related to the remote informal hearing, whether paper or electronic, and whether provided before, during, or after the informal hearing, if needed, will be provided in translated format.

**Identify and Resolve Technology Barriers Prior to Conducting the Remote Informal Hearing.** The lack of technology or inability to use technology for a remote informal hearing can impose a disadvantage for individuals or families that may not be apparent to HACA. Thus, HACA will determine if barriers exist prior to scheduling the remote informal hearing. If the participant does not have proper technology access which will allow the individual to fully participate, then the remote informal hearing will be postponed, or an in-person alternative will be provided

**Presenting Documents Prior to a Remote Informal Hearing**. If video or telephone conference is used for the remote informal hearing, all materials being presented, whether paper or electronic, will be provided to the individual or family prior to the remote informal hearing. Individuals or families may prefer paper printouts over electronic documents, due to lack of access to printers, difficulty viewing detailed documents on a cell phone, or difficulty viewing screen sharing on an app. Any materials made available to the individual or family must meet the requirements for accessibility for persons with disabilities and persons with LEP.

Generally, HACA will compile a hearing packet, consisting of all documents HACA intends to produce at the informal hearing. HACA will mail copies of the informal hearing packet to the family, the family's representatives, if any, and the informal hearing officer at least five business days before the scheduled remote informal hearing. The original hearing packet will be in the possession of HACA'S representative and retained by HACA. Documents may also be shared electronically by a secured, encrypted delivery method.

**Establish Procedures**. HACA will establish written procedures of all aspects of how the remote informal hearing will be conducted and the procedures will be readily available to the public. The procedures will explain how documents will be presented prior to a remote informal hearing. Note that when making procedures readily available to the public, HACA will meet the obligations under Section 504 and the ADA to effectively communicate to persons with disabilities, and under Title VI of the Civil Rights Act of 1964 to provide meaningful access to individuals with LEP.

**Personally Identifiable Information (PII).** For documents that contain PII and are provided prior to a remote informal hearing, HACA will minimizing the risk of exposure or misuse of the data collected, used, and shared. PII is information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information directly linked or linkable to a specific individual. Examples of PII include name, social security number, biometric records, date and place of birth, and mother's maiden name. When considering how the informal remote hearing will be conducted, HACA shall ensure that electronic information stored or transmitted is secure per Notice PIH-2015-06.

**Due Process for Remote Informal Hearings**

**Conducting Discovery and Providing Evidence.** HACA may request and copy any of the individual's or family's documents at HACA's own expense in accordance with the applicable regulations. Additionally, the individual or family must be given the opportunity to examine any of HACA's documents that are directly relevant to the informal hearing prior to the remote informal hearing. This may include transmitting documents electronically or by mail that would normally be exchanged at HACA's office. Under Section 504, the ADA, and the Fair Housing Act, HACA may need to make reasonable accommodations and take appropriate steps to ensure effective communication with individuals with disabilities through the provision of AA/S before, during, and after any hearing. This may require changes in how the individual or family seeks discovery of information held by HACA and the manner in which evidence is made available to persons with disabilities during remote informal hearings (while still meeting any applicable rules concerning the acceptance of evidence by the informal hearing officer). HACA will also take reasonable steps to ensure meaningful access for LEP persons before, during, and after such remote hearings (28 CFR 35.160-164; 24 CFR 8.6; 24 CFR 982.555(e)(2) and (5); 24 CFR 966.56(b)).

HACA may requests the family to provide documents directly relevant to the informal hearing prior to the informal hearing either electronically or by mail. However, if documents are not provided prior to the informal hearing, the documents relevant to the informal hearing should be provided either at the informal hearing or by the due date established by the informal hearing officer.

## Informal Hearing Procedures

### *Notice to the Family* [24 CFR 982.555(c)]

When HACA makes a decision that is subject to informal hearing procedures, HACA must inform the family of its right to an informal hearing at the same time that it informs the family of the decision.

For decisions related to the family's annual or adjusted income, the determination of the appropriate utility allowance, and the determination of the family unit size, HACA must notify the family that they may ask for an explanation of the basis of the determination, and that if they do not agree with the decision, they may request an informal hearing on the decision.

For decisions related to the termination of the family's assistance, or the denial of a family's request for an exception to HACA's subsidy standards, the notice must contain a brief statement of the reasons for the decision, a statement that if the family does not agree with the decision, the family may request an informal hearing on the decision, and a statement of the deadline for the family to request an informal hearing.

> HACA Policy
>
> In cases where HACA makes a decision for which an informal hearing must be offered, the notice to the family will include all of the following:
>
> The proposed action or decision of HACA.
>
> A brief statement of the reasons for the decision, including the regulatory reference.
>
> The date the proposed action will take place.
>
> A statement that if the family does not agree with the decision the family may request an informal hearing of the decision.
>
> A deadline for the family to request the informal hearing
>
> To whom the hearing request should be addressed.
>
> A copy of HACA's hearing procedures.

## Scheduling an Informal Hearing [24 CFR 982.555(d)]

When an informal hearing is required, HACA must proceed with the hearing in a reasonably expeditious manner upon the request of the family.

> HACA Policy
>
> A request for an informal hearing must be made in writing and delivered to HACA either in person by first class mail, or by email by the close of the business day, no later than 15 calendar days from the date of HACA's decision or notice to terminate assistance.

HACA will schedule and send written notice of the informal hearing to the family within 30 calendar days of the family's request.

If the hearing will be conducted remotely, at the time the notice is sent to the family, the family will be notified:

Regarding the processes involved in a remote informal hearing;

That HACA will provide technical assistance prior to and during the informal hearing, if needed; and

That if the family or any individual witness has any technological, resource, or accessibility barriers, the family may inform the HACA and HACA will assist the family in either resolving the issue or allow the family to participate in an in-person hearing, as appropriate.

The family may request to reschedule a hearing for good cause, or if it is needed as a reasonable accommodation for a person with disabilities. Good cause is defined as an unavoidable conflict, which seriously affects the health, safety or welfare of the family. Requests to reschedule a hearing must be made orally or in writing within forty-eight (48) hours of hearing date. At its discretion, HACA may request documentation of the "good cause" prior to rescheduling the hearing. Failure to adhere to the forty-eight (48) hour notice requirement or failure to show up for the hearing will result in automatic loss of appeal.

### Failure to Appear

There may be times when a participant does not appear due to unforeseen circumstances that are out of their control and are no fault of their own.

HACA Policy

If the tenant does not appear at the scheduled time of the hearing, the Hearing Officer will wait up to 15 minutes. If the tenant appears within 15 minutes of the scheduled time, the hearing will be held. If the tenant does not arrive within 15 minutes of the scheduled time, they will be considered to have failed to appear.

If the tenant fails to appear and was unable to reschedule the hearing in advance, the tenant must contact HACA within 24 hours of the scheduled hearing date, excluding weekends and holidays. The Hearing Officer will reschedule the hearing only if the tenant can show good cause for the failure to appear, or it is needed as a reasonable accommodation for a person with disabilities.

Good cause is defined as an unavoidable conflict that seriously affects the health, safety or welfare of the family.

### Pre-Hearing Right to Discovery [24 CFR 982.555(e)]

Participants and HACA are permitted pre-hearing discovery rights. The family must be given the opportunity to examine before the hearing any PHA documents that are directly relevant to the hearing. The family must be allowed to copy any such documents at their own expense. If HACA does not make the document available for examination on request of the family, HACA may not rely on the document at the hearing.

HACA hearing procedures may provide that HACA must be given the opportunity to examine at HACA offices before the hearing, any family documents that are directly relevant to the hearing. HACA must be allowed to copy any such document at HACA's expense. If the family does not make the document available for examination on request of HACA, the family may not rely on the document at the hearing.

For the purpose of informal hearings, *documents* include records and regulations.

> <u>HACA Policy</u>
>
> The family will be allowed to copy any documents related to the informal hearing at a cost of $.10 per page. The participant or representative must present any documents relevant to the informal hearing at the informal hearing or as requested by HACA, otherwise, the family many not rely on the documents at the informal hearing.

HACA must be given the opportunity to examine any family documents that are directly relevant to the informal hearing. HACA must be allowed to copy any such document at the HACA's expense. If the family does not make the document available for examination on request of HACA, the family may not rely on the document at the informal hearing.

> <u>HACA Policy</u>
>
> For in-person hearings, HACA may require pre-hearing discovery by HACA of family documents directly relevant to the hearing.
>
> Documents may be  sent to HACA by mail, dropped off, or shared electronically via a secured, encrypted electronic delivery method..

### Participant's Right to Bring Counsel [24 CFR 982.555(e)(3)]

At their own expense, the family may be represented by a lawyer or other representative at the informal hearing.

### Informal Hearing Officer [24 CFR 982.555(e)(4)]

Informal hearings will be conducted by a person or persons approved by HACA, other than the person who made or approved the decision or a subordinate of the person who made or approved the decision.

HACA Policy

The informal hearing will be conducted by an appointed Hearing Officer who is a person other than the one who made or approved the decision under review, or a subordinate of this person.

## Attendance at the Informal Hearing

HACA Policy

Hearings may be attended by a hearing officer and the following applicable

persons:

A HACA representative(s) and any witnesses for HACA

The participant and any witnesses for the participant

The participant's counsel or other representative

Any other person approved by HACA as a reasonable accommodation for a person with a disability.

## Conduct at Hearings

The person who conducts the hearing may regulate the conduct of the hearing in accordance with HACA's hearing procedures [24 CFR 982.555(4)(ii)].

HACA Policy

The hearing officer is responsible to manage the order of business and to ensure that hearings are conducted in a professional and businesslike manner. Attendees are expected to comply with all hearing procedures established by the hearing officer and guidelines for conduct. Any person demonstrating disruptive, abusive or otherwise inappropriate behavior will be excused from the hearing at the discretion of the hearing officer.

## *Evidence* [24 CFR 982.555(e)(5)]

HACA and the family must be given the opportunity to present evidence and question any witnesses. In general, all evidence is admissible at an informal hearing. Evidence may be considered without regard to admissibility under the rules of evidence applicable to judicial proceedings.

HACA Policy

Any evidence to be considered by the hearing officer must be presented at the time of the hearing. There are four categories of evidence.

**Oral evidence**: the testimony of witnesses

**Documentary evidence**: documentation, which is relevant to the case, for example, a letter written to HACA. Writings include all forms of recorded communication or representation, including letters, words,

pictures, sounds, videotapes or symbols or combinations thereof.

**Demonstrative evidence**: Evidence created specifically for the hearing and presented as an illustrative aid to assist the hearing officer, such as a model, a chart or other diagram.

**Real evidence**: A tangible item relating directly to the case.

**Hearsay Evidence** is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter. Even though evidence, including hearsay, is generally admissible, hearsay evidence alone cannot be used as the sole basis for the hearing officer's decision.

If either HACA or the family fail to comply with the discovery requirements described above, the hearing officer will refuse to admit such evidence.

Other than the failure of a party to comply with discovery, the hearing officer has the authority to overrule any objections to evidence.

## Hearing Officer's Decision [24 CFR 982.555(e)(6)]

The person who conducts the hearing must issue a written decision, stating briefly the reasons for the decision. Factual determinations relating to the individual circumstances of the family must be based on a preponderance of evidence presented at the hearing. A copy of the hearing must be furnished promptly to the family.

HACA Policy

In rendering a decision, the hearing officer will consider the following matters:

**HACA Notice to the Family**: The hearing officer will determine if the reasons for HACA's decision are factually stated in the Notice.

**Discovery:** The hearing officer will determine if HACA and the family were given the opportunity to examine any relevant documents in accordance with HACA Policy.

**HACA Evidence to Support HACA's Decision**: The evidence consists of the facts presented. Evidence is not conclusion and it is not argument. The hearing officer will evaluate the facts to determine if they support HACA's conclusion.

**Consideration of circumstances:** The Hearing Officer may consider all relevant circumstances such as the seriousness of the case, the extent of participation or culpability of individual family members, mitigating circumstances related to the disability of a family member, and the effects of denial or termination of assistance on other family members who were not involved in the action or failure. Also, whether such household member is participating in or has successfully completed a supervised drug or alcohol rehabilitation program, or has otherwise been rehabilitated successfully.

If the family includes a person with disabilities, the Hearing Officer's decision

will be subject to consideration of the reasonable accommodation requests made by the head of household or their representative. The Hearing Officer's decision will also be consistent with fair housing and equal opportunity provisions of Fair Housing Act, and with the requirements regarding protection for victims of domestic violence, dating violence, or stalking.

**Validity of Grounds for Termination of Assistance (when applicable)**: The hearing officer will determine if the termination of assistance is for one of the grounds specified in the HUD regulations and HACA's policies. If the grounds for termination are not specified in the regulations or in compliance with HACA's policies, then the decision of HACA will be overturned.

The hearing officer will issue a written decision to the family within 10 business days after the hearing. The report will contain the following information:

**Hearing information:**

Name of the participant;

Date, time and place of the hearing;

Name of the hearing officer;

Name of HACA representative; and

Name of family representative (if any).

Names of witnesses (if any)

**Background**: A brief, impartial statement of the reason for the hearing.

**Summary of the Evidence**: The hearing officer will summarize the testimony of each witness and identify any documents that a witness produced in support of his/her testimony and that are admitted into evidence.

**Findings of Fact:** The hearing officer will include all findings of fact, based on a preponderance of the evidence. *Preponderance of the evidence* is defined as evidence which is of greater weight or more convincing than the evidence which is offered in opposition to it; that is, evidence which as a whole shows that the fact sought to be proved is more probable than not. Preponderance of the evidence may not be determined by the number of witnesses, but by the greater weight of
all evidence.

**Conclusions:** The hearing officer will render a conclusion derived from the facts that were found to be true by a preponderance of the evidence. The conclusion will result in a determination of whether these facts uphold HACA's decision.

**Order:** The hearing report will include a statement of whether HACA's decision is upheld or overturned. If it is overturned, the hearing officer will

instruct HACA to change the decision in accordance with the hearing officer's determination. In the case of termination of assistance, the hearing officer will instruct HACA to restore the participant's program status.

### Procedures for Rehearing or Further Hearing

HACA Policy

The hearing officer may ask the family for additional information and/or might adjourn the hearing in order to reconvene at a later date, before reaching a decision. If the family misses an appointment or deadline ordered by the hearing officer, the action of HACA will take effect and another hearing will not be granted.

## 16-III.D. HEARING AND APPEAL PROVISIONS FOR NON-CITIZENS [24 CFR 5.514]

Denial or termination of assistance based on immigration status is subject to special hearing and notice rules. Applicants who are denied assistance due to immigration status are entitled to an informal hearing, not an informal review.

Assistance to a family may not be delayed, denied, or terminated on the basis of immigration status at any time prior to a decision under the United States Citizenship and Immigration Services (USCIS) appeal process. Assistance to a family may not be terminated or denied while HACA hearing is pending, but assistance to an applicant may be delayed pending the completion of the informal hearing.

A decision against a family member, issued in accordance with the USCIS appeal process or HACA informal hearing process, does not preclude the family from exercising the right, that may otherwise be available, to seek redress directly through judicial procedures.

### Notice of Denial or Termination of Assistance [24 CFR 5.514(d)]

The notice of denial or termination of assistance for noncitizens must advise the family:

That financial assistance will be denied or terminated, and provide a brief explanation of the reasons for the proposed denial or termination of assistance.

The family may be eligible for proration of assistance.

In the case of a participant, the criteria and procedures for obtaining relief under the provisions for preservation of families [24 CFR 5.514 and 5.518].

That the family has a right to request an appeal to the USCIS of the results of secondary verification of immigration status and to submit additional documentation or explanation in support of the appeal.

That the family has a right to request an informal hearing with HACA either upon completion of the USCIS appeal or in lieu of the USCIS appeal.

For applicants, assistance may not be delayed until the conclusion of the USCIS appeal process, but assistance may be delayed during the period of the informal hearing process.

## USCIS Appeal Process [24 CFR 5.514(e)]

When HACA receives notification that the USCIS secondary verification failed to confirm eligible immigration status, HACA must notify the family of the results of the USCIS verification. The family will have 30 days from the date of the notification to request an appeal of the USCIS results. The request for appeal must be made by the family in writing directly to the USCIS. The family must provide HACA with a copy of the written request for appeal and the proof of mailing.

> <u>HACA Policy</u>
>
> HACA will notify the family in writing of the results of the USCIS secondary verification within 10 calendar days of receiving the results.
>
> The family will have 30 calendar days from the date of HACA's notification to appeal the results directly to the USCIS.
>
> The family must provide HACA with a copy of the written request for appeal and proof of mailing within 10 calendar days of sending the request to the USCIS.

The family must forward to the designated USCIS office any additional documentation or written explanation in support of the appeal. This material must include a copy of the USCIS document verification request (used to process the secondary request) or such other form specified by the USCIS, and a letter indicating that the family is requesting an appeal of the USCIS immigration status verification results.

The USCIS will notify the family, with a copy to HACA, of its decision. When the USCIS notifies HACA of the decision, HACA must notify the family of its right to request an informal hearing.

> <u>HACA Policy</u>
>
> HACA will send written notice to the family of its right to request an informal hearing within 10 business days of receiving notice of the USCIS decision regarding the family's immigration status.

## Informal Hearing Procedures for Applicants [24 CFR 5.514(f)]

After notification of the USCIS decision on appeal, or in lieu of an appeal to the USCIS, the family may request that HACA provide a hearing. The request for a hearing must be made either within 30 days of receipt of HACA notice of denial, or within 30 days of receipt of the USCIS appeal decision.

The informal hearing procedures for applicant families are described below.

### *Informal Hearing Officer*

HACA must provide an informal hearing before an impartial individual, other than a person who made or approved the decision under review, and other than a person who is a subordinate of the person who made or approved the decision. See Section 16-III.C for a listing of positions that serve as informal hearing officers.

### Evidence

The family must be provided the opportunity to examine and copy at the family's expense, at a reasonable time in advance of the hearing, any documents in the possession of HACA pertaining to the family's eligibility status, or in the possession of the USCIS (as permitted by USCIS requirements), including any records and regulations that may be relevant to the hearing.

> HACA Policy
>
> The family will be allowed to copy any documents related to the hearing at a cost of $.10 per page. The family must request discovery of HACA documents no later than 12:00 p.m. two business day prior to the hearing.

The family must be provided the opportunity to present evidence and arguments in support of eligible status. Evidence may be considered without regard to admissibility under the rules of evidence applicable to judicial proceedings.

The family must also be provided the opportunity to refute evidence relied upon by HACA, and to confront and cross-examine all witnesses on whose testimony or information HACA relies.

### Representation and Interpretive Services

The family is entitled to be represented by an attorney or other designee, at the family's expense, and to have such person make statements on the family's behalf.

The family is entitled to request an interpreter. Upon request, the HACA will provide competent interpretation services, free of charge.

### Recording of the Hearing

The family is entitled to have the hearing recorded by audiotape. HACA may, but is not required to provide a transcript of the hearing.

> HACA Policy
>
> HACA will not provide a transcript of an audio taped hearing.

### Hearing Decision

HACA must provide the family with a written final decision, based solely on the facts presented at the hearing, within 15 calendar days of the date of the informal hearing. The decision must state the basis for the decision.

### Informal Hearing Procedures for Residents [24 CFR 5.514(f)]

After notification of the USCIS decision on appeal, or in lieu of an appeal to the USCIS, the family may request that HACA provide a hearing. The request for a hearing must be made either within 30 days of receipt of HACA notice of termination, or within 30 days of receipt of the USCIS appeal decision.

For the informal hearing procedures that apply to participant families whose assistance is being terminated based on immigration status, see Section 16-III.C.

## Retention of Documents [24 CFR 5.514(h)]

HACA must retain for a minimum of 5 years the following documents that may have been submitted to HACA by the family, or provided to HACA as part of the USCIS appeal or HACA informal hearing process:

The application for assistance;

Form completed by the family for income reexamination;

Photocopies of any original documents, including original USCIS documents;

Signed verification consent form;

USCIS verification results;

Request for a USCIS appeal;

Final USCIS determination;

Request for an informal hearing; and

Final informal hearing decision

## PART IV: OWNER OR FAMILY DEBTS TO HACA

## 16-IV.A. OVERVIEW

PHAs are required to include in the administrative plan, policies concerning repayment by a family of amounts owed to HACA [24 CFR 982.54]. If the family breaches an agreement with the PHA to pay amounts owed to a PHA, or amounts paid to an owner by a PHA, the PHA, at its discretion, may offer a family the opportunity to enter an agreement to pay amounts owed to a PHA or amounts paid to an owner by a PHA. The PHA may prescribe the terms of the agreement [24 CFR 982.552(c)(1)(vii).

This part describes HACA's policies for recovery of monies that have been overpaid on behalf of families, or to owners.

HACA Policy

When an action or inaction of an owner or participant results in the overpayment of housing assistance, HACA holds the owner or participant liable to return any overpayments to HACA.

HACA will enter into repayment agreements in accordance with the policies contained in this part as a means to recover overpayments.

When an owner or participant refuses to repay monies owed to HACA, HACA will utilize other available collection alternatives.

## 16-IV.B. REPAYMENT POLICY

### Owner Debts to HACA

<u>HACA Policy</u>

Any amount due to HACA by an owner must be repaid by the owner within 30 days of HACA's determination of the debt.

If the owner fails to repay the debt within the required time frame and is entitled to future HAP payments, HACA will reduce the future HAP payments by the amount owed until the debt is paid in full.

If the owner is not entitled to future HAP payments, HACA will offer to enter into a repayment agreement in accordance with the policies below.

If the owner refuses to repay the debt, enter into a repayment agreement, or breaches a repayment agreement, HACA will ban the owner from future participation in the program and pursue other modes of collection including, but not limited to, the following:

Collection agencies

Small claims court

Civil lawsuit

State income tax set-off program

### Family Debts to HACA

Families are required to reimburse the PHA if they were charged less rent than required because the family either underreported or failed to report income. PHAs are required to determine retroactive rent amounts as far back as the PHA has documentation of family unreported income [Notice PIH 2018-18].

<u>HACA Policy</u>

Any amount due to HACA by an HCV participant must be repaid by the family. If the family is unable to repay the debt within 30 days, HACA may offer to enter into a repayment agreement in accordance with the policies below.

If the family refuses to repay the debt, enter into a repayment agreement, or breaches a repayment agreement, HACA will terminate the assistance in accordance with the policies in Chapter 12 and pursue other modes of collection, including, but not limited to, the following:

Collection agencies

Small claims court

Civil lawsuit

State income tax set-off program

### Repayment Agreement [24 CFR 792.103]

The term r*epayment agreement* refers to a formal document signed by a tenant or owner and provided to HACA in which a tenant or owner acknowledges a debt in a specific amount and agrees to repay the amount due at specific time periods.

### Repayment Agreement Guidelines

### Payment Thresholds

Notice PIH 2018-18 recommends that the total amount that a family must pay each month—the family's monthly share of rent plus the monthly debt repayment amount—should not exceed 40 percent of the family's monthly adjusted income. However, a family may already be paying 40 per cent or more of its monthly adjusted income in rent. Moreover, Notice PIH 2018-18 acknowledges that PHAs have the discretion to establish "thresholds and policies" for repayment agreements with families [24 CFR 982.552(c)(1)(vii)].

> HACA Policy
>
> For fraud cases, any amounts owed in the amount of more than $5,000, HACA will not enter into repayment agreement, unless approval is granted by the Vice President of Assisted Housing. HACA may pursue termination of assistance and refer the case to HUD's Office of Inspector General for prosecution.
> For all balances owed under HACA's established threshold, repayment timeframes will be established as listed below:
>
> Amounts between $4,000 and $5,000 must be repaid within 48 months.
> Amounts between $3,000 and $3,999 must be repaid within 36 months.
> Amounts between $2,000 and $2,999 must be repaid within 24 months.
> Amounts between $1,000 and $1,999 must be repaid within 18 months.
> Amounts between $500 and $999 must be repaid within 12 months.
> Amounts under $500 must have a minimum monthly payment of $50 and cannot exceed 12 months.
>
> *Exceptions to this schedule may be made at the discretion of the Vice President of Assisted Housing.*

### Execution of the Agreement

All repayment agreements must be in writing, dated, and signed by both the family and the PHA [Notice PIH 2018-18].

> HACA Policy
>
> The head of household and spouse/co-head (if applicable) must sign the repayment agreement.

### Due Dates

> HACA Policy
>
> All payments are due by the close of business on the 5th day of the month. If the 5th does not fall on a business day, the due date is the close of business on the first business day after the 5th.

### Non-Payment

> HACA Policy
> If the family fails to make any payment as required by the terms set forth within the repayment agreement, HACA retains the right to demand immediate payment of the remaining unpaid balance. If the family fails to make payment of the full balance, it will be considered a breach of the agreement and HACA will terminate tenancy in accordance with the policies in Chapter 12.

### No Offer of Repayment Agreement

> HACA Policy
> HACA will not enter into a new repayment agreement if there is already a current repayment agreement in place with the family, or the amounts owed by the family exceed the Federal or State threshold for criminal prosecution and/or HACA's established threshold under fraud cases.

## Repayment Agreement Terms

All repayment agreements must be in writing, dated, signed by both the family and the PHA, include the total retroactive rent amount owed, any amount of lump sum payment made at time of execution, if applicable, and the monthly repayment amount. Notice PIH 2018-18 requires certain provisions, at a minimum, be included in any repayment agreement involving amounts owed by a family because it underreported or failed to report income:

- A reference to the items in the family briefing packet that state the family's obligation to provide true and complete information at every reexamination and the grounds on which the PHA may terminate assistance because of a family's action or failure to act

- A statement clarifying that each month the family not only must pay to the PHA the monthly payment amount specified in the agreement but must also pay to the owner the family's monthly share of the rent to owner

- A statement that the terms of the repayment agreement may be renegotiated if the family's income decreases or increases

- A statement that late or missed payments constitute default of the repayment agreement and may result in termination of assistance.

### PART V: SECTION 8 MANAGEMENT ASSESSMENT PROGRAM (SEMAP)

### 16-V.A. OVERVIEW

The Section 8 Management Assessment Program (SEMAP) is a tool that allows HUD to measure PHA performance in key areas to ensure program integrity and accountability. SEMAP scores translate into a rating for each PHA as high performing, standard, or troubled. Scores on individual SEMAP indicators, as well as overall SEMAP ratings, can affect HACA in several ways.

High-performing PHAs can be given a competitive advantage under notices of funding availability [24 CFR 985.103].

PHAs with deficiencies on one or more indicators are required to correct the deficiencies and report to HUD [24 CFR 985.106].

PHAs with an overall rating of "troubled" are subject to additional HUD oversight, including on-site reviews by HUD staff, a requirement to develop a corrective action plan, and monitoring to ensure the successful implementation of the corrective action plan. In addition, PHAs that are designated "troubled" may not use any part of the administrative fee reserve for other housing purposes [24 CFR 985.107].

HUD may determine that HACA's failure to correct identified SEMAP deficiencies or to prepare and implement a corrective action plan required by HUD constitutes a default under the ACC [24 CFR 985.109].

### 16-V.B. SEMAP CERTIFICATION [24 CFR 985.101]

PHAs must submit the HUD-required SEMAP certification form within 60 calendar days after the end of its fiscal year. The certification must be approved by PHA board resolution and signed by HACA executive director. If HACA is a unit of local government or a state, a resolution approving the certification is not required, and the certification must be executed by the Section 8 program director.

PHAs with less than 250 voucher units are only required to be assessed every other PHA fiscal year. HUD will assess such PHAs annually if HACA elects to have its performance assessed on an annual basis; or is designated as "troubled" [24 CFR 985.105].

Failure of HACA to submit its SEMAP certification within the required time frame will result

in an overall performance rating of "troubled."

HACA's SEMAP certification is subject to HUD verification by an on-site confirmatory review at any time.

Upon receipt of HACA's SEMAP certification, HUD will rate HACA's performance under each SEMAP indicator in accordance with program requirements.

**HUD Verification Method**

Several of the SEMAP indicators are scored based on a review of a quality control sample selected for this purpose. HACA or the Independent Auditor must select an unbiased sample that provides an adequate representation of the types of information to be assessed, in accordance with SEMAP requirements [24 CFR 985.2].

If the HUD verification method for the indicator relies on data in the Form-50058 module (formerly known as MTCS) in the PIH Information Center (PIC), and HUD determines that those data are insufficient to verify HACA's certification on the indicator due to HACA's failure to adequately report family data, HUD will assign a zero rating for the indicator [24 CFR 985.3].

## 16-V.C. SEMAP INDICATORS [24 CFR 985.3 and form HUD-52648]

The table below lists each of the SEMAP indicators, contains a description of each indicator, and explains the basis for points awarded under each indicator.

HACA that expends less than $300,000 in Federal awards and whose Section 8 programs are not audited by an independent auditor, is not to be rated under SEMAP indicators 1-7.

| **SEMAP Indicators** |
|---|

**Indicator 1: Selection from the waiting list**

**Maximum Score: 15**

This indicator shows whether HACA has written policies in its administrative plan for selecting applicants from the waiting list and whether HACA follows these policies when selecting applicants from the waiting list.

Points are based on the percent of families that are selected from the waiting list in accordance with HACA's written policies, according to HACA's quality control sample.

**Indicator 2: Rent reasonableness**

**Maximum Score: 20**

This indicator shows whether HACA has and implements a reasonable written method to determine and document for each unit leased that the rent to owner is reasonable based on current rents for comparable unassisted units at the required times.

Points are based on the percent of units for which HACA follows its written method to determine reasonable rent and has documented its determination that the rent to owner is reasonable, according to HACA's quality control sample.

**Indicator 3: Determination of adjusted income**

**Maximum Score: 20**

This indicator measures whether HACA verifies and correctly determines adjusted income for each assisted family, and where applicable, uses the appropriate utility allowances for the unit leased in determining the gross rent.

Points are based on the percent of files that are calculated and verified correctly, according to HACA's quality control sample.

**Indicator 4: Utility allowance schedule**

**Maximum Score: 5**

This indicator shows whether HACA maintains an up-to-date utility allowance schedule. Points are based on whether HACA has reviewed the utility allowance schedule and adjusted it when required, according to HACA's certification.

### Indicator 5: HQS quality control inspections

**Maximum Score: 5**

This indicator shows whether a HACA supervisor re-inspects a sample of units under contract during HACA fiscal year, which meets the minimum sample size requirements for quality control of HQS inspections.

Points are based on whether the required quality control re-inspections were completed, according to HACA's certification.

### Indicator 6: HQS enforcement

**Maximum Score: 10**

This indicator shows whether, following each HQS inspection of a unit under contract where the unit fails to meet HQS, any cited life-threatening deficiencies are corrected within 24 hours from the inspection and all other deficiencies are corrected within no more than 30 calendar days from the inspection or any PHA-approved extension.

Points are based on whether HACA corrects all HQS deficiencies in accordance with required time frames, according to HACA's certification.

### Indicator 7: Expanding housing opportunities

**Maximum Points: 5**

Only applies to PHAs with jurisdiction in metropolitan FMR areas.

This indicator shows whether HACA has adopted and implemented a written policy to encourage participation by owners of units located outside areas of poverty or minority concentration; informs voucher holders of the full range of areas where they may lease units both inside and outside HACA's jurisdiction; and supplies a list of landlords or other parties who are willing to lease units or help families find units, including units outside areas of poverty or minority concentration.

Points are based on whether HACA has adopted and implemented written policies in accordance with SEMAP requirements, according to HACA's certification.

### Indicator 8: FMR limit and payment standards

**Maximum Points: 5 points**

This indicator shows whether HACA has adopted a payment standard schedule that establishes payment standard amounts by unit size for each FMR area in HACA's jurisdiction, that are within the basic range of 90 to 110 percent of the published FMR.

Points are based on whether HACA has appropriately adopted a payment standard schedule(s), according to HACA's certification.

### Indicator 9: Annual reexaminations

**Maximum Points: 10**

- This indicator shows whether the PHA completes a reexamination for each participating family at least every 12 months.
- Points are based on the percent of reexaminations that are less than two months overdue, according to data from PIC. the percent of reexaminations that are more than 2 months overdue, according to data from PIC.

### Indicator 10: Correct tenant rent calculations

**Maximum Points: 5**

This indicator shows whether HACA correctly calculates the family's share of the rent to owner.

Points are based on the percent of correct calculations of family share of the rent, according to data from PIC.

### Indicator 11: Pre-contract HQS inspections

**Maximum Points: 5**

This indicator shows whether newly leased units pass HQS inspection on or before the effective date of the assisted lease and HAP contract.

Points are based on the percent of newly leased units that passed HQS inspection on or before the effective date of the lease and HAP contract, according to data from PIC.

### Indicator 12: Annual HQS inspections

**Maximum Points: 10**

This indicator shows whether HACA inspects each unit under contract at least annually.
Points are based on the percent of annual HQS inspections of units under contract that are more than 2 months overdue, according to data from PIC.

### Indicator 13: Lease-up

**Maximum Points: 20 points**

This indicator shows whether HACA enters HAP contracts for at least 98 percent of the number of the PHA's baseline voucher units in the ACC for the calendar year ending on or before the PHA's fiscal year, or whether the PHA has expended at least 98 percent of its allocated budget authority for the same calendar year. The PHA can receive 15 points if 95 to 97 percent of vouchers are leased or budget authority is utilized. Points are based on utilization of vouchers and HAP expenditures as reported in the voucher management system (VMS) for the most recently completed calendar year.

**Indicator 14: Family self-sufficiency (FSS) enrollment and escrow account balances**

**Maximum Points: 10**

Only applies to PHAs with mandatory FSS programs.

This indicator shows whether HACA has enrolled families in the FSS program as required, and measures the percent of current FSS participants that have had increases in earned income which resulted in escrow account balances.

Points are based on the percent of mandatory FSS slots that are filled and the percent of families with escrow account balances, according to data from PIC.

---

**Success Rate of Voucher Holders**

**Maximum Points: 5**

Only applies to PHAs that have received approval to establish success rate payment standard amounts, and isn't effective until the second full PHA fiscal year following the date of HUD approval of success rate payment standard amounts.

This indicator shows whether voucher holders were successful in leasing units with voucher assistance.

Points are based on the percent of families that were issued vouchers, and that became participants in the voucher program.

---

**De-concentration Bonus Indicator**

**Maximum Points: 5**

Submission of data for this indicator is mandatory for HACA using one or more payment standard amount(s) that exceed(s) 100 percent of the published FMR set at the 50 percentile rent, starting with the second full PHA fiscal year following initial use of payment standard amounts based on the FMRs set at the 50th percentile.

Additional points are available to PHAs that have jurisdiction in metropolitan FMR areas and that choose to submit the required data.

Points are based on whether the data that is submitted meets the requirements for bonus points.

## PART VI: RECORD KEEPING

## 16-VI.A. OVERVIEW

HACA must maintain complete and accurate accounts and other records for the program in accordance with HUD requirements, in a manner that permits a speedy and effective audit. All such records must be made available to HUD or the Comptroller General of the United States upon request.

In addition, HACA must ensure that all applicant and participant files are maintained in a way that protects an individual's privacy rights.

## 16-VI.B. RECORD RETENTION [24 CFR 982.158; 24 CFR 908.101]

During the term of each assisted lease, and for at least three years thereafter, the PHA must keep:

- A copy of the executed lease;
- The HAP contract; and
- The application from the family.

In addition, the PHA must keep the following records for at least three years:

- Records that provide income, racial, ethnic, gender, and disability status data on program applicants and participants;
- An application from each ineligible family and notice that the applicant is not eligible;
- HUD-required reports;
- Unit inspection reports;
- Lead-based paint records as required by 24 CFR 35, Subpart B.
- Accounts and other records supporting PHA budget and financial statements for the program;
- Records to document the basis for PHA determination that rent to owner is a reasonable rent (initially and during the term of a HAP contract); and
- Other records specified by HUD.
- The PHA must keep the last three years of the Form HUD-50058 and supporting documentation during the term of each assisted lease, and for a period of at least three years from the end of participation (EOP) date [24 CFR 908.101].
- The PHA must maintain Enterprise Income Verification (EIV) system Income Reports in the tenant file for the duration of the tenancy but for a period not to exceed three years from the EOP date [Notice PIH 2018-18].

- Notice PIH 2014-20 requires PHAs to keep records of all complaints, investigations, notices, and corrective actions related to violations of the Fair Housing Act or the equal access final rule.

If an informal hearing to establish a family's citizenship status is held, longer retention requirements apply for some types of documents. For specific requirements, see Section 16- III.D., Retention of Documents.

## 16-VI.C. RECORDS MANAGEMENT

PHAs must maintain applicant and participant files and information in accordance with the regulatory requirements described below.

HACA Policy

All applicant and participant information will be kept in a secure location and access will be limited to authorized HACA staff.

HACA staff will not discuss personal family information unless there is a business reason to do so. Inappropriate discussion of family information or improper disclosure of family information by staff will result in disciplinary action.

## Privacy Act Requirements [24 CFR 5.212 and Form-9886]

The collection, maintenance, use, and dissemination of social security numbers (SSN), employer identification numbers (EIN), any information derived from these numbers, and income information of applicants and participants must be conducted, to the extent applicable, in compliance with the Privacy Act of 1974, and all other provisions of Federal, State, and local law.

Applicants and participants, including all adults in the household, are required to sign a consent form, HUD-9886, Authorization for Release of Information. This form incorporates the Federal Privacy Act Statement and describes how the information collected using the form may be used, and under what conditions HUD or HACA may release the information collected.

## Upfront Income Verification (UIV) Records

PHAs that access UIV data through HUD's Enterprise Income Verification (EIV) system are required to adopt and follow specific security procedures to ensure that all EIV data is protected in accordance with federal laws, regardless of the media on which the data is recorded (e.g. electronic, paper). These requirements are contained in the HUD issued document, *Enterprise Income Verification (EIV) System, Security Procedures for Upfront Income Verification data.*

HACA Policy

HACA has adopted and implemented EIV security procedures as required by HUD.

## Criminal Records

HACA may only disclose the criminal conviction records which HACA receives from a law enforcement agency to officers or employees of HACA, or to authorized representatives of HACA who have a job-related need to have access to the information [24 CFR 5.903(e)].

HACA must establish and implement a system of records management that ensures that any criminal record received by HACA from a law enforcement agency is maintained confidentially, not misused or improperly disseminated, and destroyed, once the purpose for which the record was requested has been accomplished, including expiration of the period for filing a challenge to HACA action without institution of a challenge or final disposition of any such litigation [24 CFR 5.903(g)].

HACA must establish and implement a system of records management that ensures that any

sex offender registration information received by HACA from a State or local agency is maintained confidentially, not misused or improperly disseminated, and destroyed, once the purpose for which the record was requested has been accomplished, including expiration of the period for filing a challenge to HACA action without institution of a challenge or final disposition of any such litigation. However, a record of the screening, including the type of screening and the date performed must be retained [Notice PIH 2012-28]. This requirement does not apply to information that is public information, or is obtained by HACA other than under [24 CFR 5.905].

> HACA Policy

> In order to ensure compliance with federal statute and protect the confidentiality of HACA's applicants and residents, all criminal records shall be maintained as follows:

>> D.P.S. records obtained for the purpose of applicant screening shall be maintained by the Admissions department in a separate depository for a period of 5 years, unless required for a pending matter. A notation of the nature, type and identification of the criminal record shall be noted in the applicant's file. Destruction of such criminal records will consist of shredding and thereafter proper disposal. Under no circumstances shall such information be improperly disseminated to any person who does not have a legitimate reason for such information.

>> Any criminal records produced by the applicant for the purpose of applicant screening shall be maintained by the Admissions department in a separate depository for a period of 5 years, unless required for a pending matter. A notation of the nature, type and identification of the criminal record shall be noted in the applicant's file. Destruction of such criminal records will consist of shredding and thereafter proper disposal. Under no circumstances shall such information be improperly disseminated to any person who does not have a legitimate reason for such information.

>> Any other criminal records used by HACA in its review for applicant screening shall be maintained by the Admissions department in a separate depository for a period of 5 years, unless required for a pending matter. A notation of the nature, type and identification of the criminal record shall be noted in the applicant's file. Destruction of such criminal records will consist of shredding and thereafter proper disposal. Under no circumstances shall such information be improperly disseminated to any person who does not have a legitimate reason for such information.

## Medical/Disability Records

PHAs are not permitted to inquire about the nature or extent of a person's disability. HACA may not inquire about a person's diagnosis or details of treatment for a disability or medical condition. If HACA receives a verification document that provides such information, HACA should not place this information in the tenant file. HACA should destroy the document.

**Documentation of Domestic Violence, Dating Violence, Sexual Assault or Stalking**

For requirements and HACA policies related to management of documentation obtained from victims of domestic violence, dating violence, sexual assault or stalking, see section 16-IX.E.

**Eligible Immigration Status Documents**
The following documents will be retained for a minimum of 5 years if provided as part of the INS appeal or informal hearing process: the application; form completed by family for family reexamination; photocopies of any original documents (front and back), including original INS documents; signed verification consent form; INS verification results (primary and secondary); request for an INS appeal; final INS determination; request for an informal hearing; and final informal hearing decision.

## PART VII: REPORTING AND RECORD KEEPING FOR CHILDREN WITH ENVIRONMENTAL INTERVENTION BLOOD LEAD LEVEL

### 16-VII.A. OVERVIEW

HACA has certain responsibilities relative to children with environmental intervention blood lead levels that are receiving HCV assistance. The notification, verification, and hazard reduction requirements are discussed in Chapter 8. This part deals with the reporting requirements, and
data collection and record keeping responsibilities that HACA is subject to.

### 16-VII.B. REPORTING REQUIREMENT [24 CFR 35.1225(e); Notice PIH 2017-13]

The owner must report the name and address of a child identified as having an elevated blood lead level to the public health department within five business days of being so notified by any other medical health care professional. The owner must also notify the HUD field office and the HUD Office of Lead Hazard Control and Healthy Homes (OLHCHH) of the child's address within five business days. The PHA may collaborate with the owner on the notification process, such as by agreeing with the owner to provide the required notifications on the owner's behalf.

> <u>HACA Policy</u>
>
> Upon notification by the owner, HACA will provide the public health department written notice of the name and address of any child identified as having an elevated blood lead level within five business days.
>
> Upon notification by the owner, HACA will notify the HUD field office and the HUD Office of Lead Hazard Control and Healthy Homes (OLHCHH) of the child's address within five business days.

## 16-VII.C. DATA COLLECTION AND RECORD KEEPING [24 CFR 35.1225(f)]

At least quarterly, HACA must attempt to obtain from the public health department(s) with a similar area of jurisdiction, the names and/or addresses of children less than 6 years old with an identified environmental intervention blood lead level.

If HACA obtains names and addresses of environmental intervention blood lead level children from the public health department(s), HACA must match this information with the names and addresses of families receiving HCV assistance, unless the public health department performs such a procedure. If a match occurs, HACA must carry out the notification, verification, and hazard reduction requirements discussed in Chapter 8, and the reporting requirement discussed above.

At least quarterly, HACA must also report an updated list of the addresses of units receiving assistance under the HCV program to the same public health department(s), unless the public health department(s) states that it does not wish to receive such a report.

> <u>HACA Policy</u>
>
> The public health department(s) has stated they **do not** wish to receive a report of an updated list of the addresses of units receiving assistance under the HCV program, on a quarterly basis. Therefore, HACA is not providing such a report.

<div align="center">

**PART VIII: DETERMINATION OF INSUFFICIENT FUNDING**

</div>

## 16-VIII.A. OVERVIEW

The HCV regulations allow PHAs to deny families permission to move and to terminate Housing Assistance Payments (HAP) contracts if funding under the consolidated ACC is insufficient to support continued assistance [24 CFR 982.314(e)(1) and 982.454]. If a PHA denies a family a portability move based on insufficient funding, the PHA is required to notify the local HUD office within 10 business days [24 CFR 982.354]. Insufficient funding may also impact HACA's ability to issue vouchers to families on the waiting list. This part discusses the methodology HACA will use to determine whether or not HACA has sufficient funding to issue vouchers, approve moves, and to continue subsidizing all families currently under a HAP contract.

## 16-VIII.B. METHODOLOGY

> <u>HACA Policy</u>
>
> HACA will determine whether there is adequate funding to issue vouchers, approve moves to higher cost units and areas, and continue subsidizing all current participants by comparing HACA's annual budget authority to the annual total HAP needs on a monthly basis. The total HAP needs for the calendar year will be projected by establishing the actual HAP costs year to date. To that figure, HACA will add anticipated HAP expenditures for the remainder of the calendar year. Projected HAP expenditures will be calculated by multiplying the projected number of units leased per remaining months by the most current month's average HAP. The projected number of units leased per month will take into account the average monthly turnover

of participant families. If the total annual HAP needs equal or exceed the annual budget authority and funding reserves, or if HACA cannot support the cost of the proposed subsidy commitment (voucher issuance or move) based on the funding analysis, HACA will be considered to have insufficient funding.

If it is determined that there is insufficient funding, HACA may suspend issuing vouchers, discontinue approving moves, discontinue entering into any new HAP Contracts, and may also terminate existing HAP contracts.

## PART IX: VIOLENCE AGAINST WOMEN ACT (VAWA): NOTIFICATION, DOCUMENTATION, CONFIDENTIALITY

## 16-IX.A. OVERVIEW

The Violence against Women Act of 2013 (VAWA) provides special protections for victims of domestic violence, dating violence, sexual assault and stalking who are applying for or receiving assistance under the housing choice voucher (HCV) program. If your state or local laws provide greater protection for such victims, those laws apply in conjunction with VAWA.

In addition to definitions of key terms used in VAWA, this part contains general VAWA requirements and HACA policies in three areas: notification, documentation, and confidentiality. Specific VAWA requirements and HACA policies are located primarily in the following sections: 3-I.C, "Family Breakup and Remaining Member of Tenant Family"; 3-III.G, "Prohibition against Denial of Assistance to Victims of Domestic Violence, Dating Violence, and Stalking"; 10-I.A, "Allowable Moves"; 10-I.B, "Restrictions on Moves"; 12-II.E, "Terminations Related to Domestic Violence, Dating Violence, or Stalking"; and 12-II.F, "Termination Notice."

## 16-IX.B. DEFINITIONS [24 CFR 5.2003, 42 USC 13925 ]

As used in VAWA:

The term *bifurcate* means, with respect to a public housing or Section 8 lease, to divide a lease as a matter of law such that certain tenants can be evicted or removed while the remaining family members' lease and occupancy rights are allowed to remain intact.

The term *dating violence* means violence committed by a person who is or has been in a social relationship of a romantic or intimate nature with the victim; and where the existence of such a relationship shall be determined based on a consideration of the following factors:

- The length of the relationship

- The type of relationship

- The frequency of interaction between the persons involved in the relationship

The term *domestic violence* includes felony or misdemeanor crimes of violence committed by a

current or former spouse or intimate partner of the victim, by a person with whom the victim shares a child in common, by a person who is cohabitating with or has cohabitated with the victim as a spouse or intimate partner, by a person similarly situated to a spouse of the victim under the domestic or family violence laws of the jurisdiction receiving grant monies, or by any other person against an adult or youth victim who is protected from that person's acts under the domestic or family violence laws of the jurisdiction.

The term affiliated individual  *member* means, with respect to a person:

-  A spouse, parent, brother or sister, or child of that individual , or an individual to whom that  individual stands in the position or place of a parent; or

**-** Any other individual  tenant or lawful occupant living in the household of that   the victim of domestic violence, dating violence, sexual assault, or stalking.

The term *sexual assault* means:

**-** Any nonconsensual sexual act proscribed by federal, tribal, or state law, including when the victim lacks the capacity to consent

The term *stalking* means:

**-** To engage in a course of conduct directed at a specific person that would cause a reasonable person to fear for his or her safety or the safety of others, or suffer substantial emotional distress.

### 16-IX.C. NOTIFICATION [24 CFR 5.2005(a)] Notification to Public

HACA adopts the following policy to help ensure that all actual and potential beneficiaries of its HCV program are aware of their rights under VAWA.

HACA Policy

HACA will post the following information regarding VAWA in its offices and on its website. It will also make the information readily available to anyone who requests it.

A  notice of occupancy rights under VAWA to housing choice voucher program applicants and participants who are or have been victims of domestic violence, dating violence, sexual assault or stalking.

A copy of form HUD-5382, Certification of Domestic Violence, Dating Violence, Sexual Assault, or Stalking and Alternate Documentation

A copy of the PHA's emergency transfer plan (Addendum 1)

The National Domestic Violence Hot Line: 1-800-799-SAFE (7233) or 1-800-787-3224 (TTY)

Contact information for local victim advocacy groups or service providers

**Notification to Program Applicants and Participants [24 CFR 5.2005(a)(1)]**

HACA is required to inform program applicants and participants of their rights under VAWA, including their right to confidentiality and the limits thereof, when they are denied assistance, when they are admitted to the program, and when they are notified of an eviction or termination of housing benefits.

> HACA Policy
>
> HACA will provide all applicants with information about VAWA at the time they request an application for housing assistance. HACA will also include information about VAWA in all notices of denial of assistance (see section 3-III.G).
>
> HACA will provide all participants with information about VAWA at the time of admission (see section 5-I.B) and at annual reexamination. HACA will also include information about VAWA in notices of termination of assistance, as provided in section 12-II.F.
>
> The VAWA information provided to applicants and participants will consist of the Notice of Occupancy Rights under VAWA  and a copy of form, Certification of Domestic Violence, Dating Violence, Sexual Assault, and Stalking.

HACA is not limited to providing VAWA information at the times specified in the above policy. If HACA decides to provide VAWA information to a participant following an incident of domestic violence, Notice PIH 2017-08 cautions against sending the information by mail, since the abuser may be monitoring the mail. The notice recommends that in such cases the PHA make alternative delivery arrangements that will not put the victim at risk.

> HACA Policy
>
> Whenever HACA has reason to suspect that providing information about VAWA to a participant might place a victim of domestic violence at risk, it will attempt to deliver the information by hand directly to the victim or by having the victim come to an office or other space that may be safer for the individual, making reasonable accommodations as necessary. For example, HACA may decide not to send mail regarding VAWA protections to the victim's unit if HACA believes the perpetrator may have access to the victim's mail, unless requested by the victim.
>
> When discussing VAWA with the victim, HACA will take reasonable precautions to ensure that no one can overhear the conversation, such as having conversations in a private room.
>
> The victim may, but is not required to, designate an attorney, advocate, or other secure contact for communications regarding VAWA protections.

**Notification to Owners and Managers**

While PHAs are no longer  required by regulation to notify owners and managers participating in the HCV program of their rights and obligations under VAWA, the PHA may still choose to inform them.

> <u>HACA Policy</u>
> HACA will provide owners and managers with information about their rights and obligations under VAWA on HACA's website and at initial lease-up for HCV participants.
>
> The VAWA information provided to owners will consist of the Notice to Housing Choice Voucher Owners and Managers regarding the Violence Against Women's Act.

## 16-IX.D. DOCUMENTATION [24 CFR 5.2007]

HACA presented with a claim for initial or continued assistance based on status as a victim of domestic violence, dating violence, sexual assault, stalking, or criminal activity related to any of these forms of abuse may—but is not required to request that the individual making the claim document the abuse. Any request for documentation must be in writing, and the individual must be allowed at least 14 business days after receipt of the request to submit the documentation. HACA may extend this time period at its discretion. [24 CFR 5.2007(a)]

The individual may satisfy HACA's request by providing any one of the following three forms of documentation [24 CFR 5.2007(b)]:

1) A completed and signed HUD-approved certification form (Certification of Domestic Violence, Dating Violence, Sexual Assault, or Stalking), which must include the name of the perpetrator only if the name of the perpetrator is safe to provide and is known to the victim.

2) A federal, state, tribal, territorial, or local police report or court record, or administrative record. or

3) Documentation signed by a person who has assisted the victim in addressing domestic violence, dating violence, sexual assault or stalking, or the effects of such abuse. This person may be an employee, agent, or volunteer of a victim service provider; an attorney; a mental health professional; or a medical professional. The person signing the documentation must attest under penalty of perjury to the person's belief that the incidents in question are bonafide incidents of abuse. The victim must also sign the documentation.

HACA may not require third-party documentation (forms 2 and 3) in addition to certification (form 1), except as specified below under "Conflicting Documentation," nor may it require certification in addition to third-party documentation [VAWA final rule].

> <u>HACA Policy</u>
> Any request for documentation of domestic violence, dating violence, sexual assault

or stalking will be in writing, will specify a deadline of 14 business days following receipt of the request, will describe the three forms of acceptable documentation, will provide explicit instructions on where and to whom the documentation must be submitted, and will state the consequences for failure to submit the documentation or request an extension in writing by the deadline.

HACA may, in its discretion, extend the deadline for 10 business days. Any extension granted by HACA will be in writing.

## Conflicting Documentation [24 CFR 5.2007(e)]

In cases where HACA receives conflicting certification documents from two or more members of a household, each claiming to be a victim and naming one or more of the other petitioning household members as the perpetrator, HACA may determine which is the true victim by requiring each to provide acceptable third-party documentation, as described above (forms 2 and 3). HACA within 30 calendar days of the date of the request for third-party documentation must honor any court orders issued to protect the victim or to address the distribution of property.

<u>HACA Policy</u>
If presented with conflicting certification documents (two or more Certifications of Domestic Violence, Dating Violence, Sexual Assault, or Stalking forms) from members of the same household, HACA will attempt to determine which is the true victim by requiring each of them to provide third-party documentation in accordance with [24 CFR 5.2007(e)] and by following any HUD guidance on how such determinations should be made. The family will have 30 calendar days from the date of request by the PHA to provide this documentation.

## Discretion to Require No Formal Documentation [24 CFR 5.2007(d)]

HACA has the discretion to provide benefits to an individual based solely on the individual's statement or other corroborating evidence (i.e., without requiring formal documentation of abuse in accordance with [24 CFR 5.2007(b)].

<u>HACA Policy</u>

If HACA accepts an individual's statement or other corroborating evidence of domestic violence, dating violence, sexual assault or stalking, HACA will document acceptance of the statement or evidence in the individual's file.

## Failure to Provide Documentation [24 CFR 5.2007(c)]

In order to deny relief for protection under VAWA, a PHA must provide the individual requesting relief with a written request for documentation of abuse. If the individual fails to provide the documentation within 14 business days from the date of receipt, or such longer time as HACA may allow, HACA may deny relief for protection under VAWA.

## 16-IX.E. CONFIDENTIALITY [24 CFR 5.2007(b)(4)]

All information provided to HACA regarding domestic violence, dating violence, sexual assault or stalking, including the fact that an individual is a victim of such violence or stalking, must be retained in confidence. This means that HACA (1) may not enter the information into any shared database, (2) may not allow employees or others to access the information unless they are explicitly authorized to do so and have a need to know the information for purposes of their work, and (3) may not provide the information to any other entity or individual, except to the extent that the disclosure is (a) requested or consented to by the individual in writing, (b) required for use in an eviction proceeding, or (c) otherwise required by applicable law.

<u>HACA Policy</u>

If disclosure is required for use in an eviction proceeding or is otherwise required by applicable law, HACA will inform the victim before disclosure occurs so that safety risks can be identified and addressed.

| |
|---|
| **EXHIBIT 16-1: NOTICE OF OCCUPANCY RIGHTS UNDER THE VIOLENCE AGAINST WOMEN ACT** |
| |

The Violence Against Women Act (VAWA) provides protections for victims of domestic violence, dating violence, sexual assault, or stalking. VAWA protections are not only available to women, but are available equally to all individuals regardless of sex, gender identity, or sexual orientation. The U.S. Department of Housing and Urban Development (HUD) is the Federal agency that oversees that the Housing Choice Voucher Program is in compliance with VAWA. This notice explains your rights under VAWA. A HUD-approved certification form is attached to this notice. You can fill out this form to show that you are or have been a victim of domestic violence, dating violence, sexual assault, or stalking, and that you wish to use your rights under VAWA."

### Protections for Applicants

If you otherwise qualify for assistance under HUD's Housing Choice Voucher Program you cannot be denied admission or denied assistance because you are or have been a victim of domestic violence, dating violence, sexual assault, or stalking.

### Protections for Residents

If you are receiving assistance under HUD's Housing Choice Voucher Program, you may not be denied assistance, terminated from participation, or be evicted from your rental housing because you are or have been a victim of domestic violence, dating violence, sexual assault, or stalking.

Also, if you or an affiliated individual of yours is or has been the victim of domestic violence, dating violence, sexual assault, or stalking by a member of your household or any guest, you may not be denied rental assistance or occupancy rights

under HUD's Housing Choice Voucher Program solely on the basis of criminal activity directly relating to that domestic violence, dating violence, sexual assault, or stalking.

Affiliated individual means your spouse, parent, brother, sister, or child, or a person to whom you stand in the place of a parent or guardian (for example, the affiliated individual is in your care, custody, or control); or any individual, tenant, or lawful occupant living in your household.

### Removing the Abuser or Perpetrator from the Household

Your landlord may divide (bifurcate) your lease in order to evict the individual or terminate the assistance of the individual who has engaged in criminal activity (the abuser or perpetrator) directly relating to domestic violence, dating violence, sexual assault, or stalking.

If your landlord chooses to remove the abuser or perpetrator, your landlord may not take away the rights of eligible residents to the unit or otherwise punish the remaining residents. If the evicted abuser or perpetrator was the sole tenant to have established eligibility for assistance under the program, the landlord must allow the tenant who is or has been a victim and other household members to remain in the unit for a period of time, in order to establish eligibility under the program or under another HUD housing program covered by VAWA, or, find alternative housing.

In removing the abuser or perpetrator from the household, your landlord must follow Federal, State, and local eviction procedures. In order to divide a lease, your landlord may, but is not required to, ask you for documentation or

certification of the incidences of domestic violence, dating violence, sexual assault, or stalking.

### Moving to Another Unit

Upon your request, HACA may permit you to move to another unit, subject to the availability of other units, and still keep your assistance.

In order to approve a request, HACA may ask you to provide documentation that you are requesting to move because of an incidence of domestic violence, dating violence, sexual assault, or stalking.

If the request is a request for emergency transfer, HACA will ask you to submit a written request or fill out a form where you certify that you meet the criteria for an emergency transfer under VAWA. The criteria are:

(1) You are a victim of domestic violence, dating violence, sexual assault, or stalking. If your housing provider does not already have documentation that you are a victim of domestic violence, dating violence, sexual assault, or stalking, your housing provider may ask you for such documentation, as described in the documentation section below.

(2) You expressly request the emergency transfer. Your housing provider may choose to require that you submit a form, or may accept another written or oral request.

(3) You reasonably believe you are threatened with imminent harm from further violence if you remain in your current unit. This means you have a reason to fear that if you do not receive a transfer you would suffer violence in the very near future.
OR

You are a victim of sexual assault and the assault occurred on the premises during the 90-calendar-day period before you

request a transfer. If you are a victim of sexual assault, then in addition to qualifying for an emergency transfer because you reasonably believe you are threatened with imminent harm from further violence if you remain in your unit, you may qualify for an emergency transfer if the sexual assault occurred on the premises of the property from which you are seeking your transfer, and that assault happened within the 90-calendar day period before you expressly request the transfer.

HACA will keep confidential requests for emergency transfers by victims of domestic violence, dating violence, sexual assault, or stalking, and the location of any move by such victims and their families.

HACA's emergency transfer plan provides further information on emergency transfers, and HACA must make a copy of its emergency transfer plan available to you if you ask to see it.

### Documenting You Are or Have Been a Victim of Domestic Violence, Dating Violence, Sexual Assault or Stalking

HACA can, but is not required to, ask you to provide documentation to "certify" that you are or have been a victim of domestic violence, dating violence, sexual assault, or stalking. Such request from HACA must be in writing, and HACA must give you at least 14 business days (Saturdays, Sundays, and Federal holidays do not count) from the day you receive the request to provide the documentation. HACA may, but does not have to, extend the deadline for the submission of documentation upon your request.

You can provide one of the following to HACA as documentation. It is your choice which of the following to submit if HACA asks you to provide documentation that you are or have been a victim of domestic violence, dating violence, sexual

assault, or stalking.

- A complete HUD-approved certification form given to you by HACA with this notice, that documents an incident of domestic violence, dating violence, sexual assault, or stalking. The form will ask for your name, the date, time, and location of the incident of domestic violence, dating violence, sexual assault, or stalking, and a description of the incident. The certification form provides for including the name of the abuser or perpetrator if the name of the abuser or perpetrator is known and is safe to provide.

- A record of a Federal, State, tribal, territorial, or local law enforcement agency, court, or administrative agency that documents the incident of domestic violence, dating violence, sexual assault, or stalking.  Examples of such records include police reports, protective orders, and restraining orders, among others.

- A statement, which you must sign, along with the signature of an employee, agent, or volunteer of a victim service provider, an attorney, a medical professional or a mental health professional (collectively, "professional") from whom you sought assistance in addressing domestic violence, dating violence, sexual assault, or stalking, or the effects of abuse, and with the professional selected by you attesting under penalty of perjury that he or she believes that the incident or incidents of domestic violence, dating violence, sexual assault, or stalking are grounds for protection.

- Any other statement or evidence that HACA has agreed to accept.  If you fail or refuse to provide one of these documents within the 14 business days, HACA does not have to provide you with the protections contained in this notice.

If HACA receives conflicting evidence that an incident of domestic violence, dating violence, sexual assault, or stalking has been committed (such as certification forms from two or more members of a household each claiming to be a victim and naming one or more of the other petitioning household members as the abuser or perpetrator), HACA has the right to request that you provide third-party documentation within thirty 30 calendar days in order to resolve the conflict.  If you fail or refuse to provide third-party documentation where there is conflicting evidence, HACA does not have to provide you with the protections contained in this notice.

### Confidentiality

HACA must keep confidential any information you provide related to the exercise of your rights under VAWA, including the fact that you are exercising your rights under VAWA.

HACA must not allow any individual administering assistance or other services on behalf of HACA (for example, employees and contractors) to have access to confidential information unless for reasons that specifically call for these individuals to have access to this information under applicable Federal, State, or local law.

HACA must not enter your information into any shared database or disclose your information to any other entity or individual.  HACA, however, may disclose the information provided if:

- You give written permission to HACA to release the information on a time limited basis.
- HACA needs to use the information in an eviction or termination proceeding, such as to evict your abuser or perpetrator or terminate your abuser or perpetrator from assistance under this program.
- A law requires HACA or your landlord to release the information.

VAWA does not limit management's duty to honor court orders about access to or control of the property. This includes orders issued to protect a victim and orders dividing property among household members in cases where a family breaks up.

### Reasons a Tenant Eligible for Occupancy Rights under VAWA May Be Evicted or Assistance May Be Terminated

You can be evicted and your assistance can be terminated for serious or repeated lease violations that are not related to domestic violence, dating violence, sexual assault, or stalking committed against you. However, HACA cannot hold residents who have been victims of domestic violence, dating violence, sexual assault, or stalking to a more demanding set of rules than it applies to residents who have not been victims of domestic violence, dating violence, sexual assault, or stalking.

The protections described in this notice might not apply, and you could be evicted and your assistance terminated, if HACA and/or your landlord can demonstrate that not evicting you or terminating your assistance would present a real physical danger that:

(1) Would occur within an immediate time frame, and
(2) Could result in death or serious bodily harm to other residents or those who work on the property.

If HACA or your landlord can demonstrate the above, HACA and/or your landlord should only terminate your assistance or evict you if there are no other actions that could be taken to reduce or eliminate the threat.

### Other Laws

VAWA does not replace any Federal, State, or local law that provides greater protection for victims of domestic violence, dating violence, sexual assault, or stalking. You may be entitled to additional housing protections for victims of domestic violence, dating violence, sexual assault, or stalking under other Federal laws, as well as under State and local laws.

### Non-Compliance with The Requirements of This Notice

You may report a covered housing provider's violations of these rights and seek additional assistance, if needed, by contacting or filing a complaint with HUD's San Antonio Field Office.

### For Additional Information

*   You may view a copy of HUD's final VAWA rule at **https://www.gpo.gov/fdsys/pkg/FR-2016-11-16/pdf/2016-25888.pdf**.
*   Additionally, HACA must make a copy of HUD's VAWA regulations available to you if you ask to see them.
*   For questions regarding VAWA, please contact HACA at 512-477-1314.
*   For help regarding an abusive relationship, you may call the National Domestic Violence Hotline at 1-800-799-7233 or, for persons with hearing impairments, 1-800-787-3224 (TTY). For tenants who are or have been victims of stalking seeking help   may visit the National Center for Victims of Crime's Stalking Resource Center at https://www.victimsofcrime.org/our-programs/stalking-resource-center.

Local organizations that offer assistance to victims of domestic violence, dating violence, sexual assault, or stalking (list is not exhaustive):

*   ***Safe Place***
    24/7 Hotline:  (512) 267-SAFE (7233)

*   ***The Salvation Army Shelter for Women and Children***
    4523 Tannehill Ln

Austin, TX 78721
(512) 933-0600

- **Casa Marianella**
  Posada Esperanza
  821 Gunter St
  Austin, TX 78702
  (512) 928-8862

- **Asian Family Support Services of Austin**
  Hotline:  1-877-281-8371
  Local:  (512) 651-3743

- **Travis County Health and Human Services Community Centers**

| | |
|---|---|
| **Palm Square** <br> 100 N IH 35 Suite 2000     Austin, TX 78701 <br> 512-854-4120 | **Del Valle** <br> 3518 FM 973 S <br> Del Valle, TX 78617 <br> 512-854-1520 |
| **Post Road** <br> 2201 Post Rd., Ste. 101 <br> Austin, TX  78704 <br> 512-854-9130 | **Manor** <br> 600 W Carrie Manor St. <br> Manor, TX  78653 <br> 512-854-1550 |
| **Pflugerville** <br> 15822 Foothill Farm Lp <br> Pflugerville, TX 78660 <br> 512-854-1530 | **Oak Hill** <br> 8656 W Hwy 71 <br> Oak Hill, TX 78735 <br> 512-854-2130 |

- **City of Austin Neighborhood Centers**

| | |
|---|---|
| **Blackland** <br> 2005 Salina St. <br> Austin, TX  78722 <br> 512-972-5790 | **East Austin** <br> 211 Comal St. <br> Austin, TX  78702 <br> 512-972-6650 |
| **Montopolis** <br> 1416 Montopolis Dr. <br> Austin, TX  78741 <br> 512-972-6650 | **Rosewood-Zaragoza** <br> 2800 Webberville Rd. <br> Austin, TX  78702 <br> 512-972-6740 |

| | |
|---|---|
| **South Austin** <br> 2508 Durwood St. <br> Austin, TX  78704 <br> 512-972-6840 | |

**EXHIBIT 16-2: CERTIFICATION OF DOMESTIC VIOLENCE, DATING VIOLENCE, SEXUAL ASSAULT, OR STALKING AND ALTERNATE DOCUMENTATION**

**Purpose of Form:** The Violence Against Women Reauthorization Act of 2013 ("VAWA") protects qualified tenants, participants, and applicants, and affiliated individuals, who are victims of domestic violence, dating violence, sexual assault, or stalking from being denied housing assistance, evicted, or terminated from housing assistance based on acts of such violence against them.

**Use of Form:** This is an optional form. An owner or manager presented with a claim for continued or initial tenancy or assistance based on status as a victim of domestic violence, dating violence, sexual assault, or stalking (herein referred to as "Victim") has the option to request that the Victim document or provide written evidence to demonstrate that the violence occurred. The Victim has the option of either submitting this form or submitting third-party documentation, such as:

(1) A record of a Federal, State, tribal, territorial, or local law enforcement agency (e.g. police), court, or administrative agency; or
(2) Documentation signed by the Victim and signed by an employee, agent or volunteer of a victim service provider, an attorney, a medical professional, or a mental health professional from whom the Victim has sought assistance relating to domestic violence, dating violence, sexual assault, or stalking, or the effects of abuse, in which the professional attests under penalty of perjury (28 U.S.C. 1746) that he or she believes that the incident of domestic violence, dating violence, sexual assault, or stalking is grounds for protection under 24 Code of Federal Regulations (CFR) § 5.2005 or 24 CFR § 5.2009.

**Submission of Documentation Deadline:** If this form is used by the Victim, the Victim must complete and submit it within 14 business days of receiving it from HACA. This form must be returned to the person and address specified in the written request for the certification. If the Victim does not complete and return this form (or provide third-party verification) by the 14th business day or by an extension of the date provided by the manager or owner, the Victim cannot be assured s/he will receive VAWA protections.

If the Victim submits this form or 3rd party documentation as listed above, HACA cannot require any additional evidence from the Victim.

**Confidentiality:** All information provided to HACA concerning the incident(s) of domestic violence, dating violence, sexual assault, or stalking relating to the Victim (including the fact that an individual is a victim of domestic violence, dating violence, sexual assault, or stalking) shall be kept confidential by the owner or manager, and such information shall not be entered into any shared database. Employees of the owner, or manager are not to have access to these details unless to afford or reject VAWA protections to the Victim; and may not disclose this information to any other entity or individual, except to the extent that disclosure is: (i) requested or consented to by the Victim in writing; (ii) required for use in an eviction proceeding; or

41

*Housing Authority of the City of Austin*                                    *Housing Choice Voucher Program*

(iii) otherwise required by applicable law.

### TO BE COMPLETED BY OR ON BEHALF OF THE VAWA VICTIM:

| Today's Date | Victim's Name:<br><br>Current Address of Victim: | Name of Person Completing This Form: |
|---|---|---|
| **Names of Person(s) Living with the Victim** | | |
| **Phone Number of Victim:** ☐ Home (    )　　　☐ Cell  (    )　　　☐ Work (    )<br><br>**Email address of Victim** | | |
| **Name of the Perpetrator (Note:** *The Victim is required to provide the name of the perpetrator only if the name of the perpetrator is safe to provide, and is known to the victim.)* | | |

| **Perpetrator's Relationship to Victim** *(if any)*: | **Does the Victim currently live with the Perpetrator?** |
|---|---|

<table>
<tr><td colspan="2" align="center">Description of Incident 1<br><br><em>The Victim may provide a description of each incident on a separate sheet if more space is needed.</em></td></tr>
<tr><td><strong>Date(s) the Incident(s):</strong></td><td><strong>Location of Incident(s):</strong></td></tr>
<tr><td colspan="2"><strong>Description of Incident(s) (This description may be used by the owner or manager for purposes of evicting the perpetrator.  Be as descriptive as possible.):</strong><br><br><br><br><br></td></tr>
</table>

Title 18, Section 1001 of the U.S. Code states that a person is guilty of a felony for knowingly and willingly making false or fraudulent statements to any department of the United States Government, HUD, the PHA and any owner (or any employee of HUD, the PHA or the owner) may be subject to penalties for unauthorized disclosures or improper uses of information collected based on the consent form.  Use of the information collected based on this verification form is restricted to the purposes cited above.  Any person who knowingly or willfully requests, obtains or discloses any information under false pretenses concerning an applicant or participant may be subject to a misdemeanor and fined not more than $5,000.  Any applicant or participant affected by negligent disclosure of information may bring civil action for damages, and seek other relief, as may be appropriate, against the officer or employee of HUD, the PHA  or the owner responsible for the unauthorized disclosure or improper use.  Penalty provisions for misusing the social security number are contained in the **Social Security Act at 208 (a) (6), (7) and (8).  Violation of these provisions are cited as violations of 42 U.S.C.  408 (a) (6), (7) and (8).

Public Reporting Burden: The public reporting burden for this collection of information is estimated to average 1 hour per response. This includes the time for collecting, reviewing, and reporting the data. The information provided is to be used by the housing provider to request certification that the applicant or tenant is a victim of domestic violence, dating violence, sexual assault, or stalking. The information is subject to the confidentiality requirements of VAWA. This agency may not collect this information, and you are not required to complete this form, unless it displays a currently valid Office of Management and Budget control

number

I hereby certify that the information that I have provided is true and correct and I believe that, based on the information I have provided, that I am a victim of domestic violence, dating violence, sexual assault or stalking.  I acknowledge that submission of false information is a basis for denial of admission, termination of assistance, or eviction.

Please print
name:_____

Signature: _____ Executed on
(Date)_____

41

**EXHIBIT 16-3: EMERGENCY TRANSFER REQUEST FOR CERTAIN VICTIMS OF DOMESTIC VIOLENCE, DATING VIOLENCE, SEXUAL ASSAULT, OR STALKING, FORM HUD-5383**

| | | |
|---|---|---|
| **EMERGENCY TRANSFER** 0286 | **U.S. Department of Housing** | OMB Approval No. 2577- |
| **REQUEST FOR CERTAIN** 06/30/2017 | **and Urban Development** | Exp. |

**VICTIMS OF DOMESTIC**

**VIOLENCE, DATING VIOLENCE,**

**SEXUAL ASSAULT, OR STALKING**

**Purpose of Form:** If you are a victim of domestic violence, dating violence, sexual assault, or stalking, and you are seeking an emergency transfer, you may use this form to request an emergency transfer and certify that you meet the requirements of eligibility for an emergency transfer under the Violence Against Women Act (VAWA). Although the statutory name references women, VAWA rights and protections apply to all victims of domestic violence, dating violence, sexual assault or stalking. Using this form does not necessarily mean that you will receive an emergency transfer. See your housing provider's emergency transfer plan for more information about the availability of emergency transfers.

**The requirements you must meet are:**

**(1) You are a victim of domestic violence, dating violence, sexual assault, or stalking.** If your housing provider does not already have documentation that you are a victim of domestic violence, dating violence, sexual assault, or stalking, your housing provider may ask you for such documentation. In response, you may submit Form HUD-5382, or any one of the other types of documentation listed on that Form.

**(2) You expressly request the emergency transfer.** Submission of this form confirms that you have expressly requested a transfer. Your housing provider may choose to require that you submit this form, or may accept another written or oral request. Please see your housing provider's emergency transfer plan for more details.

**(3) You reasonably believe you are threatened with imminent harm from further violence if you remain in your current unit.** This means you have a reason to fear that if you do not receive a transfer you would suffer violence in the very near future.

**OR**

**You are a victim of sexual assault and the assault occurred on the premises during the 90-calendar-day period before you request a transfer.** If you are a victim of sexual assault, then in addition to qualifying for an emergency transfer because you reasonably believe you are threatened with imminent harm from further violence if you remain in your unit, you may qualify for an emergency transfer if the sexual assault occurred on the premises of the property from which you are seeking your transfer, and that assault happened within the 90-calendar-day period before you submit this form or otherwise expressly request the transfer.

**Submission of Documentation:** If you have third-party documentation that demonstrates why you are eligible for an emergency transfer, you should submit that documentation to your housing provider if it is safe for you to do so. Examples of third party documentation include, but are not limited to: a letter or other documentation from a victim service provider, social worker, legal assistance provider, pastoral counselor, mental health provider, or other professional from whom you have sought assistance; a current restraining order; a recent court order or other court records; a law enforcement report or records; communication records from the perpetrator of the violence or family members or friends of the perpetrator of the violence, including emails, voicemails, text messages, and social media posts.

**Confidentiality:** All information provided to your housing provider concerning the incident(s) of domestic violence, dating violence, sexual assault, or stalking, and concerning your request for an emergency transfer shall be kept confidential. Such details shall not be entered into any shared database. Employees of your housing provider are not to have access to these details unless to grant or deny VAWA protections or an emergency transfer to you. Such employees may not disclose this information to any other entity or individual, except to the extent that disclosure is: (i) consented to by you in writing in a time-limited release; (ii) required for use in an eviction proceeding or hearing regarding termination of assistance; or (iii) otherwise required by applicable law.

## TO BE COMPLETED BY OR ON BEHALF OF THE PERSON REQUESTING A TRANSFER

**1. Name of victim requesting an emergency transfer:**

_____

**2. Your name (if different from**

**victim's)**_____

**3. Name(s) of other family member(s) listed on the**

**lease:**_____

_____

**4. Name(s) of other family member(s) who would transfer with the victim:**_____

_____

_

**5. Address of location from which the victim seeks to transfer:** _____

**6. Address or phone number for contacting the victim:**_____

**7. Name of the accused perpetrator (if known and can be safely disclosed):**_____

**8. Relationship of the accused perpetrator to the victim:**_____

**9. Date(s), Time(s) and location(s) of**

incident(s):_____

_____

—

**10.  Is the person requesting the transfer a victim of a sexual assault that occurred in the past 90 days on the premises of the property from which the victim is seeking a transfer? If yes, skip question 11. If no, fill out question 11. _____**

**11.  Describe why the victim believes they are threatened with imminent harm from further violence if they remain in their current unit.**

_____

_____

—

**12.  If voluntarily provided, list any third-party documentation you are providing along with this notice: _____**

This is to certify that the information provided on this form is true and correct to the best of my knowledge, and that the individual named above in Item 1 meets the requirement laid out on this form for an emergency transfer.  I acknowledge that submission of false information could jeopardize program eligibility and could be the basis for denial of admission, termination of assistance, or eviction.

Signature _____Signed on (Date) _____

**EXHIBIT 16-4: NOTICE TO HOUSING CHOICE VOUCHER OWNERS AND MANAGERS REGARDING THE VIOLENCE AGAINST WOMEN ACT (VAWA)**

A federal law that went into effect in 2013 protects individuals who are victims of domestic violence, dating violence, sexual assault and stalking. The name of the law is the Violence against Women Act, or "VAWA." This notice explains your obligations under VAWA.

**Protections for Victims**
You cannot refuse to rent to an applicant solely because he or she is has been a victim of domestic violence, dating violence, sexual assault or stalking.
You cannot evict a tenant who is or has been the victim of domestic violence, dating violence, sexual assault or stalking based on acts or threats of violence committed against the victim. Also, criminal acts directly related to the domestic violence, dating violence, sexual assault or stalking that are caused by a household member or guest cannot be cause for evicting the victim of the abuse.

**Permissible Evictions**
You can evict a victim of domestic violence, dating violence, sexual assault or stalking if you can demonstrate that there is an *actual and imminent* (immediate) threat to other tenants or employees at the property if the victim is not evicted. Also, you may evict a victim for serious or repeated lease violations that are not related to the domestic violence, dating violence, sexual assault, or stalking. You cannot hold a victim of domestic violence, dating violence, sexual assault or stalking to a more demanding standard than you hold tenants who are not victims.

**Removing the Abuser from the Household**
You may bifurcate (split) the lease to evict a tenant who has committed criminal acts of violence against family members or others, while allowing the victim and other household members to stay in the unit. If you choose to remove the abuser, you may not take away the remaining tenants' rights to the unit or otherwise punish the remaining tenants. In removing the abuser from the household, you must follow federal, state, and local eviction procedures.

**Certification of Domestic Violence, Dating Violence, Sexual Assault or Stalking**
If a tenant asserts VAWA's protections, you can ask the tenant to certify that he or she is a victim of domestic violence, dating violence, sexual assault or stalking. You are not required to demand official documentation and may rely upon the victim's statement alone. If you choose to request certification, you must do so in writing and give the tenant at least 14 business days to provide documentation. You are free to extend this deadline. A tenant can certify that he or she is victim by providing any one of the following three documents:

☐ A completed, signed HUD-approved certification form – Certification of Domestic Violence, Dating Violence, Stalking or Sexual Assault.

☐ A statement from a victim service provider, attorney, mental health professional, or medical professional who has helped the victim address incidents of domestic violence, dating violence, sexual assault, or stalking. The professional must state that he or she believes that the incidents of abuse are real. Both the victim and the professional must sign the statement under penalty of perjury.

☐ A police or court record, such as a protective order, or administrative record.

If the tenant fails to provide one of these documents within 14 business days, you may evict the tenant if authorized by otherwise applicable law and lease provisions.

41

**Confidentiality**

You must keep confidential any information a tenant provides to certify that he or she is a victim of domestic violence, dating violence, sexual assault or stalking. You cannot enter the information into a shared database or reveal it to outside entities unless:

- The tenant provides written permission releasing the information.
- The information is required for use in an eviction proceeding, such as to evict the abuser.

Release of the information is otherwise required by law.
The victim should inform you if the release of the information would put his or her safety at risk.

**VAWA and Other Laws**

VAWA does not limit your obligation to honor court orders regarding access to or control of the property. This includes orders issued to protect the victim and orders dividing property among household members in cases where a family breaks up.

VAWA does not replace any federal, state, or local law that provides greater protection for victims of domestic violence, dating violence, sexual assault or stalking.

**Definitions**

For purposes of determining whether a tenant may be covered by VAWA, the following list of definitions applies:

VAWA defines *domestic violence* to include felony or misdemeanor crimes of violence committed by any of the following:

- A current or former spouse or intimate partner of the victim
- A person with whom the victim shares a child in common
- A person who is cohabitating with or has cohabitated with the victim as a spouse or intimate partner
- A person similarly situated to a spouse of the victim under the domestic or family violence laws of the jurisdiction receiving grant monies
- Any other person against an adult or youth victim who is protected from that person's acts under the domestic or family violence laws of the jurisdiction

VAWA defines *dating violence* as violence committed by a person (1) who is or has been in a social relationship of a romantic or intimate nature with the victim AND (2) where the existence of such a relationship shall be determined based on a consideration of the following factors:

- The length of the relationship
- The type of relationship
- The frequency of interaction between the persons involved in the relationship

VAWA defines *sexual assault* as "any nonconsensual sexual act proscribed by federal, tribal, or state law, including when the victim lacks capacity to consent" (42 U.S.C. 13925(a)).

VAWA defines *stalking* as engaging in a course of conduct directed at a specific person that would cause a reasonable person to fear for his or her safety or the safety of others, or suffer

substantial emotional distress.

## CHAPTER 17
## PROJECT-BASED VOUCHERS

**INTRODUCTION**

This chapter describes HUD regulations and PHA policies related to the project-based voucher (PBV) program in nine parts:

Part I: General Requirements. This part describes general provisions of the PBV program including maximum budget authority requirements, relocation requirements, and equal opportunity requirements.

Part II: PBV Owner Proposals. This part includes policies related to the submission and selection of owner proposals for PBV assistance. It describes the factors the PHA will consider when selecting proposals, the type of housing that is eligible to receive PBV assistance, the cap on assistance at projects receiving PBV assistance, subsidy layering requirements, site selection standards, and environmental review requirements.

Part III: Dwelling Units. This part describes requirements related to housing quality standards, the type and frequency of inspections, and housing accessibility for persons with disabilities.

Part IV: Rehabilitated and Newly Constructed Units. This part describes requirements and policies related to the development and completion of rehabilitated and newly constructed housing units that will be receiving PBV assistance.

Part V: Housing Assistance Payments Contract. This part discusses HAP contract requirements and policies including the execution, term, and termination of the HAP contract. In addition, it describes how the HAP contract may be amended and identifies provisions that may be added to the HAP contract at the PHA's discretion.

Part VI: Selection of PBV Program Participants. This part describes the requirements and policies governing how the PHA and the owner will select a family to receive PBV assistance.

Part VII: Occupancy. This part discusses occupancy requirements related to the lease, and describes under what conditions families are allowed or required to move. In addition, exceptions to the occupancy cap (which limits PBV assistance to 25 percent of the units in any project) are also discussed.

Part VIII: Determining Rent to Owner. This part describes how the initial rent to owner is determined, and how rent will be redetermined throughout the life of the HAP contract. Rent reasonableness requirements are also discussed.

Part IX: Payments to Owner. This part describes the types of payments owners may receive under this program.

PART I. GENERAL REQUIREMENTS

## 17-I.A. OVERVIEW [24 CFR 983.5; FR Notice 1/18/17; Notice PIH 2017-21]

The project-based voucher (PBV) program allows PHAs that already administer a tenant-based voucher program under an annual contributions contract (ACC) with HUD to take up to 20 percent of its authorized units and attach the funding to specific units rather than using it for tenant-based assistance [24 CFR 983.6]. PHAs may only operate a PBV program if doing so is consistent with the PHA's Annual Plan, and the goal of deconcentrating poverty and expanding housing and economic opportunities [42 U.S.C. 1437f(o)(13)].

HACA Policy

HACA will operate a project-based voucher program as outlined in this chapter.

PBV assistance may be attached to existing housing or newly constructed or rehabilitated housing [24 CFR 983.52]. If PBV units are already selected for project-based assistance either under an agreement to enter into HAP Contract (Agreement) or a HAP contract, the PHA is not required to reduce the number of these units if the amount of budget authority is subsequently reduced. However, the PHA is responsible for determining the amount of budget authority that is available for project-based vouchers and ensuring that the amount of assistance that is attached to units is within the amounts available under the ACC, regardless of whether the PHA has vouchers available for project-basing [FR Notice 1/18/17].

## Additional Project-Based Units [FR Notice 1/18/17; Notice PIH 2017-2; FR Notice 1/24/22]

The PHA may project-base an additional 10 percent of its units above the 20 percent program limit. The units may be distributed among one, all, or a combination of the categories as long as the total number of units does not exceed the 10 percent cap.

For units under a HAP contract that was first executed on or after April 18, 2017, units qualify under this exception if the units:

- Are specifically made available to house individuals and families that meet the definition of homeless under section 103 of the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11302) and contained in the Continuum of Care Interim Rule at 24 CFR 578.3.

- Are specifically made available to house families that are comprised of or include a veteran.

  - *Veteran* means an individual who has served in the United States Armed Forces.

- Provide supportive housing to persons with disabilities or elderly persons as defined in 24 CFR 5.403.

- Are located in a census tract with a poverty rate of 20 percent or less, as determined in the most recent American Community Survey Five-Year Estimates. Only units that that are

~~under a HAP contract that was first executed on or after April 18, 2017, may be covered by~~ the 10 percent exception.

- PBV units that house eligible youth receiving FUPY/FYI assistance are also covered by this 10 percent exception authority if the units are under a HAP contract that became effective after December 27, 2020, and if the unit is occupied by an eligible youth receiving FUPY/FYI assistance. FYI TPVs that were awarded under Notice PIH 2019-20 are not part of this exception since PHAs are prohibited from project-basing FYI TPVs. Units added after December 27, 2020, through an amendment of a HAP contract that became effective after December 27, 2020, are eligible for this 10 percent exception authority. In contrast, units added after December 27, 2020, through an amendment of a HAP contract that became effective on or prior to December 27, 2020, are not eligible for this 10 percent exception authority [FR Notice 1/24/22]. See Chapter 19 for policies specific to project-basing FUPY vouchers.

  HACA Policy

  HACA may project-base up to an additional 10 percent of its authorized units, up to 30 percent, in accordance with HUD regulations and requirements.

**Units Not Subject to the PBV Program Limitation [FR Notice 1/18/17]**

PBV units under the RAD program and HUD-VASH PBV set-aside vouchers do not count toward the 20 percent limitation when PBV assistance is attached to them.

In addition, units that were previously subject to certain federal rent restrictions or were receiving another type of long-term housing subsidy provided by HUD are not subject to the cap. The unit must be covered under a PBV HAP contract that first became effective on or after April 18, 2017.

  HACA Policy

  HACA may project-base units not subject to the 20 percent cap in accordance with HUD regulations and requirements.

## 17-I.B. TENANT-BASED VS. PROJECT-BASED VOUCHER ASSISTANCE [24 CFR 983.2]

Much of the tenant-based voucher program regulations also apply to the PBV program. Consequently, many of the PHA policies related to tenant-based assistance also apply to PBV assistance. The provisions of the tenant-based voucher regulations that do not apply to the PBV program are listed at 24 CFR 983.2.

  HACA Policy

Except as otherwise noted in this chapter, or unless specifically prohibited by PBV program regulations, HACA's policies for the tenant-based voucher program contained in this administrative plan also apply to the PBV program and its participants.

## 17-I.C. RELOCATION REQUIREMENTS [24 CFR 983.7]

Any persons displaced as a result of implementation of the PBV program must be provided relocation assistance in accordance with the requirements of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 (URA)[42 U.S.C. 4201-4655] and implementing regulations at 49 CFR part 24.

The cost of required relocation assistance may be paid with funds provided by the owner, local public funds, or funds available from other sources. PHAs may not use voucher program funds to cover relocation costs, except that PHAs may use their administrative fee reserve to pay for relocation expenses after all other program administrative expenses are satisfied, and provided that payment of the relocation benefits is consistent with state and local law. Use of the administrative fee for these purposes must also be consistent with other legal and regulatory requirements, including the requirement in 24 CFR 982.155 and other official HUD issuances.

The acquisition of real property for a PBV project is subject to the URA and 49 CFR part 24, subpart B. It is the responsibility of the PHA to ensure the owner complies with these requirements.

## 17-I.D. EQUAL OPPORTUNITY REQUIREMENTS [24 CFR 983.8]

The PHA must comply with all equal opportunity requirements under federal law and regulations in its implementation of the PBV program. This includes the requirements and authorities cited at 24 CFR 5.105(a). In addition, the PHA must comply with the PHA Plan certification on civil rights and affirmatively furthering fair housing, submitted in accordance with 24 CFR 903.7(o).

## PART II: PBV OWNER PROPOSALS

## 17-II.A. OVERVIEW

With certain exceptions, the PHA must describe the procedures for owner submission of PBV proposals and for PHA selection of PBV proposals [24 CFR 983.51]. Before selecting a PBV proposal, the PHA must determine that the PBV proposal complies with HUD program regulations and requirements, including a determination that the property is eligible housing [24 CFR 983.53 and 983.54], complies with the cap on the number of PBV units per project [24 CFR 983.56], and meets the site selection standards [24 CFR 983.57]. The PHA may not commit PBVs until or unless it has followed the proposal selection requirements defined in 24 CFR 983.51 [Notice PIH 2011-54].

~~**17-II.B. OWNER PROPOSAL SELECTION PROCEDURES** [24 CFR 983.51(b)]~~

The PHA must select PBV proposals in accordance with the selection procedures in the PHA administrative plan. The PHA must select PBV proposals by either of the following two methods.

<u>HACA request for PBV Proposals</u>.

The PHA may solicit proposals by using a request for proposals to select proposals on a competitive basis in response to the PHA request.  The PHA may not limit proposals to a single site or impose restrictions that explicitly or practically preclude owner submission of proposals for PBV housing on different sites.

<u>HACA may select proposal that were previously selected based on a competition</u>.

This may include selection of a proposal for housing assisted under a federal, state, or local government housing assistance program that was subject to a competition in accordance with the requirements of the applicable program, community development program, or supportive services program that requires competitive selection of proposals (e.g., HOME, and units for which competitively awarded LIHTCs have been provided), where the proposal has been selected in accordance with such program's competitive selection requirements within three years of the PBV proposal selection date, and the earlier competitive selection proposal did not involve any consideration that the project would receive PBV assistance. The PHA need not conduct another competition.

**Units Selected Non-Competitively [FR Notice 1/18/17; Notice PIH 2017-21; 24 CFR 983.51(b)]**

For certain public housing projects where the PHA has an ownership interest or control, the PHA may attach PBV assistance non-competitively without following one of the two processes above.

This exception applies to projects in which the PHA is engaged in an initiative to improve, develop, or replace a public housing property or site. The public housing units may either currently be in the public housing inventory or may have been removed from the public housing inventory within five years of the date on which the PHA entered into the AHAP or HAP.

- If the PHA is planning rehabilitation or new construction on the project, a minimum threshold of $25,000 per unit in hard costs must be expended.
- If the PHA plans to replace public housing by attaching PBV assistance to existing housing in which the PHA has an ownership interest or control, then the $25,000 per unit minimum threshold does not apply as long as the existing housing substantially complies with HQS.
- The PHA must include in the administrative plan what work it plans to do on the property or site and how many PBV units will be added to the site.

- *Ownership interest* means that the PHA or its officers, employees, or agents are in an entity that holds any direct or indirect interest in the building, including, but not limited to an interest as: titleholder; lessee; stockholder; member, or general or limited partner; or a member of a limited liability corporation.

HACA Policy

HACA is currently undertaking a complete redevelopment and expansion of its Rosewood Courts public housing property in east Austin.  In accordance with HUD requirements, this redevelopment and expansion will exceed the required minimum of $25,000 in per unit hard costs.  This property is a high priority for HACA – it is in an area of expanding opportunity that is rapidly gentrifying and where there is a significant need for additional affordable housing to meet the needs of current residents of the area and others moving to Austin.

This redevelopment contemplates the new construction of approximately 184 multi-family units with modern, energy efficient appliances and amenities, which will replace 17 of the existing 25 buildings on the site. HACA and AAHC also recognize the historic significance of the property and as such the redevelopment also contemplates a robust historic preservation component consisting of the restoration of eight existing buildings. The redevelopment plan will significantly improve the quality of life for the residents of Rosewood Courts East and allow AAHC to provide more affordable housing by moderately increasing density.  Additionally, the redevelopment will include an opportunity for homeownership for  approximately 12 low income families. HACA may elect to project-base vouchers not to exceed 50 units.

Residents of Rosewood Courts will have the first right to return to the newly rebuilt Pathways at Rosewood Courts. During construction, Rosewood Courts residents will be supported with comprehensive relocation assistance, ensuring each household's needs are accounted for and are offered options that minimize having to leave their immediate neighborhood. It is anticipated that nearby HACA properties will also be a viable relocation option for families while Rosewood is being rebuilt.

HACA has determined that the placement of project-based Housing Choice Vouchers will significantly benefit HACA's ability to meet its mission of serving the lowest income persons in our community, including seniors, persons with disabilities, transitioning homeless, and families with children.

HACA is currently undertaking a complete redevelopment and expansion of its Chalmers Courts public housing property in east Austin.  In accordance with HUD requirements, this redevelopment and expansion will exceed the required minimum of $25,000 in per unit hard costs.  This property is a high priority for HACA – it is in an area of expanding opportunity that is rapidly gentrifying and where there is a significant

need for additional affordable housing to meet the needs of current residents of the area and others moving to Austin.  The first phase of the redevelopment is the construction of 86 new affordable housing units south of the existing Chalmers Courts site (Chalmers South).  HACA project-based 42 regular vouchers and 8 VASH vouchers at Chalmers East. HACA will project-base 42 regular vouchers and 8 VASH vouchers at Chalmers West.  Once complete, HACA will relocate residents from either the east or west side of the existing Chalmers Courts site, minimizing displacement and disruption to families.  A redevelopment will then begin on either the east or west side of the site.

The east side and west side redevelopments of Chalmers Courts will involve the construction of approximately 160 units on each side.  Once fully completed, the new Chalmers Courts – south, west and east – will total approximately 400 units, significantly helping address Austin's affordable housing needs.

HACA has determined that the placement of project-based Housing Choice Vouchers, as well as the placement of a to-be-determined number of project-based HUD VASH vouchers, will significantly benefit HACA's ability to meet its mission of serving the lowest income persons in our community, including seniors, persons with disabilities, transitioning homeless, and families with children.

### Solicitation and Selection of PBV Proposals [24 CFR 983.51(c)]

PHA procedures for selecting PBV proposals must be designed and actually operated to provide broad public notice of the opportunity to offer PBV proposals for consideration by the PHA.  The public notice procedures may include publication of the public notice in a local newspaper of general circulation and other means designed and actually operated to provide broad public notice. The public notice of the PHA request for PBV proposals must specify the submission deadline. Detailed application and selection information must be provided at the request of interested parties.

**HACA Policy**

**HACA Request for Proposals for Rehabilitated and Newly Constructed Units**

HACA will advertise its request for proposals (RFP) for rehabilitated and newly constructed housing in the following newspapers and trade journals.

**Austin American Statesman**

**The Austin Chronicle**

**The Villager**

**El Mundo**

**HACA may also advertise the RFPs in other trade journals and industry sources, including electronic advertising, as HACA determines is appropriate for the project.**

In addition, HACA will post the RFP and proposal submission and rating and ranking procedures on its electronic web site.

HACA will publish its advertisement in the newspapers and trade journals mentioned above for at least one day per week for two consecutive weeks. The advertisement will specify the number of project based units that HACA estimates will be available. The due date for proposals will be specified in the RFP. In order for the proposal to be considered, the owner must submit the proposal to HACA by the published deadline date, and the proposal must respond to all requirements as outlined in the RFP. Incomplete proposals will not be reviewed. Advertisements will also contain a statement that participation in the PBV program requires compliance with Fair Housing and Equal Opportunity (FHEO) requirements.

HACA will rate and rank proposals for rehabilitated and newly constructed housing using the following criteria:

> Owner experience and capability to build or rehabilitate housing as identified in the RFP;

> Extent to which the project furthers HACA's goal of deconcentrating poverty and expanding housing and economic opportunities;

> If applicable, the extent to which services for special populations are provided on site or in the immediate area for occupants of the property; and

> Projects which will provide affordable housing and support services to individuals or families experiencing homelessness.

> Projects which will provide affordable housing and support services to low-income or homeless veterans.

**HACA Requests for Proposals for Existing Housing Units**

HACA will advertise its request for proposals (RFP) for existing housing in the following newspapers and trade journals.

**Austin American Statesman**

**The Austin Chronicle**

**The Villager**

**El Mundo**

**HACA may also advertise the RFPs in other trade journals and industry sources, including electronic advertising, as HACA determines is appropriate for the**

**project.**

In addition, HACA will post the notice inviting such proposal submission and the rating and ranking procedures on its electronic web site.

HACA may periodically publish its advertisement in the newspapers and trade journals mentioned above for at least one day per week for two consecutive weeks. The advertisement will specify the number of project based units available. The due date for proposals will be specified in the RFP. Advertisements will also contain a statement that participation in the PBV program requires compliance with Fair Housing and Equal Opportunity (FHEO) requirements.

Owner proposals will be accepted on a first-come first-served basis and will be evaluated using the following criteria:

> Experience as an owner in the tenant-based voucher program and owner compliance with the owner's obligations under the tenant-based program;

> Extent to which the project furthers HACA's goal of deconcentrating poverty and expanding housing and economic opportunities;

> Extent to which units are occupied by families that are eligible to participate in the PBV program.

> Projects which will provide affordable housing and support services to individuals or families experiencing homelessness.

> Projects which will provide affordable housing and support services to low-income or homeless veterans.

<u>HACA Selection of Proposals Subject to a Previous Competition under a Federal, State, or Local Housing Assistance Program</u>

HACA may select, without competition, a proposal for housing assisted under a federal, State, or local government housing assistance, community development, or supportive services program that required competitive selection of proposals (e.g., HOME and units competitively awarded low-income housing tax credits (LIHTCs)), where the proposal has been selected in accordance with such program's competitive selection requirements within 3 years of the PBV proposal selection date, and the earlier competitively selected housing assistance proposal did not involve any consideration that the project would receive PBV assistance.

HACA may periodically advertise that it is accepting proposals, in the following newspapers and trade journals:

**Austin American Statesman**

**The Austin Chronicle**

**The Villager**

**El Mundo**

**HACA may also advertise the RFPs in other trade journals and industry sources, including electronic advertising, as HACA determines is appropriate for the project.**

In addition to, or in place of advertising, HACA may, on an ongoing basis, also directly contact specific owners that have already been selected for Federal, state, or local housing assistance based on a previously held competition, to inform them of available PBV assistance. Any awards of PBV units selected under this method will be published in the Austin American Statesman within 30 days of the award.

> Proposals will be reviewed on a first-come first-serve basis. HACA will evaluate each proposal on its merits using the following factors: Owner experience and capability to build or rehabilitate housing as identified in the RFP;

> Extent to which the project furthers HACA's goal of deconcentrating poverty and expanding housing and economic opportunities; and

> Projects that will provide affordable housing and support services to individuals or families experiencing homelessness.

> Projects which will provide affordable housing and support services to low-income or homeless veterans.

> Extent to which the proposal complements other local activities such as the redevelopment of a public housing site under the HOPE VI program, the HOME program, CDBG activities, other development activities in a HUD-designated Enterprise Zone, Economic Community, Choice Neighborhood, or Renewal Community.

### PHA-Owned Units [24 CFR 983.51(e) 983.59, FR Notice 1/18/17 and Notice PIH 2017-21]

A PHA-owned unit may be assisted under the PBV program only if the HUD field office or HUD-approved independent entity reviews the selection process and determines that the PHA-owned units were appropriately selected based on the selection procedures specified in the PHA administrative plan. . This also applies to noncompetitive selections. If the PHA selects a proposal for housing that is owned or controlled by the PHA, the PHA must identify the entity that will review the PHA proposal selection process and perform specific functions with respect to rent determinations, the term of the HAP contract, and inspections In the case of PHA-owned units, the term of the HAP contract and any HAP contract renewal must be agreed

upon by the PHA and a HUD-approved independent entity. In addition, an independent entity must determine the rent to owner, the redetermined rent to owner, and reasonable rent. Housing quality standards inspections must also be conducted by an independent entity.

The independent entity that performs these program services may be the unit of general local government for the PHA jurisdiction (unless the PHA is itself the unit of general local government or an agency of such government) or another HUD-approved public or private independent entity.

> HACA Policy
>
> HACA may submit a proposal for project-based housing that is owned or controlled by HACA or its subsidiary.  If the proposal for HACA-owned  or controlled housing is selected, the HUD field office or a HUD-approved independent entity will review the selection process to determine if the HACA owned or controlled units were appropriately selected based on the selection procedures specified in HACA's administrative plan. HACA will make documentation available for public inspection regarding the basis of selection of a PVB proposal.
>
> For HACA-owned or controlled housing, the initial contract rent will be approved by an independent entity. In addition, housing quality standards inspections will be conducted by an independent entity.

The PHA may only compensate the independent entity from PHA ongoing administrative fee income (including amounts credited to the administrative fee reserve). The PHA may not use other program receipts to compensate the independent entity for its services. The PHA and independent entity may not charge the family any fee for the appraisal or the services provided by the independent entity.

## PHA Notice of Owner Selection [24 CFR 983.51(d)]

The PHA must give prompt written notice to the party that submitted a selected proposal and must also give prompt public notice of such selection. Public notice procedures may include publication of public notice in a local newspaper of general circulation and other means designed and actually operated to provide broad public notice.

> HACA Policy
> Within 15 business days of HACA making the selection, HACA will notify the selected owner in writing of the owner's selection for the PBV program.  HACA will also notify in writing all owners that submitted proposals that were not selected and advise such owners of the name of the selected owner.
>
> In addition, HACA will post the notice of owner selection on its electronic website. The announcement will include the name of the owner that was selected for the PBV

program.

HACA will make available to any interested party its rating and ranking sheets and documents that identify HACA's basis for selecting the proposal. These documents will be available for review by the public and other interested parties for one month after publication of the notice of owner selection. HACA will not make available sensitive owner information that is privileged, such as financial statements and similar information about the owner.

HACA will make these documents available for review at HACA during normal business hours. The cost for reproduction of allowable documents will be $.25 per page.

## 17-II.C. HOUSING TYPE [24 CFR 983.52]

The PHA may attach PBV assistance for units in existing housing or for newly constructed or rehabilitated housing developed under and in accordance with an agreement to enter into a housing assistance payments contract that was executed prior to the start of construction. A housing unit is considered an existing unit for purposes of the PBV program, if, at the time of notice of PHA selection, the units substantially comply with housing quality standards (HQS). Units for which new construction or rehabilitation began after the owner's proposal submission but prior to the execution of the HAP do not subsequently qualify as existing housing. Units that were newly constructed or rehabilitated in violation of program requirements also do not qualify as existing housing.

The PHA must decide what housing type, new construction, rehabilitation, or existing housing, will be used to develop project-based housing.  The PHA choice of housing type must be reflected in its solicitation for proposals.

## 17-II.D. PROHIBITION OF ASSISTANCE FOR CERTAIN UNITS

### Ineligible Housing Types [24 CFR 983.53]

The PHA may not attach or pay PBV assistance to:

- shared housing units;
- units on the grounds of a penal reformatory, medical, mental, or similar public or private institution;
- nursing homes or facilities providing continuous psychiatric, medical, nursing services, board and care, or intermediate care (except that assistance may be provided in assisted living facilities);
- units that are owned or controlled by an educational institution or its affiliate and are designated for occupancy by students;
- manufactured homes;

- and transitional housing.

In addition, the PHA may not attach or pay PBV assistance for a unit occupied by an owner and the PHA may not select or enter into an agreement to enter into a HAP contract or HAP contract for a unit occupied by a family ineligible for participation in the PBV program. A member of a cooperative who owns shares in the project assisted under the PBV program is not considered an owner for purposes of participation in the PBV program. Finally, PBV assistance may not be attached to units for which construction or rehabilitation has started after the proposal submission and prior to the execution of an AHAP.

### Subsidized Housing [24 CFR 983.54]

A PHA may not attach or pay PBV assistance to units in any of the following types of subsidized housing:

- A public housing unit;

- A unit subsidized with any other form of Section 8 assistance;

- A unit subsidized with any governmental rent subsidy;

- A unit subsidized with any governmental subsidy that covers all or any part of the operating costs of the housing;

- A unit subsidized with Section 236 rental assistance payments (except that a PHA may attach assistance to a unit subsidized with Section 236 interest reduction payments);

- A Section 202 project for non-elderly with disabilities;

- Section 811 project-based supportive housing for persons with disabilities;

- Section 202 supportive housing for the elderly;

- A Section 101 rent supplement project;

- A unit subsidized with any form of tenant-based rental assistance;

- A unit with any other duplicative federal, state, or local housing subsidy, as determined by HUD or the PHA in accordance with HUD requirements.

### 17-II.E. SUBSIDY LAYERING REQUIREMENTS [24 CFR 983.55, Notice PIH 2013-11, and FR Notice 2/28/20]

The subsidy layering review is intended to prevent excessive public assistance by combining (layering) housing assistance payment subsidy under the PBV program with other governmental housing assistance from federal, state, or local agencies, including assistance such as tax concessions or tax credits.

HUD requires new construction and rehabilitation housing that will include forms of governmental assistance other than PBVs to undergo a subsidy layering review (SLR) prior to

entering into an Agreement to Enter into Housing Assistance Payments Contract (AHAP). Subsidy layering requirements do not apply to existing housing, when PBV is the only governmental assistance, or for projects already subject to a PBV HAP contract, even if the project is recapitalized with outside sources of funding.

When a PHA selects a new construction or rehabilitation project, the PHA must require information regarding all HUD and/or other federal, state, or local governmental assistance to be disclosed by the project owner using Form HUD-2880. Appendix A of FR Notice 2/28/20 contains a list of all required documentation.

Either HUD or a HUD-approved housing credit agency (HCA) in the PHA's jurisdiction performs the subsidy layering review. The PHA must request an SLR though their local HUD Field Office or, if eligible, through a participating HCA.

If the SLR request is submitted to an approved HCA, and the proposed project-based voucher assistance meets HUD subsidy layering requirements, the HCA must submit a certification to HUD and notify the PHA. The PHA may proceed to execute an AHAP at that time if the environmental approval is received.

The HAP contract must contain the owner's certification that the project has not received and will not receive (before or during the term of the HAP contract) any public assistance for acquisition, development, or operation of the housing other than assistance disclosed in the subsidy layering review in accordance with HUD requirements

### 17-II.F. CAP ON NUMBER OF PBV UNITS IN EACH PROJECT

**25 Percent per Project Cap [24 CFR 983.56, FR Notice 1/18/17, and Notice PIH 2017-21]**
In general, the PHA may not select a proposal to provide PBV assistance for units in a project or enter into an agreement to enter into a HAP or a HAP contract to provide PBV assistance for units in a project, if the total number of dwelling units in the project that will receive PBV assistance during the term of the PBV HAP contract is more than the greater of 25 units or 25 percent of the number of dwelling units (assisted or unassisted) in the project.

**Exceptions to 25 Percent per Project Cap [FR Notice 1/18/17; Notice PIH 2017-21; FR Notice 1/24/22]**
As of April 18, 2017, units are not counted against the 25 percent or 25-unit per project cap if:

- The units are exclusively for elderly families

- The units are for households eligible for supportive services available to all families receiving PBV assistance in the project

- If the project is located in a census tract with a poverty rate of 20 percent or less, as determined in the most recent American Community Survey Five-Year estimates, the project cap is the greater of 25 units or 40 percent (instead of 25 percent) of the units in the project [FR Notice 7/14/17].

The Housing Opportunity Through Modernization Act of 2016 (HOTMA) eliminated the

~~project cap exemption for projects that serve disabled families and modified the exception for~~ supportive services.

Under the Fostering Stable Housing Opportunities (FSHO) amendments, units exclusively made available to youth receiving FUPY/FYI assistance may be excepted from the project cap for HAP contracts first effective after December 27, 2020. For more information on excepted units for FUPY, see Chapter 19.

Projects where these caps were implemented prior to HOTMA (HAP contracts executed prior to April 18, 2017) or FSHO (contract in effect on or prior to December 27, 2020) may continue to use the former exceptions and may renew their HAP contracts under the old requirements, unless the PHA and owner agree to change the conditions of the HAP contract. However, this change may not be made if it would jeopardize an assisted family's eligibility for continued assistance in the project.

***Supportive Services***

PHAs must include in the PHA administrative plan the type of services offered to families for a project to qualify for the exception and the extent to which such services will be provided. As of April 18, 2017, the project must make supportive services available to all families receiving PBV assistance in the project, but the family does not actually have to accept and receive supportive services for the exception to apply to the unit.  It is not necessary that the services be provided at or by the project, but must be reasonably available to families receiving PBV assistance at the project and designed to help families in the project achieve self-sufficiency or live in the community as independently as possible. A PHA may not require participation in the supportive service as a condition of living in the excepted unit, although such services may be offered.

> HACA Policy
> HACA may develop housing for occupancy by families in need of services. This may include disabled families, families in need of particular supportive services, or families participating in the Family Self-Sufficiency (FSS) program.  Families will not be required to accept and receive supportive services for the exception to apply to the unit.
>
> The following types of services will be provided depending on the needs of the family:
>
> Supportive Services
>
> The types of supportive services that will be offered include, but are not limited to:
>
> **Job readiness / Job training:** Includes preparation and counseling, job development and placement, follow-up assistance after placement, completion of FSS "Contract of Family Participation;
>
> **Education**: Includes education for the completion of GED, post-secondary education,

or computer training classes for children and adults.;

**Household Training:**  Includes homemaking, parenting skills, financial literacy and stability programs;

**Self-Sufficiency Services and Resources**:  Includes participating in the FSS program and accessing all appropriate services to assist the family to achieve economic independence and self-sufficiency.

**Substance Abuse Treatment**: Includes counseling, treatment for substance abuse and participation in ongoing support groups.

### Projects not Subject to a Project Cap [FR Notice 1/18/17; Notice PIH 2017-21]]

PBV units that were previously subject to certain federal rent restrictions or receiving another type of long-term housing subsidy provided by HUD are exempt from the project cap. In other words, 100 percent of the units in these projects may receive PBV assistance.

HACA Policy

HACA does not have any PBV units that are subject to the per project cap exception.

**Promoting Partially-Assisted Projects [24 CFR 983.56(c)]**

A PHA may establish local requirements designed to promote PBV assistance in partially assisted projects. A *partially assisted project* is a project in which there are fewer units covered by a HAP contract than residential units [24 CFR 983.3].

A PHA may establish a per-project cap on the number of units that will receive PBV assistance or other project-based assistance in a multifamily project containing excepted units or in a single-family building. A PHA may also determine not to provide PBV assistance for excepted units, or the PHA may establish a per-project cap of less than 25 units or 25 percent of units.

> PHA Policy:
> Excepted units will be limited to units for elderly families.
>
> Beyond that, the PHA will not impose any further cap on the number of PBV units assisted per project.

## 17-II.G. SITE SELECTION STANDARDS

### Compliance with PBV Goals, Civil Rights Requirements, and HQS Site Standards [24 CFR 983.57(b)]

The PHA may not select a proposal for existing, newly constructed, or rehabilitated PBV housing on a site or enter into an agreement to enter into a HAP contract or HAP contract for units on the site, unless the PHA has determined that PBV assistance for housing at the selected site is consistent with the goal of deconcentrating poverty and expanding housing and economic opportunities. The standard for deconcentrating poverty and expanding housing and economic opportunities must be consistent with the PHA Plan under 24 CFR 903 and the PHA administrative plan.

In addition, prior to selecting a proposal, the PHA must determine that the site is suitable from the standpoint of facilitating and furthering full compliance with the applicable Civil Rights Laws, regulations, and Executive Orders, and that the site meets the HQS site and neighborhood standards at 24 CFR 982.401(l).

> HACA Policy
> It is HACA's goal to select sites for PBV housing that provide for deconcentrating poverty and expanding housing and economic opportunities. In complying with this goal, HACA will limit approval of sites for PBV housing in census tracts that have poverty concentrations of 20 percent or less.
>
> However, HACA will grant exceptions to the 20 percent standard where HACA determines that the PBV assistance will complement other local redevelopment activities designed to deconcentrate poverty and expand housing and economic opportunities in census tracts with poverty concentrations greater than 20 percent, such as sites in:
>
> > A census tract in which the proposed PBV development will be located in a

HUD-designated Enterprise Zone, Economic Community, Choice Neighborhood or Renewal Community;

A census tract where the concentration of assisted units will be or has decreased as a result of public housing demolition and HOPE VI redevelopment;

A census tract in which the proposed PBV development will be located is undergoing significant revitalization as a result of state, local, or federal dollars invested in the area;

A census tract where new market rate units are being developed where such market rate units will positively impact the poverty rate in the area;

A census tract where there has been an overall decline in the poverty rate within the past five years; or

A census tract where there are meaningful opportunities for educational and economic advancement.

**Existing and Rehabilitated Housing Site and Neighborhood Standards [24 CFR 983.57(d)]**

The PHA may not enter into an agreement to enter into a HAP contract nor enter into a HAP contract for existing or rehabilitated housing until it has determined that the site complies with the HUD required site and neighborhood standards. The site must:

- Be adequate in size, exposure, and contour to accommodate the number and type of units proposed;

- Have adequate utilities and streets available to service the site;

- Promote a greater choice of housing opportunities and avoid undue concentration of assisted persons in areas containing a high proportion of low-income persons;

- Be accessible to social, recreational, educational, commercial, and health facilities and services and other municipal facilities and services equivalent to those found in neighborhoods consisting largely of unassisted similar units; and

- Be located so that travel time and cost via public transportation or private automobile from the neighborhood to places of employment is not excessive.

**New Construction Site and Neighborhood Standards [24 CFR 983.57(e)]**

In order to be selected for PBV assistance, a site for newly constructed housing must meet the following HUD required site and neighborhood standards:

- The site must be adequate in size, exposure, and contour to accommodate the number and type of units proposed;

- The site must have adequate utilities and streets available to service the site;

- The site must not be located in an area of minority concentration unless the PHA determines that sufficient, comparable opportunities exist for housing for minority families in the income range to be served by the proposed project outside areas of minority concentration or that the project is necessary to meet overriding housing needs that cannot be met in that housing market area;

- The site must not be located in a racially mixed area if the project will cause a significant increase in the proportion of minority to non-minority residents in the area.

- The site must promote a greater choice of housing opportunities and avoid undue concentration of assisted persons in areas containing a high proportion of low-income persons;

- The neighborhood must not be one that is seriously detrimental to family life or in which substandard dwellings or other undesirable conditions predominate;

- The housing must be accessible to social, recreational, educational, commercial, and health facilities and services and other municipal facilities and services equivalent to those found in neighborhoods consisting largely of unassisted similar units; and

- Except for housing designed for elderly persons, the housing must be located so that travel time and cost via public transportation or private automobile from the neighborhood to places of employment is not excessive.

## 17-II.H. ENVIRONMENTAL REVIEW [24 CFR 983.58]

HACA activities under the PBV program are subject to HUD environmental regulations in 24 CFR parts 50 and 58. The *responsible entity* is responsible for performing the federal environmental review under the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.). HACA may not enter into an agreement to enter into a HAP contract nor enter into a HAP contract until it has complied with the environmental review requirements.

In the case of existing housing, the responsible entity that is responsible for the environmental review under 24 CFR part 58 must determine whether or not PBV assistance is categorically excluded from review under the National Environmental Policy Act and whether or not the assistance is subject to review under the laws and authorities listed in 24 CFR 58.5.

The PHA may not enter into an agreement to enter into a HAP contract or a HAP contract with an owner, and the PHA, the owner, and its contractors may not acquire, rehabilitate, convert, lease, repair, dispose of, demolish, or construct real property or commit or expend program or local funds for PBV activities under this part, until the environmental review is completed.

The PHA must supply all available, relevant information necessary for the responsible entity to perform any required environmental review for any site. The PHA must require the owner to carry out mitigating measures required by the responsible entity (or HUD, if applicable) as a result of the environmental review.

PART III. DWELLING UNITS

## 17-III.A. OVERVIEW

This part identifies the special housing quality standards that apply to the PBV program, housing accessibility for persons with disabilities, and special procedures for conducting housing quality standards inspections.

## 17-III.B. HOUSING QUALITY STANDARDS [24 CFR 983.101]

The housing quality standards (HQS) for the tenant-based program, including those for special housing types, generally apply to the PBV program. HQS requirements for shared housing, manufactured home space rental and the homeownership option do not apply because these housing types are not assisted under the PBV program.

The physical condition standards at 24 CFR 5.703 does not apply to the PBV program.

**Lead-based Paint [24 CFR 983.101(c)]**
The lead-based paint requirements for the tenant-based voucher program do not apply to the PBV program. Instead, The Lead-based Paint Poisoning Prevention Act (42 U.S.C. 4821-4846), the Residential Lead-based Paint Hazard Reduction Act of 1992 (42 U.S.C. 4851-4856), and implementing regulations at 24 CFR part 35, subparts A, B, H, and R, and 40 CFR 745.227, apply to the PBV program.

## 17-III.C. HOUSING ACCESSIBILITY FOR PERSONS WITH DISABILITIES

The housing must comply with program accessibility requirements of section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794) and implementing regulations at 24 CFR part 8. The PHA must ensure that the percentage of accessible dwelling units complies with the requirements of section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794), as implemented by HUD's regulations at 24 CFR 8, subpart C.

Housing first occupied after March 13, 1991, must comply with design and construction requirements of the Fair Housing Amendments Act of 1988 and implementing regulations at 24 CFR 100.205, as applicable. (24 CFR 983.102)

## 17-III.D. INSPECTING UNITS

**Pre-selection Inspection [24 CFR 983.103(a)]**
The PHA must examine the proposed site before the proposal selection date. If the units to be assisted already exist, the PHA must inspect all the units before the proposal selection date, and must determine whether the units substantially comply with HQS. To qualify as existing housing, units must substantially comply with HQS on the proposal selection date. However, the PHA may not execute the HAP contract until the units fully comply with HQS.

**Pre-HAP Contract Inspections [24 CFR 983.103(b), FR Notice 1/18/17, and Notice PIH 2017-20]**

The PHA must inspect each contract unit before execution of the HAP contract. The PHA may not provide assistance on behalf of the family until the unit fully complies with HQS, unless the PHA has adopted a policy to enter into a HAP contract for units that fail the initial HQS inspection as a result of only non-life-threatening conditions, or if the unit passed an alternative inspection.

> HACA Policy

> HACA will not provide assistance on behalf of the family until the unit fully complies with HQS.

**Turnover Inspections [24 CFR 983.103(c)]**

Before providing assistance to a new family in a contract unit, the PHA must inspect the unit. The PHA may not provide assistance on behalf of the family until the unit fully complies with HQS.

**Annual/Biennial Inspections [24 CFR 983.103(d); FR Notice 6/25/14]**

At least once every 24 months during the term of the HAP contract, the PHA must inspect a random sample consisting of at least 20 percent of the contract units in each building to determine if the contract units and the premises are maintained in accordance with HQS. Turnover inspections are not counted toward meeting this inspection requirement. The PHA also has the option in certain mixed finance properties to rely on alternative inspections conducted at least triennially.

> HACA Policy

> HACA will inspect on an annual basis a random sample consisting of at least 20 percent of the contract units in each building to determine if the contract units and the premises are maintained in accordance with HQS. Turnover inspections are not counted toward meeting this inspection requirement. If more than 20% of the annual sample fails the annual inspection, HACA shall re-inspect 100 percent of the contract units in the building.

**Other Inspections [24 CFR 983.103(e)]**

The PHA must inspect contract units whenever needed to determine that the contract units comply with HQS and that the owner is providing maintenance, utilities, and other services in accordance with the HAP contract. The PHA must take into account complaints and any other information coming to its attention in scheduling inspections.

The PHA must conduct follow-up inspections needed to determine if the owner (or, if applicable, the family) has corrected an HQS violation, and must conduct inspections to determine the basis for exercise of contractual and other remedies for owner or family violation

of HQS.

In conducting PHA supervisory quality control HQS inspections, the HACA will include a representative sample of both tenant-based and project-based units.

**Inspecting PHA-Owned Units [24 CFR 983.103(f)]**
In the case of PHA-owned units, the inspections must be performed by an independent entity designated by the PHA and approved by HUD. The independent entity must furnish a copy of each inspection report to the PHA and to the HUD field office where the project is located. The PHA must take all necessary actions in response to inspection reports from the independent agency, including exercise of contractual remedies for violation of the HAP contract by the PHA-owner.

<p align="center"><span style="color:red"><b>PART IV: REHABILITATED AND NEWLY CONSTRUCTED UNITS</b></span></p>

<span style="color:red"><b>17-IV.A. OVERVIEW [24 CFR 983.151]</b></span>

There are specific requirements that apply to PBV assistance for newly constructed or rehabilitated housing that do not apply to PBV assistance in existing housing. This part describes the requirements unique to this type of assistance.

Housing selected for this type of assistance may not at a later date be selected for PBV assistance as existing housing.

17-IV.B. AGREEMENT TO ENTER INTO HAP CONTRACT

In order to offer PBV assistance in rehabilitated or newly constructed units, the PHA must enter into an agreement to enter into HAP contract (Agreement) with the owner of the property. The Agreement must be in the form required by HUD [24 CFR 983.152(b)]. The PHA may not enter into an Agreement commencement of  construction or rehabilitation has commenced after proposal submission [24 CFR 983.152(c)]. Construction begins when excavation or site preparation (including clearing of the land) begins for the housing. Rehabilitation begins with the physical commencement of rehabilitation activity on the housing.

In the Agreement the owner agrees to develop the PBV contract units to comply with HQS, and the PHA agrees that upon timely completion of such development in accordance with the terms of the Agreement, the PHA will enter into a HAP contract with the owner for the contract units [24 CFR 983.152(a)].

**Content of the Agreement [24 CFR 983.152(d)]**
At a minimum, the Agreement must describe the following features of the housing to be developed and assisted under the PBV program:

- Site and the location of the contract units;

- Number of contract units by area (size) and number of bedrooms and bathrooms;

- Services, maintenance, or equipment to be supplied by the owner without charges in addition to the rent;

- Utilities available to the contract units, including a specification of utility services to be paid by the owner and utility services to be paid by the tenant;

- An indication of whether or not the design and construction requirements of the Fair Housing Act and section 504 of the Rehabilitation Act of 1973 apply to units under the Agreement. If applicable, any required work item resulting from these requirements must be included in the description of work to be performed under the Agreement;

- Estimated initial rents to owner for the contract units;

- Description of the work to be performed under the Agreement. For rehabilitated units, the description must include the rehabilitation work write up and, where determined necessary by the PHA, specifications and plans. For new construction units, the description must include the working drawings and specifications.

- Any additional requirements for quality, architecture, or design over and above HQS.

**Execution of the Agreement [24 CFR 983.153]**

The Agreement must be executed promptly after PHA notice of proposal selection to the selected owner. The PHA may not enter into the Agreement if construction or rehabilitation has started after proposal submission. Generally, the PHA may not enter into the Agreement with the owner until the subsidy layering review is completed. Likewise, the PHA may not enter into the Agreement until the environmental review is completed and the PHA has received environmental approval. However, the PHA does not need to conduct a subsidy layering review in the case of a HAP contract for existing housing or if the applicable state or local agency has conducted such a review. Similarly, environmental reviews are not required for existing structures unless otherwise required by law or regulation.

> HACA Policy
>
> HACA will enter into the Agreement with the owner within 15 business days of receiving both environmental approval and notice that subsidy layering requirements have been met, and before construction or rehabilitation work is started.

## 17-IV.C. CONDUCT OF DEVELOPMENT WORK

**Labor Standards [24 CFR 983.154(b)]**

If an Agreement covers the development of nine or more contract units (whether or not completed in stages), the owner and the owner's contractors and subcontractors must pay Davis-Bacon wages to laborers and mechanics employed in the development of housing. Further, these Davis-Bacon requirements apply to existing PBV units when the nature of any work to be performed either before the execution of the HAP contract or within 18 months after execution constitutes project development. Any development initiated on existing units within 18 months after the effective date of the HAP contract on projects with nine or more contract

units triggers Davis-Bacon requirements.

The HUD-prescribed form of the Agreement will include the labor standards clauses required by HUD, such as those involving Davis-Bacon wage rates. The addendum to the HAP contract, Form HUD-5679, also includes the required labor standards clauses.

The owner, contractors, and subcontractors must also comply with the Contract Work Hours and Safety Standards Act, Department of Labor regulations in 29 CFR part 5, and other applicable federal labor relations laws and regulations. The PHA must monitor compliance with labor standards.

**Owner Disclosure [24 CFR 983.154(d) and (e)]**
The Agreement and HAP contract must include a certification by the owner that the owner and other project principals are not on the U.S. General Services Administration list of parties excluded from federal procurement and non-procurement programs.

The owner must also disclose any possible conflict of interest that would be a violation of the Agreement, the HAP contract, or HUD regulations.

## 17-IV.D. COMPLETION OF HOUSING

The Agreement must specify the deadlines for completion of the housing, and the owner must develop and complete the housing in accordance with these deadlines. The Agreement must also specify the deadline for submission by the owner of the required evidence of completion.

**Evidence of Completion [24 CFR 983.155(b)]**
At a minimum, the owner must submit the following evidence of completion to the PHA in the form and manner required by the PHA:

Owner certification that the work has been completed in accordance with HQS and all requirements of the Agreement; and

Owner certification that the owner has complied with labor standards and equal opportunity requirements in development of the housing.
At the PHA's discretion, the Agreement may specify additional documentation that must be submitted by the owner as evidence of housing completion.

HACA Policy

HACA will determine the need for the owner to submit additional documentation as evidence of housing completion on a case-by-case basis depending on the nature of the PBV project. HACA will specify any additional documentation requirements in the Agreement to enter into the HAP contract.

**PHA Acceptance of Completed Units [24 CFR 983.156]**

Upon notice from the owner that the housing is completed, the PHA must inspect to determine if the housing has been completed in accordance with the Agreement, including compliance with HQS and any additional requirements imposed under the Agreement. The PHA must also determine if the owner has submitted all required evidence of completion.

If the work has not been completed in accordance with the Agreement, the PHA must not enter into the HAP contract.

If the PHA determines the work has been completed in accordance with the Agreement and that the owner has submitted all required evidence of completion, the PHA must submit the HAP contract for execution by the owner and must then execute the HAP contract.

## PART V: HOUSING ASSISTANCE PAYMENTS CONTRACT (HAP)

### 17-V.A. OVERVIEW

The PHA must enter into a HAP contract with an owner for units that are receiving PBV assistance. The purpose of the HAP contract is to provide housing assistance payments for eligible families. Housing assistance is paid for contract units leased and occupied by eligible families during the HAP contract term. With the exception of single-family scattered-site projects, a HAP contract shall cover a single project. If multiple projects exist, each project is covered by a separate HAP contract. The HAP contract must be in the form required by HUD [24 CFR 983.202(a)].

### 17-V.B. HAP CONTRACT REQUIREMENTS

**Contract Information [24 CFR 983.203]**

The HAP contract must specify the following information:

- The total number of contract units by number of bedrooms;

- The project's name, street address, city or county, state and zip code, block and lot number (if known), and any other information necessary to clearly identify the site and the building;

- The number of contract units in each building, the location of each contract unit, the area of each contract unit, and the number of bedrooms and bathrooms in each contract unit;

- Services, maintenance, and equipment to be supplied by the owner and included in the rent to owner;

- Utilities available to the contract units, including a specification of utility services to be paid by the owner (included in rent) and utility services to be paid by the tenant;

- Features provided to comply with program accessibility requirements of Section 504 of the Rehabilitation Act of 1973 and implementing regulations at 24 CFR part 8;

- The HAP contract term;

- The number of units in any project that will exceed the 25 percent per project cap, which will be set aside for occupancy by qualifying families (elderly and/or disabled families and families receiving supportive services); and
- The initial rent to owner for the first 12 months of the HAP contract term.

### Execution of the HAP Contract [24 CFR 983.204; FR Notice 1/18/17]

The PHA may not enter into a HAP contract until each contract unit has been inspected and the PHA has determined that the unit complies with the Housing Quality Standards (HQS), unless the PHA has adopted a policy to enter into a HAP contract for units that fail the initial HQS inspection as a result of only non-life-threatening conditions. For existing housing, the HAP contract must be executed promptly after the PHA selects the owner proposal and inspects the housing units. For newly constructed or rehabilitated housing the HAP contract must be executed after the PHA has inspected the completed units and has determined that the units have been completed in accordance with the agreement to enter into HAP, and the owner furnishes all required evidence of completion.

>   HACA Policy

>   For existing housing, the HAP contract will be executed within 15 business days of HACA determining that all units pass HQS.

>   For rehabilitated or newly constructed housing, the HAP contract will be executed within 15 business days of HACA determining that the units have been completed in accordance with the agreement to enter into HAP, all units meet HQS, and the owner has submitted all required evidence of completion.

### Term of HAP Contract [24 CFR 983.205; FR Notice 1/18/17 and Notice PIH 2017-21]

The PHA may enter into a HAP contract with an owner for an initial term of no less than one year and no more than 20 years for each contract unit. The length of the term of the HAP contract for any contract unit may not be less than one year, or more than 20 years. In the case of PHA-owned units, the term of the HAP contract must be agreed upon by the PHA and the independent entity approved by HUD [24 CFR 983.59(b)(2)].

>   HACA Policy

>   The term of all PBV HAP contracts will be negotiated with the owner on a case-by-case basis.

At the time of the initial HAP contract term or any time before expiration of the HAP contract, the PHA may extend the term of the contract for an additional term of up to 20 years if the PHA determines an extension is appropriate to continue providing affordable housing for low-income families. A HAP contract extension may not exceed 20 years. A PHA may provide for multiple extensions; however, in no circumstances may such extensions exceed 40 years, cumulatively. Extensions after the initial extension are allowed at the end of any extension term, provided that not more than 24 months prior to the expiration of the previous extension

contract the PHA agrees to extend the term, and that such extension is appropriate to continue providing affordable housing for low-income families or to expand housing opportunities. Extensions after the initial extension term shall not begin prior to the expiration date of the previous extension term. Subsequent extensions are subject to the same limitations. All extensions must be on the form and subject to the conditions prescribed by HUD at the time of the extension. In the case of PHA-owned units, any extension of the term of the HAP contract must be agreed upon by the PHA and the independent entity approved by HUD [24 CFR 983.59(b)(2)].

> HACA Policy
>
> When determining whether or not to extend an expiring PBV contract, HACA will consider several factors including, but not limited to:
>
>> The cost of extending the contract and the amount of available budget authority;
>>
>> The condition of the contract units;
>>
>> The owner's record of compliance with obligations under the HAP contract and lease(s);
>>
>> Whether the location of the units continues to support the goals of deconcentrating poverty and expanding housing opportunities; and
>>
>> Whether the funding could be used more appropriately for tenant-based assistance.

### Termination by PHA [24 CFR 983.205(c) and FR Notice 1/18/17]

The HAP contract must provide that the term of the PHA's contractual commitment is subject to the availability of sufficient appropriated funding as determined by HUD or by the PHA in accordance with HUD instructions. For these purposes, sufficient funding means the availability of appropriations, and of funding under the ACC from such appropriations, to make full payment of housing assistance payments payable to the owner for any contract year in accordance with the terms of the HAP contract.

In times of insufficient funding, HUD requires that PHAs first take all cost-saving measures prior to failing to make payments under existing PBV HAP contracts.

If it is determined that there may not be sufficient funding to continue housing assistance payments for all contract units and for the full term of the HAP contract, the PHA may terminate the HAP contract by notice to the owner. The termination must be implemented in accordance with HUD instructions.

### Termination by Owner [24 CFR 983.205(d)]

If in accordance with program requirements the amount of rent to an owner for any contract

unit is reduced below the amount of the rent to owner at the beginning of the HAP contract term, the owner may terminate the HAP contract by giving notice to the PHA. In this case, families living in the contract units must be offered tenant-based assistance.

### Statutory Notice Requirements: Contract Termination or Expiration [24 CFR 983.206; FR Notice 1/18/17 and Notice PIH 2017-21]

Not less than one year before the HAP contract terminates, or if the owner refuses to renew the HAP contract, the owner must notify the PHA and assisted tenants of the termination. The notice must be provided in the form prescribed by HUD. If the owner does not give timely notice, the owner must permit the tenants in assisted units to remain in their units for the required notice period with no increase in the tenant portion of their rent, and with no eviction as a result of the owner's inability to collect an increased tenant portion of rent. An owner may renew the terminating contract for a period of time sufficient to give tenants one-year advance notice under such terms as HUD may require.

Upon termination or expiration of the contract, a family living at the property is entitled to receive a tenant-based voucher. Tenant-based assistance would not begin until the owner's required notice period ends. The PHA must provide the family with a voucher and the family must also be given the option by the PHA and owner to remain in their unit with HCV tenant-based assistance as long as the unit complies with inspection and rent reasonableness requirements. The family must pay their total tenant payment (TTP) and any additional amount if the gross rent exceeds the applicable payment standard. The family has the right to remain in the project as long as the units are used for rental housing and are otherwise eligible for HCV assistance. The owner may not terminate the tenancy of a family that exercises its right to remain except for serious or repeated lease violations or other good cause. Families that receive a tenant-based voucher at the expiration or termination of the PBV HAP contract are not new admissions to the PHA HCV tenant-based program and are not subject to income eligibility requirements or any other admission requirements. If the family chooses to remain in their unit with tenant-based assistance, the family may do so regardless of whether the family share would initially exceed 40 percent of the family's adjusted monthly income.

### Remedies for HQS Violations [24 CFR 983.208(b)]

The PHA may not make any HAP payment to the owner for a contract unit during any period in which the unit does not comply with HQS. If the PHA determines that a contract does not comply with HQS, the PHA may exercise any of its remedies under the HAP contract, for any or all of the contract units. Available remedies include termination of housing assistance payments, abatement or reduction of housing assistance payments, reduction of contract units, and termination of the HAP contract.

<u>HACA Policy</u>

HACA will abate and terminate PBV HAP contracts for non-compliance with HQS in accordance with the policies defined in the tenant-based voucher program.  These policies are contained in Chapter 8 of HACA's HCV Administrative Plan.

17-V.C. AMENDMENTS TO THE HAP CONTRACT

**Substitution of Contract Units [24 CFR 983.207(a)]**

At the PHA's discretion and subject to all PBV requirements, the HAP contract may be amended to substitute a different unit with the same number of bedrooms in the same project for a previously covered contract unit. Before any such substitution can take place, the PHA must inspect the proposed unit and determine the reasonable rent for the unit.

**Addition of Contract Units [FR Notice 1/18/17 and Notice PIH 2017-21]**

The PHA and owner may amend the HAP contract to add additional PBV contract units in projects that already have a HAP contract without having to fulfill the selection requirements found at 24 CFR 983.51(b) for those additional PBV units, regardless of when the HAP contract was signed. The additional PBV units, however, are still subject to the PBV program cap and individual project caps. Prior to attaching additional units without competition, the PHA must submit to the local field office information outlined in FR Notice 1/18/17. The PHA must also detail in the administrative plan their intent to add PBV units and the rationale for adding units to the specific PBV project.

HACA Policy

HACA will consider adding units to the contract on a case-by-case basis to ensure the availability of affordable housing as long as the addition of units does not exceed allowable project caps. Circumstances may include, but are not limited to:

The local housing inventory is reduced due to a disaster (either due to loss of housing units, or an influx of displaced families); and

Voucher holders are having difficulty finding units that meet program requirements.

HACA will seek HUD approval to add 50 Project-based voucher units to the Cady Loft HAP Contract without competition. The justification for this is described below:

1) HACA's commitment to expand housing opportunities to vulnerable persons experiencing homelessness who struggle to locate affordable housing in the Austin rental market.

2) Cady Lofts received a 9% Low Income Housing Tax Credit (LIHTC) allocation. This qualifies for selection of proposal subject to previous competition under a federal, state, or local housing assistance program. Cady Loft's proposal was selected in accordance with the LIHTC competitive selection requirements within 3 years of the PBV proposal selection date, and the earlier competitively selected housing assistance proposal did not involve any consideration that the project would receive additional PBV assistance.

**17-V.D. HAP CONTRACT YEAR, ANNIVERSARY AND EXPIRATION DATES [24**

CFR 983.207(b) and 983.302(c)]

The HAP contract year is the period of 12 calendar months preceding each annual anniversary of the HAP contract during the HAP contract term. The initial contract year is calculated from the first day of the first calendar month of the HAP contract term.

The annual anniversary of the HAP contract is the first day of the first calendar month after the end of the preceding contract year.

There is a single annual anniversary and expiration date for all units under a particular HAP contract, even in cases where contract units are placed under the HAP contract in stages (on different dates) or units are added by amendment. The anniversary and expiration dates for all units coincide with the dates for the contract units that were originally placed under contract.

### 17-V.E. OWNER RESPONSIBILITIES UNDER THE HAP CONTRACT [24 CFR 983.210]

When the owner executes the HAP contract s/he certifies that at such execution and at all times during the term of the HAP contract:

- All contract units are in good condition and the owner is maintaining the premises and contract units in accordance with HQS;

- The owner is providing all services, maintenance, equipment and utilities as agreed to under the HAP contract and the leases;

- Each contract unit for which the owner is receiving HAP, is leased to an eligible family referred by the PHA, and the lease is in accordance with the HAP contract and HUD requirements;

- To the best of the owner's knowledge the family resides in the contract unit for which the owner is receiving HAP, and the unit is the family's only residence;

- The owner (including a principal or other interested party) is not the spouse, parent, child, grandparent, grandchild, sister, or brother of any member of a family residing in a contract unit;

- The amount of the HAP the owner is receiving is correct under the HAP contract;

- The rent for contract units does not exceed rents charged by the owner for comparable unassisted units;

- Except for HAP and tenant rent, the owner has not received and will not receive any other payment or consideration for rental of the contract unit;

- The family does not own or have any interest in the contract unit (does not apply to family's membership in a cooperative); and

- Repair work on the project selected as an existing project that is performed after HAP execution within such post-execution period as specified by HUD may constitute

development activity, and if determined to be development activity, the repair work
undertaken shall be in compliance with Davis-Bacon wage requirements.

## 17-V.F. ADDITIONAL HAP REQUIREMENTS

**Housing Quality and Design Requirements [24 CFR 983.101(e) and 983.208(a)]**

The owner is required to maintain and operate the contract units and premises in accordance
with HQS, including performance of ordinary and extraordinary maintenance. The owner must
provide all the services, maintenance, equipment, and utilities specified in the HAP contract
with the PHA and in the lease with each assisted family. In addition, maintenance, replacement
and redecoration must be in accordance with the standard practice for the building as
established by the owner.

The PHA may elect to establish additional requirements for quality, architecture, or design of
PBV housing. Any such additional requirements must be specified in the Agreement to enter
into a HAP contract and the HAP contract. These requirements must be in addition to, not in
place of, compliance with HQS.

> HACA Policy
>
> HACA will identify the need for any special features on a case-by-case basis depending
> on the intended occupancy of the PBV project. HACA will specify any special design
> standards or additional requirements in the request for PBV proposals (RFP), the
> agreement to enter into HAP contract, and the HAP contract.

**Vacancy Payments [24 CFR 983.352(b)]**

At the discretion of the PHA, the HAP contract may provide for vacancy payments to the
owner for a PHA-determined period of vacancy extending from the beginning of the first
calendar month after the move-out month for a period not exceeding two full months following
the move-out month. The amount of the vacancy payment will be determined by the PHA and
cannot exceed the monthly rent to owner under the assisted lease, minus any portion of the
rental payment received by the owner (including amounts available from the tenant's security
deposit).

> HACA Policy
>
> If an assisted family moves out of the unit without notice or is deceased, the owner may
> keep the HAP payable for the calendar month when the family moves out (move out
> month).  However, the owner may not keep the payment if HACA determines that the
> vacancy is the owner's fault.
>
> HACA shall not pay for an overlapping HAP.
>
> HACA will decide on case-by-case basis if HACA will provide vacancy payments to

the owner. The HAP Contract with the owner will contain any such agreements including the amount of the vacancy payment and the period of time for which the owner qualifies for these payments.

If HACA provides a vacancy payment as defined in a HAP contract with an owner, the following policies would apply:

When a family vacates its unit, the owner is eligible for a vacancy payment if:

> The owner gives HACA prompt written notice certifying that the family has vacated the unit and containing the date when the family moved out (to the best of the owner's knowledge and belief).

> The owner certifies that the vacancy is not the fault of the owner and that the unit was vacant during the period for which payment is claimed.

> The owner certifies that it has taken every reasonable action to minimize the likelihood and length of vacancy.

> The owner provides any additional information required and requested by HACA to verify that the owner is entitled to the vacancy payment.

> The owner must submit a request for vacancy payment in the form and manner required by HACA and must provide any information or substantiation required by HACA to determine the amount of any vacancy payment.

**Vacancy loss and payment Calculation:**

The vacancy loss begins the later of:

> The date the unit is rent ready, per the owner / manager.

> The day after the lease end date for the HAP was paid to the owner.

The vacancy payment will not exceed the monthly contract rent.

Any rental payment received by the owner from the tenant (including amounts available from the tenant's security deposit) will be deducted from the vacancy payment.

Vacancy loss extends from the beginning of the first calendar month after the move-out month for a period not exceeding one full month following the move-out month.

Vacancy loss calculation will be based on actual calendar days per month.

Vacancy payments may cover only the period the unit remains vacant and is in rent-ready condition.

**PART VI. SELECTION OF PBV PROGRAM PARTICIPANTS**

## 17-VI.A. OVERVIEW

Many of the provisions of the tenant-based voucher regulations [24 CFR 982] also apply to the PBV program. This includes requirements related to determining eligibility and selecting applicants from the waiting list. Even with these similarities, there are requirements that are unique to the PBV program. This part describes the requirements and policies related to eligibility and admission to the PBV program.

## 17-VI.B. ELIGIBILITY FOR PBV ASSISTANCE [24 CFR 983.251(a) and (b)]

The PHA may select families for the PBV program from those who are participants in the PHA's tenant-based voucher program and from those who have applied for admission to the voucher program. For voucher participants, eligibility was determined at original admission to the voucher program and does not need to be redetermined at the commencement of PBV assistance. For all others, eligibility for admission must be determined at the commencement of PBV assistance.

Applicants for PBV assistance must meet the same eligibility requirements as applicants for the tenant-based voucher program. Applicants must qualify as a family as defined by HUD and the PHA, have income at or below HUD-specified income limits, and qualify on the basis of citizenship or the eligible immigration status of family members [24 CFR 982.201(a) and 24 CFR 983.2(a)]. In addition, an applicant family must provide social security information for family members [24 CFR 5.216 and 5.218] and consent to the PHA's collection and use of family information regarding income, expenses, and family composition [24 CFR 5.230]. The PHA may also not approve a tenancy if the owner (including a principal or other interested party) of the unit is the parent, child, grandparent, grandchild, sister, or brother of any member of the family, unless needed as a reasonable accommodation. An applicant family must also meet HUD requirements related to current or past criminal activity.

> HACA Policy
>
> HACA will determine an applicant family's eligibility for the PBV program in accordance with the policies in Chapter 3 of HACA's HCV Administrative Plan.

**In-Place Families [24 CFR 983.251(b)]**

An eligible family residing in a proposed PBV contract unit on the date the proposal is selected by the PHA is considered an "in-place family." These families are afforded protection from displacement under the PBV rule. If a unit to be placed under contract (either an existing unit or a unit requiring rehabilitation) is occupied by an eligible family on the date the proposal is selected, the in-place family must be placed on the PHA's waiting list. Once the family's continued eligibility is determined (the PHA may deny assistance to an in-place family for the

grounds specified in 24 CFR 982.552 and 982.553), the family must be given an absolute selection preference and the PHA must refer these families to the project owner for an appropriately sized PBV unit in the project. Admission of eligible in-place families is not subject to income targeting requirements.

This regulatory protection from displacement does not apply to families that are not eligible to participate in the program on the proposal selection date.

## 17-VI.C. ORGANIZATION OF THE WAITING LIST [24 CFR 983.251(c)]

The PHA may establish a separate waiting list for PBV units or it may use the same waiting list for both tenant-based and PBV assistance. The PHA may also merge the PBV waiting list with a waiting list for other assisted housing programs offered by the PHA. If the PHA chooses to offer a separate waiting list for PBV assistance, the PHA must offer to place applicants who are listed on the tenant-based waiting list on the waiting list for PBV assistance.

If a PHA decides to establish a separate PBV waiting list, the PHA may use a single waiting list for the PHA's whole PBV program, or it may establish separate waiting lists for PBV units in particular projects or buildings or for sets of such units.

> HACA Policy
>
> HACA will establish and manage separate PBV waiting lists for PBV units in particular projects or buildings or sets of PBV units in a project.

## 17-VI.D. SELECTION FROM THE WAITING LIST [24 CFR 983.251(c)]

Applicants who will occupy units with PBV assistance must be selected from the PHA's waiting list. The PHA may establish selection criteria or preferences for occupancy of particular PBV units. The PHA may place families referred by the PBV owner on its PBV waiting list.

**Income Targeting [24 CFR 983.251(c)(6)]**
At least 75 percent of the families admitted to the PHA's tenant-based and project-based voucher programs during the PHA fiscal year from the waiting list must be extremely-low income families. The income targeting requirement applies to the total of admissions to both programs.

**Units with Accessibility Features [24 CFR 983.251(c)(7)]**
When selecting families to occupy PBV units that have special accessibility features for persons with disabilities, the PHA must first refer families who require such features to the owner.

**Preferences [24 CFR 983.251(d), FR Notice 11/24/08]**

The PHA may use the same selection preferences that are used for the tenant-based voucher program, establish selection criteria or preferences for the PBV program as a whole, or for occupancy of particular PBV developments or units. The PHA must provide an absolute selection preference for eligible in-place families as described in Section 17-VI.B above.

The PHA may establish a selection preference for families who qualify for voluntary services, including disability-specific services, offered in conjunction with assisted units, provided that preference is consistent with the PHA plan. The PHA may not, however, grant a preference to a person with a specific disability [FR Notice 1/18/17].

In advertising such a project, the owner may advertise the project as offering services for a particular type of disability; however, the project must be open to all otherwise eligible disabled persons who may benefit from services provided in the project. In these projects, disabled residents may not be required to accept the particular services offered as a condition of occupancy.

If the PHA has projects with "excepted units" for elderly families or supportive services, the PHA must give preference to such families when referring families to these units [24 CFR 983.261(b); FR Notice 1/18/17].

> HACA Policy
>
> HACA will provide a selection preference when required by the regulation (e.g., eligible in-place families, elderly families or units with supportive services, or mobility impaired persons for accessible units).
>
> HACA may offer additional preferences for the PBV program or for particular PBV projects or units. HACA will collaborate with the PBV partner to define the additional preferences, eligibility requirements and referral process.
>
> HACA will use separate waiting lists for PBV units in individual projects. At the time the project's waiting list is opened, applicants on the Housing Choice Voucher program tenant-based waiting list will be given the opportunity to be added to any open project-based voucher waiting list. Additionally, referrals would come directly from the collaborating agency to be added to the project-based voucher waiting list. Households who meet the criteria would be given first preference for the limited preference units.
>
> If HACA's Housing Choice waiting list is open when an applicant is placed on the PBV waiting list, applicants will be given the opportunity to apply to the Housing Choice Voucher waiting list. The applicant will remain on the waiting list for tenant-based voucher assistance, even after the applicant has applied for, received, or refused an offer of PBV assistance.
>
> **ELYSIUM GRAND**

HACA will project-base 25 HUD-VASH vouchers at the Elysium Grand, located at 3300 Oak Creek Drive, Austin TX 78727.

### Tenant Selection

HACA will accept HUD-VASH applicants for vacant units in the order received from the Veterans Affairs Austin Outpatient Clinic in accordance with HUD-VASH Operating Requirements.

### TERRACE AT OAK SPRINGS (previously Housing First at Oak Springs)

HACA will project-base 25 HUD-VASH vouchers and 25 Housing Choice Vouchers at the Terrace at Oak Springs (previously Housing First at Oak Springs), located at 3000 Oak Springs Drive, Austin TX 78702.

### Tenant Selection

HACA will accept HUD-VASH applicants for vacant units in the order received from the Veterans Affairs Austin Outpatient Clinic in accordance with HUD-VASH Operating Requirements.

For non-specified category vouchers, HACA will allow the PBV owner to refer households for placement on the waiting list. HACA will use the following local preferences for purposes of establishing priority. The local preferences are weighted differently, with the higher number representing a higher ranking. Each applicant family can be granted a maximum of one local preference plus the Owner Referral preference (if they qualify). Weights for each preference are as follows:

| | |
|---|---|
| Owner Referral | = 1 |
| Project-Specific Supportive Services Need | = 1 |
| Disability | = 1 |
| Chronically Homeless | = 2 |

**Owner Referral Preference:** HACA will give preference to households (including individuals) referred by the project owner who have completed a Coordinated Assessment administered by a member of the Austin/Travis County Continuum of Care (CoC) and been verified by the CoC Lead Agency as the highest priority eligible household as required by the project's funding sources.

**Project-Specific Supportive Services Need Preference:** HACA will give preference to households (including individuals) with disabilities that significantly interfere with their ability to obtain and maintain housing, who without appropriate supportive services will not be able to obtain or maintain housing, and for whom such services

cannot be provided in a non-segregated setting. HACA will verify qualification for this preference with the PBV owner's on-site clinical staff. Disabled residents shall not be required to accept particular services offered at the project. HACA is prohibited from granting preferences to persons with specific disabilities (24 CFR 982.207(b)(3)).

**Disability:** HACA will give preference to disabled families. A disabled family is a family in which the head, spouse or co-head is disabled using the current HUD definition of disability.

**Chronically Homeless Preference:** HACA will give preference to households (including individuals) who meet the HUD definition of chronically homeless defined in the Final Rule published December 4, 2015 (24 CFR Part 91).

When notified of a vacancy in a non-specified voucher unit, HACA will first draw applicants that meet and score the highest site-based preferences based on date and time of application. HACA will then draw all other applicants based on the date and time of application.

## Pathways at Chalmers Court East

HACA has project-based 50 vouchers at Chalmers Court East, eight (8) are Project-based VASH Vouchers. The property is located at 1700 E 3rd Street, Austin Texas.

## <u>Tenant Selection</u>

Eight (8) Project-based VASH Vouchers

For the eight PBV VASH vouchers. HACA will accept HUD-VASH applicants for vacant units in the order received from the Veterans Affairs Austin Outpatient Clinic in accordance with HUD-VASH Operating Requirements.

Forty-two (42) regular Project-based Vouchers

HACA will use the same selection preferences that are used for the HCV tenant-based voucher program for the 42 regular PBV units.

Applicants on the Housing Choice Voucher programs tenant-based waiting list will be added to Pathways at Chalmers Court East project-based voucher waiting list. If the Housing Choice Voucher waiting list doesn't provide enough referrals to fill the available project-based voucher units, referrals would come directly from Pathways at Chalmers Court East to be added to the project-based voucher waiting list. Households who meet the Housing Choice Voucher initial eligibility requirements will be referred to Pathways at Chalmers Court East for a project-based voucher unit.

Eligible applicants must meet Pathways at Chalmers Court East tenant selection screening criteria.

If the applicant was previously on the Housing Choice Voucher waiting and decides not to lease a unit at Pathways at Chalmers Court East, the applicant will remain on the HCV tenant-based voucher waiting list.

If the applicant was not previously on the Housing Choice Voucher waiting list and was referred to apply by Pathways at Chalmers Court East and refuses an offer of PBV assistance or does not meet Pathways at Chalmers Court East's screening criteria, they will not be eligible to remain on the regular tenant-based Housing Choice Voucher waiting list.

**Pathways at Chalmers Court West**

HACA will project-base 100 vouchers at Chalmers Court West, eight (8) will be Project-based VASH Vouchers.  HACA received 50 tenant-protection vouchers (TPV) for Chalmers West, which were project-based and included in the 100 total PBVs.

The property is located at 1600 E 3rd Street, Austin Texas.

**<u>Tenant Selection</u>**

Eight (8) Project-based VASH Vouchers

For the eight PBV VASH vouchers. HACA will accept HUD-VASH applicants for vacant units in the order received from the Veterans Affairs Austin Outpatient Clinic in accordance with HUD-VASH Operating Requirements.

Ninety-two (92) regular Project-based Vouchers

HACA will use the same selection preferences that are used for the HCV tenant-base voucher program for the 92 regular PBV units.

Applicants on the Housing Choice Voucher programs tenant-base waiting list will be added to Pathways at Chalmers Court West project-based voucher waiting list.  If the Housing Choice Voucher waiting list doesn't provide enough referrals to fill the available project-based voucher units, referrals would come directly from Pathways at Chalmers Court West to be added to the project-based voucher waiting list. Households who meet the Housing Choice Voucher initial eligibility requirements will be referred to Pathways at Chalmers Court West for a project-based voucher unit.

Eligible applicants must meet Pathways at Chalmers Court West tenant selection screening criteria.

If the applicant was previously on the Housing Choice Voucher waiting and decides not to lease a unit at Pathways at Chalmers Court West, the applicant will remain on the HCV tenant-base voucher waiting list.

If the applicant was not previously on the Housing Choice Voucher waiting list and was

referred to apply by Pathways at Chalmers Court West and refuses an offer of PBV assistance or does not meet Pathways at Chalmers Court West's screening criteria, they will not be eligible to remain on the regular tenant-base Housing Choice Voucher waiting list.

### Pathways at Rosewood Courts

HACA will project-base 50 vouchers at Rosewood Courts. The property is located at 1141 Chicon Street, Austin Texas.

### <u>Tenant Selection</u>

Fifty (50) regular project-based vouchers

HACA will use the same selection preferences that are used for the HCV tenant-base voucher program for 50 regular PBV units.

Applicants on the Housing Choice Voucher programs tenant-based waiting list will be added to Pathways at Rosewood Courts project-based voucher waiting list. If the Housing Choice Voucher waiting list doesn't provide enough referrals to fill the available project-based voucher units, referrals would come directly from Pathways at Rosewood Courts to be added to the project-based voucher waiting list. Households who meet the Housing Choice Voucher initial eligibility requirements will be referred to Pathways at Rosewood Courts for a project-based voucher unit.

Eligible applicants must meet Pathways at Rosewood Courts tenant selection screening criteria.

If the applicant was previously on the Housing Choice Voucher waiting and decide not to lease a unit at Pathways at Rosewood Courts, the applicant will remain on the HCV tenant-based voucher waiting list.

If the applicant was not previously on the Housing Choice Voucher waiting list and was referred to apply by Pathways at Rosewood Courts and refuses an offer of PBV assistance or does not meet Pathways at Rosewood Court's screening criteria, they will not be eligible to remain on the regular tenant-base Housing Choice Voucher waiting list.

### Cambrian East Riverside

HACA will project-base 8 vouchers at Cambrian East Riverside located at 1806 Clubview Avenue, Austin TX 78741

HACA will use the same selection preferences that are used for the HCV tenant-base voucher program.

Applicants on the Housing Choice Voucher programs tenant-base waiting list will be added to the Cambrian East Riverside project-based voucher waiting list. If the Housing Choice Voucher waiting list does not provide enough referrals to fill the available project-based voucher units, referrals would come directly from Cambrian East Riverside to be added to the project-based voucher waiting list. Households who meet the Housing Choice Voucher initial eligibility requirements will be referred to Cambrian East Riverside for a project-base voucher

unit.

Eligible applicants must meet Cambrian East Riverside's tenant selection screening criteria.

If the applicant was previously on the Housing Choice Voucher waiting and decides not to lease a unit at Cambrian East Riverside, the applicant will remain on the waiting list for HCV tenant-based voucher assistance.

If the applicant was not previously on the Housing Choice Voucher waiting list and was referred to apply by Cambrian East Riverside and refuses an offer of PBV assistance or doesn't meet Cambrian East Riverside's screening criteria, they will not be eligible to remain on the regular tenant-base Housing Choice Voucher waiting list.

**Waterloo Terrace**

HACA will project-base 15 units at Waterloo Terrace. The property is located at 12190 North Mopac Expressway, Austin TX 78758.

**<u>Tenant Selection</u>**

> HACA will allow the PBV owner to refer households for placement on the waiting list. HACA will use the following local preferences for purposes of establishing priority. The local preferences are weighted differently, with the higher number representing a higher ranking. Each applicant family can be granted a maximum of one local preference plus the Owner Referral preference (if they qualify). Weights for each preference are as follows:

> | | |
> |---|---|
> | Owner Referral | = 1 |
> | Project-Specific Supportive Services Need | = 1 |
> | Disability | = 1 |
> | Chronically Homeless | = 2 |

> **Owner Referral Preference:** HACA will give preference to households (including individuals) referred by the project owner who have completed a Coordinated Assessment administered by a member of the Austin/Travis County Continuum of Care (CoC) and been verified by the CoC lead agency as the highest priority eligible household as required by the project's funding sources.

> **Project-Specific Supportive Services Need Preference:** HACA will give preference to households (including individuals) with disabilities that significantly interfere with their ability to obtain and maintain housing, who without appropriate supportive services will not be able to obtain or maintain housing, and for whom such services cannot be provided in a non-segregated setting. HACA will verify qualification for this

preference with the PBV owner's on-site clinical staff. Disabled residents shall not be required to accept particular services offered at the project.  HACA is prohibited from granting preferences to persons with specific disabilities (24 CFR 982.207(b)(3)).

**Disability:** HACA will give preference to disabled families. A disabled family is a family in which the head, spouse or co-head is disabled using the current HUD definition of disability.

**Chronically Homeless Preference:** HACA will give preference to households (including individuals) who meet the HUD definition of chronically homeless defined in the Final Rule published December 4, 2015 (24 CFR Part 91).

When notified of a vacancy in a PBV unit, HACA will first draw applicants that meet and score the highest site-based preferences based on date and time of application.  HACA will then draw all other applicants based on the date and time of application.

**Capital Studios**

HACA will project-base 10 units at Capital Studios. The property is located at 309 East 11th Street, Austin TX 78701.

**<u>Tenant Selection</u>**

HACA will allow the PBV owner to refer households for placement on the waiting list.  HACA will use the following local preferences for purposes of establishing priority.  The local preferences are weighted differently, with the higher number representing a higher ranking.  Each applicant family can be granted a maximum of one local preference plus the Owner Referral preference (if they qualify).  Weights for each preference are as follows:

| | |
|---|---|
| Owner Referral | = 1 |
| Project-Specific Supportive Services Need | = 1 |
| Disability | = 1 |
| Chronically Homeless | = 2 |

**Owner Referral Preference:** HACA will give preference to households (including individuals) referred by the project owner who have completed a Coordinated Assessment administered by a member of the Austin/Travis County Continuum of Care (CoC) and been verified by the CoC lead agency as the highest priority eligible household as required by the project's funding sources.

**Project-Specific Supportive Services Need Preference:** HACA will give preference to households (including individuals) with disabilities that significantly interfere with their ability to obtain and maintain housing, who without appropriate supportive services will not be able to obtain or maintain housing, and for whom such services cannot be provided in a non-segregated setting. HACA will verify qualification for this preference with the PBV owner's on-site clinical staff. Disabled residents shall not be required to accept particular services offered at the project. HACA is prohibited from granting preferences to persons with specific disabilities (24 CFR 982.207(b)(3)).

**Disability:** HACA will give preference to disabled families. A disabled family is a family in which the head, spouse or co-head is disabled using the current HUD definition of disability.

**Chronically Homeless Preference:** HACA will give preference to households (including individuals) who meet the HUD definition of chronically homeless defined in the Final Rule published December 4, 2015 (24 CFR Part 91).

When notified of a vacancy in a PBV unit, HACA will first draw applicants that meet and score the highest site-based preferences based on date and time of application. HACA will then draw all other applicants based on the date and time of application.

## Espero at Rutland

HACA will project-base 25 HCV and 25 HUD-VASH units at Espero at Rutland. The property is located at 1934 Rutland Drive, Austin TX 78758.

## <u>Tenant Selection</u>

HACA will accept HUD-VASH applicants for vacant units in the order received from the Veterans Affairs Austin Outpatient Clinic in accordance with HUD-VASH Operating Requirements.

For non-specified category vouchers, HACA will allow the PBV owner to refer households for placement on the waiting list. HACA will use the following local preferences for purposes of establishing priority. The local preferences are weighted differently, with the higher number representing a higher ranking. Each applicant family can be granted a maximum of one local preference plus the Owner Referral preference (if they qualify). Weights for each preference are as follows:

| | |
|---|---|
| Owner Referral | = 1 |
| Project-Specific Supportive Services Need | = 1 |
| Disability | = 1 |
| Chronically Homeless | = 2 |

**Owner Referral Preference:** HACA will give preference to households (including individuals) referred by the project owner who have completed a Coordinated Assessment administered by a member of the Austin/Travis County Continuum of Care (CoC) and been verified by the CoC lead agency as the highest priority eligible household as required by the project's funding sources.

**Project-Specific Supportive Services Need Preference:** HACA will give preference to households (including individuals) with disabilities that significantly interfere with their ability to obtain and maintain housing, who without appropriate supportive services will not be able to obtain or maintain housing, and for whom such services cannot be provided in a non-segregated setting. HACA will verify qualification for this preference with the PBV owner's on-site clinical staff. Disabled residents shall not be required to accept particular services offered at the project. HACA is prohibited from granting preferences to persons with specific disabilities (24 CFR 982.207(b)(3)).

**Disability:** HACA will give preference to disabled families. A disabled family is a family in which the head, spouse or co-head is disabled using the current HUD definition of disability.

**Chronically Homeless Preference:** HACA will give preference to households (including individuals) who meet the HUD definition of chronically homeless defined in the Final Rule published December 4, 2015 (24 CFR Part 91).

When notified of a vacancy in a PBV unit, HACA will first draw applicants that meet and score the highest site-based preferences based on date and time of application. HACA will then draw all other applicants based on the date and time of application.

**Balcones Terrace**

HACA will project-base 25 HCV and 25 HUD-VASH units at Balcones Terrace. The property is located at 10024 N. Capital of Texas Hwy, Austin TX 78759.

**<u>Tenant Selection</u>**

HACA will accept HUD-VASH applicants for vacant units in the order received from the Veterans Affairs Austin Outpatient Clinic in accordance with HUD-VASH Operating Requirements.

For non-specified category vouchers, HACA will allow the PBV owner to refer households for placement on the waiting list. HACA will use the following local preferences for purposes of establishing priority. The local preferences are weighted differently, with the higher number representing a higher ranking. Each applicant family can be granted a maximum of one local preference plus the Owner Referral preference (if they qualify). Weights for each preference are as follows:

| | |
|---|---|
| Owner Referral | = 1 |
| Project-Specific Supportive Services Need | = 1 |
| Disability | = 1 |
| Chronically Homeless | = 2 |

**Owner Referral Preference:** HACA will give preference to households (including individuals) referred by the project owner who have completed a Coordinated Assessment administered by a member of the Austin/Travis County Continuum of Care (CoC) and been verified by the CoC lead agency as the highest priority eligible household as required by the project's funding sources.

**Project-Specific Supportive Services Need Preference:** HACA will give preference to households (including individuals) with disabilities that significantly interfere with their ability to obtain and maintain housing, who without appropriate supportive services will not be able to obtain or maintain housing, and for whom such services cannot be provided in a non-segregated setting. HACA will verify qualification for this preference with the PBV owner's on-site clinical staff. Disabled residents shall not be required to accept particular services offered at the project. HACA is prohibited from granting preferences to persons with specific disabilities (24 CFR 982.207(b)(3)).

**Disability:** HACA will give preference to disabled families. A disabled family is a family in which the head, spouse or co-head is disabled using the current HUD definition of disability.

**Chronically Homeless Preference:** HACA will give preference to households (including individuals) who meet the HUD definition of chronically homeless defined in the Final Rule published December 4, 2015 (24 CFR Part 91).

When notified of a vacancy in a PBV unit, HACA will first draw applicants that meet and score the highest site-based preferences based on date and time of application. HACA will then draw all other applicants based on the date and time of application.

**Libertad Austin at Gardner**

HACA will project-base 25 HCV and 25 HUD-VASH units at Libertad Austin at Gardner. The property is located at 900 Gardner Rd, Austin TX 78721.

**<u>Tenant Selection</u>**

HACA will accept HUD-VASH applicants for vacant units in the order received from the Veterans Affairs Austin Outpatient Clinic in accordance with HUD-VASH Operating Requirements.

For non-specified category vouchers, HACA will allow the PBV owner to refer households for placement on the waiting list. HACA will use the following local preferences for purposes of establishing priority. The local preferences are weighted differently, with the higher number representing a higher ranking. Each applicant family can be granted a maximum of one local preference plus the Owner Referral preference (if they qualify). Weights for each preference are as follows:

| | |
|---|---|
| Owner Referral | = 1 |
| Project-Specific Supportive Services Need | = 1 |
| Disability | = 1 |
| Chronically Homeless | = 2 |

**Owner Referral Preference:** HACA will give preference to households (including individuals) referred by the project owner who have completed a Coordinated Assessment administered by a member of the Austin/Travis County Continuum of Care (CoC) and been verified by the CoC lead agency as the highest priority eligible household as required by the project's funding sources.

**Project-Specific Supportive Services Need Preference:** HACA will give preference to households (including individuals) with disabilities that significantly interfere with their ability to obtain and maintain housing, who without appropriate supportive services will not be able to obtain or maintain housing, and for whom such services cannot be provided in a non-segregated setting. HACA will verify qualification for this preference with the PBV owner's on-site clinical staff. Disabled residents shall not be required to accept particular services offered at the project. HACA is prohibited from granting preferences to persons with specific disabilities (24 CFR 982.207(b)(3)).

**Disability:** HACA will give preference to disabled families. A disabled family is a family in which the head, spouse or co-head is disabled using the current HUD definition of disability.

**Chronically Homeless Preference:** HACA will give preference to households (including individuals) who meet the HUD definition of chronically homeless defined in the Final Rule published December 4, 2015 (24 CFR Part 91).

When notified of a vacancy in a PBV unit, HACA will first draw applicants that meet and score the highest site-based preferences based on date and time of application. HACA will then draw all other applicants based on the date and time of application.

**Cady Lofts**

HACA will project-base 75 units at Cady Lofts. The property is located at 1004-1008 E. 39th

St, Austin TX 78751.

### Tenant Selection

HACA will allow the PBV owner to refer households for placement on the waiting list.  HACA will use the following local preferences for purposes of establishing priority.  The local preferences are weighted differently, with the higher number representing a higher ranking.  Each applicant family can be granted a maximum of one local preference plus the Owner Referral preference (if they qualify).  Weights for each preference are as follows:

| | |
|---|---|
| Owner Referral | = 1 |
| Project-Specific Supportive Services Need | = 1 |
| Disability | = 1 |
| Chronically Homeless | = 2 |

**Owner Referral Preference:** HACA will give preference to households (including individuals) referred by the project owner who have completed a Coordinated Assessment administered by a member of the Austin/Travis County Continuum of Care (CoC) and been verified by the CoC lead agency as the highest priority eligible household as required by the project's funding sources.

**Project-Specific Supportive Services Need Preference:** HACA will give preference to households (including individuals) with disabilities that significantly interfere with their ability to obtain and maintain housing, who without appropriate supportive services will not be able to obtain or maintain housing, and for whom such services cannot be provided in a non-segregated setting.  HACA will verify qualification for this preference with the PBV owner's on-site clinical staff.  Disabled residents shall not be required to accept particular services offered at the project.  HACA is prohibited from granting preferences to persons with specific disabilities (24 CFR 982.207(b)(3)).

**Disability:** HACA will give preference to disabled families. A disabled family is a family in which the head, spouse or co-head is disabled using the current HUD definition of disability.

**Chronically Homeless Preference:** HACA will give preference to households (including individuals) who meet the HUD definition of chronically homeless defined in the Final Rule published December 4, 2015 (24 CFR Part 91).

When notified of a vacancy in a PBV unit, HACA will first draw applicants that meet and score the highest site-based preferences based on date and time of application.  HACA will then draw all other applicants based on the date and time of application.

**The Lancaster**

HACA will project-base 30 units at Lancaster. The property is located at 5111-5115 Lancaster Court, Austin TX 78723.

**Tenant Selection**

HACA will allow the PBV owner to refer households for placement on the waiting list. HACA will use the following local preferences for purposes of establishing priority. The local preferences are weighted differently, with the higher number representing a higher ranking. Each applicant family can be granted a maximum of one local preference plus the Owner Referral preference (if they qualify). Weights for each preference are as follows:

|  |  |
|---|---|
| Owner Referral | = 1 |
| Project-Specific Supportive Services Need | = 1 |
| Disability | = 1 |
| Chronically Homeless | = 2 |

**Owner Referral Preference:** HACA will give preference to households (including individuals) referred by the project owner who have completed a Coordinated Assessment administered by a member of the Austin/Travis County Continuum of Care (CoC) and been verified by the CoC lead agency as the highest priority eligible household as required by the project's funding sources.

**Project-Specific Supportive Services Need Preference:** HACA will give preference to households (including individuals) with disabilities that significantly interfere with their ability to obtain and maintain housing, who without appropriate supportive services will not be able to obtain or maintain housing, and for whom such services cannot be provided in a non-segregated setting. HACA will verify qualification for this preference with the PBV owner's on-site clinical staff. Disabled residents shall not be required to accept particular services offered at the project. HACA is prohibited from granting preferences to persons with specific disabilities (24 CFR 982.207(b)(3)).

**Disability:** HACA will give preference to disabled families. A disabled family is a family in which the head, spouse or co-head is disabled using the current HUD definition of disability.

**Chronically Homeless Preference:** HACA will give preference to households (including individuals) who meet the HUD definition of chronically homeless defined in the Final Rule published December 4, 2015 (24 CFR Part 91).

When notified of a vacancy in a PBV unit, HACA will first draw applicants that meet and score

~~the highest site-based preferences based on date and time of application. HACA will then draw~~
all other applicants based on the date and time of application.

### The Sasha

HACA will project-base 30 units at the Sasha. The property is located at 1401 Grove Blvd, Austin, TX 78741.

### Tenant Selection

HACA will allow the PBV owner to refer households for placement on the waiting list. HACA will use the following local preferences for purposes of establishing priority. The local preferences are weighted differently, with the higher number representing a higher ranking. Each applicant family can be granted a maximum of one local preference plus the Owner Referral preference (if they qualify). Weights for each preference are as follows:

| | |
|---|---|
| Owner Referral | = 1 |
| Project-Specific Supportive Services Need | = 1 |
| Disability | = 1 |
| Chronically Homeless | = 2 |

**Owner Referral Preference:** HACA will give preference to households (including individuals) referred by the project owner who have completed a Coordinated Assessment administered by a member of the Austin/Travis County Continuum of Care (CoC) and been verified by the CoC lead agency as the highest priority eligible household as required by the project's funding sources.

**Project-Specific Supportive Services Need Preference:** HACA will give preference to households (including individuals) with disabilities that significantly interfere with their ability to obtain and maintain housing, who without appropriate supportive services will not be able to obtain or maintain housing, and for whom such services cannot be provided in a non-segregated setting. HACA will verify qualification for this preference with the PBV owner's on-site clinical staff. Disabled residents shall not be required to accept particular services offered at the project. HACA is prohibited from granting preferences to persons with specific disabilities (24 CFR 982.207(b)(3)).

**Disability:** HACA will give preference to disabled families. A disabled family is a family in which the head, spouse or co-head is disabled using the current HUD definition of disability.

**Chronically Homeless Preference:** HACA will give preference to households (including individuals) who meet the HUD definition of chronically homeless defined

in the Final Rule published December 4, 2015 (24 CFR Part 91).

When notified of a vacancy in a PBV unit, HACA will first draw applicants that meet and score the highest site-based preferences based on date and time of application.  HACA will then draw all other applicants based on the date and time of application.

### The Works at Tillery

HACA will project-base 25 HCV and 25 Foster Youth to Independence (FYI) units at the Works at Tillery. The property is located at 701 Tillery St, Austin, TX 78702.

### Tenant Selection

For FYI Vouchers, HACA will accept applicants for vacant units in the order received from the FYI wait list.

HACA will allow the PBV owner to refer households for placement on the waiting list.  HACA will use the following local preferences for purposes of establishing priority.  The local preferences are weighted differently, with the higher number representing a higher ranking.  Each applicant family can be granted a maximum of one local preference plus the Owner Referral preference (if they qualify).  Weights for each preference are as follows:

| | |
|---|---|
| Owner Referral | = 1 |
| Project-Specific Supportive Services Need | = 1 |
| Disability | = 1 |
| Chronically Homeless | = 2 |

**Owner Referral Preference:** HACA will give preference to households (including individuals) referred by the project owner who have completed a Coordinated Assessment administered by a member of the Austin/Travis County Continuum of Care (CoC) and been verified by the CoC lead agency as the highest priority eligible household as required by the project's funding sources.

**Project-Specific Supportive Services Need Preference:** HACA will give preference to households (including individuals) with disabilities that significantly interfere with their ability to obtain and maintain housing, who without appropriate supportive services will not be able to obtain or maintain housing, and for whom such services cannot be provided in a non-segregated setting.  HACA will verify qualification for this preference with the PBV owner's on-site clinical staff.  Disabled residents shall not be required to accept particular services offered at the project.  HACA is prohibited from granting preferences to persons with specific disabilities (24 CFR 982.207(b)(3)).

**Disability:** HACA will give preference to disabled families. A disabled family is a family in which the head, spouse or co-head is disabled using the current HUD definition of disability.

**Chronically Homeless Preference:** HACA will give preference to households (including individuals) who meet the HUD definition of chronically homeless defined in the Final Rule published December 4, 2015 (24 CFR Part 91).

When notified of a vacancy in a PBV unit, HACA will first draw applicants that meet and score the highest site-based preferences based on date and time of application. HACA will then draw all other applicants based on the date and time of application.

### Skyline Terrace

HACA will project-base 10 HCV and 10 Mainstream Vouchers at Skyline Terrace. The property is located at 1212 W. Ben White, Austin, TX 78704.

### <u>Tenant Selection</u>

For Mainstream Vouchers, HACA will accept applicants for vacant units in the order received from the Mainstream Voucher wait list.

HACA will allow the PBV owner to refer households for placement on the waiting list. HACA will use the following local preferences for purposes of establishing priority. The local preferences are weighted differently, with the higher number representing a higher ranking. Each applicant family can be granted a maximum of one local preference plus the Owner Referral preference (if they qualify). Weights for each preference are as follows:

| | |
|---|---|
| Owner Referral | = 1 |
| Project-Specific Supportive Services Need | = 1 |
| Disability | = 1 |
| Chronically Homeless | = 2 |

**Owner Referral Preference:** HACA will give preference to households (including individuals) referred by the project owner who have completed a Coordinated Assessment administered by a member of the Austin/Travis County Continuum of Care (CoC) and been verified by the CoC lead agency as the highest priority eligible household as required by the project's funding sources.

**Project-Specific Supportive Services Need Preference:** HACA will give preference to households (including individuals) with disabilities that significantly interfere with their ability to obtain and maintain housing, who without appropriate supportive

services will not be able to obtain or maintain housing, and for whom such services cannot be provided in a non-segregated setting. HACA will verify qualification for this preference with the PBV owner's on-site clinical staff. Disabled residents shall not be required to accept particular services offered at the project. HACA is prohibited from granting preferences to persons with specific disabilities (24 CFR 982.207(b)(3)).

**Disability:** HACA will give preference to disabled families. A disabled family is a family in which the head, spouse or co-head is disabled using the current HUD definition of disability.

**Chronically Homeless Preference:** HACA will give preference to households (including individuals) who meet the HUD definition of chronically homeless defined in the Final Rule published December 4, 2015 (24 CFR Part 91).

When notified of a vacancy in a PBV unit, HACA will first draw applicants that meet and score the highest site-based preferences based on date and time of application. HACA will then draw all other applicants based on the date and time of application.

## Real Gardens

HACA will project-base 45 HCV and 15HUD-VASH units at Real Gardens. The property is located at 2824/2826 Real St, Austin, TX 78722.

## <u>Tenant Selection</u>

HACA will accept HUD-VASH applicants for vacant units in the order received from the Veterans Affairs Austin Outpatient Clinic in accordance with HUD-VASH Operating Requirements.

For non-specified category vouchers, HACA will allow the PBV owner to refer households for placement on the waiting list. HACA will use the following local preferences for purposes of establishing priority. The local preferences are weighted differently, with the higher number representing a higher ranking. Each applicant family can be granted a maximum of one local preference plus the Owner Referral preference (if they qualify). Weights for each preference are as follows:

| | |
|---|---|
| Owner Referral | = 1 |
| Project-Specific Supportive Services Need | = 1 |
| Disability | = 1 |
| Chronically Homeless | = 2 |

**Owner Referral Preference:** HACA will give preference to households (including individuals) referred by the project owner who have completed a Coordinated

Assessment administered by a member of the Austin/Travis County Continuum of Care (CoC) and been verified by the CoC lead agency as the highest priority eligible household as required by the project's funding sources.

**Project-Specific Supportive Services Need Preference:** HACA will give preference to households (including individuals) with disabilities that significantly interfere with their ability to obtain and maintain housing, who without appropriate supportive services will not be able to obtain or maintain housing, and for whom such services cannot be provided in a non-segregated setting. HACA will verify qualification for this preference with the PBV owner's on-site clinical staff. Disabled residents shall not be required to accept particular services offered at the project. HACA is prohibited from granting preferences to persons with specific disabilities (24 CFR 982.207(b)(3)).

**Disability:** HACA will give preference to disabled families. A disabled family is a family in which the head, spouse or co-head is disabled using the current HUD definition of disability.

**Chronically Homeless Preference:** HACA will give preference to households (including individuals) who meet the HUD definition of chronically homeless defined in the Final Rule published December 4, 2015 (24 CFR Part 91).

When notified of a vacancy in a PBV unit, HACA will first draw applicants that meet and score the highest site-based preferences based on date and time of application. HACA will then draw all other applicants based on the date and time of application.

## The Roz

HACA will project-base 25 HCV and 15 HUD-VASH units at the Roz. The property is located at 3435 Parker Ln, Austin, TX 78741 .

## <u>Tenant Selection</u>

HACA will accept HUD-VASH applicants for vacant units in the order received from the Veterans Affairs Austin Outpatient Clinic in accordance with HUD-VASH Operating Requirements.

For non-specified category vouchers, HACA will allow the PBV owner to refer households for placement on the waiting list. HACA will use the following local preferences for purposes of establishing priority. The local preferences are weighted differently, with the higher number representing a higher ranking. Each applicant family can be granted a maximum of one local preference plus the Owner Referral preference (if they qualify). Weights for each preference are as follows:

Owner Referral                                             = 1

Project-Specific Supportive Services Need                    = 1

Disability                                                                          = 1

Chronically Homeless                                                      = 2

**Owner Referral Preference:** HACA will give preference to households (including individuals) referred by the project owner who have completed a Coordinated Assessment administered by a member of the Austin/Travis County Continuum of Care (CoC) and been verified by the CoC lead agency as the highest priority eligible household as required by the project's funding sources.

**Project-Specific Supportive Services Need Preference:** HACA will give preference to households (including individuals) with disabilities that significantly interfere with their ability to obtain and maintain housing, who without appropriate supportive services will not be able to obtain or maintain housing, and for whom such services cannot be provided in a non-segregated setting. HACA will verify qualification for this preference with the PBV owner's on-site clinical staff. Disabled residents shall not be required to accept particular services offered at the project. HACA is prohibited from granting preferences to persons with specific disabilities (24 CFR 982.207(b)(3)).

**Disability:** HACA will give preference to disabled families. A disabled family is a family in which the head, spouse or co-head is disabled using the current HUD definition of disability.

**Chronically Homeless Preference:** HACA will give preference to households (including individuals) who meet the HUD definition of chronically homeless defined in the Final Rule published December 4, 2015 (24 CFR Part 91).

When notified of a vacancy in a PBV unit, HACA will first draw applicants that meet and score the highest site-based preferences based on date and time of application. HACA will then draw all other applicants based on the date and time of application.

**Burleson Studios**

HACA will project-base 30 HCV and 20 HUD-VASH units at Burleson Studios. The property is located at 7905 Burleson Rd, Austin, TX 78744.

**Tenant Selection**

HACA will accept HUD-VASH applicants for vacant units in the order received from the Veterans Affairs Austin Outpatient Clinic in accordance with HUD-VASH Operating Requirements.

For non-specified category vouchers, HACA will allow the PBV owner to refer households for placement on the waiting list. HACA will use the following local

preferences for purposes of establishing priority. The local preferences are weighted differently, with the higher number representing a higher ranking. Each applicant family can be granted a maximum of one local preference plus the Owner Referral preference (if they qualify). Weights for each preference are as follows:

| | |
|---|---|
| Owner Referral | = 1 |
| Project-Specific Supportive Services Need | = 1 |
| Disability | = 1 |
| Chronically Homeless | = 2 |

**Owner Referral Preference:** HACA will give preference to households (including individuals) referred by the project owner who have completed a Coordinated Assessment administered by a member of the Austin/Travis County Continuum of Care (CoC) and been verified by the CoC lead agency as the highest priority eligible household as required by the project's funding sources.

**Project-Specific Supportive Services Need Preference:** HACA will give preference to households (including individuals) with disabilities that significantly interfere with their ability to obtain and maintain housing, who without appropriate supportive services will not be able to obtain or maintain housing, and for whom such services cannot be provided in a non-segregated setting. HACA will verify qualification for this preference with the PBV owner's on-site clinical staff. Disabled residents shall not be required to accept particular services offered at the project. HACA is prohibited from granting preferences to persons with specific disabilities (24 CFR 982.207(b)(3)).

**Disability:** HACA will give preference to disabled families. A disabled family is a family in which the head, spouse or co-head is disabled using the current HUD definition of disability.

**Chronically Homeless Preference:** HACA will give preference to households (including individuals) who meet the HUD definition of chronically homeless defined in the Final Rule published December 4, 2015 (24 CFR Part 91).

When notified of a vacancy in a PBV unit, HACA will first draw applicants that meet and score the highest site-based preferences based on date and time of application. HACA will then draw all other applicants based on the date and time of application.

## Cairn Point

HACA will project-base 30 HCV and 20 HUD-VASH units at Cairn Point. The property is located at 7205 Cameron Rd, Austin, TX 78752.

## <u>Tenant Selection</u>

HACA will accept HUD-VASH applicants for vacant units in the order received from the Veterans Affairs Austin Outpatient Clinic in accordance with HUD-VASH Operating Requirements.

For non-specified category vouchers, HACA will allow the PBV owner to refer households for placement on the waiting list.  HACA will use the following local preferences for purposes of establishing priority.  The local preferences are weighted differently, with the higher number representing a higher ranking.  Each applicant family can be granted a maximum of one local preference plus the Owner Referral preference (if they qualify).  Weights for each preference are as follows:

| | |
|---|---|
| Owner Referral | = 1 |
| Project-Specific Supportive Services Need | = 1 |
| Disability | = 1 |
| Chronically Homeless | = 2 |

**Owner Referral Preference:** HACA will give preference to households (including individuals) referred by the project owner who have completed a Coordinated Assessment administered by a member of the Austin/Travis County Continuum of Care (CoC) and been verified by the CoC lead agency as the highest priority eligible household as required by the project's funding sources.

**Project-Specific Supportive Services Need Preference:** HACA will give preference to households (including individuals) with disabilities that significantly interfere with their ability to obtain and maintain housing, who without appropriate supportive services will not be able to obtain or maintain housing, and for whom such services cannot be provided in a non-segregated setting.  HACA will verify qualification for this preference with the PBV owner's on-site clinical staff.  Disabled residents shall not be required to accept particular services offered at the project.  HACA is prohibited from granting preferences to persons with specific disabilities (24 CFR 982.207(b)(3)).

**Disability:** HACA will give preference to disabled families. A disabled family is a family in which the head, spouse or co-head is disabled using the current HUD definition of disability.

**Chronically Homeless Preference:** HACA will give preference to households (including individuals) who meet the HUD definition of chronically homeless defined in the Final Rule published December 4, 2015 (24 CFR Part 91).

When notified of a vacancy in a PBV unit, HACA will first draw applicants that meet and score the highest site-based preferences based on date and time of application.  HACA will then draw all other applicants based on the date and time of application.

**Cairn Point at Montopolis**

HACA will project-base 50 HCV and 15 HUD-VASH units at Cairn Point at Montoplis. The property is located at 1013 Montopolis Dr, Austin, TX 78741.

**Tenant Selection**

HACA will accept HUD-VASH applicants for vacant units in the order received from the Veterans Affairs Austin Outpatient Clinic in accordance with HUD-VASH Operating Requirements.

For non-specified category vouchers, HACA will allow the PBV owner to refer households for placement on the waiting list.  HACA will use the following local preferences for purposes of establishing priority.  The local preferences are weighted differently, with the higher number representing a higher ranking.  Each applicant family can be granted a maximum of one local preference plus the Owner Referral preference (if they qualify).  Weights for each preference are as follows:

| | |
|---|---|
| Owner Referral | = 1 |
| Project-Specific Supportive Services Need | = 1 |
| Disability | = 1 |
| Chronically Homeless | = 2 |

**Owner Referral Preference:** HACA will give preference to households (including individuals) referred by the project owner who have completed a Coordinated Assessment administered by a member of the Austin/Travis County Continuum of Care (CoC) and been verified by the CoC lead agency as the highest priority eligible household as required by the project's funding sources.

**Project-Specific Supportive Services Need Preference:** HACA will give preference to households (including individuals) with disabilities that significantly interfere with their ability to obtain and maintain housing, who without appropriate supportive services will not be able to obtain or maintain housing, and for whom such services cannot be provided in a non-segregated setting.  HACA will verify qualification for this preference with the PBV owner's on-site clinical staff.  Disabled residents shall not be required to accept particular services offered at the project.  HACA is prohibited from granting preferences to persons with specific disabilities (24 CFR 982.207(b)(3)).

**Disability:** HACA will give preference to disabled families. A disabled family is a family in which the head, spouse or co-head is disabled using the current HUD definition of disability.

**Chronically Homeless Preference:** HACA will give preference to households

(including individuals) who meet the HUD definition of chronically homeless defined in the Final Rule published December 4, 2015 (24 CFR Part 91).

When notified of a vacancy in a PBV unit, HACA will first draw applicants that meet and score the highest site-based preferences based on date and time of application.  HACA will then draw all other applicants based on the date and time of application.

## Kensington Apartments

HACA will project-base 30 HCV and 25 HUD-VASH vouchers at the Kensington Apartments, located at 3300 Manor Rd, Austin, TX 78723.

HACA will accept HUD-VASH applicants for vacant units in the order received from the Veterans Affairs Austin Outpatient Clinic in accordance with HUD-VASH Operating Requirements.

For non-specified category vouchers, HACA will allow the PBV owner to refer households for placement on the waiting list.  HACA will use the following local preferences for purposes of establishing priority.  The local preferences are weighted differently, with the higher number representing a higher ranking.  Each applicant family can be granted a maximum of one local preference plus the Owner Referral preference (if they qualify).  Weights for each preference are as follows:

| | |
|---|---|
| Owner Referral | = 1 |
| Project-Specific Supportive Services Need | = 1 |
| Disability | = 1 |
| Chronically Homeless | = 2 |

**Owner Referral Preference:** HACA will give preference to households (including individuals) referred by the project owner who have completed a Coordinated Assessment administered by a member of the Austin/Travis County Continuum of Care (CoC) and been verified by the CoC lead agency as the highest priority eligible household as required by the project's funding sources.

**Project-Specific Supportive Services Need Preference:** HACA will give preference to households (including individuals) with disabilities that significantly interfere with their ability to obtain and maintain housing, who without appropriate supportive services will not be able to obtain or maintain housing, and for whom such services cannot be provided in a non-segregated setting.  HACA will verify qualification for this preference with the PBV owner's on-site clinical staff.  Disabled residents shall not be required to accept particular services offered at the project.  HACA is prohibited from granting preferences to persons with specific disabilities (24 CFR 982.207(b)(3)).

**Disability:** HACA will give preference to disabled families. A disabled family is a family in which the head, spouse or co-head is disabled using the current HUD definition of disability.

**Chronically Homeless Preference:** HACA will give preference to households (including individuals) who meet the HUD definition of chronically homeless defined in the Final Rule published December 4, 2015 (24 CFR Part 91).

When notified of a vacancy in a PBV unit, HACA will first draw applicants that meet and score the highest site-based preferences based on date and time of application. HACA will then draw all other applicants based on the date and time of application.

## Urban Empowerment Zone – Austin Area Urban League

HACA will project-base 15 HCV, 40 Mainstream, and 25 HUD-VASH vouchers at the Urban Empowerment Zone located at 6400 FM969, Austin, TX 78724.

HACA will accept HUD-VASH applicants for vacant units in the order received from the Veterans Affairs Austin Outpatient Clinic in accordance with HUD-VASH Operating Requirements.

For Mainstream and non-specified category vouchers, HACA will allow the PBV owner to refer households for placement on the waiting list. HACA will use the following local preferences for purposes of establishing priority. The local preferences are weighted differently, with the higher number representing a higher ranking. Each applicant family can be granted a maximum of one local preference plus the Owner Referral preference (if they qualify). Weights for each preference are as follows:

| | |
|---|---|
| Owner Referral | = 1 |
| Project-Specific Supportive Services Need | = 1 |
| Disability | = 1 |
| Chronically Homeless | = 2 |

**Owner Referral Preference:** HACA will give preference to households (including individuals) referred by the project owner who have completed a Coordinated Assessment administered by a member of the Austin/Travis County Continuum of Care (CoC) and been verified by the CoC lead agency as the highest priority eligible household as required by the project's funding sources.

**Project-Specific Supportive Services Need Preference:** HACA will give preference to households (including individuals) with disabilities that significantly interfere with their ability to obtain and maintain housing, who without appropriate supportive services will not be able to obtain or maintain housing, and for whom such services

cannot be provided in a non-segregated setting. HACA will verify qualification for this preference with the PBV owner's on-site clinical staff. Disabled residents shall not be required to accept particular services offered at the project. HACA is prohibited from granting preferences to persons with specific disabilities (24 CFR 982.207(b)(3)).

**Disability:** HACA will give preference to disabled families. A disabled family is a family in which the head, spouse or co-head is disabled using the current HUD definition of disability.

**Chronically Homeless Preference:** HACA will give preference to households (including individuals) who meet the HUD definition of chronically homeless defined in the Final Rule published December 4, 2015 (24 CFR Part 91).

When notified of a vacancy in a PBV unit, HACA will first draw applicants that meet and score the highest site-based preferences based on date and time of application. HACA will then draw all other applicants based on the date and time of application.

## Bailey at Berkman

HACA will project-base 10 HCV and 16 HUD-VASH vouchers at Bailey at Berkman located at 6405 Berkman Dr, Austin, TX 78723.

HACA will accept HUD-VASH applicants for vacant units in the order received from the Veterans Affairs Austin Outpatient Clinic in accordance with HUD-VASH Operating Requirements.

For non-specified category vouchers, HACA will allow the PBV owner to refer households for placement on the waiting list. HACA will use the following local preferences for purposes of establishing priority. The local preferences are weighted differently, with the higher number representing a higher ranking. Each applicant family can be granted a maximum of one local preference plus the Owner Referral preference (if they qualify). Weights for each preference are as follows:

| | |
|---|---|
| Owner Referral | = 1 |
| Project-Specific Supportive Services Need | = 1 |
| Disability | = 1 |
| Chronically Homeless | = 2 |

**Owner Referral Preference:** HACA will give preference to households (including individuals) referred by the project owner who have completed a Coordinated Assessment administered by a member of the Austin/Travis County Continuum of Care (CoC) and been verified by the CoC lead agency as the highest priority eligible household as required by the project's funding sources.

**Project-Specific Supportive Services Need Preference:** HACA will give preference to households (including individuals) with disabilities that significantly interfere with their ability to obtain and maintain housing, who without appropriate supportive services will not be able to obtain or maintain housing, and for whom such services cannot be provided in a non-segregated setting. HACA will verify qualification for this preference with the PBV owner's on-site clinical staff. Disabled residents shall not be required to accept particular services offered at the project. HACA is prohibited from granting preferences to persons with specific disabilities (24 CFR 982.207(b)(3)).

**Disability:** HACA will give preference to disabled families. A disabled family is a family in which the head, spouse or co-head is disabled using the current HUD definition of disability.

**Chronically Homeless Preference:** HACA will give preference to households (including individuals) who meet the HUD definition of chronically homeless defined in the Final Rule published December 4, 2015 (24 CFR Part 91).

When notified of a vacancy in a PBV unit, HACA will first draw applicants that meet and score the highest site-based preferences based on date and time of application. HACA will then draw all other applicants based on the date and time of application.

## Bailey at Stassney

HACA will project-base 10 HCV and 16 HUD-VASH vouchers at Bailey at Stassney located at 400 & 404 W Stassney, Austin, TX 78745.

HACA will accept HUD-VASH applicants for vacant units in the order received from the Veterans Affairs Austin Outpatient Clinic in accordance with HUD-VASH Operating Requirements.

For non-specified category vouchers, HACA will allow the PBV owner to refer households for placement on the waiting list. HACA will use the following local preferences for purposes of establishing priority. The local preferences are weighted differently, with the higher number representing a higher ranking. Each applicant family can be granted a maximum of one local preference plus the Owner Referral preference (if they qualify). Weights for each preference are as follows:

|  |  |
|---|---|
| Owner Referral | = 1 |
| Project-Specific Supportive Services Need | = 1 |
| Disability | = 1 |
| Chronically Homeless | = 2 |

**Owner Referral Preference:** HACA will give preference to households (including

individuals) referred by the project owner who have completed a Coordinated Assessment administered by a member of the Austin/Travis County Continuum of Care (CoC) and been verified by the CoC lead agency as the highest priority eligible household as required by the project's funding sources.

**Project-Specific Supportive Services Need Preference:** HACA will give preference to households (including individuals) with disabilities that significantly interfere with their ability to obtain and maintain housing, who without appropriate supportive services will not be able to obtain or maintain housing, and for whom such services cannot be provided in a non-segregated setting. HACA will verify qualification for this preference with the PBV owner's on-site clinical staff. Disabled residents shall not be required to accept particular services offered at the project. HACA is prohibited from granting preferences to persons with specific disabilities (24 CFR 982.207(b)(3)).

**Disability:** HACA will give preference to disabled families. A disabled family is a family in which the head, spouse or co-head is disabled using the current HUD definition of disability.

**Chronically Homeless Preference:** HACA will give preference to households (including individuals) who meet the HUD definition of chronically homeless defined in the Final Rule published December 4, 2015 (24 CFR Part 91).

When notified of a vacancy in a PBV unit, HACA will first draw applicants that meet and score the highest site-based preferences based on date and time of application. HACA will then draw all other applicants based on the date and time of application.

### The Rhett

HACA will project-base 8 HUD-VASH vouchers at the Rhett, located at 1000 East Yager Ln, Austin, TX 78753.

### Tenant Selection

HACA will accept HUD-VASH applicants for vacant units in the order received from the Veterans Affairs Austin Outpatient Clinic in accordance with HUD-VASH Operating Requirements.

### 17-VI.E. OFFER OF PBV ASSISTANCE

**Refusal of Offer [24 CFR 983.251(e)(3)]**
The PHA is prohibited from taking any of the following actions against a family who has

applied for, received, or refused an offer of PBV assistance.

- Refuse to list the applicant on the waiting list for tenant-based voucher assistance;

- Deny any admission preference for which the applicant qualifies;

- Change the applicant's place on the waiting list based on preference, date, and time of application, or other factors affecting selection under the PHA's selection policy;

- Remove the applicant from the tenant-based voucher waiting list.

**Disapproval by Landlord [24 CFR 983.251(e)(2)]**
If a PBV owner rejects a family for admission to the owner's units, such rejection may not affect the family's position on the tenant-based voucher waiting list.

**Acceptance of Offer [24 CFR 983.252]**
*Family Briefing*

(a) *Oral briefing.* When a family accepts an offer of PBV assistance, the HACA must give the family an oral briefing.

(1) The briefing must include information on the following subjects:

(i) A description of how the program works;

(ii) Family and owner responsibilities; and

(iii) Family right to move.

(2) HACA must take appropriate steps to ensure effective communication in accordance with 24 CFR 8.6 and 28 CFR part 35, subpart E, and must provide information on the reasonable accommodation process.

(b) *Information packet.* HACA must give the family a packet that includes information on the following subjects:

(1) How the PHA determines the total tenant payment for a family;

(2) Family obligations under the program; and

(3) Information on Federal, State, and local equal opportunity laws, the contact information for the Section 504 coordinator, a copy of the housing discrimination complaint form, and information on how to request a reasonable accommodation or modification under Section 504, the Fair Housing Act, and the Americans with Disabilities Act;

(4) PHA subsidy standards, including when the PHA will consider granting exceptions to the standards as allowed by 24 CFR 982.402(b)(8), and when exceptions are required as a

reasonable accommodation for a person with disabilities under Section 504, the Fair Housing Act, or the Americans with Disabilities Act; and

(5) Family right to move.

(c) ***Statement of family responsibility.*** The PHA and family must sign the statement of family responsibility.

(d) ***Providing information for persons with limited English proficiency.*** The PHA must take reasonable steps to ensure meaningful access by persons with limited English proficiency in accordance with obligations and procedures contained in Title VI of the Civil Rights Act of 1964, and HUD's implementing regulation at 24 CFR part 1., Executive Order 13166, and HUD's *Final Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons* (72 FR 2732) or successor authority.

### Persons with Disabilities

If an applicant family's head or spouse is disabled, the PHA must assure effective communication, in accordance with 24 CFR 8.6, in conducting the oral briefing and in providing the written information packet. This may include making alternative formats available (see Chapter 2). In addition, the PHA must have a mechanism for referring a family that includes a member with a mobility impairment to an appropriate accessible PBV unit.

### Persons with Limited English Proficiency

The PHA should take reasonable steps to assure meaningful access by persons with limited English proficiency in accordance with Title VI of the Civil Rights Act of 1964 and Executive Order 13166 (see Chapter 2).

## 17-VI.F. OWNER SELECTION OF TENANTS

The owner is responsible for developing written tenant selection procedures that are consistent with the purpose of improving housing opportunities for very low-income families and reasonably related to program eligibility and an applicant's ability to fulfill their obligations under the lease. An owner must promptly notify in writing any rejected applicant of the grounds for any rejection [24 CFR 983.253(a)(2) and (a)(3)].

**Leasing [24 CFR 983.253(a)]**
During the term of the HAP contract, the owner must lease contract units to eligible families that are selected and referred by the PHA from the PHA's waiting list. The contract unit leased to the family must be the appropriate size unit for the size of the family, based on the PHA's subsidy standards.

**Filling Vacancies [24 CFR 983.254(a)]**

The owner must promptly notify the PHA of any vacancy or expected vacancy in a contract unit. After receiving such notice, the PHA must make every reasonable effort to promptly refer a sufficient number of families for the owner to fill such vacancies. The PHA and the owner must make reasonable efforts to minimize the likelihood and length of any vacancy.

> <u>HACA Policy</u>
>
> The owner must notify HACA in writing (mail, fax, or e-mail) within five  business day of learning about any vacancy or expected vacancy.
>
> After receiving a notice from the owner, HACA will refer families to the owner.

**Reduction in HAP Contract Units Due to Vacancies [24 CFR 983.254(b)]**

If any contract units have been vacant for 120 or more days since owner notice of the vacancy, the PHA may give notice to the owner amending the HAP contract to reduce the number of contract units by subtracting the number of contract units (according to the bedroom size) that have been vacant for this period.

> <u>HACA Policy</u>
>
> If any contract units have been vacant for 120 days, HACA will give notice to the owner that the HAP contract will be amended to reduce the number of contract units that have been vacant for this period. HACA will provide the notice to the owner within 10 business days of the 120th day of the vacancy. The amendment to the HAP contract will be effective the 1st day of the month following the date of HACA's notice.

## 17-VI.G. TENANT SCREENING [24 CFR 983.255]

**PHA Responsibility**

The PHA is not responsible or liable to the owner or any other person for the family's behavior or suitability for tenancy. However, the PHA may opt to screen applicants for family behavior or suitability for tenancy and may deny applicants based on such screening.

> <u>HACA Policy</u>
>
> HACA will not conduct screening to determine a PBV applicant family's suitability for tenancy.

The PHA must provide the owner with an applicant family's current and prior address (as shown in PHA records) and the name and address (if known by the PHA) of the family's current landlord and any prior landlords.

In addition, the PHA may offer the owner other information the PHA may have about a family, including information about the tenancy history of family members or about drug trafficking and criminal activity by family members. The PHA must provide applicant families a

description of the PHA policy on providing information to owners, and the PHA must give the same types of information to all owners.

The PHA may not disclose to the owner any confidential information provided in response to a request for documentation of domestic violence, dating violence, sexual assault, or stalking except at the written request or with the written consent of the individual providing the documentation [24 CFR 5.2007(a)(4)].

> <u>HACA Policy</u>
>
> HACA will inform owners of their responsibility to screen prospective tenants and will provide owners with the required known name and address information, at the time of the turnover HQS inspection or before. HACA will not provide any additional information to the owner, such as tenancy history, criminal history, etc.

**Owner Responsibility**

The owner is responsible for screening and selection of the family to occupy the owner's unit. When screening families the owner may consider a family's background with respect to the following factors:

- Payment of rent and utility bills;

- Caring for a unit and premises;

- Respecting the rights of other residents to the peaceful enjoyment of their housing;

- Drug-related criminal activity or other criminal activity that is a threat to the health, safety, or property of others; and

- Compliance with other essential conditions of tenancy.


## PART VII: OCCUPANCY

### 17-VII.A. OVERVIEW

After an applicant has been selected from the waiting list, determined eligible by the PHA, referred to an owner and determined suitable by the owner, the family will sign the lease and occupancy of the unit will begin.

### 17-VII.B. LEASE [24 CFR 983.256]

The tenant must have legal capacity to enter a lease under state and local law. *Legal capacity* means that the tenant is bound by the terms of the lease and may enforce the terms of the lease against the owner.

**Form of Lease [24 CFR 983.256(b)]**

The tenant and the owner must enter into a written lease agreement that is signed by both parties. If an owner uses a standard lease form for rental units to unassisted tenants in the

locality or premises, the same lease must be used for assisted tenants, except that the lease must include a HUD-required tenancy addendum. The tenancy addendum must include, word-for-word, all provisions required by HUD.

If the owner does not use a standard lease form for rental to unassisted tenants, the owner may use another form of lease, such as a PHA model lease.

The PHA may review the owner's lease form to determine if the lease complies with state and local law. If the PHA determines that the lease does not comply with state or local law, the PHA may decline to approve the tenancy.

> HACA Policy
>
> HACA generally will not review the owner's lease for compliance with state or local law but reserves the right to review an owner lease for compliance with state or local law.

**Lease Requirements [24 CFR 983.256(c)]**

The lease for a PBV unit must specify all of the following information:

- The names of the owner and the tenant;

- The unit rented (address, apartment number, if any, and any other information needed to identify the leased contract unit);

- The term of the lease (initial term and any provision for renewal);

- The amount of the tenant rent to owner, which is subject to change during the term of the lease in accordance with HUD requirements;

- A specification of the services, maintenance, equipment, and utilities that will be provide by the owner; and

- The amount of any charges for food, furniture, or supportive services.

**Tenancy Addendum [24 CFR 983.256(d)]**

The tenancy addendum in the lease must state:

- The program tenancy requirements;

- The composition of the household as approved by the PHA (the names of family members and any PHA-approved live-in aide);

- All provisions in the HUD-required tenancy addendum must be included in the lease. The terms of the tenancy addendum prevail over other provisions of the lease.

**Initial Term and Lease Renewal [24 CFR 983.256(f)]**

The initial lease term must be for at least one year. The lease must provide for automatic renewal after the initial term of the lease in either successive definitive terms (e.g. month-to-month or year-to-year) or an automatic indefinite extension of the lease term. For automatic indefinite extension of the lease term, the lease terminates if any of the following occur:

- The owner terminates the lease for good cause
- The tenant terminates the lease
- The owner and tenant agree to terminate the lease
- The PHA terminates the HAP contract
- The PHA terminates assistance for the family

### Changes in the Lease [24 CFR 983.256(e)]

If the tenant and owner agree to any change in the lease, the change must be in writing, and the owner must immediately give the PHA a copy of all changes.

The owner must notify the PHA in advance of any proposed change in the lease regarding the allocation of tenant and owner responsibilities for utilities. Such changes may only be made if approved by the PHA and in accordance with the terms of the lease relating to its amendment. The PHA must redetermine reasonable rent, in accordance with program requirements, based on any change in the allocation of the responsibility for utilities between the owner and the tenant. The redetermined reasonable rent will be used in calculation of the rent to owner from the effective date of the change.

### Owner Termination of Tenancy [24 CFR 983.257]

With two exceptions, the owner of a PBV unit may terminate tenancy for the same reasons an owner may in the tenant-based voucher program (see Section 12-III.B. and 24 CFR 982.310). In the PBV program, terminating tenancy for "good cause" does not include doing so for a business or economic reason, or a desire to use the unit for personal or family use or other non-residential purpose.

### *Tenant Absence from the Unit [24 CFR 983.256(g) and 982.312(a)]*

The lease may specify a maximum period of family absence from the unit that may be shorter than the maximum period permitted by PHA policy. According to program requirements, the family's assistance must be terminated if they are absent from the unit for more than 180 consecutive days. PHA termination of assistance actions due to family absence from the unit are subject to 24 CFR 981.312, except that the unit is not terminated from the HAP contract if the family is absent for longer than the maximum period permitted.

### Continuation of Housing Assistance Payments [24 CFR 982.258]

Housing assistance payments shall continue until the tenant rent equals the rent to owner. The cessation of housing assistance payments at such point will not affect the family's other rights under its lease, nor will such cessation preclude the resumption of payments as a result of later changes in income, rents, or other relevant circumstances if such changes occur within 180 days following the date of the last housing assistance payment by the PHA. After the 180-day period, the unit shall be removed from the HAP contract pursuant to 24 CFR 983.211.

HACA Policy

If a participating family receiving zero rental assistance experiences a change in circumstances that would result in a HAP payment to the owner, the family must notify HACA of the change and request an interim reexamination before the expiration of the 180-day period.

**Security Deposits [24 CFR 983.259]**

The owner may collect a security deposit from the tenant. The PHA may prohibit security deposits in excess of private market practice, or in excess of amounts charged by the owner to unassisted tenants.

> HACA Policy

> HACA will allow the owner to collect a security deposit amount that is not in excess of amounts charged by the owner to unassisted tenants.

When the tenant moves out of a contract unit, the owner, subject to state and local law, may use the security deposit, including any interest on the deposit, in accordance with the lease, as reimbursement for any unpaid tenant rent, damages to the unit, or other amounts owed by the tenant under the lease.

The owner must give the tenant a written list of all items charged against the security deposit and the amount of each item. After deducting the amount used to reimburse the owner, the owner must promptly refund the full amount of the balance to the tenant.

If the security deposit does not cover the amount owed by the tenant under the lease, the owner may seek to collect the balance from the tenant. The PHA has no liability or responsibility for payment of any amount owed by the family to the owner.

## 7-VII.C. MOVES

**Overcrowded, Under-Occupied, and Accessible Units [24 CFR 983.260]**

HACA's subsidy standards determine the appropriate unit size for the family size and composition.

If HACA determines that a family is occupying a wrong-size unit, or a unit with accessibility features that the family does not require and the unit is needed by a family that requires the accessibility features (see 24 CFR 8.27), HACA will follow the policy below:

> HACA Policy

> Within 30 days from the HACA's determination, notify the family and the owner of this determination; and

> Within 60 days from the HACA's determination, offer the family continued housing assistance.

HACA will offer the family the following types of continued assistance in the following order, based on the availability of assistance:

1. PBV assistance in an appropriate-size unit in the same project;
2. PBV assistance in the appropriate-size in another project;
3. Tenant-based rental assistance under the housing choice voucher program; or
4. Other comparable tenant-based rental assistance.

If no continued PBV housing assistance is available as described in 1 above, the HACA will remove the wrong-size or accessible unit from the HAP contract to make voucher assistance available to issue the family a tenant-based voucher.

**Termination of housing assistance payments**

1) If the HACA offers the family the opportunity to receive tenant-based rental assistance under the voucher program:

a. The HACA must terminate the housing assistance payments for a wrong-sized or accessible unit at the earlier of the expiration of the term of the family's voucher (including any extension granted by the HACA) or the date upon which the family vacates the unit.
b. If the family does not move out of the wrong-sized unit or accessible unit by the expiration date of the term of the family's voucher, the HACA must remove the unit from the HAP contract.

2) If the PHA offers the family another form of assistance that is not a tenant-based voucher, and the family does not accept the offer, does not move out of the PBV unit within a reasonable time as determined by the PHA, or both, the PHA must terminate the housing assistance payments for the unit at the expiration of a reasonable period as determined by the PHA and remove the unit from the HAP contract.

    a. In the case of an offer by the PHA of PBV assistance or other project-based housing assistance in an appropriate-size unit, the family does not accept the offer and does not move out of the PBV unit within 30 days from the date of the offer, the family may request and the HACA may grant one extension not to exceed up to an additional 90 days to accommodate the family's efforts to locate affordable, safe, and geographically proximate replacement housing.
    b. In the case of an offer by the HACA of PBV assistance or other project-based housing assistance in an appropriate size unit, the family accepts the offer but does not move out of the PBV unit within 30 days, HACA may grant one extension not to exceed up to an additional 90 days to accommodate the family's

efforts to locate affordable, safe, and geographically proximate replacement housing.

    c.   In the case of an offer by the HACA of other comparable tenant-based rental assistance, the family either accepts or does not accept the offer but does not move out of the PBV unit within 30 days. The family may request and the HACA may grant one extension not to exceed up to an additional 90 days to accommodate the family's efforts to locate affordable, safe, and geographically proximate replacement housing.

***Reinstatement.*** The HACA may reinstate a unit removed  when the family does not move out of the wrong-sized unit or accessible unit by the expiration date of the term of the family's voucher, after the family vacates the property, in accordance with § 983.207(b).

**Family Right to Move [24 CFR 983.261]**

The family may terminate the lease at any time after the first year of occupancy. The family must give advance written notice to the owner in accordance with the lease and provide a copy of such notice to the PHA. If the family wishes to move with continued tenant-based assistance, the family must contact the PHA to request the rental assistance prior to providing notice to terminate the lease.

    <u>HACA Policy</u>

    PBV participants may be eligible to move when all the following criteria are true:

- The PBV participant family has completed 1 full year of occupancy;

- The participant family has no outstanding debts to the owner and / or HACA; and

- The participant family has given advance notice of intent to vacate to the owner and HACA in accord with any terms of the lease.

If the family terminates the lease in accordance with these requirements, the PHA is required to offer the family the opportunity for continued tenant-based assistance, in the form of a voucher or other comparable tenant-based rental assistance. If voucher or other comparable tenant-based assistance is not immediately available upon termination of the family's lease in the PBV unit, the PHA must give the family priority to receive the next available opportunity for continued tenant-based assistance.

If the family terminates the assisted lease before the end of the first year, the family relinquishes the opportunity for continued tenant-based assistance.

**17-VII.D. EXCEPTIONS TO THE OCCUPANCY CAP [24 CFR 983.262]**

As of April 17, 2018, the PHA may not pay housing assistance under a PBV HAP contract for more than the greater of 25 units or 25 percent of the number of dwelling units in a project unless the units are [24 CFR 983.56]:

- The units are exclusively for elderly families

- The units are for households eligible for supportive services available to all families receiving PBV assistance in the project

If the project is located in a census tract with a poverty rate of 20 percent or less, as determined in the most recent American Community Survey Five-Year estimates, the project cap is the greater of 25 units or 40 percent (instead of 25 percent) of the units in the project [FR Notice 7/14/17].

If a family at the time of initial tenancy is receiving and while the resident of an excepted unit has received Family Self-Sufficiency (FSS) supportive services or any other service as defined by the PHA and successfully completes the FSS contract of participation or the supportive services requirement, the unit continues to count as an excepted unit for as long as the family resides in the unit. However, if the FSS family fails to successfully complete the FSS contract of participation or supportive services objective and consequently is no longer eligible for the supportive services, the family must vacate the unit within a reasonable period of time established by the PHA, and the PHA shall cease paying HAP on behalf of the family.

Further, when a family (or remaining members of a family) residing in an excepted unit that no longer meets the criteria for a "qualifying family" because the family is no longer an elderly family due to a change in family composition the PHA has the discretion to allow the family to remain in the excepted unit. . If the PHA does not exercise this discretion, the family must vacate the unit within a reasonable period of time established by the PHA, and the PHA must cease paying housing assistance payments on behalf of the non-qualifying family.

Individuals in units with supportive services who choose to no longer participate in a service or who no longer qualify for services they qualified for at the time of initial occupancy cannot subsequently be denied continued housing opportunity because of this changed circumstance. A PHA or owner cannot determine that a participant's needs exceed the level of care offered by qualifying services or require that individuals be transitioned to different projects based on service needs.

If the family fails to vacate the unit within the established time, the unit must be removed from the HAP contract unless the project is partially assisted, and it is possible for the HAP contract to be amended to substitute a different unit in the building in accordance with program requirements; or the owner terminates the lease and evicts the family. The housing assistance payments for a family residing in an excepted unit that is not in compliance with its family obligations to comply with supportive services requirements must be terminated by the PHA.

The PHA may allow a family that initially qualified for occupancy of an excepted unit based on elderly family status to continue to reside in a unit, where through circumstances beyond the control of the family (e.g., death of the elderly family member or long-term or permanent hospitalization or nursing care), the elderly family member no longer resides in the unit. In this case, the unit may continue to be counted as an excepted unit for as long as the family resides

in that unit. Once the family vacates the unit, in order to continue as an excepted unit under the HAP contract, the unit must be made available to and occupied by a qualified family.

> HACA Policy
>
> HACA will allow families who initially qualified to live in an excepted unit to remain when circumstances change due to circumstances beyond the remaining family members' control.
>
> In all other cases, HACA will provide written notice to the family and owner within 10 business days of making the determination. The family will be given 30 days from the date of the notice to move out of the PBV unit. If the family does not move out within this 30-day time frame, HACA will terminate the housing assistance payments at the expiration of this 30-day period.
>
> HACA may make exceptions to this 30-day period if needed for reasons beyond the family's control such as death, serious illness, or other medical emergency of a family member.

## PART VIII: DETERMINING RENT TO OWNER

### 17-VIII.A. OVERVIEW

The amount of the initial rent to an owner of units receiving PBV assistance is established at the beginning of the HAP contract term. Although for rehabilitated or newly constructed housing, the agreement to enter into HAP Contract (Agreement) states the estimated amount of the initial rent to owner, the actual amount of the initial rent to owner is established at the beginning of the HAP contract term.

During the tem of the HAP contract, the rent to owner is redetermined at the owner's request in accordance with program requirements, and at such time that there is a five percent or greater decrease in the published FMR.

### 17-VIII.B. RENT LIMITS [24 CFR 983.301]

Except for certain tax credit units (discussed below), the rent to owner must not exceed the lowest of the following amounts:

- An amount determined by the PHA, not to exceed 110 percent of the applicable fair market rent (or any HUD-approved exception payment standard) for the unit bedroom size minus any utility allowance;

- The reasonable rent; or

- The rent requested by the owner.

**Certain Tax Credit Units [24 CFR 983.301(c)]**

For certain tax credit units, the rent limits are determined differently than for other PBV units.

Different limits apply to contract units that meet all of the following criteria:

- The contract unit receives a low-income housing tax credit under the Internal Revenue Code of 1986;

- The contract unit is not located in a qualified census tract;

- There are comparable tax credit units of the same bedroom size as the contract unit in the same project, and the comparable tax credit units do not have any form of rental assistance other than the tax credit; and

- The tax credit rent exceeds 110 percent of the fair market rent or any approved exception payment standard;

For contract units that meet all of these criteria, the rent to owner must not exceed the lowest of:

- The tax credit rent minus any utility allowance;

- The reasonable rent; or

- The rent requested by the owner.

*Definitions*

A *qualified census tract* is any census tract (or equivalent geographic area defined by the Bureau of the Census) in which at least 50 percent of households have an income of less than 60 percent of Area Median Gross Income (AMGI), or where the poverty rate is at least 25 percent and where the census tract is designated as a qualified census tract by HUD.

*Tax credit rent* is the rent charged for comparable units of the same bedroom size in the project that also receive the low-income housing tax credit but do not have any additional rental assistance (e.g., tenant-based voucher assistance).

**Reasonable Rent [24 CFR 983.301(e) and 983.302(c)(2)]**

The PHA must determine reasonable rent in accordable with 24 CFR 983.303. The rent to owner for each contract unit may at no time exceed the reasonable rent, except in cases where the PHA has elected within the HAP contract not to reduce rents below the initial rent to owner and, upon redetermination of the rent to owner; the reasonable rent would result in a rent below the initial rent. However, the rent to owner must be reduced in the following cases:

- To correct errors in calculations in accordable with HUD requirements

- If additional housing assistance has been combined with PBV assistance after the execution of the initial HAP contract and a rent decrease is required pursuant to 24 CFR 983.55

- If a decrease in rent to owner is required based on changes in the allocation of the responsibility for utilities between owner and tenant

If the PHA has not elected within the HAP contract to establish the initial rent to owner as the rent floor, the rent to owner shall not at any time exceed the reasonable rent.

> HACA Policy
>
> HACA will elect within the HAP contract not to reduce rents below the initial level, with the exception of circumstances listed in 24 CFR 983.302(c)(2). If, upon redetermination of the rent to owner, the reasonable rent would result in a rent below the initial rent, HACA will use the higher initial rent to owner amount.

**Use of FMRs, Exception Payment Standards, and Utility Allowances [24 CFR 983.301(f)]**
When determining the initial rent to owner, the PHA must use the most recently published FMR in effect and the utility allowance schedule in effect at execution of the HAP contract. When redetermining the rent to owner, the PHA must use the most recently published FMR and the utility allowance schedule in effect at the time of redetermination. At its discretion, the PHA may for initial rent, use the amounts in effect at any time during the 30-day period immediately before the beginning date of the HAP contract, or for redeterminations of rent, the 30-day period immediately before the redetermination date.

Any HUD-approved exception payment standard amount under the tenant-based voucher program also applies to the project-based voucher program. HUD will not approve a different exception payment stand amount for use in the PBV program.

Likewise, the PHA may not establish or apply different utility allowance amounts for the PBV program. The same utility allowance schedule applies to both the tenant-based and project-based voucher programs.

> HACA Policy
>
> Upon written request by the owner, HACA will consider using the FMR or utility allowances in effect during the 30-day period before the start date of the HAP, or redetermination of rent. The owner must explain the need to use the previous FMRs or utility allowances and include documentation in support of the request. HACA will review and make a decision based on the circumstances and merit of each request.
>
> In addition to considering a written request from an owner, HACA may decide to use the FMR or utility allowances in effect during the 30-day period before the start date of the HAP, or redetermination of rent, if HACA determines it is necessary due to PHA budgetary constraints.

## Use of Small Area FMRs (SAFMRs) [24 CFR 888.113(h)]

While small area FMRs (SAFMRs) do not apply to PBV projects, PHAs that operate a tenant-based program under SAFMRs  may apply SAFMRs to all future PBV HAP contracts. If the PHA adopts this policy, it must apply to all future PBV projects and the PHA's entire jurisdiction. The PHA and owner may not subsequently choose to revert back to use of the FMRs once the SAFMRs have been adopted, even if the PHA subsequently changes its policy. Further, the PHA may apply SAFMRs to current PBV projects where the notice of owner selection was made on or before the effective dates of PHA  implementation, provided the owner is willing to mutually agree to doing so and the application is prospective. The PHA and owner may not subsequently choose to revert back to use of the FMRs once the SAFMRs have been adopted, even if the PHA subsequently changes its policy. If rents increase as a result of the use of SAFMRs, the rent increase may not be effective until the first anniversary of the HAP contract.

> HACA Policy
>
> The PHA will not apply SAFMRs to the PHA's PBV program.

**Redetermination of Rent [24 CFR 983.302]**

The PHA must redetermine the rent to owner upon the owner's request or when there is a five percent or greater decrease in the published FMR.

**Rent Increase**

If an owner wishes to request an increase in the rent to owner from the PHA, it must be requested at the annual anniversary of the HAP contract (see Section 17-V.D.). The request must be in writing and in the form and manner required by the PHA. The PHA may only make rent increases in accordance with the rent limits described previously. There are no provisions in the PBV program for special adjustments (e.g., adjustments that reflect increases in the actual and necessary expenses of owning and maintaining the units which have resulted from substantial general increases in real property taxes, utility rates, or similar costs).

> HACA Policy
>
> An owner's request for a rent increase must be submitted to HACA 60 days prior to the anniversary date of the HAP contract, and must include the new rent amount the owner is proposing.

The PHA may not approve and the owner may not receive any increase of rent to owner until and unless the owner has complied with requirements of the HAP contract, including compliance with HQS. The owner may not receive any retroactive increase of rent for any period of noncompliance.

**Rent Decrease**

If there is a decrease in the rent to owner, as established in accordance with program requirements such as a change in the FMR or exception payment standard, or reasonable rent amount, the rent to owner must be decreased regardless of whether the owner requested a rent adjustment, except where the PHA has elected within the HAP contract to not reduce rents below the initial rent under the initial HAP contract.

**Notice of Rent Change**

The rent to owner is redetermined by written notice by the PHA to the owner specifying the amount of the redetermined rent. The PHA notice of rent adjustment constitutes an amendment of the rent to owner specified in the HAP contract. The adjusted amount of rent to owner applies for the period of 12 calendar months from the annual anniversary of the HAP contract.

> HACA Policy
>
> HACA will provide the owner with at least 30 days written notice of any change in the amount of rent to owner.

**PHA-Owned Units [24 CFR 983.301(g)]**

For PHA-owned PBV units, the initial rent to owner and the annual redetermination of rent at the anniversary of the HAP contract are determined by the independent entity approved by HUD. The PHA must use the rent to owner established by the independent entity.

### 17-VIII.C. REASONABLE RENT [24 CFR 983.303]

At the time the initial rent is established and all times during the term of the HAP contract, the rent to owner for a contract unit may not exceed the reasonable rent for the unit as determined by the PHA, except where the PHA has elected within the HAP contract to not reduce rents below the initial rent under the initial HAP contract.

**When Rent Reasonable Determinations Are Required**

The PHA must redetermine the reasonable rent for a unit receiving PBV assistance whenever any of the following occur:

- There is a 10 percent or greater decrease in the published FMR in effect 60 days before the contract anniversary (for the unit sizes specified in the HAP contract) as compared with the FMR that was in effect one year before the contract anniversary date;

- The PHA approves a change in the allocation of responsibility for utilities between the owner and the tenant;

- The HAP contract is amended to substitute a different contract unit in the same building or project; or

- There is any other change that may substantially affect the reasonable rent.

**How to Determine Reasonable Rent**

The reasonable rent of a unit receiving PBV assistance must be determined by comparison to rent for other comparable unassisted units. When making this determination, the PHA must consider factors that affect market rent. Such factors include the location, quality, size, type and age of the unit, as well as the amenities, housing services maintenance, and utilities to be provided by the owner.

**Comparability Analysis**

For each unit, the comparability analysis must use at least three comparable units in the private unassisted market. This may include units in the premises or project that is receiving project-based assistance. The analysis must show how the reasonable rent was determined, including major differences between the contract units and comparable unassisted units, and must be retained by the PHA. The comparability analysis may be performed by PHA staff or by another qualified person or entity. Those who conduct these analyses or are involved in determining the housing assistance payment based on the analyses may not have any direct or indirect interest in the property.

**PHA-Owned Units**

For PHA-owned units, the amount of the reasonable rent must be determined by an

~~independent agency approved by HUD in accordance with PBV program requirements. The~~ independent agency must provide a copy of the determination of reasonable rent for PHA-owned units to the PHA and to the HUD field office where the project is located.

**Owner Certification of Reasonable Rent**
By accepting each monthly housing assistance payment, the owner certifies that the rent to owner is not more than rent charged by the owner for other comparable unassisted units in the premises. At any time, the PHA may require the owner to submit information on rents charged by the owner for other units in the premises or elsewhere.

## 17-VIII.D. EFFECT OF OTHER SUBSIDY AND RENT CONTROL

In addition to the rent limits discussed in Section 17-VIII.B above, other restrictions may limit the amount of rent to owner in a PBV unit. In addition, certain types of subsidized housing are not even eligible to receive PBV assistance (see Section 17-II.D).

**Other Subsidy [24 CFR 983.304]**
To comply with HUD subsidy layering requirements, at the discretion of HUD or its designee, a PHA shall reduce the rent to owner because of other governmental subsidies, including tax credits or tax exemptions, grants, or other subsidized funding.

For units receiving assistance under the HOME program, rents may not exceed rent limits as required by that program.

For units in any of the following types of federally subsidized projects, the rent to owner may not exceed the subsidized rent (basic rent) or tax credit rent as determined in accordance with requirements for the applicable federal program:

- An insured or non-insured Section 236 project;

- A formerly insured or non-insured Section 236 project that continues to receive Interest Reduction Payment following a decoupling action;

- A Section 221(d)(3) below market interest rate (BMIR) project;

- A Section 515 project of the Rural Housing Service;

- Any other type of federally subsidized project specified by HUD.

*Combining Subsidy*

Rent to owner may not exceed any limitation required to comply with HUD subsidy layering requirements.

**Rent Control [24 CFR 983.305]**
In addition to the rent limits set by PBV program regulations, the amount of rent to owner may

also be subject to rent control or other limits under local, state, or federal law.

# PART IX: PAYMENTS TO OWNER

## 17-IX.A. HOUSING ASSISTANCE PAYMENTS [24 CFR 983.351]

During the term of the HAP contract, the PHA must make housing assistance payments to the owner in accordance with the terms of the HAP contract. During the term of the HAP contract, payments must be made for each month that a contract unit complies with HQS and is leased to and occupied by an eligible family. The housing assistance payment must be paid to the owner on or about the first day of the month for which payment is due, unless the owner and the PHA agree on a later date.

Except for discretionary vacancy payments, the PHA may not make any housing assistance payment to the owner for any month after the month when the family moves out of the unit (even if household goods or property are left in the unit).

The amount of the housing assistance payment by the PHA is the rent to owner minus the tenant rent (total tenant payment minus the utility allowance).

In order to receive housing assistance payments, the owner must comply with all provisions of the HAP contract. Unless the owner complies with all provisions of the HAP contract, the owner does not have a right to receive housing assistance payments.

## 17-IX.B. VACANCY PAYMENTS [24 CFR 983.352]

If an assisted family moves out of the unit, the owner may keep the housing assistance payment for the calendar month when the family moves out. However, the owner may not keep the payment if the PHA determines that the vacancy is the owner's fault.

> HACA Policy
>
> If HACA determines that the owner is responsible for a vacancy and, as a result, is not entitled to the keep the housing assistance payment, HACA will notify the landlord of the amount of housing assistance payment that the owner must repay. HACA will require the owner to repay the amount owed in accordance with the policies defined in HACA's HCV Administrative Plan Section 16-IV.B.

At the discretion of the PHA, the HAP contract may provide for vacancy payments to the owner. The PHA may only make vacancy payments if:

- The owner gives the PHA prompt, written notice certifying that the family has vacated the unit and identifies the date when the family moved out (to the best of the owner's knowledge);

- The owner certifies that the vacancy is not the fault of the owner and that the unit was vacant during the period for which payment is claimed;

- The owner certifies that it has taken every reasonable action to minimize the likelihood and length of vacancy; and

- The owner provides any additional information required and requested by the PHA to verify that the owner is entitled to the vacancy payment.

The owner must submit a request for vacancy payments in the form and manner required by the PHA and must provide any information or substantiation required by the PHA to determine the amount of any vacancy payment.

> HACA Policy
>
> If an owner's HAP contract calls for vacancy payments to be made, and the owner wishes to receive vacancy payments, the owner must have properly notified HACA of the vacancy in accordance with the policy in Section 17-VI.F.
> In order for a vacancy payment request to be considered, it must be made within 10 business days of the end of the period for which the owner is requesting the vacancy payment. The request must include the required owner certifications and HACA may require the owner to provide documentation to support the request. If the owner does not provide the information requested by HACA within 10 business days of HACA's request, no vacancy payments will be made.

## 17-IX.C. TENANT RENT TO OWNER [24 CFR 983.353]

The tenant rent is the portion of the rent to owner paid by the family. The amount of tenant rent is determined by the PHA in accordance with HUD requirements. Any changes in the amount of tenant rent will be effective on the date stated in the PHA notice to the family and owner. The family is responsible for paying the tenant rent (total tenant payment minus the utility allowance). The amount of the tenant rent determined by the PHA is the maximum amount the owner may charge the family for rental of a contract unit. The tenant rent covers all housing services, maintenance, equipment, and utilities to be provided by the owner. The owner may not demand or accept any rent payment from the tenant in excess of the tenant rent as determined by the PHA. The owner must immediately return any excess payment to the tenant.

**Tenant and PHA Responsibilities**
The family is not responsible for the portion of rent to owner that is covered by the housing assistance payment and the owner may not terminate the tenancy of an assisted family for nonpayment by the PHA.

Likewise, the PHA is responsible only for making the housing assistance payment to the owner in accordance with the HAP contract. The PHA is not responsible for paying tenant rent, or any other claim by the owner, including damage to the unit. The PHA may not use housing assistance payments or other program funds (including administrative fee reserves) to pay any

part of the tenant rent or other claim by the owner.

**Utility Reimbursements**

If the amount of the utility allowance exceeds the total tenant payment, the PHA must pay the amount of such excess to the tenant as a reimbursement for tenant-paid utilities, and the tenant rent to the owner must be zero.

The PHA may pay the utility reimbursement directly to the family or to the utility supplier on behalf of the family. If the PHA chooses to pay the utility supplier directly, the PHA must notify the family of the amount paid to the utility supplier.

> HACA Policy
>
> HACA will make utility reimbursements payments directly to the family.

## 17-IX.D. OTHER FEES AND CHARGES [24 CFR 983.354]

**Meals and Supportive Services**

With the exception of PBV assistance in assisted living developments, the owner may not require the tenant to pay charges for meals or supportive services. Non-payment of such charges is not grounds for termination of tenancy.

In assisted living developments receiving PBV assistance, the owner may charge for meals or supportive services. These charges may not be included in the rent to owner, nor may the value of meals and supportive services be included in the calculation of the reasonable rent. However, non-payment of such charges is grounds for termination of the lease by the owner in an assisted living development.

**Other Charges by Owner**

The owner may not charge extra amounts for items customarily included in rent in the locality or provided at no additional cost to unsubsidized tenants in the premises.

| EXHIBIT 17-1: PBV DEVELOPMENT INFORMATION |
|---|
| (Fill out one for each development) |

**Date:** [Enter the date on which this form was completed]

## DEVELOPMENT INFORMATION

**Development Name:** [Insert name of PBV development]

**Address:** [Insert full address of PBV development]

**Owner Information:** [Insert PBV development owner name and contact information. If development is PHA-owned, enter "PHA-owned."]

**Property Management Company:** [Insert property management company name and contact information, or enter "None"]

**PHA-Owned:** [Enter "Yes" or "No." If yes, enter name of independent entity]

**Mixed Finance Development:** [Enter "Yes" or "No." If yes, list other types of funding and units to which other funding applies.]

## HAP CONTRACT

**Effective Date of Contract:** [Enter start date of HAP contract]

**HOTMA Requirements:** [If HAP contract was signed prior to April 18, 2017, enter "Pre-HOTMA." If HAP contract was signed on or after April 18, 2017, enter "Post-HOTMA."]

**Term of HAP Contract:** [Enter term from HAP contract]

**Expiration Date of Contract:** [Enter expiration date from HAP contract]

## PBV UNITS

|  | 0 BR | 1 BR | 2 BR | 3 BR | 4 BR | 5 BR | Total |
|---|---|---|---|---|---|---|---|
| **# of Units** |  |  |  |  |  |  |  |
| **Initial Contract Rent** | $ | $ | $ | $ | $ | $ |  |

**Structure Type:** [Identify the structure type, i.e. Single Family Detached, Duplex or Two

Family, Row House or Town House, Low Rise (3,4 Stories, including Garden Apartment), High-rise (5 or more stories)

**Housing Type:** [Identify if the units are an Independent Group Residence or Single Room Occupancy]

**UTILITY RESPONSIBILITY**

**[Enter in Accordance with the HAP Exhibit C]**

| Utility | Fuel Type<br><br>(Gas, Electric, Oil, Coal, Other) | Paid By<br>(Tenant/Owner) | Provided By<br>(Tenant/Owner) |
|---|---|---|---|
| Heating | Electric | Tenant | Owner |
| Cooking | Electric | Tenant | Owner |
| Water Heating | Electric | Tenant | Owner |
| Other Electric | | Tenant | Owner |
| Water | | Owner | Owner |
| Sewer | | Owner | Owner |
| Trash Collection | | Owner | Owner |
| Air Conditioning | | Tenant | Owner |
| Refrigerator | | | |
| Range/Microwave | | | |
| Other (specify) | | | |

**Accessible Units and Features:** [Identify which units are accessible and describe accessibility features or enter "None"]

**Target Population:** [Describe targeted population in accordance with HAP contract or enter "None"]

**Excepted Units:** [Identify excepted unit types below or enter "None"]

- **Supportive Services:** [Enter "Yes, see Exhibit D of HAP Contract" or enter "No"]
- **Elderly Units**: [Enter "Yes" or "No." If yes, identify which units are elderly units.]

- **Disabled Units** (only for HAP contracts executed prior to April 18, 2017) [Enter "Yes" or "No." If yes, identify which units are for persons with disabilities.]

- **FUPY/FYI Units:** [Enter "Yes" or "No." If yes, identify which units are FUP units]

- **Are units excepted because they are located in a low-poverty census tract area?:** [Enter "Yes" or "No"]

## WAITING LIST AND SELECTION

**Waiting List Type:** [ Enter "Site-based waiting list," "Combined with HCV," "Waiting list for entire PBV program," or "Merged with another assisted housing program"]

**Preferences:** [Enter "Same as HCV; see Chapter 4" or describe preferences offered. If different from HCV, also note in Section 17.1.B of this policy.]

**Preference Verification:** [Enter "Same as HCV; see Chapter 7" or describe for each preference listed above. If different from HCV, note in Section 17.1.B of this policy.]

**For the PBV program, is the income limit the same as the HCV program?** (Note: In mixed finance developments, other income limits may also apply.) [Enter "Same as HCV; see Chapter 3" or clearly describe. If different from HCV, note in Section 17.1.B of this policy.]

## OCCUPANCY

**Subsidy Standards:** [Enter "Same as HCV; see Chapter 5" or describe. If different from HCV, note in Section 17.1.B of this policy]

**Vacancy Payments:** [Enter in accordance with HAP contract Part 1, e, 2 and Section 17-V.F. within this chapter]

**EXHIBIT 17-2: Special Provisions Applying to TPVs Awarded as Part of a Voluntary Conversion of Public Housing Units in Projects that Include RAD PBV Units**

**[24 CFR Part 972.200; Notice PIH 2019-05; Notice PIH 2019-23]**

Under certain circumstances, HUD allows small PHAs to reposition a public housing project (or portion of a project) by voluntarily converting units to tenant-based housing choice voucher assistance. In order to preserve affordable housing for residents of the project, the PHA is given priority to receive replacement tenant protection vouchers (TPVs). As part of the voluntary conversion, the PHA has the option to continue to operate it as rental housing. If so, the PHA or subsequent owner must allow existing families to remain in their units using the TPV in the form of tenant-based assistance.  In this situation, however, the PHA may choose to project-base these TPVs in the former public housing project. Families must still be provided with the option to remain in their unit using tenant-based assistance. In order for the PHA to project-base the assistance and include these units on the PBV HAP contract, the family must voluntarily consent in writing to PBV assistance following the requirements in Appendix A of Notice PIH 2019-05. If the family fails to consent to PBV assistance and chooses to remain using tenant-based assistance, the family's unit is excluded from the PBV HAP contract until the family moves out or consents to switching to PBV assistance. In general, all applicable program regulations and guidance for the standard PBV program apply to these units.

The PHA may also convert units in the same former public housing project to the PBV program under the rental assistance demonstration (RAD) program. The RAD statute authorizes HUD to waive certain statutory and regulatory provisions governing the standard PBV program and specify alternative requirements. In order to facilitate the uniform treatment of residents and units at the project, Notice PIH 2019-23 extended some of the alternative requirements to non-RAD PBV units in the converted project (i.e., the TPV units in the project). As such, while PBV TPV units in the converted project generally follow the requirements for the standard PBV program listed in this chapter, where HUD has specified alternative requirements for non-RAD PBV units in the project, PBV TPV units will instead follow the requirements outlined in Chapter 18 of this policy for the RAD PBV program.

**RAD Requirements Applicable to Non-RAD units in the Project**

| Alternative Requirement under RAD as Listed in Notice PIH 2019-23 | Standard PBV Policy That Does Not Apply | Applicable Policy in Chapter 18 |
|---|---|---|
| 1.6.A.4. Site Selection – Compliance with PBV Goals | 17-II.G. SITE SELECTION STANDARDS applies with the exception of deconcentration of poverty and expanding | 18-II.F. SITE SELECTION STANDARDS |

| | | |
|---|---|---|
| | housing and economic opportunity requirements. | |
| 1.6.B.5.d. PBV Site-Specific Utility Allowances | Alternative requirement under RAD. No corresponding policy in Chapter 17. | 18-VII.C. UTILITY ALLOWANCES |
| 1.6.C.1. No Rescreening of Tenants upon Conversion | Policies contained in Chapter 3 relating to eligibility do not apply to existing tenants who receive TPVs. | 18-V.B. PROHIBITED RESCREENING OF EXISTING TENANTS UPON CONVERSION |
| 1.6.C.2. Right to Return | Alternative requirement under RAD. No corresponding policy in Chapter 17. | 18-I.D. RELOCATION REQUIREMENTS |
| 1.6.C.3. Phase-in of Tenant Rent Increases | Alternative requirements under RAD. No corresponding policy in Chapter 17. | 18-VIII.D. PHASE-IN OF TENANT RENT INCREASES |
| 1.6.C.4. Family Self Sufficiency (FSS) and Resident Opportunities and Self-Sufficiency Service Coordinator (ROSS-SC) Programs | Not covered in administrative plan. | 18-VI.C. PUBLIC HOUSING FSS AND ROSS PARTICIPANTS |
| 1.6.C.5. Resident Participation and Funding | Alternative requirement under RAD. No corresponding policy in Chapter 17. | 18-VI.D. RESIDENT PARTICIPATION AND FUNDING |
| 1.6.C.6. Resident Procedural Rights | Policies related to hearings in Chapter 16 apply, with added procedural rights and notice requirements as outlined in Chapter 18. | 18-VI.H. RESIDENTS' PROCEDURAL RIGHTS |

| 1.6.C.7. Earned Income Disregard (EID) | Alternative requirements under RAD for in-place residents.<br><br>New admissions follow policies in Chapter 6. | 18-VI.G. EARNED INCOME DISALLOWANCE |
|---|---|---|
| 1.6.C.8. Jobs Plus | Not covered in administrative plan. | No corresponding policy. |
| 1.6.C.9. When Total Tenant Payment Exceeds Gross Rent | Alternative requirements under RAD for in-place residents.<br><br>New admissions follow policies in 17-VII.B. LEASE, Continuation of Housing Assistance Payments. | 18-VI.B. LEASE, Continuation of Housing Assistance Payments |
| 1.6.C.10. Under-Occupied Unit | Alternative requirements under RAD for in-place residents.<br><br>New admissions follow 17-VII.C. MOVES, Overcrowded, Under-Occupied, and Accessible Units | 18-VI.E. MOVES, Overcrowded, Under-Occupied, and Accessible Units |
| 1.6.D.4. Establishment of Waiting List | Alternative requirements under RAD for initial establishment of the waiting list.<br><br>Once waiting list is established, follow 17-VI.D. SELECTION FROM THE WAITING | 18-V.D. ORGANIZATION OF THE WAITING LIST |

| | LIST | |
|---|---|---|
| 1.6.D.10. Initial Certifications and Tenant Rent Calculations | Alternative requirements under RAD for in-place residents. No corresponding policy in Chapter 17. | 18-VIII.C. TENANT RENT TO OWNER, Initial Certifications |

Note, while Notice PIH 2019-05 states that the PHA must screen families for eligibility for a tenant protection voucher and that families must be below the low-income limit (80 percent of AMI), Notice PIH 2019-23 waives these requirements for residents in projects that include RAD PBV units.

# CHAPTER 18

# CHOICE MOBILITY POLICY

As part of the Rental Assistance Demonstration (RAD), HUD requires Housing Authorities to give residents the choice to request a Housing Choice Voucher after living in a Project Based Rental Assistance (PBRA) property for 24 months.  HUD calls this "Choice Mobility".   When HACA transitions Public Housing properties to PBRA, the Choice Mobility policy would be followed as outlined in this Chapter.

## I.  Definitions:

**Covered Project:**  Any Public Housing property that has converted to the Project Based Rental Assistance (PBRA) program through RAD.

**Choice Mobility:**  The opportunity for families to request a Housing Choice Voucher (HCV) and move into the private rental market with voucher assistance.

**Turnover Caps:**  The maximum number of families that can receive a voucher in a calendar year.  PHAs can establish caps for the maximum number of families that can receive a voucher from each property in the calendar year.  PHAs can also establish caps for the maximum number of vouchers from all properties combined that can receive a voucher in a calendar year.

## II.  Eligibility and Voucher Caps

HUD seeks to provide all residents of Covered Projects with viable  Choice Mobility options. The Housing Choice Voucher (HCV) program provides the most options for families to choose where they want to live within that housing authority's jurisdiction.

PHAs that are applying to convert the assistance of a  project to PBRA are required to provide a Choice-Mobility option to residents of  Covered Projects in accordance with the following:

    A. ***Resident Eligibility***. Residents have a right to move with tenant-based rental  assistance (e.g., Housing Choice Voucher (HCV)) the later of: (a) 24 months  from the date of execution of the HAP or (b) 24 months after the move-in date.

    B. ***Voucher Inventory Turnover Cap***. Recognizing the limitation on the  availability of turnover vouchers from year to year, a voucher agency would  not be required, in any year, to provide more than one-third of its turnover  vouchers to the residents of Covered Projects. While a voucher agency is not  required to establish a voucher inventory turnover cap, if such a cap is  implemented the voucher agency must create and maintain a waiting list in the  order in which the requests from eligible households were received.

C. ***Project Turnover Cap.*** Recognizing the limited availability of turnover vouchers and the importance of managing turnover in the best interests of the property, in any year, a Project Owner and voucher agency may agree to limit the number of Choice-Mobility moves exercised by eligible households to 15 percent of the assisted units in the project. (For example, if the project has 100 assisted units, the Project Owner and voucher agency could limit the number of families exercising Choice Mobility to 15 in any year, but not to less than 15.) While a Project Owner and voucher agency are not required to establish a project turnover cap, if such a cap is implemented the voucher agency must create and maintain a waiting list in the order in which the requests from eligible households were received.

### HACA Policy

HACA will provide all residents the opportunity to request a Housing Choice Voucher after the later of a) 24 months from the date of the execution of the HAP contract, or b) 24 months from the date of move in.

- If a family moves from one covered project to another covered project, their 24 month clock resets. These families will have to wait for 24 months from the date of move in to the new property, before they can exercise Choice Mobility.
- If a family transfers within the same covered project, their 24 month clock does not reset. They will be eligible to request a Choice Mobility voucher at the later of: (a) 24 months from the date of execution of the HAP or (b) 24 months after the move-in date.
- A family may request the choice mobility voucher at any time after completing the 24 month requirement. They remain eligible as long as they continue living at the same covered project.
- A family that receives a Choice Mobility voucher, but allows it to expire without using it, can request another Choice Mobility voucher. However, they must wait 1 year from the date of the issuance of the expired voucher before requesting another Choice Mobility voucher. When they do request again, they will start the process from the beginning and are subject to any waiting lists in place at that time.

HACA will implement the voucher inventory cap. Each calendar year, the HCV program will only make 1/3 of its turnover vouchers available to families exercising Choice Mobility from any of its 18 covered projects transitioning into PBRA through the Rental Assistance Demonstration (RAD). HACA will establish an agency-wide Choice Mobility waiting list for times when there are more requests for vouchers than vouchers available due to the cap.

HACA will implement the Project Turnover Cap. In any calendar year, we will limit

the number of Choice-Mobility moves exercised by eligible households to 15% of the assisted units in the project in any given year. HACA will maintain a Choice-Mobility Priority List in the order in which the requests from eligible households were received.

The HCV program also provides the opportunity to move to other parts of the country by exercising the portability options. Families will be required to follow the housing authority's guidelines regarding when they can exercise the portability option.

### HACA Policy

In order to be eligible for the Choice Mobility option, families have to live in Austin, in a HACA owned PBRA property for at least 2 years. These families meet HACA's HCV program requirements and are eligible to exercise portability when they first receive a voucher.

## III.  Notification of Eligibility

In keeping with HUD's goal to provide viable Choice Mobility options to residents of all covered projects, PHAs should provide clear notification and explanation of the Choice Mobility options available to them.

### HACA Policy

At the time of the initial lease signing, HACA will provide a copy of the Choice Mobility policy to the family and explain the Choice Mobility option. HACA will provide clear direction and guidance regarding how to request a Choice Mobility voucher.

If anything changes in the method for requesting the Choice Mobility voucher, HACA will provide written notification to the residents at least 30 days in advance of the change becoming effective.

## IV.  Waiting Lists

PHA's that establish a voucher turnover cap are required to create a waiting list for families that request the Choice Mobility voucher.

### HACA Policy

HACA will establish a Choice Mobility waiting list for all eligible families that request a voucher. The waiting list will be managed by HACA's centralized Admissions Department. Eligible families that request the voucher will be placed directly onto the Choice Mobility waiting list in order of date and time of application.

HACA will remove families from the Choice Mobility waiting list who move out of the covered project before receiving a voucher.

51

- If a family moves out of the covered project into the private rental market after being placed on the Choice Mobility waiting list, they are no longer eligible for the voucher and their name will be removed from the Choice Mobility waiting list.

- If a family moves from one covered project to another covered project after being placed on the Choice Mobility waiting list, their 2 year clock resets. They will be removed from the Choice Mobility waiting list. They can re-apply once they have lived at the new covered project for 2 years.

Families that are already on the regular HCV waiting list will be allowed to request a Choice Mobility voucher if they are eligible. Families will be allowed to keep their place on both lists until one of the following happens:

- The family moves out of the covered project and is no longer eligible to be on the Choice Mobility list. The family will be removed from the Choice Mobility waiting list, but maintain their position on the regular HCV waiting list.
- The family voluntarily withdraws their name from one or both lists.
- The family receives a voucher and exercises the voucher by leasing up in the voucher program. The family will then be removed from the other list.
    - If a family receives a voucher through the regular HCV waiting list, but does not exercise the voucher (i.e. lease up in the voucher program), they will remain on the Choice Mobility waiting list.

## V.  Exercising the Choice Mobility Option

In order to ensure that all residents at all covered projects have an equal and fair opportunity to request and receive a Choice Mobility voucher, PHAs should provide clear guidance and instructions regarding how to apply for the voucher.

### HACA Policy

In order to maintain a safe, orderly and fair process for families to request a Choice Mobility voucher, HACA will implement the following:

- **Voucher Request:**
    - When a family is eligible to request a voucher, they must do so in writing using the Choice Mobility Voucher application provided at the property.
    - The application must be submitted to the management office at the covered property or at HACA's Central Administration building.
    - Once received, the property management staff or central office staff will forward the request to the Admissions Department to be placed on the Choice Mobility waiting list.

- **Acknowledgement of Request:**
  - o Once the request is received and processed onto the Choice Mobility waiting list, the Admissions Department will send the family a notice acknowledging receipt of the voucher request (See Appendix 3).
  - o This is the family's confirmation that they are on the Choice Mobility waiting list.
  - o The acknowledgement of request will be sent to the family within 5 business days of receipt of the request.

- **Waiting List Management:**
  - o All applications received will be placed on the Choice Mobility waiting list in order of application date and time.
  - o HACA has chosen to implement the project turnover cap of 15% per property. Once a property has reached its 15% turnover cap for the calendar year, all applicants for that property will be skipped until the following year when the cap resets.

When a family is drawn from the Choice Mobility waiting list, they will be invited to attend the Housing Choice Voucher (HCV) program eligibility interview.

## VI.  Screening Process for the Choice Mobility HCV Voucher

In order to receive a Housing Choice voucher, families will be required to meet all the eligibility requirements for the HCV program in effect at the time of their eligibility processing.  These requirements can be found in the HCV Administrative Plan.

### HACA Policy

HACA will screen all Choice Mobility families using the same criteria as for all other families.  However, HACA will streamline the eligibility determination process in the following ways:

- HACA will use the certifications of identification, age, social security number and citizenship that it already has on file for the family.
- HACA will review the most recent certification and 50059 for basic information about the family composition and annual household income.
- HACA will only require new verification of income if the verifications for the most recent certification are too old to meet the criteria for the HCV program.

If eligible to receive a voucher, families will follow the HCV program rules and guidelines for  using the voucher.  Families are reminded of the following:

- ***The voucher has an expiration date.***  If extensions are available, families must follow the HCV program guidelines in effect at that time to request an extension.  Failure to use the voucher before it expires will result in loss of the voucher.
- ***Receipt of a voucher is not a guarantee that the family will be able to find a***

*place to use the voucher.*  Landlords have their own screening criteria which families will have to meet to be able to live at that property.

- ***The family's lease at their current property requires at least 30 day notice to vacate.***  The family must provide this notice to their current property management staff.

## VII.  Transitioning from Project Based Rental Assistance to the Housing Choice Voucher Program

When transitioning from PBRA to the HCV program with a Choice Mobility voucher, program participants are required to fulfill their obligations to the terms of the PBRA lease as well as all HCV requirements.  Families are not allowed to receive assistance from both programs at the same time.   To assist with the transition process and prevent duplicate assistance, PHA's should develop policies and guidelines to ensure that both program requirements are met.

> ### HACA Policy
> Residents at a HACA PBRA property will be required to complete the following when transitioning to HACA's HCV program with a choice mobility voucher:
> - Remain current on all rent, fees or other monies owed to the PBRA property. Families with outstanding debts will be considered ineligible (including families who are in a repayment agreement). Eligibility for a housing choice voucher will require the debt to be paid in full.
> - Provide at least 30 day notice of their intent to vacate the unit to the property management.
> - Participate in the move out inspection.
> - Turn in their keys to the property management.
> - Pay all move out expenses that may be charged after moving to their new home with  voucher assistance.
>   - If necessary, repayment agreements can be established to pay any outstanding move out balances.
>   - Failure to pay the move out balance or to remain current in any repayment agreements that are established is grounds for termination of the family's voucher assistance.
> - Pay all moving expenses related to the move from the PBRA property to their voucher assisted unit.
>
> HACA and PBRA property staff will work to facilitate this process by doing the following:
>
> - Communicate between departments information related to the issuance of the voucher, move out notices, voucher extensions and specific dates of move out / move in.
>   - Note:  Coordination of communication between departments does not remove any of the family's obligations.
> - Communicate the move out date from the PBRA program to the HCV Intake

Team to prevent the overlapping of assistance.
   o The move out from PBRA will not be effective until the property
     manager receives the keys from the resident family.
   o The family will be required to pay the full rental cost for any days that
     they have moved in to their new unit before returning the keys to the
     PBRA property management.
   o The voucher assistance will not start until the day after the family
     provides the keys to the PBRA property management.

## VIII.  Promoting Self-Sufficiency Through Choice Mobility

The decision about where to live can have a significant impact on a family's journey toward
self-sufficiency.  Through the Choice Mobility voucher option, families living in the PBRA
property are given the opportunity to make that decision.  Therefore PHA's should strategize
how to maximize the use of the Choice Mobility voucher as a self-sufficiency tool.

### HACA Policy
Within available resources, HACA will intentionally strategize and leverage the
utilization of specific supportive services to provide a solid foundation for the use of
the Choice Mobility voucher as a self-sufficiency and resource building tool.

- HACA will explore how to efficiently and effectively use the 2 + years that
  families are living in PBRA to offer community development services that
  focus on preparing families for transition to use of a voucher in the private
  rental market.  Such services may include, but are not limited to, financial
  literacy training, credit counseling and credit improvement, addressing rental
  history, increasing income through employment, financial coaching, and home
  maintenance and upkeep among others.
- HACA will explore how to use the resources available (i.e. opportunity
  mapping) to help direct families toward areas of higher opportunity when they
  are searching for neighborhoods and housing that meets their needs and where
  they can use the voucher.  This will include helping families to understand
  how to use these tools to gain information on items such as schools, supportive
  services and transportation.

# CHAPTER 19
## SPECIAL PURPOSE VOUCHERS

### INTRODUCTION

Special purpose vouchers are specifically funded by Congress in separate appropriations from regular HCV program funding in order to target specific populations. Special purpose vouchers include vouchers for the following programs:

- Family Unification Program (FUP)

- Foster Youth to Independence (FYI) program

- Veterans Affairs Supportive Housing (VASH)

- Mainstream

- Non-Elderly Disabled (NED)

- Stability Vouchers (SV)

- Emergency Housing Vouchers (EHV)

  PHA Policy

  The PHA will administer the following types of special purpose vouchers: **FUP; FYI; VASH; Mainstream; NED; SV; EHV**

This chapter describes HUD regulations and PHA policies for administering special purpose vouchers. The policies outlined in this chapter are organized into five sections, as follows:

Part I: Family Unification Program (FUP)

Part II: Foster Youth to Independence (FYI) program

Part III: Veterans Affairs Supportive Housing (VASH)

Part IV: Mainstream voucher program

Part V: Non-Elderly Disabled (NED) vouchers

Part VI: Stability Vouchers (SV)

PartVII: Emergency Housing Vouchers (EHV) Temporary Policy Supplement

Except as addressed by this chapter and as required under federal statute and HUD requirements, the general requirements of the HCV program apply to special purpose vouchers.

## PART I: FAMILY UNIFICATION PROGRAM (FUP)

### 19-I.A. PROGRAM OVERVIEW [Fact Sheet, Housing Choice Voucher Program Family Unification Program (FUP)]

**Overview**

The Family Unification Program (FUP) was authorized by Congress in 1990 to help preserve and reunify families. PHAs that administer the program provide vouchers to two different populations—FUP families and FUP youth.

Families eligible for FUP are families for whom the lack of adequate housing is a primary factor in:

- The imminent placement of the family's child or children in out-of-home care; or
- The delay in the discharge of the child or children to the family from out-of-home care.

There is no time limitation on FUP family vouchers, and the family retains their voucher as long as they are HCV-eligible. There is no requirement for the provision of supportive services for FUP family vouchers.

Youth eligible for FUP are those who:

- Are at least 18 years old and not more than 24 years of age;
- Have left foster care or will leave foster care within 90 days, in accordance with a transition plan described in section 475(5)(H) of the Social Security Act at age 16 and older; and
- Are homeless or at risk of becoming homeless.

FUP youth vouchers are limited by statute to a period between 36 and 60 months of housing assistance. Supportive services must also be provided to FUP-eligible youth by the Public Child Welfare Agency (PCWA) or by another agency or organization under contract with the PCWA for the period of time defined in the notice or Notice of Funding Availability/Opportunity (NOFA/O) for which funding was made available.

PHAs that wish to administer FUP vouchers must apply to HUD by submitting an application under an active Notice of Funding Opportunity (NOFO). While the FUP program is administered in accordance with HCV regulations, the FUP NOFOs issued by HUD provide specific program information and requirements.

In order to administer the program, the PHA must also form a partnership with a local PCWA who is responsible for determining the family or youth meets FUP eligibility requirements and referring them to the PHA. Once the referral is received, the PHA is responsible for placing the FUP family or youth on the PHA's waiting list and determining whether they are eligible to receive assistance under the PHA's HCV program.

**Assigning Vouchers [FUP FAQs]**

The PHA may, but is not required to, assign a specific number or percentage of FUP vouchers for FUP youths and FUP families. Unless the PHA assigns a specific number or percentage of FUP vouchers to a designated FUP population, the PHA must serve any referrals (youths or families) that meet all program eligibility requirements up to the PHA's designated FUP program size.

HACA Policy

> HACA has not designated any specific number or percentage of FUP vouchers for youths or families. HACA will serve all referrals that meet program eligibility requirements, up to HACA's FUP voucher allocation.

### 19-I.B. PUBLIC CHILD WELFARE AGENCY (PCWA)

Families and youth do not apply directly to the PHA for FUP vouchers. They are instead referred by a PCWA with whom the PHA has entered into a Memorandum of Understanding (MOU). The partnering PCWA initially determines whether the family or youth meets the FUP program eligibility requirements listed in 19-I.C. and 19-I.D. and then refers those families or youths to the PHA.

HUD strongly encourages PHAs and PCWAs to make decisions collaboratively on the administration of the program and to maintain open and continuous communication. The PCWA must have a system for identifying FUP-eligible youth within the agency's caseload and for reviewing referrals from a Continuum of Care (COC) if applicable.

HACA Policy

HACA has entered into an MOU with the following partnering organizations:

***Texas Department of Family Protective Services (DFPS) (PCWA)*Supportive Services**

The PCWA must provide supportive services for the period of time defined in the notice or NOFA/O for which the funding was made available to all FUP-eligible youth regardless of their age. The MOU between the PHA and the PCWA should identify the period of time in which supportive services will be provided.

HACA Policy

DFPS and/or its designated contractor for its Aftercare Transitional Living Services Program (ACTS) will provide supportive services for all FUP youth for a period of no less than 18 months after lease-up.

Supportive services may be provided to FUP-eligible youth by the PCWA or by another agency or organization under agreement or contract with the PCWA, including the PHA. The organization providing the services and resources must be identified in the

MOU. The following services must be offered.

- Basic life skills information or counseling on money management, use of credit, housekeeping, proper nutrition or meal preparation, and access to health care (e.g., doctors, medication, and mental and behavioral health services);

- Counseling on compliance with rental lease requirements and with HCV program participant requirements, including assistance or referrals for assistance on security deposits, utility hook-up fees, and utility deposits;

- Providing such assurances to owners of rental property as are reasonable and necessary to assist a FUP-eligible youth to rent a unit with a FUP voucher;

- Job preparation and attainment counseling (where to look and how to apply, dress, grooming, relationships with supervisory personnel, etc.); and

- Educational and career advancement counseling regarding attainment of general equivalency diploma (GED), or attendance or financing of education at a technical school, trade school, or college, including successful work ethic and attitude models.

HACA Policy

The following additional supportive services will be offered as needed: self-esteem and personal relationships; parenting skills; counseling and mentoring.

A FUP-eligible youth cannot be required to participate in these services as condition of receipt of the FUP voucher.

### 19-I.C. FUP FAMILY VOUCHER ELIGIBILITY CRITERIA

FUP family assistance is reserved for eligible families that the PCWA has certified are a family for whom a lack of adequate housing is a primary factor in:

- The imminent placement of the family's child or children in out-of-home care, or

- The delay in the discharge of the child or children to the family from out-of-home care.

*Lack of adequate housing* means the family meets any one of the following conditions:

- Living in substandard housing, which refers to a unit that meets any one of the following conditions:

  o Does not have operable indoor plumbing

  o Does not have a usable flush toilet inside the unit for the exclusive use of a family or youth

  o Does not have a usable bathtub or shower inside the unit for the exclusive use of a family or youth

  o Does not have electricity, or has inadequate or unsafe electrical service

  o Does not have a safe or adequate source of heat

- o Should, but does not, have a kitchen

  - o Has been declared unfit for habitation by an agency or unit of government, or in its present condition otherwise endangers the health, safety, or well-being of the family or youth

  - o Has one or more critical defects, or a combination of intermediate defects in sufficient number or to the extent that it requires considerable repair or rebuilding. The defects may result from original construction, from continued neglect or lack of repair, or from serious damage to the structure

- Being homeless as defined in 24 CFR 578.3

- Living in a unit where the presence of a household member with certain characteristics (i.e., conviction for certain criminal activities) would result in the imminent placement of the family's child or children in out-of-home care, or the delay in the discharge of the child or children to the family from out-of-home care

- Living in housing not accessible to the family's disabled child or children due to the nature of the disability

- Living in an overcrowded unit, which is defined as living in a unit where one of the following conditions has been met:

  - o The family is separated from its child or children and the parents are living in an otherwise standard housing unit, but, after the family is reunited, the parents' housing unit would be overcrowded for the entire family and would be considered substandard; or

  - o The family is living with its child or children in a unit that is overcrowded for the entire family and this overcrowded condition may result, in addition to other factors, in the imminent placement of its child or children in out-of-home care.

  - o For purposes of this definition, the determination as to whether the unit is overcrowded is made in accordance with the PHA subsidy standards in Chapter 5, Part III of this policy.

Since HUD does not define *imminent placement*, the partnering PCWA may use its discretion to determine whether the potential out of home placement of the family's child or children is imminent [FUP FAQs].

## 19-I.D. FUP YOUTH VOUCHER ELIGIBILITY CRITERIA

While FUP family vouchers operate as regular HCVs after the family is referred from the PCWA, there are several aspects of the FUP youth vouchers that make them distinct from the FUP family vouchers and from regular HCVs.

**Eligibility Criteria**

A FUP-eligible youth is a youth the PCWA has certified:

- Is at least 18 years old and not more than 24 years of age (has not yet reached their 25th birthday);

  - The FUP youth must be no more than 24 years old at the time the PCWA certifies them as eligible and at the time of HAP contract execution.

- Has left foster care or will leave foster care within 90 days, in accordance with a transition plan described in section 475(5)(H) of the Social Security Act;

  - Foster care placement can include, but is not limited to, placements in foster family homes, foster homes of relatives, group homes, emergency shelters, residential facilities, child care institutions, and pre-adoptive homes in accordance with 24 CFR 5.576.

- Is homeless or at risk of becoming homeless at age 16 or older;

  - *At risk of being homeless* is fully defined at 24 CFR 576.2.

    o This includes a person that is exiting a publicly funded institution, or system of care (such as a healthcare facility, a mental health facility, foster care or other youth facility, or correction program or institution).

    o Therefore, youth being discharged from an institution may be eligible for a FUP voucher [FUP FAQs].

- Has an annual income at or below 30 percent of area median income; and

- Does not have sufficient resources or support networks (e.g., family, friends, faith-based or other social networks) immediately available to prevent them from moving to a supervised publicly or privately operated shelter designed to provide temporary living arrangements.

## 19-I.E. ASSISTANCE PERIOD [FR Notice 1/24/22]

**Maximum Assistance Period**

Although there is no time limit on FUP family vouchers, FUP youth vouchers are limited by statute. Unless the FUP youth meets an exception outlined below, after 36 months of assistance, the FUP youth voucher must be terminated. However, any period of time for which no subsidy (HAP) is being paid on behalf of the youth does not count toward the 36-month limitation.

If the FUP youth does meet the requirements outlined below, the statutory limit on FUP assistance is a total of 60 months of FUP voucher assistance [FR Notice 1/24/22].

**Extension of Assistance**

FUP youth who first leased or lease a unit after December 27, 2020, may be eligible for an extension of assistance up to 24 months beyond the 36-month time limit (for a total of 60 months of assistance).

While FUP youth cannot be required to participate in the Family Self-Sufficiency (FSS) program as a condition of receipt of assistance, an eligible youth who participates in the FSS

program and is in compliance with the applicable terms and conditions of the program is entitled to receive assistance for up to an additional 24 months. A FUP youth must accept an FSS slot if it is offered to them prior to the 36-month mark in order to receive an extension of assistance (unless the youth meets one of the statutory exceptions described below).

**Statutory Exceptions**

A FUP youth will be entitled to receive an extension of assistance for up to 24 months beyond the 36-month time limit without participating in the PHA's FSS program if they certify that they meet one of the exceptions below:

- The FUP youth is a parent or other household member responsible for the care of a dependent child under the age of six or for the care of an incapacitated person.

  <u>HACA Policy</u>

  HACA and the State of Texas defines *incapacitated person* as

  (1)  a minor;

  (2)  an adult who, because of a physical or mental condition, is substantially unable to:

      (A)  provide food, clothing, or shelter for himself or herself;

      (B)  care for the person's own physical health; or

      (C)  manage the person's own financial affairs; or

  (3)  a person who must have a guardian appointed for the person to receive funds due the person from a governmental source.

  The PHA will apply this exception in a manner that provides extensions of FUP youth assistance to the broadest population possible consistent with the statutory requirements.

  The FUP youth will be required to self-certify that they meet this exception on a PHA-provided form. This certification is the only documentation that the FUP youth must submit.

  The child or incapacitated person is not required to reside in the household in order for the youth to certify they meet this exception. For example, a child in a joint custody arrangement under the age of six who resides in the household only part-time may qualify the youth for this exception.

  The FUP youth is a person who is regularly and actively participating in a drug addiction or alcohol treatment and rehabilitation program.

  <u>HACA Policy</u>

  HACA will define *regular and active participation* in a manner that provides extensions of FUP youth assistance to the broadest population possible consistent with the statutory requirements.

  The FUP youth will be required to self-certify that they meet this exception on a HACA-provided form. This certification is the only documentation that the FUP youth must submit.

- The FUP youth is a person who is incapable of complying with the requirement to participate in a FSS program as described above or engage in education, workforce development, or employment activities as described below, as applicable, due to a documented medical condition.

    HACA Policy

    HACA will apply this requirement in a manner that provides extensions of FUP youth assistance to the broadest population possible consistent with statutory requirements.

    The FUP youth will be required to self-certify that they meet this exception on a HACA-provided form. This certification is the only documentation that the FUP youth must submit.

    A FUP youth that meets one of the above exceptions must still be offered an opportunity to enroll in the PHA's FSS program (if it is available to them) and receive any supportive services available to FUP youth. A FUP youth may choose to participate in an FSS program or engage in education, workforce development, or employment activities, even if they meet one of the above statutory exceptions.

**Education, Workforce Development, or Employment Activities**

If a PHA that carries out an FSS program is unable to offer a FUP youth an FSS slot during their first 36 months of receiving FUP youth assistance, the youth is considered to have been "unable to enroll" in the program and may have their voucher extended by meeting the education, workforce development, or employment criteria described below:

- The youth was engaged in obtaining a recognized postsecondary credential or a secondary school diploma or its recognized equivalent.

    HACA Policy

    HACA will use the definitions of *recognized postsecondary credential* and *secondary school diploma or its recognized equivalent* under the Workforce Innovation and Opportunity Act (WIOA). WIOA defines a *recognized postsecondary credential* as a credential consisting of an industry-recognized certificate or certification, a certificate of completion of an apprenticeship, a license recognized by the state involved or federal government, or an associate or baccalaureate degree (29 U.S.C. 3102). Examples of a recognized postsecondary credential include, but are not limited to, an associate's degree, bachelor's degree, occupational licensure, or occupational certification (see U.S. Department of Labor, Training and Employment Guidance Letter No. 10–16, Change 1). For the purpose of WIOA, the U.S. Department of Labor defines a *secondary school diploma or its recognized equivalent* as a secondary school diploma (or alternate diploma) that is recognized by a state and that is included for accountability purposes under the Elementary and Secondary Education Act of 1965 (ESEA), as amended by the Every Student Succeeds Act (ESSA). A secondary school equivalency certification signifies that a student has completed the requirement for a high school education. Examples of a secondary school diploma or its recognized equivalent include, but are not limited to, obtaining certification of attaining passing scores on a state-recognized high school equivalency test, earning a secondary school diploma or state-recognized equivalent, or obtaining certification of passing a state-recognized competency-based assessment.

- The youth was enrolled in an *institution of higher education*, as such term is defined in section 101(a) of the Higher Education Act of 1965 (20 U.S.C. 1001(a)) or an institution that meets the definition of a *proprietary institution of higher education* or a *postsecondary vocational institution* under sections 102(b)(1) and (c)(1) of the Higher Education Act of 1965 (20 U.S.C. 1002(b)(1) and (c)(1)), respectively.

> ### HACA Policy
>
> Youth must be enrolled in education activities on at least a half-time basis, as defined by the institution that they attend. However, HACA may make exceptions to this requirement if the youth is unable to enroll in a sufficient number of classes due to a lack of course offerings by the educational institution where the youth is enrolled.

The youth was participating in a career pathway, as such term is defined in Section 3 of the Workforce Innovation and Opportunity Act (29 U.S.C. 3102). The term *career pathway* means a combination of rigorous and high-quality education, training, and other services that:

- Aligns with the skill needs of industries in the economy of the state or regional economy involved;

- Prepares an individual to be successful in any of a full range of secondary or postsecondary education options, including apprenticeships registered under the Act of August 16, 1937 (commonly known as the "National Apprenticeship Act"; 50 Stat. 664, chapter 663; 29 U.S.C. 50 et seq.) (referred to individually in this Act as an *apprenticeship*, except in section 3226 of this title);

- Includes counseling to support an individual in achieving the individual's education and career goals;

- Includes, as appropriate, education offered concurrently with and in the same context as workforce preparation activities and training for a specific occupation or occupational cluster;

- Organizes education, training, and other services to meet the particular needs of an individual in a manner that accelerates the educational and career advancement of the individual to the extent practicable;

- Enables an individual to attain a secondary school diploma or its recognized equivalent, and at least one recognized postsecondary credential; and

- Helps an individual enter or advance within a specific occupation or occupational cluster.

- The youth was employed.

> ### HACA Policy
>
> HACA will consider the youth to be employed if they work a minimum of 20 hours per week. HACA may make exceptions to this requirement if the youth's hours are reduced due to circumstances beyond their control or the youth must temporarily reduce their work hours due to a verified family emergency.

**FSS Enrollment at 24 Months**

If the FUP youth has not been provided an opportunity to enroll in the FSS program during the

first 24 months of FUP assistance, HUD encourages the PHA to remind the youth at the 24-month reexamination of the education, workforce development, and employment requirements described above so that the youth has enough time to meet these requirements prior to the expiration of the 36-month time period for FUP assistance.

    <u>HACA Policy</u>

        If the FUP youth has not been provided an opportunity to enroll in the FSS program during the first 24 months of FUP assistance, HACA will remind the youth at their second regular reexam of the education, workforce development, and employment requirements described above.

## FSS Enrollment Between 36 and 48 Months

If an FSS slot becomes available between the 36-month and 48-month mark:

- The PHA must offer the slot to a FUP youth who had their voucher extended based on meeting the education, workforce development, or employment requirement listed above, or one of the statutory exceptions listed above (even if the youth previously declined an FSS slot because they met one of the statutory exceptions).

- The PHA must work with the youth to determine whether enrollment in FSS is feasible and in their best interest given any education, workforce development, or employment activities that the youth is engaged in and any statutory exceptions that apply to the youth, as well as the remaining time on their voucher.

- If the FUP youth accepts the FSS slot, the PHA must work with the youth to establish Contract of Participation goals and an Individual Training and Services Plan (ITSP) that can be accomplished within the time period left on the voucher.

        If the FUP youth is offered an FSS slot prior to the 36-month mark, the youth:

- Will be required to enroll in the FSS program in order to receive an extension of assistance at the end of the 36-month time period (unless they meet one of the statutory exceptions described above).

- Will not be considered to have been "unable to enroll" in the FSS program as described above, and as a result, will not be eligible to receive an extension of assistance based on meeting the education, workforce development, or employment requirements described above.

**FSS Enrollment After 48 Months**

The PHA may, but is not required to, offer a FUP youth an FSS slot that becomes available between the 48-month mark and the 60-month mark, since the youth will have already received their second and final extension.

> HACA Policy
>
> If an FSS slot becomes available between the 48 and 60-month marks, HACA will not offer the FSS slot to a FUP youth.
>
> **Extensions of Assistance**
>
> At the 36-month and 48-month reexamination, the PHA must extend FUP youth assistance if the youth is participating in and in compliance with the FSS program as long as the youth is still eligible for the HCV program.
>
> In any case, the FUP youth cannot receive more than a total of 60 months of FUP youth voucher assistance, even if the FSS Contract of Participation time period extends beyond the voucher 60- month mark.
>
> **No FSS Program or Unable to Enroll in FSS**
>
> If a PHA does not carry out an FSS program or the FUP youth has been unable to enroll in the program during the first 36 months of receiving FUP assistance, the FUP youth is entitled to receive an extension of assistance for up to two successive 12-month periods beyond the 36-month time limit provided that the youth engaged in at least one of the education, workforce development, or employment activities described above for not less than nine months of the 12-month period preceding each extension. In order to meet the nine months out of the preceding 12 months requirement, the youth may have engaged in one of the education, workforce development, or employment activities described above or a combination of these activities.
>
> **Verification Prior to Annual Reexam**
>
> In order to provide an extension of assistance, the PHA must verify compliance with the above requirements at the end of the 36-month time period and the 48-month time periods. The PHA does not need to verify compliance with these requirements at the end of the 60-month time period since the maximum length of assistance is 60 months.
>
> To verify compliance with the education, workforce development, or employment requirement or one of the statutory exceptions, the PHA must provide the FUP youth written notification informing them that they may receive an extension of their FUP assistance and providing instructions on how the youth may demonstrate that they meet one of these conditions. This notification must be provided sufficiently in advance of the end of the 36-month or 48-month time periods, as applicable, to allow the FUP youth to demonstrate that they meet the education, workforce development, or employment requirement, or one of the statutory exceptions, and for the PHA to conduct an annual reexamination prior to the expiration of the FUP assistance.

HACA will verify compliance with the education, workforce development, or employment requirement, or one of the statutory exceptions, at the end of the 36-month and 48-month time periods prior to the FUP youth's scheduled annual reexamination. HACA will not verify compliance at the end of the 60-month time period.

HACA will provide each FUP youth on HACA's program with a written notification informing them that they may receive an extension of their FUP assistance if they meet conditions outlined in this chapter and providing them with instructions on how they may demonstrate compliance at least 60 days prior to their scheduled annual reexam date. When necessary, the PHA will provide this notification in a format accessible to FUP youth with disabilities and in a translated format for FUP youth with limited English proficiency in accordance with Chapter 2.

HACA will use the following verification methods to verify a FUP youth's eligibility for voucher extensions:

To verify compliance with the FSS requirement, HACA will examine its records to confirm, or obtain confirmation from HACA's FSS program staff, that the FUP youth participant is in compliance with FSS program requirements and has not been terminated from the FSS program.

To meet the education, workforce development, or employment requirement, HACA will verify that the FUP youth was engaged in at least one education, workforce development, or employment activity for at least nine months of the 12-month period immediately preceding the end of 36-month or 48-month time period, as applicable.

Due to the timing of when the PHA verifies compliance and conducts the annual reexamination, the FUP youth may have not yet met the nine-month requirement but may be able to demonstrate that they will meet the nine-month requirement as of the end of the 36-month or 48-month time period. In such cases, the FUP youth will still be considered to have met the requirements.

In order for the FUP youth to meet one of the statutory exceptions described above, the youth must submit a certification to HACA that they meet one of these exceptions. This certification is the only documentation that the FUP youth must submit in order to demonstrate that they meet one of the statutory exceptions.

A FUP youth who received an extension of voucher assistance at the end of the 36-month time period based on meeting one of the conditions described in this chapter does not have to meet the same conditions when they reach the end of the 48-month time period. The FUP youth may demonstrate that they meet a different condition in order to receive an extension of their assistance.

If the PHA determines that the youth meets one of the statutory conditions, the PHA would then conduct an annual reexamination. If the annual reexamination determines that the youth is still eligible for the HCV program, the PHA must provide the FUP youth the extension of voucher assistance.

**Termination of Assistance for Failure to Meet Conditions**

Failure of the FUP youth to meet one of the above conditions will only impact their ability to receive subsequent extensions of assistance. It will not serve as a basis for terminating the FUP assistance prior to the annual reexam.

If the FUP youth does not meet any of the conditions described in in this chapter, the youth is subject to the statutory time limit of 36 months or the time limit of any extension that the youth has already received, and the FUP youth voucher must be terminated once the youth reaches this time limit. The calculation of the time limit begins from the date the first HAP contract is signed (for tenant-based vouchers) or from the date the youth entered into the initial lease agreement (for project-based vouchers). The number of months is calculated based on the number of months that HAP subsidy is being paid on behalf of the youth, not the number of months that the youth is in the FUP youth program. Prior to termination, the PHA must offer the FUP youth the opportunity to request an informal hearing, in accordance with Chapter 16.

## 19-I.F. REFERRALS AND WAITING LIST MANAGEMENT

**Referrals**

The PCWA must establish and implement a system to identify FUP-eligible families and youths within the agency's caseload and make referrals to the PHA. The PCWA must certify that the FUP applicants they refer to the PHA meet FUP eligibility requirements. The PHA is not required to maintain full documentation that demonstrates the family's or youth's FUP eligibility as determined by the PCWA but should keep the referral or certification from the PCWA.

<u>HACA Policy</u>

As part of the MOU, HACA and DFPS have identified staff positions to serve as lead FUP liaisons. These positions will be responsible for transmission and acceptance of FUP referrals. DFPS must commit sufficient staff and resources to ensure eligible families and youths are identified and determined eligible in a timely manner.

When FUP vouchers are available, the HACA liaison responsible for acceptance of referrals will contact the DFPS FUP liaison via email indicating the number of vouchers available and requesting an appropriate number of referrals. No more than 10 business days from the date DFPS receives this notification, the DFPS liaison will provide HACA with a list of eligible referrals include the name, address, and contact phone number for each adult individual who is being referred; a completed release form for each adult family member; and a written certification for each referral indicating the youth or family is FUP-eligible.

HACA will maintain a copy of the referral or certification from DFPS in the participant's file along with other eligibility paperwork.

A PHA must serve any referrals (youths or families) that meet all program eligibility requirements. If a PHA determines that it has received a sufficient number of referrals from the

~~PCWA so that the PHA will be able to lease all FUP vouchers awarded, the PHA may request~~ that the PCWA suspend transmission of referrals. If the PHA determines that additional referrals will be needed after it has made such a request, the PHA may request that the PCWA resume transmission of referrals [Notice PIH 2011-52].

**Waiting List Placement**

A family that is already participating in the regular HCV program cannot be transferred to a FUP voucher.

Once a referral is made, the PHA must compare the list of PCWA referrals to its HCV waiting list to determine if any applicants on the PCWA's referral list are already on the PHA's HCV waiting list. Applicants already on the PHA's HCV waiting list retain the order of their position on the list. Applicants not already on the PHA's HCV waiting list must be placed on the HCV waiting list.

If the PHA's HCV waiting list is closed, the PHA must open its HCV waiting list in order to accept new FUP applicants. If necessary, the PHA may open its waiting list solely for FUP applicants, but this information must be included in the PHA's notice of opening its waiting list (see section 4-II.C., Opening and Closing the Waiting List of this administrative plan).

<u>HACA Policy</u>

Within 10 business days of receiving the referral from DFPS, HACA will review the HCV waiting list and will send DFPS a list confirming whether or not referrals are on the waiting list.

Referrals who are already on the list will retain their position and the list will be notated to indicate the family or youth is FUP-eligible.

For those referrals not already on the waiting list, HACA will work with DFPS to ensure they receive and successfully complete a pre-application or application, as applicable. Once the pre-application or application has been completed, the PHA will place the referral on the HCV waiting list with the date and time of the original referral and an indication that the referral is FUP-eligible.

**Waiting List Selection**

The PHA selects FUP-eligible families or youths based on the PHA's regular HCV waiting list selection policies in Chapter 4, including any preferences that may apply.

## 19.I.G. PHA HCV ELIGIBILITY DETERMINATION

Once a FUP-eligible family or youth is selected from the HCV waiting list, the PHA must determine whether the family or youth meets HCV program eligibility requirements. Applicants must be eligible under both FUP family or youth eligibility requirements, as applicable, and HCV eligibility requirements as outlined in Chapter 3 of this policy

The PCWA may, but is not obligated to, provide information to the PHA on the family's criminal history.

<u>HACA Policy</u>

DFPS will not provide information regarding the applicant's criminal history to HACA.


**Additional FUP Eligibility Factors [FUP FAQs]**

For FUP family vouchers, the family must remain FUP-eligible thorough lease-up.

- If, after a family is referred by the PCWA but prior to issuing a family FUP voucher, the PHA discovers that the lack of adequate housing is no longer a primary factor for the family not reunifying, the FUP voucher may not be issued to the family.

- Similarly, if the FUP voucher has already been issued before the PHA discovers that the reunification will not happen, but the family has not yet leased up under the voucher, the PHA must not execute the HAP contract, as the family is no longer FUP-eligible.

> FUP-eligible youth must be no more than 24 years old both at the time of PCWA certification and at the time of the HAP execution. If a FUP youth is 24 at the time of PCWA certification but will turn 25 before the HAP contract is executed, the youth is no longer eligible for a FUP youth voucher.

<u>HACA Policy</u>

Any applicant that does not meet the eligibility criteria for the HCV program listed in Chapter 3 or any eligibility criteria listed in this section will be notified by HACA in writing following policies in Section 3-III.F., including stating the reasons the applicant was found ineligible and providing an opportunity for an informal review.

## 19.I.H. LEASE UP [FR Notice 1/24/22]

Once the PHA determines that the family or youth meets HCV eligibility requirements, the family or youth will be issued a FUP voucher in accordance with PHA policies.

During the family briefing, PHAs must inform the FUP youth of:

- The extension of assistance provisions and requirements;

- The availability of the FSS program and offer them an FSS slot, if available, or offer to place them on the FSS waiting list (provided the PHA has an FSS program); and

- Supportive services available to them, the existence of any other programs or services, and their eligibility for such programs and services. However, participation in

supportive services cannot be required as a condition of receiving FUP youth assistance.

HACA Policy

Eligible applicants will be notified by HACA in writing following policies in Section 3-III.F. of this administrative plan. FUP families will attend a standard HCV briefing in accordance with PHA policies in Part I of Chapter 5 of this administrative plan. FUP youth will be briefed individually. The PHA will provide all aspects of the written and oral briefing as outlined in Part I of Chapter 5 but will also provide an explanation of the required items listed above, as well as discussing supportive services offered by DFPS and/or its contracted ACTS Program provider.

For both FUP youth and FUP families, vouchers will be issued in accordance with PHA policies in Chapter 5 Part II, except that the PHA will consider one additional 30-day extension beyond the first automatic extension for any reason, not just those listed in the policy in Section 5-II.E.

Once the family or youth locate a unit, the PHA conducts all other processes relating to voucher issuance and administration per HCV program regulations and the PHA's policies (including, but not limited to: HQS inspection, determination of rent reasonableness, etc.).

## 19-I.I. TERMINATION OF ASSISTANCE

**General Requirements**

With the exception of terminations of assistance for FUP youth after the statutorily required time period, terminations of FUP assistance are handled in the same way as the regular HCV program. Termination of a FUP voucher must be consistent with regulations for termination in 24 CFR Part 982, Subpart L and be in compliance with PHA policies (Chapter 12).

If the person who qualifies for the FUP voucher passes away, the family retains the FUP voucher. In the case of a FUP-youth voucher, assistance will terminate after the statutorily required time period, even if the FUP-eligible youth is no longer included in the household.

If the person who qualifies for the FUP voucher moves, the remaining family members may keep the FUP voucher based on PHA policy (see administrative plan, Section 3-I.C., Family Breakup and Remaining Member of Tenant Family).

**FUP Family Vouchers**

If parents lose their parental rights or are separated from their children after voucher lease-up (or their children reach adulthood), the family is still eligible to keep their FUP assistance, as the regulations do not permit HCV termination for a family losing parental rights or the children reaching adulthood. However, the PHA may transfer the assistance of a FUP family voucher holder to regular HCV assistance if there are no longer children in the household.

HACA Policy

HACA will transfer the assistance of a FUP family voucher holder to regular HCV assistance if there are no longer children in the household and there is no prospect of any minor child being returned to the household.

If the PHA has no regular HCV vouchers available at the time this determination is made, including if no vouchers are available due to lack of funding, the PHA will issue the family the next available regular HCV voucher after those being issued to families residing in PBV units claiming Choice Mobility.

## FUP Youth Vouchers

A PHA cannot terminate a FUP youth's assistance for noncompliance with PCWA case management, nor may the PHA terminate assistance for a FUP youth for not accepting services from the PCWA.

The PHA may not transfer the assistance of a FUP youth voucher holder to regular HCV assistance upon the expiration of the statutorily required time period. However, the PHA may issue a regular HCV to FUP youth if they were selected from the waiting list in accordance with PHA policies and may also adopt a preference for FUP youth voucher holders who are being terminated for this reason.

HACA Policy

HACA provides a selection preference on the PHA's HCV waiting list for FUP youth who are terminated due to the time limit on assistance.

Upon the expiration of the statutorily required time period, a FUP youth voucher holder who has children and who lacks adequate housing may qualify for a FUP family voucher provided they are referred by the PCWA as an eligible family and meet the eligibility requirements for the PHA's HCV program.

## 19-I.J. FUP PORTABILITY

Portability for a FUP family or youth is handled in the same way as for a regular HCV family. A PHA may not restrict or deny portability for a FUP family or youth for reasons other than those specified in the HCV program regulations, as reflected in Chapter 10 of the administrative plan.

A FUP family or youth does not have to port to a jurisdiction that administers FUP.

If the receiving PHA administers the FUP voucher on behalf of the initial PHA, the voucher is still considered a FUP voucher regardless of whether the receiving PHA has a FUP program.

If the receiving PHA absorbs the voucher, the receiving PHA may absorb the incoming port into its FUP program (if it has one) or into its regular HCV program (if the receiving PHA has vouchers available to do so) and the family or youth become regular HCV participants. In either case, when the receiving PHA absorbs the voucher, a FUP voucher becomes available to the initial PHA.

**Considerations for FUP Youth Vouchers**

If the voucher is a FUP youth voucher and remains such upon lease-up in the receiving PHA's jurisdiction, termination of assistance must still take place once the youth has received assistance for the statutorily required time period. If the receiving PHA is administering the FUP youth voucher on behalf of the initial PHA, the two PHAs must work together to initiate termination upon expiration of the statutorily required time period.

### 19-I.K. PROJECT-BASING FUP VOUCHERS [Notice PIH 2017-21; FR Notice 1/24/22]

The PHA may project-base FUP vouchers without HUD approval in accordance with Notice PIH 2017-21, FR Notice 1/24/22, and all statutory and regulatory requirements for the PBV program. Project-based FUP vouchers are subject to the PBV program percentage limitation discussed in Section 17-I.A.

The PHA may limit PBVs to one category of FUP-eligible participants (families or youth) or a combination of the two.

While FUP vouchers can be used for either families or youth, a PBV unit may only be counted towards the PHA's 10 percent exception authority under the program cap and the project's income-mixing requirement if the FUP PBV assistance is provided on behalf of an eligible youth. The PHA must amend its administrative plan to include the limitation of these FUP PBV units to eligible youth.

> HACA Policy

> HACA may elect to project-base FUP vouchers.

### PART II: FOSTER YOUTH TO INDEPENDENCE INITIATIVE

### 19-II.A. PROGRAM OVERVIEW [Notice PIH 2020-28; Notice PIH 2021-26; FR Notice 1/24/22]

The Foster Youth to Independence (FYI) initiative was announced in 2019. The FYI initiative allows PHAs who partner with a Public Child Welfare Agency (PCWA) to request targeted HCVs to serve eligible youth with a history of child welfare involvement that are homeless or at risk of being homeless. Rental assistance and supportive services are provided to qualified youth for a period of between 36 and 60 months.

Funding is available either competitively though an FYI NOFA or noncompetitively on a rolling basis in accordance with the application requirements outlined in Notice PIH 2020-28 or Notice PIH 2021-26, as applicable. Under the noncompetitive process, PHAs are limited to 25 vouchers in a fiscal year with the ability to request additional vouchers for those PHAs with 90 percent or greater utilization or utilization of its FUP and/or FYI vouchers, as applicable. For competitive awards, the number of vouchers is dependent on PHA program size and need.

### 19-II.B. PARTNERING AGENCIES [Notice PIH 2021-26; FYI Updates and Partnering Opportunities Webinar]

**Public Child Welfare Agency (PCWA)**

The PHA must enter into a partnership agreement with a PCWA in the PHA's jurisdiction in the form of a Memorandum of Understanding (MOU) or letter of intent. The PCWA is responsible for identifying and referring eligible youth to the PHA and providing or securing a commitment for the provision of supportive services once youth are admitted to the program.

> HACA Policy
>
> HACA will implement a Foster Youth to Independence (FYI) program in partnership with ***Texas Department of Family Protective Services (DFPS)***

DFPS is responsible for:

- Identifying FYI-eligible youth;
- Developing a system of prioritization based on the level of need of the youth and the appropriateness of intervention;
- Providing a written certification to the PHA and the Austin/Travis County CoC's Coordinated Entry System that the youth is eligible; and
- Providing or securing supportive services for 36 months.

**Continuum of Care (CoC) and Other Partners**

HUD strongly encourages PHAs to add other partners into the partnership agreement with the PCWA such as state, local, philanthropic, faith-based organizations, and the CoC, or a CoC recipient it designates.

> HACA Policy
>
> In addition to the PCWA, the PHA will implement the FYI program in partnership with ***the Ending Community Homelessness Coalition (ECHO), the Continuum of Care Lead Agency***

**19-II.C. YOUTH ELIGIBILITY CRITERIA [Notice PIH 2021-26; FYI Q&As; FYI FAQs]**

The PCWA is responsible for certifying that the youth has prior qualifying foster care involvement. As determined by the PCWA, eligible youth:

- Are at least 18 years of age and not more than 24 years of age (have not yet reached their 25th birthday);
- Youth must be no more than 24 years of age at the time the PCWA certifies them as eligible and at the time of HAP contract execution.

- Have left foster care or will leave foster care within 90 days, in accordance with a transition plan described in section 475(5)(H) of the Social Security Act;

    - Placements can include, but are not limited to, placements in foster family homes, foster homes of relatives, group homes, emergency shelters, residential facilities, child care institutions, and pre-adoptive homes in accordance with 24 CFR 5.576;

- Are homeless or at risk of becoming homeless at age 16 and older;

    - *At risk of being homeless* is fully defined at 24 CFR 576.2.

    - This includes a person that is exiting a publicly funded institution, or system of care (such as a healthcare facility, a mental health facility, foster care or other youth facility, or correction program or institution). Therefore, youth being discharged from an institution may be eligible for an FYI voucher [FYI FAQs].

Eligibility is not limited to single persons. For example, pregnant and/or parenting youth are eligible to receive assistance assuming they otherwise meet eligibility requirements.


### 19-II.D. SUPPORTIVE SERVICES [Notice PIH 2021-26; FYI Updates and Partnering Opportunities Webinar; FYI Q&As]

Supportive services may be provided by the PHA, PCWA or a third party. The PCWA must provide or secure a commitment to provide supportive services for participating youth for the period of time defined in the NOFA/O for which the funding was made available. At a minimum, the following supportive services must be offered:

- Basic life skills information/counseling on money management, use of credit, housekeeping, proper nutrition/meal preparation, and access to health care (e.g., doctors, medication, and mental and behavioral health services);

- Counseling on compliance with rental lease requirements and with HCV program participant requirements, including assistance/referrals for assistance on security deposits, utility hook-up fees, and utility deposits;

- Providing such assurances to owners of rental property as are reasonable and necessary to assist eligible youth to rent a unit with a voucher;

- Job preparation and attainment counseling (where to look/how to apply, dress, grooming, relationships with supervisory personnel, etc.); and

- Educational and career advancement counseling regarding attainment of general equivalency diploma (GED) or attendance/financing of education at a technical school, trade school, or college, including successful work ethic and attitude models.

HACA Policy

The following additional supportive services will be offered as needed and as available: security and utility deposits; SOAR benefits application assistance; childcare; LGBTQ support; parenting education, and transportation.

Since participation in supportive services is optional, but strongly encouraged, an FYI participant may decline supportive service.

## 19-II.E. REFERRALS AND WAITING LIST MANAGEMENT [Notice PIH 2021-26; FYI Updates and Partnering Opportunities Webinar; FYI FAQs]

**Referrals**

The PCWA is responsible for certifying that the youth has prior qualifying foster care involvement. Once the PCWA sends the PHA and the Coordinated Entry System confirmation certifying the youth is program-eligible, the PHA determines HCV eligibility.

The PCWA must have a system for identifying eligible youth within the agency's caseload and reviewing referrals from other partners, as applicable. The PCWA must also have a system for prioritization of referrals to ensure that youth are prioritized for an FYI voucher based upon their level of need and appropriateness of the intervention.

Referrals may come from other organizations in the community who work with the population, but the PCWA must certify that the youth meets eligibility requirements, unless the PCWA has vested another organization with this authority.

The PHA is not required to maintain full documentation that demonstrates the youth's eligibility as determined by the PCWA but should keep the referral or certification from the PCWA. The PCWA is not required to provide the PHA with HCV eligibility documents.

HACA Policy

HACA and DFPS have identified staff positions to serve as lead FYI liaisons. These positions will be responsible for transmission and acceptance of referrals. DFPS must commit sufficient staff and resources to ensure eligible youths are identified, prioritized, and determined eligible in a timely manner.

When vouchers are available, the PHA liaison responsible for acceptance of referrals will contact the DFPS liaison via email indicating the number of vouchers available and requesting an appropriate number of referrals. No more than 10 business days from the date DFPS receives this notification, the DFPS liaison must provide HACA with a list of eligible referrals, a completed release form, and a written certification for each referral indicating the referral is eligible. The list will include the name, address, and

contact phone number for each adult individual who is being referred.

HACA will maintain a copy of each certification from DFPS in the participant's file along with other eligibility paperwork.

**Waiting List Placement [Notice PIH 2021-26 and FYI FAQs]**

The PHA must use the HCV waiting list for the FYI program. Youth already on the HCV program may not be transferred to an FYI voucher since they are not homeless or at-risk of homelessness.

Once a referral is made, the PHA must compare the list of PCWA referrals to its HCV waiting list to determine if any applicants on the PCWA's referral list are already on the PHA's HCV waiting list. Applicants already on the PHA's HCV waiting list retain the order of their position on the list. Applicants not already on the PHA's HCV waiting list must be placed on the HCV waiting list.

If the PHA's HCV waiting list is closed, the PHA must open its HCV waiting list in order to accept new referrals. The PHA may reopen the waiting list to accept an FYI eligible youth without opening the waiting list for other applicants; however, the requirements at 24 CFR 982.206 for giving public notice when opening and closing the waiting list apply (see section 4-II.C., Opening and Closing the Waiting List of this administrative plan).

HACA Policy

Within 10 business days of receiving the referral from DFPS, HACA will review the HCV waiting list and will send DFPS a list confirming whether or not referrals are on the waiting list.

Referrals who are already on the list will retain their position and the list will be notated to indicate the applicant is FYI-eligible.

For those referrals not already on the waiting list, HACA will work with DFPS or identified partner agency to ensure they receive and successfully complete a pre-application or application, as applicable. Once the pre-application or application has been completed, HACA will place the referral on the HCV waiting list with the date and time of the original referral and an indication that the referral is FYI-eligible.

**Waiting List Selection**

The PHA selects eligible youths based on the PHA's regular HCV waiting list selection policies in Chapter 4, including any preferences that may apply.

**19-II.F. PHA HCV ELIGIBILITY DETERMINATION [FYI FAQs]**

Once an eligible youth is selected from the HCV waiting list, the PHA must determine whether

~~the youth meets HCV program eligibility requirements. Applicants must be eligible under both~~ FYI eligibility requirements and HCV eligibility requirements as outlined in Chapter 3 of this policy.

The PCWA may, but is not obligated to, provide information to the PHA on the youth's criminal history.

> ### HACA Policy
>
> DFPS will not provide information regarding the applicant's criminal history to HACA.

**Additional Eligibility Factors**

Youth must be no more than 24 years old both at the time of PCWA certification and at the time of the HAP execution. If a youth is 24 at the time of PCWA certification but will turn 25 before the HAP contract is executed, the youth is no longer eligible for a FYI voucher.

> ### HACA Policy
>
> Any applicant that does not meet the eligibility criteria for the HCV program listed in Chapter 3 or any eligibility criteria listed in this section will be notified by HACA in writing following policies in Section 3-III.F, including stating the reasons the applicant was found ineligible and providing an opportunity for an informal review.

## 19-II.G. LEASE UP [FR Notice 1/24/22]

Once the PHA determines that the family or youth meets HCV eligibility requirements, the youth will be issued an FYI voucher in accordance with PHA policies.

During the family briefing, PHAs must inform the FYI voucher holder of:

- The extension of assistance provisions and requirements;
- The availability of the FSS program and offer them an FSS slot, if available, or offer to place them on the FSS waiting list (provided the PHA has an FSS program); and
- The supportive services available to them, the existence of any other programs or services, and their eligibility for such programs and services. However, participation in supportive services cannot be required as a condition of receiving FYI assistance.

> ### HACA Policy
>
> Eligible applicants will be notified by HACA in writing following policies in Section 3-III.F. of this policy. FYI youth will be briefed individually. The PHA will provide all aspects of the written and oral briefing as outlined in Part I of Chapter 5.
>
> Vouchers will be issued in accordance with HACA policies in Chapter 5, Part II, except that HACA will consider one additional 30-day extension beyond the first automatic extension for any reason, not just those listed in the policy in Section 5-II.E.

53

Once the youth locates a unit, the PHA conducts processes relating to voucher issuance and administration per HCV program regulations and the PHA policy in Chapter 9.

Should a youth fail to use the voucher, the PHA may issue the voucher to another eligible youth if one has been identified [Notice PIH 2021-26].

## Turnover [**FYI FAQs**]

For PHAs awarded FYI Tenant Protection Vouchers (TPVs) under Notice PIH 2019-20 where the recipient of the FYI TPV leaves the program, the PHA may request an FYI voucher under the requirements of Notice PIH 2021-26. (Not applicable to HACA)

For PHAs awarded FYI vouchers under Notices PIH 2020-28 and PIH 2021-26, where the recipient of the FYI voucher leaves the program, the PHA must continue to use the FYI voucher for eligible youth upon turnover. Where there are more eligible youth than available FYI turnover vouchers, the PHA may request an FYI voucher under the requirements of Notice PIH 2021-26. If another eligible youth is not available, the PHA must notify HUD, and HUD will reduce the PHA's HCV assistance to account for the removal of the FYI assistance from the PHA's HCV baseline.

## 19-II.H. MAXIMUM ASSISTANCE PERIOD [**Notice PIH 2021-26** and **FYI FAQs**; **FR Notice 1/24/22**]

Vouchers are limited by statute to a total of between 36 months and 60 months of housing assistance. At the end of the statutory time period, assistance must be terminated. However, any period of time for which no subsidy (HAP) is being paid on behalf of the youth does not count toward the limitation. It is not permissible to reissue another FYI TPV to the same youth upon expiration of their FYI assistance.

Participants do not "age out" of the program. A participant may continue with the program until they have received the period of assistance for which they are eligible. Age limits are only applied for entry into the program.

### Extension of Assistance

FYI voucher holders who first leased or lease a unit after December 27, 2020, may be eligible for an extension of assistance up to 24 months beyond the 36-month time limit (for a total of 60 months of assistance).

While FYI voucher holders cannot be required to participate in the Family Self-Sufficiency (FSS) program as a condition of receipt of assistance, an eligible youth who participates in the FSS program and is in compliance with the applicable terms and conditions of the program is entitled to receive assistance for up to an additional 24 months. A FYI voucher holders must

accept an FSS slot if it is offered to them prior to the 36-month mark in order to receive an extension of assistance (unless the youth meets one of the statutory exceptions described below).

**Statutory Exceptions**

FYI voucher holders will be entitled to receive an extension of assistance for up to 24 months beyond the 36-month time limit without participating in the PHA's FSS program if they certify that they meet one of the exceptions below:

- The FYI voucher holder is a parent or other household member responsible for the care of a dependent child under the age of six or for the care of an incapacitated person.

  HACA Policy

  HACA and the State of Texas defines *incapacitated person* as

  (1)  a minor;

  (2)  an adult who, because of a physical or mental condition, is substantially unable to:

  (A)  provide food, clothing, or shelter for himself or herself;

  (B)  care for the person's own physical health; or

  (C)  manage the person's own financial affairs; or

  (3)  a person who must have a guardian appointed for the person to receive funds due the person from a governmental source.

  HACA will apply this exception in a manner that provides extensions of FYI assistance to the broadest population possible consistent with the statutory requirements.

  The FYI voucher holder will be required to self-certify that they meet this exception on a HACA-provided form. This certification is the only documentation that the FYI voucher holder must submit.

  The child or incapacitated person is not required to reside in the household in order for the FYI voucher holder to certify they meet this exception. For example, a child in a joint custody arrangement under the age of six who resides in the household only part time may qualify the FYI voucher holder for this exception.

  The FYI voucher holder is a person who is regularly and actively participating in a drug addiction or alcohol treatment and rehabilitation program.

HACA Policy

HACA will define *regular and active participation* in a manner that provides extensions of FYI voucher holder assistance to the broadest population possible consistent with the statutory requirements.

The FYI voucher holder will be required to self-certify that they meet this exception on a HACA-provided form. This certification is the only documentation that the FYI voucher holder must submit.

The FYI voucher holder is a person who is incapable of complying with the requirement to participate in a FSS program as described above or engage in education, workforce development, or employment activities as described below, as applicable, due to a documented medical condition.

HACA Policy

HACA will apply this requirement in a manner that provides extensions of FYI voucher holder assistance to the broadest population possible consistent with statutory requirements.

The FYI voucher holder will be required to self-certify that they meet this exception on a HACA-provided form. This certification is the only documentation that the FYI voucher holder must submit.

An FYI voucher holder that meets one of the above exceptions must still be offered an opportunity to enroll in the PHA's FSS program (if it is available to them) and receive any supportive services available to FYI voucher holders. An FYI voucher holder may choose to participate in an FSS program or engage in education, workforce development, or employment activities, even if they meet one of the above statutory exceptions.

### Education, Workforce Development, or Employment Activities

If a PHA that carries out an FSS program is unable to offer a FYI voucher holder an FSS slot during their first 36 months of receiving FYI assistance, the FYI voucher holder is considered to have been "unable to enroll" in the program and may have their voucher extended by meeting the education, workforce development, or employment criteria described below:

- The FYI voucher holder was engaged in obtaining a recognized postsecondary credential or a secondary school diploma or its recognized equivalent.

HACA Policy

HACA will use the definitions of recognized postsecondary credential and secondary school diploma or its recognized equivalent under the Workforce Innovation and Opportunity Act (WIOA). WIOA defines a recognized postsecondary credential as a credential consisting of an industry-recognized certificate or certification, a certificate of completion of an apprenticeship, a license recognized by the state involved or federal government, or an associate or baccalaureate degree (29 U.S.C. 3102). Examples of a recognized postsecondary credential include, but are not limited to, an associate's degree, bachelor's degree, occupational licensure, or occupational certification (see U.S. Department of Labor, Training and Employment Guidance Letter No. 10–16, Change 1). For the purpose of WIOA, the U.S. Department of Labor defines a secondary school *diploma or its recognized equivalent* as a secondary school diploma (or alternate diploma) that is recognized by a state and that is included for accountability purposes under the

Elementary and Secondary Education Act of 1965 (ESEA), as amended by the Every Student Succeeds Act (ESSA). A secondary school equivalency certification signifies that a student has completed the requirement for a high school education. Examples of a secondary school diploma or its recognized equivalent include, but are not limited to, obtaining certification of attaining passing scores on a state-recognized high school equivalency test, earning a secondary school diploma or state-recognized equivalent, or obtaining certification of passing a state-recognized competency-based assessment.

The FYI voucher holder was enrolled in an *institution of higher education*, as such term is defined in section 101(a) of the Higher Education Act of 1965 (20 U.S.C. 1001(a)) or an institution that meets the definition of a *proprietary institution of higher education* or a *postsecondary vocational institution* under sections 102(b)(1) and (c)(1) of the Higher Education Act of 1965 (20 U.S.C. 1002(b)(1) and (c)(1)), respectively.

HACA Policy

The FYI voucher holder must be enrolled in education activities on at least a half-time basis, as defined by the institution which they attend. However, HACA may make exceptions to this requirement if the FYI voucher holder is unable to enroll in a sufficient number of classes due to a lack of course offerings by the educational institution where they are enrolled.

- The FYI voucher holder was participating in a career pathway, as such term is defined in Section 3 of the Workforce Innovation and Opportunity Act (29 U.S.C. 3102).
- The FYI voucher holder was employed.

HACA Policy

HACA will consider the FYI voucher holder to be employed if they work a minimum of 20 hours per week. HACA may make exceptions to this requirement if the FYI voucher holder's hours are reduced due to circumstances beyond their control or the FYI voucher holder must temporarily reduce their work hours due to a verified family emergency.

### FSS Enrollment at 24 Months

If the FYI voucher holder has not been provided an opportunity to enroll in the FSS program during the first 24 months of FYI assistance, HUD encourages the PHA to remind the FYI voucher holder at the 24-month reexamination of the education, workforce development, and employment requirements described above so that they have enough time to meet these requirements prior to the expiration of the 36-month time period for FYI assistance.

HACA Policy

If the FYI voucher holder has not been provided an opportunity to enroll in the FSS program during the first 24 months of FYI assistance, HACA will remind the FYI voucher holder at their second regular reexam of the education, workforce development, and employment requirements described above.

### FSS Enrollment Between 36 and 48 Months

If an FSS slot becomes available between the 36-month and 48-month mark:

- The PHA must offer the slot to an FYI voucher holder who had their voucher extended based on meeting the education, workforce development, or employment requirement listed above, or one of the statutory exceptions listed above (even if the FYI voucher holder previously declined an FSS slot because they met one of the statutory exceptions).

- The PHA must work with the FYI voucher holder to determine whether enrollment in FSS is feasible and in their best interest given any education, workforce development, or employment activities that the FYI voucher holder is engaged in and any statutory exceptions that apply to the FYI voucher holder, as well as the remaining time on their voucher.

- If the FYI voucher holder accepts the FSS slot, the PHA must work with them to establish Contract of Participation goals and an Individual Training and Services Plan (ITSP) that can be accomplished within the time period left on the voucher.

- If the FYI voucher holder is offered an FSS slot prior to the 36-month mark, the FYI voucher holder:

- Will be required to enroll in the FSS program in order to receive an extension of assistance at the end of the 36-month time period (unless they meet one of the statutory exceptions described above).

- Will not be considered to have been "unable to enroll" in the FSS program, and as a result, will not be eligible to receive an extension of assistance based on meeting the education, workforce development, or employment requirements described above.

### FSS Enrollment After 48 Months

The PHA may, but is not required, to offer an FYI voucher holder an FSS slot that becomes available between the 48-month mark and the 60-month mark, since the FYI voucher holder will have already received their second and final extension.

HACA Policy

If an FSS slot becomes available between the 48 and 60-month marks, HACA will not offer the FSS slot to an FYI voucher holder.

**Extensions of Assistance**

At the 36-month and 48-month reexamination, the PHA must extend FYI assistance if the FYI voucher holder is participating in and in compliance with the FSS program as long as the FYI voucher holder is still eligible for the HCV program.

In any case, the FYI voucher holder cannot receive more than a total of 60 months of FYI assistance even if the FSS Contract of Participation time period extends beyond the voucher 60- month mark.

**No FSS Program or Unable to Enroll in FSS**

~~If a PHA does not carry out an FSS program or the FYI voucher holder has been unable to~~ enroll in the program during the first 36 months of receiving FYI assistance, the FYI voucher holder is entitled to receive an extension of assistance for up to two successive 12-month periods beyond the 36-month time limit provided that the FYI voucher holder engaged in at least one of the education, workforce development, or employment activities described above for not less than nine months of the 12-month period preceding each extension. In order to meet the nine months out of the preceding 12 months requirement, the FYI voucher holder may have engaged in one of the education, workforce development, or employment activities described above or a combination of these activities.

**Verification Prior to Annual Reexam**

In order to provide an extension of assistance, the PHA must verify compliance with the above requirements at the end of the 36-month time period and the 48-month time periods. The PHA does not need to verify compliance with these requirements at the end of the 60-month time period since the maximum length of assistance is 60 months.

To verify compliance with the education, workforce development, or employment requirement or one of the statutory exceptions, the PHA must provide the FYI voucher holder written notification informing them that they may receive an extension of their FYI assistance and providing instructions on how the FYI voucher holder may demonstrate that they meet one of these conditions. This notification must be provided sufficiently in advance of the end of the 36-month or 48-month time periods, as applicable, to allow the FYI voucher holder to demonstrate that they meet the education, workforce development, or employment requirement, or one of the statutory exceptions, and for the PHA to conduct an annual reexamination prior to the expiration of the FYI assistance.

HACA Policy

HACA will verify compliance with the education, workforce development, or employment requirement, or one of the statutory exceptions, at the end of the 36-month and 48-month time periods prior to the FYI voucher holder's scheduled annual reexamination. HACA will not verify compliance at the end of the 60-month time period.

HACA will provide each FYI voucher holder on the PHA's program with a written notification informing them that they may receive an extension of their FYI assistance if they meet conditions outlined in this chapter and providing them with instructions on how they may demonstrate compliance at least 60 days prior to their scheduled annual reexam date. When necessary, HACA will provide this notification in a format accessible to FYI voucher holders with disabilities and in a translated format for FYI voucher holders with limited English proficiency in accordance with Chapter 2.

HACA will use the following verification methods to verify an FYI voucher holder's eligibility for voucher extensions:

To verify compliance with the FSS requirement, HACA will examine its records to confirm, or obtain confirmation from the HACA's FSS program staff, that the FYI participant is in compliance with FSS program requirements and has not been terminated from the FSS program.

To meet the education, workforce development, or employment requirement,

HACA will verify that the FYI voucher holder was engaged in at least one education, workforce development, or employment activity for at least nine months of the 12-month period immediately preceding the end of the 36-month or 48-month time period, as applicable.

Due to the timing of when HACA verifies compliance and conducts the annual reexamination, the FYI voucher holder may have not yet met the nine-month requirement but may be able to demonstrate that they will meet the nine-month requirement as of the end of the 36-month or 48-month time period. In such cases, the FYI voucher holder will still be considered to have met the requirements.

In order for the FYI voucher holder to meet one of the statutory exceptions described above, the FYI voucher holder must submit a certification to HACA that they meet one of these exceptions. This certification is the only documentation that the FYI voucher holder must submit in order to demonstrate that they meet one of the statutory exceptions.

An FYI voucher holder who received an extension of voucher assistance at the end of the 36-month time period based on meeting one of the conditions described in this chapter does not have to meet the same conditions when they reach the end of the 48-month time period. The FYI voucher holder may demonstrate that they meet a different condition in order to receive an extension of their assistance.

If the PHA determines that the FYI voucher holder meets one of the statutory conditions, the PHA would then conduct an annual reexamination. If the annual reexamination determines that the FYI voucher holder is still eligible for the HCV program, the PHA must provide the FYI voucher holder the extension of voucher assistance.

**Termination of Assistance for Failure to Meet Conditions**

Failure of the FYI voucher holder to meet one of the above conditions will only impact their ability to receive subsequent extensions of assistance. It will not serve as a basis for terminating the FYI assistance prior to the annual reexam.

If the FYI voucher holder does not meet any of the statutory conditions described in in this chapter, the youth is subject to the statutory time limit of 36 months or the time limit of any extension that the youth has already received, and the FYI voucher must be terminated once they reach this time limit. The calculation of the time limit begins from the date the first HAP contract is signed (for tenant-based vouchers) or from the date the FYI voucher holder entered into the initial lease agreement (for project-based vouchers). The number of months is calculated based on the number of months that HAP subsidy is being paid on behalf of the FYI voucher holder, not the number of months that they are in the FYI program. Prior to termination, the PHA must offer the FYI voucher holder the opportunity to request an informal hearing, in accordance with Chapter 16.

19-II.I. TERMINATION OF ASSISTANCE [FYI FAQs]

Termination of a FYI voucher is handled in the same way as with any HCV; therefore, termination of a FYI voucher must be consistent with HCV regulations at 24 CFR Part 982, Subpart L and PHA policies in Chapter 12. Given the statutory time limit that requires FYI vouchers to sunset, a PHA must terminate the youth's assistance once the limit on assistance has expired.

A PHA cannot terminate a FYI youth's assistance for noncompliance with PCWA case management, nor may the PHA terminate assistance for a FYI youth for not accepting services from the PCWA.

The PHA may not transfer the assistance of FYI voucher holders to regular HCV assistance upon the expiration of the limit on assistance. However, the PHA may issue a regular HCV to FYI voucher holders if they were selected from the waiting list in accordance with PHA policies. The PHA may also adopt a waiting list preference for FYI voucher holders who are being terminated for this reason.

> HACA Policy
>
> HACA provides a selection preference on HACA's HCV waiting list for FYI voucher holders who are terminated due to the time limit on assistance.

## 19-II.J. PORTABILITY [FYI FAQs]

Portability for an FYI youth is handled in the same way as for a regular HCV family. A PHA may not restrict or deny portability for an FYI youth for reasons other than those specified in the HCV program regulations, as reflected in Chapter 10 of the administrative plan.

An FYI youth does not have to port to a jurisdiction that administers FYI vouchers.

If the receiving PHA absorbs the voucher, the PHA may absorb the youth into its regular HCV program if it has vouchers available to do so. If the receiving PHA absorbs the youth into its regular HCV program, that youth becomes a regular HCV participant with none of the limitations of an FYI voucher.

The initial and receiving PHA must work together to initiate termination of assistance upon expiration of the time limit on assistance.

## 19-II.K. PROJECT-BASING FYI VOUCHERS [FYI FAQs; FR Notice 1/24/22]

The PHA may project-base certain FYI vouchers without HUD approval in accordance with all applicable PBV regulations and PHA policies in Chapter 17. This includes FYI vouchers awarded under Notices PIH 2020-28 and PIH 2021-26. Assistance awarded under Notice PIH 2019-20 is prohibited from being project-based.

> HACA Policy
>
> HACA may elect to project-base FYI vouchers.

~~PART III: VETERANS AFFAIRS SUPPORTIVE HOUSING (VASH) PROGRAM~~

## 19-III.A. OVERVIEW

Since 2008, HCV program funding has provided rental assistance under a supportive housing program for homeless veterans. The Veterans Affairs Supportive Housing (VASH) program combines HCV rental assistance with case management and clinical services provided by the Department of Veterans Affairs (VA) at VA medical centers (VAMCs) and Community-Based Outpatient Clinics (CBOCs), or through a designated service provider (DSP) as approved by the VA Secretary. Eligible families are homeless veterans and their families that agree to participate in VA case management and are referred to the VAMC's partner PHA for HCV assistance. The VAMC or DSP's responsibilities include:

- Screening homeless veterans to determine whether they meet VASH program participation criteria;

- Referring homeless veterans to the PHA;

  - The term *homeless veteran* means a veteran who is homeless (as that term is defined in subsection (a) or (b) of Section 103 of the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11302)). See 38 U.S.C. 2002.

- Providing appropriate treatment and supportive services to potential VASH participants, if needed, prior to PHA issuance of a voucher;

- Providing housing search assistance to VASH participants;

- Identifying the social service and medical needs of VASH participants, and providing or ensuring the provision of regular ongoing case management, outpatient health services, hospitalization, and other supportive services as needed throughout the veterans' participation period; and

- Maintaining records and providing information for evaluation purposes, as required by HUD and the VA.

VASH vouchers are awarded noncompetitively based on geographic need and PHA administrative performance. Eligible PHAs must be located within the jurisdiction of a VAMC and in an area of high need based on data compiled by HUD and the VA. When Congress funds a new allocation of VASH vouchers, HUD invites eligible PHAs to apply for a specified number of vouchers.

Generally, the HUD-VASH program is administered in accordance with regular HCV program requirements. However, HUD is authorized to waive or specify alternative requirements to allow PHAs to effectively deliver and administer VASH assistance. Alternative requirements are established in the HUD-VASH Operating Requirements, which were originally published in the Federal Register on May 6, 2008, and updated September 27, 2021. Unless expressly waived by HUD, all regulatory requirements and HUD directives regarding the HCV program are applicable to VASH vouchers, including the use of all HUD-required contracts and other forms, and all civil rights and fair housing requirements. In addition, the PHA may request additional statutory or regulatory waivers that it determines are necessary for the effective delivery and administration of the program.

The VASH program is administered in accordance with applicable Fair Housing requirements since civil rights requirements cannot be waived under the program. These include applicable authorities under 24 CFR 5.105(a) and 24 CFR 982.53 including, but not limited to, the Fair Housing Act, Section 504 of the Rehabilitation Act of 1973, Title VI of the Civil Rights Act of 1964, the Americans with Disabilities Act, and the Age Discrimination Act and all PHA policies as outlined in Chapter 2 of this document.

When HUD-VASH recipients include veterans with disabilities or family members with disabilities, reasonable accommodation requirements in Part II of Chapter 2 of this policy apply.

### 19-III.B. REFERRALS [FR Notice 9/27/21 and HUD-VASH Qs and As]

VAMC case managers will screen all families in accordance with VA screening criteria and refer eligible families to the PHA for determination of program eligibility and voucher issuance. The PHA has no role in determining or verifying the veteran's eligibility under VA screening criteria, including determining the veteran's homelessness status. The PHA must accept referrals from the partnering VAMC and must maintain written documentation of referrals in VASH tenant files. Upon turnover, VASH vouchers must be issued to eligible veteran families as identified by the VAMC.

HACA Policy

In order to expedite the screening process, HACA will provide all forms and a list of documents required for the VASH application to the VAMC. Case managers will work with veterans to fill out the forms and compile all documents prior to meeting with HACA and submitting an application. When feasible, the VAMC case manager should email or fax copies of all documents to the PHA prior to the meeting in order to allow HACA time to review them and start a file for the veteran.

After the VAMC has given HACA a complete referral, HACA will perform an eligibility screening within five business days of receipt of a VAMC referral.

### 19-III.C. HCV PROGRAM ELIGIBILITY [FR Notice 9/27/21]

Eligible participants are homeless veterans and their families who agree to participate in case management from the VAMC.

- A *VASH Veteran* or *veteran family* refers to either a single veteran or a veteran with a household composed of two or more related persons. It also includes one or more eligible persons living with the veteran who are determined to be important to the veteran's care or well-being.

- A veteran for the purpose of VASH is a person whose length of service meets statutory requirements, and who served in the active military, naval, or air service, was discharged or released under conditions other than dishonorable, and is eligible for VA health care.

- Under VASH, PHAs do not have authority to determine family eligibility in accordance with HCV program rules and PHA policies. The only reasons for denial of assistance by the

PHA are failure to meet the income eligibility requirements and/or that a family member is subject to a lifetime registration requirement under a state sex offender registration program. Under portability, the receiving PHA must also comply with these VASH screening requirements.

## Social Security Numbers

When verifying Social Security numbers (SSNs) for homeless veterans and their family members, an original document issued by a federal or state government agency, which contains the name and SSN of the individual along with other identifying information of the individual, is acceptable in accordance with Section 7-II.B. of this policy.

In the case of the homeless veteran, the PHA must accept the Certificate of Release or Discharge from Active Duty (DD-214) or the VA-verified Application for Health Benefits (10-10EZ) as verification of SSN and cannot require the veteran to provide a Social Security card. A VA-issued identification card may also be used to verify the SSN of a homeless veteran.

### Proof of Age

The DD-214 or 10-10EZ must be accepted as proof of age in lieu of birth certificates or other PHA-required documentation as outlined in Section 7-II.C. of this policy. A VA-issued identification card may also be used to verify the age of a homeless veteran.

### Photo Identification

A VA-issued identification card must be accepted in lieu of another type of government-issued photo identification. These cards also serve as verification of SSNs and date of birth.

### Income Eligibility

The PHA must determine income eligibility for VASH families in accordance with 24 CFR 982.201 and policies in Section 3-II.A. If the family is over-income based on the most recently published income limits for the family size, the family will be ineligible for HCV assistance.

While income-targeting does not apply to VASH vouchers, the PHA may include the admission of extremely low-income VASH families in its income targeting numbers for the fiscal year in which these families are admitted.

> HACA Policy
>
> While income-targeting requirements will not be considered by HACA when families are referred by the partnering VAMC, HACA will include any extremely low-income VASH families that are admitted in its income targeting numbers for the fiscal year in which these families are admitted.
>
> HACA will admit VASH referrals who qualify under the low income (80%) limit.

**Screening**

The PHA may not screen any potentially eligible family members or deny assistance for any grounds permitted under 24 CFR 982.552 and 982.553 with one exception: the PHAs is still required to prohibit admission if any member of the household is subject to a lifetime registration requirement under a state sex offender registration program. Accordingly, with the exception of denial for registration as a lifetime sex offender under state law and PHA policies on how sex offender screenings will be conducted, PHA policy in Sections 3-III.B. through 3-III.E. do not apply to VASH. The prohibition against screening families for anything other than lifetime sex offender status applies to all family members, not just the veteran.

If a family member is subject to lifetime registration under a state sex offender registration program, the remaining family members may be served if the family agrees to remove the sex offender from its family composition. This is true unless the family member subject to lifetime registration under a state sex offender registration program is the homeless veteran, in which case the family would be denied admission to the program [New HCV GB, *HUD-VASH,* p. 6].

**Denial of Assistance [Notice PIH 2008-37]**

Once a veteran is referred by the VAMC, the PHA must either issue a voucher or deny assistance. If the PHA denies assistance, it must provide the family with prompt notice of the decision and a brief statement of the reason for denial in accordance with Section 3-III.F. Like in the standard HCV program, the family must be provided with the opportunity for an informal review in accordance with policies in Section 3-III.F. In addition, a copy of the denial notice must be sent to the VAMC case manager.

## 19-III.D. CHANGES IN FAMILY COMPOSITION

**Adding Family Members [FR Notice 9/27/21]**

When adding a family member after the family has been admitted to the program, PHA policies in Section 3-II.B. apply. Other than the birth, adoption, or court-awarded custody of a child, the PHA must approve additional family members and will apply its regular screening criteria in doing so.

**Remaining Family Members [HUD-VASH Qs and As]**

If the homeless veteran dies while the family is being assisted, the voucher would remain with the remaining members of the tenant family. The PHA may use one of its own regular vouchers, if available, to continue assisting this family and free up a VASH voucher for another VASH-eligible family. If a regular voucher is not available, the family would continue utilizing the VASH voucher. Once the VASH voucher turns over, however, it must go to a homeless veteran family.

**Family Break Up [HUD-VASH Qs and As]**

In the case of divorce or separation, since the set-aside of VASH vouchers is for veterans, the voucher must remain with the veteran. This overrides the PHA's policies in Section 3-I.C. on how to determine who remains in the program if a family breaks up.

### 19-III.E. LEASING [FR Notice 9/27/21]

**Waiting List**

The PHA does not have the authority to maintain a waiting list or apply local preferences for HUD–VASH vouchers. Policies in Chapter 4 relating to applicant selection from the waiting list, local preferences, special admissions, cross-listing, and opening and closing the waiting list do not apply to VASH vouchers.

**Exception Payment Standards**

To assist VASH participants in finding affordable housing, especially in competitive markets, HUD allows PHAs to establish a HUD-VASH exception payment standard. PHAs may go up to but no higher than 120 percent of the published area-wide fair market rent (FMR) or small area fair market rent (SAFMR) specifically for VASH families. PHAs who want to establish a VASH exception payment standard over 120 percent must still request a waiver from HUD through the regular waiver process outlined in Notice PIH 2018-16.

> HACA Policy
>
> HACA may establish a HUD-VASH exception payment standard at 120% of the published area-wide FMR.

**Voucher Issuance**

Unlike the standard HCV program which requires an initial voucher term of at least 60 days, VASH vouchers must have an initial search term of at least 120 days. PHA policies on extensions as outlined in Section 5-II.E. will apply.

> HACA Policy
>
> All VASH vouchers will have an initial term of 120 calendar days.
>
> The family must submit a Request for Tenancy Approval and proposed lease within the 120-day period unless HACA grants an extension.
>
> The PHA must track issuance of HCVs for families referred by the VAMC or DSP in PIC as required in Notice PIH 2011-53.

**Initial Lease Term**

Unlike in the standard the HCV program, VASH voucher holders may enter into an initial lease that is for less than 12 months. Accordingly, PHA policy in Section 9-I.E., Term of Assisted

Tenancy, does not apply.

### Ineligible Housing [FR Notice 6/18/14]

Unlike in the standard HCV program, VASH families are permitted to live on the grounds of a VA facility in units developed to house homeless veterans. This applies to both tenant-based assistance and PBV. Therefore, 24 CFR 982.352(a)(5) and 983.53(a)(2), which prohibit units on the physical grounds of a medical, mental, or similar public or private institution, do not apply to VASH for this purpose only. Accordingly, PHA policy in 9-I.D., Ineligible Units, does not apply for this purpose only.

### HQS Pre-Inspections

To expedite the leasing process, PHAs may pre-inspect available units that veterans may be interested in leasing in order to maintain a pool of eligible units. If a VASH family selects a unit that passed an HQS inspection (without intervening occupancy) within 45 days of the date of the Request for Tenancy Approval (Form HUD-52517), the unit may be approved if it meets all other conditions under 24 CFR 982.305. However, the veteran must be free to select their unit and cannot be steered to these units.

> HACA Policy
>
> To expedite the leasing process, HACA may pre-inspect available units that veterans may be interested in leasing to maintain a pool of eligible units. If a VASH family selects a unit that passed a HQS pre-inspection (without intervening occupancy) within 45 days of the date of the RTA, the unit may be approved provided that it meets all other conditions under 24 CFR 982.305. The veteran will be free to select their unit.
>
> When a pre-inspected unit is not selected, HACA will make every effort to fast-track the inspection process, including adjusting the normal inspection schedule for both initial and any required reinspections.

### 19-III.F. PORTABILITY [FR Notice 9/27/21 and Notice PIH 2011-53]

### General Requirements

Portability policies under VASH depend on whether the family wants to move within or outside of the initial VA facility's catchment area (the area in which the VAMC or DSP operates). In all cases, the initial VA facility must be consulted prior to the move and provide written confirmation that case management will continue to be provided in the family's new location. VASH participant families may only reside in jurisdictions that are accessible to case management services, as determined by case managers at the partnering VAMC or DSP.

> Under VASH, applicant families may move under portability even if the family did not have legal residency in the jurisdiction of the initial PHA when they applied. As a result, PHA policies in Section 10-II.B. about nonresident applicants do not apply.
>
> If the family no longer requires case management, there are no portability restrictions. Normal portability rules apply.

### Portability within the Initial VAMC or DSP's Catchment Area

A VASH family can move within the VAMC's catchment area as long as case management can still be provided, as determined by the VA. If the initial PHA's partnering VAMC will still provide the case management services, the receiving PHA must process the move in accordance with portability procedures:

- o If the receiving PHA has been awarded VASH vouchers, it can choose to either bill the initial PHA or absorb the family if it has a VASH voucher available to do so.
- o If the PHA absorbs the family, the VAMC or DSP providing the initial case management must agree to the absorption and the transfer of case management.
- o If the receiving PHA does not administer a VASH program, it must always bill the initial PHA.

**Portability Outside of the Initial VAMC or DSP's Catchment Area**

If a family wants to move to another jurisdiction where it will not be possible for the initial PHA's partnering VAMC or DSP to provide case management services, the initial VAMC or DSP must first determine that the VASH family could be served by another VAMS or DSP that is participating in the VASH program, and the receiving PHA has an available VASH voucher.

In these cases, the family must be absorbed by the receiving PHA either as a new admission or as a portability move-in, as applicable. Upon absorption, the initial PHA's VASH voucher will be available to lease to a new VASH-eligible family, and the absorbed family will count toward the number of VASH slots awarded to the receiving PHA.

**Portability Outside of the Initial VAMC or DSP's Catchment Area under VAWA**

Veterans who request to port beyond the catchment area of the VAMC or DSP where they are receiving case management to protect the health or safety of a person who is or has been the victim of domestic violence, dating violence, sexual assault, or stalking, and who reasonably believes they are threatened with imminent harm from further violence by remaining in the unit may port prior to receiving approval from the receiving VAMC or DSP. The initial PHA must follow its emergency transfer plan (see Exhibit 16-3). PHAs may require verbal self-certification or a written request from a participant seeing a move beyond the catchment area of the VAMC or DSP.

The verbal self-certification or written request must include either a statement expressing why the participant reasonably believes that there is a threat of imminent harm from further violence if they were to remain in the same unit or a statement that the tenant was a sexual assault victim and that the sexual assault occurred on the premises during the 90-day period preceding the participants request for the move.

The participant must still port to a PHA that has a VASH program. If the receiving PHA does not have a VASH voucher available to lease, they may bill the initial PHA until a VASH voucher is available, at which point the porting veteran must be absorbed into the receiving PHA's program.

## 19-III.G. TERMINATION OF ASSISTANCE [FR Notice 9/27/21]

With the exception of terminations for failure to receive case management, HUD has not established any alternative requirements for termination of assistance for VASH participants. However, prior to terminating VASH participants, HUD strongly encourages

PHAs to exercise their discretion under 24 CFR 982.552(c)(2) as outlined in Section 12-II.D. of this policy and consider all relevant circumstances of the specific case. This includes granting reasonable accommodations for persons with disabilities, as well as considering the role of the case manager and the impact that ongoing case management services can have on mitigating the conditions that led to the potential termination.

VASH participant families may not be terminated after admission for a circumstance or activities that occurred prior to admission and were known to the PHA but could not be considered at the time of admission due to VASH program requirements. The PHA may terminate the family's assistance only for program violations that occur after the family's admission to the program.

**Cessation of Case Management**

As a condition of receiving HCV rental assistance, a HUD-VASH-eligible family must receive case management services from the VAMC or DSP. A VASH participant family's assistance must be terminated for failure to participate, without good cause, in case management as verified by the VAMC or DSP.

However, a VAMC or DSP determination that the participant family no longer requires case management is not grounds for termination of voucher or PBV assistance. In such a case, at its option, the PHA may offer the family continued assistance through one of its regular vouchers. If the PHA has no voucher to offer, the family will retain its VASH voucher or PBV unit until such time as the PHA has an available voucher for the family.

**VAWA [FR Notice 9/27/21]**

When a veteran's family member is receiving protection under VAWA because the veteran is the perpetrator of domestic violence, dating violence, sexual assault, or stalking, the victim must continue to be assisted. Upon termination of the perpetrator's VASH assistance, the victim must be given a regular HCV if one is available, and the perpetrator's VASH voucher must be used to serve another eligible veteran family. If a regular HCV is not available, the perpetrator must be terminated from assistance and the victim will continue to use the VASH voucher.

## ~~19-III.H. PROJECT-BASING VASH VOUCHERS~~

### General Requirements [Notice PIH 2017-21 and FR Notice 9/27/21]

PHAs are authorized to project-base their tenant-based VASH vouchers without additional HUD review or approval in accordance with Notice PIH 2017-21 and all PBV program requirements provided that the VAMC will continue to make supportive services available In addition, since 2010, HUD has awarded VASH vouchers specifically for project-based assistance in the form of PBV HUD-VASH set-aside vouchers. While these vouchers are excluded from the PBV program cap as long as they remain under PBV HAP contract at the designated project, all other VASH vouchers are subject to the PBV program percentage limitation discussed in Section 17-I.A. Note that VASH supportive services only need to be provided to VASH families receiving PBV assistance in the project, not all families receiving PBV assistance in the project. If a VASH family does not require or no longer requires case management, the unit continues to count as an excepted PBV unit as long as the family resides in the unit.

If the PHA project-bases VASH vouchers, the PHA must consult with the partnering VAMC or DSP to ensure approval of the project or projects. PHAs may project-base VASH vouchers in projects alongside other PBV units and may execute a single HAP contract covering both the VASH PBVs and the other PBVs. The PHA must refer only VASH families to PBV units exclusively made available to VASH families and to PBV units funded through a HUD set-aside award.

If a VASH family is referred to the PHA and there is an available PBV unit that is not exclusively made available to VASH families, the PHA may offer to refer the family to the owner if allowable under the selection policy for that project, and the owner and PHA may amend the HAP contract to designate the PBV unit as a VASH PBV unit.

The PHA and owner may agree to amend a PBV HAP contract to redesignate a regular PBV unit as a unit specifically designated for VASH families so long as the PHA first consults with the VAMC or DSP. Additionally, the PHA and owner may agree to amend a PBV HAP contract to redesignate a unit specifically designated for VASH families as a regular PBV unit, so long as the unit is not funded through a VASH PBV set-aside award and is eligible for regular PBV (i.e., the unit is not on the grounds of a medical facility and the unit is eligible under the PHA's program and project caps).

Policies for VASH PBV units will generally follow PHA policies for the standard PBV program as listed in Chapter 17, with the exception of the policies listed below.

### Failure to Participate in Case Management [FR Notice 9/27/21]

Upon notification by the VAMC or DSP of the family's failure to participate, without good cause, in case management, the PHA must provide the family a reasonable time period to vacate the unit. The PHA must terminate assistance to the family at the earlier of either the time the family vacates or the expiration of the reasonable time period given to vacate.

HACA Policy

Upon notification by the VAMC or DSP that a VASH PBV family has failed to participate in case management without good cause, HACA will provide written notice of termination of assistance to the family and the owner within 10 business days. The family will be given 60 days from the date of the notice to move out of the unit.

HACA may make exceptions to this 60-day period if needed for reasons beyond the family's control such as death, serious illness, or other medical emergency of a family member.

If the family fails to vacate the unit within the established time, the owner may evict the family. If the owner does not evict the family, the PHA must remove the unit from the HAP contract or amend the HAP contract to substitute a different unit in the project if the project is partially assisted. The PHA may add the removed unit to the HAP contract after the ineligible family vacates the property.

**Moves [HUD-VASH Qs and As, FR Notice 9/27/21]**

When a VASH PBV family is eligible to move from its PBV unit in accordance with Section 17-VIII.C. of this policy, but there is no other comparable tenant-based rental assistance, the following procedures must be implemented:

- If a VASH tenant-based voucher is not available at the time the family wants (and is eligible) to move, the PHA may require a family who still requires case management to wait for a VASH tenant-based voucher for a period not to exceed 180 days;

- If a VASH tenant-based voucher is still not available after that period, the family must be allowed to move with its VASH voucher. Alternatively, the PHA may allow the family to move with its VASH voucher without having to meet this 180-day period. In either case, the PHA is required to replace the assistance in the PBV unit with one of its regular vouchers, unless the PHA and owner agree to temporarily remove the unit from the HAP contract; and

- If a VASH veteran is determined to no longer require case management, the PHA must allow the family to move with the first available tenant-based voucher if not VASH voucher is immediately available and cannot require the family to wait for a VASH voucher to become available.

## PART IV: MAINSTREAM VOUCHER PROGRAM

### 19-IV.A. PROGRAM OVERVIEW [Notice PIH 2024-30 updates Sections 5 (f) and (g) of PIH 2020-01; PIH 2012-31]

Mainstream vouchers assist non-elderly persons with disabilities and their families in the form of either project-based or tenant-based voucher assistance.

Mainstream Vouchers are special purpose vouchers for non-elderly persons with disabilities that are subject to the requirements in Section 8(o) of the 1937 Act and 24 CFR 982 except as provided in this notice and any subsequent notice issued by HUD. However, funding and reporting for Mainstream Vouchers is separate from the HCV

program.

In targeting housing assistance to non-elderly persons with disabilities and their families, particularly those transitioning out of institutions or at serious risk of institutionalization, Mainstream Vouchers help further the goals of the Americans with Disabilities Act (ADA).

The Mainstream voucher program, (previously referred to as the Mainstream 5-Year program or the Section 811 voucher program) was originally authorized under the National Affordable Housing Act of 1990. Mainstream vouchers operated separately from the regular HCV program until the passage of the Frank Melville Supportive Housing Investment Act of 2010. Funding for Mainstream voucher renewals and administrative fees was first made available in 2012. In 2017 and 2019, incremental vouchers were made available for the first time since the Melville Act (in addition to renewals and administrative fees), and PHAs were invited to apply for a competitive award of Mainstream vouchers under the FY17 and FY19 NOFAs. In 2020, Notice PIH 2020-22 provided an opportunity for any PHA administering an HCV program to apply for Mainstream vouchers noncompetitively, while Notice PIH 2020-09 authorized an increase in Mainstream voucher units and budget authority for those PHAs already awarded Mainstream vouchers under the FY17 and FY19 NOFAs.

Funds for Mainstream vouchers may be recaptured and reallocated if the PHA does not comply with all program requirements or fails to maintain a utilization rate of 80 percent for the PHA's Mainstream vouchers.

Notice PIH **2024-30 updates Sections 5 (f) and (g) of PIH** 2020-01 established waivers and alternative requirements for Mainstream Vouchers that are necessary for the effective delivery and administration of funds. The policies in this section incorporate the mandatory and optional waivers allowed per PIH 2024-30.


### 19-IV.B. ELIGIBLE POPULATION [Notice PIH 2020-01 and Notice PIH 2020-22]

All Mainstream vouchers must be used to serve non-elderly persons with disabilities and their families, defined as any family that includes a person with disabilities who is at least 18 years old and not yet 62 years old as of the effective date of the initial HAP contract. The eligible disabled household member does not need to be the head of household.

The definition of person with disabilities for purposes of Mainstream vouchers is the statutory definition under section 3(b)(3)(E) of the 1937 Act, which is the same as is used for allowances and deductions in the HCV program and is provided in Exhibit 3-1 of this policy.

Existing families receiving Mainstream vouchers, where the eligible family member is now age 62 or older, will not "age out" of the program as long as the family was eligible on the day it was first assisted under a HAP contract.

The PHA may not implement eligibility screening criteria for Mainstream vouchers that is different from that of the regular HCV program.

### 19-IV.C. PARTNERSHIP AND SUPPORTIVE SERVICES [Notice PIH 2020-01]

PHAs are encouraged but not required to establish formal and informal partnerships with a variety of organizations that assist persons with disabilities to help ensure eligible participants find and maintain stable housing.

> HACA Policy
>
> The PHA will implement a Mainstream program, in partnership with Integral Care, ARCIL, and other agencies throughout the Austin/Travis County Continuum of Care.

### 19-IV.D. WAITING LIST ADMINISTRATION

**General Waiting List Requirements** Notice PIH **2024-30 updates Sections 5 (f) and (g) of PIH** 2020-01

As allowed per Notice PIH 2024-30, HACA established a waiting list separate from their HCV waiting list for Mainstream Vouchers

HACA's Mainstream waiting list will rely on the date and time of their Mainstream voucher application.

Upon turnover, vouchers must be provided to Mainstream-eligible families. If a Mainstream turnover voucher becomes available, HACAmust determine if the families at the top of the Mainstream voucher waiting list qualify under program requirements.

HACA will ensure effective communication is provided to ensure that families on its HCV waiting list are informed of the separate Mainstream Voucher waiting list and have an opportunity to be placed on the list

HACA will inform families on the HCV waiting list of the Mainstream Voucher waiting list by posting the information on HACA's website.

When notifying families and providing notice, HACA will describe the eligibility criteria for Mainstream Vouchers and describe the actions a family should take to be added to the Mainstream Voucher waiting list. HACA's notice will make clear to applicants that if they decide to be included on the Mainstream waiting list, they will not lose their position on the HCV waiting list. HACA will take reasonable steps to ensure meaningful access to persons with disabilities, including persons with vision, hearing, speech, intellectual or developmental disabilities, or any other communication-related disabilities and for persons with limited English proficiency (LEP).

**Local Preferences [Notice PIH 2024-30, Notice PIH 2020-01; FY17 Mainstream NOFA; FY19 Mainstream NOFA]**

If the PHA claimed points for a preference in a NOFA application for Mainstream vouchers, the PHA must adopt a preference for at least one of the targeted groups identified in the NOFA. Per **Notice PIH 2024-30**, PHAs may establish separate preferences for Mainstream voucher applicants.

HACA has established referral preferences to place applicants on the Mainstream Voucher wait list from the following partner agencies:

- Ending Community Homeless Coalition – www.austinecho.org
- Integral Care – integralcare.org
- ARCIL (A Resource Center for Independent Living) – arcilinc.org

> HACA will make information regarding partner agency referrals publicly available, by providing clear information on these partnerships and the direct referrals process on HACA's website to include the names and contact information of the partnering agencies (24 CFR 982.54(d)(1)). Written documentation of these referrals will be maintained in the tenant file by the PHA.

> HACA Local Preference Policy

> HACA claimed a preference for a targeted group as part of an application for Mainstream vouchers under a NOFA. The PHA will offer the following preference:

> - HACA will provide a preference for non-elderly persons with disabilities transitioning out of institutional and other congregate settings, or who are non-elderly persons with disabilities who are homeless.

### Mainstream NED for homeless or institutional transitions

For the issuance of Mainstream NED vouchers, only applicants certified eligible for Mainstream NED Vouchers will be issued a Mainstream NED voucher. To be an eligible application for a Mainstream NED voucher, HACA will have to receive both (1) a completed application and (2) a completed referral from ECHO, Integral Care, ARCIL, or verification of age, verification of disability, and verification of homelessness or verification of residence in an eligible institution or eligible segregated setting. Until both are received, the application will not be considered an eligible application. The applicant will only be placed on the waiting list once both documents have been received.

Therefore, Mainstream NED eligible applicants are granted a preference over all other applicants not eligible for Mainstream NED vouchers. Applicants certified eligible for the Mainstream NED vouchers will be coded as such on HACA's Mainstream voucher waiting list. This preference will be granted only for the issuance of Mainstream NED vouchers and not any other voucher. If Mainstream NED vouchers are not available, Mainstream NED eligible families will maintain their original place on the waiting list for the issuance of other vouchers. All families granted a Mainstream NED preference will be prioritized based on date and time of being certified eligible and any other applicable preference (elderly, disabled, displaced, homeless, residency).

Placing Mainstream NED eligible families referred by ECHO, Integral Care, or ARCIL, or by direct application with necessary supplemental documentation on HACA's Mainstream voucher waiting list:

Those eligible applicants on the current waiting list will have priority over families not on the waiting list.  If additional funding is available, and all eligible families on the waiting list are exhausted, the waiting list will remain open for Mainstream NED eligible families. Eligibility for the Mainstream NED vouchers will be based on the respective HUD Notice of Funding. When HACA receives a completed application and referral from ECHO, Integral Care, ARCIL, or necessary supplemental documents, the applicant will be placed on the waiting list after all lottery applicants and in order according to the date and time when HACA first had received both documents.

If a family coded as Mainstream NED ceases to meet the criteria for Mainstream NED eligibility before the family has moved into an assisted unit, HACA will remove the Mainstream NED coding.  If the family was previously on the waiting list, they will maintain their original place on the waiting list.  If the family was only on the waiting list due to a Mainstream NED referral or a direct application for a Mainstream NED voucher, they will be removed from the waiting list or lose their voucher if already issued.

### 19-IV.E. PORTABILITY [Notice PIH 2020-01 and Mainstream Voucher Basics Webinar, 10/15/20]

Mainstream voucher participants are eligible for portability under standard portability rules and all PHA policies regarding portability in Chapter 10, Part II apply to Mainstream families.

The following special considerations for Mainstream vouchers apply under portability:

- If the receiving PHA has a Mainstream voucher available, the participant may remain a Mainstream participant.

- If the receiving PHA chooses to bill the initial PHA, then the voucher will remain a Mainstream voucher.

- If the receiving PHA chooses to absorb the voucher, the voucher will be considered a regular voucher, or a Mainstream voucher if the receiving PHA has a Mainstream voucher available, and the Mainstream voucher at the initial PHA will be freed up to lease to another Mainstream-eligible family.

If the receiving PHA does not have a Mainstream voucher available, the participant may receive a regular voucher.### 19-IV.F. PROJECT-BASING MAINSTREAM VOUCHERS [FY19 Mainstream Voucher NOFA Q&A]

The PHA may project-base Mainstream vouchers in accordance with all applicable PBV regulations and PHA policies in Chapter 17. PHAs are responsible for ensuring that, in addition to complying with project-based voucher program requirements, the project complies with all applicable federal nondiscrimination and civil rights statutes and requirements. This includes, but is not limited to, Section 504 of the Rehabilitation Act (Section 504), Titles II or III of the Americans with Disabilities (ADA), and the Fair Housing Act and their implementing regulations at 24 CFR Part 8; 28 CFR Parts 35 and 36; and 24 CFR Part 100. Mainstream vouchers are subject to the PBV program percentage limitation discussed in Section 17-I.A.

### 19.IV.G EXTRAORDINARY ADMINISTRATIVE FEES (EAF) [Notice PIH 2022-19]

This extraordinary administrative funding must be used to support the Mainstream Voucher Program for two purposes: (1) any currently eligible voucher administrative costs, including activities to support housing search and lease up of eligible applicants; and (2) costs related to the retention, recruitment, and support of participating owners in the form of security deposits, signing bonuses, vacancy payments, and damage mitigation. Note that the uses of extraordinary administrative funding for retention, recruitment and support of participating owners described in this notice are unique to these amounts and include specific uses that regular, ongoing administrative fees cannot cover.

The funding provided through this notice cannot be used for the repayment of debts or any amounts owed to HUD or program participants including, but not limited to, Office of

Inspector General (OIG), Quality Assurance Division (QAD) or other monitoring review findings. Additionally, administrative fee funds provided through this notice considered for salaries, bonuses and/or employee incentives must comply with the executive compensation requirements under Section 220 of Public Law No. 116-94, Further Consolidated Appropriations Act, 2020 and must comply with reasonable compensation requirements found at 2 CFR Part 200.430(b).

The extraordinary administrative fees allocated through this notice are funded through carryover from previous appropriations for Mainstream vouchers. Funds will be reported using standard protocols for Mainstream vouchers (see PIH Notice 2020-01: Revised Policies and Procedures for the Mainstream Voucher Program).

HACA PolicyHACA will use Mainstream EAF for currently eligible administrative costs and to assist Mainstream clients with paying security deposits. The amount of the security deposit assistance may not exceed the lesser of two months' rent to owner, the maximum security deposit allowed under applicable state and/or local law, or the actual security deposit required by the owner. Security deposit assistance will be for initial move-ins and paid directly to the owner on behalf of the family when other resources cannot. HACA will offer security deposit assistance to new Mainstream participants for initial lease-up at admission until the EAF is exhausted.

**19.IV.H Mandatory Mainstream Voucher Waivers as required per Notice PIH 2024-30**

**Initial Search Term**

**HACA Policy**

The initial search term for a Mainstream voucher is 120 days. The initial 120-day term also applies when a family chooses to move to a new unit with continued assistance inside or outside the PHA's jurisdiction, in accordance with 24 CFR 982 subpart H.

When issuing a Mainstream Voucher, HACA will provide a current listing of available accessible units known to HACA.

**Extensions of Term**

**HACA Policy**

HACA will grant extensions of the initial 120-day term for Mainstream voucher applicants and participants as outlined below:

1) HACA will notify the family prior to the initial term expiration to remind them of the term expiration date, the process for requesting an extension, and to inquire if the family needs assistance with their housing search.
2) Extension requests may be made in writing or verbally
3) Each extension will be for a minimum of 90 days
4) HACA will approve the first extension request, regardless of how the request is made

(written or verbal), as long as the request is made on or before the term expiration date,

As part of its search extension policy, HACA will not restrict a first extension approval to certain circumstances or require documentation from applicants.  For all extension requests, the written or verbal request is sufficient.  Note that this alternative requirement also applies to current Mainstream Voucher participants who choose to move to a new unit with continued assistance inside or outside HACA's jurisdiction, in accordance with 24 CFR 982 subpart H.  In providing notice to families of the expiration date and extension request process, HACA will ensure effective communication with persons with disabilities, including those with vision, hearing, speech, intellectual or other developmental disabilities, or any other communication-related disabilities.

**Residency Preference**

Because Mainstream Vouchers are intended to facilitate access to housing for individuals with disabilities, including for individuals who reside in institutional or other segregated settings that may not be located in the geographic area that is typically served by a PHA, a residency preference may prevent an otherwise eligible applicant from accessing Mainstream Vouchers. Consequently, HUD is waiving Section 8(o)(6)(A) of the 1937 Act and 24 CFR 982.207(b)(1) and establishing an alternative requirement under which a PHA cannot apply a residency preference to Mainstream Voucher applicants.

HACA Policy

A residency preference will not be applied for any Mainstream Voucher applicant.

## PART IV: NON-ELDERLY DISABLED (NED) VOUCHERS

## 19-V.A. PROGRAM OVERVIEW [Notice PIH 2013-19]

NED vouchers help non-elderly disabled families lease suitable, accessible, and affordable housing in the private market. Aside from separate funding appropriations and serving a specific population, NED vouchers follow the same program requirements as standard vouchers. The PHA does not have special authority to treat families that receive a NED voucher differently from other applicants and participants.

Some NED vouchers are awarded to PHAs through competitive NOFAs. The NOFA for FY2009 Rental Assistance for NED made incremental funding available for two categories of NED families:

- **Category 1** vouchers enable non-elderly persons or families with disabilities to access affordable housing on the private market.

- **Category 2** vouchers enable non-elderly persons with disabilities currently residing in nursing homes or other healthcare institutions to transition into the community. PHAs with NED Category 2 vouchers were required to partner with a state Medicaid or health agency or the state Money Follows the Person (MFP) Demonstration agency.

- Since 1997, HCVs for NED families have been also awarded under various special purpose HCV programs: Rental Assistance for Non-Elderly Persons with Disabilities in Support of Designated Housing Plans (Designated Housing), Rental Assistance for Non-Elderly Persons with Disabilities Related to Certain Types of Section 8 Project-Based Developments (Certain Developments), One-Year Mainstream Housing Opportunities for Persons with Disabilities, and the Project Access Pilot Program (formerly Access Housing 2000).

- **Designated Housing** vouchers enable non-elderly disabled families, who would have been eligible for a public housing unit if occupancy of the unit or entire project had not been restricted to elderly families only through an approved Designated Housing Plan, to receive rental assistance. These vouchers may also assist non-elderly disabled families living in a designated unit/project/building to move from that project if they so choose.  The family does not have to be listed on the PHA's voucher waiting list. Instead, they may be admitted to the program as a special admission. Once the impacted families have been served, the PHA may begin issuing these vouchers to non-elderly disabled families from their HCV waiting list. Upon turnover, these vouchers must be issued to non-elderly disabled families from the PHA's HCV waiting list.

- **Certain Developments** vouchers enable non-elderly families having a person with disabilities, who do not currently receive housing assistance in certain developments where owners establish preferences for, or restrict occupancy to, elderly families, to obtain affordable housing. These non-elderly families with a disabled person do not need to be listed on the PHA's HCV waiting list in order to be offered and receive housing choice voucher rental assistance. It is sufficient that these families' names are on the waiting list for a covered development at the time their names are provided to the PHA by the owner. Once the impacted families have been served, the PHA may begin issuing these vouchers to non-elderly disabled families from their HCV waiting list. Upon turnover, these vouchers must be issued to non-elderly disabled families from the PHA's HCV waiting list.

- **One-Year Mainstream Housing Opportunities for Persons with Disabilities** (**One-Year Mainstream**) **vouchers** enable non-elderly disabled families on the PHA's waiting list to receive a voucher.  After initial leasing, turnover vouchers must be issued to non-elderly disabled families from the PHA's voucher waiting list.

## 19-V.B. ELIGIBLE POPULATION

**General Requirements [Notice PIH 2013-19]**

Only eligible families whose head of household, spouse, or cohead is non-elderly (under age 62) and disabled may receive a NED voucher. Families with only a minor child with a disability are not eligible.

In cases where the qualifying household member now qualifies as elderly due to the passage of time since the family received the NED voucher, existing NED participant families do not "age out," as the family was eligible on the day it was first assisted under a housing assistance payments (HAP) contract.

The definition of person with disabilities for purposes of NED vouchers is the statutory definition under Section 3(b)(3)(E) of the 1937 Act, which is the same as is used for allowances and deductions in the HCV program and is provided in Exhibit 3-1 of this policy.

The PHA may not implement eligibility screening criteria for NED vouchers that is different from that of the regular HCV program.

**NED Category 2 [Notice PIH 2013-19 and NED Category 2 FAQs]**

In addition to being eligible for the PHA's regular HCV program and a non-elderly person with a disability, in order to receive a Category 2 voucher, the family's head, spouse, cohead, or sole member must be transitioning from a nursing home or other healthcare institution and  provided services needed to live independently in the community.

Nursing homes or other healthcare institutions may include intermediate care facilities and specialized institutions that care for those with intellectual disabilities, developmentally disabled, or mentally ill, but do not include board and care facilities (e.g., adult homes, adult day care, adult congregate living).

The PHA cannot limit who can apply to just those persons referred or approved by a Money Follows the Person (MFP) Demonstration agency or state health agency. Other individuals could be placed on the waiting list if they can show, with confirmation by an independent agency or organization that routinely provides such services (this can be the MFP or partnering agency, but need not be), that the transitioning individual will be provided with all necessary services, including care or case management.

For each Category 2 family, there must be documentation (e.g., a copy of a referral letter from the partnering or referring agency) in the tenant file identifying the institution where the family lived at the time of voucher issuance.

**19-V.C. WAITING LIST**

**General Requirements [Notice PIH 2013-19]**

Families must be selected for NED vouchers from the PHA's waiting list in accordance with all applicable regulations and PHA policies in Chapter 4.

Regardless of the number of NED families the PHA is required to serve, the next family on the

waiting list must be served. Further, the PHA may not skip over NED-eligible families on the waiting list because the PHA is serving the required number of NED families.

**NED Category 2 Referrals [NED Category 2 FAQs]**

For NED Category 2 families, the partnering agency may make referrals of eligible families to the PHA for placement on the waiting list. The PHA will then select these families from the waiting list for voucher issuance. Because language in the NOFA established that vouchers awarded under the NOFA must only serve non-elderly disabled families transitioning from institutions, the PHA does not need to establish a preference in order to serve these families ahead of other families on the PHA's waiting list.

PHAs must accept applications from people living outside their jurisdictions or from people being referred from other Medicaid or MFP service agencies in their state.

If the PHA's waiting list is closed, the PHA must reopen its waiting list to accept referrals from its partnering agency. When opening the waiting list, PHAs must advertise in accordance with 24 CFR 982.206 and PHA policies in Section 4-II.C. In addition, the PHA must ensure that individuals living in eligible institutions are aware when the PHA opens its waiting list by reaching out to social service agencies, nursing homes, intermediate care facilities and specialized institutions in the local service area.

**Reissuance of Turnover Vouchers [Notice PIH 2013-19]**

All NED turnover vouchers must be reissued to the next NED family on the PHA's waiting list with the following exception: A Category 2 voucher must be issued to another Category 2 family upon turnover if a Category 2 family is on the PHA's waiting list. If there are no Category 2 families on the PHA's waiting list, the PHA must contact its partnering agency as well as conduct outreach through appropriate social service agencies and qualifying institutions to identify potentially eligible individuals. Only after all means of outreach have been taken to reach Category 2 families can the PHA reissue the voucher to another Category 2 NED family on the PHA's waiting list. Any subsequent turnover of that voucher must again be used for a Category 2 family on the PHA's waiting list, and the PHA is under the same obligation to conduct outreach to Category 2 families if no such families are on the PHA's waiting list.

For PHAs that received both Category 1 and Category 2 vouchers, if at any time the PHA is serving fewer Category 2 families than the number of Category 2 HCVs awarded under the NOFA, when a Category 2 family applies to the waiting list and is found eligible, the PHA must issue the next NED voucher to that family. HUD monitors the initial leasing and reissuance of Category 2 HCVs. These vouchers may be recaptured and reassigned if not leased properly and in a timely manner.

All NED vouchers should be affirmatively marketed to a diverse population of NED-eligible

families to attract protected classes least likely to apply. If at any time following the turnover of a NED HCV a PHA believes it is not practicable to assist NED families, the PHA must contact HUD.

## 19-V.D. LEASE UP [Notice PIH 2013-19]

**Briefings**

In addition to providing families with a disabled person a list of accessible units known to the PHA, HUD encourages, but does not require, PHAs to provide additional resources to NED families as part of the briefing.

> HACA Policy
>
> HACA's referral partners will provide NED families with housing search assistance and other support services or referrals to support services.

**Voucher Term**

While the PHA is not required to establish different policies for the initial term of the voucher for NED vouchers, HUD has encouraged PHAs with NED vouchers to be generous in establishing reasonable initial search terms and subsequent extensions for families with a disabled person.

> HACA Policy
>
> All NED vouchers will have an initial term of 120 calendar days.
>
> The family must submit a Request for Tenancy Approval and proposed lease within the 120-day period unless the PHA grants an extension.
>
> All other HACA policies on extensions and suspension of vouchers in Section 5-II.E. will apply.

**Special Housing Types [Notice PIH 2013-19 and NED Category 2 FAQs]**

In general, a PHA is not required to permit families to use any of the special housing types and may limit the number of families using such housing.  However, the PHA must permit the use of a special housing type if doing so provides a reasonable accommodation so that the program is readily accessible to and usable by a person with disabilities.

Such special housing types include single room occupancy housing, congregate housing, group homes, shared housing, cooperative housing, and manufactured homes when the family owns the home and leases the manufactured home space.

Persons with disabilities transitioning out of institutional settings may choose housing in the community that is in a group or shared environment or where some additional assistance for daily

living is provided for them on site. Under HUD regulations, group homes and shared housing are considered special housing types and are not excluded as an eligible housing type in the HCV program. Assisted living facilities are also considered eligible housing under the normal HCV program rules, as long as the costs for meals and other supportive services are not included in the housing assistance payments (HAP) made by the PHA to the owner, and as long as the person does not need continual medical or nursing care.

### 19-V.E. PORTABILITY [NED Category 2 FAQs]

NED voucher participants are eligible for portability under standard portability rules and all PHA policies regarding portability in Chapter 10, Part II apply to NED families. However, the PHA may, but is not required to, allow applicant NED families to move under portability, even if the family did not have legal residency in the initial PHA's jurisdiction when they applied.

HACA Policy

> If neither the head of household nor the spouse or cohead of a NED applicant family had a domicile (legal residence) in HACA's jurisdiction at the time that the family's initial application for assistance was submitted, the family must lease a unit within HACA's jurisdiction for at least 12 months before requesting portability.

> HACA will consider exceptions to this policy for purposes of reasonable accommodation (see Chapter 2) or reasons related to domestic violence, dating violence, sexual assault, or stalking.

### PART VI: STABILITY VOUCHER PROGRAM

### 19-VI.A. PROGRAM OVERVIEW [Notice PIH 2022-24]

The Consolidated Appropriations Act, 2021 (Public Law 116-260) (2021 Act) provided new incremental funding for voucher assistance through Stability Vouchers (SVs) for households who are:

- Homeless, as defined in section 103(a) of the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11302(a));

- At-risk of homelessness;

- Those fleeing or attempting to flee domestic violence dating violence, sexual assault, stalking, or human trafficking; and

- Veterans and families that include a veteran family member that meet one of the above criteria.

HUD may waive certain statutory and regulatory provisions to administer the SVs (except for

requirements related to tenant rights and protections, rent setting, fair housing, nondiscrimination, labor standards and the environment) upon a finding that any such waivers or alternative requirements are necessary to facilitate the use of funds made available for SVs. Unless expressly waived below, all statutory and regulatory requirements and HUD directives regarding the HCV program are applicable to SVs, including the use of all HUD required contracts and other forms. A PHA may request additional good cause regulatory waivers as established in Notice PIH 2018-16 in connection with the use of the SVs, which HUD will consider and assess upon the request of the PHA.

## 19-VI.B. PARTNERING ORGANIZATION [Notice PIH 2022-24]

SV funding is only awarded to PHAs that partner with eligible Continuums of Care (CoCs) or other entities that serve the targeted population, such as Victim Service Providers (VSPs) and Veteran Service Organizations (VSOs) serving the targeted population in the PHA's jurisdiction to implement coordinated approaches to reduce the prevalence of homelessness, improve service engagement, and promote housing stability while ensuring geographical need of assistance.

The PHA must enter into a Memorandum of Understanding (MOU) with the CoC to establish a partnership with the CoC to pair SVs with CoC-funded supportive services, and to collaborate with the CoC and other stakeholders to develop a prioritization plan for these vouchers.

> HACA Policy
>
> HACA has entered into an MOU with the following partnering organization: Ending Community Homelessness Coalition (ECHO).

## 19-VI.C. REFERRALS [Notice PIH 2022-24]

> In general, families are issued SVs as the result of either:

- The direct referral process from the CoC or other partnering organizations; or
- A situation where the PHA makes an SV available in order to facilitate an emergency transfer for victims of domestic violence, dating violence, sexual assault, stalking, and human trafficking.

**CoC Referrals**

The primary responsibility of the CoC under the MOU is to make direct referrals of qualifying individuals and families to the PHA and to identify any CoC-funded available supportive services that may be paired with SVs.

The CoC or other partnering agency must certify that the SV applicants they refer to the PHA meet the definition of a qualifying individual or family for SV assistance.

The referring agency must provide documentation to the PHA of the referring agency's verification that the family meets one of the four eligible categories for SV assistance. The PHA must retain this

documentation as part of the family's file.

> ### HACA Policy
>
> As part of the MOU, HACA and ECHO will identify staff positions to serve as lead SV liaisons. These positions will be responsible for transmission and acceptance of referrals. ECHO must commit sufficient staff and resources to ensure eligible individuals and families are identified in a timely manner.
>
> ECHO will use the Coordinated Entry System to identify SV-eligible individuals and families within the partnering agencies' caseloads and make referrals to the PHA.
>
> The HACA liaison responsible for acceptance of referrals will contact the ECHO liaison via email or in person at case staffing meetings indicating the number of vouchers available and requesting an appropriate number of referrals. ECHO will provide HACA and the partnering service provider the names and ServicePoint numbers of the referrals presumed eligible for the SV. The service provider will locate and engage with the referred family and submit an application through HACA's online portal and all forms required to determine eligibility for voucher issuance. ECHO will ensure service provider compliance with the Coordinated Entry MOU and Written Standards. HACA will not take an adverse action against a referred client that causes service provider non-compliance with the written standards.
>
> HACA will maintain a copy of the referral from ECHO and the eligibility documents from the service provider in the participant's file. Homeless service providers may, but are not required to, use the certification form found in Exhibit 19-1 of this chapter. Victim services providers may, but are not required to, use the certification form found in Exhibit 19-2 of this chapter when identifying eligible families who qualify as victims of human trafficking.

**Referrals from Outside the CoC**

The PHA must also take direct referrals from outside the CoC process if:

- The CoC does not have a sufficient number of eligible families to refer to the PHA; or

- The CoC does not identify families that may be eligible for SV assistance because they are fleeing, or attempting to flee, domestic violence, dating violence, sexual assault, stalking, or human trafficking.

If a direct referral is taken from outside of the CoC, the PHA must enter into a partnership to receive direct referrals from another entity, assuming there are such additional organizations that can certify that an individual or family is eligible for an SV.

The PHA must enter into an MOU with a partnering referral agency or may add the partnering referral agency to the MOU between the PHA and CoC.

## 19-VI.D. WAITING LIST [Notice PIH 2022-24]

**HCV Waiting List**

The regulation that requires the PHA to admit applicants as waiting list admissions or special admissions in accordance with admission policies in Chapter 4 does not apply to PHAs operating the SV program. Direct referrals are not added to the PHA's HCV waiting list.

The PHA must inform families on the HCV waiting list of the availability of SVs by, at a minimum, either by posting the information to their website or providing public notice in their respective communities in accordance with the requirements listed in Notice PIH 2022-24.

<u>HACA Policy</u>

HACA will post information about the SV program for families on HACA's HCV waiting list on their website. The notice will:

- Describe the eligible populations to which SVs are limited.
- Clearly state that the availability of these SVs is managed through a direct referral process.
- Advise the family to contact ECHO for information about the Coordinated Entry System if the family believes they may be eligible for SV assistance.

HACA will ensure effective communication with persons with disabilities, including those with vision, hearing, and other communication-related disabilities in accordance with Chapter 2. HACA will also take reasonable steps to ensure meaningful access for persons with limited English proficiency (LEP) in accordance with Chapter 2.

**SV Waiting List**

The HCV regulations requiring the PHA to operate a single waiting list for admission to the HCV program do not apply to PHAs operating the SV program. Instead, when the number of applicants referred by the CoC or partnering agency exceeds the SVs available, the PHA must maintain a separate waiting list for SV referrals. Upon turnover, SV vouchers must continue to remain available for eligible families.

Further, the SV waiting list is not subject to PHA policies in Chapter 4 regarding opening and closing the HCV waiting list. The PHA will work directly with its CoC and other referral agency partners to manage the number of referrals and the size of the SV waiting list.

**HCV Waiting List Preferences**

If local preferences are established by the PHA for HCV in Chapter 4, they do not apply to SVs. However, if the PHA has a homelessness preference or a preference for survivors of domestic violence, dating violence, sexual assault, stalking, or human trafficking for the regular HCV program, the PHA must refer any applicant on the waiting list that indicated they qualified for this preference to the CoC, or the applicable partnering referral agency.

HACA Policy

HACA has a homeless preference for the HCV waiting list as outlined in Section 4-III.C. Local Preferences.

HACA will refer any applicant on the waiting list that indicates they qualify for the homeless preference to the CoC. The CoC will determine whether the family is eligible for an SV (based on the qualifying definition for SV assistance for homelessness or another eligible category as applicable). The CoC will also determine if the family is eligible for other homeless assistance.

**SV Waiting List Preferences**

With the exception of a residency preference, which may not be applied to the PHA's SV waiting list, the PHA may choose, in coordination with the CoC and other referral partners, to establish separate local preferences for SVs, or may simply choose to not establish any local preferences for the SV waiting list. The preference system may not prohibit SV admissions from any of the four qualifying categories of eligibility.

HACA Policy

No local preferences have been established for the SV waiting list.

## 19-VI.E. FAMILY ELIGIBILITY [Notice PIH 2022-24]

**Referring Agency Determination of Eligibility**

> The CoC or referring agency determines whether the individual or family meets any one of the eligibility criteria described in Notice PIH 2022-24 and then refers the family to the PHA. The PHA determines that the family meets other eligibility criteria for the HCV program, as modified for the SV program and outlined below.

In order to be eligible for an SV, a household must meet one of four eligibility criteria:

- Homeless, as defined in section 103(a) of the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11302(a)) and 24 CFR 578.3;

- At-risk of homelessness as defined in 24 CFR 5.78.3;

- Those fleeing or attempting to flee domestic violence dating violence, sexual assault, stalking, or human trafficking; and

- Veterans [as defined in 38 U.S.C. 101(2); 38 CFR 3.1(d)] and families that include a veteran family member that meet one of the above criteria.

**Mandatory Denials**

HUD waived 24 CFR 982.552 and 982.553 in part for the SV applicants and established alternative requirements for mandatory and permissive prohibitions of admissions. Except where

applicable, PHA policies regarding denials in Chapter 3 of this policy do not apply to screening individuals and families for eligibility for an SV. Instead, the SV alternative requirement listed in this section will apply to all SV applicants.

The mandatory and permissive prohibitions listed in Notice PIH 2022-24 and in this chapter, however, apply only when screening the individual or family for eligibility for an SV. When adding a family member after the family has been placed under a HAP contract with SV assistance, the regulations at 24 CFR 982.551(h)(2) apply. Other than the birth, adoption, or court-awarded custody of a child, the PHA must approve additional family members and may apply its regular HCV screening criteria in Chapter 3 in doing so.

Under alternative requirements for the SV program, mandatory denials for SV applicants include:

- 24 CFR 982.553(a)(1)(ii)(C), which prohibits admission if any household member has ever been convicted of drug-related criminal activity for manufacture or production of methamphetamine on the premises of federally assisted housing.

- 24 CFR 982.553(a)(2)(i), which prohibits admission to the program if any member of the household is subject to a lifetime registration requirement under a state sex offender registration program.

The PHA will also deny assistance to household members already receiving assistance from another program.

The PHA must deny admission to the program if any member of the family fails to sign and submit consent forms for obtaining information as required by 24 CFR 982.552(b)(3) but should notify the family of the limited SV grounds for denial of admission first.

> HACA Policy
>
> While the PHA will deny admission to the program if any adult member (or head of household or spouse, regardless of age) fails to sign and submit consent forms, HACA will first notify the family of the limited SV grounds for denial of admission as part of the notice of denial that will be mailed to the family.

**Permissive Denial**

Notice PIH 2022-24 lists permissive prohibitions for which the PHA may, but is not required to, deny admission to SV families. The notice also lists prohibitions that, while allowable under the HCV program, may not be used to deny assistance for SV families.

If the PHA intends to establish permissive prohibition policies for SV applicants, the PHA must first consult with its CoC partner to understand the impact that the proposed prohibitions may have on referrals and must take the CoC's recommendations into consideration.

> HACA Policy
>
> HACA will not adopt any permissive prohibitions for the SV program.

**Self-Certification of Income at Admission**

The requirement to obtain third-party verification of income in accordance with Notice PIH 2018-

18 does not apply to the SV program applicants at admission, and alternatively, PHAs may consider self-certification the highest form of income verification at admission. As such, PHA policies related to the verification of income in Section 7-I.B. do not apply to SV families at admission. Instead, applicants must submit an affidavit attesting to their reported income, assets, expenses, and other factors that would affect an income eligibility determination.

Additionally, applicants may provide third-party documentation that represents the applicant's income within the 60-day period prior to admission or voucher issuance but is not dated within 60 days of the PHA's request.

<u>HACA Policy</u>

HACA will accept third-party documentation that represents the applicant's income within the 60-day period prior to admission or voucher issuance but is not dated within 60 days of the PHA's request. Any documents used for verification must not be damaged, altered, or in any way illegible.

Printouts from webpages are considered original documents.

Any family self-certifications must be made in a format acceptable to HACA and must be signed by the family member whose information or status is being verified.

HACA will incorporate additional procedures to remind families of the obligation to provide true and complete information in accordance with Chapter 14. HACA will address any material discrepancies (i.e., unreported income or a substantial difference in reported income) that may arise later. HACA may, but is not required to, offer the family a repayment agreement in accordance with Chapter 16. If the family fails to repay the excess subsidy, HACA will terminate the family's assistance in accordance with the policies in Chapter 12.

**Recently Conducted Income Determinations**

PHAs may accept income calculations and verifications from third-party providers or from an examination that the PHA conducted on behalf of the family for another subsidized housing program in lieu of conducting an initial examination of income as long as:

- The income was calculated in accordance with rules outlined at 24 CFR Part 5 and within the last six months; and

- The family certifies there has been no change in income or family composition in the interim.

<u>HACA Policy</u>

HACA will accept income calculations and verifications from third-party providers provided they meet the criteria outlined above.

The family certification must be made in a format acceptable to HACA and must be signed by all adult family members whose information or status is being verified.

At the time of the family's annual reexamination, the PHA must conduct the annual

reexamination of income as outlined at 24 CFR 982.516 and the PHA policies in Chapter 11.

**EIV Income Validation**

Once HUD makes the EIV data available to PHAs under this waiver and alternative requirement, the PHA must:

- Review the EIV Income and Income Validation Tool (IVT) reports to confirm and validate family-reported income within 90 days of the PIC submission date;

- Print and maintain copies of the EIV Income and IVT Reports in the tenant file; and

- Resolve any income discrepancy with the family within 60 days of the EIV Income or IVT Report dates.

  Prior to admission, PHAs must continue to use HUD's EIV system to search for all household members using the Existing Tenant Search in accordance with PHA policies in Chapter 3.

  If a PHA later determines that an ineligible family received assistance, the PHA must take steps to terminate that family from the program in accordance with Chapter 12.

**Social Security Number and Citizenship Status Verification**

For the SV program, the PHA is not required to obtain and verify SSN documentation and documentation evidencing eligible noncitizen status before admitting the family to the SV program. Instead, PHAs may adopt policies to admit SV applicants who are unable to provide the required SSN or citizenship documentation during the initial eligibility determination. As an alternative requirement, such individuals must provide the required documentation within 180 days of admission to be eligible for continued assistance, pending verification, unless the PHA provides an extension based on evidence from the family or confirmation from the CoC or other partnering agency that the family has made a good-faith effort to obtain the documentation.

If a PHA determines that an ineligible family received assistance, the PHA must take steps to terminate that family from the program.

<u>HACA Policy</u>

HACA will admit SV applicants who are unable to provide the required SSN or citizenship documentation during the initial eligibility determination. These individuals must provide the required documentation in accordance with policies in Chapter 7 within 180 days of admission. HACA may provide an additional 60-day extension based on evidence from the family or confirmation from the CoC or other partnering agency that the family has made a good-faith effort to obtain the documentation.

If HACA determines that an ineligible family received assistance, HACA will take steps to terminate that family from the program in accordance with policies in Chapter 12.

**Age and Disability Verifications**

PHAs may accept self-certification of date of birth and disability status if a higher level of verification is not immediately available. If self-certification is used, the PHA must obtain a higher level of verification within 90 days of admission or verify the information in EIV.

If a PHA determines that an ineligible family received assistance, the PHA must take steps to terminate that family from the program.

> HACA Policy
>
> HACA will accept self-certification of date of birth and disability status if a higher form of verification is not immediately available. The certification must be made in a format acceptable to HACA and must be signed by the family member whose information or status is being verified. If self-certification is accepted, within 90 days of admission, HACA will verify the information in EIV or through other third-party verification if the information is not available in EIV. HACA will note the family's file that self-certification was used as initial verification and include an EIV printout or other third-party verification confirming the applicant's date of birth and/or disability status.
>
> If HACA determines that an ineligible family received assistance, HACA will take steps to terminate that family from the program in accordance with policies in Chapter 12.

**Income Targeting**

PHA must determine income eligibility for SV families in accordance with 24 CFR 982.201 and PHA policy in Chapter 3; however, income targeting requirements do not apply for SV families. The PHA may still choose to include the admission of extremely low-income SV families in its income targeting numbers for the fiscal year in which these families are admitted.

> HACA Policy
>
> HACA will include the admission of extremely low-income SV families in its income targeting numbers for the fiscal year in which these families are admitted.

## 19-VI.F. HOUSING SEARCH AND LEASING

**Initial Voucher Term**

Unlike the standard HCV program, which requires an initial voucher term of at least 60 days, SV vouchers must have an initial search term of at least 120 days. PHA policies on extensions as outlined in Section 5-II.E. will apply.

> HACA Policy
>
> All SVs will have an initial term of 120 calendar days.
> The family must submit a Request for Tenancy Approval and proposed lease within the 120-day period unless HACA grants an extension.

**HQS Pre-Inspections**

To expedite the leasing process, PHAs may pre-inspect available units that SV families may be interested in leasing in order to maintain a pool of eligible units.

> HACA Policy
>
> To expedite the leasing process, HACA may pre-inspect available units that SV families may be interested in leasing to maintain a pool of eligible units. If an SV family selects a unit that

passed a HQS pre-inspection (without intervening occupancy) within 45 days of the date of the Request for Tenancy Approval, the unit may be approved provided that it meets all other conditions under 24 CFR 982.305. The family will be free to select his or her unit.

When a pre-inspected unit is not selected, HACA will make every effort to fast-track the inspection process, including adjusting the normal inspection schedule for any required reinspections.

### Initial Lease Term

Unlike in the standard the HCV program, SV voucher holders may enter into an initial lease that is for less than 12 months, regardless of the PHA policy in Section 9-I.E., Term of Assisted Tenancy.

### Portability

The normal HCV portability procedures and requirements outlined in Chapter 10 generally apply to SVs. Exceptions are addressed below.

- Under SV, applicant families may move under portability even if the family did not have legal residency in the jurisdiction of the initial PHA when they applied, regardless of PHA policy in Section 10-II.B.

- A receiving PHA cannot refuse to assist an incoming SV family, regardless of whether the PHA administers SVs under its own ACC.

- If the SV family moves under portability to another PHA that administers SVs under its own ACC:

  o The receiving PHA may only absorb the incoming SV family with an SV (assuming it has an SV voucher available to do so).

  o If the PHA does not have an SV available to absorb the family, it must bill the initial PHA. The receiving PHA must allow the family to lease the unit with SV assistance and may not absorb the family with a regular HCV when the family leases the unit.

  o Regardless of whether the receiving PHA absorbs or bills the initial PHA for the family's SV assistance, the SV administration of the voucher is in accordance with the receiving PHA's SV policies.

- If the SV family moves under portability to another PHA that does not administer SVs under its own ACC, the receiving PHA may absorb the family into its regular HCV program or may bill the initial PHA.

- **Family Briefing**

  In addition to the applicable family briefing requirements at 24 CFR 982.301(a)(2) as to how portability works and how portability may affect the family's assistance, the initial PHA must inform the family how portability may impact the special SV services and assistance that may be available to the family.

  The initial PHA is required to help facilitate the family's portability move to the receiving PHA and inform the family of this requirement in writing, taking

reasonable steps to ensure meaningful access for persons with limited English proficiency (LEP).

HACA Policy

In addition to following HACA policy on briefings in Chapter 5, as part of the briefing packet for SV families, HACA will include a written notice that HACA will assist the family with moves under portability.

For limited English proficient (LEP) applicants, HACA will provide interpretation services in accordance with the PHA's LEP plan (See Chapter 2).

## 19-VI.G. PAYMENT STANDARDS

### Overview

For the SV program, HUD has waived the regulation requiring a single payment standard for each unit size. Instead, the PHA may, but is not required to, establish separate higher payment standards for SVs. Lower SV payment standards are not permitted. If the PHA is increasing the regular HCV payment standard, the PHA must also increase the SV payment standard if it would be otherwise lower than the new regular HCV payment standard. The separate SV payment standard must comply with all other HCV requirements with the exception of the alternative requirements discussed below.

Further, if the PHA chooses to establish higher payments standards for SVs, HUD has provided other regulatory waivers:

- Defining the "basic range" for payment standards as between 90 and 120 percent of the published Fair Market Rent (FMR) for the unit size (rather than 90 to 110 percent).

- Allowing a PHA that is not in a designated Small Area FMR (SAFMR) area or has not opted to voluntarily implement SAFMRs to establish exception payment standards for a ZIP code area above the basic range for the metropolitan FMR based on the HUD-published SAFMRs. The PHA may establish an exception payment standard up to 120 percent (as opposed to 110 percent) of the HUD published Small Area FMR for that ZIP code area. The exception payment standard must apply to the entire ZIP code area.

HACA Policy

HACA may establish a SV exception payment standard up to 120%.  All rent reasonableness requirements apply to SV units, regardless of whether the PHA has established an alternative or exception SV payment standard.

### Increases in Payment Standards

The requirement that the PHA apply increased payment standards at the family's first regular recertification on or after the effective date of the increase does not apply to SV. The PHA may, but is not required to, establish an alternative policy on when to apply the increased payment standard, provided the increased payment standard is used to calculate the HAP no later than the effective date of the family's first regular reexamination following the change.

HACA Policy

HACA will not establish an alternative policy for increases in the payment standard. HACA

policy in Section 11-III.B. governing increases in payment standards will apply to SVs.

## 19-VI.H. PROJECT-BASED UNITS

All tenant-based SV awards can be converted to Project-Based Vouchers (PBV) at any time after award without HUD approval provided all the established PBV regulations and requirements are followed.

All PBV requirements in 24 CFR Part 983 and in Chapter 17 apply to project-based SVs with the exception of 24 CFR 983.251(c)(1), which requires PHAs to select families for project-based units from its HCV or PBV waiting list. HUD is waiving this requirement and establishing an alternative requirement that PHAs receive SV referrals from CoC partners for vouchers as well as project-based assistance.

### EXHIBIT 19-1: SAMPLE Stability Voucher (SV) Homeless Provider's Certification

**Stability Voucher (SV)**
**HOMELESS CERTIFICATION**

SV Applicant Name: _____

☐    Household without dependent children (complete one form for each adult in the household)

☐    Household with dependent children (complete one form for household)

Number of persons in the household: _____

**This is to certify that the above named individual or household meets the following criteria based on the check mark, other indicated information, and signature indicating their current living situation**

**Check only one box and complete only that section**

**Living Situation: place not meant for human habitation (e.g., cars, parks, abandoned buildings, streets/sidewalks)**

☐    The person(s) named above is/are currently living in (or, if currently in hospital or other institution, was living in immediately prior to hospital/institution admission) a public or private place not designed for, or ordinarily used as a regular sleeping accommodation for human beings, including a car, park, abandoned building, bus station, airport, or campground.

Description of current living situation:

_____

_____

_____

Homeless Street Outreach Program Name: _____
This certifying agency must be recognized by the local Continuum of Care (CoC) as an agency that has a program designed to serve persons living on the street or other places not meant for human habitation. Examples may be street outreach workers, day shelters, soup kitchens, Health Care for the Homeless sites, etc.

Authorized Agency Representative Signature: _____

Date: _____

**Living Situation: Emergency Shelter**

☐    The person(s) named above is/are currently living in (or, if currently in hospital or other institution, was living in immediately prior to hospital/institution admission) a supervised publicly or privately operated shelter as follows:

Emergency Shelter Program Name: _____

*This emergency shelter must appear on the CoC's Housing Inventory Chart submitted as part of the most recent CoC Homeless Assistance application to the U.S. Department of Housing and Urban Development (HUD) or otherwise be recognized by the CoC as part of the CoC inventory (e.g., newly established Emergency Shelter).*

Authorized Agency Representative Signature: _____

Date: _____

**Living Situation: Recently Homeless**

☐    The person(s) named above is/are currently receiving financial and supportive services for persons who are homeless. Loss of such assistance would result in a return to homelessness (e.g., households in rapid rehousing programs, residents of permanent supportive housing programs participating in Moving On, etc.)

Authorized Agency Representative Signature: _____

Date: _____

*This referring agency must appear on the CoC's Housing Inventory Chart submitted as part of the most recent CoC Homeless Assistance application to HUD or otherwise be recognized by the CoC as part of the CoC inventory.*

Immediately prior to entering the household's current living situation, the person(s) named above was/were residing in:

☐ Emergency shelter  OR  ☐ A place unfit for human habitation

Authorized Agency Representative Signature: _____

Date: _____

## EXHIBIT 19-2: SAMPLE Victim Service Provider's Certification

**Stability Voucher (SV)**

**SAMPLE CERTIFICATION FOR SURVIVORS OF DOMESTIC VIOLENCE, DATING VIOLENCE, SEXUAL ASSAULT, STALKING, AND/OR HUMAN TRAFFICKING**

**Use of this Optional Form:**

Service providers may utilize this form to certify a family's eligibility for SV to document households who are fleeing, or attempting to flee, domestic violence, dating violence, sexual assault, stalking, and/or human trafficking. In response to this request, the service provider may complete this form and submit it to the Public Housing Agency (PHA) to certify eligibility for the U.S. Department of Housing and Urban Development's (HUD) Stability Voucher program.

**Confidentiality:**

All information provided during the referral process concerning the incident(s) of domestic violence, dating violence, dating violence, sexual assault, stalking, and human trafficking shall be kept confidential and such details shall not be entered into any shared database. Employees of the PHA will not have access to these details, and such employees may not disclose this information to any other entity or individual, except to the extent that disclosure is: (i) consented to by you in writing in a time-limited release; (ii) required for use in an eviction proceeding or hearing regarding termination of assistance; or (iii) otherwise required by applicable law.

**TO BE COMPLETED ON BEHALF OF SURVIVORS OF DOMESTIC VIOLENCE, DATING VIOLENCE, SEXUAL ASSAULT, STALKING, AND/OR HUMAN TRAFFICKING**

SV Applicant Name: _____

The applicant named above is a survivor of (please check from the list all that apply):

☐ Domestic Violence

☐ Dating Violence

☐ Sexual Assault

☐ Stalking

☐ Human Trafficking

58

This certifies that the above named individual or household meets the definition for persons who are fleeing, or attempting to flee domestic violence, dating violence, sexual assault, stalking and/or human trafficking as these terms are defined under 34 U.S.C. Section 12291 of the Violence Against Women Act[4] and 22 U.S.C. Section 7102(11) of the Trafficking Victims Protection Act.[5]

I acknowledge that submission of false information could jeopardize program eligibility and could be the basis for denial of admission, termination of assistance, or eviction.

Authorized Agency Representative Signature: _____

Date: _____

---

[4] The Violence Against Women Act protects applicants, tenants, and program participants in certain HUD programs from being evicted, denied housing assistance, or terminated from housing assistance based on acts of domestic violence, dating violence, sexual assault, or stalking against them. VAWA protection is available to victims of domestic violence, dating violence, sexual assault, and stalking, regardless of sex, gender identity, or sexual orientation.

[5] The Victims of Trafficking and Violence Protection Act of 2000 provides assistance to victims of trafficking making housing, educational health care, job training and other federally-funded social service programs available to assist victims in rebuilding their lives.

58

## PART VII: EMERGENCY HOUSING VOUCHER PROGRAM

### The Housing Authority of the City of Austin

### Emergency Housing Voucher (EHVs) Policy

## INTRODUCTION

On March 11, 2021, President Biden signed the American Rescue Plan Act of 2021 (ARP) (P.L. 117-2). Section 3202 of the ARP appropriated $5 billion for the creation, administration, and renewal of new incremental emergency housing vouchers (EHVs) and other eligible expenses related to COVID-19.

On May 5, 2021, HUD issued Notice PIH 2021-15, which described HUD's process for allocating approximately 70,000 EHVs to eligible PHAs and set forth the operating requirements for PHAs who administer them. Based on criteria outlined in the notice, HUD notified eligible PHAs of the number of EHVs allocated to their agency, and PHAs were able to accept or decline the invitation to participate in the program.

PHAs may not project-base EHVs; EHVs are exclusively tenant-based assistance.

All applicable nondiscrimination and equal opportunity requirements apply to the EHV program, including requirements that the PHA grant reasonable accommodations to persons with disabilities, effectively communicate with persons with disabilities, and ensure meaningful access for persons with limited English proficiency (LEP).

This chapter describes HUD regulations and HACA's policies for administering EHVs. The policies outlined in this chapter are organized into seven sections, as follows:

<u>Part I: Funding</u>

<u>Part II: Partnering Agencies</u>

<u>Part III: Waiting List Management</u>

<u>Part IV: Family Eligibility</u>

<u>Part V: Housing Search and Leasing</u>

<u>Part VI: Use of Funds, Reporting, and Financial Records</u>

Except as addressed by this chapter and as required under federal statute and HUD requirements, the general requirements of the HCV program apply to EHVs.

## PART I: FUNDING

### 19-VII.I.A. FUNDING OVERVIEW

The American Rescue Plan Act of 2021 (ARP) provides administrative fees and funding for the costs of administering emergency housing vouchers (EHVs) and other eligible expenses defined in Notice PIH 2021-15. These fees may only be used for EHV administration and other eligible expenses and must not be used for or applied to other HACA programs or vouchers. The HACA must maintain separate financial records from its regular HCV funding for all EHV funding.

**Housing Assistance Payments (HAP) Funding**

ARP funding obligated to the HACA as housing assistance payments (HAP) funding may only be used for eligible EHV HAP expenses (i.e., rental assistance payments). EHV HAP funding may not be used for EHV administrative expenses or for the eligible uses under the EHV services fee.

The initial funding term will expire December 31, 2022. HUD will provide renewal funding to the PHAs for the EHVs on a calendar year (CY) basis commencing with CY 2023. The renewal funding allocation will be based on the HACA's actual EHV HAP costs in leasing, similar to the renewal process for the regular HCV program. EHV renewal funding is not part of the annual HCV renewal funding formula; EHVs are renewed separately from the regular HCV program. All renewal funding for the duration of the EHV program has been appropriated as part of the ARP funding.

**Administrative Fee and Funding**

The following four types of fees and funding are allocated as part of the EHV program:

- **Preliminary fees** support immediate start-up costs that the HACA will incur in implementing alternative requirements under EHV, such as outreach and coordination with partnering agencies:
  - $400 per EHV allocated to the HACA, once the consolidated annual contributions contract (CACC) is amended.
  - This fee may be used for any eligible administrative expenses related to EHVs.
  - The fee may also be used to pay for any eligible activities under EHV service fees (TPS-I.B).

- **Placement fees/expedited issuance reporting fees** will support initial lease-up costs and the added cost and effort required to expedite leasing of EHVs:

  o $100 for each EHV initially leased, if the PHA reports the voucher issuance date in Public Housing Information Center–Next Generation (PIC–NG) system within 14 days of voucher issuance or the date the system becomes available for reporting or as further defined by HUD.

  o Placement fees:

      ▪ $500 for each EHV family placed under a HAP contract effective within four months of the effective date of the ACC funding increment; or

      ▪ $250 for each EHV family placed under a HAP contract effective after four months but less than six months after the effective date of the ACC funding increment.

      ▪ HUD will determine placement fees in the event of multiple EHV allocations and funding increment effective dates.

  o Placement/expedited issuance fees only apply to the initial leasing of the voucher; they are not paid for family moves or to turnover vouchers.

- **Ongoing administrative fees,** which are calculated in the same way as the standard HCV program:

  o PHAs are allocated administrative fees using the full column A administrative fee amount for each EHV under contract as of the first day of each month.

  o Ongoing EHV administrative fees may be subject to proration in future years, based on available EHV funding.

- **Services fees,** which are a one-time fee to support PHAs' efforts to implement and operate an effective EHV services program in its jurisdiction (TPS-I.B):

  o The fee is allocated once the PHA's CACC is amended to reflect EHV funding.

  o The amount allocated is $3,500 for each EHV allocated.

### 19-VII.I.B. SERVICE FEES

Services fee funding must be initially used for defined eligible uses and not for other administrative expenses of operating the EHV program. Service fees fall into four categories:

- Housing search assistance

- Security deposit/utility deposit/rental application/holding fee uses

- Owner-related uses

- Other eligible uses such as moving expenses or tenant-readiness services

The PHA must establish the eligible uses and the parameters and requirements for service fees in the PHA's administrative plan.

HACA Policy

In coordination with the EHV participant, CoC case manager and HACA's representative, a customized service fee allocation plan will be created to help each EHV participant successfully obtain and retain housing. If funds are identified from another resource in the community that resource will be utilized with no duplication of assistance. Generally, the allocation for each participant will not exceed $3,500. However, depending on the needs of individual participants and if funds are available, the service fee dollar amount could go above this amount.

The eligible uses for service fees include the following and will be paid subject to funding availability.

**Housing search assistance**

which may include activities such as, but not limited to, helping a family identify and visit potentially available units during their housing search, providing housing mobility services to encourage moves to high opportunity neighborhoods, helping to find a unit that meets the household's disability-related needs, providing transportation and directions, assisting with the completion of rental applications and HACA forms, and helping to expedite the EHV leasing process..

**Application fees/non-refundable administrative or processing fees/refundable application deposit assistance.** HACA may assist the family with these expenses when other resources are unavailable.

**Security deposit assistance.**

HACA may assist with the security deposit payment. The amount of the security deposit assistance may not exceed the lesser of two months' rent to owner, the maximum security deposit allowed under applicable state and/or local law, or the actual security deposit required by the owner. Security deposit assistance will be for initial move-ins and paid directly to the owner on behalf of the family when other resources cannot.

**Utility deposit assistance**.

HACA may provide utility deposit assistance for family's utility deposit expenses. Utility deposit assistance includes connection fees required for the utilities to be supplied by the tenant under the lease. HACA may pay the utility deposit assistance directly to the utility company or may pay the assistance to the family when other resources cannot. If paid to the family, HACA will require documentation the family paid the utility deposit. HACA will not require the utility supplier or family to return the utility deposit assistance to the HACA.

**Utility arrears.**

Some families may have large balances with gas, electric, water, sewer, or trash companies that will make it difficult to establish services for tenant-supplied utilities. HACA may provide the family with assistance to help address these utility arrears to facilitate leasing when other resources cannot.

**Owner recruitment and outreach for EHVs.**

The HACA may use the service fee funding to conduct owner recruitment and outreach. In addition to traditional owner recruitment and outreach, activities may include conducting pre-inspections or otherwise expediting the inspection process, providing enhanced customer service, and offering owner incentive and/or retention payments.

**Owner Sign-on Bonus.**

HACA may pay a sign-on bonus to a property owner that agree to enter into a HAP Contract with HACA to provide housing to an EHV family. The sign-on bonuses are not housing assistance payments or part of the rent to owner. Sign-on bonuses will equal $1,000 per HAP Contract execution. Sign-on bonuses are paid at the beginning of the initial HAP Contract term.  Only one sign-on bonus is allowed per EHV participant. HACA will not pay sign-on bonuses for units owned by the Austin Affordable Housing Corporation (AAHC), a subsidiary of HACA.

**Owner retention payments.**

HACA may make retention payments to owners that agree to renew the initial lease of an EHV family. Payments will be made as a single payment at the lease renewal upon receipt of a new 12-month lease. Owner retention payments are not housing assistance payments, are not part of the rent to owner, and are not taken into consideration when determining whether the rent for the unit is reasonable. Retention payments will equal $1,000 per lease renewal. Retention payments are only paid at renewal of the first lease term and owners are not eligible for a second retention payment.

**Risk mitigation funds.**

HACA may provide risk mitigation funds to owners who initially lease their units to EHV families. HACA may pay risk mitigation in cases where the security deposit is insufficient to cover the cost of damages and other amounts owed under the lease. Payment consideration will occur after receipt of the final itemized ledger and receipts for repairs made within 30 days of the date the tenant vacated the assisted unit. Owners are no longer eligible for risk mitigation funds upon renewal of the initial lease. Assisted units that are part of the CoC's partnership portfolio are not eligible for HACA's risk mitigation funds. Maximum risk mitigation payment amounts are as follows:

   **0-**bedroom unit: $500

   **1-**bedroom unit: $700

   **2-**bedroom unit: $1,000

   **3-**bedroom units and larger: $1,200

**Rental arrears to private landlords for admission**.

HACA may provide applicants with rental arrear assistance for some or all of the applicant's rental arrears to a private landlord but only if the rental arrear is a barrier to leasing the EHV unit. For example, the EHV family found a landlord, but the landlord will not lease the unit because of the previous rental debt (this may occur if the EHV unit is with the same landlord or management agent). HACA will pay the rental arrears assistance directly to the private landlord. HACA may not use the EHV services fee for debts owed by the family to the PHA, another PHA, or a closely-

58

associated entity affiliated with the PHA.

**Moving expenses (including move-in fees and deposits).**

HACA may provide assistance for moving expenses when they initially lease a unit with the EHV program. HACA will not provide moving expenses assistance for subsequent moves unless the family is required to move for reasons other than something the family did or failed to do.  HACA will reimburse families up to $300 upon providing a receipt for the incurred cost when other resources cannot.

**Pre-tenancy services and services that support EHV families in fulfilling their family obligations under the EHV program.**

HACA may use services fees to help create a customized plan to address or mitigate barriers that individual families may face in renting a unit with an EHV, such as negative credit, lack of credit, negative rental or utility history, or to connect the family to other community resources (including COVID-related resources) that can assist with rental arrears. HACA may run full criminal background, rental, and credit history checks for adult family members at initial voucher issuance at a cost not to exceed $50 per adult with the family member's permission. HACA may also use the services fee for services to remedy a lease violation/prevent an eviction or notice to vacate (e.g. rectifying unsanitary living conditions or property damage) and will establish a spending cap for this service of $3,500; this excludes financial assistance for rental/utility arrears. All services and training provided must be voluntary for the family and cannot be a condition of the lease or a PHA requirement for admission or continued participation in the EHV program.

**Renter's insurance.**

HACA may assist the family with renters insurance not to exceed $200 for one policy. HACA will not assist with this expense beyond the initial lease term.

Any services fee assistance returned to the HACA after its initial or subsequent use may only be applied to the eligible services fee uses defined in Notice PIH 2021-15 (or subsequent notice) or other EHV administrative costs. Any amounts not expended for these eligible uses when the HACA's EHV program ends must be remitted to HUD.

## PART II: PARTNERING AGENCIES

### 19-VII.II.A. CONTINUUM OF CARE (CoC)

PHAs that accept an allocation of EHVs are required to enter into a Memorandum of Understanding (MOU) with the Continuum of Care (CoC) to establish a partnership for the administration of EHVs.

> <u>HACA Policy</u>
>
> HACA has entered into an MOU with the Ending Community Homelessness Coalition (ECHO)**.**

## 19-VII.II.B. OTHER PARTNERING ORGANIZATIONS

The PHA may, but is not required to, partner with other organizations trusted by persons experiencing homelessness, such as victim services providers (VSPs) and other community partners. If the PHA chooses to partner with such agencies, the PHA must either enter into an MOU with the partnering agency or the partnering agency may be added to the MOU between the HACA and CoC.

HACA Policy

HACA may choose to enter into an MOU with other partnering agencies or add the agency to the MOU with ECHO if it deems necessary to effectively serve the homeless.

## 19-VII.II.C. REFERRALS

### CoC and Partnering Agency Referrals

The primary responsibility of the CoC under the MOU with the PHA is to make direct referrals of qualifying individuals and families to the PHA. The PHA must generally refer a family that is seeking EHV assistance directly from the PHA to the CoC or other referring agency for initial intake, assessment, and possible referral for EHV assistance. Partner CoCs are responsible for determining whether the family qualifies under one of the four eligibility categories for EHVs. The CoC or other direct referral partner must provide supporting documentation to the PHA verifying that the family meets one of the four eligible categories for EHV assistance.

HACA Policy

The CoC or partnering agency must establish and implement a system to identify EHV-eligible individuals and families within the agency's caseload and make referrals to the HACA. The CoC or other partnering agency must certify that the EHV applicants referred to HACA meet at least one of the four EHV eligibility criteria. The HACA will maintain a copy of the referral or certification from the CoC or other partnering agency in the participant's file along with other eligibility paperwork.

As part of the MOU, the HACA and CoC or other partnering agency will identify staff positions to serve as lead EHV liaisons. These positions will be responsible for transmission and acceptance of referrals. The CoC or partnering agency must commit sufficient staff and other resources to ensure eligible individuals and families are identified and determined eligible in a timely manner.

The HACA liaison responsible for acceptance of referrals will contact the CoC or partnering agency liaison via email indicating the number of vouchers available and requesting an appropriate number of referrals. The CoC will submit referrals in a timely manner and in a method and format defined in the MOU.

**Offers of Assistance with CoC Referral**

The HACA may make an EHV available without a referral from the CoC or other partnering organization in order to facilitate an emergency transfer under VAWA in accordance with the HACA's Emergency Transfer Plan (ETP) in Chapter 16.

The HACA must also take direct referrals from outside the CoC if:

- The CoC does not have a sufficient number of eligible families to refer to the HACA; or

- The CoC does not identify families that may be eligible for EHV assistance because they are fleeing, or attempting to flee, domestic violence, dating violence, sexual assault, stalking or human trafficking.

If at any time the HACA is not receiving enough referrals or is not receiving referrals in a timely manner from the CoC or other partner referral agency, HUD may permit the HACA on a temporary or permanent basis to take EHV applications directly from applicants and admit eligible families to the EHV program in lieu of or in addition to direct referrals in those circumstances.

## PART III: WAITING LIST MANAGEMENT
## 19-VII.III.A. HCV WAITING LIST

The regulation that requires the HACA to admit applicants as waiting list admissions or special admissions in accordance with admission policies in Chapter 4 does not apply to HACAs operating the EHV program. Direct referrals are not added to the HACA's HCV waiting list.

The HACA must inform families on the HCV waiting list of the availability of EHVs by posting the information to their website or providing public notice in their respective communities in accordance with the requirements listed in Notice PIH 2021-15.

HACA Policy
HACA will inform the public and families on the HCV waiting list of the availability of EHVs by posting the information on the HACA website. The notice will:
- Describe the eligible populations to which EHVs are limited
- Clearly state that the availability of these EHVs is managed through a direct referral process
- Advise the family to contact the CoC or any other applicable HACA referral partner
The HACA will ensure effective communication with persons with disabilities, including those with vision, hearing, and other communication-related disabilities in accordance with Chapter 2. The HACA will also take reasonable steps to ensure meaningful access for persons with limited English proficiency (LEP) in accordance with Chapter 2.

## 19-VII.III.B. EHV WAITING LIST

The HCV regulations requiring PHAs to operate a single waiting list for admission to the HCV program do not apply to PHAs operating the EHV program. Instead, when the number of applicants referred by the CoC or partnering agency exceeds the EHVs available, the PHA must maintain a separate waiting list for EHV referrals, both at initial leasing and for any turnover vouchers that may be issued prior to September 30, 2023.

Further, the EHV waiting list is not subject to PHA policies in Chapter 4 regarding opening and closing the HCV waiting list. The PHA will work directly with its CoC and other referral agency partners to manage the number of referrals and the size of the EHV waiting list.

## 19-VII.III.C. PREFERENCES

**HCV Waiting List Preferences**

If local preferences are established by the PHA for HCV, they do not apply to EHVs. However, if the PHA has a homeless preference or a VAWA preference for the HCV waiting list, the PHA must adopt additional policies related to EHVs in accordance with Notice PIH 2021-15.

> HACA Policy

> The HACA has a homeless preference for the HCV waiting list as outlined in Section 4-III.C. Local Preferences.

> HACA will refer any applicant on the waiting list that indicates they qualify for the homeless preference to the CoC. The CoC will determine whether the family is eligible for an EHV (based on the qualifying definition for EHV assistance for homelessness or another eligible category as applicable). The CoC will also determine if the family is eligible for other homeless assistance.

**EHV Waiting List Preferences**

With the exception of a residency preference, the PHA may choose, in coordination with the CoC and other referral partners, to establish separate local preferences for EHVs. The PHA may, however, choose to not establish any local preferences for the EHV waiting list.

> HACA Policy

> No local preferences have been established for the EHV waiting list. The ECHO (CoC) or partnering agency must establish and implement a system to identify EHV-eligible individuals and families within the agency's caseload and make referrals to the HACA.

## PART IV: FAMILY ELIGIBLTY

## 19-VII.IV.A. OVERVIEW

The CoC or referring agency determines whether the individual or family meets any one of the four eligibility criteria described in Notice PIH 2021-15 and then refers the family to the PHA. The PHA determines that the family meets other eligibility criteria for the HCV program, as modified for the EHV program and outlined below.

## 19-VII.IV.B. REFERRING AGENCY DETERMINATION OF ELIGIBLITY

In order to be eligible for an EHV, an individual or family must meet one of four eligibility criteria:

- Homeless as defined in 24 CFR 578.3;

- At risk of homelessness as defined in 24 CFR 578.3;

- Fleeing, or attempting to flee, domestic violence, dating violence, sexual assault, stalking (as defined in Notice PIH 2021-15), or human trafficking (as defined in the 22 U.S.C. Section 7102); or

- Recently homeless and for whom providing rental assistance will prevent the family's homelessness or having high risk of housing instability as determined by the CoC or its designee in accordance with the definition in Notice PIH 2021-15.

As applicable, the CoC or referring agency must provide documentation to the HACA verifying that the family meets one of the four eligible categories for EHV assistance. The HACA must retain this documentation as part of the family's file.

## 19-VII.IV.C. HACA SCREENING

### Overview

HUD waived 24 CFR 982.552 and 982.553 in part for the EHV applicants and established alternative requirement for mandatory and permissive prohibitions of admissions. Except where applicable, HACA policies regarding denials in Chapter 3 of this policy do not apply to screening individuals and families for eligibility for an EHV. Instead, the EHV alternative requirement listed in this section will apply to all EHV applicants.

The mandatory and permissive prohibitions listed in Notice PIH 2021-15 and in this chapter, however, apply only when screening the individual or family for eligibility for an EHV. When adding a family member after the family has been placed under a HAP contract with EHV assistance, the regulations at 24 CFR 982.551(h)(2) apply. Other than the birth, adoption, or court-awarded custody of a child, the HACA must approve additional family members and may apply its regular HCV screening criteria in Chapter 3.

### Mandatory Denials

Under alternative requirements for the EHV program, mandatory denials for EHV applicants include:

- 24 CFR 982.553(a)(1)(ii)(C), which prohibits admission if any household member has ever been convicted of drug-related criminal activity for manufacture or production of methamphetamine on the premises of federally assisted housing.

- 24 CFR 982.553(a)(2)(i), which prohibits admission to the program if any member of the household is subject to a lifetime registration requirement under a state sex offender registration program.

The PHA must deny admission to the program if any member of the family fails to sign and submit consent forms for obtaining information as required by 24 CFR 982.552(b)(3) but should notify the family of the limited EHV grounds for denial of admission first.

> HACA Policy
>
> HACA will deny admission to the program if any adult member (or head of household or spouse, regardless of age) fails to sign and submit consent forms.  The HACA will notify the family of the limited EHV grounds for denial of admission via email and mail.

**Permissive Denial**

Notice PIH 2021-15 lists permissive prohibitions for which the HACA may, but is not required to, deny admission to EHV families. The notice also lists prohibitions that, while allowable under the HCV program, may not be used to deny assistance for EHV families.

If the PHA intends to establish permissive prohibition policies for EHV applicants, the PHA must first consult with its CoC partner to understand the impact that the proposed prohibitions may have on referrals and must take the CoC's recommendations into consideration.

> HACA Policy
>
> The HACA will not adopt any permissive prohibitions for the EHV program.

### 19-VII.IV.D. INCOME VERIFICATION AT ADMISSION

**Self-Certification at Admission**

The requirement to obtain third-party verification of income in accordance with Notice PIH 2018-18 does not apply to the EHV program applicants at admission, and alternatively, PHAs may consider self-certification the highest form of income verification at admission. As such, HACA policies related to the verification of income in Section 7-I.B. do not apply to EHV families at admission. Instead, applicants must submit an affidavit attesting to their reported income, assets, expenses, and other factors that would affect an income eligibility determination.

Additionally, applicants may provide third-party documentation that represents the applicant's income within the 60-day period prior to admission or voucher issuance but is not dated within 60 days of the HACA's request.

> HACA Policy
>
> Any documents used for verification must not be damaged, altered, or in any way illegible.
>
> HACA will consider self-certification the highest form of income verification at admission. HACA will request written third party verification if readily available in attempt to mitigate future material discrepancies.
>
> HACA will accept third-party documents provided by applicants that represent the applicant's income within the 60-day period prior to admission or voucher issuance but is

not dated within 60 days of the HACA's request. For example, a Supplemental Security Income (SSI) benefit letter that was issued in November 2020 to represent the applicant's benefit amount for 2021 and was provided to the HACA in September 2021 would be an acceptable form of income verification.

Printouts from webpages are acceptable documentation.

Any family self-certifications must be made in a format acceptable to the HACA and must be signed by the family member whose information or status is being verified. HACA will define its standard Certification Forms for new admissions as a format acceptable to the HACA.

The HACA will incorporate additional procedures to remind families of the obligation to provide true and complete information in accordance with Chapter 14. The HACA will address any material discrepancies (i.e., unreported income or a substantial difference in reported income). The HACA may, but is not required to, offer the family a repayment agreement in accordance with Chapter 16. If the family fails to repay the excess subsidy, the HACA will terminate the family's assistance in accordance with the policies in Chapter 12.

**Recently Conducted Income Determinations**

HACAs may accept income calculations and verifications from third-party providers or from a certification or recertification that the HACA conducted on behalf of the family for another subsidized housing program in lieu of conducting an initial certification of income as long as:

- The income was calculated in accordance with rules outlined at 24 CFR Part 5 and within the last six months; and
- The family certifies there has been no change in income or family composition in the interim.

    HACA Policy

    The HACA will accept income calculations and verifications from third-party providers provided they meet the criteria outlined above.

    The family certification must be made in a format acceptable to the HACA and must be signed by all adult family members whose information or status is being verified.

    At the time of the family's annual certification the HACA must conduct the annual certification of income as outlined at 24 CFR 982.516 and HACA policies in Chapter 11.

**EIV Income Validation**

Once HUD makes the EIV data available to HACAs under this waiver and alternative requirement, the HACA must:

- Review the EIV Income and Income Validation Tool (IVT) reports to confirm and validate family-reported income within 90 days of the PIC submission date;

- Print and maintain copies of the EIV Income and IVT Reports in the tenant file; and

- Resolve any income discrepancy with the family within 60 days of the EIV Income or IVT Report dates.

  Prior to admission, HACA must continue to use HUD's EIV system to search for all household members using the Existing Tenant Search in accordance with HACA policies in Chapter 3.

  If HACA later determines that an ineligible family received assistance, the HACA must take steps to terminate that family from the program in accordance with Chapter 12.

## 19-VII.IV.E. SOCIAL SECURITY NUMBER AND CITIZENSHIP STATUS VERIFICATION

For the EHV program, the PHA is not required to obtain and verify SSN documentation and documentation evidencing eligible noncitizen status before admitting the family to the EHV program. Instead, PHAs may adopt policies to admit EHV applicants who are unable to provide the required SSN or citizenship documentation during the initial eligibility determination. As an alternative requirement, such individuals must provide the required documentation within 180 days of admission to be eligible for continued assistance, pending verification, unless the PHA provides an extension based on evidence from the family or confirmation from the CoC or other partnering agency that the family has made a good-faith effort to obtain the documentation.

If a PHA determines that an ineligible family received assistance, the PHA must take steps to terminate that family from the program.

> HACA Policy
>
> The HACA will accept self-certification and admit EHV applicants who are unable to provide the required SSN or citizenship documentation during the initial eligibility determination. These individuals must provide the required documentation in accordance with policies in Chapter 7 within 180 days of admission. HACA will verify SSN in EIV if the family is unable to obtain verification by the deadline and address material discrepancies as they arise. HACA will provide an additional 90-day extension based on evidence from the family or confirmation from the CoC or other partnering agency that the family has made a good-faith effort to obtain the documentation of eligible immigration status.
>
> If the HACA determines that an ineligible family received assistance, the HACA will take steps to terminate that family from the program in accordance with policies in Chapter 12.

## 19-VII.IV.F. AGE AND DISABILITY VERIFICATION

PHAs may accept self-certification of date of birth and disability status if a higher level of verification is not immediately available. If self-certification is used, the PHA must obtain a

higher level of verification within 90 days of admission or verify the information in EIV.

If a PHA determines that an ineligible family received assistance, the PHA must take steps to terminate that family from the program.

HACA Policy

The HACA will accept self-certification of date of birth and disability status if a higher form of verification is not immediately available. The certification must be made in a format acceptable to the HACA and must be signed by the family member whose information or status is being verified. If self-certification is accepted, within 90 days of admission, the HACA will verify the information in EIV or through other third-party verification method. The HACA will note the family's file that self-certification was used as initial verification and include an EIV printout or other third-party verification confirming the applicant's date of birth and/or disability status.

If the HACA determines that an ineligible family received assistance, the HACA will take steps to terminate that family from the program in accordance with policies in Chapter 12.

## 19-VII.IV.G. INCOME TARGETING

The PHA must determine income eligibility for EHV families in accordance with 24 CFR 982.201 and HACA policy in Chapter 3; however, income targeting requirements do not apply for EHV families. The PHA may still choose to include the admission of extremely low-income EHV families in its income targeting numbers for the fiscal year in which these families are admitted.

HACA Policy

The HACA will include the admission of extremely low-income EHV families in its income targeting numbers for the fiscal year in which these families are admitted.

## PART V: HOUSING SEARCH AND LEASING

## 19-VII.V.A. INITIAL VOUCHER TERM

Unlike the standard HCV program, which requires an initial voucher term of at least 60 days, EHV vouchers must have an initial search term of at least 120 days. HACA policies on extensions as outlined in Section 5-II.E. will apply.

HACA Policy

All EHVs will have an initial term of 120 calendar days.

The family must submit a Request for Tenancy Approval and proposed lease within the 120-day period unless HACA grants an extension.

## 19-VII.V.B. HOUSING SEARCH ASSISTANCE

The PHA must ensure housing search assistance is made available to EHV families during their initial housing search. The housing search assistance may be provided directly by the PHA or through the CoC or another partnering agency or entity.

At a minimum, housing search assistance must:

o   Help individual families identify potentially available units during their housing search, including physically accessible units with features for family members with disabilities, as well as units in low-poverty neighborhoods;
o   Provide transportation assistance and directions to potential units;
o   Conduct owner outreach;
o   Assist with the completion of rental applications and PHA forms; and
o   Help expedite the EHV leasing process for the family

HACA Policy

As identified in the MOU between the HACA and CoC, the following housing search assistance will be provided to each EHV family:

HACA will:

o   Conduct owner outreach in accordance with policies in Chapter 13

o   Provide directions to potential units as part of the EHV briefing packet

o   Expedite the EHV leasing process for the family and in accordance with policies in this chapter

o   At least every 30 days, conduct check-ins via email and telephone with families who are searching with an EHV and remind them of their voucher expiration date

o   Assign a dedicated landlord liaison for EHV voucher families

o   HACA or the partner agency identified by the CoC will:

o   Help families identify potentially available units during their housing search, including physically accessible units with features for family members with disabilities, as well as units in low-poverty neighborhoods

o   Provide transportation assistance to potential units

o   Assist the family with the completion of rental applications and HACA forms

## 19-VII.V.C. HQS PRE-INSPECTIONS

To expedite the leasing process, PHAs may pre-inspect available units that EHV families may be interested in leasing in order to maintain a pool of eligible units.

HACA Policy

To expedite the leasing process, HACA may pre-inspect available units that EHV families may be interested in leasing to maintain a pool of eligible units. If an EHV family select a unit that passed a HQS pre-inspection (without intervening occupancy) within 45 days of the date

of the Request for Tenancy Approval, the unit may be approved provided that it meets all other conditions under 24 CFR 982.305.

The family will be free to select his or her unit.

When a pre-inspected unit is not selected, HACA will make every effort to fast-track the inspection process, including adjusting the normal inspection schedule for any required initial or re-inspections.

## 19-VII.V.D. INITIAL LEASE TERM

Unlike in the standard the HCV program, EHV voucher holders may enter into an initial lease that is for less than 12 months, regardless of the PHA policy in Section 9-I.E., Term of Assisted Tenancy.

## 19-VII.V.E. PORTABILITY

The normal HCV portability procedures and requirements outlined in Chapter 10 generally apply to EHVs. Exceptions are addressed below.

**Nonresident Applicants**

Under EHV, applicant families may move under portability even if the family did not have legal residency in the jurisdiction of the initial PHA when they applied, regardless of HACA's policy in Section 10-II.B.

**Billing and Absorption**

A receiving PHA cannot refuse to assist an incoming EHV family, regardless of whether the PHA administers EHVs under its own ACC.

- If the EHV family moves under portability to another PHA that administers EHVs under its own ACC:

  o The receiving PHA may only absorb the incoming EHV family with an EHV (assuming it has an EHV voucher available to do so).

  o If the PHA does not have an EHV available to absorb the family, it must bill the initial PHA. The receiving PHA must allow the family to lease the unit with EHV assistance and may not absorb the family with a regular HCV when the family leases the unit.

  o Regardless of whether the receiving PHA absorbs or bills the initial PHA for the family's EHV assistance, the EHV administration of the voucher is in accordance with the receiving PHA's EHV policies.

- If the EHV family moves under portability to another PHA that does not administer EHV under its own ACC, the receiving PHA may absorb the family into its regular HCV program or may bill the initial PHA.

**Family Briefing**

In addition to the applicable family briefing requirements at 24 CFR 982.301(a)(2) as to how portability works and how portability may affect the family's assistance, the initial PHA must inform the family how portability may impact the special EHV services and assistance that may be available to the family.

The initial PHA is required to help facilitate the family's portability move to the receiving PHA and inform the family of this requirement in writing, taking reasonable steps to ensure meaningful access for persons with limited English proficiency (LEP).

> HACA Policy

> In addition to HACA'S policy on briefings described in Chapter 5, HACA will inform the family in writing that HACA will assist with moves under portability.

> For limited English proficient (LEP) applicants, the HACA will provide interpretation services in accordance with the HACA's LEP plan (See Chapter 2).

**Coordination of Services**

If the portability move is in connection with the EHV family's initial lease-up, the receiving PHA and the initial PHA must consult and coordinate on the EHV services to determine the appropriate assistance available to the family.

> HACA Policy

> For EHV families who are exercising portability, when HACA contacts the receiving PHA in accordance with Section 10-II.B. Preapproval Contact with Receiving PHA, the HACA will consult and coordinate with the receiving PHA to ensure there is no duplication of EHV services and assistance, and ensure the receiving PHA is aware of the maximum amount of services fee funding that the initial PHA may provide to the receiving PHA on behalf of the family.

**Services Fee**

Standard portability billing arrangements apply for HAP and ongoing administrative fees for EHV families.

For service fees funding, the amount of the service fee provided by the initial PHA may not exceed the lesser of the actual cost of the services and assistance provided to the family by the receiving HACA or $1,750, unless the initial PHA and receiving PHA mutually agree to change the $1,750 cap. Service fees are paid as follows:

- If the receiving PHA, in consultation and coordination with the initial PHA, will provide eligible services or assistance to the incoming EHV family, the receiving PHA may be compensated for those costs by the initial PHA regardless of whether the receiving PHA bills or absorbs.

- If the receiving PHA administers EHVs, the receiving PHA may use its own services fee and may be reimbursed by the initial PHA, or the initial PHA may provide the services funding upfront to the receiving PHA for those fees and assistance.

- If the receiving PHA does not administer EHVs, the initial PHA must provide the services funding upfront to the receiving PHA. Any amounts provided to the receiving PHA that are not used for services or assistance on behalf of the EHV family must promptly be returned by the receiving PHA to the initial PHA.

### Placement Fee/Issuance Reporting Fee

If the portability lease-up qualifies for the placement fee/issuance reporting fee, the receiving PHA receives the full amount of the placement component of the placement fee/issuing reporting fee. The receiving PHA is eligible for the placement fee regardless of whether the receiving PHA bills the initial PHA or absorbs the family into its own program at initial lease-up. The initial PHA qualifies for the issuance reporting component of the placement fee/issuance reporting fee, as applicable.

## 19-VII.V.F. PAYMENT STANDARDS

### Payment Standard Schedule

For the EHV program, HUD has waived the regulation requiring a single payment standard for each unit size. Instead, the PHA may, but is not required to, establish separate higher payment standards for EHVs. Lower EHV payment standards are not permitted. If the PHA is increasing the regular HCV payment standard, the PHA must also increase the EHV payment standard if it would be otherwise lower than the new regular HCV payment standard. The separate EHV payment standard must comply with all other HCV requirements with the exception of the alternative requirements discussed below.

Further, if the PHA chooses to establish higher payments standards for EHVs, HUD has provided other regulatory waivers:

- Defining the "basic range" for payment standards as between 90 and 120 percent of the published Fair Market Rent (FMR) for the unit size (rather than 90 to 110 percent).
- Allowing a PHA that is not in a designated Small Area FMR (SAFMR) area or has not opted to voluntarily implement SAFMRs to establish exception payment standards for a ZIP code area above the basic range for the metropolitan FMR based on the HUD published SAFMRs. The HACA may establish an exception payment standard up to 120 percent (as opposed to 110 percent) of the HUD published Small Area FMR for that ZIP code area.  The exception payment standard must apply to the entire ZIP code area.
- The PHA must notify HUD if it establishes an EHV exception payment standard based on the SAFMR.

  <u>HACA Policy</u>

  HACA will implement higher payment standards for EHVs. The EHV payment standard will be set at 120% of the current Fair Market Rent (FMR) for the metropolitan area.

**Rent Reasonableness**

All rent reasonableness requirements apply to EHV units, regardless of whether the HACA has established an alternative or exception EHV payment standard.

**Increases in Payment Standards**

The requirement that the PHA apply increased payment standards at the family's first regular recertification on or after the effective date of the increase does not apply to EHV. The PHA may, but is not required to, establish an alternative policy on when to apply the increased payment standard, provided the increased payment standard is used to calculate the HAP no later than the effective date of the family's first regular reexamination following the change.

> HACA Policy
>
> The HACA will not establish an alternative policy for increases in the payment standard. HACA policy in Section 11-III.B governing increases in payment standards will apply to EHV.

## 19-VII.V.G. TERMINATION OF VOUCHERS

After September 30, 2023, a PHA may not reissue EHVs when assistance for an EHV-assisted family ends. This means that when an EHV participant (a family that is receiving rental assistance under a HAP contract) leaves the program for any reason, the PHA may not reissue that EHV to another family unless it does so no later than September 30, 2023.

If an applicant family that was issued the EHV is unsuccessful in finding a unit and the EHV expires after September 30, 2023, the EHV may not be reissued to another family.

All EHVs under lease on or after October 1, 2023, may not under any circumstances be reissued to another family when the participant leaves the program for any reason.

An EHV that has never been issued to a family may be initially issued and leased after September 30, 2023, since this prohibition only applies to EHVs that are being reissued upon turnover after assistance to a family has ended. However, HUD may direct PHAs administering EHVs to cease leasing any unleased EHVs if such action is determined necessary by HUD to ensure there will be sufficient funding available to continue to cover the HAP needs of currently assisted EHV families.

## PART VI: USE OF FUNDS, REPORTING, AND FINANCIAL RECORDS

EHV funds allocated to the PHA for HAP (both funding for the initial allocation and HAP renewal funding) may only be used for eligible EHV HAP purposes. EHV HAP funding obligated to the HACA may not be used for EHV administrative expenses or the other EHV eligible expenses under this notice. Likewise, EHV administrative fees and funding obligated to the PHAs are to be used for those purposes and must not be used for HAP.

The appropriated funds for EHVs are separate from the regular HCV program and may not be used for the regular HCV program but may only be expended for EHV eligible purposes. EHV HAP funds may not roll into the regular HCV restricted net position (RNP) and must be tracked

and accounted for separately as EHV RNP. EHV administrative fees and funding for other eligible expenses permitted by Notice PIH 2021-15 may only be used in support of the EHVs and cannot be used for regular HCVs. EHV funding may not be used for the repayment of debts or any amounts owed to HUD by HUD program participants including, but not limited to, those resulting from Office of Inspector General (OIG), Quality Assurance Division (QAD), or other monitoring review findings.

The PHA must comply with EHV reporting requirements in the Voucher Management System (VMS) and Financial Data Schedule (FDS) as outlined in Notice PIH 2021-15.

The PHA must maintain complete and accurate accounts and other records for the program and provide HUD and the Comptroller General of the United States full and free access to all accounts and records that are pertinent the administration of the EHVs in accordance with the HCV program requirements at 24 CFR 982.158.

## GLOSSARY

## A.  ACRONYMS USED IN THE HOUSING CHOICE VOUCHER (HCV) PROGRAM

**AAF**  Annual adjustment factor (published by HUD in the *Federal Register* and used to compute annual rent adjustments)

**ACC**  Annual contributions contract

**ADA**  Americans with Disabilities Act of 1990

**AIDS**  Acquired immune deficiency syndrome

**BR**  Bedroom

**CDBG**  Community Development Block Grant (Program)

**CFR**  Code of Federal Regulations (published federal rules that define and implement laws; commonly referred to as "the regulations")

**CPI**  Consumer price index (published monthly by the Department of Labor as an inflation indicator)

**EID**  Earned income disallowance

**EIV**  Enterprise Income Verification

**FDIC**  Federal Deposit Insurance Corporation

**FHA**  Federal Housing Administration (HUD Office of Housing)

**FHEO**  Fair Housing and Equal Opportunity (HUD Office of)

**FICA**  Federal Insurance Contributions Act (established Social Security taxes)

**FMR**  Fair market rent

**FR**  Federal Register

**FSS**  Family Self-Sufficiency (Program)

**FY**  Fiscal year

**FYE**  Fiscal year end

**GAO**  Government Accountability Office

**GR**  Gross rent

**HA**  Housing authority or housing agency

**HAP**  Housing assistance payment

**HCV**  Housing choice voucher

**HQS**  Housing quality standards

**HUD**  Department of Housing and Urban Development

| **HUDCLIPS** | HUD Client Information and Policy System |
| **IPA** | Independent public accountant |
| **IRA** | Individual retirement account |
| **IRS** | Internal Revenue Service |
| **IVT** | Income Validation Tool |
| **JTPA** | Job Training Partnership Act |
| **LBP** | Lead-based paint |
| **LEP** | Limited English proficiency |
| **MSA** | Metropolitan statistical area (established by the U.S. Census Bureau) |
| **MTCS** | Multi-family Tenant Characteristics System (now the Form HUD-50058 submodule of the PIC system) |
| **MTW** | Moving to Work |
| **NOFA** | Notice of funding availability |
| **OGC** | HUD's Office of General Counsel |
| **OIG** | HUD's Office of Inspector General |
| **OMB** | Office of Management and Budget |
| **PASS** | Plan to Achieve Self-Support |
| **PBRA** | Project Based Rental Assistance |
| **PBV** | **Project Based Voucher** |
| **PHA** | Public housing agency |
| **PIC** | PIH Information Center |
| **PIH** | (HUD Office of) Public and Indian Housing |
| **PS** | Payment standard |
| **QC** | Quality control |
| **REAC** | (HUD) Real Estate Assessment Center |
| **RFP** | Request for proposals |
| **RFTA** | Request for tenancy approval |
| **RIGI** | Regional inspector general for investigation (handles fraud and program abuse matters for HUD at the regional office level) |
| **RVI** | Remote Video Inspection |
| **SEMAP** | Section 8 Management Assessment Program |

| | |
|---|---|
| **SRO** | Single room occupancy |
| **SSA** | Social Security Administration |
| **SSI** | Supplemental security income |
| **SWICA** | State wage information collection agency |
| **TANF** | Temporary assistance for needy families |
| **TPV** | Tenant protection vouchers |
| **TR** | Tenant rent |
| **TTP** | Total tenant payment |
| **UA** | Utility allowance |
| **UFAS** | Uniform Federal Accessibility Standards |
| **UIV** | Upfront income verification |
| **URP** | Utility reimbursement payment |
| **VAWA** | Violence Against Women Reauthorization Act of 2013 |

## B.    GLOSSARY OF SUBSIDIZED HOUSING TERMS

***Absorption.*** In portability (under subpart H of this part 982): the point at which a receiving PHA stops billing the initial PHA for assistance on behalf of a portability family. The receiving PHA uses funds available under the receiving PHA consolidated ACC.

***Accessible.*** The facility or portion of the facility can be approached, entered, and used by persons with disabilities.

***Adjusted income.*** Annual income, less allowable HUD deductions and allowances.

***Administrative fee.*** Fee paid by HUD to the PHA for administration of the program. See §982.152.

***Administrative plan.*** The plan that describes PHA policies for administration of the tenant-based programs. The Administrative Plan and any revisions must be approved by the PHA's board and included as a supporting document to the PHA Plan. See §982.54.

***Admission.*** The point when the family becomes a participant in the program. The date used for this purpose is the effective date of the first HAP contract for a family (first day of initial lease term) in a tenant-based program.

***Affiliated individual.*** With respect to an individual, a spouse, parent, brother, sister, or child of that individual, or an individual to whom that individual stands in loco parentis (in the place of a parent), or any individual, tenant, or lawful occupant living in the household of that individual

***Amortization payment.*** In a manufactured home space rental: The monthly debt service payment by the family to amortize the purchase price of the manufactured home.

***Annual.*** Happening once a year.

***Annual contributions contract (ACC).*** The written contract between HUD and a PHA under which HUD agrees to provide funding for a program under the 1937 Act, and the PHA agrees to comply with HUD requirements for the program.

***Annual income.*** The anticipated total income of an eligible family from all sources for the 12-month period following the date of determination of income, computed in accordance with the regulations.

***Applicant (applicant family).*** A family that has applied for admission to a program but is not yet a participant in the program.

***Area exception rent.*** An amount that exceeds the published FMR. See 24 CFR 982.504(b).

***As-paid states.*** States where the welfare agency adjusts the shelter and utility component of the welfare grant in accordance with actual housing costs.

***Assets.*** (See *net family assets.*)

***Auxiliary aids.*** Services or devices that enable persons with impaired sensory, manual, or speaking skills to have an equal opportunity to participate in, and enjoy the benefits of, programs or activities receiving federal financial assistance.

**Biennial.** Happening every two years.

**Bifurcate.** With respect to a public housing or Section 8 lease, to divide a lease as a matter of law such that certain tenants can be evicted or removed while the remaining family members' lease and occupancy rights are allowed to remain intact.

**Budget authority.** An amount authorized and appropriated by the Congress for payment to PHAs under the program. For each funding increment in a PHA program, budget authority is the maximum amount that may be paid by HUD to the PHA over the ACC term of the funding increment.

**Child.** A member of the family other than the family head or spouse who is under 18 years of age.

**Child care expenses.** Amounts anticipated to be paid by the family for the care of children under 13 years of age during the period for which annual income is computed, but only where such care is necessary to enable a family member to actively seek employment, be gainfully employed, or to further his or her education and only to the extent such amounts are not reimbursed. The amount deducted shall reflect reasonable charges for child care. In the case of child care necessary to permit employment, the amount deducted shall not exceed the amount of employment income that is included in annual income.

**Citizen.** A citizen or national of the United States.

**Cohead.** An individual in the household who is equally responsible for the lease with the head of household. A family may have a cohead or spouse but not both. A cohead never qualifies as a dependent. The cohead must have legal capacity to enter into a lease.

**Common space.** In shared housing, the space available for use by the assisted family and other occupants of the unit.

**Computer match.** The automated comparison of databases containing records about individuals.

**Confirmatory review.** An on-site review performed by HUD to verify the management performance of a PHA.

**Consent form.** Any consent form approved by HUD to be signed by assistance applicants and participants to obtain income information from employers and SWICAs; return information from the Social Security Administration (including wages, net earnings from self-employment, and retirement income); and return information for unearned income from the IRS. Consent forms expire after a certain time and may authorize the collection of other information to determine eligibility or level of benefits.

**Congregate housing.** Housing for elderly persons or persons with disabilities that meets the HQS for congregate housing. A special housing type: see 24 CFR 982.606–609.

**Contiguous MSA.** In portability (under subpart H of part 982): An MSA that shares a common boundary with the MSA in which the jurisdiction of the initial PHA is located.

**Continuously assisted.** An applicant is continuously assisted under the 1937 Act if the family is already receiving assistance under any 1937 Housing Act program when the family is admitted to the voucher program.

**Contract authority.** The maximum annual payment by HUD to a PHA for a funding increment.

**Cooperative** (term includes mutual housing). Housing owned by a nonprofit corporation or association, and where a member of the corporation or association has the right to reside in a particular apartment, and to participate in management of the housing. A special housing type (see 24 CFR 982.619).

**Covered families.** Statutory term for families who are required to participate in a welfare agency economic self-sufficiency program and who may be subject to a welfare benefit sanction for noncompliance with this obligation. Includes families who receive welfare assistance or other public assistance under a program for which federal, state or local law requires that a member of the family must participate in an economic self-sufficiency program as a condition for the assistance.

**Dating violence.** Violence committed by a person who is or has been in a social relationship of a romantic or intimate nature with the victim; and where the existence of such a relationship shall be determined based on a consideration of the following factors:

- The length of the relationship

- The type of relationship

- The frequency of interaction between the persons involved in the relationship

**Dependent.** A member of the family (except foster children and foster adults) other than the family head or spouse, who is under 18 years of age, or is a person with a disability, or is a full-time student.

**Dependent child.** In the context of the student eligibility restrictions, a dependent child of a student enrolled in an institution of higher education. The dependent child must also meet the definition of *dependent* as specified above.

**Disability assistance expenses.** Reasonable expenses that are anticipated, during the period for which annual income is computed, for attendant care and auxiliary apparatus for a disabled family member, and that are necessary to enable a family member (including the disabled member) to be employed, provided that the expenses are neither paid to a member of the family nor reimbursed by an outside source.

**Disabled family.** A family whose head, cohead, spouse, or sole member is a person with disabilities; two or more persons with disabilities living together; or one or more persons with disabilities living with one or more live-in aides.

**Disabled person.** See *person with disabilities.*

**Disallowance.** Exclusion from annual income.

**Displaced family.** A family in which each member, or whose sole member, is a person displaced by governmental action, or a person whose dwelling has been extensively damaged or destroyed as a result of a disaster declared or otherwise formally recognized pursuant to federal disaster relief laws.

**Domestic violence.** Felony or misdemeanor crimes of violence committed by a current or former spouse of the victim, by a person with whom the victim shares a child in common, by a person who is cohabitating with or has cohabitated with the victim as a spouse, by a person similarly situated to a spouse of the victim under the domestic or family violence laws of the jurisdiction receiving grant monies, or by any other person against an adult or youth victim who is protected from that person's acts under the domestic or family violence laws of the jurisdiction.

**Domicile.** The legal residence of the household head or spouse as determined in accordance with state and local law.

**Drug-related criminal activity.** The illegal manufacture, sale, distribution, or use of a drug, or the possession of a drug with intent to manufacture, sell, distribute, or use the drug.

**Economic self-sufficiency program.** Any program designed to encourage, assist, train or facilitate the economic independence of assisted families, or to provide work for such families. Can include job training, employment counseling, work placement, basic skills training, education, English proficiency, Workfare, financial or household management, apprenticeship, or any other program necessary to ready a participant to work (such as treatment for drug abuse or mental health treatment). Includes any work activities as defined in the Social Security Act (42 U.S.C. 607(d)). Also see 24 CFR 5.603(c).

**Elderly family.** A family whose head, cohead, spouse, or sole member is a person who is at least 62 years of age; two or more persons who are at least 62 years of age living together; or one or more persons who are at least 62 years of age living with one or more live-in aides.

**Elderly person.** An individual who is at least 62 years of age.

**Eligible family** A family that is income eligible and meets the other requirements of the 1937 Act and Part 5 of 24 CFR. See also *family*.

**Employer identification number (EIN).** The nine-digit taxpayer identifying number that is assigned to an individual, trust, estate, partnership, association, company, or corporation.

**Evidence of citizenship or eligible status.** The documents which must be submitted as evidence of citizenship or eligible immigration status. See 24 CFR 5.508(b).

**Extremely low-income family.** A very low-income family whose annual income does not exceed the higher of:

(1) The poverty guidelines established by the Department of Health and Human Services applicable to the family of the size involved (except in the case of families living in Puerto Rico or any other territory or possession of the United States); or

(2) Thirty (30) percent of the median income for the area, as determined by HUD, with adjustments for smaller and larger families, except that HUD may establish income ceilings higher or lower than 30 percent of the area median income for the area if HUD finds that such variations are necessary because of unusually high or low family incomes.

***Facility.*** All or any portion of buildings, structures, equipment, roads, walks, parking lots, rolling stock, or other real or personal property or interest in the property.

***Fair Housing Act.*** Title VIII of the Civil Rights Act of 1968, as amended by the Fair Housing Amendments Act of 1988.

***Fair market rent (FMR).*** The rent, including the cost of utilities (except telephone), as established by HUD for units of varying sizes (by number of bedrooms), that must be paid in the housing market area to rent privately owned, existing, decent, safe, and sanitary rental housing of modest (non-luxury) nature with suitable amenities. See periodic publications in the *Federal Register* in accordance with 24 CFR Part 888.

***Family.*** Includes, but is not limited to the following, regardless actual or perceived sexual orientation, gender identity, or marital status, a single person, who may be an elderly person, disabled person, near-elderly person, or any other single person; or  a group of persons residing together. Such group includes, but is not limited to a family with or without children (a child who is temporarily away from the home because of placement in foster care is considered a member of the family), an elderly family, a near-elderly family, a disabled family, a displaced family, or the remaining member of a tenant family. The PHA has the discretion to determine if any other group of persons qualifies as a family.

*Gender Identity* means actual or perceived gender characteristics.

*Sexual orientation* means homosexuality, heterosexuality, or bisexuality.

***Family rent to owner.*** In the voucher program, the portion of rent to owner paid by the family.

***Family self-sufficiency program*** (FSS program). The program established by a PHA within its jurisdiction to promote self-sufficiency among participating families, including the coordination of supportive services to these families (24 CFR 984.103).

***Family share.*** The portion of rent and utilities paid by the family. For calculation of family share, see 24 CFR 982.515(a).

***Family unit size.*** The appropriate number of bedrooms for a family, as determined by the PHA under the PHA subsidy standards.

***Federal agency.*** A department of the executive branch of the federal government.

***Foster child care payment.*** A payment to eligible households by state, local, or private agencies appointed by the state to administer payments for the care of foster children.

***Full-time student.*** A person who is attending school or vocational training on a full-time basis (carrying a subject load that is considered full-time for day students under the standards and practices of the educational institution attended). See 24 CFR 5.603.

***Funding increment.*** Each commitment of budget authority by HUD to a PHA under the consolidated annual contributions contract for the PHA program.

***Gender identity.*** Actual or perceived gender-related characteristics.

***Gross rent.*** The sum of the rent to owner plus any utility allowance.

***Group home.*** A dwelling unit that is licensed by a state as a group home for the exclusive residential use of two to twelve persons who are elderly or persons with disabilities (including any live-in aide). (A special housing type: see  24 CFR 982.610–614.)

***Handicap.*** Any condition or characteristic that renders a person an individual with handicaps. (See *person with disabilities*.)

***HAP contract.*** The housing assistance payments contract. A written contract between the PHA and an owner for the purpose of providing housing assistance payments to the owner on behalf of an eligible family.

***Head of household.*** The adult member of the family who is the head of the household for purposes of determining income eligibility and rent.

***Household.*** A household includes additional people other than the family who, with the PHA's permission, live in an assisted unit, such as live-in aides, foster children, and foster adults.

***Housing assistance payment.*** The monthly assistance payment by a PHA, which includes: (1) A payment to the owner for rent to the owner under the family's lease; and (2) An additional payment to the family if the total assistance payment exceeds the rent to owner.

***Housing agency (HA).*** See *public housing agency.*

***Housing quality standards (HQS).*** The HUD minimum quality standards for housing assisted under the voucher program.

***HUD.*** The U.S. Department of Housing and Urban Development.

***Imputed asset.*** An asset disposed of for less than fair market value during the two years preceding examination or reexamination.

***Imputed asset income.*** The PHA-established passbook rate multiplied by the total cash value of assets. The calculation is used when net family assets exceed $5,000.

***Imputed welfare income.*** An amount of annual income that is not actually received by a family as a result of a specified welfare benefit reduction, but is included in the family's annual income and therefore reflected in the family's rental contribution.

***Income.*** Income from all sources of each member of the household, as determined in accordance with criteria established by HUD.

***Income for eligibility.*** Annual income.

***Income information*** means information relating to an individual's income, including: All employment income information known to current or previous employers or other income sources.  All information about wages, as defined in the state's unemployment compensation law, including any social security number; name of the employee; quarterly wages of the employee; and the name, full address, telephone number, and, when known, employer identification number of an employer reporting wages under a state unemployment compensation law Whether an individual is receiving, has received, or has applied for unemployment compensation, and the amount and the period received.

Unearned IRS income and self-employment, wages, and retirement income

- Wage, social security, and supplemental security income data obtained from the Social Security Administration.

***Individual with handicaps.*** See *person with disabilities.*

***Initial PHA.*** In portability, the term refers to both: (1) A PHA that originally selected a family that later decides to move out of the jurisdiction of the selecting PHA; and (2) A PHA that absorbed a family that later decides to move out of the jurisdiction of the absorbing PHA.

***Initial payment standard.*** The payment standard at the beginning of the HAP contract term.

***Initial rent to owner.*** The rent to owner at the beginning of the HAP contract term.

***Institution of higher education.*** An institution of higher education as defined in 20 U.S.C. 1001 and 1002. See Exhibit 3-2 in this Administrative Plan.

***Jurisdiction.*** The area in which the PHA has authority under state and local law to administer the program.

***Landlord.*** Either the owner of the property or his/her representative, or the managing agent or his/her representative, as shall be designated by the owner.

***Lease.*** A written agreement between an owner and a tenant for the leasing of a dwelling unit to the tenant. The lease establishes the conditions for occupancy of the dwelling unit by a family with housing assistance payments under a HAP contract between the owner and the PHA.

***Live-in aide.*** A person who resides with one or more elderly persons, or near-elderly persons, or persons with disabilities, and who:

- Is determined to be essential to the care and well-being of the persons;

- Is not obligated for the support of the persons; and

- Would not be living in the unit except to provide the necessary supportive services.

***Living/sleeping room.*** A living room may be used as sleeping (bedroom) space, but no more than two persons may occupy the space. A bedroom or living/sleeping room must have at least one window and two electrical outlets in proper operating condition. See HCV GB p. 10-6 and 24 CFR 982.401.

***Local preference.*** A preference used by the PHA to select among applicant families.

***Low-income family.*** A family whose income does not exceed 80 percent of the median income for the area as determined by HUD with adjustments for smaller or larger families, except that HUD may establish income limits higher or lower than 80 percent for areas with unusually high or low incomes.

***Manufactured home.*** A manufactured structure that is built on a permanent chassis, is designed for use as a principal place of residence, and meets the HQS. (A special housing type: see 24 CFR 982.620 and 982.621.)

***Manufactured home space.*** In manufactured home space rental: A space leased by an owner to a family. A manufactured home owned and occupied by the family is located on the space. See 24 CFR 982.622 to 982.624.

***Medical expenses.*** Medical expenses, including medical insurance premiums that are anticipated during the period for which annual income is computed, and that are not covered by insurance (a deduction for elderly or disabled families only). These allowances are given when calculating adjusted income for medical expenses in excess of 3 percent of annual income.

***Minor.*** A member of the family household other than the family head or spouse, who is under 18 years of age.

***Mixed family.*** *A* family whose members include those with citizenship or eligible immigration status, and those without citizenship or eligible immigration status. ***Monthly adjusted income.*** One twelfth of adjusted income.

***Monthly income.*** One twelfth of annual income.

***Mutual housing.*** Included in the definition of *cooperative.*

***National.*** *A* person who owes permanent allegiance to the United States, for example, as a result of birth in a United States territory or possession.

***Near-elderly family.*** A family whose head, spouse, or sole member is a person who is at least 50 years of age but below the age of 62; or two or more persons, who are at least 50 years of age but below the age of 62, living together; or one or more persons who are at least 50 years of age but below the age of 62 living with one or more live-in aides.

***Net family assets.*** (1) Net cash value after deducting reasonable costs that would be incurred in disposing of real property, savings, stocks, bonds, and other forms of capital investment, excluding interests in Indian trust land and excluding equity accounts in HUD homeownership programs. The value of necessary items of personal property such as furniture and automobiles shall be excluded.

In cases where a trust fund has been established and the trust is not revocable by, or under the control of, any member of the family or household, the value of the trust fund will not be considered an asset so long as the fund continues to be held in trust. Any income distributed from the trust fund shall be counted when determining annual income under §5.609.

- In determining net family assets, PHAs or owners, as applicable, shall include the value of any business or family assets disposed of by an applicant or tenant for less than fair market value (including a disposition in trust, but not in a foreclosure or bankruptcy sale) during the two years preceding the date of application for the program or reexamination, as applicable, in excess of the consideration received therefore. In the case of a disposition as part of a separation or divorce settlement, the disposition will not be considered to be for less than fair market value if the applicant or tenant receives important consideration not measurable in dollar terms.

***Noncitizen.*** *A* person who is neither a citizen nor national of the United States.

***Notice of funding availability (NOFA).*** For budget authority that HUD distributes by competitive process, the *Federal Register* document that invites applications for funding. This document explains how to apply for assistance and the criteria for awarding the funding.

***Office of General Counsel (OGC).*** The General Counsel of HUD.

**Overcrowded.** A unit that does not meet the following HQS space standards: (1) Provide adequate space and security for the family; and (2) Have at least one bedroom or living/sleeping room for each two persons.

**Owner.** Any person or entity with the legal right to lease or sublease a unit to a participant.

**PHA Plan.** The annual plan and the 5-year plan as adopted by the PHA and approved by HUD.

**PHA's quality control sample.** An annual sample of files or records drawn in an unbiased manner and reviewed by a PHA supervisor (or by another qualified person other than the person who performed the original work) to determine if the work documented in the files or records conforms to program requirements. For minimum sample size see CFR 985.3.

**Participant (participant family).** A family that has been admitted to the PHA program and is currently assisted in the program. The family becomes a participant on the effective date of the first HAP contract executed by the PHA for the family (first day of initial lease term).

**Payment standard.** The maximum monthly assistance payment for a family assisted in the voucher program (before deducting the total tenant payment by the family).

**Person with disabilities.** *For the purposes of program eligibility.* A person who has a disability as defined under the Social Security Act or Developmental Disabilities Care Act, or a person who has a physical or mental impairment expected to be of long and indefinite duration and whose ability to live independently is substantially impeded by that impairment but could be improved by more suitable housing conditions. This includes persons with AIDS or conditions arising from AIDS but excludes persons whose disability is based solely on drug or alcohol dependence. *For the purposes of reasonable accommodation.* A person with a physical or mental impairment that substantially limits one or more major life activities, a person regarded as having such an impairment, or a person with a record of such an impairment.

**Portability.** Renting a dwelling unit with a Section 8 housing choice voucher outside the jurisdiction of the initial PHA.

**Premises.** The building or complex in which the dwelling unit is located, including common areas and grounds.

**Previously unemployed.** With regard to the earned income disallowance, a person with disabilities who has earned, in the 12 months previous to employment, no more than would be received for 10 hours of work per week for 50 weeks at the established minimum wage.

**Private space.** In shared housing, the portion of a contract unit that is for the exclusive use of an assisted family.

**Processing entity.** The person or entity that, under any of the programs covered, is responsible for making eligibility and related determinations and any income reexamination. In the HCV program, the "processing entity" is the "responsible entity."

**Project owner.** The person or entity that owns the housing project containing the assisted dwelling unit.

**Public assistance.** Welfare or other payments to families or individuals, based on need, which are made under programs funded, separately or jointly, by federal, state, or local governments.

***Public housing agency (PHA).*** Any state, county, municipality, or other governmental entity or public body, or agency or instrumentality of these entities, that is authorized to engage or assist in the development or operation of low-income housing under the 1937 Act. ***Qualified family*** (under the earned income disallowance). A family participating in an applicable assisted housing program or receiving HCV assistance:

- Whose annual income increases as a result of employment of a family member who is a person with disabilities and who was previously unemployed for one or more years prior to employment;

- Whose annual income increases as a result of increased earnings by a family member who is a person with disabilities during participation in any economic self-sufficiency or other job training program; or

- Whose annual income increases, as a result of new employment or increased earnings of a family member who is a person with disabilities, during or within six months after receiving assistance, benefits or services under any state program for temporary assistance for needy families funded under Part A of Title IV of the Social Security Act, as determined by the responsible entity in consultation with the local agencies administering temporary assistance for needy families (TANF) and Welfare-to-Work (WTW) programs. The TANF program is not limited to monthly income maintenance, but also includes such benefits and services as one-time payments, wage subsidies and transportation assistance-- provided that the total amount over a six-month period is at least $500.

***Qualified census tract.*** With regard to certain tax credit units, any census tract (or equivalent geographic area defined by the Bureau of the Census) in which at least 50 percent of households have an income of less than 60 percent of Area Median Gross Income (AMGI), or where the poverty rate is at least 25 percent, and where the census tract is designated as a qualified census tract by HUD.

***Reasonable rent.*** A rent to owner that is not more than rent charged: (1) For comparable units in the private unassisted market; and (2) For comparable unassisted units in the premises.

***Reasonable accommodation.*** A change, exception, or adjustment to a rule, policy, practice, or service to allow a person with disabilities to fully access the PHA's programs or services.

***Receiving PHA.*** In portability: A PHA that receives a family selected for participation in the tenant-based program of another PHA. The receiving PHA issues a voucher and provides program assistance to the family.

***Recertification.*** Sometimes called *reexamination.* The process of securing documentation of total family income used to determine the rent the tenant will pay for the next 12 months if there are no additional changes to be reported.

***Remaining member of the tenant family.*** The person left in assisted housing who may or may not normally qualify for assistance on their own circumstances (i.e., an elderly spouse dies, leaving widow age 47 who is not disabled).

**Rent to owner.** The total monthly rent payable to the owner under the lease for the unit (also known as contract rent). Rent to owner covers payment for any housing services, maintenance, and utilities that the owner is required to provide and pay for.

**Residency preference.** A PHA preference for admission of families that reside anywhere in a specified area, including families with a member who works or has been hired to work in the area (See *residency preference area*). **Residency preference area.** The specified area where families must reside to qualify for a residency preference.

**Responsible entity.** For the public housing and the Section 8 tenant-based assistance, project-based voucher  assistance, and moderate rehabilitation programs, the responsible entity means the PHA administering the program under an ACC with HUD. For all other Section 8 programs, the responsible entity means the Section 8 owner.

**Secretary.** The Secretary of Housing and Urban Development.

**Section 8.** Section 8 of the United States Housing Act of 1937.

**Section 8 covered programs.** All HUD programs which assist housing under Section 8 of the 1937 Act, including Section 8 assisted housing for which loans are made under Section 202 of the Housing Act of 1959.

**Section 214.** Section 214 of the Housing and Community Development Act of 1980, as amended.

**Section 214 covered programs.** The collective term for the HUD programs to which the restrictions imposed by Section 214 apply. These programs are set forth in 24 CFR 5.500.

**Security deposit.** A dollar amount (maximum set according to the regulations) which can be used for unpaid rent or damages to the owner upon termination of the lease.

**Set-up charges.** In a manufactured home space rental, charges payable by the family for assembling, skirting, and anchoring the manufactured home.

**Sexual assault.** Any nonconsensual sexual act proscribed by federal, tribal, or state law, including when the victim lacks capacity to consent (42 U.S.C. 13925(a)).

**Sexual orientation.** Homosexuality, heterosexuality or bisexuality.

**Shared housing.** A unit occupied by two or more families. The unit consists of both common space for shared use by the occupants of the unit and separate private space for each assisted family. (A special housing type: see 24 CFR 982.615–982.618.)

**Single person.** A person living alone or intending to live alone.

**Single room occupancy housing (SRO).** A unit that contains no sanitary facilities or food preparation facilities, or contains either, but not both, types of facilities. (A special housing type: see 24 CFR 982.602–982.605.)

**Small rural public housing agency (PHA).** Section 38 defines the term "small public housing agency" as a public housing agency "for which the sum of the number of public housing dwelling units administered by the agency and the number of vouchers under section 8(o) administered by the agency is 550 or fewer" and "that predominantly operates in a rural area, as described in section 1026.35(b)(2)(iv)(A) of title 12, Code of Federal Regulations." After

consideration of the public comments discussed above, HUD is interpreting "predominantly operates in a rural area" to mean a small PHA that:

(1) Has a primary administrative building with a physical address in a rural area as described in 12 CFR 1026.35(b)(2)(iv)(A); or

(2) more than 50 percent of its combined public housing units and voucher units under section 8(o) are in rural areas as described in 12 CFR 1026.35(b)(2)(iv)(A). HUD also clarifies that voucher units under section 8(o) include those in the tenant-based Housing Choice Voucher (HCV) program and the Project-Based Voucher (PBV) program.

***Social security number (SSN).*** The nine-digit number that is assigned to a person by the Social Security Administration and that identifies the record of the person's earnings reported to the Social Security Administration. The term does not include a number with a letter as a suffix that is used to identify an auxiliary beneficiary.

***Special admission.*** Admission of an applicant that is not on the PHA waiting list or without considering the applicant's waiting list position.

***Special housing types.*** See subpart M of part 982. Subpart M states the special regulatory requirements for: SRO housing, congregate housing, group homes, shared housing, cooperatives (including mutual housing), and manufactured homes (including manufactured home space rental).

***Specified welfare benefit reduction.*** Those reductions of welfare benefits (for a covered family) that may not result in a reduction of the family rental contribution. A reduction of welfare benefits because of fraud in connection with the welfare program, or because of welfare sanction due to noncompliance with a welfare agency requirement to participate in an economic self-sufficiency program.

***Spouse.*** The marriage partner of the head of household.

***Stalking.*** To follow, pursue, or repeatedly commit acts with the intent to kill, injure, harass, or intimidate; or to place under surveillance with the intent to kill, injure, harass, or intimidate another person; and in the course of, or as a result of, such following, pursuit, surveillance, or repeatedly committed acts, to place a person in reasonable fear of the death of, or serious bodily injury to, or to cause substantial emotional harm to (1) that person, (2) a member of the immediate family of that person, or (3) the spouse or intimate partner of that person.

***State wage information collection agency (SWICA).*** The state agency, including any Indian tribal agency, receiving quarterly wage reports from employers in the state, or an alternative system that has been determined by the Secretary of Labor to be as effective and timely in providing employment-related income and eligibility information.

***Subsidy standards.*** Standards established by a PHA to determine the appropriate number of bedrooms and amount of subsidy for families of different sizes and compositions.

***Suspension.*** The term on the family's voucher stops from the date the family submits a request for PHA approval of the tenancy, until the date the PHA notifies the family in writing whether the request has been approved or denied. This practice is also called *tolling*.

***Tax credit rent.*** With regard to certain tax credit units, the rent charged for comparable units of the same bedroom size in the building that also receive the low-income housing tax credit but do not have any additional rental assistance (e.g., tenant-based voucher assistance).

***Tenancy addendum.*** For the housing choice voucher program, the lease language required by HUD in the lease between the tenant and the owner.

***Tenant.*** The person or persons (other than a live-in aide) who executes the lease as lessee of the dwelling unit.

***Tenant rent to owner.*** See *family rent to owner*.

***Term of lease.*** The amount of time a tenant agrees in writing to live in a dwelling unit.

***Total tenant payment (TTP).*** The total amount the HUD rent formula requires the tenant to pay toward rent and utilities.

***Unit.*** Residential space for the private use of a family. The size of a unit is based on the number of bedrooms contained within the unit and generally ranges from zero (0) bedrooms to six (6) bedrooms.

***Utilities.*** Water, electricity, gas, other heating, refrigeration, cooking fuels, trash collection, and sewage services. Telephone service is not included.

***Utility allowance.*** If the cost of utilities (except telephone) and other housing services for an assisted unit is not included in the tenant rent but is the responsibility of the family occupying the unit, an amount equal to the estimate made or approved by a PHA or HUD of the monthly cost of a reasonable consumption of such utilities and other services for the unit by an energy-conservative household of modest circumstances consistent with the requirements of a safe, sanitary, and healthful living environment.

***Utility reimbursement.*** In the voucher program, the portion of the housing assistance payment which exceeds the amount of rent to owner.

***Utility hook-up charge.*** In a manufactured home space rental: Costs payable by a family for connecting the manufactured home to utilities such as water, gas, electrical and sewer lines.

***Very low-income family.*** A low-income family whose annual income does not exceed 50 percent of the median income for the area, as determined by HUD, with adjustments for smaller and larger families. HUD may establish income limits higher or lower than 50 percent of the median income for the area on the basis of its finding that such variations are necessary because of unusually high or low family incomes. This is the income limit for the housing choice voucher program.

***Veteran.*** A person who has served in the active military or naval service of the United States at any time and who shall have been discharged or released under conditions other than dishonorable.

***Violence Against Women Reauthorization Act (VAWA) of 2013.*** Prohibits denying admission to the program to an otherwise qualified applicant or terminating assistance on the basis that the applicant or program participant is or has been a victim of domestic violence, dating violence, sexual assault, or stalking.

***Violent criminal activity.*** Any illegal criminal activity that has as one of its elements the use, attempted use, or threatened use of physical force substantial enough to cause, or be reasonably likely to cause, serious bodily injury or property damage.

***Voucher*** *(housing choice voucher).* A document issued by a PHA to a family selected for admission to the housing choice voucher program. This document describes the program and the procedures for PHA approval of a unit selected by the family. The voucher also states obligations of the family under the program.

***Voucher holder.*** A family holding a voucher with an unexpired term (search time).

***Voucher program.*** The housing choice voucher program.

***Waiting list.*** A list of families organized according to HUD regulations and PHA policy who are waiting for a unit to become available.

***Waiting list admission.*** An admission from the PHA waiting list.

***Welfare assistance***. Income assistance from federal or state welfare programs, including assistance provided under TANF and general assistance. Does not include assistance directed solely to meeting housing expenses, nor programs that provide health care, child care or other services for working families. For the FSS program (24 CFR 984.103), *welfare assistance* includes only cash maintenance payments designed to meet a family's ongoing basic needs. Does not include nonrecurring short term benefits designed to address individual crisis situations, work subsidies, supportive services such as child care and transportation provided to families who are employed, refundable earned income tax credits, contributions to and distributions from Individual Development Accounts under TANF, services such as counseling, case management, peer support, child care information and referral, financial empowerment, transitional services, job retention, job advancement, and other employment-related services that to not provide basic income support, amounts solely directed to meeting housing expenses, amounts for health care, Supplemental Nutrition Assistance Program (SNAP) and emergency rental and utilities assistance, SSI, SSDI, or social security, and child-only or non-needy TANF grants made to or on behalf of a dependent child solely on the basis of the child's need and not the need of the child's current non-parental caretaker.

## ADDENDUM 1

## EMERGENCY TRANSFER MOVE PLAN
## FOR VICTIMS OF DOMESTIC VIOLENCE, DATING VIOLENCE, SEXUAL ASSAULT, OR STALKING

**Emergency Transfers**

The Housing Authority of the City of Austin (HACA) is concerned about the safety of its residents and program participants in the Housing Choice Voucher (HCV) program, Public Housing (PH) program and the Project Based Rental Assistance (PBRA) program. Such concern extends to residents who are victims of domestic violence, dating violence, sexual assault, or stalking. In accordance with the Violence Against Women Act (VAWA),[6] HACA allows residents who are victims of domestic violence, dating violence, sexual assault, or stalking to request an emergency transfer move from the resident's current unit to another unit within HACA's three programs mentioned above. The ability to request a transfer move is available regardless of sex, gender identity, or sexual orientation.[7]

The ability of HACA to honor such requests for residents currently receiving assistance, however, may depend upon two things:

- a preliminary determination that the resident is or has been a victim of domestic violence, dating violence, sexual assault, or stalking, and
- whether HACA has another dwelling unit that is available and is safe to offer the resident for temporary or permanent occupancy.

This plan identifies residents who are eligible for an emergency transfer move, the documentation needed to request an emergency transfer move, confidentiality protections, how an emergency transfer move may occur, and tips for residents on safety and security. This plan is based on a model emergency transfer move plan published by the U.S. Department of Housing and Urban Development (HUD), oversees the HCV, PH and PBRA programs.

---

[6] Despite the name of this law, VAWA protection is available to all victims of domestic violence, dating violence, sexual assault, and stalking, regardless of sex, gender identity, or sexual orientation.

[7] Housing providers cannot discriminate on the basis of any protected characteristic, including race, color, national origin, religion, sex, familial status, disability, or age. HUD-assisted and HUD-insured housing must be made available to all otherwise eligible individuals regardless of actual or perceived sexual orientation, gender identity, or marital status.

**Eligibility for Emergency Transfers**

A resident of HACA's HCV, PH or PBRA program who is a victim of domestic violence, dating violence, sexual assault, or stalking, as provided in HUD's regulations at 24 CFR part 5, subpart L, is eligible for an emergency transfer move if:

- the resident reasonably believes that there is a threat of imminent harm from further violence if the resident remains within the same unit; or
- in the case of sexual assault, the resident may also be eligible to transfer if the sexual assault occurred on the premises within the 90-calendar-day period preceding a request for an emergency transfer move.

A resident requesting an emergency transfer move must expressly request the transfer move in accordance with the procedures described in this plan.

Residents who are not in good standing may still request an emergency transfer move if they meet the eligibility requirements in this section.

**Emergency Transfer Move Request Documentation**

To request an emergency transfer move, the resident must do the following:

*HCV Resident:*  The resident shall notify his / her eligibility specialist and submit a written request for a transfer move to another unit.  The eligibility specialist will provide the resident with an Emergency Transfer Move Request form.  HACA will provide reasonable accommodations to this policy to allow individuals with disabilities to submit the request in an accessible manner.

*PH and PBRA Residents:*  The resident shall notify the property manager and submit a written request for a transfer to the property manager. The property manager will provide the resident with an Emergency Transfer Request form.  HACA will provide reasonable accommodations to this policy to allow individuals with disabilities to submit the request in an accessible manner.

The HCV, PH or PBRA resident's written request for an emergency transfer move should include either:

- A statement expressing that the resident reasonably believes that there is a threat of imminent harm from further violence if the resident were to remain in the same dwelling unit assisted under HACA's program; OR
- A statement that the resident was a sexual assault victim and that the sexual assault occurred on the premises during the 90-calendar-day period preceding the resident's request for an emergency transfer.

**Confidentiality**

HACA will keep confidential any information that the resident submits in requesting an emergency transfer move, and information about the emergency transfer move, unless:

- the resident gives HACA written permission to release the information on a time limited basis, or
- disclosure of the information is required by law; or
- disclosure is required for use in an eviction proceeding or hearing regarding termination of assistance from the covered program.

This confidentiality includes keeping confidential the new location of the dwelling unit of the resident, if one is provided, from the person(s) that committed an act(s) of domestic violence, dating violence, sexual assault, or stalking against the resident.  See the Notice of Occupancy Rights under the Violence Against Women Act For All Residents for more information about HACA's responsibility to maintain the confidentiality of information related to incidents of domestic violence, dating violence, sexual assault, or stalking.

**Emergency Transfer Move Timing and Availability**

HACA cannot guarantee that a transfer move request will be approved or how long it will take to process a transfer move request.  HACA will, however, act as quickly as possible to move a resident who is a victim of domestic violence, dating violence, sexual assault, or stalking to another unit, subject to availability and safety of a unit.

Residents can request internal and external transfer moves.  Internal transfer moves are moves within the same program.  External transfer moves are moves that cross over to a different program.  Residents can make these requests simultaneously to allow for the opportunity to move at the earliest possible time.

> *HCV Residents:*  Upon receipt of the Transfer Move Request and verification of being a victim of domestic violence, dating violence, sexual assault, or stalking, the eligibility specialist will provide the resident with a Rescission form to be completed by the resident and their current landlord.  The eligibility specialist will assist the resident with both internal and external move options:

- *Internal Transfer Move Options:* The resident will be given a voucher which can be used to locate a new unit within HACA's voucher jurisdiction where the family feels safe. The family can also use the portability feature of the voucher and move to the jurisdiction of any other Public Housing Authority that administers the HCV program.

- *External Transfer Move Options:* The resident will be given the opportunity to place their name on the waiting list for any of HACA's 18 PH and PBRA properties where the family feels safe, even if the waiting list for that property is closed. This placement on the waiting list is done with a preference that will move the family to the top of the list. HACA's Admissions Department will streamline the eligibility determination process to assist the family with moving as quickly as possible.

*PH and PBRA Residents:* Upon receipt of the Transfer Move Request and verification of being a victim of domestic violence, dating violence, sexual assault, or stalking, the property manager will assist the resident with both internal and external move options:

- *Internal Transfer Move Options:* The resident will be given the opportunity to place their name on the waiting list for any of HACA's 18 PH and PBRA properties where the family feels safe even if the waiting list for that property is closed. This placement on the waiting list is done with a preference that will move the family to the top of the list. If a resident reasonably believes a proposed internal transfer would not be safe, the resident may reject the transfer offer and request a transfer to a different unit.

- *External Transfer Move Options:* When voucher funding is available, the resident may request to be placed on the voucher waiting list with an emergency preference, even if the list is closed. With a voucher the family can locate a new unit within HACA's voucher jurisdiction where the family feels safe. The family can also use the portability feature of the voucher and move to the jurisdiction of any other Public Housing Authority that administers the HCV program. HACA's Admissions Department will streamline the eligibility determination process to assist the family with moving as quickly as possible.

If a unit is available, the transferred resident must agree to abide by the terms and conditions that govern occupancy in the unit and program to which the resident has been transferred. HACA may be unable to transfer a resident to a particular unit if the resident has not or cannot establish eligibility for that unit.

If HACA has no safe and available units for which a resident who needs an emergency transfer move is eligible, HACA will assist the resident by referring them to local organizations offering assistance to victims of domestic violence, dating violence, sexual assault, or stalking that are attached to this plan.

**Safety and Security of Residents**

Pending processing of the transfer move and the actual transfer move, if it is approved and occurs, the resident is urged to take all reasonable precautions to be safe.

Residents who are or have been victims of domestic violence are encouraged to contact the National Domestic Violence Hotline at 1-800-799-7233, or a local domestic violence shelter, for assistance in creating a safety plan. For persons with hearing impairments, that hotline can be accessed by calling 1-800-787-3224 (TTY).

Residents who have been victims of sexual assault may call the Rape, Abuse & Incest National Network's National Sexual Assault Hotline at 800-656-HOPE, or visit the online hotline at https://ohl.rainn.org/online/.

Residents who are or have been victims of stalking may visit the National Center for Victims of Crime's Stalking Resource Center at https://www.victimsofcrime.org/our-programs/stalking-resource-center.

**Attachment:  Local organizations offering assistance to victims of domestic violence, dating violence, sexual assault, or stalking include the following (list may not be exhaustive):**

- **Safe Place**
  24/7 Hotline:  (512) 267-SAFE (7233)

- **The Salvation Army Shelter for Women and Children**
  4523 Tannehill Ln
  Austin, TX 78721
  (512) 933-0600

- **Casa Marianella**
  Posada Esperanza
  821 Gunter St
  Austin, TX 78702
  (512) 928-8862

- **Asian Family Support Services of Austin**
  Hotline:  1-877-281-8371
  Local:  (512) 651-3743

- **Travis County Health and Human Services Community Centers**

| **Palm Square** | **Del Valle** | **Post Road** |
|---|---|---|
| 100 N IH 35 Suite 2000 | 3518 FM 973 S | 2201 Post Rd Suite101 |
| Austin, TX 78701 | Del Valle, TX 78617 | Austin, TX 78704 |
| (512) 854-4120 | (512) 854-1520 | (512) 854-9130 |
| **Manor** | **Pflugerville** | **Oak Hill** |
| 600 W Carrie Manor St | 15822 Foothill Farm Loop | 8656 W Hwy 71 |
| Manor, TX 78653 | Pflugerville, TX 78660 | Oak Hill, TX 78735 |
| (512) 854-1550 | (512) 854-1530 | (512) 854-2130 |

- **City of Austin Neighborhood Centers**

| **Blackland** | **East Austin** | **Montopolis** |
|---|---|---|
| 2005 Salina St | 211 Comal St | 1416 Montopolis Dr |
| Austin, TX 78722 | Austin, TX 78702 | Austin, TX 78741 |
| (512) 972-5790 | (512) 972-6650 | (512) 972-6650 |
| **Rosewood-Zaragoza** | **South Austin** | |
| 2800 Webberville Rd | 2508 Durwood St | |
| Austin, TX 78702 | Austin, TX 78704 | |
| (512) 972-6740 | (512) 972-6840 | |