**FILED**

May 22, 2026

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _Christian Rodriguez_

DEPUTY

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

JOHN COPELAND,                                                    Civil Action No. 1:26-cv-00461-ADA-DH

　　　　Plaintiff,

v.

HOUSING AUTHORITY OF THE
CITY OF AUSTIN,

　　　　Defendant.

**FIRST AMENDED VERIFIED COMPLAINT**

**I. NATURE OF THE CASE**

1.  This case challenges HACA's termination of a HUD-VASH voucher for a severely disabled veteran because his disability-required live-in aide was present in the assisted unit. HACA had notice that the alleged unauthorized occupant was the aide providing daily care, yet treated the accommodation evidence as irrelevant because it did not prove preexisting permission.

2.  Plaintiff John Copeland is a veteran who is disabled within the meaning of 42 U.S.C. § 3602(h) as, after a January 2025 stroke, he became wheelchair-dependent, cognitively and functionally limited, and unable to safely live alone without assistance with eating, toileting, transfers, medication, and financial-management tasks.

3.  Ms. Danielle Pitts provided that care. She was not added to the household for personal convenience. She was the person willing to provide intimate, daily, disability-related care when Mr. Copeland could not safely remain housed alone.

4.  The legal error is simple. Permission for a live-in aide was the accommodation being sought. HACA could deny a particular aide only under lawful standards and after

individualized consideration. It could not deny the request because the aide lacked permission, then terminate the voucher because the aide lacked permission.

## II. PARTIES, JURISDICTION, AND VENUE

5. Mr. Copeland resides in Austin, Texas. He is a disabled veteran and HUD-VASH voucher participant.

6. Defendant Housing Authority of the City of Austin is a Texas public housing authority that administers federally funded Housing Choice Voucher and HUD-VASH assistance in Austin. HACA receives federal financial assistance and acts under color of state law when administering and terminating voucher benefits.

7. The Court has federal-question jurisdiction under 28 U.S.C. § 1331 because this action arises under Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, the Fair Housing Act, and 42 U.S.C. § 1983. The Court may award declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202 and its equitable powers.

8. Venue is proper in this District and Division under 28 U.S.C. § 1391 because the events occurred in Austin, Travis County, Texas.

## III. FACTUAL ALLEGATIONS

### A. Disability Care Needs and the VA/VASH Process

9. Mr. Copeland had a VA disability rating before January 2025. On or about January 22, 2025, he suffered a stroke. On or about January 24, 2025, he was admitted to Central Texas Rehabilitation Hospital for post-stroke rehabilitation.

10. Central Texas Rehabilitation Hospital discharge records reflect stroke-related impairments and discharge instructions requiring substantial caregiver assistance, including help with self-care tasks, transfers, medication management, and financial management.

11. On or about February 13, 2025, Mr. Copeland was discharged home with a caregiver. After returning home, he could not safely live alone. As HACA's own hearing summary memorializes, Ms. Pitts moved in to provide the disability-related care he required.

12. Mr. Copeland had received his HUD-VASH voucher after applying through the VA.  Ms. Pitts therefore applied through the VA to be Mr. Copeland's caregiver, and on July 18, 2025, after almost five months of working full time caring for Mr. Copeland's needs without compensation, the VA approved compensation for Ms. Pitts's work providing Mr. Copeland's disability-related care.

13. Mr. Copeland and Ms. Pitts reasonably understood this VA approval to be sufficient to comply with the process to authorize her presence because they had initially received the voucher through applying with the VA, not HACA, and the same disability, the same veteran-housing program, and the same caregiving relationship were involved.

**B. HACA Paperwork and Reasonable Accommodation Notice.**

14. In either August or September 2025, Mr. Copeland and Ms. Pitts contacted the VA about moving to a larger, disability-friendly unit and were directed to HACA. HUD/VASH liaison for HACA and caseworker for Mr. Copeland, Kristen Petersen, informed that in addition to their approved VA application they also needed to apply with HACA to add Ms. Pitts to the voucher, and to submit documentation of Mr. Copeland's disability and need for a live-in aide.

15. Mr. Copeland obtained physician documentation requesting a live-in-aide accommodation. That documentation was delivered to HACA on or about August 19, 2025.

16. Mr. Copeland's VA HUD-VASH counselor, Malcolm Adair, interviewed Ms. Pitts on October 1, 2025, and filled out the required HACA application to approve Ms. Pitts as a live-in aide.

17. Later in October 2025, Ms. Petersen also sent Mr. Copeland the same HACA live-in-aide application but formatted and sent through DocuSign. Ms. Pitts completed and submitted it.

18. Between the July VA approval and the October VA applications, neither caseworker indicated that Ms. Pitts risked denial simply for how long she had been caring for Mr. Copeland before HACA approval much less that Mr. Copeland risked termination of his voucher for the length of that care.

19. In that same interim, however, Mr. Adair also made an Adult Protective Services welfare report or referral when he checked on Mr. Copeland and found Ms. Pitts was absent, which reinforced their understanding that her presence was legally required under penalty of jail for abuse because Mr. Copeland could not safely care for himself.

**C. Coordination between HACA and Landlord and Non-renewal of Lease**

20. On or about June 12, 2025, the private landlord issued a notice of non-renewal of Mr. Copeland's lease with an effective end date of September 30, 2025.

21. After that notice, HACA had Mr. Copeland fill out a form on August 15, 2025, to renew his voucher on which he selected "Renew Lease."

22. Mr. Copeland reasonably believed that effected a withdrawal of the non-renewal, and they immediately asked the landlord for a first floor, two-bedroom apartment, as his apartment was a one-bedroom, non-disabled accessible unit on the fourth floor.

23. After the non-renewal notice issued, HACA asked the landlord to reconsider but did not invoke disability accommodation, 24 C.F.R. § 982.316(a), or HACA's Administrative Plan accommodation provisions in support of that request, and the landlord declined. HACA did not treat the non-renewal as ending Mr. Copeland's program participation at that time.

24. After being told that the landlord was not going let them transfer into one of the available disabled-accessible units, HACA had Mr. Copeland fill out another form in which he selected "Move withint eh Austin Area" as opposed to "Renew Lease"

25. HACA then issued Mr. Copeland a one-bedroom tenant-based voucher replacement voucher that did not resolve the disability-access problem because Mr. Copeland needed a larger ground-floor unit and live-in-aide approval for Ms. Pitts, and those accommodations were already being pursued through the VA/VASH and HACA processes.

26. Mr. Copeland did not realize until the landlord gave them notice to vacate and filed an eviction suit to have them removed that they did not have a renewed lease.

27. At the eviction hearing, the landlord testified that his voucher had "expired" and that since he had only offered the same amount as he had every other month, they refused anything short of the full amount despite Mr. Copeland's voucher being in full effect. The eviction was granted and Mr. Copeland timely appealed.

28. On or about February 17, 2026, five days after HACA's February 12, 2026 final hearing decision and before this lawsuit was filed, HACA's Director of Intake and Special Programs, Dylan Shubitz, communicated by email with the landlord's community manager about Mr. Copeland's voucher status.

29. Mr. Shubitz stated that Mr. Copeland's "participation in the voucher program ends 2/28/26" and that "the last payment was for September because that was the date of his vacate

notice." He then offered: "If y'all and Mr Copeland agree to change the vacate date we can release additional months of payment, but I'm not sure if the eviction case would complicate that."

30. The landlord declined: "No thanks, we are moving forward with eviction. Just wanted to confirm nothing will be paid later." After the landlord declined, HACA did not release additional HAP payments and treated Mr. Copeland's participation in the voucher program as ending on February 28, 2026.

31. Plaintiff does not plead that HACA's cessation of HAP payments after the lease expired, standing alone, was the final voucher termination. The challenged injury is HACA's denial of the live-in-aide request, its termination of program assistance, its fraud-coded status treatment, and its refusal to decide the accommodation issue under the correct legal standard, each of which impaired Mr. Copeland's ability to use the original tenancy or the replacement voucher for accessible housing.

**D. Voucher Termination and Hearing Defects**

32. On December 19, 2025, HACA denied the live-in-aide or add-on request based on its policy that a household addition who had lived in the unit more than six months without authorization was to be denied and that termination was appropriate. The denial notice did not identify any individualized assessment of Mr. Copeland's post-stroke need for live-in care or any alternative accommodation that would allow him to use the voucher while receiving the daily care he required.

33. On December 29, 2025, HACA issued notice terminating Mr. Copeland's voucher assistance. Mr. Copeland timely requested an informal hearing.49.     HACA issued a notice

of informal hearing concerning termination of Mr. Copeland's voucher assistance. The notice told him he could present evidence.

34. The notice did not inform Mr. Copeland that he had the right to request and examine, before the hearing, HACA documents directly relevant to the hearing. The notice also did not disclose HACA's public-facing recording and transcription procedure.

35. As of May 2026, HACA's public-facing telephone or automated information system stated that a participant may request a recording of an informal hearing by submitting a written request to the hearing officer no later than 48 hours before noon on the hearing day, and that a transcript can be prepared at the participant's expense.

36. Mr. Copeland is functionally illiterate and cognitively impaired following his stroke. HACA selected and controlled the Microsoft Teams platform for the hearing but did not record the hearing

37. HACA and its hearing office had notified Mr. Adair or his VA HUD-VASH office of the informal hearing. Mr. Adair did not appear, yet HACA proceeded with the hearing without postponement after Mr. Adair did not appear.

38. Mr. Adair could explain the VA caregiver approval, the paper live-in-aide form, the "10 months" notation, the APS report, and why Mr. Copeland believed the VA/VASH and HACA processes were connected.

39. HACA also did not produce Ms. Petersen or her file. Ms. Petersen was Mr. Copeland's caseworker, had sent the DocuSign live-in-aide application, and had communicated with both Mr. Copeland and Ms. Pitts about the live-in-aide process and household paperwork.

40. The fifteen-minute hearing was functionally only nine minutes long as approximately six minutes, was spent transitioning to the advocate's computer and internet connection, as the

apartment complex, in coordination with HACA, had terminated Mr. Copeland's internet access and his phone-tethered internet connection was inadequate.

41. At the hearing and over the objection of Mr. Copeland's advocate, hearing officer Cecilia Vargas relied on or asserted documents and allegations Mr. Copeland had not been given a meaningful prehearing opportunity to review.

42. Those materials included the "10 months" form, the November 2024 incident, the undisclosed property-management ban document, and alleged prior unauthorized-occupant history from other locations.

43. HACA and the landlord also relied on an alleged November 2024 lease-violation incident involving Ms. Pitts. HACA has asserted that a property-management ban document barred Ms. Pitts from the property after that event.

44. The ban document exists. HACA did not disclose it to Mr. Copeland before the informal hearing. Mr. Copeland disputes the underlying November 2024 incident. The lease-violation document states that the incident occurred on "Monday November 5, 2024," but November 5, 2024 was not a Monday, and Ms. Pitts was not residing in the unit at that time, and

45. The asserted property-management ban was based on a pre-stroke event before Mr. Copeland's January 2025 stroke and February 2025 discharge home with caregiver needs.

46. Mr. Copeland disputes the ban document, denies the prior-history characterization, and still has not received the supporting evidence for the prior-history allegation.

47. At the hearing and over the objection of Mr. Copeland's advocate, hearing officer Vargas also shut down Mr. Copeland's and Ms. Pitts' attempts to give their version of these surprise allegations in the middle of their explanation of the alleged Nov 2024 lease

violation, stating that they had nothing to do with an unauthorized guest, instead pivoting to asking both sides whether Mr. Copeland or Ms. Pitts had ever submitted any reasonable accommodation requests.

48. The timing of the hearing was thus: six minutes of logistical errors caused by HACA's collusion with the apartment complex, then five to six minutes of HACA presenting the undisclosed materials they were relying on to terminate his voucher, followed by approximately three to four minutes for Mr. Copeland and Ms. Pitts to speak.

49. After the hard pivot, hearing officer Vargas asked HACA representative Dylan Shubitz whether HACA had received any reasonable-accommodation evidence. Mr. Shubitz disclosed a service-animal request from Mr. Copeland's Harbor Health doctor but chose not to disclose a reasonable accommodation request sent on the same date and through the same channels from that same doctor stating the need for a 24/7 live-in-aide, the DocuSign application, the VA/VASH caregiver approval, or Ms. Petersen's communications.

50. Hearing officer Vargas issued two versions of the hearing decision or summary. The January 26, 2026 version stated that assistance was terminated because Mr. Copeland had not submitted the requested reasonable-accommodation documentation by January 20, 2026.

51. Hearing officer Vargas later located or acknowledged the submitted materials.

52. The February 12, 2026 version did not change the outcome; it changed the rationale. The January 26 decision had relied on Mr. Copeland's purported failure to submit documentation by the January 20 deadline. The February 12 decision, issued after HACA located the same documentation, declared those materials 'irrelevant' because they did not show Ms. Pitts had permission to reside at the property.

53. Neither version reflected any recognition that approval of Ms. Pitts's presence as a live-in aide, notwithstanding the months that approval had been pending, was the very accommodation Mr. Copeland sought.

54. The absence of permission the decision treated as disqualifying was the absence the accommodation was meant to cure.

55. Both versions were headed "Fraud and Other Program Violation." Fraud was not the noticed charge, and HACA did not try an intent-based fraud charge at the informal hearing.

56. After the hearing, Mr. Shubitz denied that the recording procedure was HACA's procedure or denied knowledge of it. HACA's counsel also represented that there was no recording and no policy one way or the other. Those post-hearing representations were contrary to HACA's public-facing information system.

57. HACA also separately relies on household-composition or renewal forms from August and September 2025 that were not introduced, disclosed, or discussed as part of the informal hearing process. It argues these forms are evidence of fraud because Mr. Copeland identified himself as the only family member and listed Ms. Pitts as an emergency contact with an unknown address.

58. At the time of those reports, HACA had not approved Ms. Pitts as a household member or live-in aide, but Mr. Copeland had just been informed of the separate approval tracks between the VA and HACA, therefore he reasonably understood that Ms. Pitts could not be listed as a voucher household member until HACA approved her.

59. Mr. Copeland did not understand how to report a caregiver who was physically present to provide care but not yet approved by HACA as part of the voucher household. His stroke-related cognitive limitations, functional illiteracy, and dependence on others to complete

paperwork, and the opaque nature of the twin tracks affected his ability to understand and complete HACA forms.

**E. Injury and HACA's Final Action**

60. Mr. Copeland suffered loss of housing security, non-renewal and eviction consequences tied to the unauthorized-occupant treatment of Ms. Pitts, and inability to obtain suitable accessible housing.

61. Mr. Copeland suffered emotional distress, humiliation, fear of institutionalization, and loss of the benefit of a federally funded housing program.

62. HACA's actions caused adverse status, reporting, and eligibility consequences tied to the termination and fraud characterization.

63. HACA adopted and enforced Ms. Vargas's hearing decision as HACA's final termination action.

64. HACA enforced the decision by defending it, relying on it, and treating the voucher as terminated based on it.

**COUNT I - TITLE II OF THE AMERICANS WITH DISABILITIES ACT**

65. Plaintiff incorporates all preceding paragraphs.

66. HACA is a public entity subject to Title II. Mr. Copeland is a qualified individual with a disability who met the essential eligibility requirements for HUD-VASH voucher assistance with reasonable modifications to rules, policies, or practices.

67. HACA denied Mr. Copeland meaningful access to and the benefits of its voucher program, and subjected him to discrimination by reason of disability, by refusing to process and consider a necessary live-in-aide accommodation, treating the disability-required aide as categorically irrelevant, applying the six-month rule without individualized analysis, failing

to identify any comparably effective alternative accommodation, and terminating the voucher because of the aide whose approval he was actively seeking. 42 U.S.C. § 12132; 28 C.F.R. § 35.130(b)(7)(i).

68. HACA's six-month rule is a policy of the general type contemplated by 24 C.F.R. § 982.551(h)(4), but § 982.551(h)(4) does not authorize a PHA to displace § 982.316(a)'s mandatory live-in-aide accommodation rule or § 982.552(c)(2)(iv)'s mandatory termination-stage accommodation rule in cases where the live-in aide is the disability-required caregiver whose approval is the accommodation being sought. An asserted property-management ban likewise did not substitute for HACA's individualized live-in-aide accommodation determination.

69. HACA had notice of the accommodation need through the VA/VASH approval, physician documentation, paper VA/VASH form, DocuSign application, Ms. Petersen's communications, hearing testimony, and requests for accessible housing.

70. HACA further denied Mr. Copeland a meaningful opportunity to engage in the interactive accommodation process. HACA used undisclosed adverse evidence at the hearing, failed to disclose its recording and transcription procedure, selectively disclosed only the service-animal request when the hearing officer asked HACA about reasonable-accommodation evidence, failed to produce known accommodation witnesses, and coordinated with the landlord in a way that conditioned HAP continuation on landlord-and-tenant agreement rather than on HACA's independent accommodation analysis.

71. HACA's rescission of its first decision and issuance of a second decision declaring the accommodation materials irrelevant did not cure the failure to engage in good faith. The

sequence converted a missed-deadline rationale into a substantive refusal to decide the requested accommodation on lawful grounds.

73. HACA's reliance on incorrect household forms and a fraud-coded rationale did not supply a lawful basis to bypass the accommodation inquiry. The pleaded facts show that any inaccuracy in those forms reflected confusion caused by Mr. Copeland's disability, the VA/VASH process, and the absence of HACA approval for Ms. Pitts — not an intent to deceive.

74. HACA acted with deliberate indifference by refusing to engage in good faith after notice. *See Strife v. Aldine Indep. Sch. Dist.*, 138 F.4th 237, 247-48 (5th Cir. 2025). HACA's conduct caused damages and warrants declaratory, injunctive, compensatory, fee, cost, and other relief.

## COUNT II - SECTION 504 OF THE REHABILITATION ACT

75. Plaintiff incorporates all preceding paragraphs.

76. HACA receives federal financial assistance and is subject to Section 504 and 24 C.F.R. part 8. Mr. Copeland is an otherwise qualified individual with a disability.

77. HACA denied Mr. Copeland the benefits of, excluded him from participation in, or subjected him to discrimination under federally assisted housing programs solely by reason of disability by refusing to process and consider a necessary live-in-aide accommodation, terminating voucher assistance for the presence of the disability-required aide, applying a rigid six-month rule without individualized accommodation analysis, and failing to consider reasonable accommodation in connection with termination.

78. HACA's conduct violated 24 C.F.R. §§ 8.4, 8.24, 8.28, 982.316(a), and 982.552(c)(2)(iv). A PHA must approve a live-in aide if needed as a reasonable accommodation, and a

termination decision involving a family that includes a person with disabilities is subject to reasonable-accommodation consideration.

79. HACA's undisclosed adverse evidence and deficient hearing procedures foreclosed Mr. Copeland's meaningful opportunity to develop accommodation-related evidence. HACA acted with deliberate indifference after notice. See *Strife,* 138 F.4th at 247-48. HACA's conduct caused damages and warrants declaratory, injunctive, compensatory, fee, cost, and other relief available under Section 504.

**COUNT III - FAIR HOUSING ACT**

80. Plaintiff incorporates all preceding paragraphs.

81. HACA refused or failed to make reasonable accommodations in rules, policies, practices, or services when necessary to afford Mr. Copeland equal opportunity to use and enjoy a dwelling. 42 U.S.C. § 3604(f)(3)(B). HACA also made housing unavailable or materially interfered with housing by terminating or rendering unusable his voucher based on the presence of his disability-required aide. 42 U.S.C. § 3604(f)(1)-(2).

82. HACA's six-month rule, refusal to process the live-in-aide accommodation, proximate contribution to non-renewal and eviction consequences, issuance of a one-bedroom replacement voucher without resolving the live-in-aide and accessible-housing accommodation issues, coordination with the landlord and conditioning of additional HAP payments on landlord-and-tenant agreement to a revised vacate date, fraud-coded treatment, adverse status reporting, and reliance on undisclosed adverse evidence were discriminatory housing-related practices that materially interfered with Mr. Copeland's equal opportunity to use and enjoy a dwelling. 42 U.S.C. § 3604(f)(1)-(2).

83. HACA acted intentionally, knowingly, or with reckless disregard of Mr. Copeland's federally protected rights. Plaintiff seeks actual damages, equitable relief, attorney's fees, costs, and punitive damages to the extent legally available under the FHA.

**COUNT IV - 42 U.S.C. § 1983 - PROCEDURAL DUE PROCESS**

84. Plaintiff incorporates all preceding paragraphs.

85. Mr. Copeland had a protected property interest in continued voucher assistance absent lawful termination under federal regulations, HACA policy, and due process. See Goldberg v. Kelly, 397 U.S. 254 (1970). HACA deprived him of that interest under color of state law.

86. HUD regulations required the informal hearing to determine whether termination complied with law, HUD regulations, and PHA policy, and required an opportunity to examine directly relevant HACA documents before the hearing. 24 C.F.R. § 982.555(a)(1), (e)(2)(i). Because Mr. Copeland is disabled, termination was also subject to reasonable-accommodation consideration. 24 C.F.R. § 982.552(c)(2)(iv). The constitutional baseline requires notice and a meaningful opportunity to be heard. *See Mathews v. Eldridge*, 424 U.S. 319 (1976).

87. HACA failed to provide constitutionally adequate process because the hearing notice did not disclose the document-examination right or recording/transcript procedure; HACA relied on undisclosed evidence, including the "10 months" form, November 2024 incident, alleged ban, and alleged prior unauthorized-occupant history; HACA proceeded without central accommodation witnesses; and the hearing officer treated legally material accommodation evidence as irrelevant because it did not prove preexisting permission.

88. The undisclosed adverse evidence and procedures included, without limitation: (a) the alleged November 2024 lease-violation incident and the undisclosed property-management

ban document, neither of which HACA disclosed to Mr. Copeland before the hearing and as to which HACA's supporting document bears an internal date error and predates Ms. Pitts's residence in the unit; (b) the alleged prior unauthorized-occupant history at other locations, for which HACA still has not produced supporting documentation and which Mr. Copeland denies; and (c) the recording and transcription procedure described by HACA's own public-facing automated information system, which HACA did not disclose in the hearing notice and which HACA representatives later denied existed. Each independently denied Mr. Copeland the pre-hearing notice and document-examination opportunity that 24 C.F.R. § 982.555(e)(2)(i) requires.

89. The hearing failed to satisfy 24 C.F.R. §§ 982.552(c)(2)(iv) and 982.555 because permission was the accommodation being sought, and the hearing officer did not consider whether termination complied with law, HUD regulations, and HACA policy under that accommodation framework. HUD regulations define fraud and abuse to require a false statement, omission, or concealment made with intent to deceive or mislead and resulting in improper Section 8 payments. 24 C.F.R. § 792.103. The pleaded facts do not support treating Mr. Copeland's caregiver reporting and VA/VASH/HACA-process confusion as an intent-based fraud violation.

90. HACA also conditioned the release of additional HAP payments on landlord-and-tenant agreement to a revised vacate date, thereby delegating to a private party the decision whether to continue Mr. Copeland's federally funded housing assistance rather than making that decision through HACA's own administrative process with the reasonable-accommodation analysis federal law requires.

91. HACA's municipal liability arises from formal policy, custom, ratification, and final action. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). HACA's Administrative Plan contains reasonable-accommodation, live-in-aide, and informal-hearing provisions, but HACA's operative procedures failed to integrate pending or asserted reasonable-accommodation requests into termination decisions. HACA applied, enforced, or ratified a practice of treating a person as categorically barred from add-on or live-in-aide approval if HACA deemed the person present for more than six months, without individualized disability-accommodation analysis. HACA adopted and enforced the hearing decision as final action; alternatively, the decision was made or implemented by officials with final authority over voucher termination. *See Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986). HACA's coordination with the landlord at the February 17, 2026 stage, and its parallel posture around the June 2025 non-renewal, also evidence a custom or practice of allowing landlord decisions to drive HACA's HAP and voucher decisions rather than HACA conducting independent disability-accommodation analysis.

92. HACA's conduct caused damages and warrants declaratory, injunctive, compensatory, fee, cost, and other relief under § 1983. Plaintiff does not seek punitive damages against HACA under § 1983.

## PRAYER

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and grant the following relief:

a. declare that HACA's challenged termination decision violated Title II of the ADA, Section 504, the FHA, 42 U.S.C. § 1983, and applicable HUD regulations;

b. enjoin HACA from relying on or enforcing the challenged termination decision;

c.    order HACA to restore or maintain Mr. Copeland's HUD-VASH voucher in active and good standing, without reliance on the challenged termination decision;

d.    order HACA to process Mr. Copeland's live-in-aide reasonable-accommodation request under the correct legal standard and within a definite time set by the Court;

e.    order HACA to remove, withdraw, or correct any fraud, termination, inactive, ineligible, or other adverse internal or external reporting or records tied to the challenged decision;

f.    order HACA to take all steps necessary to make Mr. Copeland's voucher usable for accessible housing, including any voucher-status correction required for portability, landlord approval, or lease-up;

g.    award compensatory damages in an amount to be determined by the jury;

h.    award punitive damages to the extent legally available under the FHA;

i.    award attorney's fees and costs under 42 U.S.C. §§ 12205, 3613(c), 1988, 29 U.S.C. § 794a, and any other applicable authority;

j.    award pre-judgment and post-judgment interest as allowed by law; and

k.    grant all other relief to which Plaintiff is entitled.

## JURY DEMAND

Plaintiff demands a jury trial on all issues so triable.

Respectfully submitted,
/s/ Audrey Bean
Audrey Bean
Texas Bar No. 24073897
Law Offices of Audrey Bean
440 Hickory Forest Dr.
Seguin, Texas 78155
Telephone: (512) 290-5739
Email: audrey@austinlitigator.com
Counsel for Plaintiff John Copeland

## VERIFICATION

My name is John Copeland. I am the Plaintiff in this case. I have read the foregoing First

Amended Verified Complaint, or it has been read to me. The factual statements in it are true and

correct to the best of my knowledge and belief.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Executed on May 21, 2026.

_____

John Copeland

## CERTIFICATE OF SERVICE

I certify that on May 21, 2026, a true and correct copy of the foregoing was served on all counsel

of record through the Court's CM/ECF system.

/s/ Audrey Bean
Audrey Bean